UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **THE HUMANE SOCIETY**<br>**OF THE UNITED STATES**<br>2100 L. St., N.W.<br>Washington, DC 20037, | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| **ANIMAL WELFARE INSTITUTE**<br>P.O. Box 3650<br>Washington, DC  20027, | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| **THE FUND FOR ANIMALS**<br>200 West 57th St.<br>New York, NY  10019, | )    Civ. No. 06-0265 (CKK) |
|  | ) |
|  | ) |
|  | ) |
| **SOCIETY FOR ANIMAL**<br>**PROTECTIVE LEGISLATION**<br>P.O. Box 3719<br>Washington, DC  20027, | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| **DORIS DAY ANIMAL LEAGUE**<br>227 Massachusetts Avenue, N.E., Suite 100<br>Washington, DC  20002, | ) |
|  | ) |
|  | ) |
|  | ) |
| **AMERICAN SOCIETY FOR THE**<br>**PREVENTION OF CRUELTY TO ANIMALS**<br>424 East 92nd Street<br>New York, NY 10128, | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| **AMERICAN HUMANE ASSOCIATION**<br>2007 15th St. North, Suite 201<br>Arlington, VA 22201, | ) |
|  | ) |
|  | ) |
|  | ) |
| **ROBERT ELDRIDGE**<br>107 Booker Street<br>Kaufman, TX  75142, | ) |
|  | ) |
|  | ) |
|  | ) |
| **GAIL VACCA**<br>19501 West Ballou Road<br>Wilmington, IL  60481, | ) |
|  | ) |
|  | ) |
|  | ) |
| **JUANITA SMITH**<br>309 Carver Street<br>Kaufman, TX  75142 | ) |
|  | ) |
|  | ) |

**JUDY TAYLOR**                                    )
1500 Thames Drive                                  )
Clarksville, IN  47129,                            )
                                                   )
**TONJA RUNNELS**                                  )
207 Booker Street                                  )
Kaufman, TX  75142,                                )
                                                   )
**YOLANDA SALAZAR**                                )
3722 N. Terry St.                                  )
Fort Worth, TX  76106,                             )
                                                   )
**MARGARITA GARCIA**                               )
3800 N. Terry St.                                  )
Fort Worth, TX  76106,                             )
                                                   )
**JAVIER ZUNIGA**                                  )
3804 N. Terry St.                                  )
Forth Worth, TX  76106,                            )
                                                   )
    Plaintiffs,                )
  v.                                     )
                                                   )
**MIKE JOHANNS**, Secretary,                       )
U.S. Department of Agriculture                      )
1400 Independence Ave., S.W.                        )
Washington, DC 20250,                              )
                                                   )
**BARBARA J. MASTERS**, Administrator,             )
Food Safety and Inspection Service                 )
U.S. Department of Agriculture                      )
1400 Independence Ave., S.W., Room 331-E           )
Washington, DC 20250,                              )
                                                   )
    Defendants.                )
_____           )

## FIRST AMENDED COMPLAINT FOR
## <u>DECLARATORY AND INJUNCTIVE RELIEF</u>

2

1.      This action challenges the United States Department of Agriculture's ("USDA") recent decision to create a "fee-for-service" inspection system that is designed to facilitate the continued transport and slaughter of tens of thousands of American horses for human consumption abroad.  The USDA created this new horse slaughter system without advance public notice and comment, and in direct contravention of an unequivocal Congressional command in section 794 of the FY2006 Agriculture Appropriations Act that is intended to suspend the slaughter and transport to slaughter of America's horses for human consumption on March 10, 2006.  USDA's action not only flouts Congress's clear intent in enacting the FY2006 Agriculture Appropriations Act and violates other federal legal mandates, but also abrogates the public's right to comment on such important matters, in contravention of the Administrative Procedure Act, 5 U.S.C. § 553 ("APA").

## Jurisdiction

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## Parties

3.      Plaintiff The Humane Society of the United States ("The HSUS") is a nonprofit animal protection organization headquartered in Washington, DC, with seven regional offices across the country.  The HSUS has over nine and a half million members and constituents, including over 355,000 members and constituents in Illinois and over 393,000 members and constituents in Texas.  Members of The HSUS reside in the communities in which the plants that presently slaughter horses are located.  More specifically, twenty-seven members of The HSUS reside in Kaufman, Texas, home to the Dallas Crown, Inc. slaughter plant, 112 members reside in DeKalb, Illinois, home to the Cavel International plant, and thirteen members reside in the

area of Fort Worth, Texas that is home to the Beltex Corporation plant.  The HSUS brings this action on its own institutional behalf and also on behalf of its members.

4.        Since its inception in 1954, The HSUS has been actively involved in equine protection initiatives.  The HSUS has invested considerable organizational resources in public education, research and investigation, advocacy, legislation, and litigation concerning horse welfare and the prevention of horse slaughter.  The HSUS investigates horse cruelty complaints and assists individuals with guidance and advice as to how to best care for their horses, including how to prevent horses from being lost, stolen, or sold to "killer buyers" at auction – middlemen hired by the slaughterhouses to purchase horses for human food.  The HSUS actively collaborates with federal agencies to develop wild horse immunocontraception field studies and trials, in order to reduce the sale and slaughter of wild horses.  The HSUS has also been active in strengthening provisions of the Horse Protection Act through strong advocacy in support of the American Horse Slaughter Prevention Act (H.R. 503 and S. 1915) since its original introduction in 2002, and the Wild Horse Act that was introduced this Congress (H.R. 297 and S. 576).  The HSUS has assisted in the passage of state laws that ban horse slaughter or govern the treatment and transportation of horses sold for slaughter within their borders.  The HSUS also advocated for the Commercial Transportation of Equines for Slaughter Act, passed by Congress in 1996. Most recently, The HSUS worked with bipartisan leaders in Congress to pass an Amendment to the FY2006 Agriculture Appropriations Act to de-fund federal ante-mortem inspection of horses for slaughter, as explained further below.  The HSUS maintains a website, which can be accessed by the public through the World Wide Web (http://www.hsus.org), and publishes reports,

comments, press releases, web stories, action alerts, and other materials that inform The HSUS's members and the general public on the government's actions with regard to horse slaughter.

5.     Members of The HSUS enjoy observing, photographing, studying and otherwise appreciating wild horses. Members of The HSUS also enjoy observing, photographing, and otherwise appreciating companion horses. The interests of The HSUS and its members in observing, studying, and enjoying horses, and otherwise protecting these animals from slaughter, are injured by defendants' decision to provide for a voluntary fee-for-service program under which establishments that slaughter horses will be able to apply for and pay for ante-mortem inspections, because this program will allow the three establishments to continue slaughtering wild and companion horses. These injuries will be redressed if the Plaintiffs prevail in this action, because if the fee-for-service system is set aside, horse slaughter at the plants will cease on March 10, 2006, in accordance with the will of Congress.

6.     The members of The HSUS who reside in Kaufman, Texas are adversely affected by the aesthetic and economic impacts of Dallas Crown. This community and its residents suffer from the stench emanating from Dallas Crown, reduced enjoyment of the land surrounding the plant, depressed property values, increased burden on the local hospital's filtration system, and the increased expense of the city to maintain and upgrade an over-burdened sewer system due to the plant's horse slaughter operations. The members of The HSUS who reside in Fort Worth, Texas are also adversely affected by the aesthetic impacts of Beltex Corporation. The Texas Commission on Environmental Quality has documented at least three public complaints regarding the plant's severe stench. Thus, the aesthetic and economic interests of The HSUS's members are harmed by the defendants' decision to provide for a voluntary fee-

for-service program under which establishments that slaughter horses will be able to apply for and pay for ante-mortem inspections, because this program will allow the Dallas Crown and Beltex facilities to remain in operation.

7.    Additionally, the ability of The HSUS and its members to engage in educational, legislative and advocacy activities with respect to horse protection is injured by defendants' failure to comply with the APA and the National Environmental Policy Act, 42 U.S.C. § 4321 <u>et seq.</u> ("NEPA"), as further described below.  By publishing these drastic regulatory changes for the first time as a Final Rule with the full force of law, and without the required environmental analysis, and response to public comments, defendants have violated The HSUS's statutory right to obtain from USDA information and advance notice about changes in the law, and to otherwise learn about and be able to participate in the rulemaking process before a Final Rule is finalized. The HSUS also relies on this advance notice and information to communicate with its members, so that its members may in turn contact administrative agencies and elected representatives when advocating for the humane treatment of horses and other animals.

8.    Plaintiff Animal Welfare Institute ("AWI") is a non-profit charitable organization founded in 1951 to reduce the sum total of pain and fear inflicted on animals by humans.  It has 27,000 members across the United States, including members in Texas and Illinois.  It brings this action on its own behalf and on behalf of its members.

9.    AWI spends considerable resources advocating protection for domestic and wild horses, including those slaughtered in the United States and around the world.  It routinely sends submissions to the federal government concerning the treatment of wild horses, and it submits comments in response to the government's requests for public comment concerning animal

6

welfare issues.  AWI also publishes a magazine on a quarterly basis which is disseminated to its members, public libraries, humane societies, law enforcement officers, scientists, animal care technicians, teachers and other interested persons in the United States and around the world, and to federal, state and local government agencies and all members of Congress.  AWI also operates a website on the World Wide Web.  The magazine and website report on animal welfare issues, including legislative and regulatory matters affecting domestic and wild horses, and they also inform AWI's members about actions they can take to promote the protection and humane treatment of these animals, such as contacting representatives and administrative agencies.

10.    The ability of AWI and its members to engage in educational, legislative and advocacy activities with respect to horse protection is injured by defendants' failure to comply with the APA and NEPA, as described below.  By publishing these drastic regulatory changes for the first time as a Final Rule with the full force of law, and without the required environmental analysis, and response to public comments, defendants have violated AWI's statutory right to obtain from USDA information and advance notice about changes in the law, and to otherwise learn about and be able to participate in the rulemaking process before a Final Rule is finalized.  AWI also relies on this advance notice and information to communicate with its members, so that its members may in turn contact administrative agencies and elected representatives when advocating for the humane treatment of horses and other animals.

11.    Plaintiff The Fund for Animals ("the Fund") is an animal protection organization headquartered in New York City, with various offices and animal sanctuaries located throughout the country.  On January 1, 2005, the Fund and The HSUS combined operations and now pursue their adjoining programs jointly, although the Fund maintains its corporate identity and officers.

7

The Fund and its 200,000 members and supporters are committed to preserving animal and plant species in their natural habitats and to preventing the abuse and exploitation of wild and domestic animals. The Fund and its members are particularly dedicated to the protection of wild horses and are active in wild horse protection issues in Western states. The Fund brings this action on its own institutional behalf and also on behalf of its members.

12.     In recent years, the Fund has invested considerable organizational resources in the protection of wild horses. In addition to prior litigation to protect wild horses from slaughter, the Fund has submitted comments on numerous Bureau of Land Management ("BLM") actions, including decisions to remove wild horses from public lands, and has actively participated before BLM's wild horse and burro advisory board and other forums where wild horse and burro issues are considered. The Fund has also engaged in extensive public education and advocacy on behalf of wild horses, including action alerts and publications, such as its quarterly newsletter, which is distributed to over 200,000 members and supporters nationwide.

13.     Members of the Fund regularly engage in, and will continue to engage in, educational, recreational, and scientific activities related to wild horses. Members also routinely enjoy observing wild horses on public lands, as well as interacting with these animals after they have been removed from those lands. These members' interests in observing, studying, and appreciating wild horses in their natural habitat, as well as once they are removed from public lands, are injured by defendants' decision to provide for a voluntary fee-for-service program under which establishments that slaughter horses will be able to apply for and pay for ante-mortem inspections, because this program will allow the establishments to remain in operation and to continue slaughtering wild horses. These injuries will be redressed if the Plaintiffs prevail

in this action, because if the fee-for-service system is set aside, slaughter at the plants will cease on March 10, 2006, in accordance with the will of Congress; when slaughter at the plants ceases, fewer horses will ultimately be removed from the wild, thus increasing the number of such horses available for members of the Fund to observe and otherwise enjoy.

14.    Additionally, the ability of the Fund and its members to engage in educational, legislative and advocacy activities with respect to horse protection is injured by defendants' failure to comply with the APA and NEPA, as described below.  By publishing these drastic regulatory changes for the first time as a Final Rule with the full force of law, and without the required environmental analysis, and response to public comments, defendants have violated the Fund's statutory right to obtain from USDA information and advance notice about changes in the law, and to otherwise learn about and be able to participate in the rulemaking process before a Final Rule is finalized.  The Fund also relies on this advance notice and information to communicate with its members, so that its members may in turn contact administrative agencies and elected representatives to advocate for the humane treatment of horses and other animals.

15.    Plaintiff the Society for Animal Protective Legislation ("SAPL") is the oldest non-profit organization in the United States specifically dedicated to the passage and enforcement of federal, international and local legislation to promote animal welfare, including the protection of domestic and wild horses. SAPL has approximately 2,700 constituents throughout the United States, including Texas and Illinois.  It brings this action on its own behalf and on behalf of its constituents.

16.    SAPL, along with Plaintiff Doris Day Animal League, initiated a national campaign to end horse slaughter in the United States in 2001.  SAPL has committed significant

resources, including constituent involvement, toward the passage of a ban on horse slaughter, which occurred late last year when Congress approved the Amendment to the 2006 Agriculture Appropriations Act, as explained further below.

17.    SAPL also helped initiate and lead state legislative efforts in the Illinois and Texas legislatures to ban horse slaughter.  SAPL also operates a website on the World Wide Web where it reports on animal welfare issues, including legislative and regulatory matters affecting domestic and wild horses, and it also informs SAPL's constituents about actions they can take to promote the protection and humane treatment of these animals.

18.    The ability of SAPL and its members to engage in educational, legislative and advocacy activities with respect to horse protection is injured by defendants' failure to comply with the APA and NEPA, as described below.  By publishing these drastic regulatory changes for the first time as a Final Rule with the full force of law, and without the required environmental analysis, and response to public comments, defendants have violated SAPL's statutory right to obtain from USDA information and advance notice about changes in the law, and to otherwise learn about and be able to participate in the rulemaking process before a Final Rule is finalized.  SAPL also relies on this advance notice and information to communicate with its members, so that its members may in turn contact administrative agencies and elected representatives when advocating for the humane treatment of horses and other animals.

19.    Plaintiff Doris Day Animal League ("DDAL") is a nonprofit, national citizens' lobbying organization formed to focus attention on issues involving the protection of animals, including ending the slaughter of domestic and wild horses for human consumption.  DDAL's primary activity is the passage and enforcement of federal and state animal protection laws

and regulations, and it actively works with and influences the U.S. Congress, federal agencies, and state legislatures for this purpose. DDAL regularly and consistently engages its politically active base of members and supporters, totaling approximately 325,000, in these activities. It brings this action on its own behalf and on behalf of its member and supporters, which includes 18,300 individuals in Illinois and 16,346 individuals in Texas.

20.    In the mid-1990s, DDAL began to monitor and investigate the federal government's mismanagement of America's wild horses, many whom have been slaughtered for human consumption once removed from their natural range. Since 2001, DDAL, along with other Plaintiffs, has worked to end horse slaughter in the United States for human consumption. DDAL has committed tremendous resources to this campaign, which includes efforts to pass a federal law to permanently end the slaughter and export for slaughter of American horses. DDAL also played a central role in the successful effort to pass the Amendment to the FY2006 Agriculture Appropriations Act as described below. The issue of horse slaughter is of significant interest and concern to DDAL's members and supporters, who have actively engaged in and are currently engaged in efforts to end the practice.

21.    Additionally, the ability of DDAL and its members to engage in educational, legislative and advocacy activities with respect to horse protection is injured by defendants' failure to comply with the APA and NEPA, as described below. By publishing these drastic regulatory changes for the first time as a Final Rule with the full force of law, and without the required environmental analysis, and response to public comment, defendants have violated DDAL's statutory right to obtain from USDA information and advance notice about changes in the law, and to otherwise learn about and be able to participate in the rulemaking process before

a Final Rule is finalized. DDAL also relies on this advance notice and information to communicate with its members, so that its members may in turn contact administrative agencies and elected representatives to advocate for the humane treatment of horses and other animals.

22.    Plaintiff American Society for the Prevention of Cruelty to Animals ("ASPCA") is a non-profit membership organization dedicated to eliminating the abuse, neglect, and exploitation of all animals, including wild and domestic horses. The ASPCA has over 800,000 members and supporters throughout the United States, including 75,000 in Illinois and 80,000 in Texas. It brings this action on its own behalf and on behalf of its members.

23.    The ASPCA spends substantial resources each year on advocating better treatment for animals, including wild and domestic horses. It routinely sends submissions to the federal government concerning the treatment of horses, and it responds to requests for public comment from the federal government concerning animal welfare issues. ASPCA's members also routinely comment on such matters.

24.     The ASPCA publishes a magazine, on a quarterly basis, which goes to all of its members, and it operates a website on the World Wide Web. The magazine and website report on animal welfare issues, including legislative and regulatory matters affecting horses and horse slaughter, and they also inform the ASPCA's members about actions that can be taken to promote the protection and humane treatment of horses. ASPCA also disseminates advice to its members and other members of the public with respect to horse health, safety, and welfare.

25.    In 2005, ASPCA's Equine Program made more than $157,000 in grants to horse rescue facilities across the United States, for the care of unclaimed or unwanted horses. Many of the horses cared for with these funds would otherwise go to slaughter, including 90 Premarin

horses rescued by the Animali Farm in Santa Barbara, California with funds received from the Equine Program. ASPCA has also advocated for the health, safety, and welfare of carriage horses in New York City, and has developed new educational opportunities and enforcement protocols concerning horses for its humane law enforcement agents.

26.     The ability of ASPCA and its members to engage in educational, legislative and advocacy activities with respect to horse protection is injured by defendants' failure to comply with the APA and NEPA, as described below. By publishing these drastic regulatory changes for the first time as a Final Rule with the full force of law, and without the required environmental analysis, and response to public comments, defendants have violated ASPCA's statutory right to obtain from USDA information and advance notice about changes in the law, and to otherwise learn about and be able to participate in the rulemaking process before a Final Rule is finalized. ASPCA also relies on this advance notice and information to communicate with its members, so that its members may in turn contact administrative agencies and elected representatives when advocating for the humane treatment of horses and other animals.

27.     Plaintiff American Humane Association ("American Humane") is a non-profit, charitable organization dedicated to protecting and advancing the welfare of animals. American Humane has been working to protect animals since 1877. American Humane has thousands of members in states across the nation, including Texas and Illinois. American Humane brings this action on behalf of itself and all of its members. American Humane has invested substantial resources toward the protection of horses. These resources have been directed toward advocacy efforts, public awareness campaigns, and other programs designed to protect the welfare of wild and companion horses in the United States. American Humane's efforts include recent support

of the American Horse Slaughter Prevention Act and other legislative endeavors designed to eliminate the slaughter of horses for export.

28.    The ability of American Humane and its members to engage in educational, legislative, and advocacy activities with respect to horse protection is injured by defendants' failure to comply with the APA and NEPA, as described below.  By publishing these drastic regulatory changes for the first time as a Final Rule with the full force of law, and without the required environmental analysis, and response to public comments, defendants have violated American Humane's statutory right to obtain from USDA information and advance notice about changes in the law, and to otherwise learn about and be able to participate in the rulemaking process before a Final Rule is finalized.  American Humane also relies on this advance notice and information to communicate with its members, so that its members may in turn contact administrative agencies and elected representatives when advocating for the humane treatment of horses and other animals.

29.    Plaintiff Robert Eldridge is a fifty-three year resident of Kaufman, Texas.  He resides at 107 Booker Street, located approximately one-half block from the Dallas Crown horse slaughter plant.  For over a decade, Mr. Eldridge has endured, and continues to endure, the severe odor of the plant.  Due to the stench, he is unable to use the property outside of his home. During the summer months, when the stench is especially unbearable, he is unable to enjoy his yard for recreational purposes, such as barbequing, sports, and other outside activities.  In addition to his home, Mr. Eldridge owns a second plot of land that is adjacent to the Dallas Crown plant.  Due to the plant's impact on the plot's property value, he is unable to secure a loan and develop the property into a senior apartment community.

30.    Mr. Eldridge's aesthetic and economic interests have been injured by USDA's decision to provide for a voluntary fee-for-service program under which establishments that slaughter horses will be able to apply for and pay for ante-mortem inspections, as described below, because this program will allow the Dallas Crown slaughterhouse to remain in operation. Due to this program, the Dallas Crown slaughterhouse's operations will continue to adversely affect Mr. Eldridge's ability to enjoy going outside of his home and his ability to develop the adjacent plot of land into a senior apartment community. Because of the aesthetic and economic harm that the horse slaughter at Dallas Crown has inflicted and continues to inflict on him, Mr. Eldridge wishes to obtain advance notice from USDA concerning the fee-for-service program, and to use that advance notice to participate in any rulemaking process concerning that program before it is finalized. His ability to obtain such information and to participate in any rulemaking has been undermined by USDA's decision to make sweeping changes in its inspection program without complying with 5 U.S.C. § 553, or with NEPA. Mr. Eldridge's injuries will be redressed if the Plaintiffs prevail in this action, because if the fee-for-service system is set aside, horse slaughter at the plants will cease on March 10, 2006.

31.    Plaintiff Gail Vacca resided in DeKalb, Illinois from 1999 to 2005. Her residence and business were located at 16217 State Route 23, approximately two miles from Cavel International. Ms. Vacca operated "Top of the Hill," a twenty acre horse farm that housed and rehabilitated race horses. When Cavel International reopened in June 2004, Ms. Vacca's business suffered a significant loss. Many of her clients were fearful of housing their horses at a facility located in a town associated with a horse slaughter plant. The stigma of the horse slaughter plant and the fear of horses being stolen and taken to the nearby plant for slaughter

drove many of Ms. Vacca's clients away. For an eighteen month period, over half of Ms. Vacca's stalls remained unoccupied, and she suffered significant revenue loss.

32.    Ms. Vacca was also unable to enjoy going outside onto her property when the double-decker slaughter trucks passed in front of her farm with horses destined for slaughter, because she was aware of and disturbed by the horses' fate at the slaughterhouse. Although Ms. Vacca moved from DeKalb in November 2005 and now resides in Wilmington, Illinois, she would move back to DeKalb if it were not for the Cavel International plant. She loved and enjoyed the community of DeKalb, and the property she previously leased, along with other pasture properties, are currently available for lease in DeKalb. Her suppliers still remain in DeKalb, and she continues to make frequent hour and a half long drives back to DeKalb to do business with these suppliers. However, the presence of Cavel International in the city has prevented her from returning to DeKalb, due to the stigma of operating a horse farm in the same town as a horse slaughter plant.

33.    Ms. Vacca's interest in moving back to DeKalb, Illinois and pursuing her business there has been injured by defendants' decision to provide for a voluntary fee-for-service program under which establishments that slaughter horses will be able to apply for and pay for ante-mortem inspections, because this program will allow Cavel International to remain in operation. Due to this program, Cavel International's operations will continue to adversely affect Ms. Vacca's ability to live and continue to operate a business in the location of her choice. Additionally, as Illinois Coordinator for the National Horse Protection Coalition, Ms. Vacca wishes to obtain advance notice from USDA concerning the fee-for-service program, in order to solicit and submit comments on the program. Ms. Vacca desires that her comments be

considered by the USDA before the Final Rule is issued.  Her ability to participate in any rulemaking has been undermined by USDA's decision to make sweeping changes in its inspection program without complying with 5 U.S.C. § 553, or with NEPA.  Ms. Vacca's injuries will be redressed if the Plaintiffs prevail in this action, because if the fee-for-service system is set aside, horse slaughter at the plants will cease on March 10, 2006.

34.    Plaintiff Juanita Smith has lived in Kaufman, Texas for nearly fifty years.  She resides at 309 Carver Street, located directly behind the Dallas Crown plant.  Ms. Smith's backyard abuts the plant's property.  For over a decade, Ms. Smith has endured, and continues to endure, the severe odor and stench of the plant.  Ms. Smith is unable to enjoy going outside of her home, especially during the morning and evening hours, when the odor is most severe.

35.    Ms. Smith's aesthetic interests have been injured by defendants' decision to provide for a voluntary fee-for-service program under which establishments that slaughter horses will be able to apply for and pay for ante-mortem inspections, because this program will allow Dallas Crown to remain in operation.  Due to this program, Dallas Crown's operations will continue to adversely affect Ms. Smith's enjoyment of her home and property.  These injuries will be redressed if the Plaintiffs prevail in this action, because if the fee-for-service system is set aside, horse slaughter at the plants will cease on March 10, 2006.

36.    Plaintiff Judy Taylor is a resident of Clarksville, Indiana.  While previously living in Louisville, Kentucky, Ms. Taylor owned two companion Appaloosa horses, a fourteen-year old gelding nicknamed Poco, and a thirteen-year old mare nicknamed P.J.  Ms. Taylor had cared for Poco since he was a foal and for P.J. since her birth.  Ms. Taylor loved Poco and P.J. as if they were her "children" and was very attached to them.  Due to a variety of medical problems, it

became increasingly difficult for Ms. Taylor to perform some of the physical tasks necessary to properly care for the horses by herself.  Because she did not want to sell or separate Poco and P.J., she agreed to let her brother's friends take, care, and house the two horses on their farm.  However, when Ms. Taylor went to visit her horses, she was informed that they had been sold to a killer buyer.  After a month of frantic searching, Ms. Taylor learned that the horses had been transported to Fort Worth, Texas and slaughtered at Beltex Corporation.  Ms. Taylor continues to grieve over the slaughter of her horses.  She actively participated in the legislative process leading up to the passage of the legislation at issue, always responding to horse slaughter action alerts and contacting Senator Evan Bayh, Senator Richard Lugar, and Congressman Michael Sodrel to ask their support on horse protection legislation.  Most recently, Ms. Taylor signed a petition urging USDA to abide by the Amendment that Congress passed.

37.     Because of her experience and the emotional damage that it inflicted and continues to inflict on her, Ms. Taylor wishes to obtain information from USDA concerning the fee-for-service program, and to fully participate in any rulemaking process concerning that program.  Her ability to obtain such information and to participate in any rulemaking has been undermined by USDA's decision to make sweeping changes in its inspection program without complying with 5 U.S.C. § 553, or with NEPA.  Ms. Taylor's injuries will be redressed if the Plaintiffs prevail in this action, because if the fee-for-service system is set aside, slaughter at the plants will cease on March 10, 2006.

38.     Plaintiff Tonja Runnels is a lifelong resident of Kaufman, Texas.  Since 1989, she has resided at 207 Booker Street, located seventy-five feet from the Dallas Crown plant.  For over a decade, Ms. Runnels has endured, and continues to endure, the severe stench and odor of

the horse slaughter plant. Due to the stench, Ms. Runnels is unable to go outside as much as she would like. During the summer months, when the stench is especially unbearable, Ms. Runnels is unable to enjoy her yard for recreational purposes. Every evening, Ms. Runnels has been disturbed, and continues to be disturbed, by the noise of horses crying and whining as they enter the kill chute.

39.     Ms. Runnels' aesthetic interests, and those of her family, have been injured by defendants' decision to provide for a voluntary fee-for-service program under which establishments that slaughter horses will be able to apply for and pay for ante-mortem inspections, because this program will allow Dallas Crown to remain in operation. Due to this program, Dallas Crown's operations will continue to adversely affect Ms. Runnels' and her family's enjoyment of their homes and property. These injuries will be redressed if the Plaintiffs prevail in this action, because if the fee-for-service system is set aside, horse slaughter at the plants will cease on March 10, 2006.

40.     Plaintiff Yolanda Salazar is a four year resident of 3722 N. Terry Street, located approximately one block from the Beltex horse slaughter plant in Fort Worth, Texas. Ms. Salazar resides at her home with her husband, Angel, and two teenage children, Martha and Miguel. Mrs. Salazar and her family can view the horse slaughter plant from their home. For the last four years, Mrs. Salazar and her family have endured, and continue to endure, the severe stench of the plant. The odor is so repugnant that it is difficult to breathe. As a result, Mrs. Salazar and her family are unable to go outside and use their yard for gardening, barbecuing, or spending time with family and friends. Because of the noxious stench, Mrs. Salazar has been, and continues to be, concerned for the health of her children. Additionally, Mrs. Salazar is an

avid horse lover, and in fact, grew up on a horse ranch. Accordingly, Mrs. Salazar has been, and continues to be, saddened and disturbed by the sight of horses on trailers and the knowledge that these majestic animals are being slaughtered near her home.

41.     Mrs. Salazar's interests, and those of her family, have been injured by defendants' decision to provide for a voluntary fee-for-service program under which establishments that slaughter horses will be able to apply for and pay for ante-mortem inspections, because this program will allow Beltex to remain in operation. Due to this program, Beltex's operations will continue to adversely affect Mrs. Salazar's and her family's enjoyment of their home and property. Because of the harm that the horse slaughter at Beltex has inflicted and continues to inflict on her and her family, Mrs. Salazar wishes to obtain advance notice from USDA concerning the fee-for-service program, and to use that advance notice to participate in any rulemaking process concerning that program before it is finalized. Her ability to obtain such information and to participate in any rulemaking has been undermined by USDA's decision to make sweeping changes in its inspection program without complying with 5 U.S.C. § 553, or with NEPA. These injuries will be redressed if the Plaintiffs prevail in this action, because if the fee-for-service system is set aside, horse slaughter at the plants will cease on March 10, 2006.

42.     Plaintiff Margarita Garcia has lived at 3800 N. Terry Street for four years, located approximately one block from the Beltex horse slaughter plant. Mrs. Garcia resides at her home with her husband, Bernardo, and two children. Mrs. Garcia and her family can view the horse slaughter plant from their home. For the last four years, Mrs. Garcia and her family have endured, and continue to endure, the noxious odor of the plant. The stench is especially unbearable during the morning and evening hours and when it is hot. As a result, Mrs. Garcia

and her family are unable to open their windows and unable to go outside. Mrs. Garcia's children cannot play in the yard, and the family is unable to barbecue or use their yard for other recreational activities. Additionally, Mrs. Garcia has seen, and continues to see, the large trailers driving in the neighborhood taking the horses to slaughter. Mrs. Garcia is an animal lover, and it saddens her to know that horses are being slaughtered near her home.

43. Mrs. Garcia's interests, and those of her family, have been injured by defendants' decision to provide for a voluntary fee-for-service program under which establishments that slaughter horses will be able to apply for and pay for ante-mortem inspections, because this program will allow Beltex to remain in operation. Due to this program, Beltex's operations will continue to adversely affect Mrs. Garcia's and her family's enjoyment of their home and property. These injuries will be redressed if the Plaintiffs prevail in this action, because if the fee-for-service system is set aside, horse slaughter at the plants will cease on March 10, 2006.

44. Plaintiff Javier Zuniga has resided at 3804 North Terry Street for four years, located approximately one block from the Beltex horse slaughter plant. Mr. Zuniga lives at his home with his wife, Sandra, and their two young children. For the last four years, Mr. Zuniga and his family have endured, and continue to endure, the severe stench of the plant. The odor is unbearable, especially during the late afternoon and early evening hours, and as a result, Mr. Zuniga and his family are unable to enjoy going outside of their home. Mr. Zuniga's children are unable to play in the yard.

45. Mr. Zuniga's interests, and those of his family, have been injured by defendants' decision to provide for a voluntary fee-for-service program under which establishments that slaughter horses will be able to apply for and pay for ante-mortem

inspections, because this program will allow Beltex to remain in operation.  Due to this program, Beltex's operations will continue to adversely affect Mr. Zuniga's and his family's enjoyment of their home and property.  These injuries will be redressed if the Plaintiffs prevail in this action, because if the fee-for-service system is set aside, horse slaughter at the plants will cease on March 10, 2006.

46.    Defendant Mike Johanns is the Secretary of Agriculture, and has ultimate responsibility for ensuring that agencies within the U.S. Department of Agriculture ("USDA") comply with the mandates of Congress and with requirements of the APA and NEPA.

47.    Defendant Barbara J. Masters is the Administrator of the Food Safety and Inspection Service ("FSIS"), an agency within USDA, and is responsible for authorizing the emergency fee-for-service inspection program challenged in this case.  Adminstrator Masters has ultimate responsibility for ensuring that the FSIS complies with the mandates of Congress and with the requirements of the APA and NEPA.

**Statutory and Regulatory Framework**

A.    **Administrative Procedure Act**

48.    The APA requires that agencies must: (1) publish notice of proposed rulemaking in the Federal Register; (2) give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation; (3) publish the substantive rule no less than thirty days before the effective date; and (4) give an "interested person" the right to petition for the issuance, amendment, or repeal of a rule.  The notice must include "(1) a statement of the time, place, and nature of public rulemaking proceedings; (2) reference to the legal authority under which the rule is proposed;

and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b).

49.    The APA allows an agency to promulgate a final rule without the public notice and comment otherwise required only "when the agency for <u>good cause</u> finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b) (emphasis added).

50.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and shall also "hold unlawful and set aside" rules adopted "without observance of procedure required by law." <u>Id.</u> § 706(2)(D).

B.    **Federal Meat Inspection Act**

51.    The Federal Meat Inspection Act, 21 U.S.C. § 601 <u>et seq.</u> ("FMIA"), is a self-contained, comprehensive statutory inspection scheme that prohibits meat from covered species – including horses – from entering interstate commerce unless both pre-slaughter (ante-mortem) and post-slaughter (post-mortem) inspections are conducted pursuant to the FMIA. 21 U.S.C. § 603. Sections 603 and 604 of the FMIA require USDA inspection of animals, including horses, both before they may enter a slaughtering facility and after slaughter, to ensure that no part of a carcass determined to be "adulterated" passes into the human food supply.

52.    Section 603 of the FMIA makes clear that these inspectors shall be "appointed" by the Secretary of Agriculture. It provides that "[f]or the purpose of preventing the use in commerce of meat and meat food products which are adulterated, the Secretary shall cause to be

made, by inspectors appointed for that purpose, an examination and inspection of all amenable species before they shall be allowed to enter into any slaughtering . . . or similar establishment." Id.  The term "amenable species" is defined as "those species subject to the provisions of the Act on the day before the date of the enactment of the [ ] Act," 21 U.S.C. § 601(w), which included "cattle, sheep, swine, goats, horses, mules, and other equines."  21 U.S.C. § 603.

53.    The FMIA also expressly requires that the costs of ante-mortem and post-mortem inspections "shall be borne by the United States." 21 U.S.C. § 695 (emphasis added).  In short, the FMIA requires inspection for horse slaughter to be carried out under that Act, rather than under any other statute, and to be paid for by USDA itself out of federal appropriations.

C.    **Section 903 of the Federal Agriculture Improvement and Reform Act of 1996 and Implementing Guidelines**

54.    Section 903 of the Federal Agriculture Improvement and Reform Act of 1996 ("FAIR Act") is the sole source of statutory authority for the inspection of horses during transport to slaughterhouses.  This uncodified provision of the Humane Methods of Slaughter Act, 7 U.S.C. § 1901 et seq., provides that :

(a) Subject to the availability of appropriations, the Secretary of Agriculture may issue guidelines for the regulation of the commercial transportation of equine for slaughter by persons regularly engaged in that activity within the United States.

(b) In carrying out this section, the Secretary of Agriculture shall review the food, water, and rest provided to equine for slaughter in transit, the segregation of stallions from other equine during transit, and such other issues as the Secretary considers appropriate.

(c) In carrying out this section, the Secretary of Agriculture may-- (1) require any person to maintain such records and reports as the Secretary considers necessary; (2) conduct such investigations and inspections as the Secretary considers necessary; and (3) establish and enforce appropriate and effective civil penalties.

24

Pub. L. No. 104-127, § 903, 110 Stat. 1184.  USDA exercised its authority to provide for "the

regulation of the commercial transportation of equine for slaughter" by promulgating inspection

regulations at 9 C.F.R. § 88 et seq.  These regulations govern inspection upon arrival at a

slaughter facility, as well as arrival at international border checkpoints for trucks leaving the

United States, as well as trucks entering the United States.

D.    **Agricultural Marketing Act**

55.    The Agricultural Marketing Act ("AMA") sets forth the overall aims of USDA

with respect to the marketing of agricultural commodities.  In pertinent part, it authorizes USDA:

> [t]o inspect, certify, and identify the class, quality, quantity, and condition of
> agricultural products when shipped or received in interstate commerce, under
> such rules and regulations as the Secretary of Agriculture may prescribe,
> including assessment and collection of such fees as will be reasonable and as
> nearly as may be to cover the cost of the service rendered, to the end that
> agricultural products may be marketed to the best advantage, that trading may be
> facilitated, and that consumers may be able to obtain the quality product which
> they desire, except that no person shall be required to use the service authorized
> by this subsection.

7 U.S.C. § 1622(h).  Under this provision of the AMA, USDA currently provides voluntary

inspection of certain exotic animals and rabbits, such as reindeer, elk, deer, antelope, water

buffalo, and bison – animals not covered by the FMIA.  See 9 C.F.R. §§ 352.2, 352.10.

56.    Read in conjunction with the FMIA, the AMA is not a stand-alone source of

authority for the slaughterhouse inspection and transport inspection of horses and other animals

already covered by the FMIA.  Nothing in the AMA suggests that USDA may simply choose to

disregard the detailed requirements of the FMIA, one of which specifies that meat from covered

species – including horses – may not enter interstate commerce unless both ante-mortem and

post-mortem inspections are conducted pursuant to the FMIA.  21 U.S.C. § 603.  To the contrary,

for nearly two decades, USDA has reiterated its position that only species not covered by the FMIA may be inspected under an AMA fee-for-service program. See, e.g., Final Policy Statement for Research and Regulation of Biotechnology Processes and Products, 51 Fed. Reg. 23,336, 23,343 (June 26, 1986) (limiting the animals who "may be inspected under a voluntary reimbursable program established under the Agricultural Marketing Act" to "animals and animal products other than those required to be inspected under the FMIA").

E.    **National Environmental Policy Act**

57.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. Among the critical purposes of the statute are to "insure that environmental information is available to public officials and citizens before decisions are made and actions are taken," and to "help public officials make decisions that are based on understanding of environmental consequences . . . ." Id. § 1500.1(b)-(c). "Public scrutiny [is] essential to implementing NEPA." Id.

58.    To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement is known as an Environmental Impact Statement ("EIS").

59.    An EIS must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) alternatives to the proposed action, (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term

26

productivity," and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented."  42 U.S.C. § 4332.

60.    NEPA requires that when an agency proposes to undertake an "action" -- which includes activities that "are potentially under federal control," such as "new and continuing activities, including projects and programs entirely or partially financed, assisted, conducted, regulated, or approved by federal agencies," as well as "federally assisted activities," 40 C.F.R. § 1508.18 -- the agency "must first determine whether the action is one that normally requires" the preparation of an EIS pursuant to NEPA and the Council on Environmental Quality ("CEQ") regulations implementing NEPA.  40 C.F.R. § 1501.4(a).

61.    If the agency is not certain whether an EIS is required, it must prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary.  40 C.F.R. § 1501.4.  The EA must discuss the need for the proposal, evaluate alternatives that would cause less adverse environmental impacts, and provide sufficient evidence and analysis to support the agency's determination as to whether the proposed action will significantly affect the environment.  Id.

62.    The only time environmental analysis is not required is when the agency has "categorically excluded" the action from NEPA review.  40 C.F.R. § 1501.4 (a).  However, a categorical exclusion may only be invoked for those actions which do not "individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementing [the CEQ] regulations."  40 C.F.R. § 1508.4.

## Facts Giving Rise to Plaintiffs' Claims for Relief

A. **The Slaughter of American Horses, Including Wild Horses, for Overseas Human Consumption**

63.     Each year, three European-owned slaughterhouses based in the U.S. kill and process tens of thousands of American horses for human consumption in foreign countries.  In 2005 alone, more than 85,000 horses met this fate.  Most horses destined for slaughter are sold at livestock auctions or sales.

64.     Horses bound for slaughter are shipped, frequently for long distances, in a manner that fails to accommodate their unique temperaments and physical requirements.  Often, terrified horses and ponies are crammed together and transported to slaughter in double-deck trucks designed for cattle and pigs.  The truck ceilings are so low that some horses are not able to hold their heads in a normal position.  Slippery floor surfaces lead to falls, and occasionally trampling. As a result, some horses arrive at the slaughterhouse seriously injured or dead.

65.     Horses of virtually all ages and breeds are slaughtered, though most are relatively young and healthy.  Horses commonly slaughtered include unsuccessful or retired race horses, surplus riding school and camp horses, wild horses, and foals from mares whose urine is collected for the production of hormone replacement therapy drugs.  Under federal law, horses are required to be rendered unconscious prior to slaughter, usually with a device called a captive bolt gun, which propels a metal rod into the horse's brain.

66.     Wild American horses are among the horses sent to their deaths at the three slaughterhouses.  Pursuant to the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331, et seq., the U.S. Bureau of Land Management ("BLM") conducts round-ups of wild horses living on BLM lands in ten western states.  Under the statute, BLM puts these wild horses up for

private adoption.  Id. § 1333(b)(2)(B).  After a year, BLM may transfer title to the adopter, at which point the animal is no longer protected by the Act.  Id. § 1333(c).

67.    Each year, hundreds of wild horses put up for adoption through this program are slaughtered at the three slaughter plants. On information and belief, were adopters to no longer have the option of selling their horses to slaughterhouses, or to middlemen for slaughterhouses, BLM would have a smaller market of individuals to whom to provide animals for adoption.  In that event, it would be more expensive and difficult for BLM to remove and maintain the same number of horses from the wild, and, as a result, the agency would be more likely to permit more wild horses to remain on the range, where the Plaintiff organizations and their members enjoy opportunities to view, photograph, study, and otherwise enjoy these majestic animals in their natural habitat.

B.    **FY 2006 Agriculture Appropriations Act and Amendment**

68.    In recognition of the overwhelming public disdain for horse slaughter for human consumption, members of Congress introduced an Amendment to the FY2006 Agriculture Appropriations Act, "the goal of [which] is simple: to end the slaughter of America's horses for human consumption overseas." 151 CONG. REC. S10,218 (daily ed. Sep. 20, 2005) (remarks of Senator Ensign) (emphasis added).  To effect this ban on horse slaughter, the Amendment flatly de-funded all of the inspections required by federal law prior to slaughter. As previously explained, federal law requires federally-funded USDA inspectors to inspect horses bound for slaughter at two stages – first, under the FMIA, USDA inspectors must inspect horses at the slaughterhouse, and, second, under Section 903 of the FAIR Act, USDA inspects horses during transport to slaughter.  Accordingly, in the absence of these federally-funded inspections, federal

law prohibits the meat from these horses from entering into commerce for the purpose of human consumption.

69.    In recognition of this legal framework, and to effect a full and complete ban on horse slaughter, the Amendment was designed to de-fund inspection under both the FMIA and the FAIR Act.  The Amendment provides:

> Effective 120 days after the date of enactment of this Act, none of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. § 603) or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996.

The Amendment goes into effect on March 10, 2006.

70.    This Amendment was sponsored in the House of Representatives by Congressmen John Sweeney (R-NY), John Spratt (D-SC), Ed Whitfield (R-KY) and Nick Rahall (D-WV), while an identical Amendment was offered in the Senate by Senators John Ensign (R-NV) and Robert Byrd (D-WV) and co-sponsored by Senators Jon Corzine (D-NJ), Jim DeMint (R-SC), Diane Feinstein (D-CA), Lindsey Graham (R-SC), Mary Landrieu (D-LA), Frank Lautenberg (D-NJ), Trent Lott (R-MS), and Debbie Stabenow (D-MI).

71.    The ban was supported by a broad coalition of over one hundred horse breeding, showing, and racing organizations such as the National Show Horse Registry, the National Thoroughbred Racing Association, and Churchill Downs — as well as numerous horse welfare and humane organizations across the country. Constituents flooded Congressional offices with calls urging their support of the Amendment, and newspapers across the country editorialized in its favor.  In a reflection of the overwhelming public sentiment that horse slaughter should be banned, the House passed the Amendment on June 8, 2005 by a vote of 269-158.  The Senate

approved the identical Amendment on September 20, 2005 by a vote of 69-28. On November 10, 2005, the President signed the Amendment into law as Section 794 of the FY 2006 Agriculture Appropriations Act.

72.    Floor debate on the Amendment in both houses confirms that members of Congress understood that they were voting on whether to cease the slaughter of horses for human consumption for FY2006.  Immediately after introducing the Amendment in the Senate on September 20, 2005, Senator Ensign explained that horses slaughtered at the foreign-owned plants are shipped to Europe and Asia for human consumption, and that "[o]ur amendment effectively stops this practice," because without "Federal funds for the inspection of horses . . . horses cannot be slaughtered, or exported for slaughter."  151 CONG. REC. S10,218.

73.    Senate co-sponsor Senator Byrd was also clear in stating the purpose of the Amendment, declaring that:

> Senator Ensign and I have offered an amendment to stop the slaughter of horses for human consumption by preventing taxpayer dollars from being used to inspect the horses intended for slaughter. Without these inspections . . . it would be impossible for these companies to slaughter horses in the U.S., or to transport horses abroad for slaughter.

Id. at S10,220. An identical understanding of the Amendment's scope and purpose prevailed in the House, where Representative Spratt, a sponsor, stated: "What is the effect of this amendment?  This amendment in simple terms will stop the slaughter [f]or human consumption of horses . . . [their] brutal slaughter . . . is the kind of slaughter that this bill will prohibit."  Id. at H4249.

74.    Even the Congressional opponents of the bill — representing the interests of the slaughter plants — agreed on the Amendment's purpose, scope, and effect.  For example,

Agriculture Appropriations Subcommittee Chairman Henry Bonilla stated that the Amendment would "prohibit USDA from inspecting horses," which is legally necessary for the slaughter plants to operate.  Id. at H4248.  Another opponent, Agriculture Committee Chairman Bob Goodlatte, also noted that the Amendment would "stop the proper inspection of these horses." Id.  Regardless of their position on the Amendment, therefore, members of Congress all shared a common understanding of what the Amendment was designed to accomplish — the "prohibit[ion]" of horse slaughter.  Id. at H4249.

75.     In passing the Amendment, Congress expressly took into account the grievances of residents who live near the plants, as do several of the plaintiffs in this action.  For instance, the Amendment's sponsors read into the record a letter from Kaufman, Texas Mayor Paula Bacon, who recounted that children living near the Dallas Crown plant, while "playing in their yards, do so with the noise of horses being sent to their deaths in the background."  Id. at S10,219.  In this letter, Mayor Bacon further described the economic and aesthetic blight inflicted upon her town and its residents by the plant, and pleaded with Congress to exercise its authority and halt the slaughter of horses.

76.     Congress also sought to pass this humane Amendment to address the concerns of individuals such as Plaintiffs and the members represented by Plaintiff organizations, who suffer aesthetic, emotional, and psychological injury when their horses are sold to such plants without their knowledge; when they must live near the plants knowing that the sounds, sights, and smells that distress them are caused by horses going to their deaths; or when the wild horses they enjoy observing are removed from public lands and sent to slaughter.  Senator Byrd, describing the "suffering these animals endure" at "their often injurious end," explained how the "[i]mproper

use of stunning equipment at the slaughterhouse can result in the animal having to endure repeated blows to [the] head, meaning that horses sometime remain conscious throughout the slaughter process." Id. at S10,220. Representative Whitfield, describing the "process of the captive penetrating bolt being administered by low-skilled workers," stated that such methods are "not humane." Id. at H4250.

77.    Not a single member of Congress suggested that the purpose of the Amendment was merely to change the manner of funding for USDA's inspections, despite the fact that the presiding officer and bill manager in the Senate chose to "delay[ ] the vote . . . and keep[ ] the afternoon as open as we have," so as not "to prevent anybody from presenting a different point of view." Id. at S10,224.

C.    **USDA's End-Run Around the Amendment Passed by Congress**

78.    On November 23, 2005, soon after the President signed the Amendment into law, the three companies that slaughter American horses on American soil – Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc. (collectively, "Petitioners") – filed a petition for emergency rulemaking with USDA to create a "fee-for-service" inspection apparatus for horse slaughter and transport to slaughter.    The proposal requested that USDA circumvent the Amendment's prohibition on ante-mortem horse slaughter inspection under the FMIA and the FAIR Act by creating an entirely new regulatory inspection scheme under the AMA.    The petitioners also requested that this new and unprecedented regulatory system, which was expressly designed to sidestep the statute just passed by Congress and signed into law, be put in place without any prior public notice and comment rulemaking.

79.     On December 7, 2005, Representatives Ed Whitfield, John Sweeney, and John Spratt, and Senator Byrd wrote to the USDA to ensure that it would follow Congress's intent to prevent horse slaughter for human consumption.  In their letter, the legislators expressed their "great concern" that USDA not "circumvent Congressional intent and allow horses and/or horsemeat to be inspected on a per-fee basis, thus permitting horse slaughter for human consumption to continue during FY 2006."

80.     On December 21, 2005, USDA Acting General Counsel James Michael Kelly sent a letter in reply, tersely informing the Congressmen and Senator that the Appropriations Act "does not prevent horse slaughter at all," and that "notwithstanding the prohibition on expenditure of funds" mandated by Congress in the Appropriations Act, the USDA believes it can still provide inspection of horses on a fee-for-service basis.

81.     On January 17, 2006 forty members of Congress wrote to Secretary Johanns to state that they were "shocked and deeply upset" upon "learn[ing] that the agency has apparently decided it need not carry out Congress's clearly expressed intent to halt horse slaughter for human consumption in FY 2006, but rather, intends to engage in a complex regulatory maneuver to willfully circumvent legislation that was passed by an overwhelming majority."  Signatories to this letter included the House and Senate sponsors and co-sponsors of the Amendment, as well as other members of both political parties concerned with upholding the integrity of the democratic process.

82.     On January 5, 2006, and in response to the petition and to USDA's December 21, 2005 letter to members of Congress announcing its position that the Amendment "does not prevent horse slaughter at all," several of the Plaintiffs in this action sent USDA a 17-page letter

urging denial of the petition because, among other reasons, (1) promulgation of an entirely new horse meat inspection scheme outside the FMIA — where it has resided for 100 years — must be preceded by full public notice and comment rulemaking in accordance with the APA; (2) the FMIA requires inspection for horse slaughter to be carried out under that Act, not the AMA, and to be paid by USDA; and (3) the legislative history of the Appropriations Act unequivocally demonstrates Congress's clear intent to prevent horse slaughter for consumption, rather than simply changing the way USDA pays for inspection.

83.    Nearly 80 days after first receiving the petition, USDA announced six days ago, on February 8, 2006, that it had granted the petition for emergency rulemaking and created the fee-for-service inspection system, but chose not to provide <u>any advance public notice or comment</u>.

84.    The Final Rule provides that the new inspection system will become effective on March 10, 2006 – the same day that the Amendment takes effect.  Although the Final Rule purports to "request [ ] comments" on an "interim final rule" already adopted, the Final Rule omits any consideration or explanation of whether or how USDA will make use of such <u>post hoc</u> "comments," nor does it even state that USDA will consider such comments and potentially withdraw, adjust, expand, or revise the Final Rule.  71 Fed. Reg. 6337 (Feb. 8, 2006).

85.    The entirety of USDA's justification for dispensing entirely with advance public notice or comment is that:

> With the passage of the FY 2006 Appropriations Act, if FSIS does not establish a means for official establishments that slaughter horses to obtain ante-mortem inspection, these establishments will not be able to operate and presumably will be forced out of business. This interim final rule is necessary to avoid disruption of operations at official establishments that slaughter horses. Therefore, the Administrator has determined that prior notice and opportunity for public comment are impracticable and contrary to the public interest under 5 U.S.C.

> 553(b), and that there is good cause under 5 U.S.C. 553(d) for making the action effective as specified herein.

Id. at 6340.  In making this "good cause" finding, USDA did not address at all Congress's intent to halt the slaughter of horses for human consumption.  Nor did the USDA even allude to the letters submitted to it by the Congressmen and Senator or other supporters of the ban urging the agency not to adopt the new inspection system.  Nor did the agency provide any explanation for why the 120-day delay between enactment of the Appropriations Act and the March 10 deadline did not provide adequate time to allow public notice and comment on the fee-for-service program.

86.    In addition to ignoring Congress's intent in adopting the Amendment, the Final Rule violates the actual terms of the Amendment, because the fee-for-service inspection program will in fact require the "use[ ]" of appropriated funds to pay the salaries of the inspectors, even if those expenditures from appropriated funds are eventually reimbursed by the users at a later, unknown date.  In addition, users of the fee-for-service program are not required to pay interest on the expended funds between the date of disbursement and the date of reimbursement. Accordingly, the fee-for-service inspection program created in the Final Rule results in a net loss of appropriated funds, in contravention of the Amendment.

87.    The Final Rule also violates the Amendment because the fee-for-service inspection program will still require the "use[ ]" of appropriated funds to pay the "expenses" of the inspectors.  The Final Rule provides that a user of the fee-for-service program shall pay only the salaries of the inspectors – "the applicable base time, overtime, and holiday rates for ante-mortem inspection in accordance with [9 C.F.R.] § 352.5."  71 Fed. Reg. 6341; 9 C.F.R. § 352.19.  The Final Rule makes no reference to reimbursement for expenses.  Although 9 C.F.R. §

352.5(d) states that "[c]harges may also be made to cover other expenses incurred by the Service," this provision of § 352.5 is not incorporated by the Final Rule, which incorporates from § 352.5 only the "the applicable base time, overtime, and holiday rates for ante-mortem inspection," as described in § 352.5(c). Accordingly, even if it were otherwise legal, the fee-for-service inspection system fails to require reimbursement for all of the "expenses" that will be incurred during administration of the inspection program.

88.     On information and belief, the expenses associated with any horse inspection program include: mileage and transportation costs incurred by the inspectors; printing and distribution of the owner/shipper certificates reviewed during inspection; creation and tracking of USDA-issued "back tags" for horses; postage for return shipping of owner/shipper certificates back to USDA Area Offices; technology used to document violations discovered during inspections, such as still cameras or video cameras; other equipment and the depreciation of that equipment; seals, stamps, or insignia; salaries and expenses incurred by USDA's Investigative and Enforcement Services department when inspectors make referrals for enforcement action; and all other overhead costs, including the salaries and expenses of the inspectors' supervisors and support staff, the buildings in which they work, and all others who contribute clerical assistance or otherwise administer the inspection system. The rule adopted by USDA in the absence of advance public notice and comment addresses none of these "expenses." As a result, the Final Rule results in a net loss of appropriated federal funds, in contravention of the Amendment, as the users will in fact reimburse the United States for only part of the inspections.

89.    The Final Rule also violates the requirement in Section 695 of the FMIA that the costs of horse inspection "<u>shall</u> be borne by the United States."   21 U.S.C. § 695 (emphasis added).

90.    The Final Rule also violates the FMIA's requirement that horse inspection be made pursuant to the FMIA, as described in paragraphs 45-47 above, because it creates an entirely new regulatory system outside of the FMIA.

91.    Notwithstanding the fact that the regulatory inspection system created by the Final Rule will allow horse slaughter and its adverse and "significant environmental effects" to proceed unabated, the head of FSIS apparently did not undertake any environmental review in conjunction with the Final Rule, as required by NEPA and by USDA's implementing regulations.   There is no mention of any NEPA review in the Final Rule or its preamble, and Plaintiffs have been unable to locate any other publicly-available environmental analysis in conjunction with the fee-for-service program.

92.    In addition to the FSIS fee-for-service inspection program described in the Final Rule, and in paragraphs 77-85 <u>supra</u>, the preamble to the Rule also states that the Animal and Plant Health Inspection Service ("APHIS") is "prepared to establish a voluntary fee-for-service program in order to continue its inspection of horses under 9 CFR part 88," and that "FSIS referred [this part of] the petitioners' request . . . to APHIS," 71 Fed. Reg. 6338, which has authority to regulate the conditions under which horses are transported to the slaughterhouses. Despite this "referr[al]," the preamble goes on to describe the APHIS fee-for-service program as one that

> APHIS intends to establish . . . under the authority provided in the FY 2006 Appropriations Act, which authorizes the agency to collect fees to cover the total costs of providing technical assistance, goods, or services requested . . . and such

> fees shall be credited to a trust fund account established for this purpose, to remain available until expended, without further appropriation, for providing such assistance, goods, or services.

Id.  The preamble indicates that APHIS has made a final decision to create this parallel fee-for-service inspection system, stating that "APHIS will make this program available to the three domestic entities that slaughter horses via agreements under which APHIS will be reimbursed for services provided to inspect horses delivered to the facilities."  Id.  The agreements and payment procedures for the APHIS fee-for-service inspections are not described further in either the preamble or the Final Rule.  The preamble simply asserts, without further analysis or invitation for public comment, that "[n]o changes to the regulations are necessary" for the APHIS fee-for-service transportation inspection system.  Id.

93.    As of today, APHIS has not published a Federal Register notice or otherwise revealed anything to the public about this fee-for-service program or its implementation.  On information and belief, APHIS, without any advance public notice or comment, is adopting a comparable program to that adopted by FSIS, that applies to the transport of horses for slaughter.

## Plaintiffs' Claims for Relief

## Claim  One – Violation of The Administrative Procedure Act, 5 U.S.C. § 553

94.    By creating a fee-for-service ante-mortem horse slaughter inspection system without providing advance public notice and an advance opportunity to comment, USDA has violated the Administrative Procedure Act, 5 U.S.C. § 553.

95.    This violation has caused and will continue to cause plaintiffs injuries as described in paragraphs 3-39.

## Claim  Two – Violation of The Administrative Procedure Act, 5 U.S.C. § 706

96.     By creating a fee-for-service ante-mortem horse slaughter inspection system that (1) will allow horse slaughter to continue despite an unequivocal Congressional command designed to end horse slaughter, (2) violates the requirements and purpose of both the Amendment and the FMIA, and (3) ignores the Constitutional separation of powers principle by which Congress makes the laws and the executive branch carries them out, USDA has abused its discretion, and acted arbitrarily and capriciously and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).  USDA has also violated the APA by failing to furnish any coherent or sufficient explanation in the Final Rule regarding USDA's understanding of Congress's intent in passing the Amendment.

97.     This violation has caused and will continue to cause plaintiffs injuries as described in paragraphs 3-39.

## Claim  Three - Violation of the National Environmental Policy Act

98.     By creating a fee-for-service ante-mortem horse slaughter inspection system without first conducting any environmental review under the National Environmental Policy Act, 42 U.S.C. § 4321, et seq., USDA has violated NEPA and the CEQ's implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

99.     This violation has caused and will continue to cause plaintiffs injuries as described in paragraphs 3-39.

**WHEREFORE**, plaintiffs request that the Court issue an Order:

1.      Declaring that the USDA's decision to implement fee-for-service horse inspection is arbitrary and capricious, and not in accordance with the Administrative Procedure Act, Section 794 of the FY2006 Agriculture Appropriations Act, the Federal Meat Inspection Act, and/or the National Environmental Policy Act;

2.      Setting aside the Final Rule;

3.      Preliminarily and permanently enjoining FSIS from accepting applications for fee-for-service horse slaughterhouse inspections, and from otherwise implementing the Final Rule;

4.      Preliminarily and permanently enjoining USDA from using any funds appropriated by the FY2006 Agriculture Appropriations Act to pay the salaries or expenses of USDA personnel to inspect horses under section 3 of the FMIA, or under the guidelines or regulations issued under section 903 of the FAIR Act;

5.      Awarding plaintiffs their costs and reasonable attorneys' fees; and

6.      Awarding plaintiffs any other relief that is just and proper.

Respectfully submitted,


____/s/_____
Eric R. Glitzenstein
(D.C. Bar No. 358287)


____/s/_____
Ethan Carson Eddy
(D.C. Bar. No. 496406)


____/s/_____
Howard M. Crystal
(D.C. Bar No. 446189)

MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, DC  20009
(202) 588-5206


Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)

Jonathan R. Lovvorn
(D.C. Bar No. 461163)

THE HUMANE SOCIETY OF THE UNITED
STATES
2100 L. St., N.W.
Washington, DC  20037
(202) 676-2333

Counsel for Plaintiffs


February 14, 2006