UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **THE HUMANE SOCIETY**<br>**OF THE UNITED STATES, ET AL.** )<br>)<br>) | |
| ) | Civ. No. 1:06CV00265 (CKK) |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| **MIKE JOHANNS, ET AL.** ) | |
| ) | |
| Defendants. ) | |

---

### PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
### AND FOR A PRELIMINARY INJUNCTION, AND REQUEST
### <u>FOR A HEARING</u>

Plaintiffs hereby move for a temporary restraining order and/or for a preliminary

injunction to enjoin the effectiveness of a final rule that was recently adopted by defendants –

with no advance public notice and comment – and that will become effective on <u>March 10, 2006</u>.

<u>See</u> 71 Fed. Reg. 6337 (Feb. 8, 2006). As fully explained in the accompanying legal

memorandum, this case concerns legislation recently enacted by Congress that is specifically

designed to halt, by no later than March 10, the slaughter of hundreds of thousands of American

horses for human consumption abroad. Absent emergency relief from this Court, the rule

adopted by federal defendants will allow such slaughter to continue – by dramatically changing

the way in which federal inspections for the horse slaughter operations are funded – in a manner

that, plaintiffs maintain, is directly contrary to Congress's command, and that will irreparably

harm plaintiffs' interests.

Plaintiffs have conferred with Assistant U.S. Attorney Beverly Russell, who is

defendants' lead counsel, and she has authorized below-signed counsel to represent that

defendants will file their response to this motion on Monday, February 27, 2006.  Government

counsel has also indicated that, in response to plaintiffs' request, USDA will file the

Administrative Record relating to the rule at issue on the same day.  On the basis of that

representation, plaintiffs are not filing a motion for expedited production of the Record.[1]

Plaintiffs have also requested that defendants voluntarily defer the effective date of the

rule beyond March 10 so that the parties would have more time to brief, and the Court more time

to address, the legal issues.  The government has declined that request.  Consequently, plaintiffs

respectfully request that the Court schedule a hearing on this motion in sufficient time for the

Court to rule on this motion prior to March 10.  Obviously, if the Court deems it appropriate,

plaintiffs have no objection to the Court granting a temporary restraining order to afford itself

some more time in which to resolve the preliminary injunction request.  Alternatively, plaintiffs

would have no objection to the Court deciding the preliminary injunction request prior to March

10, thus rendering plaintiffs' temporary restraining order request moot.[2]

---

[1] While plaintiffs believe that at least some of the legal issues they have raised – and particularly their notice and comment claim under 5 U.S.C. § 553 – do not depend on an evaluation of the Administrative Record, they are aware of the D.C. Circuit's ruling in <u>American Bioscience, Inc. v. Thompson</u>, 243 F.3d 579, 582 (D.C. Cir. 2001), suggesting that courts in APA cases should generally have access to the Administrative Record when ruling on preliminary injunction motions.  Consequently, to avoid any potential obstacles along those lines, plaintiffs indicated to defendants that they would file a motion for expedited production of the record unless defendants agreed to furnish the record to the Court expeditiously.

[2] Especially since plaintiffs will not be receiving the Administrative Record until after this motion is filed, they would greatly appreciate having at least two days following receipt of the record – <u>i.e.</u>, until Wednesday, March 1 – within which to file a reply memorandum.  Of course, however, plaintiffs will defer to whatever schedule the Court deems appropriate in light of the Court's schedule.

Respectfully submitted,


/s/_____
Eric R. Glitzenstein
D.C. Bar No. 358287
Ethan Carson Eddy
D.C. Bar No. ___
Howard M. Crystal
D.C. Bar No. 446189

Meyer Glitzenstein & Crystal
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206

Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)

Jonathan R. Lovvorn
(D.C. Bar No. 461163)

The Humane Society of the United
States
2100 L St., N.W.
Washington, D.C.  20037
(202) 676-2333

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | )
|**THE HUMANE SOCIETY** | )
|**OF THE UNITED STATES, ET AL.** | )
| | ) Civ. No. 1:06CV00265 (CKK)
|          Plaintiffs, | )
| v. | )
| | )
|**MIKE JOHANNS, ET AL.** | )
| | )
|          Defendants. | )

_____)

## PLAINTIFFS' RULE 65.1 CERTIFICATE OF COUNSEL

Pursuant to LC vR 65.1, plaintiffs hereby certify that, as set forth in the accompanying

motion for a temporary restraining and for a preliminary injunction, plaintiffs' below-signed

counsel has provided advance notice of plaintiffs' intention to file this motion to the federal

defendants' lead counsel, Assistant U.S. Attorney Beverly Russell. Plaintiffs have furnished Ms.

Russell with copies of the original complaint and amended complaint, and indicated that this

motion and all supporting papers will be furnished to her as soon as they are filed with the Court,

either through the Court's electronic filing system (if Ms. Russell has entered a formal

appearance) or through other expeditious means.

Respectfully submitted,

/s/_____

Eric R. Glitzenstein
D.C. Bar No. 358287
Ethan Carson Eddy
D.C. Bar No. ___
Howard M. Crystal
D.C. Bar No. 446189

Meyer Glitzenstein & Crystal

Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206

Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)

Jonathan R. Lovvorn
(D.C. Bar No. 461163)

The Humane Society of the United
States
2100 L St., N.W.
Washington, D.C.  20037
(202) 676-2333

Counsel for Plaintiffs

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
THE HUMANE SOCIETY                      )
OF THE UNITED STATES, et al.,           )
                                        )
            Plaintiffs,                 )        Civ. No. 06-0265 (CKK)
        v.                              )
                                        )
MIKE JOHANNS, et al.                    )
                                        )
            Defendants.                 )
_____)


**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY
RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION**

                                        ERIC R. GLITZENSTEIN
                                        ETHAN CARSON EDDY
Of Counsel:                             HOWARD M. CRYSTAL

REBECCA G. JUDD                         MEYER GLITZENSTEIN & CRYSTAL
JONATHAN R. LOVVORN                     Suite 700
THE HUMANE SOCIETY OF THE UNITED STATES 1601 Connecticut Ave., N.W.
2100 L. St., N.W.                       Washington, DC  20009
Washington, DC  20037                   (202) 588-5206
(202) 676-2333                          (202) 588-5049 (fax)

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     THE STATUTORY AND REGULATORY SCHEME . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.     The Administrative Procedure Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

       B.     The Federal Meat Inspection Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       C.     Section 903 of the Federal Agriculture Improvement and
              Reform Act of 1996 and Implementing Guidelines. . . . . . . . . . . . . . . . . . . . . .5

       D.     The Agricultural Marketing Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       E.     National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.     The Slaughter of American Horses, Including Wild Horses,
              for Overseas Human Consumption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       B.     FY 2006 Agriculture Appropriations Act and Amendment . . . . . . . . . . . . . . . . 9

       C.     USDA's Circumvention of the Amendment Passed by Congress . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. . . . . . . . . . . . . . . . 17

       A.     Defendants Unlawfully Promulgated the Final Rule Without
              Advance Notice and Public Comment In Violation of the APA. . . . . . . . . . . . .17

              1.     Any Comments Received by USDA Are Post Hoc. . . . . . . . . . . . . . . . .17

              2.     Defendants Fail to Meet the Good Cause Exception
                     To The Advance Notice and Public Comment Requirement. . . . . . . . . . 19

B.     The Final Rule Is Also Arbitrary and Capricious and Not
In Accordance With Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1.     The Final Rule Violates the Plain Meaning and
Overriding Purpose of the Amendment. . . . . . . . . . . . . . . . . . . . . . . 23

2.     The Final Rule Violates the FMIA's Ban on
Fee-For-Service Horse Inspection. . . . . . . . . . . . . . . . . . . . . . . . . . . 27

3.     The Final Rule Also Violates the APA By Failing To
Give A Reasoned Explanation As To How It Is
Consistent With the Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C.     Defendant USDA Has Also Announced Its "Inten[t] to Establish"
A Separate Fee-For-Service *Transport* Inspection Program
Without Any Rulemaking At All, In Violation of the APA. . . . . . . . . . . . . . . 31

D.     Defendants Conducted No Environmental Analysis In Conjunction
With the Final Rule, In Violation of NEPA. . . . . . . . . . . . . . . . . . . . . . . . . . 33

II.     THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST ALSO
FAVOR INJUNCTIVE RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

A.     Defendants Have Irreparably Injured Plaintiffs By Depriving Them
Of Their Statutory Rights To Advance Notice and Public Participation. . . . . . . .36

B.     Plaintiffs Are Irreparably Harmed by the Health Risks and
Environmental Degradation Caused By the Plants' Continuing Operation. . . . . .37

C.     Continued Horse Slaughter Also Irreparably Harms Plaintiffs'
Aesthetic Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

D.     Federal Defendants Will Not Suffer Irreparable Harm if the Court
Issues a Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E.     Injunctive Relief Is In the Public Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Air Transport Association of America v. Department of Transport,
900 F.2d 369 (D.C. Cir. 1990), vacated as moot on other grounds, 933 F.2d 1043
(D.C. Cir. 1991) ......................................................................................................18

American Federation of Government Employees v. Block,
655 F.2d 1153 (D.C. Cir. 1981) ...............................................................................19

American Medical Association v. Weinberger,
522 F.2d 921 (7th Cir. 1975) ....................................................................................37

American Petroleum Institute v. EPA,
52 F.3d 1113 (D.C. Cir. 1995) ..................................................................................28

American Scholastic TV Programming Foundation v. FCC,
46 F.3d 1173 (D.C. Cir. 1995) ..................................................................................24

American Bioscience, Inc. v. Thompson,
269 F.3d 1077 (D.C. Cir. 2001) ................................................................................34

Amoco Production Co. v. Village of Gambell,
480 U.S. 531 (1987).................................................................................................37

Animal Legal Defense Fund v. Glickman,
154 F.3d 426 (D.C. Cir. 1998) (internal citations omitted) ......................................39

Asiana Airlines v. FAA,
134 F.3d 393 (D.C. Cir. 1998) ...........................................................................3, 17, 19

Bluewater Network v. EPA,
370 F.3d 1 (D.C. Cir. 2004) .....................................................................................30

Burtch v. U.S. Department of Treasury,
120 F.3d 1087 (9th Cir. 1997) ..................................................................................25

Chevron. Barnhart v. Thomas,
540 U.S. 20 (2003)..................................................................................................26

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837 (1984)............................................................................................23, 26

Citizen's Alert Regarding Environment v. U.S. Department of Justice,
1995 WL 748246 (D.D.C. 1995) ...............................................................................41

City/Fed Finance Corp. v. Office Of Thrift Supervision,
    58 F.3d 738 (D.C. Cir. 1995) ...................................................................16, 34

Community Nutrition Institute v. Butz,
    420 F. Supp. 751 (D.D.C. 1976) ........................................................................36

Cuomo v. United States Nuclear Regulatory Commission,
    772 F.2d 972 (D.C. Cir. 1985) ....................................................................17, 34

Dodd v. United States,
    ___ U.S. ___, 162 L. Ed. 2d 343, 125 S. Ct. 2478 (2005) ...........................35, 36

Environmental Defense Center v. Babbitt,
    73 F.3d 867 (9th Cir. 1995) ...............................................................................25

Environmental Defense Fund, Inc. v. U.S. Environmental Prot. Agency,
    716 F.2d 915 (D.C. Cir. 1983) ....................................................................19, 22

FDA v. Brown and Williamson Tobacco Corp.,
    529 U.S. 120 (2000).........................................................................................24

Fund for Animals v. Clark,
    27 F. Supp. 2d 8 (D.D.C. 1998) ......................................................................39

Gerber v. Norton,
    294 F.3d 173 (D.C. Cir. 2002) .........................................................................32

Household Credit Services, Inc. v. Pfennig,
    541 U.S. 232 (2004).........................................................................................28

Jifry v. FAA,
    370 F.3d 1174 (D.C. Cir. 2004) .......................................................................21

Landmark Legal Foundation v. IRS,
    267 F.3d 1132 (D.C. Cir. 2001) .......................................................................27

Lorillard v. Pons,
    434 U.S. 575 (1978).........................................................................................24

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992).........................................................................................39

Methodist Hospital of Sacramento v. Shalala,
    38 F.3d 1225 (D.C. Cir. 1994) .........................................................................20

Miller v. French,
        530 U.S. 327 (2000) ........................................................................................ 27

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
        463 U.S. 29 (1983) .......................................................................................... 32

Mova Pharm. Corp. v. Shalala,
        140 F.3d 1060 (D.C. Cir. 1998) ...................................................................... 16

National Mining Association v. U.S. Army Corps of Engineers,
        145 F.3d 1399 (D.C. Cir. 1998) ...................................................................... 34

Natural Resources Defense Council, Inc. v. Browner,
        57 F.3d 1122 (D.C. Cir. 1995) ........................................................................ 24

Natural Resources Defense Council v. Lujan,
        768 F. Supp. 870 (D.D.C. 1991) ..................................................................... 36

Natural Resources Defense Council v. Morton,
        337 F. Supp. 167 (D.D.C. 1971), aff'd, 458 F.2d 827 (D.C. Cir. 1972) ............ 41

New Jersey v. U.S. Environmental Prot. Agency,
        626 F.2d 1038 (D.C. Cir. 1980) ............................................................. 18, 20, 21

Nuclear Energy Institute, Inc. v. EPA,
        373 F.3d 1251 (D.C. Cir. 2004) ...................................................................... 23

Paralyzed Veterans of America v. D.C. Arena L.P.,
        117 F.3d 579 (D.C. Cir. 1997) ........................................................................ 32

Pharmaceutical Research and Manufacturers of America v. U.S.,
        135 F. Supp. 2d 1 (D.D.C. 2001), rev'd on other grounds by Pharmaceutical
        Research and Mfrs. of Am. v. Thompson, 251 F.3d 219 (D.C. Cir. 2001) ............ 41

Public Citizen v. U.S. Department of Health and Human Services,
        332 F.3d 654 (D.C. Cir. 2003) ........................................................................ 23

Segar v. Civiletti,
        516 F. Supp. 314 (D.D.C. 1981) ..................................................................... 41

Sierra Club v. Marsh,
        872 F.2d 497 (1st Cir. 1989) ........................................................................... 37

Spirit of the Sage Council v. Norton,
        294 F. Supp. 2d 67 (D.D.C. 2003), vacated in part as moot on other grounds 411
        F.3d 225 (D.C. Cir. 2005) ......................................................................... 18, 22

TVA v. Hill,
        437 U.S. 153 (1978)................................................................................35

The Fund for Animals v. Norton,
        281 F. Supp. 2d 209 (D.D.C. 2003).....................................................39

Transitional Hospital Corporation v. Shalala,
        222 F.3d 1019 (D.C. Cir. 2000)............................................................26

United Church Board for World Ministries v SEC,
        617 F. Supp. 837 (D.D.C. 1985)...........................................................18

United States v. Mead Corp.,
        533 U.S. 218 (2001)..............................................................................26

Utility Solid Waste Activities Group v. U.S. Environmental Prot. Agency,
        236 F.3d 649 (D.C. Cir. 2001)........................................................19, 21

Washington Metropolitan Area Transit Commission v. Holiday Tours,
        559 F.2d 841 (D.C. Cir. 1977)..............................................................16

Weinberger v. Romero-Barcelo,
        456 U.S. 305 (1982)..............................................................................35

## FEDERAL STATUTES

5 U.S.C. § 553(b) .....................................................................1, 3, 17, 19, 20,
                                                                                                                        32
5 U.S.C. § 706(2) .............................................................................17, 22

7 U.S.C. § 1621 et seq...........................................................................5, 6

7 U.S.C. § 1622(h) ..................................................................................28

7 U.S.C. § 1901 et seq................................................................................5

7 U.S.C. § 1902(a) ....................................................................................8

16 U.S.C. § 1331 et seq...............................................................................9

21 U.S.C. § 601 et seq............................................................................1, 4

21 U.S.C. § 603.................................................................................10, 28

21 U.S.C. § 695 ..................................................................................2, 4, 24, 27, 29

42 U.S.C. § 4321 et seq ........................................................................................2

42 U.S.C. § 4332(C) ................................................................................6, 33, 34

Pub. L. No. 80-1852 ...........................................................................................29

Pub. L. No. 80-256, § 356 ..................................................................................29

Pub. L. No. 104-127, § 903(a) .............................................................................5

Pub. L. No. 109-97, § 794 ..................................................................................24

Pub. L. No. 109-97, § 794 ..................................................................................11

## FEDERAL REGULATIONS

9 C.F.R. §§ 352.2, 352.10 ..............................................................................6, 28

9 C.F.R. § 88 et seq ..............................................................................................5

40 C.F.R. § 1500.1(a) ...........................................................................................6

40 C.F.R. § 1501.4(a) ...........................................................................................7

40 C.F.R. § 1508.4 ...............................................................................................7

40 C.F.R. § 1508.18 ............................................................................................33

Ante-Mortem Inspection of Horses, 71 Fed. Reg. 6337 (Feb. 8, 2006) ("Final Rule") ......... passim

Final Changes in Fees for Meat, Poultry, and Egg Products Inspection Services—
    Calendar Year (CY) 2003, 68 Fed. Reg. 37,954 (June 26, 2003) ....................................29

Final Changes in Fees for Meat, Poultry, and Egg Products Inspection Services—Fiscal
    Year 2006-2008, 71 Fed. Reg. 2135 (Jan. 13, 2006) ..........................................................29

Final Fee Increase for Inspection Services, 61 Fed. Reg. 65,459 (Dec. 13, 1996) ........................29

Final Fee Increase for Inspection Services, 64 Fed. Reg. 19,865, 19,866 (Apr. 23, 1999) ...........29

Final Fee Increase for Meat and Poultry Inspection Services, 64 Fed. Reg. 72,492-93
    (Dec. 28, 1999) ...............................................................................................29

Final Increases in Fees for Meat, Poultry, and Egg Products Inspection Services—Fiscal
Year (FY) 2001, 65 Fed. Reg. 60,093 (Oct. 10, 2000) ......................................................29

Final Increases in Fees for Meat, Poultry, and Egg Products Inspection Services—Fiscal
Year (FY) 2002, 67 Fed. Reg. 3428 (Jan. 24, 2002)...........................................................29

Final Policy Statement for Research and Regulation of Biotechnology Processes and
Products, 51 Fed. Reg. 23,336, 23,343 (June 26, 1986) ....................................................29

Increased Assessment Rate, 71 Fed. Reg. 5157, 5159 (Feb. 1, 2006)...........................................17

Prohibition of the Use of Certain Stunning Devices Used to Immobilize Cattle During
Slaughter, 69 Fed. Reg. 1885 (Jan. 12, 2004)....................................................................17

## LEGISLATIVE MATERIALS

H.R. 2744, 109th Cong. (2005)......................................................................................................10

H.R. Rep. No. 80-1852 (1948)...........................................................................................2, 4, 28, 32

142 Cong. Rec. H2716-03 ...............................................................................................................5

151 Cong. Rec. H4248....................................................................................................................25

151 Cong. Rec. H4249..............................................................................................................30, 42

151 Cong. Rec. H4250....................................................................................................................43

151 Cong. Rec. S10,218 ............................................................................................9, 11, 12, 13

151 Cong. Rec. S10,219 .............................................................................................24, 25, 40

151 Cong. Rec. S10,220 .................................................................................................9, 10, 35

1948 U.S.C.C.A.N. 1706, 1709 .......................................................................................................2

## <u>INTRODUCTION</u>

Plaintiffs seek an order temporarily and preliminarily enjoining and declaring unlawful a Final Rule just promulgated by the Food Safety and Inspection Service ("FSIS") of the U.S. Department of Agriculture ("USDA") that creates a "fee-for-service" inspection system designed to facilitate the continued transport and slaughter of American horses for human consumption abroad.  <u>See</u> Ante-Mortem Inspection of Horses, 71 Fed. Reg. 6337 (Feb. 8, 2006) (to be codified at 9 C.F.R. § 352.19) (Ex. 1) ("Final Rule").  Defendants created this new horse slaughter inspection system without any advance public notice and comment, and in direct contravention of Congress's intent in enacting section 794 of the FY2006 Agriculture Appropriations Act (the "Amendment"), which is designed to suspend the slaughter of American horses for human consumption on March 10, 2006, by eliminating funding for the pre-slaughter inspections required under federal law.  As a result of defendants' action, <u>tens of thousands</u> of horses will be unlawfully slaughtered between March 10, 2006 and September 30, 2006.

As explained further below, Plaintiffs are entitled to emergency injunctive relief.  To begin with, plaintiffs are virtually certain to prevail on the merits of their claims.  First, by promulgating this controversial and entirely new horse inspection scheme without any advance public notice and/or an opportunity for comment, defendants have flagrantly violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b).  Second, the Final Rule also contravenes both the terms and the patent purpose of the Amendment to the FY2006 Agriculture Appropriations Act, which was to terminate horse slaughter operations for at least the remainder of the current fiscal year.  Third, the Final Rule, which permits the slaughter plants to pay the salaries of the federal workers who come to inspect them, violates the longstanding requirement of the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601 <u>et</u> <u>seq.</u>, that the costs of

inspection of horses and other covered animals "<u>shall</u> be borne <u>by the United States</u>," 21 U.S.C. § 695 (emphasis added). Congress enacted this provision because it "so clearly recognized the <u>dangers inherent in making inspectors dependent on meat packers for their livelihood</u>." H.R. Rep. No. 80-1852 (1948), as reprinted in 1948 U.S.C.C.A.N. 1706, 1709 (emphasis added). Finally, defendants evidently failed to undertake any analysis under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 <u>et seq.</u>, although the Final Rule will have grave impacts on members of the public – including individual Plaintiffs here – who reside in the vicinity of the plants and who are among the intended beneficiaries of the Amendment passed by Congress.

The balance of equities and public interest also support the relief sought by Plaintiffs. Plaintiffs are not only in danger of irreparably losing their statutory right to participate in the rulemaking process before important policy decisions are made, but Plaintiffs who live in the vicinity of the slaughter plants are suffering serious, irreparable environmental, health, property, and aesthetic harms. Such injuries are precisely the type of harms Congress sought to address in passing the Amendment, along with stopping the unnecessary slaughter of tens of thousands of animals, and can only be redressed if the Final Rule is set aside, thereby allowing the Amendment to have its intended effect. By the same token, Congress was fully cognizant that the three foreign-owned plants that slaughter horses may incur some financial loss if the Amendment is implemented, yet Congress nevertheless exercised its policy judgment that a suspension of these plants' operations during the remainder of FY2006 was in the overall public interest. Therefore, as reflected in the policy determination of Congress itself, the balance of equities and the public interest overwhelmingly favor injunctive relief.

## BACKGROUND

### I.     THE STATUTORY AND REGULATORY SCHEME

#### A.     The Administrative Procedure Act

The APA requires that agencies must: (1) publish notice of a proposed rule in the Federal Register; (2) give interested persons an opportunity to participate in the rulemaking process through submission of written data, views, or arguments with or without opportunity for oral presentation; and (3) publish the substantive rule no less than thirty days before the effective date. See 5 U.S.C. § 553. The advance notice to the public must include "the legal authority under which the rule is proposed," and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." Id. § 553(b).

Under the APA, an agency may promulgate a final rule without any public notice and comment process only "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor[e] in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Id. § 553(b) (emphasis added). This "good cause" exception "must be narrowly construed and only reluctantly countenanced in order to assure than an agency's decisions will be informed and responsive." Asiana Airlines v. FAA, 134 F.3d 393, 396 (D.C. Cir. 1998) (internal citations omitted). If an agency fails to meet this narrow "good cause" exception for dispensing with notice and comment, it has thus adopted its final rule "without observance of procedure required by law," and a reviewing court must therefore "hold unlawful and set aside" the rule. 5 U.S.C. § 706(2)(D). The court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A).

**B.**     **The Federal Meat Inspection Act**

Enacted by Congress in 1906 and revised in pertinent part in 1948, the FMIA, 21 U.S.C. § 601 et seq., is a comprehensive statutory inspection scheme designed both to prevent "adulterated" meat products from passing into the human food supply, id. § 603(a), and to prevent "inhumane slaughtering." Id. § 603(b). To carry out this goal, the FMIA prohibits meat from enumerated species – including horses – from entering interstate commerce unless both pre-slaughter (ante-mortem) and post-slaughter (post-mortem) inspections are conducted pursuant to the FMIA. See id. §§ 603, 604. More specifically, Congress mandated that "the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all [amenable species] before they shall be allowed to enter into any slaughtering . . . or similar establishment." Id. § 603.[1]

Of critical importance here, the FMIA also expressly requires that the costs of ante-mortem and post-mortem inspections "shall be borne by the United States," 21 U.S.C. § 695 (emphasis added). This statutory ban on private funding of federal inspectors, first passed in 1906 and reaffirmed in 1948, was expressly designed to eliminate threats to the public health based on inspectors' conflicts of interest, and grew out of "the principle that inspectors on whom American consumers must rely for the purity and wholesomeness of their meat should be paid by the consumers themselves, through the Federal Government, and not by those whose products they were inspecting." H.R. Rep. No. 80-1852. In short, the FMIA mandates inspection for horse slaughter to be carried out under that Act, rather than under any other statute, and to be paid for by USDA itself out of federal appropriations. Consequently, until the adoption of the

---

[1] The term "amenable species" is defined as "those species subject to the provisions of the Act on the day before the enactment of the [ ] Act," 21 U.S.C. § 601(w), which included "cattle, sheep, swine, goats, horses, mules, and other equines." Id. § 603.

Final Rule at issue, USDA paid for the inspection of horses and all other animals covered by the FMIA out of annual federal appropriations.

C.    **Section 903 of the Federal Agriculture Improvement and Reform Act of 1996 and Implementing Guidelines**

In response to widespread concern about the welfare and "unique and special needs of equine being transported to slaughter," 142 CONG. REC. H2716-03 (daily ed. Mar. 25, 1996) (setting forth text of conference report), Congress enacted Section 903 of the Federal Agriculture Improvement and Reform Act of 1996 ("FAIR Act"), which authorizes USDA to inspect horses during transport to slaughter.  This uncodified provision of the Humane Methods of Slaughter Act, 7 U.S.C. § 1901 et seq., is the sole source of statutory authority for the inspection of horses during transport to slaughterhouses.  It provides that:

> [s]ubject to the availability of appropriations, the Secretary of Agriculture may issue guidelines for the regulation of the commercial transportation of equine for slaughter by persons regularly engaged in that activity within the United States.

Pub. L. No. 104-127, § 903(a), 110 Stat. 1184.   USDA has exercised its authority by promulgating formal inspection regulations at 9 C.F.R. § 88 et seq. (2005).  These regulations – which make no provision for a fee-for-service inspection program – govern horse inspections upon arrival at a slaughter facility, as well as arrival at international border checkpoints for trucks both leaving and entering the United States with live horses.

D.    **The Agricultural Marketing Act**

In 1946, Congress passed the Agricultural Marketing Act of 1946 ("AMA"), 7 U.S.C. § 1621 et seq., a generic statute designed to set forth the general aims of the Department with respect to promoting trade of all agricultural commodities, and not simply meat.  In pertinent part, it authorizes USDA:

> [t]o inspect, certify, and identify the class, quality, quantity, and condition of agricultural products when shipped or received in interstate commerce, under such rules and regulations as the Secretary of Agriculture may prescribe, including assessment and collection of such fees as will be reasonable and as nearly as may be to cover the cost of the service rendered, to the end that agricultural products may be marketed to the best advantage, that trading may be facilitated, and that consumers may be able to obtain the quality product which they desire. . . .

Id. § 1622(h).  Under this provision of the AMA, USDA has previously provided voluntary inspection, for a fee, of certain animals – such as reindeer, elk, antelope, water buffalo, and bison – that are not otherwise covered by the FMIA.  See 9 C.F.R. §§ 352.2, 352.10.  Prior to the rule change at issue, USDA had never invoked the AMA as a basis for adopting such an inspection system for animals – such as horses – that are specifically covered by the FMIA.

### E.    National Environmental Policy Act

NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  Among the critical purposes of the statute are to "insure that environmental information is available to public officials and citizens before . . . actions are taken," and to "help public officials make decisions that are based on understanding of environmental consequences."  Id. § 1500.1(b)-(c).  To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" – an Environmental Impact Statement ("EIS") – regarding all "major federal actions significantly affecting the quality of the human environment," such as the Final Rule challenged here.  42 U.S.C. § 4332(C).  An EIS must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," and (4) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented."  42 U.S.C. § 4332(C)(i)-(iii), (v).

6

NEPA requires that when an agency proposes to undertake any "action," the agency "must first determine whether the action is one that normally requires" the preparation of an EIS pursuant to NEPA and the Council on Environmental Quality ("CEQ") regulations implementing NEPA. 40 C.F.R. § 1501.4(a). If the agency is not certain whether an EIS is required, it must prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. § 1501.4. The EA must discuss the need for the proposal, evaluate alternatives that would cause less adverse environmental impacts, and provide sufficient evidence and analysis to support the agency's determination as to whether the proposed action will significantly affect the environment. Id.

The only time such environmental analysis is not required is when the agency has "categorically excluded" the action from NEPA review. 40 C.F.R. § 1501.4 (a). However, a categorical exclusion may only be invoked for those actions that do not "individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementing [the CEQ] regulations." 40 C.F.R. § 1508.4.

## II.    RELEVANT FACTS

### A.    The Slaughter of American Horses, Including Wild Horses, for Overseas Human Consumption

Each year, three European-owned slaughterhouses based in the United States kill and process tens of thousands of American horses for human consumption in foreign countries. In 2005 alone, 91,757 horses met this fate. See USDA, National Agricultural Statistics Service, Equine Slaughter: 2005 (Ex. 2). Most horses destined for slaughter are sold at livestock auctions or sales, see Larson Decl. ¶ 8 (Ex. 3), where their sellers may not know of their horses' ultimate fate. Prior to slaughter, horses are shipped, frequently for long distances, in a manner that fails

to accommodate their unique temperaments and physical requirements. See id. ¶¶ 9-10. Often, terrified horses and ponies are crammed together and transported to slaughter in double-deck trucks designed for cows and pigs. Id. ¶ 10. The truck ceilings are sometimes so low that some horses are not able to hold their heads in a normal position. Id. Slippery floor surfaces lead to falls and, occasionally, trampling. Id. As a result, some horses arrive at the slaughterhouse seriously injured or dead. Id. ¶ 11.

Horses of virtually all ages and breeds are slaughtered, including unsuccessful or retired race horses, surplus riding school and camp horses, and foals from mares whose urine is collected for the production of hormone replacement therapy drugs. See id. ¶ 8. Under federal law, horses and other animals are supposed to be rendered unconscious prior to slaughter. See 7 U.S.C. § 1902(a). For this purpose, the plants use a device called a captive bolt gun, which propels a metal rod through a horse's skull and into the brain. However, as Congress found in passing the Amendment at issue, this stunning method does not prevent extreme suffering because it is difficult to properly position horses in the "kill chute," due to horses' natural agility and flight instinct. See id. ¶ 14.

The inherent problems with slaughtering horses are documented in defendants' own enforcement records. According to one FSIS inspector who cited the Cavel International horse slaughter plant for violations of humane slaughter regulations,

> [t]he employee who is routinely assigned to . . . hang[ ] the horses on the rails, was using a riding crop to whip the horse in the alleyway closest to the [captive bolt pistol]. . . . As the whipping continued the horses in the alleyway became extremely excited. . . . the last horse in the alleyway attempted to jump over the wall and became stuck . . . eventually it had flailed around to fall over to the other side of the wall . . . . the second horse . . . flipped over backwards due to the overcrowding and was subsequently trapped and trampled by the fifth and sixth horse in line in their excitement.

Food Safety and Inspection Service, Noncompliance Record No. 0019-2005-8243 (Apr. 13, 2005) (Attachment 8 to Larson Decl.); <u>see also</u> 151 CONG. REC. S10,220 (daily ed. June 8, 2005) (remarks of Senator Robert Byrd, describing how the "[i]mproper use of stunning equipment at the slaughterhouse can result in the animal having to endure repeated blows to [the] head, meaning that horses sometimes remain conscious throughout the slaughter process").

This process is particularly cruel for wild horses, who are not used to being handled by humans, and whose "resistance to handling and transport" is even greater than it is for domesticated horses sent to slaughter. Rutberg Decl. ¶ 12 (Ex. 4). Yet at least 2,500 wild American horses were sent to slaughter between 1999 and 2005. <u>See</u> Attachment to Rutberg Decl. These wild horses originate on federal public lands in ten western states, where they are rounded up by the U.S. Bureau of Land Management ("BLM") pursuant to the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331 <u>et seq.</u>. Under the statute, BLM puts these wild horses up for private adoption. <u>Id.</u> § 1333(b)(2)(B). Frequently, however, adopters sell the horses to middlemen immediately after obtaining title, and the horses are shipped and killed at the slaughter plants, often within a matter of days. <u>See</u> Attachment to Rutberg Decl.

    **B.**    <u>**FY 2006 Agriculture Appropriations Act and Amendment**</u>

In light of these and other problems occasioned by horse slaughtering, members of Congress introduced an Amendment to the FY2006 Agriculture Appropriations Act, "the goal of [which] is simple: to <u>end the slaughter</u> of America's horses for human consumption overseas." 151 CONG. REC. S10,218 (daily ed. Sept. 20, 2005) (remarks of Senator Ensign) (emphasis added). To effect this ban on horse slaughter, the sponsors proposed to completely eliminate funding for all of the inspections required by federal law prior to slaughter, because, as previously explained, horses cannot be slaughtered for human consumption unless they are

inspected both at the slaughterhouse and during transport to slaughter.  In brief, Congress recognized that, in the absence of these federally-funded inspections, federal law prohibits the meat from these horses from entering into commerce for the purpose of human consumption.

Thus, to effect a full and complete cessation of horse slaughter for human consumption, the Amendment at issue provides:

> [e]ffective 120 days after the date of enactment of this Act, none of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. § 603) or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996.

House Amendment 236 to H.R. 2744, 109th Cong. (2005); Senate Amendment 1753 to H.R. 2744, 109th Cong. (2005).  The Amendment – which goes into effect on March 10, 2006 – was sponsored by a bipartisan coalition, including Congressmen John Sweeney (R-NY), John Spratt (D-SC), Ed Whitfield (R-KY), and Nick Rahall (D-WV), and Senators John Ensign (R-NV), Robert Byrd (D-WV), Jon Corzine (D-NJ), Jim DeMint (R-SC), Diane Feinstein (D-CA), Lindsey Graham (R-SC), Mary Landrieu (D-LA), Frank Lautenberg (D-NJ), Trent Lott (R-MS), and Debbie Stabenow (D-MI).

The legislation was also supported by a broad coalition of over one hundred horse breeding, showing, and racing organizations – such as the National Show Horse Registry, the National Thoroughbred Racing Association, and Churchill Downs — as well as numerous horse welfare and humane organizations across the country, including organizational Plaintiffs here. See 151 CONG. REC. S10,220.  In a reflection of the overwhelming public sentiment that horse slaughter for human consumption should be ended, the House passed the Amendment on June 8, 2005 by a vote of 269-158.  The Senate approved the identical Amendment on September 20, 2005 by a vote of 69-28.  On November 10, 2005, the President signed the Amendment into law

as Section 794 of the FY 2006 Agriculture Appropriations Act.  See Pub. L. No. 109-97, § 794,

119 Stat. 2120, 2164 (2005) (Ex. 5).

 Floor debate on the Amendment in both houses confirms that members of Congress

understood perfectly well that they were voting on whether to cease the slaughter of horses at the

plants in FY2006.  Immediately after introducing the Amendment in the Senate on September

20, 2005, Senator Ensign explained that horses slaughtered at the plants are shipped to Europe

and Asia for human consumption, and that "[o]ur amendment effectively stops this practice,"

because without "Federal funds for the inspection of horses . . . horses cannot be slaughtered, or

exported for slaughter."  151 CONG. REC. S10,218.

 Co-sponsor Senator Byrd was also clear in stating the purpose of the Amendment:

> Senator Ensign and I have offered an amendment to stop the slaughter of horses
> for human consumption by preventing taxpayer dollars from being used to inspect
> the horses intended for slaughter. Without these inspections . . . it would be
> impossible for these companies to slaughter horses in the U.S., or to transport
> horses abroad for slaughter.

Id. at S10,220 (emphasis added). An identical understanding of the Amendment's scope and

purpose prevailed in the House, where Representative Spratt, a sponsor, stated: "What is the

effect of this amendment?  This amendment in simple terms will stop the slaughter [f]or human

consumption of horses . . . [their] brutal slaughter . . . is the kind of slaughter that this bill will

prohibit." Id. at H4249 (emphasis added).

 Tellingly, even the Congressional opponents of the bill — representing the interests of

the slaughter plants — agreed on the Amendment's purpose, scope, and effect.  For example,

Agriculture Appropriations Subcommittee Chairman Henry Bonilla stated that the Amendment

would "prohibit USDA from inspecting horses," which is legally necessary for the slaughter

plants to operate.  Id. at H4248.  Another opponent, Agriculture Committee Chairman Bob

Goodlatte, also noted that the Amendment would "stop the proper inspection of these horses." Id.  Regardless of their position on the Amendment, therefore, members of Congress all shared a common understanding of what the Amendment was designed to accomplish — the "prohibit[ion]" of horse slaughter.  Id. at H4249.

In acting to "prohibit" horse slaughter, id., a primary consideration of Congress was the plight of horses during transport and at the slaughtering plants.  For instance, Representative Whitfield, describing the "process of the captive penetrating bolt being administered by low-skilled workers," stated that such methods are "not humane" for killing horses.  Id. at H4250. Representative Sweeney, a co-sponsor, also lamented horses' "unnecessary pain and suffering before death" at the slaughterhouses.  Id. at H4247; see also id. at H4250 (Rep. Moran stating that "[w]e have responsibility over these beautiful creatures.  They ought not to be cut up in such an inhumane way. . . . That is not what we are about as a country").  Furthermore, to illustrate the breadth of public concern for the humane treatment of horses that prompted the Amendment, Senator Ensign also obtained unanimous consent to place editorials from several major newspapers into the record.  Highlighting the Amendment's humane purposes, the Charleston Gazette described the horse slaughter provision simply as "this humane Amendment," and lamented "the pain, panic, and trauma of a [horse's] trip to the slaughterhouse."  Id. at S10,219. Likewise, an article in the Washington Times that was inserted into the Congressional Record surmised that "if anyone actually saw how these noble beasts are slaughtered—strung up by their hind legs and bled—they might think twice before supporting such conduct."  Id.

Congress also expressly took into account the grievances of residents who live near the plants, as do several of the individual Plaintiffs in this action.  See, e.g., Eldridge Decl. (Ex. 6); Runnels Decl. (Ex. 7); Salazar Decl. (Ex. 8).  For instance, the Amendment's sponsors read into

the record a letter from Kaufman, Texas Mayor Paula Bacon, who recounted that children living near the Dallas Crown plant, while "playing in their yards, do so with the noise of horses being sent to their deaths in the background."  Id. at S10,219.  In her letter to Congress, Mayor Bacon further described the blight inflicted upon her town and its residents by the plant – including the horrible fumes that those living nearby must endure – and pleaded with Congress to exercise its authority and halt the slaughter of horses.  See id.; see also Bacon Decl. ¶¶ 8-11 (Ex. 9).

In the face of this public concern, not a single member of Congress suggested that the purpose of the Amendment was merely to change the manner of funding for USDA's inspections, although the presiding officer and bill manager in the Senate chose to "delay[ ] the vote . . . and keep[ ] the afternoon as open as we have," so as not "to prevent anybody from presenting a different point of view."  Id. at S10,224.  Rather, the only change made in Conference was that the Amendment was made effective 120 days from its passage, evidently to ensure an orderly shut-down of the slaughtering facilities.

C.    **USDA's Circumvention of the Amendment Passed by Congress**

On November 23, 2005, soon after the President signed the Amendment into law, the three companies that slaughter horses in the United States – Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc. (collectively, "Petitioners") – filed a petition for "emergency rulemaking" with USDA to create a "fee-for-service" inspection apparatus for horse slaughter and transport to slaughter.  See Petition of Beltex Corp., et al. for Emergency Rulemaking at 1 (Nov. 23, 2005) (Ex. 10).  The proposal requested that USDA circumvent the Amendment's prohibition on ante-mortem horse slaughter inspection under the FMIA and the FAIR Act by creating an entirely new regulatory inspection scheme under which the plants themselves would pay for the federal inspectors, see id. – i.e., exactly what Congress said it did not want when it

passed the 1948 amendments to the FMIA. The petitioners also requested that this unprecedented – and patently unlawful – regulatory system, which was expressly designed to sidestep the statute passed by Congress and signed into law two weeks earlier, be put in place without any prior public notice and comment rulemaking.  See id. at 6-7.

On December 7, 2005, Representatives Ed Whitfield, John Sweeney, and John Spratt, along with Senator Byrd, wrote to USDA to ensure that the agency would follow Congress's clear intent to prevent horse slaughter for human consumption.  In their letter, the legislators expressed their "great concern" that USDA not "circumvent Congressional intent and allow horses and/or horsemeat to be inspected on a per-fee basis, thus permitting horse slaughter for human consumption to continue during FY 2006."  Letter from Whitfield, Sweeney, Spratt, and Byrd to Johanns at 1 (Dec. 7, 2005) (Ex. 11).  Two weeks later, USDA Acting General Counsel James Michael Kelly sent a letter in reply, tersely informing the legislative sponsors that the Appropriations Act "does not prevent horse slaughter at all," and that "notwithstanding the prohibition on expenditure of funds" mandated by Congress in the Appropriations Act, the USDA believes it can still provide inspection of horses on a fee-for-service basis.  Letter from Kelly to Whitfield, Sweeney, Spratt, and Byrd at 1 (Dec. 21, 2005) (Ex. 12).

On January 5, 2006, in response to the petition and USDA's letter to members of Congress announcing the remarkable position that the Amendment "does not prevent horse slaughter at all," the organizational Plaintiffs in this action sent defendant Johanns a seventeen-page letter urging denial of the petition because, among other reasons, (1) promulgation of an entirely new horse meat inspection scheme outside the FMIA — where it has resided for 100 years — must at least be preceded by full public notice and comment rulemaking, in accordance with the APA; (2) the FMIA requires inspection for horse slaughter to be carried out under that

Act, not the AMA, and to be paid by USDA; and (3) the history of the Appropriations Act Amendment unequivocally demonstrates Congress's intent to prevent horse slaughter for human consumption, rather than to change the way USDA pays for inspection.  <u>See</u> Letter from Eddy to Johanns (Dec. 21, 2005) (Ex. 13).

Similarly, on January 17, 2006, forty members of Congress wrote USDA to state that they were "shocked and deeply upset" upon "learn[ing] that the agency has apparently decided it need not carry out Congress's clearly expressed intent to halt horse slaughter for human consumption in FY 2006, but rather, intends to engage in a complex regulatory maneuver to willfully circumvent legislation that was passed by an overwhelming majority."  Letter from Sweeney, <u>et al.</u> to Johanns at 1 (Jan. 17, 2006) (Ex. 14).  Signatories to this letter included House and Senate sponsors and co-sponsors of the Amendment, as well as other members of both political parties concerned with upholding the integrity of the democratic process.  Significantly, the members of Congress also stressed to USDA that "the issue of horse slaughter is of significant national interest, and <u>each and every one of our constituents is entitled to prior notice and a full opportunity to comment on the USDA's proposal <i>before</i> it is implemented</u>."  <u>Id.</u> at 2 (underline added, italics in original).

Nonetheless, nearly eighty days after first receiving the petition, USDA announced on February 8, 2006 that it had granted the petition for emergency rulemaking and created the fee-for-service inspection system, but had chosen not to provide <u>any advance notice or public comment</u>.  The Final Rule provides that the new inspection system will become effective on March 10, 2006 – the same day that the Amendment will take effect.  Although the Final Rule purports to "request [ ] comments" on an "interim final rule" already adopted, the Final Rule omits any consideration or explanation of whether or how USDA will make use of such <u>post hoc</u>

"comments," nor does it even state that USDA will consider such comments and potentially withdraw, adjust, expand, or revise the Final Rule. 71 Fed. Reg. 6337 (Feb. 8, 2006) (Ex. 1). Nor does the notice respond to any of the points raised in Plaintiffs' January 5 letter, or even acknowledge the letters from the legislation's sponsors.

Six days after publication of the Final Rule, Plaintiffs filed this action. Plaintiffs are animal welfare and animal protection organizations that have advocated for the legislation's enactment and that wish to participate in the notice and comment period mandated by the APA, see Heyde Decl. ¶¶ 6-12 (Ex. 15); Markarian Decl. ¶¶ 5-11 (Ex. 16), as well as individuals who live in close proximity to the plants and are suffering through direct exposure to the horse slaughter operations. See, e.g., Salazar Decl. ¶ 3 (resident living adjacent to the Beltex plant describing "the kind of odor that makes it difficult to breathe"); Attachment to Bacon Decl. (hospital president explaining that "pollution caused by Dallas Crown is causing a health threat that affects the emotion and physical well-being of our patients and families").

## ARGUMENT

Ordinarily, emergency injunctive relief is appropriate where plaintiffs demonstrate that: (1) there is a "substantial question" on the merits that is "fair ground for litigation"; (2) they will suffer irreparable injury absent the relief sought and the balance of hardships weighs in their favor; and (3) injunctive relief is in the public interest. Washington Metro. Area Transit Comm'n v. Holiday Tours, 559 F.2d 841, 842-44 (D.C. Cir. 1977); see also Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998). Under a traditional equitable analysis, these factors interrelate on a sliding scale, and relief may be afforded "where there is particularly strong likelihood of success of the merits even if there is a relatively slight showing of irreparable injury." City/Fed Fin. Corp. v. Office Of Thrift Supervision, 58 F.3d 738, 747 (D.C.

Cir. 1995); see also Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985) (justifying injunction with "either a high probability of success and some injury, or vice versa").  Here, as discussed below, Plaintiffs easily satisfy the requisite standard.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    Defendants Unlawfully Promulgated the Final Rule Without Advance Notice and Public Comment In Violation of the APA.

The Final Rule is unlawful and must be set aside because it was "adopted without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Specifically, defendants violated the APA requirement that an agency must "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments," 5 U.S.C. § 553(c), by publishing the Final Rule on February 8, 2006 without any advance notice or public comment.

### 1.    Any Comments Received by USDA Are Post Hoc.

Although the Final Rule purports to "request [ ] comments" on an "interim final rule," 71 Fed. Reg. 6337, there is nothing "interim" about the Final Rule.  It goes into effect the same day that the comment period ends, and the same day that the Amendment takes effect, thereby depriving the public of a "meaningful opportunity to comment" before the existing legal regime is changed.  Asiana Airlines, 134 F.3d at 396.  In other words, defendants' timing of the Final Rule ensures that any comments received will be post hoc, because the Final Rule becomes effective before defendants can review, analyze, and respond to comments.[2]

---

[2] While it is irrelevant to the rule's legality, it is noteworthy that, nowhere in the Final Rule do defendants even suggest that they will withdraw, suspend, or in any way revise the Final Rule, after its effective date, based on the comments received.  Compare Oranges, Grapefruit, Tangerines, and Tangelos Grown in Florida; Increased Assessment Rate, 71 Fed. Reg. 5157, 5159 (Feb. 1, 2006) (USDA providing 60-day comment period for "interim final rule," and assuring that all "comments received by April 3, 2006, will be considered prior to issuance of a final rule"); Prohibition of the Use of Certain Stunning Devices Used to Immobilize Cattle

As the D.C. Circuit has explained, this type of <u>post hoc</u> comment process flagrantly violates the APA because:

> [s]ection 553 provides that notice and an opportunity to comment are to <u>precede</u> rulemaking. We strictly enforce this requirement because we recognize that an agency is not likely to be receptive to suggested changes once the agency put[s] its credibility on the line in the form of 'final' rules. People naturally tend to be more close-minded and defensive once they have made a 'final' determination.

<u>Air Transport Ass'n of Am. v. Dep't of Transp.</u>, 900 F.2d 369, 379 (D.C. Cir. 1990), <u>vacated as moot on other grounds</u>, 933 F.2d 1043 (D.C. Cir. 1991) (internal citations omitted, emphasis added); <u>see</u> <u>also</u> <u>New Jersey v. U.S. Envtl. Prot. Agency</u>, 626 F.2d 1038, 1049-50 (D.C. Cir. 1980) (stating that "[s]ection 553 is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas"). Plaintiffs would have submitted advance comments prior to finalization of the Final Rule had defendants complied with the APA.[3] <u>See</u>, <u>e.g.</u>, Vacca Decl. ¶ 7 (Ex. 17); Markarian Decl. ¶ 13-15, 19. Therefore, since "<u>post hoc</u> notice and comment proceedings fail[ ] to cure this [APA] violation . . . vacatur of the [rule] is required in order to vindicate the procedural rights conferred by the APA." <u>Spirit of the Sage Council v. Norton</u>, 294 F. Supp. 2d 67, 91 (D.D.C. 2003) (internal citations omitted), <u>vacated in part as moot on other grounds</u> 411 F.3d 225 (D.C. Cir. 2005).[4]

---

During Slaughter, 69 Fed. Reg. 1885 (Jan. 12, 2004) (USDA stating explicitly that "comments received on or before April 12, 2004 will be considered prior to issuance of a final rule").

[3] As noted, the Final Rule does not even refer to any of the legal and factual points raised in the seventeen-page letter sent to USDA by several plaintiffs on January 5, 2006, urging denial of the petition for emergency rulemaking. <u>See</u> Letter from Eddy to Johanns (Jan. 5, 2006).

[4] Defendants' failure to provide advance notice and comment has also deprived Plaintiffs of the ability to "develop a record of objections for judicial review" during the rulemaking process. <u>United Church Bd. for World Ministries v SEC</u>, 617 F. Supp. 837, 839 (D.D.C. 1985).

**2.**      **Defendants Fail to Meet the Good Cause Exception To The Advance Notice and Public Comment Requirement.**

An agency can dispense with advance notice and comment requirements only "when the agency for <u>good cause</u> finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b) (emphasis added). The D.C. Circuit has held that "exceptions to § 553 must be narrowly construed and only reluctantly countenanced in order to assure that an agency's decisions will be informed and responsive." <u>Asiana Airlines</u>, 134 F.3d at 396 (internal citations omitted). This Circuit has further admonished that the good cause exception "should be limited to emergency situations," <u>Utility Solid Waste Activities Group v. U.S. Envtl. Prot. Agency</u>, 236 F.3d 649, 754 (D.C. Cir. 2001) (internal citations omitted), and is "not [an] escape clause that may be arbitrarily utilized at the agency's whim." <u>Am. Fed. Of Gov't Employees v. Block</u>, 655 F.2d 1153, 1156 (D.C. Cir. 1981). Rather, its use is limited to "emergency circumstances" because "[o]therwise, an agency . . . could simply wait until the eve of a[n] . . . administrative deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures." <u>Envtl. Def. Fund, Inc. v. U.S. Envtl. Prot. Agency</u>, 716 F.2d 915, 920 (D.C. Cir. 1983).

This prohibited course of action is precisely what happened here – defendants waited nearly <u>eighty days</u> after receiving the petition, and then adopted the regulation as a Final Rule just thirty days before its effective date. The Final Rule does not explain why defendants proceeded in this manner. Rather, the entirety of defendants' justification for avoiding prior public comment is that:

> With the passage of the FY 2006 Appropriations Act, if FSIS does not establish a means for official establishments that slaughter horses to obtain ante-mortem inspection, these establishments will not be able to operate and presumably will

be forced out of business. <u>This interim final rule is necessary to avoid disruption of operations at official establishments that slaughter horses</u>. Therefore, the Administrator has determined that prior notice and opportunity for public comment are <u>impracticable and contrary to the public interest</u> under 5 U.S.C. 553(b), and that there is good cause under 5 U.S.C. 553(d) for making the action effective as specified herein.

71 Fed. Reg. 6337, 6340 (emphasis added).

Generally, an agency may invoke the good cause exception on the grounds of impracticality only when a required agency action is simply too complex to finish within a deadline set by Congress. <u>See</u> <u>State of New Jersey</u>, 626 F.2d at 1045. For instance, in <u>Methodist Hospital of Sacramento v. Shalala</u>, the Court agreed with the agency's impracticability assertion where an interim rule promulgated under a tight statutory deadline "took up 133 pages in the Federal Register," including "37 pages of revised regulations, and 41 pages of new data tables." 38 F.3d 1225, 1237 (D.C. Cir. 1994).

Here, not only did USDA have nearly <u>three months</u> to propose its new fee-for-service system for public comment, but, more important, unlike cases upholding use of the good cause exception, defendants were not burdened with any "daunting task" at all, <u>Methodist Hospital</u>, 38 F.3d at 1237, as there was <u>no statutory deadline or even an affirmative legislative mandate ordering USDA to do anything</u>. Rather, the only thing required of defendants between the enactment of the Amendment and its effective date was <u>inaction</u>, <u>i.e.</u>, to <u>stop</u> spending appropriated funds for ante-mortem horse slaughter inspections – which is precisely what Congress intended in passing the Amendment. There can be no suggestion, and defendants point to none in the Final Rule, that Congress intended defendants to embark on any rulemaking exercise at all. Therefore, in the absence of genuine impracticability, USDA should not be permitted to simply "circumvent the notice and comment requirements whenever [it] finds it

inconvenient to follow them," especially in setting up a new system <u>not</u> contemplated by Congress.  <u>State of New Jersey</u>, 626 F.2d at 1045.

The Final Rule also asserts, with scant support, that expedited rulemaking is "contrary to the public interest."  71 Fed. Reg. 6337, 6340.  However, courts affirm an agency's reliance upon the public interest rationale only where "'the <u>interest of the public</u> would be defeated by any requirement of advance notice,' as when announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent."  <u>Util. Solid Waste Activities Group</u>, 236 F.3d at 754 (citing U.S. Department of Justice, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT at 31 (1947)).  At the risk of understatement, there is no such threat to the American public if there is suspension of horse slaughter for human consumption abroad while the public comments on the new inspection system.  Unlike cases that have upheld the good cause exception on public interest grounds, advance notice and comment here would not have posed any threat to national security or the public health.  <u>See</u>, <u>e.g.</u>, <u>Jifry v. FAA</u>, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (concerning FAA's ability to revoke flight certificates for pilots considered a security risk).  To the contrary, Congress decided to suspend horse slaughter precisely because the legislative branch concluded that the public interest in halting the inhumane treatment of horses and the unwholesome conditions for families living near the facilities <u>outweighed</u> any other factors.

Further, as in <u>Utility Solid Waste Activities Group</u>, "nothing [the agency] said in promulgating the [rule] suggested that it needed to forego notice and comment in order to prevent the [ ] rule from being evaded."  236 F.3d at 755.  Remarkably, and in the agency's own words, the only purported "public interest" rationale for evading notice and comment appears to be the financial benefit of the regulated industry.  The Final Rule states that "prior notice and

opportunity for public comment are impracticable and contrary to the public interest" because traditional rulemaking will somehow "disrupt[ ] operations at official establishments that slaughter horses."  71 Fed. Reg. 6337, 6340.  However, potential adverse effects to the regulated industry's financial interests are not a "legitimate reason . . . to ignore the commands of the APA regarding notice and comment."  Envtl. Def. Fund, 716 F.2d at 920 (rejecting as a good cause rationale the agency's need "to take . . . action [ ] before the regulated community expends resources").  This impermissibly narrow conception of the public interest – which actually focuses on the private interest of three companies – completely ignores the overall public interest in this issue, as reflected in the Amendment passed overwhelmingly by Congress and the statements of the legislative sponsors.  See section II(B) supra.  Therefore, defendants' slanted "public interest" justification for dispensing with advance public comment cannot be sustained.

In sum, since defendants failed to provide advance notice and public comment, and cannot meet the good cause exception, the Final Rule was "adopted without observance of procedure required by law," 5 U.S.C. § 706(2)(D), and must be "[held] unlawful and set aside." Id. § 706(2).

> **B.**    **The Final Rule Is Also Arbitrary and Capricious and Not In Accordance With Law.**

If, as here, a rule is "adopted 'without observance of the procedure required by law," the Court may set aside the rule on that basis alone, and "need not reach the question of whether the [rule] is, as a substantive matter, 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Spirit of the Sage Council, 294 F. Supp. 2d at 90 (internal citations omitted).  Indeed, if Plaintiffs had been afforded the opportunity to participate in a formal notice and comment proceeding, many of the legal problems discussed below might have been addressed by the USDA.  However, even if defendants had lawfully promulgated the Final Rule,

Plaintiffs are nearly certain to prevail on their additional claims that the Final Rule: (1) contravenes the plain terms and patent purpose of the Amendment; (2) violates the FMIA's express requirement that inspection of horses be made pursuant to the FMIA, and not a different statute, and prohibiting private payment of those inspections; and (3) fails to offer any reasoned explanation as to how the fee-for-service system can be reconciled with either the Amendment or the FMIA.  We address each point in turn.

### 1.    The Final Rule Violates the Plain Meaning and Overriding Purpose of the Amendment.

In determining whether the Final Rule violates the federal statutes at issue, the familiar two-part Chevron test applies.  See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).  Under the first step of Chevron, the Court "ask[s] 'whether Congress has directly spoken to the precise question at issue,' for if 'the intent of Congress is clear, that is the end of the matter . . . the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1269 (D.C. Cir. 2004) (quoting Chevron, 467 U.S. at 842-43).  Only "[i]f the statute is 'silent or ambiguous with respect to the specific issue,'" does the Court "proceed to Chevron's second step, asking whether the agency's interpretation 'is based on a permissible construction of the statute.'" Nuclear Energy Inst., 373 F.3d at 1269 (quoting Chevron, 467 U.S. at 843).

Here, the Court need proceed no further than the first step of Chevron, because when the Amendment's "text, structure, legislative history, and purpose" are considered, Public Citizen v. U.S. Department of Health and Human Services, 332 F.3d 654, 662 (D.C. Cir. 2003), it is plain that "Congress has directly spoken to the precise question at issue," and that the "the intent of Congress" to de-fund federal horse inspections and hence halt horse slaughter, "is clear." Nuclear Energy Inst., 373 F.3d at 1269 (quoting Chevron, 467 U.S. at 843).

As described in section II(B) supra, the Amendment prohibits the use of appropriated funds to pay for "the salaries or expenses of personnel to inspect horses" under the FMIA. Pub. L. No. 109-97, § 794. In turn, the FMIA prohibits privately paid inspections of covered animals, including horses, see 21 U.S.C. § 695, and also prohibits meat from entering into commerce unless it is inspected under that statute, see id. § 603; see also section I(B) supra. Therefore, the plain language of the Amendment, in the context of the statutory provisions it incorporates, is plainly designed to bring horse slaughter for human consumption to a halt by March 10, 2006. See Lorillard v. Pons, 434 U.S. 575, 581 (1978) (stating that where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute"); FDA v. Brown and Williamson Tobacco Corp., 529 U.S. 120, 132 (2000) (noting that "[t]he meaning . . . of certain words or phrases may only become evident when placed in context").

Floor debate on the Amendment unequivocally confirms that Congress specifically understood its de-funding mandate to be tantamount to a suspension, based on the statutory framework within which it was legislating.[5] As noted, Senator Ensign, a sponsor, stressed that without "Federal funds for the inspection of horses . . . horses cannot be slaughtered, or exported for slaughter." 151 CONG. REC. S10,219 (emphasis added); see also id. at S10,220 (statement of sponsor, Senator Byrd, declaring that the amendment would "stop the slaughter of horses for human consumption by preventing taxpayer dollars from being used to inspect the horses

---

[5] Notwithstanding statutory language that appears clear, at step one of the Chevron analysis, "[r]eference to statutory design and pertinent legislative history may often shed [ ] light on congressional intent." Natural Res. Def. Council, Inc. v. Browner, 57 F.3d 1122, 1127 (D.C. Cir. 1995) (quoting Am. Scholastic TV Programming Found. v. FCC, 46 F.3d 1173, 1180 (D.C. Cir. 1995)).

intended for slaughter.  <u>Without these inspections</u> . . . <u>it would be impossible for these companies to slaughter horses in the U.S., or to transport horses abroad for slaughter</u>") (emphasis added).[6] Importantly, although the <u>consequences</u> of such a ban were debated, not even the bill's opponents questioned that that the de-funding mandate was designed to halt horse slaughter.  <u>See</u> 151 Cong. Rec. H4248 (floor statement of Rep. Bonilla warning that the Amendment would "shut down [the] industry" of horse slaughter).

Moreover, as common sense would suggest, when Congress chooses to discontinue funding for a statutory provision, it should be "interpreted as a suspension" of that provision during the affected period.  <u>Burch v. U.S. Dep't of Treasury</u>, 120 F.3d 1087, 1090 (9th Cir. 1997).  For example, in <u>Environmental Defense Center v. Babbitt</u>, 73 F.3d 867, 871 (9th Cir. 1995), the court upheld the agency's refusal to act when an appropriations amendment de-funded the listing program under the Endangered Species Act ("ESA") and therefore prevented the Secretary from adding new species to the endangered species list.  Rejecting the plaintiffs' contention that the Secretary had violated the ESA by failing to list imperiled species, the court held that, although "the rider does not repeal the Secretary's listing duty," it nonetheless "<u>prevents him from taking final action on the [listing] petition at this time</u>."  <u>Id.</u> at 871 (emphasis added).  Similarly, here, the Amendment "prevents" defendants from taking action to inspect

---

[6] Additionally, the concerned public understood that passage of the Amendment would not merely change inspection <u>funding</u>, but, rather, would effect a ban on horse slaughter, and many constituents urged its passage on that basis.  <u>See</u> 151 Cong. Rec. S10,219 (quoting <u>St. Petersburg Times</u> editorial's understanding that the Amendment "would, in essence, stop the practice" of horse slaughter because without "taxpayer dollars for the inspection of horse meat . . . legalized horse slaughter in this country will end").

horses for human consumption, notwithstanding defendants' belief that USDA has a continuing duty under the FMIA to inspect all animals covered by the FMIA.  See 71 Fed. Reg. at 6338.[7]

Even if the Court somehow found Congress's intent to be "ambiguous," Chevron, 467 U.S. at 843, the Final Rule is certainly not a "reasonable construction of the text" and legislative intent, as it must be to pass muster under the second step of Chevron.  Barnhart v. Thomas, 540 U.S. 20, 26 (2003) (emphasis added).  Although, under Chevron "step two," a Court may defer to an agency's "interpretation of the meaning of the statute [which] is reasonable," Transit. Hospital Corp. v. Shalala, 222 F.3d 1019, 1028 (D.C. Cir. 2000), the Supreme Court held that such deference only applies where the interpretation is the result of "a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement" that has "the effect of law."  United States v. Mead Corp., 533 U.S. 218, 230 (2001).

---

[7] The Final Rule cites a single snippet in the "Joint Explanatory Statement of the Committee on Conference on the FY 2006 appropriations bill," 71 Fed. Reg. at 6338, stating simply that:

> [i]t is the understanding of the conferees that the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and exported).  The conferees recognize that the funding limitation in Section 794 prohibits the use of appropriated funds only for payment of salaries or expenses of personnel to inspect horses.

This language can easily be reconciled with the overall purpose of the Amendment to halt horse slaughter.  Indeed, the most natural reading of the quoted language is that it is merely confirms that USDA is generally obligated to provide for inspection of animals not affected by the Amendment.

Consistent with that reading, the statement at issue differentiates between the inspection of live "horses" on the one hand, and the inspection of "meat" obtained from the slaughtering of live horses on the other, suggesting that the conferees intended only to preserve the authority of FSIS inspectors — after the effective date of the Amendment — to inspect the meat from horses slaughtered before the effective date.  In other words, this passage ensures a smooth shut-down of horse slaughter, without precluding the inspection of, and hence wasting, meat from horses slaughtered just before the effective date.  In any case, the language certainly does not suggest that Congress intended horse slaughter to continue, which would fly in the face of the sponsors' intent.

Here, however, USDA did not develop the Final Rule as the result of a proper "notice-and-comment rulemaking, formal agency adjudication, or some other procedure meeting the prerequisites for Chevron deference." Landmark Legal Found. v. IRS, 267 F.3d 1132, 1135-36 (D.C. Cir. 2001). Consequently, under Mead, the Court "must decide for [itself] the best reading of the" statute. Id. at 1136 (emphasis added). In any event, in light of the patent purpose of the provision to prevent the ongoing slaughter of horses for human consumption, any construction that would allow such slaughter to continue is, to say the least, not "reasonable."

### 2. The Final Rule Violates the FMIA's Ban on Fee-For-Service Horse Inspection.

As with the Amendment, in light of the "text, structure, legislative history, and purpose" of the FMIA, Public Citizen, 322 F.3d at 662, the Court need proceed no further than the first step of Chevron to conclude that the Final Rule is also impossible to reconcile with that statute. As noted above, the FMIA requires that inspection of horses and other FMIA-listed animals be made pursuant to the FMIA, not a different statute, and that those inspections be paid for by federal funds. Id. §§ 603, 695. In particular, the Congressional mandate embodied in section 695 could not be clearer. It states simply that the "cost of inspection," including salaries, for FMIA-covered animals "shall be borne by the United States." 21 U.S.C. § 695 (emphasis added); see also Miller v. French, 530 U.S. 327, 337 (2000) (stating that "the mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion") (internal citation omitted). In light of this direct and unambiguous command, the private-payer, fee-for-service system created by the Final Rule for animals covered by the FMIA is simply unlawful.

Moreover, Congress's directive was not happenstance. Rather, the 1948 ban on fee-for-service inspection of FMIA-covered animals arose out of Congressional concern that inspectors' financial ties with "those whose products they were inspecting" would pose a public health risk.

H.R. Rep. No. 80-1852, reprinted in 1948 U.S.C.C.A.N. 1706, 1708 (1948); id. at 1709 (recognizing "the <u>dangers inherent in making inspectors dependent on meat packers for their livelihood</u>") (emphasis added).  Therefore, since the Final Rule flatly violates not only the literal terms of the FMIA, but also thwarts Congressional intent to bar private payment for inspection services of covered animals, including horses, it should be set aside under the first step of the <u>Chevron</u> analysis.  <u>See</u> <u>Household Credit Servs., Inc. v. Pfennig</u>, 541 U.S. 232, 239 (2004) (internal citation omitted) (rule should be set aside as contrary to the "particular statutory language at issue, as well as the . . . design of the statute as a whole").[8]

Conspicuously, the Final Rule does not even <u>mention</u> section 695 of the FMIA, let alone explain how the cost of inspection is "borne by the United States" if private parties pay the salaries of inspectors.  Rather, the Final Rule simply ignores this prohibition, and purports instead to derive authority from the Agricultural Marketing Act ("AMA"), 7 U.S.C. § 1622(h).  <u>See</u> 71 Fed. Reg. 6337, 6339.  However, as the Court of Appeals has held, an agency "cannot rely on its general authority to make rules . . . when a specific statutory directive defines the relevant functions of [the agency] in a particular area."  <u>Am. Petroleum Inst. v. EPA</u>, 52 F.3d 1113, 1119 (D.C. Cir. 1995).  As explained in section I(D) <u>supra</u>, the AMA is not a source of authority for the inspection of horses and other animals already covered by the FMIA.[9]  To the contrary, for nearly two decades, USDA has reiterated its position in other contexts that,

---

[8] Notably, if USDA can create a fee-for-service inspection system for horses, there is nothing to prevent it from doing the same for all of the other animals covered by the FMIA, <u>i.e.</u>, "cattle, sheep, swine, goats, horses, mules, and other equines," 21 U.S.C. § 603, and that renders Congress's directive that inspectors be federally-funded a complete nullity.

[9] As noted, under the AMA, USDA currently provides voluntary inspection of certain animals, such as reindeer, elk, antelope, water buffalo, and bison, that are <u>not</u> covered by the FMIA.  <u>See</u> 9 C.F.R. §§ 352.2, 352.10.

consistent with the plain terms of the FMIA, only species not covered by the FMIA may be inspected by a fee-for-service program under the AMA.[10]

The AMA also cannot be construed as a loophole to the FMIA's express funding restriction for horses, because the FMIA's requirement that the cost of inspection "shall be borne by the United States" was enacted in 1948, two years after Congress passed the AMA, thereby superseding it.  See Pub. L. No. 80-1852, 62 Stat. 344 (1948).  During this two year interval, Congress experimented briefly with fee-for-service inspection of animals covered under the FMIA, which includes horses.  See Pub. L. No. 80-256, § 356 (1947).  However, this program was expressly repealed the very next term, and replaced with the strict requirement that costs of inspection of all FMIA-covered animals "shall be borne by the United States."  21 U.S.C. § 695 (emphasis added).  Consequently, the intent of Congress could hardly be plainer.

Finally, even if Congress's intent was somehow ambiguous, the Final Rule is not a reasonable construction of the FMIA, and is therefore not entitled to deference under step two of Chevron.  Indeed, as described above, the Final Rule is contrary to defendants' own long-

---

[10] See, e.g., Final Policy Statement for Research and Regulation of Biotechnology Processes and Products, 51 Fed. Reg. 23,336, 23,343 (June 26, 1986) (limiting the animals who "may be inspected under a voluntary reimbursable program established under the Agricultural Marketing Act" to "animals and animal products other than those required to be inspected under the FMIA"); see also Final Fee Increase for Inspection Services, 61 Fed. Reg. 65,459, 65,459 (Dec. 13, 1996) (explaining that AMA voluntary inspections are "to assist in the orderly marketing of various animal products and byproducts not subject to the FMIA"); Final Fee Increase for Inspection Services, 64 Fed. Reg. 19,865, 19,866 (Apr. 23, 1999); Final Fee Increase for Meat and Poultry Inspection Services, 64 Fed. Reg. 72,492-93 (Dec. 28, 1999); Final Increases in Fees for Meat, Poultry, and Egg Products Inspection Services—Fiscal Year (FY) 2001, 65 Fed. Reg. 60,093 (Oct. 10, 2000); Final Increases in Fees for Meat, Poultry, and Egg Products Inspection Services—Fiscal Year (FY) 2002, 67 Fed. Reg. 3428 (Jan. 24, 2002); Final Changes in Fees for Meat, Poultry, and Egg Products Inspection Services—Calendar Year (CY) 2003, 68 Fed. Reg. 37,954 (June 26, 2003); Final Changes in Fees for Meat, Poultry, and Egg Products Inspection Services—Fiscal Year 2006-2008, 71 Fed. Reg. 2135 (Jan. 13, 2006).

standing interpretation that only <u>non</u>-FMIA animals may be inspected under the authority in the AMA – an interpretation the Final Rule conspicuously fails even to mention.

3. **The Final Rule Also Violates the APA By Failing To Give A Reasoned Explanation As To How It Is Consistent With the Statutes.**

Not only is the Final Rule based on an unreasonable <u>construction</u> of the governing statutes, it is also arbitrary and capricious because it fails to make a "reasonable <u>explanation</u> of the specific analysis and evidence upon which the Agency relied." <u>Bluewater Network v. EPA</u>, 370 F.3d 1, 21 (D.C. Cir. 2004) (citing <u>Motor Vehicle Mfrs. Ass'n v. State Farm</u>, 463 U.S. 29, 43 (1983)) (emphasis added). First and foremost, the preamble is devoid of any rational explanation as to how the Final Rule can possibly be reconciled with the clearly and forcefully stated intent of Congress to "<u>prohibit</u>" horse slaughter. 151 CONG. REC. H4249 (remarks of Rep. Spratt) (emphasis added); <u>see also id.</u> at S10,218 (remarks of Senator Ensign that "[t]he goal of our amendment is simple: <u>to end the slaughter of America's horses</u> for human consumption overseas") (emphasis added). Rather than confront such a clear statement of purpose with a "reasonable explanation of the specific analysis" by which these statements and the literal text of the statute can be reconciled with the Final Rule, <u>Bluewater Network</u>, 370 F.3d at 21 (citing <u>State Farm</u>, 463 U.S. at 43), defendants simply proceeded as though these clear expressions of legislative intent do not exist. Indeed, defendants make no effort to explain what <u>they</u> think Congress was attempting to accomplish with the Amendment, if it was not to suspend horse slaughter. Compounding this fundamental flaw, defendants failed to even <u>acknowledge</u>, let alone provide a reasonable explanation of, how the Final Rule is consistent with section 695 of the FMIA – the federal law that <u>prohibits</u> fee-for-service inspection of FMIA-listed animals.

In sum, it is hard to conceive of a more arbitrary and capricious course of conduct than that pursued here by USDA, which has embarked on a process designed to sidestep, rather than

effectuate, Congress's intent.  <u>See</u> Letter from Forty Members of Congress to Johanns at 3 (Jan. 17, 2006) (admonishing defendant Johanns that the "agency must cease inspection of horses for slaughter" and that the "[f]ailure to do so constitutes <u>willful disregard</u> of clear Congressional intent") (emphasis added).  Evidently, defendants do not like the law passed by Congress, but, in our tripartite system, that is not a valid reason for not implementing it.

    **C.**    **Defendant USDA Has Also Announced Its "Inten[t] to Establish" A Separate Fee-For-Service *Transport* Inspection Program Without Any Rulemaking At <u>All, In Violation of the APA.</u>**

In addition to the FSIS fee-for-service program described above, the Final Rule also includes language which indicates that USDA is "prepar[ing] to establish a [separate] voluntary fee-for-service program in order to continue its inspection of horses [during <u>transport</u> to slaughter] under 9 CFR part 88," through its Animal and Plant Health Inspection Service ("APHIS"), which has authority under the FAIR Act, <u>see</u> <u>supra</u> at section I(C), to regulate the conditions under which horses are transported to the slaughter facilities.  71 Fed. Reg. 6337, 6338.

As of the date of this filing, defendant USDA has not publicly disclosed further details about the new APHIS fee-for-service program, in either a separate Federal Register notice or other public document.  The Final Rule nonetheless evidently reflects a final agency determination that "APHIS <u>will</u> make [a] program available to the three domestic entities that slaughter horses via agreements under which APHIS will be reimbursed for services provided to inspect horses delivered to the facilities."  <u>Id.</u> (emphasis added).  USDA announced this substantive rule change without explaining either: (1) the justification for dispensing with advance notice and public comment; (2) the legal basis by which this program can be reconciled with the Amendment; or (3) the actual terms of the program, including the "agreements" by

which inspection will be carried out, or how the new program relates to or incorporates existing inspection regulations.

Remarkably, the preamble merely asserts that "[n]o changes to the regulations are necessary" for the creation of this new program, without further explication. Id. Instead, USDA appears prepared to regulate transport on the basis of some type of private contractual "agreements," rather than by way of rules that apply with equal force to all parties. See 71 Fed. Reg. 6337, 6338 (announcing that "APHIS will make this program available to the three domestic entities that slaughter horses via agreements under which APHIS will be reimbursed for services provided") (emphasis added); compare H.R. Rep. No. 80-1852, reprinted in 1948 U.S.C.C.A.N. 1706, 1709 (1948) (recognizing "the dangers inherent in making inspectors dependent on meat packers for their livelihood") (emphasis added).[11]

In the absence of any justification as to why it need not promulgate regulations regarding transport inspections, or why rulemaking – emergency or otherwise – can be dispensed with entirely, USDA's determination that "no changes to the regulations are necessary" also violates the APA. See State Farm, 463 U.S. at 43 (requiring "satisfactory explanation" for the basis of rulemaking). Moreover, USDA also failed to provide advance notice and public comment on the APHIS fee-for-service program announced on February 8, as required by the APA. 5 U.S.C. § 553(b).[12] Finally, the fee-for-service approach to transport inspection embodied in the APHIS

_____

[11] If USDA has entered into "agreements" with private entities, the creation of such a system, including the conditions that govern these agreements, is nonetheless a "substantive rule" change "having the force of law," and hence is subject to the requirement for advance public notice and comment. Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 587-88 (D.C. Cir. 1997).

[12] The opportunity for comment "must be a meaningful opportunity," and Plaintiffs obviously cannot meaningfully comment on the APHIS fee-for-service program if they do not even know its contents. Gerber v. Norton, 294 F.3d 173, 179 (D.C. Cir. 2002) (explaining that appellants

program is arbitrary and capricious for the same reasons as the fee-for-service approach to slaughterhouse inspections adopted in the Final Rule – it simply cannot be reconciled with the Amendment.

### D.    Defendants Conducted No Environmental Analysis In Conjunction With the Final Rule, In Violation of NEPA.

As noted above, see section I(E) supra, NEPA requires agencies to prepare an EIS, or at least an EA, whenever they take actions that affect the environment.  See 42 U.S.C. § 4332(C). Here, however, evidently defendants did not even begin to undertake NEPA review, let alone prepare a detailed statement of environmental harms as required.  There is no mention of any NEPA review in the Final Rule or its preamble, and Plaintiffs have been unable to locate any other publicly available environmental analysis in conjunction with the fee-for-service program.

This plainly violates NEPA, since the Final Rule is unquestionably a "major federal action," id., in that it creates an entirely new federal regulatory system for horse inspection that will allow horse slaughter to continue past the date that Congress intended it to stop.  See 40 C.F.R. § 1508.18 (requiring environmental analysis for "new and continuing activities, including projects and programs entirely or partially financed, assisted, conducted, regulated, or approved by federal agencies") (emphasis added).  Moreover, the Final Rule may have a significant effect upon "the quality of the human environment," 42 U.S.C. § 4332(C), by allowing horse slaughter to continue, including horses taken from the wild, see Rutberg Decl. ¶ 13, contrary to Congress's intent that it stop by March 10.

For instance, and as illustrated in Plaintiffs' declarations, the Final Rule will have severe impacts on the "quality of the human environment," especially for those who live near or adjacent to the plants, and who suffer severe environmental, aesthetic, and health harms on a

could not meaningfully comment on a rulemaking concerning a certain parcel of land without having access to a map that showed its location).

daily basis.  See, e.g., Smith Decl. ¶ 6 (Ex. 18) (attesting that she finds horse blood "in my bathtubs, sinks, and toilets . . . because the plant . . . often has blood spills and overflows that clog up the local wastewater treatment plant and septic systems"); see also section II(B) infra. By failing to consider these impacts in an EIS, or even an EA, defendants are violating NEPA concerning this "major federal action."  42 U.S.C. § 4332(C).

## II.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST ALSO FAVOR INJUNCTIVE RELIEF

Since Plaintiffs have demonstrated a "particularly strong likelihood of success on the merits," "even . . . a relatively slight showing of irreparable injury" is sufficient in order for them to prevail at the temporary restraining order or preliminary injunction stage.  City Fed Fin. Corp. v. Ofc. Of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995); see also Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985) (justifying injunction with "either a high probability of success and some injury, or vice versa").  However, Plaintiffs also easily satisfy the remaining standards for emergency injunctive relief.

Indeed, this case differs from the typical emergency injunction matter in two important ways.  First, if the Court agrees that defendants have utterly failed to provide any advance public notice and comment in contravention of the APA, 5 U.S.C. §§ 553, 706(2)(D), or have otherwise violated the APA, the Court of Appeals has made clear that relief must issue, regardless of any other factors.  As the D.C. Circuit held in American Bioscience, Inc. v. Thompson, 269 F.3d 1077 (D.C. Cir. 2001), if a plaintiff seeking preliminary injunctive relief "prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order. . . . [w]hether or not appellant has suffered irreparable injury, if it makes out its case under the APA it is entitled to a remedy."  Id. at 1084 (emphasis added); see also Nat'l Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (in the APA context,

"once the court reached the conclusion that the rule was indeed illegal . . . there was no separate need to show irreparable injury" before issuing injunction, and excusing the District Court from "mak[ing] explicit findings as to the[ ] [other] elements" of the injunction standard).

Second, where, as here, it is clear that Congress already considered the public interest and the competing hardships at issue in exercising its specific policy judgment that horse slaughter should cease for the remainder of FY 2006, the Court should not undo Congress's policy judgment in the guise of the equitable balancing test. For example, in TVA v. Hill, 437 U.S. 153, 185 (1978), the Supreme Court determined that Congress, in enacting the Endangered Species Act, had explicitly foreclosed the exercise of traditional equitable discretion because the statute at issue reflected a "conscious decision by Congress to give . . . priority" to one competing interest over another. Id.; see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 313, 320 (1982) (holding that, where Congress has already resolved any competition between the "range of public interests" as part of its policy judgment, the statute therefore "foreclose[s] the exercise of the usual discretion possessed by a Court of equity").

Here, there can be no question that the Amendment embodies Congress's specific consideration of competing policy interests in deciding whether to ban horse slaughter. Compare 151 CONG. REC. S10,220 (Sen. Byrd decrying the "suffering these animals endure"); id. at S10,219 (detailing plight of local residents plagued by "air quality and other environmental concerns" and "the most horrific stench"); with id. at H4248 (floor statement of Rep. Bonilla warning that the Amendment would "shut down an industry"). Although defendants may argue that Congress's judgment has created a "potential for harsh results" for the specific businesses affected by the legislation, a reviewing court is "not free to rewrite the statute that Congress has enacted." Dodd v. United States, ___ U.S. ___, 162 L. Ed. 2d 343, 350-51, 125 S. Ct. 2478,

2483 (2005). Rather, the Court must give effect to the clearly expressed policy determination made by Congress itself. Id. Assuming, however, that the Court nevertheless deems it appropriate to engage in a detailed consideration of the equities and the public interest, that also clearly favors injunctive relief.

### A. Defendants Have Irreparably Injured Plaintiffs By Depriving Them Of Their Statutory Rights To Advance Notice and Public Participation.

As the Court has held, "it is well established that the harm suffered by those who would otherwise participate in agency rulemaking under the APA is to be considered irreparable when the agency fails to afford them their rights to such participation." Cmty. Nutrition Inst. v. Butz, 420 F. Supp. 751, 757 (D.D.C. 1976). Here, Plaintiffs and their members – many of whom have long advocated for a ban on horse slaughter, and who live in the immediate vicinity of the plants – are being deprived of their statutory right to participate in rulemaking before the rule is finalized, as required by the APA, and are therefore irreparably injured on that basis alone. See Farley Decl. ¶ 7 (Ex. 19); Eldridge Decl. ¶¶ 8-11; Vacca Decl. ¶¶ 8-10; Markarian Decl. ¶¶ 13-15, 19; Heyde Decl. ¶¶ 6-8, 12.

Defendants also irreparably harmed Plaintiffs by failing to undertake any NEPA analysis, thereby depriving Plaintiffs of their statutory right to participate in the NEPA review process. "[W]here participation in the NEPA process is denied" to those who would otherwise participate, "irreparable" harm is presumed, as in an APA claim. Natural Res. Def. Council v. Lujan, 768 F. Supp. 870, 890 (D.D.C. 1991) (citing Cmty. Nutrition Inst., 420 F. Supp. at 757). Here, Plaintiffs are being deprived of their legal right to fully participate in, and influence, both the NEPA and APA processes, and hence are at risk of losing the opportunity to bring to USDA's attention – before the new program is set in stone – the serious environmental and public health concerns associated with the horse slaughter facilities, as well as other pertinent facts and legal

issues.  See Farley Decl. ¶ 7; Eldridge Decl. ¶¶ 8-11; Vacca Decl. ¶¶ 8-10; Markarian Decl. ¶¶

13-15, 19; Heyde Decl. ¶ 6-8, 12.  This trampling of Plaintiffs' legal right to influence the

process before the new program becomes a fait accompli is, in and of itself, a serious irreparable

injury. See Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir. 1989) (Breyer, J.) ("the difficulty of

stopping a bureaucratic steam roller, once started, [is] a perfectly proper factor for a district court

to take into account in assessing [the risk of injury] on a motion for a preliminary injunction").

   **B.    Plaintiffs Are Irreparably Harmed by the Health Risks and Environmental
          Degradation Caused By the Plants' Continuing Operation.**

   Plaintiffs are also exposed to serious health risks due to the environmental hazards caused

by continuing operation of the plants.  In the context of a preliminary injunction, "[t]he risk of

the irreparable injury to the health of patients outweighs any hardship to defendant."  Am.

Medical Ass'n v. Weinberger, 522 F.2d 921, 924 (7th Cir. 1975).  Moreover, as the Supreme

Court recognized in Amoco Production Co. v. Village of Gambell, "[e]nvironmental injury, by

its nature, can seldom be adequately remedied by money" and, thus, "the balance of harms will

usually favor the issuance of an injunction" to protect against such harm.  480 U.S. 531, 545

(1987).

   As noted previously, the public health and environmental harms caused by continuing

operations of the slaughter plants contributed heavily to Congress's decision to suspend the

practice of horse slaughter.  See supra at II(B).  For example, in September 2005, the President

of the Presbyterian Hospital of Kaufman wrote Kaufman, Texas Mayor Paula Bacon, stating that

"pollution caused by Dallas Crown is causing a health threat that affects the emotional and

physical well-being of our patients and families."  Attachment to Bacon Decl.  Likewise,

individual Plaintiffs living directly adjacent to the plants describe "the kind of odor that makes it

difficult to breathe," Salazar Decl. ¶ 3, and fumes that are so extreme that they cannot leave their

homes.  See Garcia Decl. ¶ 4 (Ex. 20) (stating that the "noxious odor prevents my family and I from enjoying our yard . . . . My kids are unable to play outside").

Further, the plants not only emit noxious fumes, but also pose health threats through releases of horse blood into the community.  As Mayor Paula Bacon attests, "[t]he City's Volunteer Fire Department was unable to recover from Dallas Crown the cost of the foam used to contain the 600-800 gallons of blood spilled on the service road and into the ditches fronting the plant."  Bacon Decl. ¶ 6.  Not only has horse blood literally flowed through the streets of adjoining neighborhoods, but Plaintiff residents have also found horse blood where it directly exposes them to infection and other health risks – "in [their] bathtubs, sinks, and toilets.  This is because the plant does not operate according to code and often has blood spills and overflows that clog up the local wastewater treatment plant and septic systems."  Smith Decl. ¶ 6.  As recognized by the Health Department of the City of Forth Worth, Texas, where the Beltex plant is located, such discharges pose a threat to human health.  See Fort Worth Public Health Department, Discharge Report (Ex. 21) (describing "non-permitted discharge(s)" and "a reddish liquid flow coming from underneath Beltex Corp. . . . . believed to contain some blood," and further stating that "the Health Department called a veterinarian associated with the Texas Department of Health ["TDH"] over the health concerns of the liquid in the creek.  TDH reported that anyone coming into contact with the liquid should wear protective gear") (emphasis added).  Kaufman residents further attest that "blood spills and animal parts left to rot on Dallas Crown's property . . . attract[ ] vermin and insects to the neighborhood and to my properties."  Eldridge Decl. ¶ 5.

These environmental harms not only pose obvious health threats, as reaffirmed by physicians who practice in the community, see Attachment to Bacon Decl., they also undermine

Plaintiffs' ability to enjoy their homes and neighborhoods, and, therefore, impair the Plaintiffs' day-to-day lives.   See, e.g., Eldridge Decl. ¶ 4 ("I am unable to use my yard for outdoor activities, such as barbequing, sports, or spending time with my family and friends"); Garcia Decl. ¶ 3 ("when it is hot . . . . the smell is so bad that we cannot open our windows to enjoy fresh air or cool breezes"); Salazar Decl. ¶ 4 ("I also love to garden but am unable to do so because of the smell"); Smith Decl. ¶ 8 ("my family does not visit my home because of the smell and other nuisances coming from the plant"); Zuniga Decl. ¶ 4 (describing impairment of his "quality of life") (Ex. 22).  Congress acted, in part, to address precisely these irreparable injuries, see section II(B) supra, and hence they should not be permitted to continue past the Amendment's effective date.[13]

### C.    Continued Horse Slaughter Also Irreparably Harms Plaintiffs' Aesthetic Interests.

Under this Circuit's well-established precedent that "specifically recognizes that people have a cognizable interest in viewing animals free from inhumane treatment," Animal Legal Def. Fund v. Glickman, 154 F.3d 426, 433 (D.C. Cir. 1998) (en banc) (emphasis added) (internal citations omitted), courts have granted injunctions in circumstances such as these, where such aesthetic interests will be irreparably harmed.  For instance, in The Fund for Animals v. Norton, 281 F. Supp. 2d 209, 220-22 (D.D.C. 2003), the Court found irreparable harm to plaintiffs' aesthetic interests based on the impending killing of mute swans, and discussed with approval a long line of cases in which courts have found irreparable harm based on plaintiffs "seeing, or contemplating" animals being mistreated.  Id.; see also Fund for Animals v. Clark, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (finding irreparable injury "not compensable in money damages" from "seeing or even contemplating" the mistreatment of bison) (emphasis added).

---

[13] At the risk of pointing out the obvious, such serious injuries also confer Article III standing on plaintiffs.  See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

Plaintiffs allege similar injuries here. For instance, Mary Farley, who lives near the Cavel plant and is a member of Plaintiff The Humane Society of the United States, describes "see[ing] the transport trucks parked in front of Cavel and . . . think[ing] about how the horses suffered while in transport . . . [and] at the plant, and it greatly upsets me to know that healthy, majestic horses are being slaughtered in my community." Farley Decl. ¶ 3. See also, e.g., Salazar Decl. ¶ 5 (resident living adjacent to the Beltex plant "was raised on a ranch and grew up around horses," and "[i]t deeply saddens me to see the horses on their way to slaughter"); Runnels Decl. ¶ 7 (attesting that she is "disturbed by the noise of horses crying and whining as they enter the kill chute," and that the "horses' cries wake me up in the night, and upset me so much that I have trouble sleeping"). Since these injuries are also among those Congress sought to stop effective March 10, 2006, see 151 CONG. REC. S10,219 (noting that children living near the Dallas Crown plant, while "playing in their yards, do so with the noise of horses being sent to their deaths in the background"), this is still another compelling basis for granting injunctive relief.[14]

---

[14] There are still more ways in which Plaintiffs risk irreparable injury if the Court does not maintain the status quo that Congress intended – i.e., an end to horse slaughter by March 10. As noted earlier, hundreds of the horses who end up in slaughter facilities are wild horses who have been obtained from adopters, see Rutberg Decl. ¶ 13, many of whom are sold at auctions, see Larson Decl. ¶ 8, where sellers often do not know the ultimate fate of their horses. Plaintiffs' members' aesthetic interests in observing wild horses are irreparably harmed when they know that the magnificent animals they are seeing may end up in slaughter facilities. See id. In addition, the slaughter facilities create a "market" for wild horses, increasing the likelihood that they will be removed from their natural habitat. Id. Likewise, the lucrative market created by the slaughter facilities leads inexorably to an increase in horse theft, see Holland Decl. ¶ 9 (Ex. 23), thus placing at increased risk the domesticated horses owned by plaintiffs and their members. See, e.g., Markarian Decl. ¶ 13-16, Taylor Decl. ¶¶ 8-10.

**D.** **Federal Defendants Will Not Suffer Irreparable Harm if the Court Issues a Preliminary Injunction.**

In contrast to the serious, irreparable harm to Plaintiffs' interests that will result if the Final Rule is not enjoined, defendant agencies certainly will not suffer any substantial injury if the Final Rule is preliminarily enjoined. Indeed, an injunction will only require defendants to carry out the course of conduct intended by Congress in the Amendment – i.e., to continue federally-funded inspections no later than March 10, 2006, and then halt the inspections, at least for this fiscal year.

As for any potential financial impact on the non-U.S. businesses that own the slaughter plants, to the extent that those interests should factor into the Court's analysis at all, "it is well established in this Circuit that monetary loss is usually accorded little or no weight in the irreparable-harm analysis." Pharmaceutical Research and Mfrs. of Am. v. U.S., 135 F. Supp. 2d 1, 18 (D.D.C. 2001), rev'd on other grounds by Pharmaceutical Research and Mfrs. of Am. v. Thompson, 251 F.3d 219 (D.C. Cir. 2001). This is because "[t]he key word in this consideration is irreparable. . . . Financial injury . . . can [ ] be mitigated in the course of litigation." Segar v. Civiletti, 516 F. Supp. 314, 320 (D.D.C. 1981) (internal citations omitted). Here, any such injuries should be afforded especially little weight since, as stressed previously, Congress itself has made a clear policy determination that such impacts do not outweigh the compelling public health, animal protection, and other interests on the other side of the equation.[15]

---

[15] If the Court grants this motion, Plaintiffs respectfully request that the Court require the posting of no more than a nominal bond, as is ordinarily the case in public interest litigation. See Citizen's Alert Regarding Environment v. U.S. Dept. of Justice, 1995 WL 748246, *12 n.10 (D.D.C. 1995) (stating that "federal courts have broadly recognized that [a] nominal bond is sufficient and appropriate where public interest groups seek enforcement of environmental laws"); see also Natural Res. Def. Council v. Morton, 337 F. Supp. 167, 169 (D.D.C. 1971), aff'd, 458 F.2d 827 (D.C. Cir. 1972) (setting $100 bond for preliminary injunction against large-scale offshore oil lease).

E.      __Injunctive Relief Is In the Public Interest.__

Unlike a broader statute whose consequences in a particular situation may not have been contemplated by Congress, there is no need to speculate here as to what Congress thought was in the public interest with respect to horse slaughter for human consumption. Here, Congress perceived a grave problem – namely, the inhumane nature of horse slaughter and transport to slaughter – and determined that it was in the public interest to halt these precise practices for this fiscal year. Representative Spratt, a sponsor, put it simply when he asked, "[w]hat is the effect of this amendment? This amendment in simple terms will stop the slaughter [f]or human consumption of horses. . . . [their] brutal slaughter . . . is the kind of slaughter that this bill will prohibit." 151 CONG. REC. H4249; see also id. at S10,220 (Senator Byrd describing that "horses often suffer unnecessarily while in transit to slaughter[ ]. . . in trucks with ceilings so low that they prevent the horses from holding their heads in a normal, upright position"); id. at H4249 (Rep. Spratt stating that "horses are jacked up by their hind legs and have their throats slit").

The harms alleged here by Plaintiffs and in the attached declarations, both to their interests and to the well-being of the horses, reinforce the policy decision already made by Congress as to what is in the public interest. For instance, veterinarian and former USDA inspector Peggy Larson explains that, "it is my professional opinion that the process of transporting and slaughtering horses for human food is inhumane and [ ] unacceptable. . . ." Larson Decl. ¶ 7. More specifically, she states that "horses bound for slaughter are frequently shipped for long distances, and sometimes in a manner that fails to accommodate their unique temperaments and physical requirements." Id. ¶ 9. Based on Dr. Larson's experience, "it is very difficult to secure a horse's head" in order to properly fire the "captive bolt" and render the horse unconscious prior to slaughter. Id. ¶ 14. She also describes the "inhumane slaughter of horses,

ranging from improper handling to outright abuse," as documented by defendants' own inspectors. <u>Id.</u> ¶ 15; <u>see</u> <u>also</u> <u>id.</u>, Attachment 8. Each of these humane considerations is especially acute with respect to wild horses, who are even more resistant to handling at slaughter than domestic horses. <u>See</u> Rutberg Decl. ¶¶ 10-12.

Given these concerns, Congress made an unambiguous policy determination that halting horse slaughter effective March 10, 2006 was in the public's best interest. The Amendment also reflects Congress's policy judgment that these humane concerns, when combined with the other kinds of harm alleged by Plaintiffs here, compelled passage of the Amendment, notwithstanding any financial impact on the slaughtering businesses themselves. <u>See</u>, <u>e.g.</u>, 151 CONG. REC. H4250 (statement of Rep. Moran urging colleagues to vote for the Amendment despite "the bottom line"); <u>id.</u> at H4249 (statement of co-sponsor Rep. Spratt prompting his colleagues to consider "who is affected? Slaughterhouses in two States. That is it. Those are the net effects because, you see, Americans do not eat horse meat"). Once again, therefore, where Congress itself has so clearly taken all of the pertinent equitable factors into account in determining where the public interest lies in a particular situation, the Court need not reconsider that specific policy determination.

## <u>CONCLUSION</u>

As a practical matter, this Court is being called upon to determine whether the Amendment will be abided by during fiscal year 2006, or whether it will never be obeyed. For the foregoing reasons, the Motion for a Temporary Restraining Order and/or Preliminary Injunction should be granted, and the Court should preliminarily declare that the Final Rule violates the Amendment and the FMIA.

Respectfully submitted,


____/s/_____
Eric R. Glitzenstein
(D.C. Bar No. 358287)

Ethan Carson Eddy
(D.C. Bar No. 496406)

Howard M. Crystal
(D.C. Bar No. 446189)

MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, DC  20009
(202) 588-5206


Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)

Jonathan R. Lovvorn
(D.C. Bar No. 461163)

THE HUMANE SOCIETY OF THE UNITED
STATES
2100 L. St., N.W.
Washington, DC  20037
(202) 676-2333

Counsel for Plaintiffs

February 22, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE HUMANE SOCIETY**<br>**OF THE UNITED STATES, ET AL.**  )<br>                                                          )<br>              Plaintiffs,                            )<br>     v.                                                )<br>                                                          )<br>**MIKE JOHANNS, ET AL.**                )<br>                                                          )<br>              Defendants.                         )<br> | Civ. No. 1:06CV00265 (CKK) |

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing plaintiffs' motion for a temporary restraining order and preliminary injunction is being served on defendants' counsel, Beverly Russell, in the following fashion, in order to supplement service through the Court's electronic filing system. A copy of the motion and legal memorandum is being sent by electronic mail on February 22, 2006 to beverly.russell@usdoj.gov. A copy of the motion, legal memorandum, and all supporting exhibits will also be hand delivered on the morning of February 23, 2006, to:

> Beverly M. Russell
> U.S. Attorney's Office for the
> District of Columbia
> 555 Fourth Street, N.W.
> Suite E-4915
> Washington, D.C. 20530.

Eric R. Glitzenstein