# Plaintiffs' Exhibit 3
# Civ. No. 02-0265 (CKK)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE HUMANE SOCIETY <br> OF THE UNITED STATES, ET AL. <br><br> Plaintiffs, <br><br> v. <br><br> MIKE JOHANNS, ET AL. <br><br> Defendants. | Civ. No. 1:06CV00265 (CKK) |

### DECLARATION OF DR. PEGGY LARSON, DVM, MS, JD

I, PEGGY W. LARSON, DVM, MS, JD, hereby declare as follows:

1. As described in the attached Curriculum Vitae, I am a licensed large animal veterinarian and have been practicing veterinary science for nearly 40 years. I received a Doctorate of Veterinary Medicine from the University of Ohio in 1965, a Masters of Science in comparative pathology from the University of California Davis in 1968, and a Juris Doctorate from Vermont Law School in 1988.

2. For 10 years, from 1968 to 1978, I was a practicing large animal veterinarian in North Dakota, focusing on food animal and equine medicine and surgery. I performed diagnosis, treatment, and surgery, and frequently assessed, observed, and treated horses in my professional capacity.

3. I also served as a Veterinary Medical Officer for the United States Department of Agriculture (USDA) from 1979 to 1985. In this capacity, I managed federal livestock disease control programs in Vermont, performed animal welfare inspections at circuses and research facilities, and issued federal health certificates on export animals.

4. In 1984, I was appointed by the Governor of Vermont to the position of Vermont State Veterinarian and Acting Chief of Livestock and Meat Inspection. In this position, I managed ongoing livestock and meat inspections programs and re-wrote Vermont's meat and poultry inspection regulations. For approximately four months, I inspected all of Vermont's slaughter facilities until a permanent veterinary meat inspector was hired.

5. I am no longer a government employee, and currently act as a consultant on issues within my areas of veterinary expertise.

6. As a veterinarian and a former USDA employee, I am familiar with the issue of slaughtering horses for human consumption, and with horse welfare issues in general. As a large animal veterinarian, I have observed horses first hand in small and large communities throughout the country.

7. Based on my training and experience, it is my professional opinion that the process of transporting and slaughtering horses for human food is inhumane and an unacceptable method for dispatching unwanted horses.

8. Horses that eventually make their way to slaughter are often taken to large horse auctions where they are purchased by "killer" buyers. Some of these horses are healthy retired or unsuccessful race horses, surplus riding school and camp horses, wild horses removed from public lands, and foals from mares whose urine is collected for the production of hormone replacement therapy drugs. Other horses slaughtered are lame, blind, starved and/or show evidence of lack of care such as saddle sores, overgrown hooves, bad teeth, and injuries. In addition, there is believed to be "a thriving trade in stolen horses going to slaughter." C.L. Stull, Evolution of the Proposed Federal Slaughter Horse Transport Regulations, 79 Journal of Animal Science E12 (2001) (Attachment 1).

9. Horses bound for slaughter are frequently shipped for long distances, and sometimes in a manner that fails to accommodate their unique temperaments and physical requirements. See C.L. Stull, Response of Horses to Trailer Design, Duration, and Floor Area During Commercial Transportation to Slaughter (1999) (Attachment 2) ("Horses tend to travel longer distances to slaughter than other livestock, because there is a limited number of equine slaughterhouses"). Often transported horses are not off-loaded for food and water every 28 hours, as required by federal law. T.H. Friend, A Review of Recent Research on the Transportation of Horses, 79 Journal of Animal Science E32 (2001) ("Continuous transport of slaughter horses for 30 hours is common, and some trips last 36 hours or longer.") (Attachment 3).

10. Horses and ponies are often crammed together and transported to slaughter in double-deck steel trailers designed to haul cattle and pigs. The truck ceilings are sometimes so low that some horses are not able to hold their heads in a normal position. K.A. Houpt & S. Lieb, Horse Handling and Transport, Livestock Handling and Transport (2000) ("moderately severe back injuries were attributed to the double-deck trailers being too low for tall horses") (Attachment 4). Inappropriate floor surfaces lead to slips and falls, as a "horse's need for the preservation of balance has [often] been neglected when compared to other important aspects of transport." G. Giovangnoli, M. Trabalza Marinucci, A. Bolla & A. Borghese, Transport Stress in Horses: An Electromyographic Study on Balance Preservation, 73 Livestock Production Science 247 (2002) (Attachment 4). The weaker horses also often go down and are trampled by the other horses, and "dominant and aggressive horses may bite, kick, shove, and displace other horses." M.N. Collins, T.H. Friend, F.D. Jousan & S.C. Chen, Effects of Density on Displacement, Falls, Injuries, and Orientation During Horse Transport, 67 Applied Animal

Behaviour Science 169 (2000) (Attachment 5). The lack of proper food and water in already weakened animals can lead to further injuries and death during extended transport.

11. Consequently, many horses arrive at the slaughterhouse as "downers," animals too sick or injured to stand up and walk, and that are dragged or pushed into the slaughterhouse. For example, several years ago, a rodeo horse broke its leg during a California bucking event. The horse was loaded onto a trailer and trucked across three states to a slaughter plant. The horse was trampled so badly that it was euthanized upon offloading of the truck at the slaughter plant site, before reaching the captive bolt pistol station. This is not an isolated event. According to a 1999 study by C.L. Stull of 60 horses transported for slaughter, the 59 arriving horses sustained a total of 81 injuries, and one animal that had to be removed from the transport trailer after 12 hours of transport, and died two days later. C.L. Stull, Responses of Horses to Trailer Design, Duration, and Floor Area During Commercial Transportation to Slaughter, 77 Journal of Animal Science 2925 (1999) (Attachment 6).

12. The horses that survive transport are put into holding pens at the slaughter plant. These pens often lack shelter and expose the horses to extreme temperatures, rain and snow. Often the pens are crowded resulting in further injuries to these compromised horses. If food and water is provided, the stronger horses often drive the weaker ones from food and water. There is little incentive on the part of the owners of these facilities to properly care for these horses, as money devoted to proper care reduces the plant owners' profits and does not benefit the slaughter process. As summarized in one study, "slaughter horses have usually been trucked for extensive distances. Many times they are injured or unhealthy, housed poorly, fed and watered improperly, and sometimes held for long times, as much as a week, in dirty confined pens at the slaughter plant." Gary D. Anderson & Don R. Lee, Salmonella in Horses: A Source

4

of Contamination of Horsemeat in a Packing Plant Under Federal Inspection, 31 Applied and Environmental Microbiology 661 (1975) (Attachment 7).

13. During my tenure as a meat inspector in Vermont, I inspected slaughter animals, mostly dairy cattle. I became quite familiar with the behavior of these animals as they proceeded through the slaughter process. Even tame dairy cattle can become quite agitated in a slaughter plant. These animals are away from familiar surroundings, often for the first time in their lives, and they are often forced to move with an electric prod and they react accordingly.

14. In my experience with farm animals, horses are more easily frightened than cattle, especially dairy cattle. Wild horses can become particularly frightened, because they are historically prey animals. Consequently, based on my experience with large domestic animals, I believe that horses are uniquely unsuited to processing at a slaughter plant. A cow can be run into a chute where the head is held securely ensuring that the captive bolt is properly placed before it is fired. It is very difficult to secure a horse's head which diminishes the effectiveness of the captive bolt. Sometimes horses have to be hit several times with the captive bolt, causing tremendous suffering before they are effectively rendered unconscious. Subsequently, it is highly probable that some horses may not be rendered unconscious when hung and bled. Horses are also more likely to injure themselves trying to escape the runway in the slaughter plant. I also believe horses are more sensitive to odors, including the blood that necessarily exists in the slaughter facility, and that this exacerbates their stress and apprehension.

15. According to USDA documents, there are numerous documented cases of inhumane slaughter of horses, ranging from improper handling to outright abuse. As explained by a USDA inspector working at the Cavel plant in Illinois:

> I observed the plant manager herding horses into the alley way to the knock box. Nine horses were overcrowded in the alleyway causing undue excitement which was further

exacerbated when two or more employees from the kill floor began yelling and hitting these horses causing the one in the end of the line to slip and fall.

Likewise, on March 13, 2005, a USDA inspector at the Cavel plant reported:

> Eight horses were in the alleyway leading directly to the knock box. The employee who is routinely assigned to work on the kill floor, hanging the horses on the rails, was using a riding crop to whip the horse in the alleyway closest to the knock-box. This horse continued to move backwards, away from the knock-box causing the other horses behind it to be overcrowded. As the whipping continued the horses in the alleyway became extremely excited. I immediately told the employee to stop but he did not listen to me. During this time, the last horse in the alleyway attempted to jump over the alleyway wall and became stuck over the top of the wall. Eventually it had flailed around enough to fall over to the other side of the wall.
> * * *
> Meanwhile two more horses fell down in the alleyway. The first was the second horse in the line to the knock box. It had fallen forward and the horse behind it began to walk on top of it as the downed horse struggled to get up. The second horse to fall was the fourth horse in the line. It had flipped over backwards due to the overcrowding and was subsequently trapped and trampled by the fifth and sixth horse in the line in their excitement to move forward.

Attached to this declaration are true and correct copies of the relevant USDA reports describing these incidents. (Attachment 8). In my professional opinion, this document illustrates the inhumane treatment of horses.

16. As companion animals, horses are not suited for this kind of inhumane treatment. An alternative for unwanted horses is euthanasia by a trained and licensed veterinarian. As with unwanted dogs and cats, the process of professional euthanasia quickly and painlessly ends the animal's life without the pain and suffering of long-distance transport, handling, and slaughter for human consumption. All equine veterinarians are capable of humanely euthanizing horses. I have personally euthanized horses when I was a large animal practitioner. When euthanasia is performed on an equine, it is done in familiar surroundings. The animal is handled gently. Tranquilizers or pre-anesthetic drugs are administered prior to injecting the euthanasia drug intravenously. The horse does not struggle, is not fearful and dies a quiet and certain death.

It is my professional opinion, based on my years of veterinary experience in the federal, state, and private sector that commercial slaughter for human consumption is not a humane or desirable method of disposing of unwanted horses.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Peggy W. Larson, DVM, MS, JD

February 21, 2006