IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **THE HUMANE SOCIETY**<br>**OF THE UNITED STATES, et al.** | ) ) ) | |
| Plaintiffs, | ) ) | **Civ. No. 1:06cv00265 (CKK)** |
| **MIKE JOHANNS, Secretary,**<br>**U.S. Department of Agriculture, et al.** | ) ) ) ) | |
| Defendants. | ) ) | |

## APPLICANT DEFENDANT-INTERVENORS' MOTION TO DENY PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION

Applicant Defendant-Intervenors Beltex Corporation ("Beltex"), Cavel International, Inc. ("Cavel"), and Dallas Crown, Inc. ("Dallas Crown") (collectively "Applicant Defendant-Intervenors") hereby move this Court to deny Plaintiffs' application for a temporary restraining order and/or preliminary injunction to enjoin the effectiveness of an interim final rule establishing a voluntary fee-for-service program for the ante-mortem inspection of horses. A Memorandum in support of this Motion is attached hereto and incorporated herein.

A proposed Order is also attached.

Respectfully submitted,

/s/ _____

James P. Murphy, Esq. (D.C. Bar No. 380857)
SQUIRE, SANDERS & DEMPSEY L.L.P.
1201 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
Telephone: 202.626.6793
Fax: 202.626.6780

Date: February 27, 2006     *Attorney for Applicant Defendant-Intervenors*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **THE HUMANE SOCIETY**<br>**OF THE UNITED STATES, et al.**<br><br>Plaintiffs,<br><br>**MIKE JOHANNS, Secretary,**<br>**U.S. Department of Agriculture, et al.**<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) )<br><br>**Civ. No. 1:06cv00265 (CKK)** |

## APPLICANT DEFENDANT-INTERVENORS' MEMORANDUM IN SUPPORT OF MOTION TO DENY PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING <u>ORDER AND FOR A PRELIMINARY INJUNCTION</u>

James P. Murphy, Esq. (D.C. Bar No. 380857)
SQUIRE, SANDERS & DEMPSEY L.L.P.
1201 Pennsylvania Ave., N.W.
Suite 500
Washington, DC  20004
Telephone:  202.626.6793
Fax:  202.626.6780

Date:  February 27, 2006

*Attorney for Applicant Defendant-Intervenors*

## TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................... 3

    A.    Applicant Defendant-Intervenors .................................................... 3

    B.    The Fiscal Year 2006 Appropriations Act and the Interim Final Rule ................. 4

    C.    The Complaint and Application for a Preliminary Injunction .............................. 8

III.   ARGUMENT .......................................................................................... 9

    A.    Legal Standard for Preliminary Injunction .......................................... 9

    B.    Preliminary Injunction Will Cause Substantial Harm to the Applicant Defendant-Intervenors and Other Third Parties ...................................... 11

        1.    Harm to Applicant Defendant-Intervenors .............................. 12

        2.    Harm to Third Parties ........................................................ 13

    C.    Plaintiffs Have No Likelihood of Success on the Merits ........................... 14

        1.    The USDA Did Not Act Arbitrarily or Capriciously in Promulgating the Interim Final Rule ......................................... 15

            a)    The USDA Acted Within the Scope of Its Authority under the FMIA and AMA ................................................. 16

            b)    The USDA Acted Rationally in Establishing a Voluntary Fee-For-Service Ante-Mortem Inspection Program ................... 19

            c)    The USDA Acted Consistent With the Appropriations Act and Implemented Congress' Command to Cease Funding Ante-Mortem Inspection of Horses in Fiscal Year 2006 ............ 21

                (1)    Language in an Appropriations Bill should not be Interpreted so as to Suspend a Statutory Provision .......... 24

                (2)    The Appropriations Act does not Repeal the Secretary's Duty to Inspect "Amendable Species" .......... 26

        2.    The USDA Correctly Employed the "Good Cause" Exception to "Notice and Comment" Rulemaking ...................................... 27

        3.    Plaintiffs' NEPA Claim Has No Likelihood of Success Because Rulemaking Actions of the USDA-FSIS are Categorically Excluded from NEPA Requirements ....................................... 30

    D.    Plaintiffs Have Failed to Demonstrate any Irreparable Harm Capable of Being Addressed by a Preliminary Injunction ....................................... 34

    E.    The Public Interest Will Not be Furthered by a Preliminary Injunction ............. 36

IV.   CONCLUSION ..................................................................................... 38

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

*American Bioscience, Inc. v. Thompson, et al.*, 269 F.3d 1077 (D.C. Cir. 2001)........ 10-11

*American Horse Prot. Assoc., Inc. v. Yeutter*, 917 F.2d 594 (D.C. Cir. 1992).................15

*Arent v. Shalala*, 70 F.3d 610 (D.C. Cir. 1995) ................................................15

*Ashland Oil, Inc. v. FTC*, 409 F.Supp.297 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976) ........................................................................................34

*Auburn Housing Auth., et al. v. Martinez*, 277 F.3d 138 (2nd Cir. 2002) .............22, 26, 27

*Barton v. Dist. of Columbia*, 131 F.Supp.2d 236 (D.D.C. 2001)........................................14

*Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044 (D.C. Cir. 1997).............................................21

*Benten v. Kessler*, 505 U.S. 1084 (1992) ........................................................................14

*Burtch v. U.S. Dep't of Treasury*, 120 F.3d 1087 (9th Cir. 1997) ...................................24

*C&K Mfg. & Sales Co. v. Yeutter*, 749 F.Supp. 8 (D.D.C. 1990)........................................37

*Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ....................15

*Cityfed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995)..............9

*Connecticut v. United States Dep't of the Interior*, 228 F.3d 82 (2nd Cir. 2000) .............27

*Cortez III Service Corp. v. NASA, et al.*, 950 F.Supp. 357 (D.D.C. 1996)............11, 13, 14

*Defenders of Wildlife, et al. v. Hogarth, et al.*, 177 F.Supp.2d 1336 (Ct. Int'l Tr. 2001) ................................................................................................15

*Douglas T.V. Hi-Fi Stereo Ctr. v. U.S. Pioneer Electronics Corp., et al.*, No. 312-74, 1974 U.S.Dist. LEXIS 9297 (D.D.C. Mar. 26, 1974).............................................10

*Emily's List v. FEC*, 362 F.Supp.2d 43 (D.D.C. 2005)................................................10, 11

*Envtl. Defense Ctr. v. Babbitt, et al.*, 73 F.3d 867 (9th Cir. 1995) .............................25, 26

*Goldring, et al. v. District of Columbia*, 416 F.3d 70 (D.C. Cir. 2005) ............................22

## TABLE OF AUTHORITIES
(continued)

**Page**

*Hawaii Helicopter Operators Ass'n v. FAA*, 51 F.3d 212 (9th Cir. 1995) .......................29

*James V. Hurson Assoc. v. Glickman*, 29 F.3d 277 (D.C. Cir. 2000) .........................21, 29

*Lamie v. United States Tr.,* 540 U.S. 526 (2004).................................................................22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .........................................................35

*MacFarland v. Washington, A.&M. v. R.Co.*, No. 1089 1901 U.S.App. LEXIS
    5079 (D.C. Cir. June 18, 1901) ....................................................................................36

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)........................................................................9

*McHugh v. Rubin*, 220 F.3d 53 (2nd Cir. 2000) .............................................................24, 25

*Mid-Tex Elec. Coop., Inc., et al. v. FERC, et al.*, 822 F.2d 1123 (D.C. Cir. 1987)..........29

*Motor Vehicle Mfr. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins.
    Co.*, 463 U.S. 29 (1983) ............................................................................................15, 19

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998).........................................9

*Mt. Airy Refining Co., et al. v. Schlesinger, et al.*, 481 F.Supp. 257 (D.D.C. 1979)...12, 13

*Nat'l Trust for Historic Preservation v. Dole*, 828 F.2d 776 (D.C. Cir. 1987) .................31

*New Jersey v. EPA*, 626 F.2d 1038 (D.C. Cir. 1980)..........................................................28

*SEC v. American Inst. Counselors, Inc. et al.*, No. 75-1965, 1975 U.S. Dist.
    LEXIS 14586 (D.D.C. Dec. 30, 1975).........................................................................10

*Sampson v. Murray*, 415 U.S. 61 (1974) ...........................................................................34

*Sociedad Anonima Vina Santa Rita v. United States Dep't of the Treasury, et al.*,
    193 F.Supp.2d 6 (D.D.C. 2001)..........................................................................9, 15, 19

*The Fund for Animals v. Clark*, 27 F.Supp.2d 8 (D.D.C. 1998)........................................35

*The Fund for Animals, et al., v. Mainella, et al.*, 294 F.Supp.2d 46 (D.D.C. 2003)..........35

*Timex V.I., Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1998)......................................21

TABLE OF AUTHORITIES
(continued)

Page

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, No. 90-1678, 1991
    U.S.Dist. LEXIS 11877 (D.D.C. 1991), *rev'd on other grounds Transcapital
    Fin. Corp. and American Capital Corp. v. Dir., Office of Thrift Supervision*,
    44 F.3d 1023 (D.C. Cir. 1995) ................................................................................23

*United States Steel Corp., et al. v. EPA*, 605 F.2d 283 (7th Cir. 1979) ..........................28

*Universal Health Services of McAllen, Inc. v. Sullivan*, 770 F.Supp. 704 (D.D.C.
    1991) .............................................................................................................30

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (2001) .............................................................1

*Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749 (D.C. Cir. 2001) ..................28

*Veitch v. Danzig*,  135 F. Supp. 2d 32 (D.D.C. 2001) .......................................................10

*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978) ........................31

*Virginia Petroleum Jobbers Ass'n v. F.P.C.*, 259 F.2d 921 (D.C. Cir. 1958) ..................12

*Washington Gas Co., et al. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ............11, 12, 34, 36

*Woods Psychiatric Inst. v. United States*, 20 Cl. Ct. 324 (Cl. Ct. 1990)....................29

**FEDERAL STATUTES**

5 U.S.C. § 500 *et seq.* .......................................................................................................2

5 U.S.C. § 553 ...........................................................................................................8, 27

5 U.S.C. § 706 ...............................................................................................................15

7 U.S.C. § 1621 *et seq.* ..........................................................................................7, 17-18, 37

7 U.S.C. § 1622 ..........................................................................................................7, 18

7 U.S.C. § 1626 ..........................................................................................................7, 18

7 U.S.C. § 1901 note....................................................................................................5

21 U.S.C. § 601 *et seq.* ............................................................................................4, 27

21 U.S.C. § 602 ...........................................................................................................16, 36

**TABLE OF AUTHORITIES**
(continued)

Page

21 U.S.C. § 603 ..................................................................................4, 17, 19, 23, 24, 27

21 U.S.C. § 610................................................................................................................4

21 U.S.C. § 621..............................................................................................................17

21 U.S.C. § 695.......................................................................................................26, 27

18 U.S.C. § 925..............................................................................................................24

42 U.S.C. § 4321 *et seq.*..........................................................................................2, 31

**FEDERAL REGULATIONS**

7 C.F.R. § 53 ..................................................................................................................19

7 C.F.R. § 1b.3.....................................................................................................30, 32, 33

7 C.F.R. § 1b.4...........................................................................................................30, 32

9 C.F.R. § 88 ....................................................................................................................5

9 C.F.R. § 350 ......................................................................................................7, 17, 19

9 C.F.R. § 352 ...................................................................................................7, 20, 24, 25

9 C.F.R. §§ 354 ................................................................................................................7

9 C.F.R. § 390 ................................................................................................................20

9 C.F.R. § 391 ..........................................................................................................7, 24

40 C.F.R. § 1500 ............................................................................................................32

40 C.F.R. § 1501 ............................................................................................................30

40 C.F.R. § 1508 ............................................................................................................31

60 Fed. Reg. 66479 ........................................................................................................33

70 Fed. Reg. 67490 ........................................................................................................27

# TABLE OF AUTHORITIES
(continued)

**Page**

71 Fed. Reg. 6,337 ...................................................................6, 7, 8, 19, 20, 28

47 Fed.Reg. 42364 ..............................................................................................33

48 Fed.Reg. 11403 .......................................................................................32, 33

## LEGISLATIVE MATERIALS

Agriculture, Rural Development, Food and Drug Administration, and Related
　　Agencies Appropriations Act of November 10, 2005,
　　Pub.L. 109-97.....................................................................4, 5, 6, 21, 23, 26

H.R. Rep. No. 109-255 (2005)....................................................................6, 8, 22

151 Cong. Rec. S10, 218 (daily ed. Sept. 20, 2005).........................................22

S. Doc. No. 248, 79th Cong., 2d Sess. 200, 258 (1946) ..................................28

Horse Slaughter Prevention Act, S. 195, 105th Cong. (2005)...........................24

H.R. 503, 105th Cong. (2005).........................................................................24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF<br>THE UNITED STATES, et al.<br><br>Plaintiffs,<br><br>v.<br><br><br>MIKE JOHANNS, Secretary,<br>U.S. Department of Agriculture, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Civ. No. 1:06cv00265 (CKK)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## APPLICANT DEFENDANT-INTERVENORS' MEMORANDUM IN SUPPORT OF MOTION TO DENY PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION

## I.  INTRODUCTION

Applicant Defendant-Intervenors Beltex Corporation ("Beltex"), Cavel International, Inc. ("Cavel"), and Dallas Crown, Inc. ("Dallas Crown") (collectively "Applicant Defendant-Intervenors") hereby oppose the Motion of The Humane Society of the United States, Animal Welfare Institute, The Fund for Animals, Society for Animal Protective Legislation, Doris Day Animal League, American Society for the Prevention of Cruelty to Animals, American Humane Association, Robert Eldridge, Gail Vacca, Juanita Smith, Judy Taylor, Tonja Runnels, Yolanda Salazar, Margarita Garcia, and Javier Zuniga (collectively "Plaintiffs") for a Preliminary Injunction, and respectfully request the Court to deny the Motion.

It is black-letter law that the very purpose of a preliminary injunction is to preserve the status quo between the parties until a trial can be held on the merits of the case. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (2001).  What the Plaintiffs seek to do by their Motion is

1

not to maintain the status quo but instead to issue a mandatory preliminary injunction that would terminate decades of an established practice – the ante-mortem inspection of horses – that is still, contrary to their argument, required by federal law. The Plaintiffs seek to turn the status quo 180 degrees, to the irreparable damage of three companies that continually have been in business for more than a decade. On the other hand, the status of Plaintiffs and the people they purport to represent will remain exactly as it has been for the past approximately 30 years only if this Court DENIES the injunction. For this reason alone, their request for a preliminary injunction should be denied.

In addition, all four factors that courts in the D.C. Circuit consider when assessing whether to grant preliminary injunctive relief compel rejection of the Plaintiffs' Motion. Plaintiffs do not enjoy a substantial likelihood of success on the merits in the underlying case, nor did the United States Department of Agriculture ("USDA" or "the Department") violate either the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA") or the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA") in promulgating the interim final rule to establish a fee-for-service program for the ante-mortem inspection of horses. In addition, the Plaintiffs will not suffer irreparable harm if the injunction is denied. In fact, the only parties endangered by the possibility of an injunction are the Government Defendants and Applicant Defendant-Intervenors. Finally, public policy concerns will not be furthered by the injunction requested by the Plaintiffs. Rather, public policy concerns mandate permitting the Applicant Defendant-Intervenors to continue the operation of their decades old businesses by the establishment of the fee-for-service inspection program. These four factors, and the jurisprudence of the D.C. Circuit not to enjoin agency regulations at this preliminary stage,

counsel that the injunction should be denied and, thereby, the status quo be maintained pending a considered determination on the merits.

## II. FACTUAL BACKGROUND

### A. <u>Applicant Defendant-Intervenors</u>

The Applicant Defendant-Intervenors operate facilities in Texas and Illinois that slaughter horses and process horse meat for export to overseas purchasers. This specialized industry includes only these three companies. Defendant-Intervenor Beltex was founded in 1976 and operates in Forth Worth, Texas. Beltex employs approximately 100 people in the day-to-day operations of the plant. Petition of Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc. for Emergency Rulemaking to Provide for Voluntary, Ante-Mortem Inspection of Horses and Related Relief ("the Petition"), pp. 2, attached as Exhibit 1. Defendant-Intervenor Dallas Crown is located in Kaufman, Texas. It has specialized in the processing of fresh and frozen horsemeat products since 1994. The company is the largest employer in Kaufman, Texas, employing 52 people in the day-to-day operations of the plant. Declaration of Dallas Crown, Inc. ("Dallas Crown Decl.") ¶ 6, attached as Exhibit 2. Applicant Defendant-Intervenors Beltex and Dallas Crown, combined, are the single largest airfreight customer at the Dallas-Forth Worth International Airport, spending $6 million annually on airfreight services. *See* Declaration of Beltex Corporation ("Beltex Decl.") ¶ 10, attached as Exhibit 3; Petition pp. 8.

Defendant-Intervenor Cavel is located in DeKalb, Illinois. Since 1987, it has processed fresh and frozen horsemeat products for export. Declaration of Cavel Inc. ("Cavel Decl.") ¶ 2, attached as Exhibit 4. Like Beltex and Dallas Crown, Cavel is a significant employer and contributor of tax revenues in the DeKalb area. The company employs 56 workers from the region. In addition, Cavel provides substantial financial support to farmers throughout the

3

Midwest and West, who, collectively, earn an additional $8 million a year by selling their horses to Cavel. Petition pp. 8

**B. The Fiscal Year 2006 Appropriations Act and the Interim Final Rule**

Applicant Defendant-Interventors are subject to ante-mortem inspection pursuant to both the Federal Meat Inspection Act and the Federal Agriculture Improvement and Reform Act of 1996. Each of these regulatory regimes is described below.

First, Applicant Defendant-Intervenors are subject to the Federal Meat Inspection Act, 21 U.S.C. § 601 *et seq.*, ("FMIA"), which requires continuous government inspection at establishments that slaughter livestock to prevent the inhumane treatment of the animals and the distribution of adulterated meat food products. Specifically, FMIA requires that the Secretary of Agriculture

> shall cause to be made, by inspectors appointed for that purpose, an examination of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce.

21 U.S.C. § 603(a), as amended by the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act of November 10, 2005, Pub. L. 109-97 ("Appropriations Act"). "Amenable Species" includes all species subject to the provisions of FMIA as of the day before the Appropriations Act was signed into law. These species include "cattle, sheep, swine, goats, horses, mules, and other equines." Appropriations Act § 98. Without ante-mortem inspection, which is carried out by inspectors from the Food Safety and Inspection Service ("FSIS"), Applicant Defendant-Intervenors are prohibited from selling their products for human consumption. 21 U.S.C. § 610.

Second, another aspect of the ante-mortem inspection of horses, the Federal Agriculture Improvement and Reform Act of 1996, 7 U.S.C. § 1901 note ("the Farm Bill"), authorizes the

Secretary of Agriculture to "issue guidelines for the regulation of the commercial transportation of equine for slaughter by personnel regularly engaged in that activity." 7 U.S.C. § 1901 note. Acting pursuant to this authority, the Secretary authorized the Animal and Plant Health Inspection Service ("APHIS") to issue regulations that address issues such as the food, water and rest provided to equines, as well as the methods by which they are loaded and transported to slaughter facilities. *See* 9 C.F.R. § 88.

Inspections made pursuant to the FMIA, as well as transportation-related inspections carried out by APHIS, have been and are currently funded by annual appropriations made to the USDA.

On November 10, 2005, the President signed into law the Fiscal Year 2006 Appropriations Act, the statue on which Plaintiffs place sole reliance for their preliminary injunction motion. The Appropriations Act changes only the funding arrangement for ante-mortem and transportation-related inspections of horses. Section 794 of the Appropriations Act provides:

> Effective 120 days after the date of enactment of this Act, none of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under Section 3 of the Federal Meat Inspection Act (21 U.S.C. 603) or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 1901 note; Public Law 104-127).

Appropriations Act § 794. Thus, as of March 10, 2006, funds appropriated under the Fiscal Year 2006 Appropriations Act cannot be used to pay the salaries and expenses of USDA personnel to conduct the statutorily mandated ante-mortem inspections of horses.

It is crucial to note that the Appropriations Act does not affect or otherwise alter either FMIA's mandate that the USDA conduct ante-mortem inspection of horses or the applicability of the transportation-related regulations to the Applicant Defendant-Intervenors' industry. The fact

that the USDA is obliged to provide ante-mortem inspection for horse slaughter is explicitly acknowledged in the conference report explaining Section 794: "It is the understanding of the conferees that the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and exported)." H.R. REP. NO. 109-255 at 107 (2005).

To address the situation in which the USDA is required by law to conduct ante-mortem inspection of horses, but is part of one fiscal year deprived of the funding to do so, the Department sought other means by which to provide the statutorily mandated ante-mortem and transportation-related inspections to Applicant Defendant-Intervenors. On February 8, 2006 it promulgated an interim final rule to provide "for a voluntary fee-for-service program under which official establishments that slaughter horses will be able to apply for and pay for ante-mortem inspection." 71 *Fed. Reg.* 6,337, 6,341 (Feb. 8, 2006) (to be codified at 9 C.F.R. § 352), attached as Exhibit 5.

Likewise, APHIS announced its intention to establish a similar program under authority explicitly provided in the Appropriations Act to

> collect fees to cover the total costs of providing technical assistance, goods, or services requested by…domestic and international organizations…or individuals, provided that such fees are structured such that any entity's liability for such fees is reasonably based on the technical assistance, goods, or services provided to the entity by the agency, and such fees shall be credited to this account, to remain available until expended, without further appropriation, for providing such assistance, goods, or services.

Appropriations Act (119 Stat. 2129); *see also* 71 *Fed. Reg.* 6,338. Notably, this authority is, like Section 794 of the same Act which prohibits federal funding for the transportation-related inspection of horses, limited only to Fiscal Year 2006.

The USDA relied upon Agricultural Meat Marketing Act, 7 U.S.C. § 1621 *et seq.* ("AMA"), which provides the Department with the authority to furnish voluntary inspection for all "agricultural, viticultural, and dairy products, livestock and poultry, bees, forest products, fish and shellfish" for a fee. 7 U.S.C. §§ 1622(h), 1626. The Act grants the Secretary of Agriculture the authority to

> inspect, certify, and identify the class, quality, quantity, and condition of agricultural products when shipped or received in interstate commerce, under such rules and regulations as the Secretary of Agriculture may prescribe, including assessment and collection of such fees as will be reasonable and as nearly as may be to cover the cost of the service rendered.

7 U.S.C. § 1622(h).

Pursuant to regulations promulgated under the AMA, FSIS currently provides voluntary inspection of certain exotic animals, including reindeer, elk, deer, antelope, water buffalo, and bison, as well as rabbits, which are not required to be inspected pursuant to the FMIA. 9 C.F.R. Parts 350, 352 and 354. FSIS also provides voluntary inspection of amendable meat food products at non-official establishments. Furthermore, pursuant to FMIA, FSIS provides overtime and holiday inspections for a fee. 9 CFR §§ 391.2, 391.3, 391.4.

The interim final rule proposes that the regulations previously adopted to apply the AMA to exotic animals now also apply to the ante-mortem inspection of horses for all inspections. 71 *Fed. Reg.* at 6,339. However, "all requirements in the regulations authorized by the FMIA that pertain to official establishments that slaughter horses will continue to apply," including the requirement that facilities that slaughter horses must "continue to use humane methods for handling and slaughtering horses." *Id.* (citing 9 CFR § 352.10).

In establishing a fee-for-service ante-mortem inspection program, the USDA explicitly relied upon both the mandate of the FMIA to inspect horses prior to slaughter, as well as the

Joint Explanatory Statement of the Committee of Conference that accompanied the Appropriations Act which recognized the "Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption..." *Id.* at 6,338. (citing H.R. REP. NO. 109-255 at 107). The Department also recognized that the Appropriations Act included no "limitation on the Agency's ability to establish a voluntary fee-for-service program for ante-mortem inspection." *Id.* at 6,3440.

The USDA adopted the interim final rule, which is scheduled to take effect on March 10, 2006, without prior notice and comment to "ensure continuity of operations at official establishments that slaughter horses." *Id.* at 6,340. The USDA and the FSIS recognized that if means were not immediately established for the statutorily mandated ante-mortem inspection of horses, Applicant Defendant-Intervenors would be unable "to operate and presumably will be forced out of business." *Id.* Thus, the "interim final rule is necessary to avoid disruption of operations at official establishments that slaughter horses." *Id.* For these reasons, "prior notice and opportunity for public comment are impracticable and contrary to the public interest under 5 U.S.C. § 553(b)...." *Id.* However, the USDA has provided more than one month for post-promulgation comments on the interim final rule. The Department has in no way indicated that comments received would not be reviewed and, if appropriate, addressed or adopted in a final rule.

## C. The Complaint and Application for a Preliminary Injunction

On February 14, 2006, the Plaintiffs, mainly nonprofit animal protection organizations headquartered in Washington, D.C. and New York, as well as five of their members, filed suit against the Secretary of Agriculture and the Administrator of FSIS for declaratory and injunctive relief. Plaintiffs filed a First Amended Complaint for Declaratory and Injunctive Relief ("the Complaint") on February 21, 2006, adding three new individual plaintiffs from the Forth Worth,

Texas area.  The Plaintiffs allege that the Department failed to comply with the APA and with NEPA in promulgating the interim final rule.

On February 22, 2006, Plaintiffs filed a Motion for a Temporary Restraining Order and for a Preliminary Injunction ("Plaintiffs' Motion").  In their Motion, Plaintiffs request an order declaring that the interim final rule violates the Appropriations Act and FMIA, thereby prohibiting the establishment of the fee-for-service ante-mortem inspection service on March 10, 2006.

## III. ARGUMENT

### A. Legal Standard for Preliminary Injunction

It is well settled that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion."  *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (emphasis in the original).  In assessing whether such extraordinary relief should be granted, the Court of Appeals for the District of Columbia Circuit has held that a plaintiff must show "1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction."  *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *Cityfed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

When applying these four factors, courts "employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another."  *Sociedad Anonima Vina Santa Rita v. United States Dep't of the Treasury, et al.,* 193 F. Supp. 2d 6, 13 (D.D.C. 2001) (citing *Cityfed Fin.,* 58 F.3d at 747).  Thus, even if there exists a showing of irreparable injury, if the plaintiff is highly unlikely to succeed on the merits or if the injunction

would substantially injure other interested parties, such as the Applicant Defendant-Intervenors in this case, an injunction will be denied.

Here, Plaintiffs' Motion asks for relief that is the exact opposite of the normal purpose of this extraordinary remedy. Preliminary injunctive relief should be prohibitory and seek to preserve the "status quo between the litigants pending final determination of the case." *Douglas T.V. Hi-Fi Stereo Ctr. v. U.S. Pioneer Electronics Corp., et al.,* No. 312-74, 1974 U.S. Dist. LEXIS 9297, at *5 (D.D.C. Mar. 26, 1974). The status quo is the "last peaceable, uncontested status between the parties which preceded the controversy about which suit is brought." *Id.* at *6. Thus, the remedy "can be protective or restorative as well as preventative...the status quo in a particular case may be 'a condition not of rest, but of action....'" *SEC v. American Inst. Counselors, Inc. et al.,* No. 75-1965, 1975 U.S. Dist. LEXIS 14586, at *54 (D.D.C. Dec. 30, 1975)(citations omitted). Injunctive relief that would alter the status quo, i.e., mandatory preliminary relief, is not favored and highly unusual. *See Emily's List v. FEC,* 362 F. Supp. 2d 43, 52 (D.D.C. 2005)("If the requested relief 'would alter, not preserve, the *status quo*...[a plaintiff] must meet a higher standard than were the injunction...sought merely prohibitory.'")(citing *Veitch v. Danzg,* 135 F. Supp. 2d 32, 35 (D.D.C. 2001)). With this application, Plaintiffs seek to change the status quo that has existed for more than a decade: Applicant Defendant-Intervenors' slaughter horses and the processing of horse meat according to federal law and regulations promulgated, implemented and policed by the USDA.

Preliminary injunctive relief is highly disfavored when the request is based on alleged violations of the APA. Several cases in this Circuit have ruled that "the preliminary injunction stage is not the appropriate time to consider the merits of Plaintiff's substantive APA claims." *Emily's List,* 362 F. Supp. 2d at 53; *American Bioscience, Inc. v. Thompson, et al.,* 269 F.3d

1077, 1083-1084 (D.C. Cir. 2001)(also warning courts that "since under 28 U.S.C. § 1657(a) the granting or denying of a preliminary injunction is the basis for an expedited appeal the district courts should be careful…not to do so.")  This is particularly so where "allegations of irreparable injury are lacking at this stage." *Emily's List,* 362 F. Supp. 2d at 53.  As is addressed in section D, *infra,* Plaintiffs devote a mere four pages of a 43-page memorandum to what ultimately is a failed effort to demonstrate "irreparably harmed" interests not associated with their substantive claims. *See id.* at 57, 58 ("Plaintiff devotes a mere one page of its Motion to this central question of irreparable harm…").  Like the plaintiff political committee in *Emily's List,* the Plaintiffs here cannot make the requisite showing of irreparable harm, which is the *sine quo non* for preliminary injunctive relief in the federal courts.  *Id.* at 52, 58.  If the interim final rule is to become effective on March 10, 2006, Plaintiffs are in no way faced with a change, let alone a greater burden upon their lives than they have faced for more than a decade.  *Id.* at 58.  On the other hand, Applicant Defendant-Intervenors face the cessation of their businesses, a clearly "irreparable harm." *Washington Gas Co., et al. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (finding that financial harm that threatens the very existence of a business constitutes irreparable harm).  Even if this Court were later to reverse the injunction, Applicant Defendant-Intervenors would have no way to recoup the revenue and profits lost while the injunction was pending. Their employees and vendors similarly would have suffered losses for which there would be no redress.

**B.  Preliminary Injunction Will Cause Substantial Harm to the Applicant Defendant-Intervenors and Other Third Parties**

A party seeking a preliminary injunction is charged with establishing that the "preliminary injunction will harm neither the defendants nor any other interested party." *Cortez III Service Corp. v. NASA, et al.,* 950 F. Supp. 357, 363 (D.D.C. 1996).  Plaintiffs cannot meet

11

this requirement. In fact, if implementation of the fee-for-service inspection program is stayed, it is Defendants, Applicant Defendant-Intervenors, their employees and other third parties who will suffer irreparable harm. This factor should weigh heavily in the analysis employed by this Court, as "courts should be hesitant to issue an injunction if such actions would have harmful effect on other persons. 'Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents.'" *Mt. Airy Refining Co., et al. v. Schlesinger, et al.,* 481 F. Supp. 257, 284 (D.D.C. 1979)(citing *Virginia Petroleum Jobbers Assn. v. F.P.C.,* 259 F. 2d 921, 925 (D.C. Cir. 1958)).

### 1. Harm to Applicant Defendant-Intervenors

It is undeniable that an order that effectively stays the fee-for-service program threatens the very existence of Applicant Defendant-Intervenors' businesses. Contrary to Plaintiffs' assertion, this result is one that should be accorded great weight by this Court. *See id.;* Plaintiffs' Motion pp. 41. In fact, it is Defendant-Intervenors, not the Plaintiffs, who face the "irreparable harm" that a preliminary injunction is meant to guard against.

Applicant Defendant-Intervenors face more than mere monetary or economic loss that can be easily compensated: they face the cessation of their businesses. As the Court of Appeals found in *Washington Gas Co.,* financial harm that threatens the very existence of an industry constitutes irreparable harm. *Washington Gas Co.,* 758 F.2d at 674.

In addition, unlike Plaintiffs' alleged harm (see section D, *infra*), the harm which faces Applicant Defendant-Intervenors is "both certain and great." *Id.* This harm is certain: without ante-mortem inspection of horses, Applicant Defendant-Intervenors cannot slaughter the animals and legally ship their meat to Applicant Defendant-Intervenors' customers abroad. Beltex Decl. ¶ 8; Dallas Crown Decl.¶ 8; Cavel Decl. ¶ 7. The harm is also great: Applicant Defendant-Intervenors face no mere financial loss that can be easily compensated. Beltex Decl. ¶ 8; Dallas

Crown Decl.¶¶ 7, 8; Cavel Decl. ¶¶ 6, 7.  Applicant Defendant-Intervenors operate multi-million dollar facilities, which are profitable, but very expensive to maintain, a financial burden that becomes even greater if the companies are forced to temporarily shut down.  Cavel Decl. ¶ 12; *see* Beltex Decl. ¶ 10.  Long-standing customers in Europe depend upon the meat and meat products that Beltex, Cavel and Dallas Crown produce on a daily basis.  *See* Beltex Decl. ¶ 3; Dallas Crown Decl.¶¶ 3, 9, 10.

Even a temporary "shut-down" of Applicant Defendant-Intervenors facilities will result in irreparable harm.  Beltex Decl. ¶ 8; Dallas Crown Decl.¶ 10; Cavel Decl. ¶ 9.  None of the companies has the ability to adapt its facilities to process, for instance, cattle or sustain its current operations if it were to attempt to process "exotic animals," such as elk, deer, or water buffalo. Beltex Decl. ¶ 8; Cavel Decl. ¶ 8.

### 2.  Harm to Third Parties

In addition to the harm caused to the Applicant Defendant-Intervenors by a preliminary injunction, third parties will also be adversely affected if the Plaintiffs' Motion is granted, and "courts should be hesitant to issue an injunction if such actions would have harmful effect on other persons." *Mt. Airy Refining, Co., et al.,* 481 F. Supp. at 285.  The principal third parties who will suffer are the employees at the plants.  Over 200 people in the Forth Worth and DeKalb areas will lose their jobs if the fee-for-inspection program is not permitted to begin on March 10, 2006.  *See* Beltex Decl. at ¶¶ 6, 7, 8; Cavel Decl. at ¶ 10; Dallas Crown Decl. at ¶ 11.

Loss of employment has been held to be an "irreparable injury" for the party seeking a preliminary injunction, and such injury should be avoided when third parties are faced with suffering that same loss.  For instance, in *Cortez III Service Corp.,* plaintiffs challenged the National Aeronautics and Space Administration's ("NASA") decision to offer a contract under the Small Business Administration's 8(a) program, which provides preferential awards of

13

contracts for small and minority-owned business, rather than offering the contract under full-and-open competition. *Cortez III Service Corp.,* 950 F. Supp. at 358-359. The plaintiffs sought to enjoin the contract offering, and were held to have successfully met the "irreparable injury" requirement by showing that "as the incumbent contractor, plaintiff corporation employs more than 500 individuals...[and] the CLASS-II contract represents 35 percent of the corporation's total business." *Id.* at 363. In this case, over 200 people are threatened with loss of their employment. Even if this Court were later to lift the injunction, the wage losses suffered by more than 200 people would be irretrievable.

Other industries also rely upon Applicant Defendant-Intervenors' continued operation. Farmers and ranchers who no longer can employ certain horses on their farms or ranches are often faced with either continuing to care for unwanted animals or utilizing Applicant Defendant-Intervenors' facilities and thereby receiving a small payment of approximately $300.

Pharmaceutical industries, universities, and other institutions also use Applicant Defendant-Intervenors' facilities for research, training for veterinary students and medical studies. Furthermore, zoos rely heavily on the products of Applicant Defendant-Intervenors' facilities to supplement animal diets across the country. *See* Beltex Decl. ¶ 3; Dallas Crown Decl.¶¶ 3, 9, 10. Zoos, institutions dedicated to animal welfare, attach importance to sourcing their meat-based animal diets from USDA-inspected facilities because of the assurance that stringent animal welfare and food safety requirements have been met.

## C. **Plaintiffs Have No Likelihood of Success on the Merits**

"It is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits" in order for a court to grant an application for a preliminary injunction. *Barton v. Dist. of Columbia,* 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler,* 505 U.S. 1084, 1085 (1992)). In this case, Plaintiffs assert causes of action for declaratory relief

14

and permanent injunctive relief against the USDA, FSIS and Applicant Defendant-Intervenors. Because Plaintiffs cannot demonstrate a substantial likelihood of success on any claim that would entitle them to injunctive relief, they cannot meet this critical requirement for a preliminary injunction.

### 1. The USDA Did Not Act Arbitrarily or Capriciously in Promulgating the Interim Final Rule

Under the APA, a court may set aside an agency's regulations if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[1] 5 U.S.C. § 706 (2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfr. Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983); *Defenders of Wildlife, et al. v. Hogarth, et al.,* 177 F. Supp. 2d 1336, 1343 (Ct. Int'l Tr. 2001)("The arbitrary and capricious standard of review is not merely deferential to agency action, but the *most* deferential of the APA standards of review."). An agency's action will be set aside only if it

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*American Horse Prot. Assoc., Inc. v. Yeutter,* 917 F.2d 594, 598 (D.C. Cir. 1992).

---

[1] Plaintiffs allege that the USDA acted in a manner not consistent with 5 U.S.C. § 706 (2)(A). *See* Plaintiffs' Motion, pp. 22. They do not allege that the USDA acted outside the boundaries of Congress' delegation of authority to the Department, under either the FMIA or AMA, to create a fee-for-service ante-mortem inspection program for horses. *See Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.* 467 U.S. 837 (1984). Thus, this case "falls within the province of traditional arbitrary and capricious review." *Arent v. Shalala,* 70 F.3d 610, 615 (D.C. Cir. 1995). However, Applicant Defendant-Intervenors note that "in some cases…a finding that an agency has acted arbitrarily or capriciously in discharging its statutory duties could be phrased as a conclusion that the agency's interpretation of the controlling statute is unreasonable," and that in such cases, a determination under the "arbitrary and capricious" standard is "functionally equivalent to a determination that the agency's interpretation of the [governing statute] is unreasonable under *Chevron.*" *Sociedad Anonima Vina Santa Rita,* 193 F. Supp. 2d at 16. In the end, the result under either the arbitrary and capricious standard or an analysis premised on *Chevron* leads to the same conclusion: the USDA did not act arbitrarily and capriciously in promulgating the interim final rule. *See id.*

Accordingly, Plaintiffs carry a daunting burden, particularly at this preliminary stage, in proving that the USDA violated 5 U.S.C. § 706(2)(A). Plaintiffs allege that the Department violated both FMIA and the Appropriations Act and acted contrary to what they claim (erroneously) was a Congressional command to end horse slaughter in the United States. *See* Complaint ¶ 96. Plaintiffs have not met their burden on either score. The USDA acted rationally and in accord with the FMIA, AMA and Appropriations Act in promulgating the interim final rule. The Department followed the only "unequivocal Congressional demand" it has received: to cease providing federal funding for the ante-mortem inspection of horses. *See* Complaint ¶ 96.

### a) The USDA Acted Within the Scope of Its Authority under the FMIA and AMA

Congress made several significant findings when it enacted FMIA. One such finding is that meat and meat food products are an important source of the Nation's total supply of food. 21 U.S.C. § 602. Concerns regarding meat were not limited to our own country's borders as a major portion of American meat products are placed in foreign commerce. *Id.* Whether meat stays in this country or is shipped abroad, Congress found that

> [i]t is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged. Unwholesome, adulterated, or misbranded meat or meat food products impair the effective regulation of meat and meat food products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged meat and meat food products, and result in sundry losses to livestock producers and processors of meat and meat food products, as well as injury to consumers.

*Id.*

To ensure that these interests would be protected, Congress directed that the Secretary of Agriculture "shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all cattle, sheep, swine, goats, horses, mules, and other equines before they

shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce." 21 U.S.C. § 603(a).

Of particular import here, Congress gave the USDA discretion in determining the nature of the required inspections, as well as the authority to prescribe regulations, not inconsistent with the Act, to ensure that its purposes are carried out. Specifically, Section 621 states the "Secretary shall, from time to time, make such rules and regulations as are necessary for the efficient execution of the provisions of this chapter, and all inspections and examinations made under this chapter, shall be such and made in such manner as described in the rules and regulations prescribed by said Secretary not inconsistent with provisions of this chapter." 21 U.S.C. § 621.

Faced with the command that horses be inspected prior to slaughter, as well as the authority to "make such rules and regulations as are necessary for the efficient execution of the provisions of this chapter," and in light of the Appropriation Act, the USDA and FSIS chose to establish a voluntary fee-for-service program for the ante-mortem inspection of horses. Such a program is already in place, established in regulations promulgated to carry out the commands of the AMA. *See* 9 C.F.R. Part 350, *et seq.*

The purpose of the AMA, among other things, is to ensure

an integrated administration of all laws enacted by Congress to aid the distribution of agricultural products through research, market aids and services, and regulatory activities, to the end that marketing methods and facilities may be improved, that distribution costs may be reduced and the price spread between the producer and consumer may be narrowed, that dietary and nutritional standards may be improved, *that new and wider markets for American agricultural products may be developed, both in the United States and in other countries, with a view to making it possible for the full production of American farms to be disposed of usefully, economically, profitably, and in an orderly manner.*

17

7 U.S.C. § 1621 (emphasis added).

The scope of the AMA is not limited to animals not covered under the FMIA, as the Plaintiffs contend. *See* Plaintiffs' Motion, pp. 28. In fact, the scope of the AMA is incredibly broad and includes "agricultural, horticultural, viticultural, and dairy products, livestock and poultry, bees, forest products, fish and shellfish, and any products thereof...." 7 U.S.C. § 1626.

Under the Act, the Secretary of Agriculture is directed to carry out two tasks which are particularly relevant here. First the USDA is charged with fostering and assisting "in the development of new or expanded markets (domestic and foreign) and new and expanded uses and in the moving of larger quantities of agricultural products through the private marketing system to consumers of the United States and abroad." 7 U.S.C. § 1622(e). Admittedly, processing horsemeat for human consumption is not a large industry in the United States. In fact all horse meat for human consumption is exported. However, horse meat for foreign human consumption qualifies as an "expanded" use of the livestock in other countries, and as such is appropriately supported by the Secretary of Agriculture, as directed by Congress.

Second, the AMA directs the Secretary of Agriculture to "inspect, certify and identify the class, quality, quantity, and condition of agricultural products when shipped or received in interstate commerce." 7 U.S.C. § 1622 (h). It is under "such rules and regulations as the Secretary of Agriculture may prescribe, including assessment and collection of such fees as will be reasonable provide inspections for and as nearly as may be to cover the cost of the service rendered, to the end that...trading may be facilitated, and that consumers may be able to obtain the quality product which they desire...." *Id.* Again, this directive is not limited to those agricultural products not subject to the FMIA. In fact, it includes them. *See* 7 U.S.C. § 1626. For example, the voluntary fee-for-inspection program that was established by the USDA

following the enactment of the AMA has historically, and on a consistent basis, been employed for the grading of meat from amenable livestock and for the inspection of amenable meat at unofficial establishments. 7 CFR § 53; 9 CFR §§ 350.7.

In sum, the FMIA directs the USDA to provide ante-mortem inspection for horses. After the 2006 Appropriations Act provided no funding for that purpose in this fiscal year, the Department and the FSIS had no choice but to exercise their statutory authority to utilize the AMA to implement a voluntary fee-for-service program.

### b) The USDA Acted Rationally in Establishing a Voluntary Fee-For-Service Ante-Mortem Inspection Program

"An agency's decision withstands arbitrary and capricious review as long as the agency has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Sociedad Anonima Vina Santa Rita.*, 193 F. Supp. 2d at 28 (citing *State Farm Mut. Auto Ins. Co.,* 463 U.S. at 43). "In this case, the entire Administrative Record and the [interim] final rule itself, demonstrate that the [USDA] engaged in the thorough analysis that the regulations and statute[s] mandate." *Id.*

The interim final rule evidences that the USDA engaged in a thorough and rational analysis of its statutory obligations, as well as the existing regulations and programs, in order that it could fulfill its legal responsibilities *and* comply with the Appropriations Act. First and foremost, the USDA was concerned with the continuing mandate of the FMIA that it provide for the ante-mortem inspection of amenable species, including horses. 21 U.S.C. § 603(a). This fact, and the fact that the "Joint Explanatory Statement makes clear that the Department is obliged to provide for inspection of meat for human consumption" is noted in the interim final rule. *See 71 Fed. Reg.* 6,338-6,6340. In addition, the Department was cognizant of its authority under the AMA to "establish a program under which official establishments that slaughter horses

19

can pay for ante-mortem inspection." *Id.* at 6,339. The USDA and FSIS noted that the establishment of such a program simply fulfilled its obligation under the AMA to "inspect…the condition of agricultural products when shipped or received in interstate commerce." *Id.*

It is noteworthy that the USDA conceived a program that would not only allow it to fulfill its statutory obligations but also to deviate only slightly from pre-existing programs. *See* 9 C.F.R. § 352. Utilizing a fee-for-service program to which the horse slaughtering facilities are already subject on a holiday and overtime basis is, contrary to what Plaintiffs state, not a "drastic regulatory change." Complaint ¶ 7; see 9 C.F.R. § 390. Rather, it is a modest and practical solution to a one year funding decision by Congress in the 2006 Appropriations Act.

Furthermore, inspections are still being carried out pursuant to the substantive dictates of the FMIA. Again, contrary to what the Plaintiffs claim, the USDA is not "simply [choosing] to disregard the detailed requirements of the FMIA." Complaint ¶ 56. The interim rule, in at least three different paragraphs on pp. 6,339 states that ante-mortem inspection of horses will continue pursuant to the FMIA. 71 *Fed. Reg.* 6,339. For instance, the USDA states that "under this interim final rule, official establishments that slaughter horses will continue to receive ante-mortem inspection services consistent with those provided to other official establishments that slaughter livestock" and "although this interim final rule will provide…ante-mortem inspection services pursuant to a fee-for-service program governed by the AMA, all other inspection services…will continue to be rendered pursuant to, and in accordance with the requirements of the FMIA." *Id.*

c)  **The USDA Acted Consistent With the Appropriations Act and Implemented Congress' Command to Cease Funding Ante-Mortem Inspection of Horses in Fiscal Year 2006**

An agency's rule can be challenged as "arbitrary and capricious" on the ground that it "failed to consider factors made relevant by Congress." *James V. Hurson Assoc. v. Glickman,* 29 F.3d 277, 284 (D.C. Cir. 2000)(citations omitted).  The Plaintiffs have alleged that the USDA ignored an "unequivocal Congressional command designed to end horse slaughter."  Complaint ¶ 96.  This "command" is a litigation position of Plaintiffs' imagination.  It is not the command that the USDA received.  Rather, the Department was told that it could not use appropriated funds in Fiscal Year 2006 to pay "the salaries and expenses of personnel to inspect Horses under Section 3 of the Federal Meat Inspection Act…or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996."  Appropriations Act ¶ 794.

To determine Congress' purpose and intent in enacting the amendment to the Appropriations Act, the traditional tools of statutory construction should be employed.  These tools include an "examination of the statute's text, legislative history, and structure[,] as well as its purpose."  *Bell Atl. Tel. Cos. v. FCC,* 131 F.3d 1044, 1047 (D.C. Cir. 1997).  The "first and foremost tool to be used is the statute's text, giving it its plain meaning.  Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter."  *Timex V.I., Inc. v. United States,* 157 F.3d 879, 882 (Fed. Cir. 1998).  Applying that rule to this case, the end of the matter is that Congress simply meant to prohibit federal appropriations from being used to pay the salaries and expenses of USDA inspectors.  The language could not be clearer.  *See* Appropriations Act ¶ 794.  There is not a hint of language in the Appropriations Act that could be construed to imply that Congress intended to "end the

slaughter of America's horses for human consumption overseas." Complaint ¶ 68 (citing 151 CONG. REC. S10, 218 (daily ed. Sept. 20, 2005)(remarks of Senator Ensign)).

However, Plaintiffs, finding the "statute's text unhelpful" to their cause, "seek refuge in its history." *Goldring, et al. v. District of Columbia*, 416 F.3d 70, 74 (D.C. Cir. 2005) (appellants unsuccessfully argued a statute allowing the recovery of "reasonable attorneys fees" also encompassed "expert fees"). This strategy is misplaced because when a "statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Id.* (citing *Lamie v. United States Tr.,* 540 U.S. 526, 534 (2004)). The Plaintiffs seek to expand the plain language of the statute by turning to statements of individual legislators during the course of the enactment process. However, "statutory text enacted by Congress trumps the views expressed by one of is [legislators]." *Id.* at 75. As the D.C. Court of Appeals wrote in *Goldring,* "job one is to read the statute, read the statute, read the statute," doing otherwise would essentially "substitute the Congressional Record for the United States Code." *Id.* at 77, 78. The USDA appropriately did not substitute the views of a few legislators for that of the United States Congress.

Even if the Court were to indulge the Plaintiffs' penchant for speeches included in the Congressional Record, the statements of individual legislators, in debates leading up to the enactment of the Appropriations Act, is far, far less persuasive than the language in the Conference Report that accompanied the Act, which stated "it is the understanding of the conferees that the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and imported)." H.R. REP. NO. 109-255 at 107 (2005); *see also Auburn Housing Auth., et al. v. Martinez,* 277 F.3d 138, 147 (2nd Cir. 2002) ("The conference report is generally the most reliable evidence in legislative history of

congressional intent because it represents the final statement of the terms agreed to by both houses"); *Transohio Sav. Bank v. Dir., Office of Thrift Supervision* No. 90-1678, 1991 U.S. Dist. LEXIS 11877, at *14 (D.D.C. 1991), *rev'd on other grounds Transcapital Fin. Corp. and American Capital Corp. v. Dir., Office of Thrift Supervision,* 44 F.3d 1023 (D.C. Cir. 1995)("[P]laintiffs cite disparate statements by individual Members of Congress on the floor of the House of Representatives.  Plaintiffs assert that these statements should be construed to indicate that Congress intended OTS to engage in a comprehensive rulemaking process...Neither the statute nor *any authoritative legislative history, such as the conference report, contain any such requirement.*")(emphasis added).

Furthermore, if Congress had wanted simply to ban the slaughter of horses for human consumption, it was capable of either drafting clear language or passing comprehensive legislation to effect that purpose.  Congress did not do so.  As discussed above, the language included in the 2006 Appropriations Act is perfectly clear and acts to prohibit federal funding for the ante-mortem inspection of horses.  *See* Appropriations Act § 794.  In the same Act, Congress also made substantive changes to the FMIA.  For instance, it changed the description of those animals subject to the FMIA from "cattle, sheep, swine, goats, horses, mules, and other equines" to "amenable species."  *Id.*  § 798, amending 21 U.S.C. § 603(a).  If Congress had meant to exclude horses from the required ante-mortem inspection, it could have simply stricken "horses" from the list of animals subject to inspection.  Instead, Congress *carefully* crafted Section 798 to ensure that horses would still be included as an "amenable species."  *Id.*

In addition, for the last several congresses, advocates of a bill to ban the slaughtering of horses for human consumption have drafted legislation to achieve the goal that Plaintiffs' claim the Appropriations Act secures: the end of horse slaughter.  These bills, S. 195, introduced by

Senator Ensign (R-NV) and H.R. 503, introduced by Representative Sweeney (R-NY) were both pending prior to the enactment of the Fiscal Year 2006 Appropriations Act. *See* The Horse Slaughter Prevention Act, S. 195, 105th Cong. (2005); H.R. 503, 105th Cong. (2005). These bills have never become law.

### (1) Language in an Appropriations Bill should not be Interpreted so as to Suspend a Statutory Provision

Plaintiffs suggest that the USDA has a fundamental legal obligation to implement a Congressional de-funding provision and that, when Congress chooses to remove funding for a statutory obligation, it should be interpreted as a suspension of the statutory obligation. Plaintiffs' Motion, pp. 25 (citing *Burch v. U.S. Dep't of Treasury,* 120 F.3d 1087, 1090 (9th Cir. 1997).[2]  However, the Second Circuit Court of Appeals has emphasized that "repeals by implication are not favored...This is especially true when the provision advanced as a repealing measure...was enacted in an appropriations bill." *Auburn Housing Auth.,* 277 F.3d at 144 (citations omitted). In order to interpret an appropriations bill in such a manner, Congress must

---

[2] Plaintiffs rely on a minor series of cases challenging the Treasury Department's failure to act on applications to restore firearms licenses to former convicts. *See McHugh v. Rubin,* 220 F.3d 53 (2nd Cir. 2000); *Burch,* 120 F.3d 1087. In those cases, the department relied upon appropriations bills' failure to fund the investigation of such applications to justify its inaction. Courts supported the Treasury Department's interpretation of the appropriations bills and held that the language included therein effectively suspended part of the authorizing statute. *See McHugh,* 220 F.3d 53; *Burch,* 120 F.3d 1087.

These cases are distinguishable. First, the statute that was held to be "suspended" provided the Attorney General the *discretion* to grant an applicant relief from the law which prevents former felons from possessing a firearm. 18 U.S.C. § 925 (c). The statute at issue here, the FMIA, does not grant the Secretary of Agriculture the discretion to provide ante-mortem inspection for amendable species, including horses. 21 U.S.C. §603(a).

Second, in these cases the parties failed to "suggest that the ATF has access to any funds other than those affected by the relevant spending limitation..." *McHugh,* 220 F.3d at 58. In the present case, Applicant Defendant-Intervenors, when petitioning the USDA for an interim final rule, noted that, pursuant to 9 C.F.R. § 391, the Department could use "funds otherwise available...to fund horse inspection activities, such as user-fees collected by FSIS for meat inspections involving overtime, holidays or exotic animals." Petition, pp. 5. In addition, in this case, there exists a whole *other program* by which the USDA can gain access to funding to support ante-mortem inspections for horses: the voluntary fee-for-inspection program established pursuant to the AMA. *See* 9 C.F.R. § 352.

make, at least, a "'positive repugnancy' between the existing statute and the appropriations statute…to indicate the earlier statute's suspension or repeal." *McHugh,* 220 F.3d at 58.

A case that Plaintiffs cite to support their argument that an appropriations bill's discontinuing funding for a statutory provision should be interpreted as a suspension of that provision actually supports the Second Circuit Court of Appeals' finding in *McHugh,* i.e., there needs to "something more" than just de-funding language to indicate the repeal of a statutory obligation. *See McHugh,* 220 F.2d at 58; *Envtl. Defense Center v. Babbitt, et al.,* 73 F. 3d 867 (9th Cir. 1995). In the appropriations bill in *Envtl. Defense Center,* Congress explicitly included language of "positive repugnancy," a crucial factor which lead the court to find that the Secretary of the Interior was prohibited from fulfilling his obligation under the Endangered Species Act. *Envtl. Defense Center,* 73 F.3d at 871-872. Specifically, Congress said "to the extent that the Endangered Species Act of 1973 has been interpreted or applied in any court order…to require the making of a determination respecting any number of species or habitats by a date certain, that Act shall not be applied to require that the determination be made by that date if the making of the determination is made impracticable by the rescission made by the preceding sentence[, 'none of the remaining funds appropriated under that heading may be made available for making a final determination that a species is threatened or endangered…']." *Envtl. Defense Center,* 73 F.3d at 870 (citing Pub. Law 104-06, 109 Stat. 73, 86 (April 10, 1995)). In this case, no such language was included in the Appropriations Act. In addition, the USDA has available to it another funding mechanism whereby it can not only follow Congress' direction but also fulfill its statutory obligations. *See* 9 C.F.R. § 352.

(2) The Appropriations Act does not Repeal the Secretary's
Duty to Inspect "Amendable Species"

As discussed above, the Second Circuit has often noted that repeals by implication, particularly when the provision was "enacted in an appropriations bill," are greatly disfavored. *Auburn Housing Auth.*, 277 F.3d at 144 (citations omitted). That court also held that for such an amendment to repeal "unilaterally statutory language" without a "clear and manifest" expression of Congress' intention to repeal the authorizing language, runs contrary to the "cardinal principle of statutory construction...to save and not to destroy." *Id.* at 146-147, 150 (citations omitted).

These two guiding principles counsel that the Appropriations Act, which prohibits federal funds from being used to pay the "salaries or expenses of personnel to inspect horses," should be interpreted narrowly, not as a repeal of the Department's duty to inspect under the FMIA, but merely as a temporary amendment to its duty to fund these inspections pursuant to 21 U.S.C. § 695. *See id.* at 146 (there exists a "presumption that a provision contained in an appropriation act applies only in the fiscal year").

Section 695 of FMIA provides that "the cost of inspection...under the requirements of laws relating to Federal inspection of meat and meat food products shall be borne by the United States." 21 U.S.C. § 695. Like Section 695, the Appropriations Act addresses only the funding mechanism by which inspections are carried out. It does not affect the USDA's substantive statutory obligations under FMIA.[3] *See* Appropriations Act § 794. There is neither language in the amendment that would lead to the conclusion that Congress meant to prohibit the ante-mortem inspection of horses nor language of "positive repugnancy" that could cause a court to

---

[3] As the Ninth Circuit Court of Appeals' analysis in *Envtl. Defense Center* indicates, language mandating or authorizing an agency to carry out a particular task is a completely separate issue from determining how such an obligation is funded. *See Envtl. Defense Center*, 73 F.3d at 871 ("The appropriations rider does not remove this statutory duty; instead, it only temporarily removes the funds available for carrying out the duty.").

determine that Congress intended to repeal the USDA and FSIS' obligations to carry out such inspections. *See McHugh,* 220 F.2d at 58.

Because the FMIA, including Section 695, and the Appropriations Act are "capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Auburn Housing Auth.,* 277 F.3d at 145 (citing *Connecticut v. United States Dep't of the Interior,* 228 F.3d 82, 88 (2nd Cir. 2000)). Applying this rule of statutory construction, both the Appropriations Act and the FMIA can be given effect: the USDA must continue the ante-mortem inspection of horses pursuant to Section 603(a) but the Department cannot pay for such inspections, as is ordinarily required under Section 695. Per the Appropriations Act, for one fiscal year only, the Department must find another means by which to fund inspections. *See* 21 U.S.C. §§ 603(a), 695. Accordingly the USDA and the FSIS developed a fee-for-inspection program designed to ensure that the mandates of both the FMIA and the Appropriations Act are fulfilled.[4]

### 2. The USDA Correctly Employed the "Good Cause" Exception to "Notice and Comment" Rulemaking

The "good cause" exception set forth in the APA authorizes an agency to dispense with notice and comment rulemaking procedures where it establishes "for good cause" that the requirements are "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). Plaintiffs claim that the USDA improperly invoked this exception when it

---

[4] We should note that Section 695 does not specifically require USDA to bear the costs relating to the ante-mortem inspection of livestock, including horses. The section only requires that the costs relating to Federal inspection of meat and meat food products be borne by USDA. Even if "meat food products" could be interpreted to include the live animal from which the meat food product derives, USDA can exempt from the definition of meat food product any products that "historically have not been considered by consumers as products of the meat food industry." 21 U.S.C. 601(j). For example, FSIS has exempted from federal inspection closed faced sandwiches containing meat or poultry and natural casings derived from meat or poultry from the definition of a "meat food product" because consumers do not perceive these products as those from the meat or poultry industries. See 70 Fed. Reg. 67490 (November 7, 2005). Likewise, USDA could determine that horsemeat is not perceived by consumers as a product of the meat industry because horsemeat has not been sold in the United States for a number of years.

"determined that prior notice and opportunity for public comment are impracticable and contrary to the public interest." 71 *Fed. Reg.* 6,340. However, the Department acted rationally and according to the APA when it utilized this "narrowly construed" exception to notice and comment rulemaking. *New Jersey v. EPA,* 626 F.2d 1038, 1045 (D.C. Cir. 1980).

The USDA determined that prior notice and comment was "impracticable" and contrary to the "public interest." *See* 71 *Fed. Reg.* at 6,340. "Impracticable" is not defined by the APA, but "the legislative history of the impracticability standard reveals that Congress intended this exemption to operate when the regular course of rulemaking procedure would interfere with the agency's ability to perform its functions within the time constraints imposed by Congress." *United States Steel Corp., et al. v. EPA,* 605 F.2d 283, 287 (7th Cir. 1979). The Senate and House Reports defined an "impracticable situation" as one in "which the due and required execution of the agency functions would be prevented by its undertaking public rulemaking proceedings." S. Doc. No. 248, 79th Cong., 2d Sess. 200, 258 (1946). The legislative situation that presented itself to the USDA after the Appropriations Act was signed into law, which included both the imminent discontinuation of federal funding for the ante-mortem inspection of horses and the transportation-related inspection of equines, and the continuing mandate that such inspections be performed, created an "impracticable" situation. To proceed with notice and comment rulemaking, the normal course of which often takes over 120 days, would have prevented the Department from "the due and timely execution of its functions" under the FMIA. *Utility Solid Waste Activities Group v. EPA,* 236 F.3d 749, 754-755 (D.C. Cir. 2001) (the "good cause" exception is available "when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required")(quoting U.S. Dep't of Justice, Attorney General's Manual on the Administrative Procedure Act 30-31 (1947)).

The "public interest" exception to notice and comment rulemaking permits an agency to fulfill its duty and prevent "real harm" to affected parties. *See Hawaii Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995) (the exception was properly invoked to promulgate a safety rule governing air tour operators following a dramatic increase in fatal accidents that the agency determined indicated an urgent safety problem). "[G]ood cause is evident when the delay created by notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Inst. v. United States*, 20 Cl. Ct. 324, 333 (Cl. Ct. 1990) (citation omitted). Such important interests include "the potential harm to *all* the parties involved."[5] *Id.* (emphasis added). Without a fee-for-service program in place on March 10, 2006, Applicant Defendant-Intervenors are threatened with closure of their facilities, and the USDA will be unable to fulfill its statutory obligation to perform ante-mortem inspections of horses or ensure the humane transport of equines. Conversely, if the fee-for-service program moves forward as provided for in the interim final rule, the plaintiffs will find themselves in a situation no different from that which they face today, and have for ten years or more. The interim rule was properly issued, without prior notice and comment, to protect the important "public interests" at stake.

Finally, the USDA and FSIS issued an *interim* final rule. The "interim status of the challenged rule is a significant factor in . . . the determination [whether "good cause" exists]." *Mid-Tex Elec. Coop., Inc., et al. v. FERC, et al.*, 822 F.2d 1123, 1132 (D.C. Cir. 1987). The District Court for the District of Columbia has found that "the Secretary's failure to engage in

---

[5] In *James v. Hurson Assoc.* plaintiff, a courier firm whose livelihood was threatened by a USDA rule doing away with "face-to-face" approval of proposed food labels, challenged the Department's failure to follow traditional notice and comment rulemaking. When the plaintiff introduced evidence suggesting that the rule would devastate his business the D.C. Circuit Court of Appeals noted that "the burden to courier/expediters – which are not regulated parties under the rules – is irrelevant." *See James V. Hurson Assoc.*, 29 F.3d at 281. Like the plaintiff in that case, the interests of Plaintiffs here are irrelevant when the USDA considers the burden the rule might impose upon certain parties.

pre-promulgation notice and comment was at least partially cured by allowing the opportunity for post-promulgation comment." *Universal Health Services of McAllen, Inc. v. Sullivan,* 770 F. Supp. 704, 721 (D.D.C. 1991). The USDA has provided for a notice and comment period of over 30 days before the Rule takes effect on March 10, 2006, and there is no indication that the Secretary of Agriculture or Administrator of the FSIS does not intend to consider public comments on the interim rule or address pertinent concerns in a final rule. The Plaintiff organizations are perfectly free to participate in the comment period.

### 3. Plaintiffs' NEPA Claim Has No Likelihood of Success Because Rulemaking Actions of the USDA-FSIS are Categorically Excluded from NEPA Requirements.

The conclusion that Plaintiffs' NEPA claim has no likelihood of success on the merits is readily confirmed on the face of Plaintiffs' First Amended Complaint and the USDA's regulations implementing NEPA. As candidly acknowledged by the Plaintiffs:

> [An] environmental analysis is not required when the agency has "categorically excluded" the action from NEPA review. 40 C.F.R. § 1501.4(a).

Complaint ¶ 62. What Plaintiffs fail to advise the Court is that, in fact, two specific categorical exclusions duly promulgated by the USDA through notice-and-comment rulemaking 23 years ago directly apply and bar their NEPA claim in the present circumstances: (i) all "programs and activities" conducted by the "Food Safety and Inspection Service," 7 CFR § 1b.4(b)(6), and (ii) "[a]ctivities which deal solely with the funding of programs…" (such as the inspection programs at issue in this case), 7 CFR § 1b.3(2), have been categorically excluded from NEPA's environmental analysis requirements since they have been found not to cause any "significant individual or cumulative effect on the human environment…." *Id.* The Court's review of Plaintiffs' NEPA claim should end here, as the claim has absolutely no likelihood of success on the merits.

NEPA is a procedural statute that ensures that federal agencies will inform themselves of the environmental effects of certain proposed federal actions. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558 (1978) ("NEPA does set forth significant substantive goals, but its mandate to the agencies is essentially procedural.") To accomplish this statutory purpose, NEPA requires that federal agencies:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on -- (i) the environmental impact of the proposed action.

NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C).

The Council on Environmental Quality ("CEQ") has promulgated regulations to guide federal agencies in determining which governmental proposals and activities are subject to this statutory requirement and, if so, the method by which to satisfy the requirement. The CEQ's regulations specifically authorize and require federal agencies to define and identify "categorical exclusions" from NEPA's environmental analysis for those:

> categor[ies] of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.

40 CFR § 1508.4. In other words, in the overall NEPA implementation process, CEQ regulations mandate that agencies such as the USDA adopt regulations that specifically exclude those categories of activities which have been determined to not give rise to any significant effect on the human environment and which are therefore exempt from the requirements to prepare an environmental impact statement ("EIS"), environmental assessment ("EA"), or undergo any further NEPA review. 40 CFR § 1508.4; *see also Nat'l Trust for Historic Preservation v. Dole,* 828 F.2d 776, 781 (D.C. Cir. 1987) ("By definition, CE's [categorical

exclusions] from NEPA are categories of actions that have been predetermined not to involve significant environmental impacts, and therefore require no further agency analysis absent extraordinary circumstances."). This express authorization spares federal agencies and subsidiary units the significant expense and time required to conduct an EIS or EA in situations where the agency has already predetermined that the proposed action will not significantly impact the human environment. *See* 40 CFR §§ 1500.4 and 1500.5(k) (directing agencies to use categorical exclusions to reduce paperwork and delay).

Pursuant to the authorization and regulatory directives of the CEQ, a vast range of federal agencies, including the USDA, have promulgated specific categorical exclusion rules and procedures. *See* 7 CFR § 1b.3 and § 1b.4. Pertinent to this case, the USDA has already determined – through formal notice-and-comment rulemaking – that the programs and activities of the FSIS do not individually or cumulatively have any significant effect on the human environment. In relevant part, § 1b.4(a) provides that:

> The USDA agencies and *agency units* listed in paragraph (b) of this section conduct programs and activities that have been *found to have no individual or cumulative effect on the human environment*. The USDA agencies and agency units listed in paragraph (b) of this section are *excluded from the requirements of preparing procedures to implement NEPA*. Actions of USDA agencies and agency units listed in paragraph (b) of this section are *categorically excluded from the preparation of an EA or EIS* unless the agency head determines that an action may have a significant effect on the environment.
>
> * * * * * * * * * *
>
> (b)(6) *Food Safety and Inspection Service*....

(Emphasis added) Since the USDA has specifically found that all programs and activities of the FSIS are categorically excluded from NEPA, the Plaintiffs' claim is necessarily groundless. The USDA's categorical exclusion of the FSIS from NEPA has been in place for nearly 23 years and has never been challenged. *See* 48 *Fed. Reg.* 11403, 11404 (March 18, 1983) (Department of

Agriculture, NEPA Policies and Procedures, Final Rule; *see also* 47 *Fed. Reg.* 42364 (Sept. 27,

1982) (Proposed Rule, establishing comment deadline of Nov. 26, 1982); 60 *Fed. Reg.* 66479

(Dec. 22, 1995) (Revised Final Rule moving continuing categorical exclusion for FSIS from §

1b.4(a)(8) to § 1b.4(b)(6)).

 Beyond the general categorical exclusion from NEPA for all programs and activities of

the FSIS, the USDA has also identified certain specific categories of actions that the agency has

determined do not have any significant effect on the human environment. *See* 7 CFR § 1b.3.

The USDA has accordingly excluded these actions from the preparation of an EA or an EIS,

unless agency procedures specifically prescribe otherwise or an agency head determines that

unique circumstances of a particular action dictate the need for an EA or an EIS. *Id.* Among the

activities categorically excluded by the USDA are:

> Activities which deal solely with the funding of programs, such as program
> budget proposals, disbursements, and transfer or reprogramming of funds.

7 CFR § 1b.3(a)(2). The Interim Final Rule comfortably fits within this categorical exclusion,

since it merely adjusts the funding arrangement, from direct federal funding to a voluntary fee-

for-service program, to cover the costs of the ante-mortem inspection services already being

provided by the FSIS. The rule leaves unchanged the substance of the inspection program itself,

and preserves the substantive status quo after March 10, 2006. Like the exclusion of actions of

the FSIS from NEPA under 7 CFR § 1b.4, this categorical exclusion has existed for nearly 23

years. *See* 48 *Fed. Reg.* 11404 (March 18, 1983).

 Accordingly, the FSIS is expressly excluded from NEPA's requirement to prepare either

an EIS or an EA for its actions – including issuance of the Interim Final Rule – unless the head

of the FSIS specifically determines that the particular action may have a significant effect on the

human environment. The head of the FSIS has made no such determination with respect to the

interim final rule. Plaintiffs' claim that any further NEPA review was required prior to issuance of the interim final rule by the USDA has no likelihood of success on the merits, much less the substantial likelihood required for the granting of a TRO/preliminary injunction.

### D. Plaintiffs Have Failed to Demonstrate any Irreparable Harm Capable of Being Addressed by a Preliminary Injunction

"The basis for injunctive relief in the federal courts has always been irreparable harm…" *Sampson v. Murray,* 415 U.S. 61, 88 (1974). In this circuit, injury is irreparable if it is "both certain and great." *Washington Gas Co.,* 758 F.2d. at 674. This requires that the alleged harm must be "actual and not theoretical" and of such "imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (quoting *Ashland Oil, Inc. v. FTC,* 409 F. Supp.297, 307 (D.D.C.), *aff'd,* 548 F.2d 977 (D.C. Cir. 1976). Plaintiffs cannot show that they will suffer "irreparable harm" if the fee-for-service program proceeds on March 10, 2006. Furthermore, when Plaintiffs' alleged injury is balanced against the severe harm that a preliminary injunction will cause to the Applicant Defendant-Intervenors, Plaintiffs' requested relief cannot be justified.

Plaintiffs claim two types of injury. First, Plaintiffs claim an injury caused by the USDA's alleged failure to comply with the APA and NEPA, which has allegedly impinged upon the animal advocacy organizations' ability to engage in educational, legislative and advocacy activities. Complaint ¶ 7, 10, 14, 18, 21, 26, and 28. Second, Plaintiffs claim an aesthetic injury that will be suffered by individual members of the organizations upon the implementation of the fee-for-service program, and which will prohibit their observing, photographing, and otherwise appreciating horses. *See* Complaint ¶¶ 5, 6, 13, and 30.

As addressed in Section C, *supra,* the Plaintiffs will be unable to establish that the USDA violated either the APA or NEPA in promulgating the interim final rule. This failure to establish

a likelihood of success on the merits of their claims also impacts upon Plaintiffs' ability to secure an injunction based solely upon the alleged aesthetic harm.  That is, Plaintiffs allege that the implementation of the fee-for-service program for ante-mortem inspection of horses will inhibit their ability to observe, study and appreciate horses.  *See id.*  While such an aesthetic, conservational or recreational interest may be protected by the courts, *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573-574 (1992); *Fund for Animals v. Clark,* 27 F. Supp. 2d 8, 14 (D.D.C. 1998), "injunctive relief for such injury has been found *only* when it exists in conjunction with a statutory violation." *The Fund for Animals, et al., v. Mainella, et al.,* 294 F. Supp. 2d 46, 58 (D.D.C. 2003) (emphasis added).

The *Mainella* opinion provides excellent guidance on this point for the instant Motion.  In that case, the plaintiffs sought a temporary restraining order to prohibit a six-day black bear hunt on federal land in New Jersey.  In a three count complaint, the plaintiffs alleged that defendants violated the APA by acting in an arbitrary and capricious manner and not in accordance with the law. *See id.* at 49, 50.  The court, applying the "familiar four-prong test," first determined that the plaintiffs failed to establish a likelihood of success on the merits of any of their claims. *Id.* at 50, 57.  Having established this fact, the court then found it was "hard-pressed to conclude that plaintiffs have established irreparable injury..." *Id.*  As Judge Walton stated, "it is equally clear that injunctive relief for such injury has been found only when it exists in conjunction with a statutory violation." *Id.* at 58.

It is also significant that the voluntary fee-for-service program, like the bear hunt, "is not designed to eradicate or even significantly reduce the [horse] population." *Id.*  For approximately 30 years, facilities in this country have engaged in the slaughter of horses and the processing of horsemeat for human consumption.  Likewise, for the last thirty years Plaintiffs

35

have been able to fulfill their aesthetic and recreational interests in observing, photographing, studying and appreciating horses. The implementation of the new funding mechanism by which to pay for the USDA inspection of Applicant Defendant-Intervenors' facilities does not at all alter this status quo or impact negatively on the Plaintiffs' interests; they will still be able to enjoy observing thousands of horses, both in captivity and in the wild. *See id.*

Plaintiffs' alleged aesthetic and recreational injury does not satisfy the requirement that it be "both certain and great." *Washington Gas Co.,* 758 F.2d at 674. It does not rise to the magnitude of having such "imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* As Plaintiffs enjoy horses now, they will be able to continue to enjoy horses after the interim final rule takes effect on March 10, 2006.

### E. The Public Interest Will Not be Furthered by a Preliminary Injunction

The public's interest in federal agencies' enforcement of Congressional will and federal laws and regulations counsels against the issuance of a preliminary injunction, as well. As the District of Columbia Court of Appeals has noted, this public interest is particularly acute when the laws being enforced by an agency relate to public health and safety. *See MacFarland v. Washington, A.&M. v. R.Co.,* No. 1089 1901 U.S. App. LEXIS 5079, at *1 (D.C. Cir. June 18, 1901) ("a statute or regulation looking to the public interest and safety will be upheld by the courts unless it is plain that it has no real or substantial relation to those objects...."). The FMIA is such a law, its purpose being to assure that meat and meat food products that are moved in foreign commerce are "wholesome, not adulterated, and properly marked, labeled and packaged." 21 U.S.C. § 602. Otherwise, the public welfare is injured, markets, including foreign markets, are destroyed, and significant losses are incurred to livestock producers and processors of meat, not to mention consumers. *Id*

36

It is the FSIS, the public health agency responsible for ensuring that this country's commercial supply of meat is safe, wholesome and correctly labeled and packaged, that has been charged with ensuring that the mandate of the FMIA is carried out. "Obviously, [then,] the public has a strong interest in seeing that the FSIS is able to do its job." *C&K Mfg. & Sales Co. v. Yeutter,* 749 F. Supp. 8, 14 (D.D.C. 1990).

Plaintiffs note that the public has an interest in protecting horses from inhumane treatment. Applicant Defendant-Intervenors share this interest. Plaintiffs' Motion, pp. 42. Contrary to Plaintiffs' assertions, Applicant Defendant-Intervenors *do* ensure that their horses are euthanized in a humane manner each year. The Applicant Defendant-Intervenors' facilities and practices are carefully scrutinized by the USDA and are required to be in compliance with the Humane Methods of Slaughter Act. *See* 7 U.S.C. § 1621 *et seq.* In addition, the method by which horses are euthanized by Applicant Defendant-Intervenors is approved by the American Veterinary Medical Association. *See* "2000 Report of the AVMA Panel on Euthanasia," 218 JAVMA 669, 681-685 (Mar. 1, 2001), attached as Exhibit 6. The reality is that if slaughter at Applicant Defendant-Intervenors' facilities is removed as a viable option for horse owners, tens of thousands of horses may face abandonment or an inhumane demise.

## IV. CONCLUSION

For the foregoing reasons, Applicant Defendant-Intervenors respectfully request that the Plaintiffs' Motion for a Temporary Restraining Order and For a Preliminary Injunction be denied.

Respectfully submitted,

/s/ _____
James P. Murphy, Esq. (D.C. Bar No. 380857)
SQUIRE, SANDERS & DEMPSEY L.L.P.
1201 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
Telephone: 202.626.6793
Fax: 202.626.6780

Date: February 27, 2006          *Attorney for Applicant Defendant-Intervenors*

38

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February, 2006 the foregoing Applicant Defendant-Intervenors' Motion to Deny Plaintiff's Motion for a Temporary Restraining Order and for a Preliminary Injunction, Memorandum in Support, proposed Order and supporting Exhibits were served via electronic mail on the following counsel in order to supplement service through the Court's electronic filing system:

Eric R. Glitzenstein
Ethan Carson Eddy
Howard M. Crystal
MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, DC  20009
eric@meyerglitz.com
howardcrystal@meyerglitz.com
Fax:  202-588-5049


Beverly M. Russell
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, N.W.
Suite E-4915
Washington, DC  20530
beverly.russell@usdoj.gov
Fax:  202-514-8780


/s/_____
                                    James P. Murphy