UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | ) ) ) |
| Plaintiffs | ) ) |
| v. | ) ) ) Civil Action No. 06-0265(CKK) |
| MIKE JOHANNS, Secretary, United States Department of Agriculture, et al., | ) ) ) ) |
| Defendants. | ) ) ) |

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

Defendants, Mike Johanns, Secretary, U.S. Department of Agriculture ("USDA"), and

Barbara J. Masters, Administrator, Food Safety and Inspection Service ("FSIS"), by and through

their undersigned attorneys, herein oppose Plaintiffs' motion for a temporary restraining order

and/or preliminary injunction[1] in this suit brought pursuant to the Administrative Procedure Act

("APA"), 5 U.S.C. § 701, et seq., and the National Environmental Policy Act ("NEPA"),

42 U.S.C. § 4321, et seq. Plaintiffs brought this action seeking to preclude the FSIS from

implementing an Interim Final Rule amending the Federal meat inspection regulations "to

provide for a voluntary fee-for-service program under which official establishments that

slaughter horses will be able to apply and pay for ante-mortem inspection." See Ante-Mortem

Inspection of Horses, 71 Fed. Reg. 6337 (Feb. 8, 2006)(to be codified at 9 C.F.R. pt. 352),

---

[1]At a February 23, 2006 telephone conference between the Court and the Parties, Plaintiff agreed to treat this matter as a request for a preliminary injunction.

Administrative Record ("AR") at 177; Am. Compl. ¶ 1l; Memorandum in Support of Plaintiff's

Motion for a Temporary Restraining Order and for a Preliminary Injunction ("Pl.'s Mem."), p. 1.

At the outset, Defendants note that a preliminary injunction is not the appropriate vehicle

to consider the merits of a substantive APA claim.  See Emily's List v. Federal Election

Comm'n, 362 F.Supp.2d 43, 52 (D.D.C. 2005).  The remedy is particularly inappropriate here

because Plaintiffs lack standing to bring this suit, and even assuming arguendo that standing

exists, they fail to meet any of the four requirements for the granting of a preliminary injunction.

Accordingly, their request for this extraordinary remedy should be denied.

I.      RELEVANT REGULATORY AND STATUTORY PROVISIONS

    A.      The Federal Meat Inspection Act, 21 U.S.C. § 601, et seq.

The Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601, et seq., was enacted in

1907 to ensure that meat and meat products are "wholesome, not adulterated, and properly

marked, labeled, and packaged." 21 U.S.C. § 602; see also H.R. Rep. No. 48-1852 (1948),

reprinted in 1948 U.S.C.C.A.N. 1706, 1711 (attached hereto as Ex. 1). Congress considered

"[t]he inspection of meat and meat products to assure [their] purity and wholesomeness" as "a

proper function" of the Federal government to protect the health and welfare of the American

people, and to ensure consumer confidence in meat purchased or otherwise obtained in the

United States.  Id.

To that end, the Act mandates that the USDA inspect the sanitary conditions of meat-

processing plants and "prescribe the rules and regulations of sanitation under which such

establishments shall be maintained." 21 U.S.C. § 608. The Act provides that FSIS inspectors

shall have access to all parts of a plant at all times. 21 U.S.C. § 606.

2

Products that are subject to inspection under the Act may not be sold or offered for sale in commerce unless they have been inspected and deemed satisfactory. 21 U.S.C. § 610(c). Where the sanitary conditions of a plant are such that the meat has been "rendered adulterated," USDA must withhold the mark of inspection. 21 U.S.C. § 608.

To prevent adulterated meat and meat food products from entering interstate commerce, the FMIA requires that FSIS inspectors conduct both ante-mortem and post-mortem examinations and inspections.  21 U.S.C. §§ 603 and 604.  Specifically, all livestock (cattle, sheep, swine, goats, horses, mules, and other equines) must be examined and inspected before they are allowed to enter any slaughtering, packing, meat-canning, rendering, or other similar establishment, in which they are to be slaughtered for meat and meat food products for human consumption.  21 U.S.C. § 603. Post-mortem examination and inspection of carcasses and parts thereof that are processed for human consumption are also mandated.[2]  21 U.S.C. § 604.

The FMIA provides that the USDA may refuse or withdraw inspection services under circumstances where the applicant for or recipient of such services has been declared unfit to engage in any business requiring inspection services. 21 U.S.C. § 671. The USDA may deny inspection services based upon a recipient's or applicant's conviction of (1) any felony or (2) more than one  conviction of crimes other than a felony based upon unlawful "acquiring, handling, or distributing of unwholesome, mislabeled, or deceptively packaged food or upon

---

[2]The Humane Methods of Slaughter Act ("HMSA"), 7 U.S.C. § 1901 et seq., requires that humane methods be used for handling and slaughtering livestock, including horses. The ante-mortem inspection provisions of the FMIA reference the HMSA and provide that, for the purposes of preventing inhumane slaughter of livestock, the Secretary of Agriculture will assign inspectors to examine and inspect the methods by which livestock are slaughtered and handled in connection with slaughter in slaughtering establishments subject to inspection.  21 U.S.C. § 603(b).

fraud in connection with transactions in food." 21 U.S.C. § 671.[3]  However, the USDA must

provide the applicant for or recipient of inspection services an opportunity for a hearing when

considering withdrawing inspection services.  Id.  The applicant or recipient is entitled to judicial

review of the USDA's order denying inspection services.  Id.

**B.**     **The Federal Agriculture Improvement and Reform Act, 7 U.S.C. § 1901 note**

Sections 901-905 of the Federal Agriculture Improvement and Reform Act of 1996

(FAIR)[4] concern the commercial transportation of equine to slaughter, and were codified as

7 U.S.C. § 1901 note.[5]  Section 903(a) of this statute authorizes the Secretary of Agriculture to

"issue guidelines for the regulation of the commercial transportation of equine for slaughter by

persons regularly engaged in that activity within the United States."  Accordingly, the USDA's

Animal and Plant Health Inspection Service ("APHIS") promulgated 9 C.F.R. pt. 88, which

---

[3]Other provisions of the FMIA provide additional reasons for withdrawal of inspection services by FSIS after opportunity for hearing.  These reasons are summarized in FSIS' Rules of Practice, 9 C.F.R. § 500.6.

[4]Pub. L. 104-127, Title IX, Subtitle A, April 4, 1996, 110 Stat. 1184.

[5]7 U.S.C. § 1901 note is not part of or an amendment to the HMSA (see n. 2 above).  Rather, it is a stand-alone statute that Congress passed in recognition of "the unique and special needs of equine being transported to slaughter."  7 U.S.C. § 1901 note.  This statutory provision authorizes the USDA to regulate the humane transport of horses to slaughter for any purpose, not just slaughter for human consumption.  See 9 C.F.R. § 88.1 (definition of slaughter facilities).

Thus, under Plaintiffs' interpretation of the Appropriations Act (i.e., the Act bans all inspections of horses slaughtered for purposes of human consumption, Am. Compl. ¶¶ 1 and 68), section 794 creates a gap in the laws related to the humane slaughter of horses for meat and meat products because if ante-mortem inspection of horses intended for human consumption is prohibited, and funding for inspections under 7 U.S.C. § 1901 note is also prohibited, then the horses that are subject to slaughter in the United States for purposes other than human consumption (such as pet or zoo food purposes), or are transported outside the United States for slaughter, no longer have the protections afforded by USDA humane-related inspections under 7 U.S.C. § 1901 note.

4

applies to owner/shippers (defined in 9 C.F.R. § 88.1 as "any individual, partnership, corporation, or cooperative association that engages in the commercial transportation of more than 20 equines per year to slaughtering facilities") and sets forth standards for the conveyances used to transport horses to slaughter, requirements for the safe handling of horses during such transportation, and certain paperwork requirements. This regulation also requires owner-shippers to allow any duly authorized APHIS employee to inspect horses being commercially transported to slaughter, the means of conveyance used for said transportation, and any required paperwork at any point from the time the horses are loaded onto the means of conveyance to the time the horses are unloaded at the slaughter facility. Unlike the FMIA, which is concerned solely with protecting public safety by ensuring the wholesomeness and purity of meat food products, and the HMSA, which is concerned with the use of humane methods to slaughter livestock generally, 7 U.S.C. § 1901 note and the regulation promulgated thereunder are concerned solely with ensuring the humane treatment of horses while they are being commercially transported to slaughter.[6]

---

[6]Plaintiffs incorrectly state that inspection of horses during commercial transportation to slaughter under 7 U.S.C. § 1901 note and 9 C.F.R. pt. 88 is a mandatory pre-requisite to the sale of horse meat for human consumption. Am. Compl. ¶ 68. Unlike ante-mortem inspections under 21 U.S.C. § 603 of the FMIA, which is concerned with public safety and therefore is mandatory, the inspection of horses during commercial transportation to slaughter under 7 U.S.C. § 1901 note and 9 C.F.R. pt. 88 is not mandatory. The regulations in 9 C.F.R. pt. 88 apply only to the owner/shipper of horses, not the horse slaughter plants, and the failure of the owner/shipper to comply with the provisions of 9 C.F.R. pt. 88 will not result in any regulatory action against the slaughter establishment or preclude the slaughter of affected horses provided that the requirements of the FMIA are otherwise met.

C.    21 U.S.C. § 695

The statutory provision 21 U.S.C § 695 requires the United States to bear the cost of meat

and meat product inspections slaughtered for human consumption except the cost of overtime

and holiday pay pursuant to 7 U.S.C. § 2219a.[7]  Congress, in the legislative history explaining

this provision, stated that "the true principle to be followed is that the cost of inspection should

be paid for by those who receive benefits of inspection."  H.R. Rep. No. 48-1852 (1948),

reprinted in 1948 U.S.C.C.A.N. 1706, 1709 (attached hereto as Ex. 1).  The legislative history

states, "[m]eat inspection is clearly [and generally] for the benefit of the [American] consumer of

meat products and [, thus,] should be paid for by consumers as a whole through Federal funds..."

Id.  In certain cases, however, 21 U.S.C. § 695 contemplates that "the benefit is to the person

receiving the inspection," and thus, this person should cover the cost of inspections.  Id.

D.    The Agricultural Marketing Act of 1946, 7 U.S.C. § 1621, et seq.

The Agricultural Marketing Act ("AMA") provides the USDA with authority to

prescribe rules and regulations for the inspection and certification of the condition of agricultural

products including the assessment and collection of fees to cover the costs of these services from

those who volunteer to pay for the services.  7 U.S.C. §§ 1622(h) and 1624.

---

[7]21 U.S.C. § 695 was enacted in Pub. L. 80-610 as part of the Act of June 5, 1948, ch. 423, 62 Stat. 344, as amended, whereas provisions for meat inspection were enacted in Pub. L. 59-242, the Act of March 4, 1907, ch. 2907, 34 Stat. 1260, as amended. These meat inspection provisions were completely revised by the Wholesome Meat Act, approved December 15, 1967, 81 Stat. 584, which, in general, designated the original meat inspection provisions as Title I of the FMIA (sections 1-24, or 21 U.S.C. § 601-624) and added titles II, III, and IV (sections 201-411, or 21 U.S.C. § 641-680). Therefore, contrary to Plaintiffs' assertion (see, e.g. Pl.'s Mem. at 1), 21 U.S.C. § 695 is not part of the FMIA.

**E.      Regulation Excluding FSIS from the Procedural Requirements of NEPA**

Congress enacted NEPA to ensure that federal agencies fully consider the environmental

consequences of proposed "major federal actions." 42 U.S.C. § 4332(C). While NEPA embodies

substantive environmental goals, its requirements are essentially procedural. See Robertson v.

Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).  Since 1983, certain USDA

agencies, including the FSIS, have been exempt "from the requirements of preparing procedures

to implement NEPA."  7 C.F.R. § 1b.4; National Environmental Policy Act (NEPA) Policies and

Procedures, 48 Fed. Reg. 11403, 11404 (March 18, 1983).  These agencies "are categorically

excluded from the preparation of an [environmental assessment] or [environmental impact

statement] unless the agency head determines that an action may have a significant

environmental effect." 7 C.F.R. § 1b.4.

**F.      Fiscal Year 2006 Appropriations Act**

The Fiscal Year ("FY") 2006 Agriculture, Rural Development, Food and Drug

Administration, and Related Agencies Appropriations Act ("Appropriations Act"), Pub. L. 109-

97, 119 Stat. 2120 (2005), was enacted on November 10, 2005.  Section 794 of the

Appropriations Act states that, effective 120 days after the date of enactment, none of the FY

2006 appropriated funds may be used to pay the salaries or expenses of personnel to inspect

horses under the FMIA, 21 U.S.C. § 603, or the guidelines issued under section 903 of the FAIR.

See Pub. L. 109-97, § 794, 119 Stat. 2164 (AR 51).

As indicated above, 21 U.S.C. § 603 mandates ante-mortem examination and inspection

of livestock, including horses, before they are allowed to enter an official establishment for

slaughter.  Section 903 of the FAIR provides that, subject to the availability of appropriations, the Secretary of Agriculture may issue guidelines for the regulation of the commercial transportation of equine for slaughter by persons regularly engaged in that activity within the United States. 7 U.S.C. § 1901 note.  APHIS, rather than FSIS, issues and administers such guidelines.  See 9 C.F.R. pt. 88.

Although the Appropriations Act specifically prohibits the use of appropriated funds for ante-mortem inspection of horses (Pub. L. 109-97, § 794, 119 Stat. 2164), it does not preclude the use of FY 2006 appropriated funds for post-mortem inspection of horse carcasses and parts thereof or other inspection services authorized by the FMIA, see id. (AR 51); see also 21 U.S.C. § 604.  The Conference Report accompanying the FY 2006 Appropriations Act states, "[i]t is the understanding of the conferees that the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and exported)." H.R. Rep. No. 109-255, p. 107 (2005)(emphasis added)(AR 112).  Neither the Appropriations Act nor the Conference report states that ante-mortem inspection and examination of horse meat or meat products for human consumption are excluded from this requirement.  Id.  Stated another way, Congress, in the Appropriations Act, did not repeal, amend or modify 21 U.S.C. § 603 obligating the USDA to conduct ante-mortem inspections of meat products, including horse meat and meat products, processed for human consumption.  Notably, the Appropriations Act includes no constraints or limitation on the USDA's ability to establish a voluntary fee-for-service program for purposes of meeting this obligation.  See generally H.R. Rep. No. 109-255 (AR 7 - 114).

The Appropriations Act demonstrates that Congress amended the FMIA when it expressly intended and desired to do so.  Specifically, section 798 of the FY 2006 Appropriations

8

Act amends the FMIA by striking the phrase "cattle, sheep, swine, goats, horses, mules, and other equines" each place it appears and replacing it with the phrase "amenable species."  Pub. L. 109-97, § 798, 119 Stat. 2164, 2166 (AR 53).  Section 798 defines "amenable species" as "those species subject to the provisions of the. . .[FMIA] on the day before the date of the enactment of" the Appropriations Act and "any additional species of livestock that the Secretary considers appropriate."  Id.  Horses slaughtered in official establishments were subject to the provisions of the FMIA on the day before the FY 2006 Appropriations Act was passed.  Id.

### G.     The Petition for Emergency Rulemaking and Interim Final Rule

#### 1.     Petition for Emergency Rulemaking

On November 23, 2005, the USDA received a petition on behalf of the Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc. (collectively "Petitioners"), the three official establishments processing horse meat and meat products in the United States, requesting that FSIS promulgate an interim final rule to provide for voluntary, fee-for-service ante-mortem inspection of horses under the AMA.  See Ante-Mortem Inspection of Horses, 71 Fed. Reg. 6337 (Feb. 8, 2006)(to be codified at 9 C.F.R. pt. 352)(AR 177); Petition of Beltex Corp., Dallas Crown, Inc., and Cavel International, Inc., for Emergency Rulemaking to Provide for Voluntary, Ante-Mortem Inspection of Horses and Related Relief ("Petition"), Nov. 23, 2005 (AR 115).  The Petition also requested that the USDA provide for voluntary, fee-for-service transportation-related inspection of equines under the AMA.   71 Fed. Reg. 6337, 6338 (AR 178); Petition, at 1 (AR 115).

Petitioners asserted that completion of notice-and-comment rulemaking prior to March 10, 2006, is practically impossible. Petition, at 7 (AR 123). Petitioners stated that, if USDA failed to provide ante-mortem inspections as mandated by 21 U.S.C. § 603, each affected establishment would be forced to close, with substantial adverse economic impact. Id.; see also Ex. 2, Declaration of James Tucker, Cavel International, Inc. ¶ 7 (Feb. 22, 2006); Ex. 3, Declaration of Christophe Soenen, Dallas Crown, Inc. ¶ 8 (Feb. 24, 2006); Ex. 4, Declaration of Richard Garcia, Beltex Corporation ¶ 8 (Feb. 24, 2006).

## 2.    The Interim Final Rule

Because the FY 2006 Appropriations Act prohibits FSIS from using FY 2006 appropriated funds for the salaries or expenses of personnel to conduct ante-mortem inspection of horses and because the Conference Report makes clear that the Department is nevertheless obligated to provide for such inspection, FSIS is establishing a voluntary fee-for-service program under the AMA, 7 U.S.C. § 1622 and 1624, in which official establishments that process horse meat and meat products for human consumption can apply and pay for ante-mortem inspection. See Ante-Mortem Inspection of Horses, 71 Fed. Reg. 6337 (AR 177 - 181).[8]    FSIS is amending

---

[8]Regulations for the commercial transportation of equines to slaughter are administered by APHIS, rather than by FSIS. See 9 C.F.R. pt. 88. Thus, FSIS referred the Petitioners' request that the USDA establish a program for voluntary fee-for-service transportation-related inspection of equines under the AMA to APHIS. 71 Fed. Reg. 6338 (AR 178). While not all of the activities conducted by APHIS under 9 CFR pt. 88 are affected by the restrictions imposed by Congress on using appropriated funds during FY 2006, activities involving inspection of horses are affected. Id. To continue to ensure the humane transportation of horses to slaughter, APHIS is prepared to establish a voluntary fee-for-service program in order to continue its inspection of horses under 9 CFR pt. 88. Id. Plaintiffs have not challenged any APHIS proposed regulation governing fee-for-service transportation-related inspection of equines in their amended complaint, nor, in fact, are there any regulations or policies to challenge at this time.

(continued...)

9 C.F.R. pt. 352 of the federal meat inspection regulations to include this program.  71 Fed. Reg. at 6339 (AR 179).  Part 352 already includes provisions for the voluntary inspection and certification service for wholesomeness relating to the slaughter and processing of exotic animals (reindeer, elk, deer, antelope, water buffalo, or bison).  Id.

Under the Interim Rule, official establishments that process horse meat and meat products will pay for ante-mortem inspection at the rates that apply to exotic animal establishments under voluntary inspection.  Id.  Although the Rule will provide that these establishments may voluntarily receive ante-mortem inspection services pursuant to the fee-for-service program governed by the AMA, all other inspection services conducted at such establishments, including post-mortem inspection of horse carcasses, parts thereof, and horse meat food products, will continue to be rendered pursuant to, and in accordance with the requirements of the FMIA. Id.

## II.    STANDARD FOR A PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." National Head Start Ass'n v. Department of Health and Human Services, 297 F.Supp.2d 242, 246 (D.D.C.

---

[8](...continued)
Accordingly, Plaintiffs' argument that the "USDA. . .failed to provide advance notice and public comment on the APHIS fee-for-service program" is not only beyond the scope of their Complaint but clearly alleges unsupported and unsupportable facts, Pls.' Mem. at 32. See, e.g. National Wrestling Coaches Ass'n v. Dept. of Education, 366 F.3d 930, 943 (D.C. Cir. 2004)(unsupported assumptions insufficient to establish Article III standing); see also U.S., ex rel. Brown v. International Business Machines Corp., No. Civ. A. 94-3940, 1996 WL 515237 (E.D. Pa. Aug. 28, 1996)(claims not pleaded but asserted for first time in motion for summary judgment are not considered part of action.); McNeil v. Aguilus, 831 F.Supp. 1079, 1086 (S.D.N.Y. 1993)(In summary judgment context, Court need not consider claims raised for the first time in motion in deciding that motion.).

2004), quoting, Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)(other citations omitted); see

also Emily's List, 362 F.Supp.2d at 51; Varicon Int'l v. Office of Personnel Management, 934

F.Supp. 440 (D.D.C. 1996).  Issuance of a preliminary injunction is appropriate only if the

movant clearly demonstrates that:

> (1) [it] has a substantial likelihood of succeeding on the merits; (2) [it] would
> suffer irreparable harm if the injunction is not granted; (3) other interested parties
> will not suffer substantial harm if the injunction is granted; and (4) the public
> interest will be furthered by the injunction.

Emily's List, 362 F.Supp.2d at 51; Sea Containers, Ltd. v. Stena AB, 890 F.2d 1205, 1208

(D.C.Cir. 1989); see also Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d

921, 925 (D.C.Cir. 1958).  The Court should balance the strengths of the requesting party's

arguments in each of these required areas.  CityFed Fin. Corp. v. Office of Thrift Supervision, 58

F.3d 738, 747 (D.C.Cir. 1995).  It is particularly important, however, for the movant to

demonstrate a substantial likelihood on the merits.  Emily's List, 362 F.Supp.2d at 51, citing,

Barton v. Dist. of Columbia, 131 F.Supp.2d 236, 242 (D.D.C. 2001), citing Benton v. Kessler,

505 U.S. 1084, 1085 (1992).  If the movant is unable to do so, the movant must then present a

"very strong showing" with respect to the other preliminary injunction factors.  Emily's List, 362

F.Supp.2d at 51-52, quoting Davenport v. Int' Bhd. of Teamsters, 166 F.3d 356, 366 (D.C. Cir.

1999)(emphasis added).

As indicated above, a preliminary injunction "is not the appropriate time to consider the

merits" of a substantive APA claim.  Emily's List, 362 F.Supp.2d at 53.  "Although a motion for

a preliminary injunction against an agency is not always inappropriate, the better course is [for

the Court] to rule on the merits of the substantive issues at a later date particularly where

12

allegations of irrepable injury are lacking at this stage." <u>Id.,</u> citing <u>Am. Bioscience, Inc. v.</u>

<u>Thompson,</u> 269 F.3d 1077, 1083-84 & nn. 7-8 (D.C. Cir. 2001).  The District of Columbia

Circuit cautioned that the district court should be careful in considering the remedy of a

preliminary injunction since the "granting or denying" of such a remedy can serve as "the basis

for an expedited appeal." <u>Am. Bioscience, Inc.,</u> 269 F.3d at 1084, n. 8.

## III.   ARGUMENT

### A.     Summary of Argument

Plaintiffs' request for the extraordinary remedy of a preliminary injunction should be

denied because, as an initial matter, they lack standing to bring this suit, and even assuming

<u>arguendo</u> that they do have standing, they do not meet any of the four requirements for the

granting of a preliminary injunction.

First, Plaintiffs will not likely prevail on the merits.  Plaintiffs make three arguments to

support their substantive claims - (1) they were entitled to an opportunity to advance notice

and/or opportunity to comment on the Interim Final Rule under the APA, (2) the Rule violates

the purpose of the Amendment to the FY2006 Agriculture Appropriations Act which, according

to Plaintiffs, was to terminate horse slaughter operations for at least the remainder of the fiscal

year, and (3) the Rule violates the requirement of the FMIA, 21 U.S.C. § 601 <u>et</u> <u>seq.</u> that the

United States bear the cost of inspection for horses processed for human consumption.  <u>See</u> Pls.'

Mem. at 2 -3.  All arguments are legally flawed.

Regarding Plaintiffs' procedural grievances pursuant to the APA, the irrefutable fact is

that Defendants expressly demonstrated and evidenced good cause to publish the Interim Final

Rule without providing for advance notice and comment.  Critically, the public actually does have the opportunity to comment on the Rule.  The Interim Final Rule was published on February 8, 2006.  <u>See</u> 71 Fed. Reg. 6337 (AR 177 - 181).  The comment period does not close until March 10, 2006.  <u>Id</u>.  Further, there is nothing in the FY 2006 Appropriations Act or accompanying Conference Report evidencing that the purpose of the de-funding section at issue was to "terminate horse slaughter" for the rest of the fiscal year.  Finally, the "cost" provision identified by Plaintiffs is not part of the FMIA and does not support the proposition that the American taxpayers must bear the burden of all food inspections, particularly in a case like this one, where the taxpayers are not the direct beneficiaries of those inspections.

Second, Plaintiffs simply do not evidence that they will be irreparably harmed by effectuation of the Interim Final Rule.  Third, the record clearly reflects that the Petitioners would suffer irrecoverable damage if the preliminary injunction is granted.  Fourth, the public interest is better served by denying the injunction given that Plaintiffs' argument for an injunction has no regard for a fundamental legal premise - i.e., existing laws should be honored, and not interpreted in a manner that brings them in irreconcilable conflict.  The USDA's interpretation of the relevant laws, incidentally, comports with this premise.

Accordingly, because Plaintiffs lack standing to bring this suit, and fail to meet any of the four factors to receive the extraordinary relief of a preliminary injunction, their motion for such relief should be denied.

14

B.    **Plaintiffs' Legally-Deficient Request for a Preliminary Injunction.**

1.    **Plaintiffs Fail to Establish a Substantial Likelihood of Prevailing on the Merits.**

Under Rule 65(a) of the Federal Rules, and as noted supra, plaintiffs must demonstrate

that they have a "substantial likelihood" of succeeding on the merits of their underlying case.

Absent a "substantial indication" of likely success on the merits, there would be "no justification

for the court's intrusion into the ordinary processes of administrative and judicial review."

American Bankers Ass'n v. National Credit Union Admin., 38 F. Supp. 2d 114, 140

(D.D.C.1999). Here, such intrusion is not justified.

a.    **Plaintiffs Lack Standing.**

Pursuant to the requirements for Article III standing, a plaintiff "must, at an irreducible

constitutional minimum . . . demonstrate that it has suffered a concrete and particularized injury

that is (1) actual or imminent, (2) caused by or fairly traceable to an act that the litigant

challenges in the instant litigation, and (3) redressable by the court. Fund Democracy, LLC v.

Securities and Exchange Commission, 278 F.3d 21, 25 (D.C. Cir. 2002), quoting Florida

Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996)(en banc)(citation and internal

quotation marks omitted). Organizational plaintiffs, whether they are suing on their own behalf

alleging that their rights as entities have suffered cognizable injury, or whether they are suing "on

behalf of their members asserting the members' individual rights," must meet these same

constitutional standing requirements. Common Cause v. Federal Election Comm'n, 108 F.3d

413, 417 (D.C. Cir. 1997). Thus, the courts have held that an organization can claim standing

only if it can prove a <u>significant</u>, particularized harm to its members' aesthetic, recreational, and economic interests as a result of agency actions. <u>Environmental Protection Information Center v. Simpson Timber Co.</u>, 255 F.3d 1073 (9th Cir. 2001). A mere allegation of administrative irregularity, absent allegations of substantive injury to the organizational plaintiff or its members, is not sufficient to support a claim. <u>Cane Creek Conservation Authority v. Orange Water and Sewer Authority</u>, 590 F. Supp. 1123, 1128 (M.D.N.C. 1984). Here, neither the organizational nor the individual Plaintiffs establish standing.

> **i.      Organizational Plaintiffs Fail to Allege Cognizable Injury Traceable to USDA's Interim Final Rule.**

Plaintiff Humane Society, and other organizational Plaintiffs, fail to meet the first and second factors for establishing standing (i.e., an injury traceable to the agency's actions). They do not claim any private property interest in the horses processed by the meat processing facilities; instead, they claim that the slaughter of horses interferes with their ability to observe, photograph, study, appreciate, and otherwise enjoy horses and to protect horses from slaughter. Am. Compl. ¶¶ 3 - 28.

However, Plaintiffs' ability to observe and otherwise enjoy horses will not be impacted by the Interim Final Rule. Plaintiffs do not argue that the three facilities at issue are zoos, wildlife refuges, open private or public spaces, or any other type of establishment serving their interests to observe and otherwise enjoy horses; nor do Plaintiffs argue that the Interim Final Rule or FY 2006 Appropriations law apply to these establishments. <u>Compare</u> <u>United States v. SCRAP</u>, 412 U.S. 669 (1973); <u>Humane Soc. of U.S. v. Babbitt</u>, 46 F.3d 93, 98 (D.C. Cir. 1995); <u>Mausolf v. Babbitt</u>, 85 F.3d 1295, 1301-02 (8th Cir. 1996); <u>Spirit of the Sage Council v. Norton</u>, 294

F.Supp.2d 67, 81-82 (D.D.C. 2003).  Accordingly, Plaintiffs' ability to observe and otherwise enjoy horses will continue to occur undisturbed after effectuation of the Interim Final Rule because the establishments, locations and areas providing or otherwise making these aesthetic activities available are not involved with this suit.  Thus, Plaintiffs fail to present a cognizable injury traceable to the USDA's actions related to the Interim Final Rule.

Plaintiffs also do not argue that, based on personal observations, Petitioners' operations are contrary to the provisions of the FMIA governing humane treatment of animals at meat processing facilities, see 21 U.S.C. § 603(b), and thus, Defendants might somehow be failing in their statutorily-mandated obligations related to inspection of these facilities.  21 U.S.C. § 603(b) is the statutory provision pursuant to which a redressable APA claim might be asserted as to Defendants' conduct (and whether it is arbitrary, capricious or contrary to law) but this provision is not at issue.  Here again, the organizational Plaintiffs fail to allege a cognizable injury traceable to Defendants' conduct.

> ii.    **Individual Plaintiffs Fail to Allege Cognizable Injury Traceable to USDA's Actions Related to Interim Final Rule.**

The individual Plaintiffs claim that sights, sounds, and smells from the horse slaughter plants are nuisances that interfere with their ability to obtain the full use and enjoyment of their lands and drive down their property values.  Am. Compl. ¶¶ 29 - 45 and 47. However, these allegations do not constitute claims that can be properly redressed under the FMIA, the substantive statute cited by Plaintiffs, and thus, cannot serve as a proper basis for standing.  The FMIA, a meat safety statute, does not specifically recognize Plaintiffs' local  nuisance and

property claims, and for that matter, neither does the FY 2006 Appropriations Act, a federal funding statute.  Further, the individual Plaintiffs' general emotional harm, because of their proximity to Petitioners' facilities, no matter how deeply felt, simply "cannot suffice for injury-in-fact for standing purposes." Animal Legal Defense Fund, Inc. v. Glickman, 130 F.3d 464, 468 (D.C. Cir. 1997), citing Humane Soc'y of the U.S. v. Babbitt, 46 F.3d 93, 97 (D.C. Cir. 1995). Moreover, any psychological consequence resulting from their objection to Petitioners' operations "is not an injury sufficient to confer standing under Article III. . ." Animal Legal Defense Fund, Inc., 130 F.3d at 468, citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 485 (1982).

To the degree that the individual Plaintiffs are aggrieved, their claims are properly brought as nuisance claims pursuant to applicable state and local law.  Allen, 468 U.S. at 751. Likewise, certain individual Plaintiffs' allegation that their horses were stolen and subsequently sent to the Petitioners' facilities (Pls.' Mem. at 40, n.4) fails to establish a causal nexus between the stealing of the horses and the horses' delivery to the plants pursuant to 7 U.S.C. § 1901 note, and thus, constitutes matters properly redressed under state and local criminal law.  Id.

> **iii.    Plaintiffs Collectively Fail to Establish a Cognizable Injury Based on Dissatisfaction With Non-Judiciable Administrative Factors Related to Promulgation of the Interim Final Rule.**

Plaintiffs' claims that their ability to engage in educational, legislative, and advocacy activities with respect to horse protection and to obtain information and advance notice about proposed changes in the law (Pl.'s Mem. at 1) are, at best,  mere allegations of broad, general

18

administrative irregularity unsupported by evidence of substantive injury, and thus, do not give them standing.  Cane Creek Conservation Authority, 590 F. Supp. at 1128.

Furthermore, these claims, along with Plaintiffs' allegation that they are unable to participate fully in the rule-making process because of the USDA's alleged failure to comply with the APA and NEPA (see Pl.'s Mem. at 17), are without merit because the USDA has been accepting public comment on the ante-mortem horse inspection rule since February 8, 2006, and will continue to do so through March 10, 2006, thereby preserving the very procedural interests of which plaintiffs complain.  71 Fed. Reg. 6337 (AR 177).

Additionally, Plaintiffs' claims that their ability to obtain information and advance notice about proposed changes in the law and to participate fully in the rule-making process is harmed by USDA's alleged failure to comply with the APA and NEPA are refuted by the fact that they submitted comments in response to the Petition in the form of a highly detailed letter to Secretary Johanns dated January 5, 2006, over a month before the USDA published the Interim Rinal Rule in the Federal Register. (AR 133 - 149).

### iv.    Plaintiffs Fail to Establish Redressability Factor.

Even if Plaintiffs had presented an actual or imminent concrete and particularized injury caused by or traceable to USDA's Interim Final Rule, they still would fail the third prong of standing, redressability.  Assuming arguendo that the preliminary injunction is granted, and the Interim Final Rule declared invalid, an entity could continue to slaughter horses in the United States for purposes other than human consumption or transport U.S.-origin horses abroad for slaughter, in which case Plaintiffs would continue to suffer most or all of the injuries which they

claim they will suffer if the ante-mortem inspection rule is allowed to go into effect. Accordingly, Plaintiffs, in essence, fail to meet any of the factors for establishing standing.

**b.    The USDA's Actions Survive APA Scrutiny.**

A court's review "of agency rulemaking is <u>highly deferential</u>, limited to determining whether the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made." <u>United States Air Tour Ass'n v. FAA</u>, 298 F.3d 997, 1005 (D.C. Cir. 2002)(quoting <u>Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto Ins.</u>, 463 U.S. 29, 43 (1983)(emphasis added).  The APA allows a court to "hold unlawful and set aside" agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §  706(2). The Act does not, however, authorize a court to "substitute its judgment for that of the agency." <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971).

**i.    The USDA's Interpretation of the Appropriations Act is Reasonable.**

The USDA's interpretation of section 794 of the FY 2006 Appropriations Act is correct and consistent with both the  legislative intent expressed in the accompanying conference report and USDA's on-going legal obligations under the FMIA.  The plain language of section 794 states that appropriated funds may not be used to pay the salaries and expenses of personnel conducting inspections of horses under the FMIA, 21 U.S.C. § 603 and 7 U.S.C. § 1901 note; it says nothing about banning the slaughter of horses for human consumption.  <u>See</u> Pub. L. 109-97, § 794, 119 Stat. 2164 (AR 51).   Indeed, Plaintiffs' contention that Congress intended section 794

20

to terminate the slaughter of horses in the United States for human consumption and export, see Pl.'s Mem. at 24 - 25, is contradicted by the fact that Congress introduced bills expressly and unambiguously banning horse slaughter in the United States and the exporting of U.S.-origin horses for slaughter in 2001, 2002, 2003, 2004, and 2005, but did not obtain sufficient votes to pass any of them.  See Ex. 5.

Plaintiffs rely exclusively on floor statements and letters by individual members of Congress to support their argument that the de-funding provision for ante-mortem inspections was a de facto ban on horse slaughter.  Pl.'s Mem. at 24 - 25.  However, in Garcia v. United States, 469 U.S. 70, 75 (1984), the Supreme Court stated that, "[i]n surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislator's intent lies in the Committee Reports on the bill ... we have eschewed reliance on the passing comments of one member ... and casual statements from floor debates."  Accordingly, Plaintiffs' argument regarding Congressional intent based on the statements of individual members of Congress lacks legal significance.

Additionally, the FY 2006 Appropriations Act evidences that Congress did, in fact, amend the FMIA when it expressly intended to do so.  See, e.g. Pub. L. 109-97, § 798, 119 Stat. 2164, 2166 (Congress amended the FMIA by striking "cattle, sheep, swine, goats, horses and other equines" appearing in various sections of the FMIA and substituting the term "amenable species.")(AR 53).  If Congress wanted to amend the FMIA to repeal USDA's ante-mortem inspection obligations under 21 U.S.C. § 603, it would have expressly done so in the Appropriations Act or, at the very least, it would have stated in the conference report that, notwithstanding the USDA's obligation to provide for ante-mortem inspections, the objective of

21

section 794 was to repeal 21 U.S.C. § 603 as applied to horses.  Instead, Congress, in the conference report accompanying the FY 2006 Appropriations Act, reiterated its "understanding" that the USDA is "<u>obliged</u> under existing statutes to provide for inspection of meat intended for human consumption (domestic and <u>exported</u>[9])" and stated this "understanding" without any qualification, exception, or exemption for horse meat produced for this purpose.  H.R. Rep. No. 109-255, p. 107 (2005)(emphasis added)(AR 112).

Accordingly, what the legislative history expressly evidences is that the USDA is obliged to continue its statutory obligations for inspection of meat intended for human consumption and the FY 2006 Appropriations Act did not change, qualify, except or amend this statutory obligation to exempt or exclude the inspection of horse meat and meat products. <u>See generally</u> Pub. L. 109-97, § 794, 119 Stat. 2164; H.R. Rep. No. 109-255, p. 107 (2005)(AR 7 - 114). "While Congress may [certainly] amend or repeal a statute by means of an appropriations bill, its intention to do so must be clear."  <u>Auburn Housing Authority v. Martinez</u>, 277 F.3d 138 (2d Cir. 2002); <u>see also</u> <u>Tennessee Valley Authority v. Hill</u>, 437 U.S. 153, 191 (1978)(The Supreme Court stated, "The doctrine disfavoring repeals by implication...applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act.  We recognize that both substantive enactments and appropriations measures are 'Acts of Congress,' but the latter have the limited and specific purpose of providing funds for authorized programs.")(emphasis in original).

---

[9]There is no domestic market for horse meat intended for human consumption and all meat in the United States for that purpose is exported.  Ex. 2, Tucker Decl. ¶ 8; Ex. 3, Soenen Decl. ¶ 9; Ex. 4, Garcia Decl. 3; Petition, at 8 (AR 124).

Here, there is simply no express indication from Congress either in the Appropriations Act or the accompanying conference report of an intent to repeal 21 U.S.C. § 603 governing the USDA's obligation to provide for ante-mortem inspections. Therefore, the sole purpose of section 794 of the Act is to prevent appropriated funds from being used to pay the salaries and expenses associated with ante-mortem inspections pursuant to the FMIA, 21 U.S.C. § 603, and 7 U.S.C. § 1901 note. This is the only clear expression of intent expressed by Congress in this section. Further, section 794 did not prohibit the use of appropriated funds for post-mortem inspection of horse carcasses under 21 U.S.C. § 604, and thus, the USDA will continue to use appropriated funds for this purpose.

Of additional significant import, and as indicated above, the Appropriations Act did not terminate or amend the USDA's obligation under 21 U.S.C. § 671 to provide meat and meat product processors, including Petitioners, an opportunity for a hearing prior to withdrawing federal inspection services. If Plaintiffs' interpretation of the de-funding provision of the Appropriations Act prevails, the Petitioners could be denied their due process rights for reasons not contemplated by the FMIA thereby possibly subjecting the de-funding provision itself to a potentially viable constitutional challenge. Indeed, a constitutional challenge could provide the district court with the jurisdiction to avoid the enforcement of the de-funding provisions of the Appropriations Act. Community-Service Broadcasting of Mid-America, Inc. v. F. C. C., 593 F.2d 1102, 1113 (D.C. Cir. 1978)("To be sure, Congress is generally free to change its mind; in amending legislation Congress is not bound by the intent of an earlier body. But it is bound by the Constitution."); United States v. Simpson, 927 F.2d 1088, 1091 (9th Cir. 1991) (court may

not impose its will upon Congress unless the behavior of Congress is unconstitutional); <u>United States v. Mexico Feed and Seed Co., Inc.</u>, 980 F.2d 478, 484 n.5 (8th Cir. 1992).

The more legally-sound interpretation of and approach to the Appropriations Act is presented by the USDA which does not put the 2006 funding provision in conflict with the longstanding meat inspection and due process provisions of the FMIA. The USDA's interpretation regards both the Appropriations Act and the FMIA as effective and reconcilable, an approach which is clearly judicially preferred. <u>Tennessee Valley Authority v. Hill</u>, 437 U.S. at 192; <u>see also</u> <u>Morton v. Mancari</u>, 417 U.S. 535 (1974)("[t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."); <u>United States v. Menasche</u>, 348 U.S. 528, 538 (1955)(stating that "'the cardinal principle of statutory construction is to save and not to destroy.'".)(quoting <u>National Labor Relations Bd. v. Jones & Laughlin Steel Corp.</u>, 301 U.S. 1, 30 (1937).

### ii. The USDA's user fee program comports with the AMA and FMIA.

Plaintiffs' claim that the USDA's plan to create a user fee program under the AMA to pay for ante-mortem inspection of horses under section 3 of the FMIA violates the FMIA has no merit. Pl.'s Mem. at 29. As indicated above, and bears repeating here, section 794 prohibits the use of appropriated funds to pay for the salaries and expenses of personnel engaged in ante-mortem inspection of horses under 21 U.S.C. § 603 and 7 U.S.C. § 1901 note, but it does not terminate or amend USDA's user fee authority under sections 1622 and 1624 of the AMA, 7

U.S.C. §§ 1622(h) and 1624, which unchallenged, has long been used to pay for inspections services of exotic species. 9 C.F.R. pt. 352.

The USDA recognizes that, in accordance with section 798 of the FY 2006 Appropriations Act, horses remain "amenable species" subject to the requirements of the FMIA, as indicated by the USDA creating a separate subpart of 9 C.F.R. § 352, Voluntary Inspection of Exotic Species, for horses rather than including horses as an exotic species under the current regulation. The ante-mortem inspection of horses under 9 C.F.R. § 352 will continue to be conducted in accordance with all provisions of 7 C.F.R. pt. 309, the regulations governing ante-mortem inspection under 21 U.S.C. § 603, that pertain to horses. The only change brought about by the ante-mortem horse inspection rule will be in the method by which USDA pays the salaries and expenses of personnel engaged in the inspection of horses under 21 U.S.C. § 603 and the statutory authorization for that funding method.

Regarding the latter, Plaintiffs' claim that the user fee program to pay for ante-mortem horse inspection is a violation of 21 U.S.C. § 695 has no merit. Pl.'s Mem. at 27 - 28. As an initial matter, 21 U.S.C. § 695, which is not part of the FMIA, is not an absolute bar to the use of user fees to pay for Federal inspection of meat and meat food products, as indicated by the fact that it makes exceptions for payment of salaries and expenses associated with Federal inspections of meat and meat food products that are conducted during overtime work and on holidays. By prohibiting the use of appropriated funds to pay the salaries and expenses of personnel who inspect horses under section 3 of the FMIA but leaving USDA's other legal obligations under the FMIA intact and unamended, section 794 has merely created a new exception to the requirements of 21 U.S.C. § 695 for ante-mortem inspection of horses during the current fiscal year.

25

Alternatively, as indicated above, the legislative history of 21 U.S.C. § 695 contemplates that the costs of Federal food safety inspections should be paid by those who receive the benefits of those inspections.  H.R. Rep. No. 48-1852 (1948), reprinted in 1948 U.S.C.C.A.N. 1706, 1709 (attached hereto as Ex. 1). Since there is no domestic market for horse meat for human consumption, see Petition, at 8 (AR 124), the beneficiaries of ante-mortem horse inspection are the horse slaughter plants themselves, so requiring them to pay for these inspections is consistent with the principle set forth in the legislative history of 21 U.S.C. § 695 as the legal rationale for the statute.

iii.    **FSIS programs exempt from NEPA procedural requirements.**

Plaintiff's claim that the USDA has not followed NEPA clearly lacks merit.  Pl.'s Mem. at 6-7 and 33-34.  Pursuant to the USDA NEPA implementing regulations, specifically, 7 CFR § 1b.4(b), all of the programs and activities of FSIS have been found to have no individual or cumulative effect on the human environment.  Thus, not only is FSIS excluded from having to prepare any specific FSIS NEPA implementing regulations, but also, since all of FSIS' actions are categorically excluded, FSIS is excluded from having to prepare an Environmental Assessment ("EA") or an Environmental Impact Statement ("EIS") unless the Administrator of

26

FSIS determines that an agency action will have a significant environmental effect.[10]  7 C.F.R. §

1b.4.

**iv.    Interim Federal Rule Issued With "Good Cause"
Consistent with APA.**

There are "three basic requirements for agency rulemaking" under the APA: "first, the

public must be given notice of the proposed rulemaking; second the public must be given an

opportunity to comment on the proposed rule, either orally or in writing; and third, the agency

must include with the final rule a statement of the rule's basis and purpose."  Emily's List, 362

F.Supp.2d at 53, citing 5 U.S.C. § 553; see also Jifry v. Federal Aviation Administration, 370

F.3d 1174, 1178 (D.C. Cir. 2004).

"The 'good cause' exception [of the APA]," provides that an agency "need not engage in

notice and comment" when the procedure is determined to be "'impracticable, unnecessary, or

contrary to the public interest.'"  Jifry, 370 F.3d at 1178, citing 5 U.S.C. § 553(b)(3)(B).   This

---

[10]Historically, FSIS has never prepared an EA or EIS when determining whether to grant,
withdraw, or transfer a grant of Federal meat inspection since FSIS has time and again evaluated
and determined that such programs and activities have no individual or cumulative effect on the
environment and thus are categorically excluded from the requirement related to preparation of
an EA or EIS.  Moreover, even assuming arguendo that 7 C.F.R. § 1b.4(b)(6) was somehow not
applicable, and FSIS was not categorically excluded from having to prepare an EA or EIS, the
Agency still could reasonably determine that, pursuant to that USDA NEPA implementing
regulation, the ante-mortem inspection Interim Final Rule at issue here would be categorically
excluded from environmental analysis since the Rule is concerned only with discretionary
financial decisions, i.e., how to pay the costs of such inspections and activities that deal solely
with the funding of programs, which are categorically excluded from the preparation of EA's and
EIS's under 7 C.F.R. § 1b.3(a)(2).  Moreover, again, assuming arguendo that 7 C.F.R. §
1b.4(b)(6) were somehow not applicable, and thus, FSIS  was not categorically excluded from
having to prepare an EA or EIS, the FSIS Administrator could still appropriately evaluate and
determine that the Interim Final Rule has no individual or cumulative effects on the environment,
and thus, is categorically excluded from having to prepare an EA or EIS since the ante-mortem
inspection rule merely continues a long-standing program and activity and accordingly merely
preserves the current identical status quo with its negligible environmental impact.

27

exception to the requirement for advance notice and comment, which is to be narrowly construe, nevertheless "excuses notice and comment in emergency situations. . . or where delay could result in serious harm." Id. at 1179 (citations omitted).

The USDA is justified in issuing the Interim Final Rule without prior notice or comment because it expressly made a determination under the good cause exception of the APA, 5 U.S.C. § 553(b)(B), that it was impracticable and contrary to the public interest to require said notice and comment with respect to this particular Rule. See 71 Fed. Reg. 6337, 6340 (AR 180). Requiring a prior notice and comment period for this Rule was impracticable because there was insufficient time to complete the notice and comment period prior to the effective date of section 794 and still meet the requirements of USDA's rule-making process. Id. USDA's Departmental Regulation, DR 1512-1, Regulatory Decision-Making Requirements, sets forth a deliberative rule-making process that requires review of all regulations by a variety of offices within USDA prior to publication in the Federal Register (http://www.ocio.usda.gov/directives/files/dr/DR1512-001.pdf). This particular rule had to be reviewed by the Office of the General Counsel, the Deputy Administrator, the Administrator, the Office of Budget and Program Analysis, and the Undersecretary for Food Safety. Id. In addition, Executive Order 12866 requires that all rules issued by USDA undergo review by the Office of Management and Budget. See 58 Fed. Reg. 51735 (Sept. 30, 1993). Each of these procedural steps took time from an already narrow window beginning with November 10, 2005, the date on which the Appropriations law was enacted to March 10, 2006, the date on which, pursuant to the law, appropriated funds can no longer be used for ante-mortem inspections of horse meat and meat product facilities.

The time limitation was not the only reason for the Interim Final Rule.  See Asiana v. Federal Aviation Admin., 134 F.3d 393, 398 (D.C. Cir. 1998)("Statutory language imposing strict deadlines, *standing alone*, does not constitute good cause" justifying departure from standard notice and comment.)(emphasis in original).  Requiring a prior notice and comment period prior to the effective date of section 794 also would have been contrary to the public interest because it would delay the implementation of the interim final rule and cause significant, immediate, and concrete financial and economic harm to the Petitioners, their employees, and their suppliers and customers. See, Petition (AR 122 - 125).

The USDA, of course, is following the APA by accepting comments on the ante-mortem horse inspection rule between February 8, 2006, and March 10, 2006. 71 Fed. Reg. 6337 (AR 177).  The USDA has balanced Plaintiffs' interests (i.e., to engage in educational, legislative, and advocacy activities with respect to horse protection, to obtain information and advance notice about proposed changes in the law, and to participate fully in the rule-making process) against the real economic harm to Petitioners and their employees that will occur if the ante-mortem horse inspection rule does not go into effect on March 10, 2006.

### 2. Plaintiff Has Made No Showing of Irreparable Harm.

The crux of injunctive relief in the federal courts has always been a showing of irreparable harm.  See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506 (1959); Sampson v. Murray, 415 U.S. 61, 88 (1974); CityFed Financial Corp. v. Office of Thrift Supervision, 58 F. 3d 738, 747-48 (D.C. Cir. 1995).  Further, it is uncontested that evidence of irreparable harm must be "certain and great." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674-675 (D.C. Cir.

1985). It must be "actual" harm, not merely speculative or theoretical.  Id.  Implicit in each of

these descriptions is the requirement that the movant substantiate that the irreparable injury is

"likely" to occur.  Wisconsin Gas Co., 758 F.2d at 674-675.  Bare allegations of what is likely to

occur is not enough: the plaintiff must "provide proof that the harm has occurred in the past, and

is likely to occur again," or must introduce "proof indicating that the harm is certain to occur in

the near future, " and that the harm will directly result from the action sought to be enjoined.  Id.

Finally, the term "irreparable" is key, for time, money, and energy expended alone will generally

not suffice, where adequate compensatory or corrective relief will be available at a later date in

the course of litigation.  Wisconsin Gas Co., 758 F.2d at 674-675; see also Taylor v. Resolution

TrustCorporation, 56 F.3d 1497, 1508 (D.C. Cir. 1995).   Financial harm alone may constitute

irreparable injury where "the very existence of the movant's business" is threatened.  Emily's

List, 362 F.Supp.2d at 52 citing, Wisconsin Gas Co., 758 F.2d at 674 (other citations omitted).

        The injuries sustained by Plaintiffs if the ante-mortem inspection rule is enjoined are

speculative and insubstantial while the economic and financial injuries sustained by the

Petitioners and the surrounding local economies if the rule is enjoined are imminent, concrete,

and grave, so the balance of the equities favors denying the injunctive relief.  As previously

stated, the harms alleged by the individual have been going on  for as long as those plants have

been in operation.  These "harms" are not properly redressed under the FMIA, the APA, or

NEPA.  Additionally, Plaintiffs' aesthetic interest in preventing the Petitioners' operations is not

sufficiently particularized.  The cases cited by Plaintiffs are distinguishable from the present case.

Pl.'s Mem. at 39. Courts have recognized an interest not to see or have to contemplate the

mistreatment of animals that are held out to the public for the purpose of enjoying the animals

but this case, implicating the operations of private facilities, does not involve such environments.

Plaintiffs appear to allege that many horse owners do not know that the horses they sell are going to meat processing facilities, that the owners would be distressed if they knew the ultimate fate of these horses and that the owners might not sell the horses if they knew. See, e.g., Pls. Am. Compl. ¶36; Pls. Mem. at 7-8. However, Plaintiffs' assertion here is entirely speculative. Plaintiffs provide no evidence showing what horse sellers actually know or what they would do if they knew.

Plaintiffs also allege that many wild horses are sent to the horse slaughter plants each year, Pls. Mem. at 40 n. 4, and that allowing the horse slaughter plants to remain in operation will create an economic incentive for rounding up more wild horses and sending them to slaughter, id. However, Plaintiffs concede that the wild horses that are sent to slaughter are not being rounded up on public lands and sent directly to slaughter, but are being adopted by private owners under a Bureau of Land Management program and then sold by those owners for slaughter. Id. at 9.

Furthermore, Plaintiffs note that 91,757 horses were slaughtered in the United States for human consumption in 2005, Pls. Mem. at 7, and assert that at least 2500 wild horse were sent to slaughter between 1999 and 2005, id. at 9. Based on these numbers, an average of 416 wild horses were sent to slaughter in each of those years, and assuming that the total number of horses slaughtered in 2005 is representative of the level of horse slaughter in the United States in any given year, the annual percentage of horses sent to slaughter that are wild rather than privately owned is 0.45%. Therefore, Plaintiffs' own data refute their argument that the continuation of horse slaughter increases the likelihood of, and creates an economic incentive for, the removal of

wild horses from their natural habitat for slaughter.   See also Ex. 2, Tucker Decl. ¶ 3 (noting that "[i]n early 2005, Cavel adopted [a] policy that it will not slaughter any 'wild' horses owned or formerly owned by the Bureau of Land Management, and "[e]ven prior to 2005, the number of 'wild horses' slaughtered by Cavel was always relatively small, approximately one out of every forty horses."); Ex. 3, Soenen Decl. ¶ 4 (stating that "Dallas Crown purchases horses from owners, mainly farmers in the Midwest, Southwest and the Western states, who no longer have need for their livestock.  In 2005, Dallas Crown adopted the policy that it will not slaughter any wild horses owned or formerly owned by the Bureau of Land Management. [However, e]ven prior 2005, the number of wild horses slaughtered by Dallas Crown was already very small, approximately 1 out of 300 horses slaughtered.); Ex. 4, Garcia Decl. ¶ 4 (stating that "[i]n 2005, Beltex adopted the policy that it would not accept any / and all wild horses for slaughter, including those for sale by the. . . BLM. . . Southwestern Cattle Raisers Association provides a Brand Inspector to inspect and identify each horse presented for slaughter.  The Brand Inspector prevents all wild horses from entering processing at Beltex Corporation.  Even before 2005, the number of wild horse mustangs slaughtered by Beltex was relatively small, and Beltex would not accept any horse lacking appropriate documentation.")

### 3.    Others Will Be Harmed by Granting the Relief Requested by Plaintiffs.

The Petitioners would be irreparably harmed if the USDA is enjoined from implementing a voluntary fee-for-service ante-mortem inspection program for horses.  Petition, at 8 (AR 124); Ex. 2, Tucker Decl. ¶ 6; Ex. 3, Soenen Decl. ¶ 8; Ex. 4, Garcia Decl. ¶ 8.  Because all livestock, including horses, intended for human consumption must be inspected by the FSIS prior to

slaughter, withholding such services will force the companies to cease their operations unless the fee-for-service inspection program is implemented as intended by the USDA and provided for in the Interim Final Rule. Id.

Cavel employs 56 workers from the DeKalb, Illinois area. Ex. 2, Tucker Decl. ¶ 10. If the fee-for-service inspection program is not permitted to be established, these workers will lose their livelihood. Id. Fifty production workers will lose their positions immediately, and Cavel will only be able to employ administrative personnel for a short period of time at significant cost to the company. Id. Cavel's facility is too small to adopt the slaughter of cattle, and it cannot operate economically by turning to the slaughter of exotic animals, such as deer, elk or water buffalo. Ex. 2, Tucker Decl. ¶ 8

Additionally, in order to run an efficient, productive business Cavel maintains and has supplied itself with such items as electricity and packaging and shipping supplies well into the future. Id. ¶ 11. For instance, Cavel currently has over $127,000 worth of supplies stored at its facility in anticipation of future shipments of horse meat. Id. The company also has a contract on utility purchases until the end of the year, which must be honored. Id. If the fee-for-service inspection program is not implemented, not only will Cavel lose the value of its stockpiled supplies, it will also be required to honor a utility contract for which the company would have no need. Id.

Finally, Cavel operations are housed in a state-of-the-art, modern facility, which was rebuilt just under two years ago. Id. ¶ 12. This is a valuable piece of property for which Cavel pays over $12,000 per month in rent. Id. Cavel is required to maintain the property and ensure

that its value does not decline, and it will therefore need to pay rent and maintenance fees, as well as property taxes, even if the fee-for-inspection program is not permitted to proceed as planned by the USDA on March 10, 2006. Id. This is a significant cost which will severely impinge upon the company's financial well-being in the event it is not permitted to continue to process horsemeat and earn revenue. Id.

Dallas Crown customers consist of foreign businesses that import and sell horsemeat for human consumption; zoos that require a high standard nutritional program for their large animals, including protected species; and pharmaceutical industries and universities that purchase by-products to find new treatments and teach the next generation of veterinarians. Ex. 3, Soenen Decl. ¶ 9. Even a temporary shutdown of Dallas Crown's facility will have a severe detrimental impact on the business. Id. ¶ 10. Customers will have to turn to alternative products and will lose their confidence in the company's ability to supply them in the future when operations resume. Id. In addition, the company's zoo customers will have to change the animals' feeding programs, and protected species are very sensitive to any change in their diet. Id.

Dallas Crown employs 52 workers from the Kaufman area. Id. ¶ 11. If the USDA's fee-for-service inspection program is not permitted to be established, these workers will lose their livelihood. Id. ¶ 11. Forty-nine production workers will lose their positions immediately, and Dallas Crown will only be able to employ administrative personnel for a short period of time thereafter, and at a significant cost to the company. Id.

In order to run an efficient, productive business, Dallas Crown maintains and has supplied itself with such items as electricity and packaging and shipping supplies well into the future.  Id. ¶ 12.  The company has different contracts on utility purchases that must be honored. Id.  If the fee-for-service inspection program is not implemented, Dallas Crown will not only lose the value of the stockpiled supplies, it will also be required to honor contracts for which the company would have no need.  Id.

Beltex is a meat processing facility that processes fresh and frozen meat for export. Ex. 4, Garcia Decl. ¶ 3.  Beltex exports approximately 5,000 tons of horsemeat each year and sell 1,000 tons of horsemeat annually domestically to zoos; these domestic customers require their product be USDA inspected to comply with their specially certified diets for large animals.  Id. Beltex is a significant employer and contributor of tax revenues in the Dallas-Fort Worth Metroplex.  Id. ¶ 6.  The company employs approximately 100 workders from around the region. Id.  Its total payroll was in excess of $5 million in 2005.  Id.  Because livestock, including horses, intended for human consumption must be inspected by the FSIS prior to slaughter, withholding such service will force Beltex to curtail operations unless the fee-for-service inspection program is implemented.  Id. ¶ 8.  The result of the cessation of these operations will be to halt sales and shipping and force the layoff of nearly all, if not all, Beltex employees.  Id. Beltex has no means to immediately replace the business that would be shut down in the absence of the Interim Final Rule going into effect on March 10, 2006.  Id.  The losses would therefore be irreparable.  Id.

Beltex has also acquired, or contracted to acquire, additional supplies for use after March 10, 2006 at a cost of over $150,000.  Id. ¶ 9.  If USDA were enjoined from making the Interim

35

Rule effective on March 10, Beltex would suffer further irreparable losses from these obligations. Id.

In addition to these direct irreparable economic impacts on Beltex, there would be indirect economic effects on the Dallas-Fort Worth Metroplex if USDA were enjoined from making the Interim Rule effective on March 10. Id. ¶ 10. Beltex has estimated these economic impacts on the order of $25 million annually. Id.

The Petition and the declarations of company officials discussed herein clearly evidence that others will be detrimentally harmed by a preliminary injunction. Therefore, Plaintiffs' request for an injunction should be denied.

4.    **Denying the Injunction Will Serve the Public Interest by Honoring the Statutory Scheme Envisioned by Congress.**

Congress, in passing the FY 2006 Appropriations Act, stated that the USDA is obliged to inspect meat intended for human consumption both domestic and exported. H.R. Rep. No. 109-255, p. 107 (2005)(AR 112). Although FY 2006 appropriated funding was not provided to pay the salary and expenses of personnel for this purpose with respect to ante-mortem inspections of horses, Pub. L. 109-97, § 794, 119 Stat. 2164, the USDA's statutory duty related to the inspection of meat and meat products was not modified by the Appropriations Act nor was there any Congressional intent to modify this statutory duty expressed either in the Appropriations Act or in the accompanying conference report. Id. Thus, the USDA's Interim Final Rule providing for ante-mortem inspection of horse meat and meat products through a voluntary fee-for-service

36

program serves the public interest by honoring both the FY 2006 Appropriations Act and the

inspection provisions of the FMIA.

The interpretation of section 794 of the FY 2006 Appropriations Act advanced by

Plaintiffs is actually contrary to both and puts the appropriations and authorizing laws in

unnecessary conflict using the former, by implication and absent clear Congressional intent, to

repeal the latter.  The public interest is simply not served by an interpretation of laws that violates

"the cardinal principle of statutory interpretation" as expressed by the Nation's highest Court -

i.e., to save and not destroy laws particularly when there has been no express intent to do the

latter.  See United States v. Menasche, 348 U.S. at 538. Also troubling, Plaintiffs' interpretation

of section 794 would place the USDA in the unavoidable position of undermining a statutorily-

protected right afforded to Petitioners (i.e., the right to an inspection which can only be denied,

after an opportunity for a hearing, for those safety and welfare reasons contemplated by the

FMIA) when there has been no law expressly withdrawing or qualifying this right.  See 21

U.S.C. § 671; see e.g. Groten v. California, 251 F.3d 844, 850-51 (9th Cir.2001) (statute

establishing standards for business license may create property interest protected by the Due

Process Clause); Cf. Gagliardi v. Village of Pawling, 18 F.3d 188, 192-93 (2d Cir.

1994)(discussing property interest in due process context).  Again, the public is not served by

interpretations of laws which are constitutionally or statutorily untenable.  Accordingly,

consistent with and pursuant to the APA, the public interest is better served by denying

Plaintiffs' motion for a preliminary injunction.

IV.    **CONCLUSION**

Defendants respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction because Plaintiffs fail to meet the stringent standards for obtaining such relief.  A proposed Order consistent with the relief requested in this opposition memorandum is attached hereto.

Respectfully Submitted,

/s/ Kenneth L. Wainstein /kvm

_____

KENNETH L. WAINSTEIN, D.C. BAR #451058
United States Attorney

/s/ R. Craig Lawrence

_____

R. CRAIG LAWRENCE, D.C. BAR # 171538
Assistant United States Attorney

/s/ Beverly M. Russell

_____

Of Counsel:                                      BEVERLY M. RUSSELL, DC Bar #454257
Thomas Bolick, Esq.                        Assistant United States Attorney
Rick Herndon, Esq.                          U.S. Attorney's Office for the
U.S. Dept. of Agriculture                  District of Columbia, Civil Division
                                                       555 4th Street, N.W., Rm. E-4915
                                                       Washington, D.C.  20530
                                                       Ph:  (202) 307-0492

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing ***Defendants' Opposition to Plaintiff's Motion***

***for a Temporary Restraining Order and Preliminary Injunction*** was sent by the Court's Electronic Case

Filing System, this <u>27th</u> day of February, 2006 to:

Eric R. Glitzenstein, Esq.
Howard M. Crystal, Esq.
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W., Suite 700
Washington, D.C.  20009
eric@meyerglitz.com
howardcrystal@meyerglitz.com

James P. Murphy, Esq.
Squire, Sanders & Dempsey L.L.P.
1201 Pennsylvania Ave., N.W., Suite 500
Washington, DC  20004
JMurphy@ssd.com

/s/ Beverly M. Russell

_____

BEVERLY M. RUSSELL
Assistant United States Attorney