UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | Civil Action No. 06-0265(CKK) |
| MIKE JOHANNS, Secretary, United States Department of Agriculture, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

# ADMINISTRATIVE RECORD
# PAGES 115 - 149

# PETITION OF
# BELTEX CORPORATION,
# DALLAS CROWN, INC., AND
# CAVEL INTERNATIONAL, INC.,
# FOR EMERGENCY RULEMAKING TO PROVIDE FOR
# VOLUNTARY, ANTE-MORTEM INSPECTION OF HORSES
# AND RELATED RELIEF

This petition is submitted on behalf of Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc., ("Petitioners") and requests action by the United States Department of Agriculture's Food Safety and Inspection Service (collectively "USDA") to promulgate on an expedited basis an interim final rule, effective as of March 10, 2006, to provide for voluntary, "fee-for-service" ante-mortem inspection of horses and transportation-related inspection of equines to slaughter under the Agriculture Marketing Act, as amended, 7 U.S.C. § 1622. As further discussed below, this action is necessary due to the apparent lack of appropriated funds for ante-mortem inspection of horses, as required by Section 3 of the Federal Meat Inspection Act (FMIA). If USDA should fail to provide ante-mortem inspection required by Section 3 of the FMIA, affected establishments would likely be forced out of operation, causing substantial economic damage contrary to the public good.

## I.     Action Requested

Pursuant to the Administrative Procedure Act[1] and USDA's implementing regulation,[2] the undersigned Petitioners request that USDA issue an emergency interim final rule, effective as of March 10, 2006, to provide voluntary, "fee-for-service" ante-mortem inspection of horses and transportation-related inspection of equines to slaughter under the Agriculture Marketing Act, as amended, 7 U.S.C. § 1622.

---

[1] 5 U.S.C. § 553(e).
[2] 7 C.F.R. § 1.28

## II.   Interests of Petitioners

Petitioner Beltex Corporation is a domestic and international exotic meat processor founded in 1976 providing fresh and frozen high-quality products to restaurants, institutions, wholesalers, and retailers. Beltex operates in Fort Worth, Texas, and is located in the industrial Stockyard sector near the Meacham Field Airport. Beltex employs between 80 and 120 people necessary in the day-to-day operations of the plant. This payroll accounts for a multimillion-dollar direct impact on the local economy.

Petitioner Dallas Crown, Inc., in Kaufman, Texas, is a meat packing plant, specializing in the processing of fresh and frozen horsemeat products and was founded in 1981. Products are packaged and shipped according to the demand and the specification of customers. Dallas Crown provides local institutions and foreign importers, wholesalers, supermarkets, butchers, and retailers. Dallas Crown currently employs 46 people necessary in the day-today operations of the plant, making it the largest employer in the town.

Petitioner Cavel International, Inc., located in DeKalb, Illinois, processes fresh and frozen horsemeat for export. Cavel has been in operation since 1987. The company also operates under a horsemeat license issued by the Illinois Department of Agriculture. Cavel is a significant employer and contributor of tax revenues in the DeKalb area. The company employs 56 workers from around the region.

## III.   Legal Background

### A. Inspection Under the Federal Meat Inspection Act, the Federal Agriculture Improvement and Reform Act of 1996, and the Agriculture Marketing Act of 1946, As Amended

One of the most distinctive features of the Federal Meat Inspection Act (FMIA) is the requirement for continuous government inspection at establishments that slaughter cattle, sheep,

2

## PETITION OF
## BELTEX CORPORATION,
## DALLAS CROWN, INC., AND
## CAVEL INTERNATIONAL, INC.,
## FOR EMERGENCY RULEMAKING TO PROVIDE FOR
## VOLUNTARY, ANTE-MORTEM INSPECTION OF HORSES
## AND RELATED RELIEF

This petition is submitted on behalf of Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc., ("Petitioners") and requests action by the United States Department of Agriculture's Food Safety and Inspection Service (collectively "USDA") to promulgate on an expedited basis an interim final rule, effective as of March 10, 2006, to provide for voluntary, "fee-for-service" ante-mortem inspection of horses and transportation-related inspection of equines to slaughter under the Agriculture Marketing Act, as amended, 7 U.S.C. § 1622. As further discussed below, this action is necessary due to the apparent lack of appropriated funds for ante-mortem inspection of horses, as required by Section 3 of the Federal Meat Inspection Act (FMIA). If USDA should fail to provide ante-mortem inspection required by Section 3 of the FMIA, affected establishments would likely be forced out of operation, causing substantial economic damage contrary to the public good.

### I.  Action Requested

Pursuant to the Administrative Procedure Act[1] and USDA's implementing regulation,[2] the undersigned Petitioners request that USDA issue an emergency interim final rule, effective as of March 10, 2006, to provide voluntary, "fee-for-service" ante-mortem inspection of horses and transportation-related inspection of equines to slaughter under the Agriculture Marketing Act, as amended, 7 U.S.C. § 1622.

---

[1] 5 U.S.C. § 553(e).
[2] 7 C.F.R. § 1.28

## II.   Interests of Petitioners

Petitioner Beltex Corporation is a domestic and international exotic meat processor founded in 1976 providing fresh and frozen high-quality products to restaurants, institutions, wholesalers, and retailers. Beltex operates in Fort Worth, Texas, and is located in the industrial Stockyard sector near the Meacham Field Airport. Beltex employs between 80 and 120 people necessary in the day-to-day operations of the plant. This payroll accounts for a multimillion-dollar direct impact on the local economy.

Petitioner Dallas Crown, Inc., in Kaufman, Texas, is a meat packing plant, specializing in the processing of fresh and frozen horsemeat products and was founded in 1981. Products are packaged and shipped according to the demand and the specification of customers. Dallas Crown provides local institutions and foreign importers, wholesalers, supermarkets, butchers, and retailers. Dallas Crown currently employs 46 people necessary in the day-today operations of the plant, making it the largest employer in the town.

Petitioner Cavel International, Inc., located in DeKalb, Illinois, processes fresh and frozen horsemeat for export. Cavel has been in operation since 1987. The company also operates under a horsemeat license issued by the Illinois Department of Agriculture. Cavel is a significant employer and contributor of tax revenues in the DeKalb area. The company employs 56 workers from around the region.

## III.   Legal Background

### A. Inspection Under the Federal Meat Inspection Act, the Federal Agriculture Improvement and Reform Act of 1996, and the Agriculture Marketing Act of 1946, As Amended

One of the most distinctive features of the Federal Meat Inspection Act (FMIA) is the requirement for continuous government inspection at establishments that slaughter cattle, sheep,

2

swine, and equine (hereinafter "livestock") to prevent the inhumane treatment of livestock and the distribution of adulterated meat food products. Specifically, Section 3 of the FMIA requires the Food Safety and Inspection Service (FSIS) to inspect all livestock before slaughter ("ante-mortem inspection") for human food.[3] Without ante-mortem inspection, establishments are prohibited from selling the meat food product for human food.[4]

As part of ante-mortem inspections of horses, USDA guidelines issued under Section 903 of the Federal Agriculture Improvement and Reform Act of 1996[5] governing the commercial transportation of equines to slaughter require USDA inspections at slaughter facilities of such horses and the trucks used to transport them.[6]

The mandatory inspection provisions under the FMIA only apply to livestock. In 1946, Congress amended the Agricultural Marketing Act (AMA) to provide USDA with the authority to furnish voluntary inspection for all agriculture products, including animals, for a fee.[7] Such inspection services are commonly referred to as "fee-for-service" inspection. Specifically, subsection 203(h) of the AMA provides that the Secretary of Agriculture has authority to:

> Inspect, certify, and identify the class, quality, quantity, and condition of agricultural products when shipped or received in interstate commerce, under such rules and regulations as the Secretary of Agriculture may prescribe, including assessment and collection of such fees as will be reasonable and as nearly as may be to cover the cost of the service rendered....[8]

---

[3] 21 U.S.C. § 603.
[4] 21 U.S.C. § 610.
[5] 7 U.S.C. § 1901 note.
[6] 9 C.F.R. § 88.5. Although these regulations are issued by the Animal and Plant Health Inspection Service (APHIS), the inspections may be conducted by any authorized USDA employee, including FSIS inspectors. See Final Rule, 66 Fed. Reg. 63,588 at 63,605, col. 1 (Dec. 7, 2001).
[7] 7 U.S.C. § 1622(h).
[8] Id.

3

0119

Pursuant to regulations promulgated under the Act,[9] FSIS currently provides voluntary inspection of certain exotic animals and rabbits. The inspected and passed meat from such animals is stamped with the FSIS mark of inspection and can be sold interstate and exported.[10]

B. Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2006

On November 10, 2005, the President signed into law the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2006, Pub. L. 109-97 ("Appropriations Act").[11] Section 794 of the Appropriations Act provides:

> Effective 120 days after the date of enactment of this Act, none of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under Section 3 of the Federal Meat Inspection Act (21 U.S.C. 603) or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 1901 note; Public Law 104-127).

As noted above, Section 3 of the FMIA requires FSIS to conduct ante-mortem inspection of horses, and the guidelines issued under Section 903 of the Federal Agriculture Improvement and Reform Act of 1996 require inspections relating to the transportation of horses. Thus, as of 120 days after the date of enactment of the Appropriations Act (*i.e.*, March 10, 2006), funds appropriated under this Appropriations Act cannot be used to pay the salaries and expenses of USDA personnel to conduct the required ante-mortem inspections of horses.

Although the Appropriations Act prevents USDA from using funds appropriated under that Act for ante-mortem inspection services, it is important to note what the Appropriations Act does not provide. First and foremost, Section 794 does not amend the FMIA or otherwise alter USDA's

---

[9] 9 C.F.R. Parts 350, 352 and 354.
[10] Id.
[11] H.R. 2744, 109th Cong. (2005)

4

obligation to provide ante-mortem inspection for horse slaughter.  This fact is explicitly acknowledged in the conference report explaining Section 794:

> It is the understanding of the conferees that the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and exported).[12]

Thus, notwithstanding the limitation on funds available under the Appropriations Act, FSIS remains obliged by law to provide for ante-mortem inspection of horses intended for human consumption.

Second, the Appropriations Act does not have the broader effect of prohibiting all funds for ante-mortem inspection activities.  The plain language of Section 794 only prevents the use of funds appropriated under the Appropriations Act of fiscal year 2006 to pay salaries or expenses of personnel to inspect horses under Section 3 of the FMIA or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996, effective 120 days after enactment. Funds otherwise available may be used to fund horse inspection activities, such as user-fees collected by FSIS for meat inspections involving overtime, holidays or exotic animals.[13] Significantly, Section 794 does not prohibit the payment of salaries and expenses of personnel performing such inspections using these funds or as part of a voluntary, fee-for-service program promulgated pursuant to the authority of the AMA.

## IV.  Legal Grounds for the Petitioned Action

As noted above, USDA is required by law to conduct ante-mortem inspection of horses before they are slaughtered for human food.[14]  Without funds appropriated under the Appropriations Act, USDA must seek other means to provide ante-mortem inspection of horses slaughtered for

---

[12] H.R. REP. No. 109-255 at 107 (2005)
[13] 9 C.F.R. § 391.

0121

human food. If funds are not available through other sources within the Department, USDA may meet its statutory obligation by promulgating a rule providing for voluntary, fee-for-service ante-mortem inspection under the AMA.

As described above, USDA has authority to establish voluntary, fee-for-service inspection of horses pursuant to the AMA.[15] Indeed, USDA has already exercised its authority to establish voluntary, fee-for-service inspection of animals such as reindeer, elk, deer, antelope, water buffalo, bison, and rabbits.[16]

## V.    Good Cause Exists for Expedited Rulemaking

Pursuant to the Administrative Procedures Act,[17] USDA must provide notice and the opportunity to comment upon proposed regulations unless the agency "for good cause finds that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."[18] In the normal course, a substantive regulation is not made effective less than 30 days after its publication except "as otherwise provided by the agency for good cause found and published with the rule."[19] Petitioners respectfully submit that good cause exists for USDA to promulgate and make immediately effective an interim final regulation establishing fee-for-service ante-mortem inspection.

As noted above, USDA has a statutory obligation to provide ante-mortem inspection for horse slaughter. To meet its inspectional duties under Section 3 of the FMIA, USDA must provide for

---

[14] 21 U.S.C. § 603. The transportation-related inspection of equines is required by USDA regulation, not by statute. 9 C.F.R. § 88.5. If these inspections cannot be funded as outlined in this petition for emergency rulemaking, USDA should not continue to require such inspections.
[15] 7 U.S.C. § 1622(h). This authority also extends to inspections relating to the commercial transportation of equines to slaughter.
[16] 9 C.F.R. Parts 350, 352, 354.
[17] 5 U.S.C. § 553(b) and (c)
[18] 5 U.S.C. § 553(b)(B).

0122

funding of salaries and expenses of ante-mortem inspectional personnel on or before March 10, 2006. Notice-and-comment proceedings and an effective date not less than 30 days after publication of the petitioned-for regulation is unnecessary. Petitioners, who are the only persons that will be currently affected by the establishment of fee-for-service ante-mortem inspection for horse slaughter, are fully prepared to accept this regulatory change upon publication. Alternatively, USDA may dispense with notice-and-comment insofar as:

> General notice of proposed rule making shall be published in the Federal Register, *unless persons subject thereto are named and either personally serviced or otherwise have actual notice thereof in accordance with law.*[20]

Petitioners submit that they will accept personal service of a regulation establishing fee-for-service ante-mortem inspection. Therefore, notice-and-comment rulemaking and delayed implementation of a fee-for-service inspectional program are unnecessary.

Completion of a notice-and-comment rulemaking prior to March 10, 2006, is practically impossible. We are unable to find precedent for USDA initiating and completing a notice-and-comment in such a short period of time. Therefore, notice-and-comment rulemaking is both unnecessary and impracticable.

The adverse economic impact of USDA's failure to provide ante-mortem inspection as required by Section 3 of the FMIA would be substantial and contrary to the public interest as defined by statute. Specifically, if USDA fails to provide ante-mortem inspection required by Section 3 of the FMIA, each affected establishment would be prohibited from continuing a large portion of their operations. As a result, petitioners expect that these facilities would be forced to close, with substantial adverse economic affect.

---

[19] 5 U.S.C. § 553(d)(3).
[20] 5 U.S.C. § 553(b) (emphasis supplied).

7

Petitioners estimate that the combined direct economic impact of their affected facilities would exceed $41,000,000 annually, including:

- Combined payroll, not including state and federal inspectors, exceeds $11,000,000.

- Petitioners Dallas Crown, Inc., and Beltex Corporation spend $6 million annually on airfreight services at Dallas-Fort Worth International Airport (DFW). Petitioners' combined use of airfreight services makes them the single largest airfreight customer for DFW. Petitioners exclusively use U.S. carriers for their airfreight needs, with significant airfreight employment and flights attributable to shipment of Petitioners' products.

- Dallas Crown and Beltex's combined overhead expenses of approximately $27 million, the majority of which is spent in the Dallas-Fort Worth Metroplex.

- Petitioner Cavel International, Inc., spends approximately $8 million a year to purchase livestock from farmers throughout the Midwest and Western United States. It spends another $1.4 million each year with local suppliers of goods and services.

- Cavel also pays transportation companies approximately $1.5 million a year to transport livestock to its facility in DeKalb, Illinois. It spends an additional $2.5 million a year to ship its finished meat products abroad.

- Petitioners' operations, which focus on the export of products to foreign markets, make a favorable contribution to the U.S. balance of trade. If Petitioners were forced to cease operations and close their facilities, the approximately $41,000,000 that Petitioners now contribute to their local economies would disappear and constitute a net loss to the U.S. economy.

Though more difficult to quantify, Petitioners' facilities have further benefit to the public good, including:

- Pharmaceutical industries, universities, and other institutions use these facilities for research and training for veterinary and medical studies.

- Zoo animal diets across the country rely heavily upon the products of Petitioners' facilities. Zoos, which are dedicated to animal welfare, attach importance to sourcing their meat-based animal diets from USDA-inspected facilities because of the assurance that stringent animal welfare and food safety requirements are met. Forcing a change in zoo animal diets may adversely affect zoo animal health.

- Petitioners provide a humane and economically beneficial solution for the tens of thousands of horses that must be euthanized each year.

8

Therefore, the ordinary timeframes for notice and public comment, as well as for delayed

implementation from publication, would be impracticable, unnecessary, and contrary to the public

interest.   USDA should find and describe in a FEDERAL REGISTER notice good cause for

promulgation and implementation of an interim final rule on an expedited basis

**VI.    Conclusion**

For the foregoing reasons, Petitioners respectfully request that the USDA promulgate on an

expedited basis an interim final rule, as of March 10, 2006, to provide for voluntary, "fee-for-

service" ante-mortem inspection of horses and transportation-related inspection of horses and the

trucks used to transport them under the Agriculture Marketing Act, as amended, 7 U.S.C. § 1622.

Respectfully submitted,

Mr. Richard Garcia
General Manager
Beltex Corporation
3801 North Grove Street
Fort Worth, TX 76106

Mr. Chris Soemen
General Manager
Dallas Crown, Inc.
2000 West Fair
Kaufman, TX 75142

Mr. James Tucker
General Manager
Cavel International, Inc
108 Harvestore Drive
DeKalb, IL 60115

9

DEC-11-2005  23:03          USDA FSIS OA EMS                    202 720 7609    P.12
11/22/2005 12 33 FAX  9729323062                                      ✆009/009

Therefore, the ordinary timeframes for notice and public comment, as well as for delayed implementation from publication, would be impracticable, unnecessary, and contrary to the public interest.  USDA should find and describe in a FEDERAL REGISTER notice good cause for promulgation and implementation of an interim final rule on an expedited basis.

**VI.    Conclusion**

For the foregoing reasons, Petitioners respectfully request that the USDA promulgate on an expedited basis an interim final rule, as of March 10, 2006, to provide for voluntary, "fee-for-service" ante-mortem inspection of horses and transportation-related inspection of horses and the trucks used to transport them under the Agriculture Marketing Act, as amended, 7 U.S.C. § 1622.

Respectfully submitted,

Mr. Richard Garcia
General Manager
Beltex Corporation
3801 North Grove Street
Fort Worth, TX 76106

Mr. Chris Sosnan
General Manager
Dallas Crown, Inc.
2000 West Fair
Kaufman, TX 75142

Mr. James Tucker
General Manager
Cavel International, Inc.
108 Harvestore Drive
DeKalb, IL 60115

9

Therefore, the ordinary timeframes for notice and public comment, as well as for delayed implementation from publication, would be impracticable, unnecessary, and contrary to the public interest.   USDA should find and describe in a FEDERAL REGISTER notice good cause for promulgation and implementation of an interim final rule on an expedited basis.

**VI.    Conclusion**

For the foregoing reasons, Petitioners respectfully request that the USDA promulgate on an expedited basis an interim final rule, as of March 10, 2006, to provide for voluntary, "fee-for-service" ante-mortem inspection of horses and transportation-related inspection of horses and the trucks used to transport them under the Agriculture Marketing Act, as amended, 7 U.S.C. § 1622.

Respectfully submitted.

Mr. Richard Garcia
General Manager
Beltex Corporation
3801 North Grove Street
Fort Worth, TX  76106


Mr. Chris Soenen
General Manager
Dallas Crown, Inc.
2000 West Fair
Kaufman, TX  75142


Mr. James Tucker
General Manager
Cavel International, Inc.
108 Harvestore Drive
DeKalb, IL 60115

9

0127



OFFICE OF THE EXECUTIVE
SECRETARIAT, USDA

' 2005 NOV 23 P 2:39

0128

First Class Mail

OLSSON, FRANK AND WEEDA, P. C.
ATTORNEYS AT LAW
SUITE 400
1400 SIXTEENTH STREET, N.W.
WASHINGTON, D.C. 20036-2220

TO:

Honorable Mike Johanns
Secretary of Agriculture
United States Department of Agriculture
Room 200-A
Washington, D.C. 20250

TOTAL  P.14








# FAX    FAX    FAX    FAX    FAX    FAX

To: Mary Porretta
Fax number: (202) ~~277~~ 0486
  *6910*

From:
Linda Russell
Executive Correspondence and Issues Management Staff
Room 1164-South Building
Phone: (202) 690-4046
E-mail: Linda.Russell@fsis.usda.gov

Hi Mary,

Attached is the petition on horse slaughter that we discussed.

Including this cover sheet, it is 14 pages.  Thanks.

 United States
Department of
Agriculture

Food Safety
and Inspection
Service

Washington, D.C.
20250

DEC 21 2005

James Tucker
General Manager
Cavel International, Inc.
108 Harvestore Drive
DeKalb, IL  60115

Dear Mr. Tucker:

The Food Safety and Inspection Service (FSIS) has received the petition submitted by you,
Mr. Richard Garcia, and Mr. Chris Soenen on behalf of Beltex Corporation, Dallas Crown,
Inc., and Cavel International, Inc., requesting that the Agency promulgate on an expedited
basis an interim final rule, effective as of March 10, 2006, to provide for voluntary, fee-for-
service ante-mortem inspection of horses and transportation-related inspection of equines to
slaughter under the Agricultural Marketing Act.

This request is being considered as a rulemaking petition under the Administrative
Procedure Act (5 U.S.C. 553(e)). The petition has been referred to the Office of Policy,
Program, and Employee Development for review and has been assigned petition number
05-08.  You may contact Mary Porretta, Program Analyst, Regulations and Petitions Policy
Staff, at (202) 720-5627, if you have any questions regarding the status of the petition.  I am
also sending this information to Mr. Garcia at Beltex Corporation and Mr. Soenen at Dallas
Crown, Inc.

Sincerely,

*Lynn E. Dickey*

Lynn E. Dickey, Ph.D., Director
Regulations and Petitions Policy Staff
Office of Policy, Program and Employee Development

0130



United States
Department of
Agriculture

Food Safety
and Inspection
Service

Washington, D.C.
20250

DEC 2 1 2005

Richard Garcia
General Manager
Beltex Corporation
3801 North Grove Street
Fort Worth, TX 76106

Dear Mr. Garcia:

The Food Safety and Inspection Service (FSIS) has received the petition submitted by you, Mr. Chris Soenen, and Mr. James Tucker on behalf of Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc., requesting that the Agency promulgate on an expedited basis an interim final rule, effective as of March 10, 2006, to provide for voluntary, fee-for-service ante-mortem inspection of horses and transportation-related inspection of equines to slaughter under the Agricultural Marketing Act.

This request is being considered as a rulemaking petition under the Administrative Procedure Act (5 U.S.C. 553(e)). The petition has been referred to the Office of Policy, Program, and Employee Development for review and has been assigned petition number 05-08. You may contact Mary Porretta, Program Analyst, Regulations and Petitions Policy Staff, at (202) 720-5627, if you have any questions regarding the status of the petition. I am also sending this information to Mr. Soenen at Dallas Crown, Inc., and Mr. Tucker at Cavel International, Inc.

Sincerely,

*Lynn E. Dickey*

Lynn E. Dickey, Ph.D., Director
Regulations and Petitions Policy Staff
Office of Policy, Program and Employee Development

0131

United States
Department of
Agriculture

Food Safety
and Inspection
Service

Washington, D.C.
20250

DEC 2 1 2005

Chris Soenen
General Manager
Dallas Crown, Inc.
2000 West Fair
Kaufman, TX 75142

Dear Mr. Soenen:

The Food Safety and Inspection Service (FSIS) has received the petition submitted by you, Mr. Richard Garcia, and Mr. James Tucker on behalf of Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc., requesting that the Agency promulgate on an expedited basis an interim final rule, effective as of March 10, 2006, to provide for voluntary, fee-for-service ante-mortem inspection of horses and transportation-related inspection of equines to slaughter under the Agricultural Marketing Act.

This request is being considered as a rulemaking petition under the Administrative Procedure Act (5 U.S.C. 553(e)). The petition has been referred to the Office of Policy, Program, and Employee Development for review and has been assigned petition number 05-08. You may contact Mary Porretta, Program Analyst, Regulations and Petitions Policy Staff, at (202) 720-5627, if you have any questions regarding the status of the petition. I am also sending this information to Mr. Garcia at Beltex Corporation and Mr. Tucker at Cavel International, Inc.

Sincerely,

*Lynn E. Dickey*

Lynn E. Dickey, Ph.D., Director
Regulations and Petitions Policy Staff
Office of Policy, Program and Employee Development

0132

## Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Joshua R. Stebbins
Tanya M. Sanerib
Erin M. Tobin

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

January 5, 2006

**By Hand Delivery**

The Honorable Mike Johanns
Secretary of Agriculture
United States Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250

> Re:    *Petition of Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc.,*
> *for an Expedited Interim Rule to Provide for Voluntary, Ante-Mortem Inspection*
> *of Horses and Related Relief*

Dear Secretary Johanns:

On behalf of The Humane Society of the United States, the Society for Animal Protective Legislation, the Doris Day Animal League, the American Society for the Prevention of Cruelty to Animals, and the American Humane Association, we are writing to urge denial of the emergency rulemaking petition, submitted by Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc. (collectively "petitioners"), requesting that the U.S. Department of Agriculture ("USDA") promulgate an expedited rule providing for "fee-for-service" inspection for horse slaughter and transport for slaughter. According to December 21, 2005 letters from USDA's Acting General Counsel James Michael Kelly to Congressmen Ed Whitfield, John Sweeney, and John Spratt, as well as Senator Robert Byrd, the USDA not only appears to be poised to grant this petition, but is also laboring under the gross misapprehension that Congress somehow did *not* intend the FY 2006 Agricultural Appropriations Act to mandate a halt to the slaughter, and transport for slaughter, of American horses in the United States for human consumption in foreign markets.[1]

---

[1] *Compare* 151 CONG. REC. S10,218 (daily ed. Sept. 20, 2005) (Senator Ensign stating immediately after introducing Amendment 1753 that "[t]he goal of our amendment is simple: *to end the slaughter of America's horses* for human consumption overseas.") (emphasis added).

As discussed below, the course of action USDA appears ready to embark on would not only contravene an unequivocally expressed Congressional directive, it would also violate the Federal Meat Inspection Act's requirement that the United States Department of Agriculture, not private facilities, fund horse slaughter inspection. Moreover, the petitioners' request – that this unprecedented end-run around Congress be carried out without prior public notice and comment – would thwart not only the democratic process, but also the rulemaking procedures required by the Administrative Procedure Act. Should the USDA nevertheless choose to grant the petition, we hereby request that you advise us immediately, so that we may pursue appropriate remedies, including legislative and/or judicial intervention.

<u>Background</u>

Each year three European-owned abattoirs based in the U.S. slaughter and process tens of thousands of American horses for human consumption in foreign countries. In 2005, more than 85,000 horses met this fate. Most horses destined for slaughter are sold at livestock auctions or sales. Horses bound for slaughter are shipped, frequently for long distances, in a manner that fails to accommodate their unique temperaments and physical requirements. Often, terrified horses and ponies are crammed together and transported to slaughter in double-deck trucks designed for cattle and pigs. The truck ceilings are so low that some horses are not able to hold their heads in a normal position. Inappropriate floor surfaces lead to slips and falls, and sometimes even trampling. Some horses arrive at the slaughterhouse seriously injured or dead.

Horses of virtually all ages and breeds are slaughtered, though most are relatively young and healthy. Horses commonly slaughtered include unsuccessful or retired race horses, surplus riding school and camp horses, wild horses, and foals from mares whose urine is collected for the production of hormone replacement therapy drugs. Under federal law, horses are required to be rendered unconscious prior to slaughter, usually with a device called a captive bolt gun, which shoots a metal rod into the horse's brain. Some horses, however, are improperly stunned and may be conscious when they are hoisted by a rear leg to have their throats cut. In addition, conditions in the slaughterhouse are stressful and frightening for horses.

The Federal Meat Inspection Act ("FMIA") requires that horses and other animals intended for human consumption be inspected by USDA employees both prior to slaughter (ante-mortem) and after slaughter (post-mortem) to ensure the meat is not adulterated.[2] No meat may enter interstate commerce unless both ante- and post-mortem inspections have been completed under the FMIA.[3] Similarly, the Animal and Plant Health Inspection Service ("APHIS") regulations implementing the FMIA also require these inspections prior to entry into interstate or foreign commerce.[4]

Accordingly, to put a halt to horse slaughter for human consumption, Congressmen John Sweeney (R-NY), John Spratt (D-SC), Ed Whitfield (R-KY) and Nick Rahall (D-WV), sponsored an Amendment to the FY2006 House Agriculture Appropriations bill to de-fund

---

[2] 21 U.S.C. §§ 603, 604.
[3] *Id.* § 610(c).
[4] *See* 9 C.F.R. §§ 71.16, 88.5, 91.3.

0134

USDA ante-mortem inspection under the FMIA and the Federal Agriculture Improvement and Reform Act of 1996. An identical Amendment was offered in the Senate by Senators John Ensign (R-NV) and Robert Byrd (D-WV) and cosponsored by Senators Jon Corzine (D-NJ), Jim DeMint (R-SC), Diane Feinstein (D-CA), Lindsey Graham (R-SC) Mary Landrieu (D-LA), Frank Lautenberg (D-NJ), Trent Lott (R-MS), and Debbie Stabenow (D-MI). The Amendment was supported by a broad coalition of over one hundred horse breeding, showing, and racing organizations such as the National Show Horse Registry, the National Thoroughbred Racing Association, and Churchill Downs — as well as numerous horse welfare and humane organizations across the country. Constituents flooded Congressional offices with calls urging their support of the Amendment, and newspapers across the country editorialized in its favor. This broad-based showing of public support for the Amendment is also reflected in several polls demonstrating that Americans overwhelmingly support an end to horse slaughter for human consumption.[5]

The Amendment passed the House on June 8, 2005 by a landslide vote of 269-158. The identical Senate Amendment was also overwhelmingly approved by a vote of 69-28 on September 20, 2005. Section 794 of the final FY2006 Appropriations Act prohibited USDA from using congressionally appropriated funds to pay for federally-mandated inspection of horses prior to slaughter, and for transport to slaughter.[6] Specifically, Section 794 states:

> Effective 120 days after the date of enactment of this Act, none of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. § 603) or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996.[7]

On November 10, 2005, the President signed this provision into law as part of the FY2006 Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act.

Shortly thereafter, petitioners submitted an emergency rulemaking petition to the USDA requesting that the agency promulgate an expedited rule to provide "fee-for-service" inspections for horse slaughter and transport to slaughter. The proposal asks the USDA to circumvent Congress' intent to prohibit ante-mortem horse slaughter inspection under the FMIA and the

---

[5] *See, e.g.*, Mason-Dixon Polling & Research, *Texas Statewide Voter Survey On Horse Slaughtering* (May 2003) (demonstrating that 72% of Texas voters oppose horse slaughter); McLaughlin & Associates, *Virginia Voters Support The Stopping Of Slaughtering Horses For Human Consumption* (June 2004) (revealing that 74% of Virginia voters oppose horse slaughter); Voter / Consumer Research, *Kentucky Voter Survey* (Jan. 4, 2006) (illustrating that 82% of Kentucky voters oppose horse slaughter); Voter / Consumer Research, *Utah - Slaughter of Horses* (Oct. 21, 2003) (showing that 69% of Utah voters favor a ban on horse slaughter). Additionally, in 1998, Californians passed Proposition 6, a ballot initiative banning horse slaughter for human consumption, with 60 percent of the vote.

[6] Agricultural Appropriations Act of 2006, Pub. L. No. 109-96, § 794 (2005).

[7] *Id.*

0135

Federal Agriculture Improvement and Reform Act of 1996 by creating an entirely new regulatory inspection scheme under the Agricultural Marketing Act.[8] Petitioners also request that this new and unprecedented regulatory system be put in place without prior public notice and comment rulemaking.

On December 7, 2005, unaware of the pending petition, Representatives Ed Whitfield, John Sweeney, John Spratt and Senator Byrd wrote to the USDA to ensure that it would follow Congress' intent to prevent horse slaughter for human consumption. The USDA responded on December 21, 2005, with a terse letter informing the Congressmen and Senator that the Appropriations Act "does not prevent horse slaughter at all," and that "notwithstanding the prohibition on expenditure of funds" mandated by Congress in the Appropriations Act, the USDA believes it can still provide inspection of horses on a fee-for-service basis.

In short, after the President signed the measure into law, the USDA informed Congress in no uncertain terms that the agency has no intention of carrying out Congress' clearly expressed intent in voting to de-fund horse inspection for slaughter by overwhelming majorities in both the House and Senate.

## Discussion

Despite the statements made by USDA Acting General Counsel Kelly to Congress in the December 21, 2005 letters, USDA should deny petitioners' request for rulemaking because: (1) the legislative history of the Appropriations Act unequivocally demonstrates Congress' clear intent to prevent horse slaughter for consumption, rather than simply changing the way USDA pays for inspection; (2) the FMIA requires inspection for horse slaughter to be carried out under that Act, not the AMA, and to be paid by USDA; and (3) promulgation of an entirely new horse meat inspection scheme outside the FMIA — where it has resided for 100 years — must be preceded by full public notice and comment rulemaking in accordance with the APA.

A.     **The Petitioners' Request Requires USDA to Willfully Circumvent the Clearly Expressed Intent of Congress.**

As discussed below, the new fee-for-service scheme concocted by the petitioners is entirely unlawful under the FMIA. However, even if the USDA erroneously believes this proposal to be within the agency's legal authority, to embark upon the rulemaking requested by petitioners would constitute a clear abuse of administrative authority in the face of an unequivocal Congressional command. Indeed, the USDA seems to be under the mistaken impression that its duty is not to promptly implement Congress' expressed will — as one would expect, and as mandated by the separation of powers embodied in the Constitution — but, rather, to find inventive ways around it.

As the Supreme Court has repeatedly recognized, "[i]t may be presumed that Congress does not intend administrative agencies, agents of Congress' own creation, to ignore clear

---

[8] 7 U.S.C. § 1622.

0136

4

jurisdictional, regulatory, statutory, or constitutional commands."[9]   In this case, by expending staff time and resources exploring various ways to continue USDA inspection of horses for slaughter — rather than working on procedures to ensure the smooth shut-down of horse slaughter — the agency is already acting in flagrant violation of a Congressional command that could hardly have been more clearly expressed.

For example, immediately after introducing Amendment 1753 in the Senate, Senator Ensign unequivocally declared that "[t]he goal of our amendment is simple: *to end the slaughter of America's horses* for human consumption overseas."[10]   After explaining that horses slaughtered at the foreign-owned plants are shipped to Europe and Asia for human consumption, Senator Ensign concluded that "[o]ur amendment effectively stops this practice."[11]   More specifically, he noted that without "Federal funds for the inspection of horses . . . horses cannot be slaughtered, or exported for slaughter."[12]

Senate co-sponsor Senator Byrd was also crystal-clear in stating the purpose of the Amendment, declaring unequivocally:

> Senator Ensign and I have offered *an amendment to stop the slaughter of horses for human consumption* by preventing taxpayer dollars from being used to inspect the horses intended for slaughter. Without these inspections . . . it would be impossible for these companies to slaughter horses in the U.S., or to transport horses abroad for slaughter.[13]

An identical understanding of the Amendment's scope and purpose prevailed in the House, where Representative Spratt, a sponsor, squarely presented the matter to be voted on: "What is the effect of this amendment?  This amendment in simple terms will stop the slaughter [f]or human consumption of horses. . . . [their] brutal slaughter . . . is the kind of slaughter that this bill *will prohibit*."[14]

The unmistakable purpose and effect of the Amendment is also reflected in the breadth of bipartisan support from all regions of the country.  For instance, as Senator Ensign read into the record, Paula Bacon, the Mayor of one of the three American towns where these European-

---

[9] *Heckler v. Chaney*, 470 U.S. 821, 839 (1985) (Brennan, J., concurring); *see also Comty. Television of Southern Cal. v. Gottfried*, 459 U.S. 498, 513 (1983) (holding that "an agency may not ignore a relevant Act of Congress"); *see also Oceanair of Florida, Inc. v. United States Dep't of Transp.*, 876 F.2d 1560, 1565 (11th Cir. 1989) (admonishing that "[a]n administrative agency is a creature of Congress and has no authority beyond that granted by Congress.").

[10] 151 CONG. REC. S10,218 (daily ed. Sept. 20, 2005) (emphasis added).

[11] *Id.*

[12] *Id.  See also id.* at S10,219 (quoting St. Petersburg Times editorial's perception that the Amendment "would, in essence, stop the practice" of horse slaughter because without "taxpayer dollars for the inspection of horse meat . . . legalized horse slaughter in this country will end. And good riddance.").

[13] *Id.* at S10,220 (emphasis added).

[14] *Id.* at H4249 (emphasis added).

0137

owned slaughterhouses are located, in a letter urging Congress to pass the Amendment, characterized horse slaughter as "out of step with American public opinion."[15] Representative Rahall characterized the Amendment as "truly bipartisan when it comes to recognizing how valuable the horse is to this country and what a symbol it is of our freedom."[16] Supporters also listed the many citizen and professional groups that worked for the Amendment's passage.[17]

Moreover, even the Congressional opponents of the bill — who presumably represent the interests of the petitioners here — agreed on the Amendment's purpose, scope, and effect. For example, Agriculture Appropriations Subcommittee Chairman Henry Bonilla stated that the Amendment would "shut down an industry," and would "prohibit USDA from inspecting horses."[18] Another opponent, Agriculture Committee Chairman Bob Goodlatte, also noted that the Amendment would "stop the proper inspection of these horses."[19] Thus, regardless of their position on the Amendment, members of Congress all shared a common understanding of what the Amendment accomplishes—the "prohibit[ion]" of horse slaughter.[20]

In the face of all of this overwhelming evidence of the meaning of the Amendment, the horse slaughter industry and the USDA have apparently switched their position since passage of the Appropriations Act, and now bizarrely suggest that the Appropriations Act "does not prevent horse slaughter at all."[21] The only support offered for this counterintuitive proposition is an isolated statement in the Conference Report accompanying the Appropriations Act that states:

> It is the understanding of the conferees that the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and exported). The conferees recognize that the funding limitation in Section 794 prohibits the use of appropriated funds only for payment of salaries or expenses of personnel to inspect horses.[22]

This single cryptic remark does not erase every clear statement made in Congress in the preceding months of debate and votes on this Amendment — including the unequivocal statements by both the Amendment's sponsors and opponents that the Amendment would halt horse slaughter.

To begin with, the most natural and plausible reading of the quoted language is that it is merely intended to make clear that, by de-funding horse inspection, the law does not affect the inspection of *other* meat under the FMIA. Alternatively, the statement at issue may be intended to make clear, that while the USDA remains "obliged under existing statute to provide for the

---

[15] *Id.* (referring to polls finding that seventy-eight percent of Texans oppose horse slaughter).

[16] *Id.* at H4251.

[17] *Id.* at S10,220 (remarks of Sen. Ensign).

[18] *Id.* at H4248.

[19] *Id.*

[20] *Id.* at H4249 (remarks of Rep. Spratt).

[21] *See* Letter from James Michael Kelly, Acting USDA General Counsel, to Hon. Ed Whitfield, U.S. House of Representatives 1-2 (Dec. 21, 2005).

[22] *Id.* (citing H.R. CONF. REP. NO. 109-255, at 107 (2005)) (emphasis added).

0138

inspection of *meat* intended for human consumption," it is nonetheless prohibited from making "payment of salaries or expenses of personnel to inspect [live] *horses*."[23]    By clearly differentiating between the inspection of live "horses" on the one hand, and the inspection of "meat" obtained from the slaughtering of live horses on the other, a plausible reading of the quoted passage is that the conferees intended only to preserve the authority of FSIS inspectors — after the effective date of the Amendment — to inspect the meat from horses slaughtered *before* the effective date.   In other words, this passage ensures a smooth shut-down of horse slaughter, without precluding the inspection of, and hence wasting, meat from horses slaughtered just before the effective date.

In any event, the fundamental problem with the post-hoc interpretation of this ambiguous snippet offered by USDA is that it would render the entire Amendment meaningless, and require Congress, the Courts, and the public to accept the absurd premise that all of the time, effort, and energy spent debating and enacting this Amendment was for the sole purpose of changing the way the agency pays for horse inspection prior to slaughter.[24]    Moreover, this unstated conclusion that the Amendment is meaningless and ineffectual — which lies at the very heart of the industry's petition and USDA's apparent position on this matter — is itself impossible to reconcile with the legislative history, a fatal defect under applicable legal precedents.[25]

For example, having clearly established that their colleagues would be voting on "an amendment to end the slaughter of one of the most precious American symbols,"[26] members who spoke on the floor of both the House and the Senate then proceeded to lay out a comprehensive rationale for why such a prohibition — and not a change in the method of payment of inspectors — is necessary.   First and foremost, supporters of the Amendment urged their colleagues to pass the Amendment for *humane* reasons.   Senator Byrd, describing the "suffering these animals endure" at "their often injurious end," explained how the "[i]mproper use of stunning equipment at the slaughterhouse can result in the animal having to endure repeated blows to [the] head, meaning that horses sometimes remain conscious throughout the slaughter process."[27]

---

[23] *Id.*

[24] *See, e.g., Baker v. Sunny Chevrolet, Inc.,* 349 F.3d 862, 871 (6th Cir. 2003) (rejecting a "reading of the legislative history [that] would render [the statute] meaningless," and quoting *TRW, Inc. v. Andrews,* 534 U.S. 19 (2001) ("it is a cardinal principle of statutory construction that the statute ought, upon the whole, be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant")); *Gurary v. Nu-Tech Bio-Med, Inc.,* 303 F.3d 212, 230 (2d Cir. 2002) (Walker, J., concurring) (admonishing the parties not to "misus[e] legislative history by following it even when it leads to a reading that would render one of the statute's provisions meaningless"); *Buckley v. Valeo,* 519 F.2d 821, 932 (D.C. Cir. 1975) (MacKinnon, J., concurring in part) (stating that "despite the language in the legislative history, I do not believe this court can so easily assume that the full Congress intended to pass meaningless legislation"), *rev'd on other grounds,* 424 U.S. 1 (1976).

[25] *INS v. Cardoza-Fonseca,* 480 U.S. 421, 445-46 (1987) (rejecting agency interpretation of statute on ground that interpretation was not consistent with congressional intent).

[26] 151 Cong. Rec. S10,220 (remarks of Sen. Byrd).

[27] *Id.; see also id.* at H4247 (daily ed. June 8, 2005) (Rep. Sweeney lamenting horses' "unnecessary pain and suffering before death" at the slaughterhouses); *id.* at H4251 (Rep.

0139

Representative Whitfield, describing the "process of the captive penetrating bolt being administered by low-skilled workers," stated that such methods are "not humane."[28]

Furthermore, to illustrate the widespread public concern for the humane treatment of horses that prompted the Amendment, Senator Ensign also read editorials from several major newspapers into the record. Highlighting the Amendment's humane purposes, the Charleston Gazette described the horse slaughter provision simply as "this humane Amendment," and lamented "the pain, panic, and trauma of a [horse's] trip to the slaughterhouse."[29]  The Washington Times surmised that "if anyone actually saw how these noble beasts are slaughtered—strung up by their hind legs and bled—they might think twice before supporting such conduct."[30]

As a matter of simple common sense, such widespread and deeply held humane concerns would not in any way be ameliorated simply by altering the funding mechanism and allowing the underlying slaughter practice to continue — as USDA apparently now reads the Amendment.  If Congress had intended for horse inspection and slaughter to continue on a fee-for-service or other basis, it would have sought to alter the *means* of inspection, rather than the "often injurious *end[s]*" so compellingly described during floor debate.[31]

Nor would a continuing fee-for-service inspection and slaughter program address Congressional concerns about the negative impact of horse slaughter on American culture and identity—an issue forcefully expressed by the measure's sponsors.  For example, Senator Ensign urged his colleagues to consider that the "Nation's history and cultural heritage is strongly associated with horses."[32]  He framed the Amendment in terms of "the morale of our country."[33]  A Washington Times editorial he read into the record further opined that, because "the horse has always held a hallowed place in our national identity," "[m]ost Americans would sooner starve than eat fillet of horse with cranberry chutney."[34]  Senator Ensign also entered into the record a Kentucky newspaper editorial, which proclaimed that Kentuckians "raise [horses] for higher purposes than ending up on some dinner table overseas."[35]  Senator Byrd, characterized the horse as part of the "indelible image of the fierce and undying determination of the American spirit."[36]

---

Rahall; same); *id.* at H4249 (Rep. Spratt describing that "horses are jacked up by their hind legs and have their throats slit"); *id.* at H4250 (Rep. Moran stating that "[w]e have responsibility over these beautiful creatures. They ought not to be cut up in such an inhumane way. . . . That is not what we are about as a country").

[28] *Id.* at H4250.

[29] *Id.* at S10,219.

[30] *Id.*

[31] *Id.* at S10,220 (emphasis added).

[32] *Id.* at S10,218.

[33] *Id.*

[34] *Id.* at S10,218-19.

[35] *Id.* at S10,219.  *See also id.* (quoting Florida newspaper editorial stating that "[h]orse slaughter has no place in the United States" and that "[e]ach year, nearly 100,000 horses are subjected to a cruel end to their lives").

[36] *Id.* at S10,220.

0140

Representative Moran echoed these sentiments on the floor of the House, asking, "What has become of us as a country, selling these horses off for horse meat to be eaten on the other side of our oceans? The wild horse is an icon of American history."[37]

Furthermore, several members also attested to the strength of the human-horse bond, and the need for the legislation to protect and enhance that bond. Senator Ensign quoted the Charleston Gazette's observation that "[t]he bond between horses and humans is as close as the connection between dogs or cats and their owners."[38] He then entreated his colleagues to heed the plea of Mayor Paula Bacon, who recounted that children living near the Dallas Crown plant, while "playing in their yards, do so with the noise of horses being sent to their deaths in the background."[39]

Certainly, the affront posed by horse slaughter to the human-horse bond would not in any way be addressed were horse slaughter allowed to continue by the back-door means proposed by the petitioners and now apparently embraced by USDA. To the contrary, and as the legislative history makes clear, Congress squarely pursued a resolution to end horse *slaughter*, not horse slaughter *funding mechanisms*.

Finally, and perhaps most tellingly, not a single member suggested USDA's new-found interpretation of the Amendment during the legislative process, despite the fact that the presiding officer and bill manager in the Senate went out of their way to "delay[] the vote . . . and keep[] the afternoon as open as we have," so as not "to prevent anybody from presenting a different point of view."[40] Had Congress intended to re-route inspection funding, presumably someone would have directly addressed the plan outlined in Acting General Counsel Kelly's letter at some point in the official record.[41]

**B.** "Fee-For-Service" Inspection Under the AMA Cannot Substitute for the Required Inspection Under the Federal Meat Inspection Act.

Petitioners' proposal to create a new horse inspection scheme as an end-run around Congress' clear command in the FY2006 Agriculture Appropriations Act is also inherently inconsistent with the FMIA. Thus, while petitioners acknowledge that the USDA may no longer use Congressionally appropriated funds for horse slaughter inspection, petitioners claim that the USDA may continue to provide inspection using an entirely different act — the Agricultural Marketing Act ("AMA"). However, nothing in the AMA suggests that USDA may simply choose to disregard the requirements of the FMIA.[42] To the contrary, the AMA is not a free-standing source of authority to inspect species already covered by the FMIA. As the petitioners point out, under the AMA, USDA currently provides voluntary inspection of "certain exotic

---

[37] *Id.* at H4250.

[38] *Id.* at S10,219.

[39] *Id.*

[40] *Id.* at S10,224 (remarks of Sen. Bennett).

[41] *See* Letter from Acting General Counsel Kelly to Representative Whitfield at 2, note 21 *supra* (citing 7 U.S.C. § 1622(h)).

[42] *See* 7 U.S.C. § 1622(h).

0141

animals and rabbits" – animals *not* covered by the FMIA.[43] In essence, the petitioners propose to create an entirely new horse meat inspection scheme outside the authority of the FMIA, structured similarly to the current inspection scheme for meat that is *not* covered by the restrictions of the FMIA.[44] However, this proposal does not adequately provide for the inspections required under the FMIA.

As discussed above, the FMIA requires USDA inspectors to determine whether meat covered by the act is "adulterated" in order to prevent "adulterated" meat products from entering the human food supply.[45] Sections 603 and 604 of the FMIA impose on USDA a non-delegable duty to inspect animals, including horses, capable of use as human food—both before they enter a slaughtering facility and after slaughter—to ensure that no part of a carcass determined to be "adulterated" passes into the human food supply.[46] Accordingly, the USDA, through its Food Safety and Inspection Service ("FSIS"), is required to mark carcasses which it determines to be adulterated as "Inspected and Condemned" and to mark those found to be unadulterated as "Inspected and Passed."[47] Any meat condemned, "shall be destroyed for food purposes . . . in the presence of an inspector."[48] Moreover, section 603 of the FMIA makes clear that these inspectors shall be appointed by the Secretary of Agriculture.[49] Likewise, section 695 of the FMIA requires that all inspection costs for species covered under the Act "*shall* be borne by the United States."[50]

In addition, USDA regulations implementing the FMIA prohibit the sale or movement of meat in interstate commerce that has not passed USDA inspection. For example, 9 C.F.R. § 325.1 provides in pertinent part that "No person shall sell, transport, offer for sale or transportation, or receive for transportation, in commerce, any product which is capable of use as human food unless the product and its container if any, bear the official inspection legend."[51] Thus, with exceptions not pertinent here, USDA regulations prohibit the movement of FMIA-covered meat in commerce that the USDA has not passed through its FMIA inspection program.[52]

---

[43] Petition at 4.

[44] USDA currently uses its AMA fee-for-services authority to inspect meat from rabbits and "exotic animals," including reindeer, elk, deer, antelope, water buffalo, and bison. 9 C.F.R. §§ 352.5, 352.10.

[45] 21 U.S.C. § 601 *et seq.*

[46] *Id.* §§ 603, 604.

[47] *Id.* §§ 604, 606.

[48] *Id.* § 604.

[49] *See id.* § 603(a) ("[f]or the purpose of preventing the use in commerce of meat and meat food products which are adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all cattle, sheep, swine, goats, horses, mules, and other equines . . . subject to a careful examination and inspection").

[50] *Id.* § 695 (emphasis added).

[51] 9 C.F.R. § 325.1(a).

[52] Moreover, USDA itself has repeatedly recognized that "[t]he Federal Meat Inspection Act [citation omitted] . . . provide[s] for mandatory Federal inspection of livestock and poultry slaughter at official establishments, and meat and poultry processing at official establishments."

0142

In this case, in addition to eviscerating Congressional intent, the petitioners' proposed fee-for-service scheme under the AMA, which USDA appears ready to adopt, is insufficient to allow continued horse slaughter for several reasons. First, and most fundamentally, the proposal overlooks the fact that meat from species covered by the FMIA — like horses — may not enter interstate commerce unless inspected both ante- and post-mortem pursuant to the FMIA.[53] Thus, although the USDA is certainly free to create an inspection scheme under the AMA, by doing so, it will not in any way satisfy the requirements of the FMIA, nor allow horse meat to move in interstate or foreign commerce.

Even if inspection under the AMA could somehow substitute for the mandatory inspection required under the FMIA, the FMIA nonetheless requires that the cost of federal inspection of meat and meat food products "*shall* be borne by the United States."[54] Thus, any fee-for-service arrangement that purports to discharge the USDA's inspection obligations under the FMIA would violate this unequivocal statutory command.[55] Indeed, if Congress intended for slaughter inspection to be paid for *either* through federal or private funds, the statutory language requiring that meat inspection costs "shall be borne by the United States" would be superfluous.[56]

Moreover, the USDA's approach to this issue overlooks the agency's fundamental legal obligation to fully implement a Congressional de-funding provision under long-established precedents. Thus, as numerous courts have made clear, when Congress chooses to remove funding for a statutory provision, it should be "interpreted as a suspension" of that provision.[57] For example, in *Burtch v. United States Department of the Treasury*, Congress prohibited the

---

Increases in Fees for Meat, Poultry, and Egg Products Inspection Services—Fiscal Year (FY) 2002, 66 Fed. Reg. 52,548 (Oct. 16, 2001); *see also* H.R. REP. No. 108-804, at 82 (Jan. 3, 2005) (noting that "[t]he inspection program of the Food Safety and Inspection Service provides continuous in-plant inspection of all domestic plants preparing meat, poultry or egg products for sale or distribution.").

[53] 21 U.S.C. § 603.

[54] *Id.* (emphasis added). Section 695 of the FMIA provides two limited exceptions to the USDA-only payment structure. *Id.* The statute provides that the USDA *may* pay federal inspectors for overtime and holiday work and allow the facility to reimburse USDA for such expenditures. *See* 7 U.S.C. § 2219a. Under this payment scheme, the facility ultimately funds both overtime and holiday work, but the USDA must still make the initial expenditure of appropriated funds for inspection.

[55] *See Lexecon. Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (using traditional rules of statutory construction, "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion").

[56] 21 U.S.C. § 695; *Astoria Fed. Sav. & Loans Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (stating that courts must interpret statutes as to "avoid rendering superfluous" any statutory language).

[57] *Burtch v. U.S. Dep't of Treasury*, 120 F.3d 1087, 1090 (9th Cir. 1997); *see also Envtl. Def. Ctr. v. Babbitt*, 73 F.3d 867, 871-72 (9th Cir. 1995) (upholding agency's refusal to act when appropriations rider de-funded and therefore prevented the Secretary from acting).

0143

Treasury Department from spending funds on agency investigations to determine whether a convicted felon's right to carry a firearm should be restored.[58] The statute provided felons with a mechanism to petition for restoration of the right, but without funding to investigate, the Treasury Department did not act on Burtch's petition. Burtch sued, claiming the Department's failure to act constituted a denial of his application. In marked contrast to the agency's position here, in *Burtch*, the government argued, and the Ninth Circuit agreed, that Burtch's case should be dismissed for lack of subject matter jurisdiction because Congress' removal of funding "suspen[ded]" everything affected by the unfunded provision, including the Department's duty to act and therefore Burtch's ability to restore his right to carry a firearm.[59] Similarly, in this case, when Congress removed federal funding for ante-mortem inspection of horses destined for slaughter, a federal court will assume that Congress intended to suspend everything affected by the provision, thereby suspending not only the federal funding of ante-mortem inspection of horses, but the inspection of horse meat altogether.[60]

Finally, although not addressed at all by petitioners or the USDA, it is worth noting that more than twenty separate federal statutes are currently subject to a Congressional de-funding directive using the "none of the funds made available in this Act may be used" language at issue here. Thus, the USDA's apparent position that it may disregard the use of such language in the FY2006 Agriculture Appropriations Act can only lead to one of two equally disturbing conclusions: (1) USDA and other agencies are willfully disregarding many other Congressional de-funding mandates; or (2) USDA appears poised to make an unprecedented decision to disregard this particular de-funding mandate for reasons that the agency has not disclosed to either Congress or the general public.[61]

C.    **Any Radical Change In 100-Year Old Horse Meat Inspection Procedures Must Be Preceded By Notice and Comment Rulemaking Under the APA.**

Although it is clear from the foregoing discussion that the USDA should not entertain this novel inspection scheme at all, there can be no serious question that the implementation of a radical change in the horse meat inspection regulations must at least be accompanied by notice and comment rulemaking under the APA. This is especially true where the agency appears ready to create a regulatory scheme for the express purpose of side-stepping a recently issued Congressional directive.

The APA provides that agencies must: (1) publish notice of proposed rulemaking in the Federal Register; (2) give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral

---

[58] *Burtch*, 120 F.3d at 1089.

[59] *Id.* at 1090.

[60] *See also United States v. McGill*, 74 F.3d 64, 68 (5th Cir. 1996) (considering the same firearm provision and finding that Congress intended to remove felons' claim for restoration entirely, not just move the dispute from the Treasury Department to the courts).

[61] A Freedom of Information Act request submitted by the Society for Animal Protective Legislation seeking all agency records concerning the agency's apparent decision to circumvent Congress on this matter has, as of yet, not been answered.

0144

presentation; (3) publish the substantive rule no less than thirty days before the effective date; and (4) give an interested person the right to petition for the issuance, amendment, or repeal of a rule.[62]

As petitioners point out, the APA provides a narrow exception to the notice and comment procedures "when the agency for *good cause* finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are *impracticable, unnecessary, or contrary to the public interest.*"[63]   Moreover, the provision requiring publication of the final rule no later than thirty days before its effective date may be dispensed with when "otherwise provided by the agency for *good cause* found and published with the rule."[64]

However, petitioners' arguments for invoking these extraordinary exemptions do not even come close to satisfying the stringent standard required before an agency may lawfully shield its rulemaking process from public participation.[65]   As the D.C. Circuit has repeatedly noted, exceptions to the notice and comment requirements will be "narrowly construed and only reluctantly countenanced."[66]   Thus, the exceptions should be invoked only in "emergency situations"[67] when delay would do "real harm."[68]   For example, federal courts have found that "real harm" justified the issuance of regulations without notice and comment where temporary gasoline shortages and discriminatory practices were found to have deprived some users of any supply and led to violence.[69]   Another "emergency situation in which the 'good cause' exception should apply" involved a situation where "every day that the [agency] delayed clarifying its regulation was another day that state and local governments might be exposed to unforeseen liability."[70]   Other "real harm" examples include a "loss or delay of medical benefits to many eligible coal miners,"[71] and a situation in which "wildlife could be reduced to a point where normal propagation and recovery will not occur."[72]

---

[62] 5 U.S.C. § 553 ("The notice shall include (1) a statement of the time, place, and nature of public rulemaking proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.").

[63] *Id.* § 553(b) (emphasis added).

[64] *Id.* § 553(d)(3) (emphasis added).

[65] Petition at 6.

[66] *New Jersey Dep't of Envtl. Protection v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980); *see also American Fed'n of Gov't Employees v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981).

[67] *American Fed'n of Gov't Employees*, 655 F.2d at 1156.

[68] *New Jersey Dep't of Envtl. Protection*, 626 F.2d at 1046 (citing *U.S. Steel Corp v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979)).

[69] *Reeves v. Simon*, 507 F.2d 455, 458-59 (Temp. Emer. Ct. App. 1974).

[70] *Serv. Employees Intern. Union Local 102 v. County of San Diego*, 35 F.3d 483, 489 (9th Cir. 1994), *amended and superceded on denial of reh'g*, 60 F.3d 1346 (9th Cir. 1994).

[71] *North American Coal Corp. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 854 F.2d 386, 389 (10th Cir. 1988).

[72] *Northern Arapahoe Tribe v. Hodel*, 808 F.2d 741, 751 (10th Cir. 1987).

0145

In this case, petitioners claim that "economic damage" justifies a decision to dispense with notice and comment. However, the issuance of regulations almost always results in "economic damage" to some segment of the regulated community. If simple economic harm, in and of itself, were sufficient to dispense with notice and comment procedures under the APA, the exception would swallow the rule. Moreover, simple economic harm does not constitute grounds for impracticability. As the Attorney General's Manual on the APA explains, "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in [section 553]."[73] For instance, a "safety investigation show[ing] that a new safety rule must be put in place immediately" would satisfy grounds for impracticability.[74] Also, if a situation "pose[s] any threat to the environment or human health or that some sort of emergency had arisen," it may be impracticable for the agency to dispense with the usual notice and comment requirements.[75] However, in this case, since the measure passed the House in June of 2005, the Appropriations Act's ban on the use of appropriated funds to pay for horse slaughter inspections was entirely foreseeable, and does not pose any threat to the environment or human health. Rather, it is precisely the opposite.

Additionally, the petitioners' "economic damage" argument proceeds from the erroneous assumption that "completion of a notice-and-comment rulemaking prior to March 10, 2006, is practically impossible."[76] In fact, the agency received the petitioner's request on November 23, 2005—more than three and a half months before the effective date of the Amendment. This is more than ample time to provide the public with notice and an opportunity to comment on its activities.

Indeed, even where Congress has imposed a timeline for agency action, courts have made clear that "strict congressional imposed deadlines, without more, by no means warrant invocation of the good cause exception."[77] Although the D.C. Circuit has on occasion permitted deviation from APA requirements where a statutory deadline is tight, it has done so only where the "statute is particularly complicated,"[78] or where "Congress has expressed its clear intent that APA notice

---

[73] UNITED STATES DEPARTMENT OF JUSTICE, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 30-31 (1947), *cited in Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001).

[74] *Utility Solid Waste Activities Group*, 236 F.3d at 754.

[75] *Id.* at 755.

[76] Petition at 7. The date, March 10, 2006, is the date that section 794 of the Appropriations Act becomes effective. Section 794 of the Act provides: "Effective 120 days after the date of enactment of this Act, none of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under Section 3 of the Federal Meat Inspection Act . . . " Because the President signed the Act into law on November 10, 2005, the Act becomes effective on approximately March 10, 2006.

[77] *Petry v. Block*, 737 F.2d 1193, 1203 (D.C. Cir. 1984). The Ninth Circuit has also twice rejected a tight deadline as good cause. *See Buschmann v. Schweiker*, 676 F.2d 352, 357-58 (9th Cir. 1981); *see also Western Oil and Gas Assoc. v. EPA*, 633 F.2d 803, 810-13 (9th Cir. 1980).

[78] *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1236 (D.C. Cir. 1994) (citing *Petry*, 737 F.2d at 1200-02) (finding good cause where the complex and extraordinary statute

0146

and comment procedures need not be followed."[79]  Here, the statutory provision prohibiting the use of appropriated funds to inspect horses is not particularly complex, and Congress certainly did not in any way mandate that the agency go out of its way to create a new regulatory apparatus to defeat the purpose of the Amendment.

Furthermore, petitioners' claim that notice and comment is unnecessary because they "are the only persons that will be currently affected by the establishment of fee-for-service ante-mortem inspection for horse slaughter,"[80] is an argument that, in the words of the D.C. Circuit, "seems too silly to do other than to state it, and pass on."[81]  The unnecessary prong of the good cause exception cited by petitioners is "confined to those situations in which the administrative rule is a routine determination, *insignificant in nature and impact*, and *inconsequential to the industry and to the public*."[82]  Thus, according to the Attorney General's Manual, "[the term unnecessary] refers to the issuance of a minor rule in which the public is not particularly interested."[83]  In this case, as is clear from the foregoing discussion, any suggestion that the public "is not particularly interested" in petitioners' request for an entirely new regulatory system to facilitate horse slaughter is simply untenable.

Finally, for all the reasons already discussed, petitioners have not demonstrated that notice and comment procedures would be contrary to the public interest.  The D.C. Circuit Court and the Attorney General's Manual both note that the term "public interest" in this exemption "connotes a situation in which the interest of the public would be defeated by any requirement of advance notice," such as "when announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent."[84]  In this case, the public interest would not be defeated by notice and comment rulemaking.  To the contrary, it could hardly be more clear that the petitioners would like closed-door rulemaking precisely because they too recognize that they

---

concerning changes in administrative reimbursements under the Child Care Food Program imposed a 60-day deadline for the promulgation of interim rules)).

[79] *Methodist Hosp.*, 38 F.3d at 1237 (noting that the statute directing the Secretary of Health and Human Services to establish new Medicare regulations expressly provided for an expedited regulatory process); *see also Air Transport Ass'n of America v. Dep't of Transp.*, 900 F.2d 369, 379 (D.C. Cir. 1990) (explaining that the statutory deadline does not constitute good cause absent express Congressional intent to this effect), *vacated for mootness*, 933 F.2d 1043 (D.C. Cir. 1991); *see also Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) (citing statute providing express direction to the FAA regarding its procedure for establishing fees for overflights: "the Administrator shall publish in the Federal Register an initial fee schedule and associated collection process as an interim final rule, pursuant to which public comment will be sought and a final rule issued").

[80] Petition at 7.

[81] *McDonnell Douglas Corp. v. National Aeronautics and Space Admin.*, 180 F.3d 303, 306 (D.C. Cir.1999).

[82] *Utility Solid Waste Activities Group*, 236 F.3d at 754 (citing *South Carolina v. Block*, 558 F. Supp. 1004, 1016 (D.S.C. 1983)) (emphasis added).

[83] *Id.* (citing ATTORNEY GENERAL'S MANUAL at 31).

[84] *Id.* (citing ATTORNEY GENERAL'S MANUAL at 31).

0147

are seeking nothing less than a back-door "fee-for-service" inspection program to defeat Congress' will in enacting the horse slaughter Amendment.

In short, the petitioned action would enable the very activity Congress sought to prevent with the 2006 Appropriations Act — a result that does not in any way serve the public interest. Rather, it would only serve the interests of a tiny segment of the agriculture industry with a short-term financial interest in putting American horses on dinner plates in foreign countries.

### Conclusion

For the foregoing reasons, we respectfully request that the USDA deny petitioners' request for expedited rulemaking, and immediately implement Congress' clear mandate to halt the slaughter of horses for human consumption. Should the USDA nevertheless choose to disregard the clear intent and will of Congress, we hereby request notification before implementation of any fee-for-service scheme, so that we may pursue appropriate remedies, including legislative and/or judicial intervention.

Respectfully submitted,

Ethan Carson Eddy, Esq.

Eric R. Glitzenstein, Esq.

Counsel for The Humane Society of the United States, the Society for Animal Protective Legislation, the Doris Day Animal League, the American Society for the Prevention of Cruelty to Animals, and the American Humane Association.

CC:    Hon. Senator Robert Byrd
       Hon. Senator John Ensign
       Hon. Senator Jon Corzine
       Hon. Senator Jim DeMint
       Hon. Senator Dianne Feinstein
       Hon. Senator Lindsey Graham
       Hon. Senator Mary Landrieu
       Hon. Senator Frank Lautenberg
       Hon. Senator Trent Lott
       Hon. Senator Debbie Stabenow

0148

16

Hon. Representative Nick Rahall
Hon. Representative John Spratt
Hon. Representative John Sweeney
Hon. Representative Ed Whitfield

0149