LEGISLATIVE HISTORY

MEAT-INSPECTION SERVICE—COST

For text of Act see p. 353

Senate Report No. 1107, Apr. 7, 1948 [To accompany S. 2256]
House Report No. 1852, May 4, 1948 [To accompany S. 2256]
The House Report repeats in substance the Senate Report.

House Report No. 1852

THE Committee on Agriculture, to whom was referred the bill (S. 2256) relating to the meat-inspection service of the Department of Agriculture, having considered the same, report thereon with a recommendation that it do pass.

STATEMENT

This bill (S. 2256) is essentially identical with two House bills (H. R. 5675 and H. R. 6259). All three bills have as their objective the return of the Federal Meat Inspection Service to the status it occupied prior to July 1, 1947—that of a direct obligation and responsibility of the Federal Government. The three bills were considered simultaneously and the committee took action on the Senate bill (S. 2256), which is reported herewith.

HISTORY OF MEAT INSPECTION

The United States Meat Inspection Service was established by act of Congress in 1906 in response to tremendous popular demand for more adequate safeguarding of the wholesomeness and purity of the meat products which constitute such an important part of the American diet.

There had been Federal meat inspection prior to 1906. In 1891 Congress passed a law directing the Secretary of Agriculture to make ante-mortem inspection of livestock to be slaughtered for interstate commerce and authorizing post-mortem inspection of the carcass if the Secretary deemed it necessary or expedient.

That this law left something to be desired in affording genuine protection to the consumer is evident from the fact that under it occurred the "meat scandals" of the Spanish-American War period, general public dissatisfaction with Federal meat inspection, and the Nation-wide demand for more effective inspection which resulted in the act of 1906. Most serious of all was the loss of confidence in Federal inspection which resulted from the inadequacies of the 1891 law.

This was clearly recognized by the House Committee on Agriculture in framing the 1906 legislation. In its report on that bill, the committee said:

One of the most important results which it is hoped will follow this legislation will be the restoration of public confidence, not only in our own country but in other countries, in the purity and wholesomeness of American meat and meat food products * * *.

The committee did an outstanding job of drafting legislation designed to restore "public confidence" in Federal inspection. For 41

1706

GOVERNMENT EXHIBIT

MEAT-INSPECTION SERVICE—COST

years—until May 1947—that law remained on the statute books with virtually not one word of its original language changed.

## PUBLIC CONFIDENCE IN INSPECTION

For 41 years the Inspection Service established by that law has operated so efficiently and effectively to safeguard the welfare of American consumers that our system of inspection has become a world model and the purity and wholesomeness of American meat products are not exceeded by those of any country.

For a demonstration of the public confidence which American consumers now have in their Federal Meat Inspection Service, one needs only to watch the housewife as she buys the chops for her family meal—or the professional buyer as he lays in the supplies for a restaurant chain. Whether the quantity involved is a half-dozen pork chops or a hundred sides of beef, the buyer recognizes instantly and accepts without question the mark of Federal inspection and grading which has been stamped on the meat.

When the consumer sees that mark, he knows that it was placed there —on that particular piece of meat—by a trained and competent inspector, employed by the United States Government, operating neither in fear nor in favor of the meat packer, who has personally inspected that specific piece of meat and certified it to be wholesome and pure and of the grade and quality indicated. He accepts without question the fact that the animal from which the meat came was healthy and that the plant in which the operation was carried on meets the highest standards of sanitation. He knows beyond any doubt that if that Government stamp reads "U S Good" the meat he is buying is indeed of a quality worthy to be graded "good."

## THE INSPECTION ACT OF 1906

IT is worth while to look briefly at the law which has resulted in this implicit public confidence in Federal meat inspection:

That law makes it a crime, punishable by a fine of $10,000 and 2 years in prison, to transport or offer for transportation in interstate or foreign commerce any meat or meat product which has not been inspected and passed by a Federal inspector, or to violate any of the provisions of the Meat Inspection Act. It provides that there must be inspection of the live animal before slaughter and of the carcasses and meat products after slaughter by a competent Federal inspector "appointed for that purpose," that only those products which he marks "inspected and approved" can be used for food, and that those which he condemns must be "destroyed for food purposes in the presence of the inspector."

The act further provides that establishments in which meat-food products are prepared for interstate commerce must meet high standards of sanitation established by the Secretary of Agriculture and that there shall be inspection of such plants by "experts in sanitation" appointed by the Secretary. In carrying out their duties, Federal inspectors are required to "have access at all times, by day or night, whether the establishment be operated or not, to every part of said establishment."

1707

LEGISLATIVE HISTORY

PAYMENT OF INSPECTORS A GOVERNMENT RESPONSIBILITY

Payment of the inspectors clothed with this authority was clearly recognized to be the responsibility of the Federal Government and the act of 1906 authorized for that purpose appropriation of an amount equivalent to almost one-third of the entire annual appropriation at that time for the whole Department of Agriculture.

The proposal that these inspectors should be paid by the owners of the plants in which they work is not new. It has been advocated many times by those seeking governmental economy and was consistently rejected until it was accepted by the Committee on Appropriations last year, written into the Agriculture Department Appropriation Act without public hearings, and approved by the Congress in adopting that appropriation.

Such a proposal was specifically rejected by the Congress in 1891 when the first Meat Inspection Act was adopted and again in 1906 when the present act was approved. In each instance this proposal was rejected after open hearings, mature consideration, and extensive debate. It was rejected on principle—on the principle that inspectors on whom American consumers must rely for the purity and wholesomeness of their meat should be paid by the consumers themselves, through the Federal Government, and not by those whose products they were inspecting.

Said the Committee on Agriculture in its report on the 1906 bill:

> Your committee does not believe that this object (confidence in the purity and wholesomeness of American meat and meat food products) would be attained by legislation which requires those who are to be inspected to pay the cost of inspection. On the contrary, we believe that the knowledge of this fact would discredit the inspection and cast suspicion upon it.

For 41 years the Federal Meat Inspection Service has been operated by the Federal Government at Federal expense. Under that policy it has established a reputation for integrity and effectiveness which has made it the deserved recipient of public confidence not exceeded by any other governmental agency. The committee believes that the wisdom of this principle has been amply demonstrated, and that to retreat from it now would inevitably have the result predicted by that Committee on Agriculture of 42 years ago—

> that the knowlege of this fact would discredict the inspection and cast suspicion upon it.

It is argued that other kinds of inspection service provided by the Federal Government are paid for by the person whose products are inspected and that this should, therefore, apply to meat inspection. Meat inspection, however, is clearly distinguished from most other types of Federal inspection. Most types of Federal inspection—such as fruits and vegetables, tobacco, and other products—are purely voluntary. They are not required by law before the article can move in interstate commerce, but are made by the Federal Government at the request of the producer. Generally, such inspections are for purposes of grading and commercial standardization, and not for the purpose of determining the basic purity and wholesomeness of the product.

1708

## MEAT-INSPECTION SERVICE—COST

The committee believes that the true principle to be followed is that the cost of inspection should be paid for by those who receive the benefits of inspection. In the case of fruits and vegetables, and similar inspections, the benefit is to the person receiving the inspection—in the grading and commercial standardization of his product. Meat inspection is clearly for the benefit of the consumer of meat products and should be paid for by consumers as a whole through Federal funds—if they are to continue to get the kind of meat inspection in which they can have confidence.

### PAYMENT BY PACKERS UNSOUND POLICY

The Congress which adopted the Meat Inspection Act of 1906 so clearly recognized the dangers inherent in making inspectors dependent on meat packers for their livelihood that it wrote into the act a section making it a felony for the operator of an inspected establishment pay an inspector "directly or indirectly" with intent to "influence" him in the performance of his duties, and a similar felony for an inspector to receive such payment.

The amendment written into the law by the Department of Agriculture Appropriation Act of last year provides for indirect payment of inspectors by meat packers. The committee believes that this idea is as unsound now as it was when it was considered and discarded in 1891 and 1906.

The relationship between a Federal meat inspector and the establishment in which he operates is a peculiarly intimate one. He is necessarily involved in every phase of the plant's operation. He is present at the plant through every minute of its activity. He recommends and enforces installation and operation of sanitation devices and equipment. His approval is necessary for alteration, expansion, or remodeling of the plant. His decisions are almost entirely a matter of his own judgment—and those decisions can cost or save the operator significant sums of money.

There are some plants—those doing a business that is largely interstate in character—where Federal meat inspection is a necessity. In these plants, since the Inspection Service and therefore the inspection jobs are permanent, it can be assumed that there would be no effect whatever on the quality of inspection because of knowledge on the part of the inspector that his salary was being paid by the packer.

There are a great many other plants, however, in which this assumption cannot safely be made. There are a large number of plants in which the volume of interstate business is relatively small compared to that which is done within the State. Federal inspection is maintained only because of the interstate business. If the cost of inspection becomes greater than the return from the interstate business, the prudent operator will discontinue the Federal inspection and confine his business within his State line. The cost of inspection is determined not only by the salary of the inspector but by the sanitary measures he requires, the number of animals he condemns, and similar decisions on his part.

Under such circumstances—human nature being what it is—the committee is not willing to assume that the Inspection Service will be improved by knowledge on the part of the inspector that the cost of the

1709

**LEGISLATIVE HISTORY**

service to the packer may cause the discontinuation of inspection and with it the termination of the inspector's job.

It has been pointed out that the cost of Federal meat inspection is only about $12,000,000 a year and that this amounts to only about one-twentieth of a cent on each pound of meat. It is argued that the packers, or the producers, or someone, should be able to absorb this cost—thereby apparently relieving the taxpayers of a $12,000,000 expenditure. This reasoning does not appeal to the committee. It is obvious that the $12,000,000 cost of inspection, if it is paid by meat packers, will become an item of operating costs, just as all other charges are. It is equally obvious that if packers are to stay in business they must pass their operating costs on either to consumers or to producers, or both. Consumers and producers are taxpayers.

On the other side of the ledger, the $12,000,000 cost of Federal meat inspection represents only about one-three thousand seven hundred and fiftieth part of each taxpayer's dollar. It seems to the committee that it is sounder both in principle and in economics for the taxpayer to pay $1 out of each $3,750 he pays in taxes to maintain his own meat-inspection force than it is to pay an equivalent amount across the meat counter so that the packers can maintain the inspection for him.

### FEWER INSPECTED PLANTS

In addition to the possibility of an adverse effect on the quality of Federal inspection, there is the certainty that if packers are required in the future to pay the salaries of inspectors there will be a sharp decrease in the number of federally inspected plants.

It was clearly the intent of Congress in establishing the Meat Inspection Service to make such inspection as widespread and general as possible. Under the system provided in the law of 1906 there has been a gradual but encouraging increase in the number of plants operating under the Federal inspection. There can be no doubt but that under the system imposed in the last Department of Agriculture Appropriation Act this trend will be reversed. Many small plants will find it impossible to continue Federal inspection and others, regardless of size, which do only a minor part of their business across State lines will drop their interstate business and their Federal inspection because of the cost. These plants will then operate only under State inspection laws, many of which are regarded as far less exacting in their requirements than the Federal regulation. The result of the new system will inevitably be to decrease both the quantity and the quality of meat inspection in the United States.

### GOVERNMENTAL PRINCIPLES INVOLVED

One other matter of principle appears to the committee to be involved here. That is the sound principle of good government involved in the control of governmental activities by the Congress. Under the plan written into the law last year, neither Congress nor the Bureau of the Budget has any control whatever over the number of persons who will be employed by the Meat Inspection Service or the amount of money which will be collected and expended for that purpose.

1710

Inspection is required by law. But the Bureau of Animal Industry is left entirely free to determine the number of inspectors and other employees it wants to hire, to assess the charges for these employees against the users of Federal inspection, and to operate an independent bureaucracy supported by a private taxing system without ever coming before the Appropriations Committee to justify its personnel and expenditures.

## SUMMARY

In summary, it seems to the committee that the principles involved here are plain and compelling reasons for the enactment of this bill:

1. The protection of the health and welfare of the people of the United States is a proper function of this Government.
2. The inspection of meat and meat products to assure its purity and wholesomeness is a proper exercise of that function.
3. Such inspection is obviously for the benefit of consumers in general—the public—rather than for the benefit of processors or producers.
4. The cost of such inspection should be paid out of the general funds of the Federal Government—not only because such inspection is a proper charge against the people as a whole, but because it is the only way in which consumers can be assured of effective, uncompromising inspection in which they can repose the fullest confidence.

## NATIONAL ARCHIVES—LIBRARY MEMBERSHIPS

For text of Act see p. 358

Senate Report No. 1236, May 4, 1948 (To accompany H.R. 3638)

House Report No. 597, June 18, 1947 (To accompany H.R. 3638)

The Senate Report repeats in substance the House Report.

*Senate Report No. 1236*

THE Committee on Post Office and Civil Service, to whom was referred the bill (H.R. 3638) to amend section 10 of the act establishing a National Archives of the United States Government, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

## GENERAL STATEMENT

The purpose of the bill is to provide statutory authority for appropriations for the National Archives that have been made in every Independent Offices Appropriation Act since 1938.

Soon after the National Archives began operations it was ascertained that certain types of publications necessary to the work of that agency were available to members of historical and other societies only or to members on more advantageous terms than to nonmembers. The Independent Offices Appropriation Act of 1938, approved June 28, 1938 (Public Law 171, 75th Cong., 1st sess.), contained in the language therein applicable to the National Archives the following:

1711