IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE HUMAN SOCIETY )
OF THE UNITED STATES )
2100 L Street, N.W. )
Washington, D.C. 20037, )
)
ANIMAL WELFARE INSTITUTE )
P.O. Box 3650 )
Washington, D.C. 20027, )
)
THE FUND FOR ANIMALS ) CASE NO. 1:06CV00265
200 West 57th Street )
New York, NY 10019, )
)
SOCIETY FOR ANIMAL )
PROTECTIVE LEGISLATION )
P.O. Box 3719 )
Washington, D.C. 20027, )
)
DORIS DAY ANIMAL LEAGUE )
227 Massachusetts Avenue, N.E., Suite 100 )
Washington, D.C. 20002, )
)
AMERICAN SOCIETY FOR THE )
PREVENTION OF CRUELTY TO ANIMALS )
424 East 92nd Street )
New York, NY 10128, )
)
AMERICAN HUMANE ASSOCIATION )
2007 15th Street North, Suite 201 )
Arlington, VA 22201, )
)
ROBERT ELDRIDGE )
107 Booker Street )
Kaufman, TX 75142, )
)
GAIL VACCA )
19501 West Ballou Road )
Wilmington, IL 60481, )
)
JUANITA SMITH )
309 Carver Street )
Kaufman, TX 75142, )

DC/192679.2

GOVERNMENT EXHIBIT 1 06-0265CKK

| | |
|---|---|
| **JUDY TAYLOR**<br>1500 Thames Drive<br>Clarksville, IN 47129,<br><br>**TONJA RUNNELS**<br>207 Booker Street<br>Kaufman, TX 75142,<br><br>        Plaintiffs,<br><br>v.<br><br>**MIKE JOHANNS**, Secretary<br>U.S. Department of Agriculture<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>**BARBARA J. MASTERS**, Administrator<br>Food Safety and Inspection Service<br>U.S. Department of Agriculture<br>1400 Independence Avenue, S.W., Room 331-E<br>Washington, D.C. 20250,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF JAMES TUCKER, CAVEL INTERNATIONAL, INC.

Mr. James D. Tucker, General Manager of Cavel International, Inc. declares pursuant to 28 U.S.C. § 1746:

1. My name is James D. Tucker. I reside in Sycamore, Illinois. I am currently General Manager of Cavel International, Inc.

2. Cavel International, Inc. ("Cavel") is located in DeKalb, Illinois, and has been in operation since 1987.

3. Cavel is a meat processing facility that processes fresh and frozen horsemeat solely for export. The company purchases healthy horses from owners, mainly farmers and ranchers in the Midwest and Western states, who no longer have need for their livestock. In

early 2005, Cavel adopted the policy that it will not slaughter any "wild" horses owned or formerly owned by the Bureau of Land Management ("BLM"). Even prior to 2005, the number of "wild horses" slaughtered by Cavel was always relatively small, approximately 1 out of every 40 horses slaughtered, but such animals tended to be small and not well-cared for and therefore not of the quality demanded by Cavel and its customers. Cavel exports 8,000 tons of horsemeat each year.

4.     The company operates under a horsemeat license issued by the Illinois Department of Agriculture, and is subject to, among others, the federal law and regulations established pursuant to the Federal Meat Inspection Act, the Agricultural Marketing Act, and the Humane Methods of Slaughter Act. *See* 21 U.S.C. § 601, *et seq.*; 7 U.S.C. § 1621 *et seq.*; 7 U.S.C. § 1901, *et seq.*

5.     Cavel is a significant employer and contributor of tax revenues in the DeKalb area. The company employs 56 workers from around the region. Its total payroll was in excess of $1.8 million in 2005.

6.     Cavel would be irreparably harmed if the United States Department of Agriculture ("USDA") is enjoined from implementing a voluntary fee-for-service ante-mortem inspection program for horses, as announced in the *Federal Register* on February 8, 2006. 70 Fed. Reg. 6,337, 6,341 (Feb. 8, 2006) (the "Regulation").

7.     Because all livestock, including horses, intended for human consumption must be inspected by the Food Safety and Inspection Service ("FSIS") prior to slaughter, withholding such services will force Cavel to cease its operations unless the fee-for-service inspection program is implemented as intended by the USDA and provided for in the Regulation.

8. Cavel's customers consist only of foreign businesses that import and sell horse meat. Accordingly, the facility is designed to service this specific demand most efficiently and economically. The facility is too small to adopt the slaughter of cattle, and it cannot operate economically by turning to the slaughter of "exotic animals," such as deer, elk or water buffalo.

9. Even a temporary "shut down" of the slaughter facility will have a severe detrimental impact on the business. After a fire in April 2002, Cavel was forced to rebuild its facility in DeKalb. When the facility reopened in June 2004, Cavel was capable of processing only 300-400 head per week. It took Cavel approximately one year to re-establish the market for its products, and it has taken almost two years for the company to increase its productivity so that it is capable of meeting the full demand of well over 500 head per week. Similarly, even a temporary closure of the facility will retard Cavel's ability to meet processing demands when it is able to resume operations.

10. Cavel employs 56 workers from the DeKalb, Illinois area. If the fee-for-service inspection program is not permitted to be established, these workers will lose their livelihood. Fifty production workers will lose their positions immediately, and Cavel will only be able to employ administrative personnel for a short period of time at significant cost to the company. Extending administrative employment for necessary shut down duties at decreasing levels for three to nine months would cost over $150,000.

11. In order to run an efficient, productive business Cavel maintains and has supplied itself with such items as electricity and packaging and shipping supplies well into the future. For instance, Cavel currently has over $127,000 worth of supplies stored at its facility in anticipation of future shipments of horse meat. In addition, the company has a contract on utility purchases until the end of the year, which must be honored. If the fee-for-service inspection program is not

implemented, not only will Cavel lose the value of its stockpiled supplies, it will also be required to honor a utility contract for which the company would have no need.

12. Finally, Cavel's operations are housed in a state-of-the-art, modern facility, which was rebuilt just under two years ago. This is a valuable piece of property for which Cavel pays over $12,000 per month in rent. Cavel is required to maintain the property and ensure that its value does not decline, and it will therefore need to pay rent and maintenance fees, as well as property taxes, even if the fee-for-inspection program is not permitted to proceed as planned by the USDA on March 10, 2006. This is a significant cost which will severely impinge upon the company's financial well being in the event it is not permitted to continue to process horsemeat and earn revenue.

I declare under penalty of perjury that the foregoing is true and correct.

James D. Tucker

Dated: February 22, 2006.