UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
THE HUMANE SOCIETY                      )
OF THE UNITED STATES, et al.,           )
                                        )
            Plaintiffs,                 )      Civ. No. 06-0265 (CKK)
        v.                              )
                                        )
MIKE JOHANNS, et al.                    )
                                        )
            Defendants.                 )
_____)


**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY
INJUNCTION, AND SUGGESTION FOR CONSOLIDATION
UNDER FED. R. CIV. P. 65(a)(2)**

ERIC R. GLITZENSTEIN
ETHAN CARSON EDDY
HOWARD M. CRYSTAL

Of Counsel:

REBECCA G. JUDD                          MEYER GLITZENSTEIN & CRYSTAL
JONATHAN R. LOVVORN                      Suite 700
THE HUMANE SOCIETY OF THE UNITED STATES  1601 Connecticut Ave., N.W.
2100 L. St., N.W.                        Washington, DC 20009
Washington, DC 20037                     (202) 588-5206
(202) 676-2333                           (202) 588-5049 (fax)

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES……………………………………………………………..ii

INTRODUCTION……………………………………………………………………...1

I.  PLAINTIFFS HAVE STANDING……………………………………………..6

    A.  PLAINTIFFS' AFFIDAVITS ASSERT MULTIPLE INJURIES………………...6

    B.  USDA'S STANDING ARGUMENTS ARE BASELESS………………………10

II.  PLAINTIFFS SHOULD PREVAIL ON THEIR APA CLAIMS………………………15

    A.  USDA HAS CLEARLY VIOLATED 5 U.S.C. § 553…………………………..15

    B.  USDA VIOLATED NEPA…………………………………………………………20

    C.  THE FINAL RULE IS ARBITRARY AND CAPRICIOUS AND
        NOT IN ACCORDANCE WITH LAW………………………………………………24

        1.  The Final Rule Cannot Be Reconciled With the FY 2006
            Amendment. ………………………………………………………………..25

        2.  The Final Rule Violates the FMIA………………………………………28

III.  THE COURT SHOULD GRANT RELIEF………………………………….............32

CONCLUSION…………………………………………………………………………..35

# TABLE OF AUTHORITIES

**FEDERAL CASES**

ALDF v. Glickman,
    154 F.3d 426 (D.C. Cir. 1998) ...................................................................7, 8, 11, 13, 15

ASPCA v. Ringling Brothers and Barnum and Bailey Circus,
    317 F.3d 334 (D.C. Cir. 2003) .........................................................................................9

Allen v. State Board of Elections,
    393 U.S. 544 (1969).......................................................................................................27

Allen v. Wright,
    468 U.S. 737 (1984).......................................................................................................13

American Petroleum Institute v. EPA,
    52 F.3d 1113 (D.C. Cir. 1995) .......................................................................................28

American Bioscience, Inc. v. Thompson,
    243 F.3d 579 (D.C. Cir. 2001) .........................................................................................3

American Bioscience, Inc. v. Thompson,
    269 F.3d 1077 (D.C. Cir. 2001) .......................................................................................3

American Federation of Government Employees v. Block,
    655 F.2d 1153 (D.C. Cir. 1981) .....................................................................................14

Anacostia Watershed Society v. Babbitt,
    871 F. Supp. 475 (D.D.C. 1994) ..............................................................................21, 23

Asiana v. FAA,
    134 F.3d 393 (D.C. Cir. 1998) .......................................................................................17

Atkins v. Parker,
    472 U.S. 115 (1980).......................................................................................................32

Ballerina Pen Co. v. Kunzig,
    433 F.2d 1204 (D.C. Cir. 1970) .....................................................................................27

Bennett v. Spear,
    520 U.S. 154 (1997).......................................................................................................11

Burtch v. U.S. Dep't of Treasury,

120 F.3d 1087 (9th Cir. 1997) ........................................................................26

Butler v. West,
164 F.3d 634 (D.C. Cir. 1999) .......................................................................27

California v. Norton,
311 F.3d 1162 (9th Cir. 2002) .......................................................................23

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837 (1984)........................................................................................24

Cobell v. Norton,
240 F.3d 1081 (D.C. Cir. 2001) .......................................................................4

Diamond Game Enterprises, Inc. v. Reno,
230 F.3d 365 (D.C. Cir. 2000) .......................................................................31

Duke Power Co. v. Carolina Environmental Study Group,
438 U.S. 59 (1978)..........................................................................................10

Edmonds Institute v. Babbitt,
42 F. Supp. 2d 1 (D.D.C. 1999) .....................................................................23

Emily's List v. FEC,
362 F. Supp. 2d 43 (D.D.C. 2005) ...............................................................5, 6

Environmental Defense Center v. Babbitt,
73 F.3d 867 (9th Cir. 1995) ...........................................................................26

Environmental Defense Fund, Inc. v. U.S. Environmental Prot. Agency,
716 F.2d 915 (D.C. Cir. 1983) .......................................................................18

FCC v. Nextwave Personal Communications, Inc.,
537 U.S. 293 (2003)........................................................................................20

FEC v. Akins,
524 U.S. 11 (1998)..........................................................................................15

Federal Express Corp. v. Mineta,
373 F.3d 112 (D.C. Cir. 2004) ..................................................................14, 20

Friends of the Earth v. Laidlaw Environmental Services,
528 U.S. 167 (2000)..........................................................................................7

Fund for Animals, Inc. v. Espy,
  814 F. Supp. 142 (D.D.C. 1993) ................................................................22, 23

Fund for Animals, Inc. v. Lujan,
  962 F.2d 1391 (9th Cir. 1998) .........................................................................8

Halverson v. Slater,
  206 F.3d 1205 (D.C. Cir. 2000) .......................................................................2

Hawaii Helicopter Operators Association v. FAA,
  51 F.3d 212 (9th Cir. 1995) ...........................................................................18

Humberson v. U.S. Attorney's Office for District of Columbia,
  236 F. Supp. 2d 28 (D.D.C. 2003) ...................................................................3

Independent Insurance Agents of America, Inc. v. Hawke,
  211 F.3d 638 (D.C. Cir. 2000) .......................................................................28

Japan Whaling Association v. American Cetacean Society,
  478 U.S. 221 (1986) .........................................................................................9

Jifry v. FAA,
  370 F.3d 1174 (D.C. Cir. 2004) ...............................................................15, 18

John Doe Agency v. John Doe Corp.,
  488 U.S. 1306 (1989) .....................................................................................35

Landmark Legal Foundation v. IRS,
  267 F.3d 1132 (D.C. Cir. 2001) .....................................................................31

Louisiana Environmental Action Network v. EPA,
  172 F.3d 65 (D.C. Cir. 1999) .........................................................................10

Lujan v. Defenders of Wildlife,
  504 U.S. 555 (1992) ...........................................................................9, 10, 12

McHugh v. Rubin,
  220 F.3d 53 (2nd Cir. 2000) ..........................................................................26

Motor Vehicle Manufacturers Association v. State Farm,
  463 U.S. 29 (1983) .........................................................................................32

Mountain States Legal Foundation v. Glickman,
  92 F.3d 1228 (D.C. Cir. 1996) ..............................................................6, 7, 10

National Parks Conservation Association v. Manson,
    414 F.3d 1 (D.C. Cir. 2005) ................................................................................................9

Nuclear Energy Institute, Inc. v. EPA,
    373 F.3d 1251 (D.C. Cir. 2004) ...................................................................................24, 27

OSG Bulk Ships, Inc. v. United States,
    132 F.3d 808 (D.C. Cir. 1998) .........................................................................................30

Public Citizen v. U.S. Department of Health and Human Services,
    332 F.3d 654 (D.C. Cir. 2003) .........................................................................................24

Richardson v. Belcher,
    404 U.S. 78 (1971).............................................................................................................32

Robertson v. Methow Valley Citizens Council,
    490 U.S. 332 (1989)...........................................................................................................23

State of New Jersey v. U.S. EPA,
    626 F.2d 1038 (D.C. Cir. 1980) .......................................................................................20

Tennessee Valley Authority v. Hill,
    437 U.S. 153 (1978)...........................................................................................................30

Tennessee Gas Pipeline Co. v. FERC,
    969 F.2d 1141 (D.C. Cir. 1982) .......................................................................................16

Walter O. Boswell Memorial Hospital v. Heckler,
    749 F.2d 788 (D.C. Cir. 1984) .........................................................................................24

Weinberger v. Romero-Barcelo,
    456 U.S. 305 (1982).............................................................................................................4

Wyoming Outdoor Council v. U.S. Forest Service,
    165 F.3d 43 (D.C. Cir. 1999) ...........................................................................................10

**FEDERAL STATUTES**

5 U.S.C. § 553 ...........................................................................................1, 5, 6, 11, 12,
    15, 20

5 U.S.C. § 706(2) .............................................................................................................20

7 U.S.C. § 1622 ..................................................................................................28

21 U.S.C. § 603 ........................................................................................28, 29, 31

21 U.S.C. § 610 ..................................................................................................28

21 U.S.C. § 671 ..................................................................................................31

21 U.S.C. § 695 ...........................................................................................2, 29, 30, 31

42 U.S.C. § 4332 <u>et seq</u> ....................................................................................1, 21

Fed. R. Civ. P. 65(a)(1)(2) ...................................................................................2

## FEDERAL REGULATIONS

7 C.F.R. § 1b.3 ..................................................................................................23

7 C.F.R. § 1b.4(b) .........................................................................................21, 22

9 C.F.R. §§ 309 <u>et seq</u> ......................................................................................31

40 C.F.R. § 1508.4 ............................................................................................22

71 Fed. Reg. 2,135 ............................................................................................29

71 Fed. Reg. 6,337 ............................................................................................31

61 Fed. Reg. 65, 459 ..........................................................................................29

48 Fed. Reg. 11,403 ..........................................................................................21

## LEGISLATIVE MATERIALS

151 Cong. Rec. S10,220 ......................................................................................26

H.R. Rep. 80-1852 (1948), reprinted in 1948 U.S.C.C.A.N. 1706, 1709 ..............................29, 30

H.R. Rep. No. 109-255 at 107 (2005) .....................................................................25

## INTRODUCTION

Rather than effectively rebut plaintiffs' principal legal arguments, both the federal defendants and defendants-intervenors ("intervenors") have only highlighted the United States Department of Agriculture's ("USDA") flagrant violations of the Administrative Procedure Act ("APA") in adopting the rule under review in this case.  To begin with, the government has not even remotely justified its disregard for the public's right to advance notice and comment under 5 U.S.C. § 553.  Indeed, if defendants' reasons for dispensing with that mandatory process for prior public involvement are sustained here, federal agencies will have little incentive to comply with that process in the future.  Defendants also flatly concede that USDA engaged in no review whatsoever under the National Environmental Policy Act, 42 U.S.C. § 4332 et seq. ("NEPA"), although, as detailed in the affidavits submitted by the plaintiffs who reside in the immediate vicinity of the horse slaughter operations, the rule under review has grave repercussions for the environment, including the public health and welfare of the people who live in those communities and who had no advance notice or opportunity to comment on the USDA's actions, as well as for wild horses and other environmental factors.

As discussed further below, these violations of important procedures mandated by federal law alone compel the crafting of appropriate judicial relief, and hence the Court can resolve the pending motion (and, indeed, the entire case) on the basis of these violations– especially since, if USDA does belatedly comply with them, then many of the other issues raised by plaintiffs may be resolved in the administrative process or, at the very least, be better illuminated for judicial review.

Even if the Court were to reach the other substantive issues in this case, defendants also

1

have no coherent response either to plaintiffs' arguments concerning the relevant Amendment to the FY2006 Agriculture Appropriations Act, or regarding the explicit requirement for <u>federal</u> funding of inspections mandated by 21 U.S.C. § 695.  As for the former, defendants essentially disregard – as they must – the patent purpose of the Amendment, as expressly and repeatedly recognized by <u>both</u> the legislation's many supporters <u>and</u> its opponents.  Nor do they ever attempt to explain – either in their briefs or the rule itself – what, in their view, the Amendment was designed to accomplish, if it was <u>not</u> to suspend horse slaughter operations for this fiscal year.  <u>See</u> <u>Halverson v. Slater</u>, 206 F.3d 1205, 1207 (D.C. Cir. 2000) ("Congress cannot be presumed to do a futile thing.").  As for 21 U.S.C. § 695, try as they might, defendants simply do not, and cannot, reconcile their novel inspection system with Congress's unequivocal directive that the costs of such inspections – other than specified expenses <u>not</u> relevant here – "<u>shall</u> be borne by the United States," 21 U.S.C. § 695 (emphasis added), or the equally clear legislative history explaining <u>why</u> Congress went to pains to mandate <u>that</u> mode of funding to ensure independent inspections.

As suggested in plaintiffs' opening memorandum, <u>see</u> Pfs. Mem. at 34-35, and especially in light of the responses filed by defendants and the precedents noted by the Court during the February 23 telephonic conference, plaintiffs respectfully suggest that the Court consolidate its disposition of the preliminary injunction with a final ruling on the merits, as expressly authorized by the federal rules.  <u>See</u> Fed. R. Civ. P. 65(a)(1)(2) ("the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application" for a preliminary injunction).  As plaintiffs noted in their motion, <u>see</u> Pfs. Mot. at 2 n. 1, plaintiffs requested that USDA rapidly file the Administrative Record so that, in accordance with

American Bioscience, Inc. v. Thompson, 243 F.3d 579, 582 (D.C. Cir. 2001) ("American Bioscience I"), the Court would be in a position to assess whether plaintiffs are entitled to relief under the APA. Accordingly, now that the government has furnished what it represents is the "'whole record,'" id. (quoting 5 U.S.C. § 706), to the Court, and all of the parties have filed extensive briefs on the legal issues in advance of the effective date of the rule, there is no valid legal reason for the Court to refrain from simply disposing of this case on the merits. See, e.g., Humberson v. U.S. Attorney's Office for District of Columbia, 236 F. Supp. 2d 28, 30 (D.D.C. 2003) ("because the issues presented in this application for preliminary relief are entirely legal and require no further development of the record, the Court has elected to consolidate its decision on the preliminary injunction with its final decision on the merits").

In American Bioscience, Inc. v. Thompson, 269 F.3d 1077 (D.C. Cir. 2001) ("American Bioscience II"), the Court of Appeals specifically held that a party moving for a preliminary injunction was entitled to final relief on its APA claim – i.e., vacatur of the agency action at issue – without the need for any equitable balancing, because, in light of the Administrative Record, it was clear that the agency had violated the APA. Thus, the Court ruled that "[i]f an appellant has standing . . . and prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order." Id. at 1084 (emphasis added); id. ("whether or not an appellant has suffered irreparable injury, if it makes out its case under the APA it is entitled to a remedy") (emphasis added).

Under American Bioscience II, the unlawful rule at issue must be vacated. As discussed below, contrary to the USDA's contention, plaintiffs – many of whom cannot even leave their homes for fear being exposed to the fumes of the horse slaughter plants – obviously have

standing.  And, just as clearly, the record demonstrates that defendants have committed egregious violations of the APA and NEPA (the requirements of which are also enforced through the APA).  Hence, if relief under the APA was warranted in American Bioscience II, as the D.C. Circuit held, it is most surely proper here.

Nevertheless, if the Court does not believe that it is in a position to make a final determination on the merits, in view of the seriousness of the legal issues raised by plaintiffs, the deplorable conditions confronted by the individual plaintiffs who reside near the facilities, and the overwhelming evidence that Congress adopted the Amendment at issue for the purpose of suspending, by no later than March 10, the cruel practice of slaughtering tens of thousands of horses for human consumption, the Court should, at the very least, enjoin implementation of the new inspection program pending a final disposition on the merits.  While American Bioscience I and American Bioscience II, taken together, certainly suggest that it is preferable for a reviewing court to resolve an APA claim on the merits – which, once again, is why plaintiffs pressed for rapid filing of the Administrative Record – neither those precedents, nor any other authority, suggests that district courts may not exercise their traditional equitable discretion in appropriate circumstances.  See generally Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982) ("[t]he comprehensiveness of [t]he court's equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command"); Cobell v. Norton, 240 F.3d 1081, 1108 (D.C. Cir. 2001) ("courts are presumed to possess the full range of remedial powers – legal as well as equitable – unless Congress has expressly restricted their exercise").[1]

_____

[1]    In this connection, plaintiffs also note that while, during the February 23 telephonic conference, plaintiffs "agreed to treat this matter as one for a preliminary injunction," Def. Mem.

Contrary to defendants' contention (at 12), this Court's ruling in Emily's List v. FEC, 362 F. Supp. 2d 43 (D.D.C. 2005), consistent with American Bioscience II, clearly counsels in favor of relief here, not against it.  Whereas in that case the Court held that the "better course" was to "rule on the merits of the substantive issues at a later date," id. at 53, since USDA has now filed the Administrative Record and the issues have been fully briefed, in this case, there is no discernible reason to refrain from ruling on the "merits of the substantive issues" – and particularly the straightforward procedural issues, which are all that need be resolved – sooner rather than later.

Moreover, even if the merits were not as susceptible to resolution as they will ever be, in sharp contrast to Emily's List, where the Court found that "allegations of irreparable injury are lacking," id., in this case, plaintiffs have submitted unrebutted affidavits detailing a host of such injuries, including that the slaughter plants pose grave risks to the health and well-being of the individual plaintiffs, their families, and their communities; that tens thousands of horses, including many wild horses, will be sent to slaughter in the coming months, contrary to Congress's pellucid policy determination that such slaughter should cease for this fiscal year; and that plaintiffs will, as a practical matter, forever lose their statutory rights under 5 U.S.C. § 553 and NEPA if relief is not forthcoming now.  With respect to the last point, it is critical to stress that, not only do defendants seek to fully implement their new program before any consideration of public comment or NEPA compliance has taken place, but that the limited

---

at 1 n. 1, plaintiffs made clear that if, for whatever reason, the Court is unable to rule by March 10, plaintiffs' alternative request for a temporary restraining order should be granted, especially since, as government counsel reiterated during the conference, USDA has, without explanation, refused to extend the effective date of its rule by even a brief time to accommodate the Court or the plaintiffs.

duration of the Amendment at issue means that, if the Court does not intervene now, plaintiffs will effectively be denied any relief at any time. Consequently, defendants' suggestion that the Court deal with the issues posed by this case "at a later date," Def. Mem. at 12, really means that the Court should allow defendants to implement their unlawful program with impunity. Plainly, neither <u>Emily's List</u>, nor any other precedent, supports that peculiar proposition.[2]

## I.  PLAINTIFFS HAVE STANDING.

### A.  PLAINTIFFS' AFFIDAVITS ASSERT MULTIPLE INJURIES.

While making virtually no effort even to respond to – let alone rebut – plaintiffs' standing and irreparable injury affidavits, USDA initially asserts that plaintiffs are suffering no injury in fact. This argument borders on the frivolous, since plaintiffs' affidavits reflect a plethora of concrete, cognizable injuries resulting directly from USDA's decision to adopt an unprecedented horse inspection funding mechanism, rather than halt such inspections (and hence the slaughter operations themselves).[3]

First, the individual plaintiffs who reside in the immediate vicinity of the plants have sworn that they must "endure the severe stench on a daily basis," Decl. of Robert Eldridge (Pfs. Exh. 6), at ¶ 3; that there are "blood spills and animal parts" that harm their neighborhoods, <u>id</u>. at ¶ 5; that they and their family members are "awakened most nights by the upsetting sounds of

---

[2]  As discussed below, also in sharp contrast to <u>Emily's List</u>, in which the Court found that there was no violation of 5 U.S.C. § 553 because the FEC <u>had</u> provided "adequate notice" and advance public comment – indeed, a thirteen-month comment period – on the rule changes at issue, 362 F. Supp. 2d at 53, here, there is no dispute that the USDA utterly failed to afford plaintiffs and other interested members of the public such an opportunity.

[3]  So long as one of the plaintiffs has standing, the court need not pass on the standing of the other plaintiffs. <u>See</u>, <u>e.g.</u>, <u>Mountain States Legal Found. v. Glickman</u>, 92 F.3d 1228, 1232 (D.C.

horses screaming and whining," Decl. of Tonja Runnels (Pfs. Exh. 7) at ¶¶ 8, 9; that the "repugnant odors" from the plants "makes it difficult to breathe" and makes them "concerned for [their] children's health," Decl. of Yolanda Salazar (Pfs. Exh. 8), at ¶¶ 3, 4; that they are exposed to horse "blood in [their] bathtubs, sinks, and toilets," Decl. of Juanita Smith (Pfs. Exh. 18), at ¶ 6; that they cannot visit with family members because of the fumes from the plants, id. at ¶ 8; and that their "kids are unable to play outside" because of the "noxious odor[s]," Decl. of Margarita Garcia (Pfs. Exh. 20), at ¶ 4. These are precisely the kinds of serious injuries to individuals' environment, health, and well-being that Courts have recognized as constituting Article III injuries.[4]

Second, both the individual plaintiffs, as well as the organizations on behalf of their members who reside in the affected communities, have asserted distinct, albeit related, injuries based on their direct, first-hand exposure to the harsh treatment of terrified horses, including wild horses, being subjected to the slaughtering process.[5] Once again, these are exactly the kinds of

---

Cir. 1996).

[4]   See, e.g., Friends of the Earth v. Laidlaw Envtl. Services, 528 U.S. 167, 183 (2000) (individuals concerned about toxic discharges in river suffered injury in fact; since the plaintiffs "aver[red] that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity," they have "adequately allege[d] injury in fact"); ALDF v. Glickman, 154 F.3d 426, 434 (D.C. Cir. 1998) (en banc) (the "Supreme Court and this circuit have frequently recognized the injury in fact of plaintiffs who suffer[] aesthetic injury stemming from the condition and quality, or despoliation, of an environmental area that they use"); Mountain States Legal Found., 92 F.3d at 1234 ("Plaintiffs' aesthetic and environmental interests in having [National Forest lands] free of devastating forest fires are clearly sufficient for Article III standing.").

[5]   See, e.g., Runnels Decl. at ¶ 6 ("I often see the slaughter trucks on the streets and entering the Dallas Crown property. Sometimes trucks are not covered, and I can view the horses. This is very upsetting, because the horses look very frightened and uncomfortable, and I know the horses are going to be slaughtered."); id. at ¶ 7 ("Every evening, I am disturbed, and continue to

injuries that Courts in this and other circuits have previously recognized under Article III.[6]

Third, plaintiffs' affidavits demonstrate that USDA's decision to, in effect, keep the slaughter facilities operating despite Congress's funding ban, also harms their distinct, longstanding interests in wild horses. Thus, despite defendants' and intervenors' patently erroneous assertions that the slaughter plants at issue do not accept wild horses for slaughter, official data obtained from the Bureau of Land Management ("BLM") reflect that over 2,500 wild horses – i.e., horses removed from areas managed by BLM in the west – were to sent to slaughter at the facilities at issue and, in "just the 12 month period between August 1, 2004, and July 31, 2005, approximately 600" wild horses were slaughtered at the facilities. Decl. of Alan Rutberg (Pfs. Exh. 4) at ¶ 13. In turn, this ongoing slaughter of wild horses directly harms the interests of the organizations' members in observing and enjoying wild horses in their natural habitat, both by reducing the number of wild horses available for viewing, and by impairing the

---

be disturbed, by the noise of horses crying and whining as they enter the kill chute."); Salazar Decl. at ¶ 5 ("I am an avid horse lover . . . I often see the slaughter trucks entering the Beltex property and can view the horses on the trucks. It deeply saddens me to see the horses on their way to slaughter."); Decl. of Gail Vacca (Pfs. Exh. 17) at ¶ 4 ("Because of my love of horses, the sight of the trucks carrying so many beautiful horses to slaughter made me sick and kept me up at night thinking about it."); Garcia Decl. at ¶ 5 ("I often see the slaughter trucks in our neighborhood. I am an animal lover, and it makes me upset to see the horses on their way to slaughter."); Decl. of Michael Markarian (Vice-President of HSUS) (Pfs. Exh. 16), at ¶ 13 (HSUS member Diana Smith "must drive by the Dallas Crown slaughter plant every[] day and is deeply saddened to see the horses on the slaughter trucks entering the facility and being corralled in the holding pens outside the plant.").

[6] See ALDF, 154 F.3d at 432 ("The Supreme Court has repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing."); id. at 433 ("This court's precedent . . . recognizes that people have a cognizable interest in 'view[ing] animals free from . . . 'inhumane treatment.'") (internal citation omitted); Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1396 (9th Cir. 1998) (animal protection organization "members had standing to sue because of the psychological injury they suffered from viewing the killing of the bison in Montana.").

members' ability to enjoy the remaining animals.[7]  Once again, such injuries have long been recognized by the courts as sufficient for standing.[8]

Fourth, plaintiffs' affidavits state that many companion horses have been stolen so that they can be sold to the slaughter plants and, hence, as a direct result of USDA's decision allowing these plants to continue to operate, plaintiffs' members who own such horses – particularly in the vicinity of the plants – risk having their own horses stolen and shipped to slaughter.[9]  It has long been recognized that, where governmental action increases a risk of

_____

[7] See Markarian Decl. at ¶ 17 ("The commercial slaughter of horses for food creates a market for wild horses, and creates an incentive for both the fraudulent adoption of horses by persons intending to sell the animals for slaughter, and for the removal of additional wild horses from the range.  In addition, the enjoyment of HSUS members in observing wild horses is greatly lessened when they know that the majestic animals they are observing may well end up in a slaughter facility and turned into meat.").

[8] See Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 231 n. 4 (1986) (plaintiffs had "undoubtedly . . . alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting"); Lujan v. Defenders of Wildlife, 504 U.S. 555, 562-63 (1992) ("the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing"); ASPCA v. Ringling Bros. and Barnum and Bailey Circus, 317 F.3d 334, 336 (D.C. Cir. 2003) ("Rider's allegations of injury fit within the decisions of this court and the Supreme Court recognizing that harm to one's aesthetic interest in viewing animals may be a sufficient injury in fact."); see also Nat'l Parks Conservation Ass'n v. Manson, 414 F.3d 1, 4 (D.C. Cir. 2005) ("As an organization dedicated to the conservation of, and whose members make use of, public lands, National Parks suffers a cognizable injury from environmental damage to those lands.").

[9] See Markarian Decl. at ¶ 16 ("There are many documented instances of companion horses being stolen and sold for slaughter, and HSUS members and staff that own horses are deeply concerned that their horses will face such a fate.  This concern is particularly acute for those members and staff living in and around the three operational horse slaughter facilities.  In fact, two HSUS members and horse owners in Kaufman, Texas . . . are fearful that their own horses will be stolen and taken to the local Dallas Crown plant for slaughter."); Declaration of John M. Holland (Pfs. Exh. 23) at ¶ 9 and Attachment (data reflecting that horse theft fell nearly 40% in California after that state enacted a ban on horse slaughter).

jeopardy to a plaintiffs' concrete property or other interests, that is also sufficient for Article III injury.[10]

Fifth, particularly in light of all of the foregoing injuries, plaintiffs' standing is also predicated on the principle endorsed by the Supreme Court and the D.C. Circuit that plaintiffs have standing "to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs" – such as the "procedural requirement for an environmental impact statement before a federal facility is constructed next door to them." Defenders of Wildlife, 504 U.S. at 572 (emphasis added). In such cases, standing is based on the rationale that the "government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." Wyoming Outdoor Council v. U.S. Forest Service, 165 F.3d 43, 51 (D.C. Cir. 1999) (emphasis added). Here, plaintiffs maintain that defendants have violated two such "procedural requirements" designed to safeguard those in plaintiffs' position – the very NEPA procedure highlighted in Defenders of Wildlife, as well as the APA's requirement for advance public notice and comment.

###    B.    USDA'S STANDING ARGUMENTS ARE BASELESS.

USDA does not appear to dispute that any of these are legitimate Article III injuries (as

---

[10] See, e.g., Duke Power Co. v. Carolina Envt'l Study Group, 438 U.S. 59, 75-76 (1978) (where liability statute increased risk of nuclear accident that, in turn, would affect plaintiffs' interests, that was sufficient for standing); Louisiana Environmental Action Network v. EPA, 172 F.3d 65, 67-68 (D.C. Cir. 1999) (environmental group had standing to challenge regulation that allowed variance from generally applicable treatment standards for hazardous waste because the rule created an incentive for hazardous waste holders to excavate and treat waste which could then be disposed at a landfill near the plaintiff); Mountain States Legal Foundation v. Glickman, 92 F.3d at 1234-35 (an "incremental" increase in the risk of a wild fire resulting from the government allowing "about 10% more fuel" to remain in a forest was "enough of a threat of injury" to the plaintiff's interests; "though the presence of other causal factors is indisputable . . . the

they surely are) but, instead, advances several arguments that are either irrelevant to plaintiffs' allegations of injury or reflect a clear misreading of standing jurisprudence. First, the USDA advances the confusing contention – unsupported by any authority – that plaintiffs' "allegations do not constitute claims that can be properly addressed under the [Federal Meat Inspection Act ("FMIA")], the substantive statute cited by Plaintiff, and thus, cannot serve as the proper basis for standing." Def. Mem. at 17. In reality, plaintiffs' APA claims are predicated on several "substantive statute[s]," including, once again, the notice and comment provisions of the APA, 5 U.S.C. § 553, USDA's conceded failure to comply with NEPA, the 2006 Amendment designed to suspend the horse slaughter operation, and the FMIA.

Accordingly, if, as appears to be the case, defendants are making an oblique <u>prudential</u> standing argument – <u>i.e.</u>, that plaintiffs do not "fall within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit," <u>Bennett v. Spear</u>, 520 U.S. 154, 162 (1997) – this argument is clearly groundless. Both the Supreme Court and D.C. Circuit have "reaffirmed [that] the zone of interests test is generous and relatively undemanding," and that there "'need be no indication of congressional purpose to benefit the would-be plaintiff.'" <u>ALDF</u>, 154 F.3d at 444 (quoting <u>Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.</u>, 522 U.S. 479 (1998)). Instead, "the test, a gloss on APA § 10(a), 5 U.S.C. § 702, asks only 'whether the interest sought to be protected is *arguably* within the zone of interests to be protected by the statute.'" <u>ALDF</u>, 154 F.3d at 444 (internal citation omitted).

Here, plaintiffs easily satisfy this "generous" test with regard to all of the statutory provisions they have invoked. They are indisputably "interested parties" within the meaning of

---

incremental risk is enough of a threat of injury to entitle plaintiffs to be heard").

the APA's requirement for advance public notice and comment, 5 U.S.C. § 553. In addition, they are not only "arguably" within the zone of interests of NEPA, but the plaintiffs who reside adjacent to the slaughter plants are in the functionally identical posture to the Supreme Court's paradigmatic example of who <u>does</u> have standing in a NEPA case, <u>i.e.</u>, those who live "next door" to a facility that directly threatens their environment. <u>Defenders of Wildlife</u>, 504 U.S. at 572. Likewise, as explained in plaintiffs' opening brief, <u>see</u> Pfs. Mem. at 9-13, plaintiffs' interests in halting the degradation of the communities near the slaughter plants, and in preventing the maltreatment of many thousands of horses sent to slaughter, are <u>precisely</u> the kinds of concerns that motivated Congress to enact the 2006 Amendment. Finally, as defendants acknowledge, the federally-funded inspections conducted pursuant to the FMIA are expressly intended to prevent inhumane treatment of animals destined for slaughter, as well as to safeguard the food supply. <u>See</u> Def. Mem. at 3 n. 2 (the "ante-mortem inspection provisions of the FMIA reference the Humane Methods of Slaughter Act," 7 U.S.C. § 1901 <u>et seq</u>.). Consequently, plaintiffs' interests in preventing the maltreatment of horses falls easily within that statute's zone of interests, as well as all of the other statutory provisions that undergird plaintiffs' APA claims.

Equally baseless is USDA's argument – again, unsupported by any precedent – that plaintiffs are not injured by the rule because "[p]laintiffs' ability to observe and otherwise enjoy horses will continue to occur undisturbed" since plaintiffs may view horses in areas "<u>not</u> involved with this suit." Def. Mem. at 17 (emphasis added). Obviously, however, the fact that there are places where horses are not being slaughtered in no way ameliorates the damage to plaintiffs who reside near, and hence are directly affected by, the specific slaughter facilities at issue; nor does it undermine plaintiffs' injuries based on the impact to wild horses or the

increased risk of horse theft.[11]

By the same token, the uncontested proposition that the "individual Plaintiffs' general emotional harm, because of their proximity to Petitioners' facilities," does not constitute an injury in fact, Def. Mem. at 18 (emphasis added) (citing ALDF), has no bearing on this case, because plaintiffs are not relying on "general emotional harm." Rather, as detailed previously, the individual plaintiffs are personally seeing the horses being transported for slaughter, hearing the frightened horses being killed, and being exposed to the grisly aftermath of the process; hence, they are advancing exactly the kind of particularized injury endorsed in ALDF, i.e., they are "seeing with [their] own eyes the particular animals whose condition cause[s] [them] aesthetic injury." ALDF, 154 F.3d at 433.[12]

With regard to plaintiffs' procedural injury, USDA argues that "Plaintiffs' allegation[s] that they are unable to participate fully in the rule-making process because of the USDA's alleged failure to comply with the APA and NEPA, are without merit because the USDA has been accepting public comment on the ante-morte horse inspection rule and will continue to do

---

[11]  With regard to the wild horse impacts, USDA asserts, relying on affidavits submitted by the slaughter plants, that the plants ceased killing wild horses in 2005. Def. Mem. at 32. This is simply false. As reflected by the most recent official records supplied by BLM itself and attached to one of plaintiffs' affidavits, contrary to the sworn declarations on which USDA relies but evidently never investigated, hundreds of wild horses with BLM "freezemarks" continued to be slaughtered throughout 2005 at the specific plants at issue here. See Rutberg Decl. at ¶ 13 and Attachment (2/08/06 Mortality Report). Indeed, the official records reflect that wild horses were slaughtered at the Beltex plant as recently as January 25, 2006. Id.

[12]  Defendants also advance the novel suggestion that plaintiffs have no standing to pursue a federal APA claim because they might also have "nuisance claims pursuant to applicable state and federal law." Fed. Mem. at 18 (citing Allen v. Wright, 468 U.S. 737, 751 (1984). Not surprisingly, Allen – which actually held that the plaintiffs had not asserted any injury traceable to governmental action – does not in any way support any such draconian limitation on standing

so through March 10, 2006" – i.e., the day the rule is set to go into effect – "thereby preserving the very procedural interests of which plaintiffs complain." Def. Mem. at 10 (emphasis added). Simply to state this argument is to expose its flaws. Not only does USDA say nothing concerning plaintiffs' standing to complain about defendants' total failure to comply with NEPA or even what the agency will do with the post hoc comments once it "accept[s]" them, but, most important, the fundamental "procedural interest of which plaintiffs complain" is, of course, the interest – as codified in the APA – to comment on important regulatory policies before they are adopted, not after they are "'chiseled into bureaucratic stone'" and fully implemented. Federal Express Corp. v. Mineta, 373 F.3d 112, 120 (D.C. Cir. 2004) (quoting American Fed'n of Gov't Employees v. Block, 655 F.2d 1153, 1157 (D.C. Cir. 1981)). As the Court of Appeals has stressed time and again, a statutory right to advance notice and comment is not, as defendants evidently believe, the right to engage in a make-work exercise after an agency has publicly announced its decision, but, rather, a "'meaningful opportunity to comment' before the [rule] became effective." Federal Express, 373 F.3d at 120 (quoting Gerber v. Norton, 294 F.3d 173, 179 (D.C. Cir. 2002) (emphasis added).

Finally, USDA advances a perfunctory "redressability" argument, contending that, if the rule is "declared invalid, an entity could continue to slaughter horses in the United States for purposes other than human consumption . . . ." Def. Mem. at 19 (emphasis added). This argument is both legally and factually baseless. As a legal matter, the Supreme Court and D.C. Circuit have made abundantly clear that, in an APA case, vacatur and remand of the agency action at issue – which, once again, is the minimum relief plaintiffs should receive if the Court

to pursue federal claims.

discerns an APA violation – is sufficient for redressability purposes.  See ALDF, 154 F.3d at 444 (setting aside an agency action as violative of the APA provides effective relief "'even though the agency . . . might later, in the exercise of its lawful discretion, reach the same result for a different reason'") (quoting FEC v. Akins, 524 U.S. 11, 25 (1998)).  As a factual matter, the government has submitted declarations from the slaughter plants themselves swearing that they will, in fact, be forced to "cease" horse slaughter operations in the absence of the rule – as the members of Congress anticipated when they passed the 2006 Amendment.  See Defendants' Exhs. 2-4.  Accordingly, defendants' unsupported speculation – contradicting their own exhibits – cannot possibly undermine plaintiffs' standing here.

## II.    PLAINTIFFS SHOULD PREVAIL ON THEIR APA CLAIMS.

### A.    USDA HAS CLEARLY VIOLATED 5 U.S.C. § 553.

The government concedes, as it must, that one of the "'basic requirements for agency rulemaking' under the APA" is that there must an "'opportunity for comment on the proposed rule'" – i.e., before the rule goes into effect and impacts the public – and that, in the absence of judicial relief here, plaintiffs will forever forfeit this advance opportunity to influence the rulemaking process.  Def. Mem. at 27 (quoting Emily's List, 362 F. Supp. 2d at 53).  Defendants also acknowledge that the "good cause" exception to the "requirement for advance notice and comment" must be "narrowly construed" under Circuit precedent, and hence only "excuses notice and comment in emergency situations . . . or where delay could result in serious harm." Def. Mem. at 28 (emphasis added) (quoting Jifry v. FAA, 370 F.3d 1174, 1179 (D.C. Cir. 2004)).  These concessions compel vacatur of the rule at issue, since defendants have not cited any pertinent authority to support their decision to dispense with the "basic requirement" of

advance public comment.  To the contrary, if USDA's flimsy rationale for avoiding advance comment is sustained here, it will convert an exception that is to be "narrowly construed and only reluctantly countenanced," Tennessee Gas Pipeline Co. v. FERC, 969 F.2d 1141, 1144 (D.C. Cir. 1982) (emphasis added), into a broad invitation to agencies to ignore prior public input whenever it suits their fancy.

        To begin with, USDA asserts that it was "impracticable" to comply with the APA because "there was insufficient time to complete the notice and comment period prior to the effective date of section 794 and still meet the requirements of USDA's rule-making process." Def. Mem. at 28.  There are two patent flaws in this argument, which is also unsupported by any case citation.  First, as plaintiffs have already explained, with no rebuttal by defendants, see Pfs. Mem. at 19-20, in sharp contrast to the cases where an agency was faced with an explicit statutory deadline for completing a mandatory rulemaking, USDA was not obligated to do anything – other than stop funding inspections – "prior to the effective date of section 794." Def. Mem. at 28.  Nothing in the Amendment instructed USDA to adopt new regulations on any topic whatsoever, let alone on a new funding program for horse inspections, which is why intervenors had to submit a petition requesting the new inspection scheme.  Thus, even assuming that it was compatible with the Amendment for USDA to engage in discretionary rulemaking in response to intervenors' petition – which plaintiffs dispute – the agency certainly lacked "good cause" to dispense with advance public comment in the course of embarking on that volitional exercise.  This, of course, is why neither USDA, nor intervenors, can cite a single case in which an agency was permitted to rely on an "impracticability" rationale for avoiding public comment with regard to a discretionary, rather than a statutorily-mandated, rulemaking.

Second, even if the Amendment could somehow be contorted into a mandatory duty to adopt new regulations by March 10, defendants' position must still fail as a matter of law. Indeed, USDA flatly concedes that even "[s]tatutory language imposing strict deadlines, *standing alone*, does not constitute good cause' justifying departure from standard notice and comment." Def. Mem. at 29 (italics in original; emphasis added) (quoting Asiana v. FAA, 134 F.3d 393, 398 (D.C. Cir. 1998)). As plaintiffs have explained, see Pfs. Mem. at 20 – again with no rebuttal by defendants – USDA waited nearly three months after receiving the petition before publishing its final rule.

Other than a generic reference to a "deliberative rule-making process that requires review of all regulations by a variety of offices within USDA," Def. Mem. at 28, the agency has not even begun to explain – either in a sworn affidavit submitted by an agency official, or otherwise – why three months following receipt of the petition was insufficient to provide for some advance public comment. Yet, at the same time, USDA stresses, ironically, that this "particular rule had to be reviewed" by no fewer than five agency officials – the "Office of the General Counsel, the Deputy Administrator, the Administrator, the Office of Budget and Program Analysis, and the Undersecretary for Food Safety," Def. Mem. at 28 (emphasis added) – without either explaining why a public comment period could not coincide with (and hence inform) these various internal "reviews" (none of which, incidentally, is reflected in the Administrative Record) or, more important, why an agency's bureaucratic preference for multiple layers of internal review should trump the public's statutory right to comment under the APA. In any case, defendants' own explanation underscores that USDA has done exactly what the D.C. Circuit has said agencies may not do, i.e., "wait until the eve of a[n] . . . administrative deadline"

and "then raise up the 'good cause' banner and promulgate rules without following APA procedures."  Envtl. Defense Fund, Inc. v. U.S. Envtl. Prot. Agency, 716 F.2d 915, 920 (D.C. Cir. 1983).

Also legally bankrupt is USDA's contention that providing for a "prior public notice and comment period" would have "been contrary to the public interest because it would delay implementation of the interim final rule and cause significant, immediate, and concrete financial and economic harm to the Petitioners . . . ."  Def. Mem. at 29 (emphasis added).  Of course, this rationale is also premised on the unsupported assumption that it was impossible for USDA to solicit public comment before March 10.  In any event, USDA's contention that it would have been "contrary to the public interest" to honor the public's legal right to advance comment on a controversial new inspection scheme is not only as counterintuitive as it sounds, but flies in the face of Circuit precedent on what the "public interest" means in this legal context.  As plaintiffs have explained, Pfs. Mem. at 22, the Court of Appeals has already rejected the notion that economic impacts on the "regulated community" are sufficient to invoke the "good cause" exception, Envtl. Defense Fund, 716 F.2d at 920, and has instead construed the "public interest" – as the phrase suggests – as limited to situations where the public health, national security, or similar public interests will be "serious[ly] harm[ed]."  Jifry v. FAA, 370 F.3d 1174, 1179 (D.C. Cir. 2004).  Predictably, therefore, neither the government, nor intervenors, can cite a single Circuit precedent (or, for that matter, any other precedent) where the private interests of the regulated industry were invoked as the rationale for dispensing with advance public comment.[13]

---

[13]  Indeed, the Ninth Circuit precedent cited by intervenors, see Interv. Mem. at 29 (citing Hawaii Helicopter Operators Ass'n v. FAA, 51 F.3d 212, 214 (9th Cir. 1995)), clearly undercuts their

Moreover, once again, vastly expanding the "good cause" exception in the manner proposed by defendants would be especially improper in this case, where Congress itself has weighed all of the competing concerns and made a clear policy determination in favor of halting the horse slaughter operations.[14]

Finally, after flatly conceding that it did <u>not</u> afford the "opportunity" for prior public comment that the APA ordinarily demands, Def. Mem. at 27, USDA insists that it "<u>is following the APA by accepting comments</u> on the ante-mortem horse inspection rule" already promulgated on February 8. Def. Mem. at 29. Once again, however, USDA is putting the legal cart before the horse – in this case, both legally and literally. To again state the obvious, deigning to "accept[] comments" <u>on a decision already made</u>, and hence "chiseled into bureaucratic stone,"

_____

position. As characterized by intervenors themselves, in that case, the exception was invoked – over the economically-based objections of the regulated industry – to "promulgate a <u>safety rule</u> governing air tour operators <u>following a dramatic increase in fatal accidents</u> that the agency determined indicated an <u>urgent safety problem</u>." Interv. Mem. at 29 (emphasis added). How that ruling – which involved a quintessential "<u>public</u> interest" – could somehow support dispensing with public comment here is a mystery.

[14] Even if intervenors' private interests could be relied on as a rationale for invoking the "good cause" exception – which they cannot – it is also noteworthy that, neither the Administrative Record, nor any of the submissions to the Court, even document what economic injury intervenors would suffer if USDA were to go through a full public comment process before deciding whether to adopt the new inspections scheme. In other words, the declarations submitted by intervenors relate solely to the purported economic impact they would suffer if horse slaughter operations ceased <u>during the remainder of FY 2006</u>, rather than the impact occasioned by the more limited time it would take for USDA to comply with the APA.

Furthermore, intervenors do not approach this matter entirely with clean hands. While intervenors had every right to submit a petition for rulemaking, rather than urge USDA to rapidly solicit public comment on their petition, intervenors opted to instead request that the agency circumvent the APA on the erroneous grounds that public comment was "practically impossible." Def. Mem. at 10 (citing AR 123). Having successfully urged USDA to bypass public comment that could (and should) have occurred prior to adoption of final rule, intervenors should not be heard to complain that they will suffer economic injury if the Court orders APA

Federal Express, 373 F.3d at 112 (emphasis added), is not what the APA, or Circuit precedent construing it, contemplates.   Rather, as the Court of Appeals has made abundantly clear in rejecting just such arguments for "post hoc comment," section 553 "'is designed to ensure that affected parties have an opportunity to participate and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas . . . It was in recognition of these realities that Congress specified that notice and an opportunity to comment are to precede rulemaking."   State of New Jersey v. U.S. EPA, 626 F.2d 1038, 1049-50 (D.C. Cir. 1980) (emphasis added).   In short, USDA has flagrantly violated the APA in adopting this rule, and hence the rule must be set aside.   See FCC v. Nextwave Personal Communications, Inc., 537 U.S. 293, 300 (2003) (The APA "requires federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A) – which means, of course, *any* law") (italics in original).[15]

### B.    USDA VIOLATED NEPA.

Defendants concede that they prepared neither an Environmental Impact Statement

---

requirements to now be followed.

[15]   In addition to the comment period being unlawfully post hoc, it is also telling that USDA cannot even say what it will do with the comments the public bothers to submit, i.e., as in the rule itself, USDA does not even affirmatively state that it will revisit its previously announced decision within any prescribed time frame or, for that matter, even bother to respond to the "comments."   The best that can be said by intervenors is that "there is no indication that the Secretary of Agriculture or Administrator of the FSIS does not intend to consider public comments on the interim rule or address pertinent concerns in a final rule."   Interv. Mem. at 30. This statement merely underscores how far the Court must stray from the plain terms and patent purpose of 5 U.S.C. § 553 to sustain the USDA's unusual approach to rulemaking.   Similarly, the organizational plaintiffs' unsolicited, "highly detailed" January 5, 2006 letter to USDA, Def. Mem. at 19 (see AR 133-149), far from undercutting plaintiffs' entitlement to relief, further reaffirms it, since that letter was completely ignored in the final rule, as were the letters submitted to the agency by dozens of the Congressional sponsors and supporters of the

("EIS"), nor an Environmental Assessment ("EA"), in connection with the rule. Yet, at the same time, defendants do not dispute that the rule <u>will</u> have adverse environmental effects that should be scrutinized in the NEPA process, <u>i.e.</u>, by allowing the horse slaughter plants to operate, when they would otherwise be shut down pursuant to the 2006 Amendment, the rule ensures that the adverse environmental impacts detailed in plaintiffs' affidavits will occur. Thus, as a direct consequence of the rule, the local communities will continue to suffer from the noxious fumes emanating from the plants, the releases of horse blood into streets and homes, and the other environmental risks set forth in the affidavits. These are precisely the kinds of impacts on the "quality of the human environment," 42 U.S.C. § 4332(C), that should be addressed in <u>at least</u> an EA. <u>See</u>, <u>e.g.</u>, <u>Anacostia Watershed Soc'y v. Babbitt</u>, 871 F. Supp. 475, 487 (D.D.C. 1994) ("The Park Service violated NEPA by failing to undertake even the first and least burdensome step towards compliance, the preparation of an environmental assessment. The Park Service must at least prepare an environmental assessment.").

Since USDA concedely did not prepare any NEPA document addressing these environmental impacts associated with its decision, it argues instead that it is under no obligation to do so. In particular, the government takes the astonishing position that <u>everything</u> done by the Food Safety and Inspection Service has been "categorically excluded" from any NEPA review in regulations adopted more than two decades ago, <u>even activities, such as the one at issue here, that do have adverse environmental impacts</u>. Def. Mem. at 7, 26 (citing 7 C.F.R. § 1b.4(b) and 48 Fed. Reg. 11403 (March 18, 1983); <u>see</u> <u>also</u> Def. Mem. at 26 ("<u>all of the programs and activities of FSIS have been found to have no individual or cumulative effect on the human</u>

_____

legislation.

environment") (emphasis added). Hence, according to defendants, USDA did not even have to consider engaging in NEPA compliance irrespective of any potential impacts associated with its decision. Id. This position is impossible to harmonize with NEPA's overriding purpose, the cases construing it, or the statute's implementing regulations – all of which reject the notion that an agency can simply exempt itself wholesale from NEPA's obligations.

To start with, the USDA's own NEPA regulations not only authorize an agency head to "determine" that an otherwise excluded "action may have a significant effect," 7 C.F.R. § 1b.4, but expressly "incorporate[] and adopt" the Council on Environmental Quality ("CEQ") NEPA regulations that are binding on all federal agencies. Id. at § 1b.1. The CEQ regulations, in turn, define a "categorical exclusion" as a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have such effect in procedures adopted by a Federal agency," and further provide that such "procedures . . . shall provide for extraordinary circumstances in which a normally excluded action may have a significant effect," and hence require either an EA or EIS. 40 C.F.R. § 1508.4 (emphasis added). Consequently, regardless of whether USDA could declare that FSIS programs do not generally have a significant impact, it could not, without violating the CEQ regulations (and hence its own regulations), refuse to evaluate whether – as is clearly the case – "extraordinary circumstances" compel preparation of an EA or EIS in this particular case. Since the Administrative Record reflects no such evaluation, and USDA does not even purport to have made any, the rule must be set aside for that reason as well.

This conclusion is buttressed by precedents that are squarely on point in this and other courts, including cases involving USDA. For example, in Fund for Animals, Inc. v. Espy, 814 F.

Supp. 142 (D.D.C. 1993), which also arose in a preliminary injunction context, USDA argued

that a research program that would affect bison was categorically excluded from any NEPA

review, although the record reflected that the project could impact the environment, and there

was no "contemporaneous consideration by the administrative decisionmaker of the applicability

of a categorical exclusion" under the particular facts.  Id. at 149.  On that basis, Judge Oberdorfer

enjoined the program, explaining that:

> neither defendant nor any authorized subordinate made any contemporaneous
> determination as to whether the study falls within or without a categorical exclusion
> under 7 C.F.R. § 1b.3, or that either an EIS or an EA (one or the other of which is
> required in the absence of a categorical exclusion).  Invocation of the categorical
> exclusion for the first time by counsel after the complaint was filed in this case appears to
> be a *post hoc* rationalization, and is inadequate as a basis for review.

Id.[16]

In short, where USDA apparently concedes that it never even considered, during the

administrative process, whether an EIS or EA should be prepared in light of the environmental

impacts associated with this particular agency action, the agency obviously did not take the "hard

look" at environmental repercussions that is contemplated by NEPA.  Robertson v. Methow

Valley Citizens Council, 490 U.S. 332, 348 (1989).  For this reason as well, the rule must be set

---

[16]  See also California v. Norton, 311 F.3d 1162, 1176 (9th Cir. 2002) ("'An agency satisfies
NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is
required, so long as the application of the exclusions to the facts of the particular action is not
arbitrary and capricious.'  It is difficult for a reviewing court to determine if the application of an
exclusion is arbitrary and capricious where there is no contemporaneous documentation to show
that the agency considered the environmental consequences of its action and decided to apply a
categorical exclusion to the facts of a particular decision.") (emphasis added; internal citation
omitted); Edmonds Inst. v. Babbitt, 42 F. Supp. 2d 1, 18-19 (D.D.C. 1999) (rejecting invocation
of categorical exclusion where the agency "could not reasonably have found" that its action
would have insignificant effects on the environment); Anacostia Watershed Soc'y, 871 F. Supp.
at 481 (rejecting categorical exclusion where administrative record failed to reflect justification

aside and remanded.[17]

### C.    THE FINAL RULE IS ARBITRARY AND CAPRICIOUS AND NOT IN ACCORDANCE WITH LAW.

Notwithstanding defendants' and intervenors' efforts to create statutory ambiguity where none exists, the Final Rule cannot survive scrutiny under Step One of <u>Chevron</u> because it is plain that "Congress has directly spoken to the precise question at issue," and that the "the intent of Congress" to de-fund federal horse inspections, and hence halt horse slaughter, "is clear." <u>Nuclear Energy Inst., Inc. v. EPA</u>, 373 F.3d 1251, 1269 (D.C. Cir. 2004) (quoting <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984)); <u>see also</u> Pfs. Mem. at 23.  Unable to counter this unassailable proposition, which derives from the "text, structure, legislative history, and purpose" of the Amendment, <u>Public Citizen v. U.S. Department of Health and Human Services</u>, 332 F.3d 654, 662 (D.C. Cir. 2003), defendants and intervenors instead abandon the <u>Chevron</u> framework entirely and embark on a series of diversions, without squarely confronting either the pertinent statutory language or the uncontested statements of legislative purpose noted by plaintiffs.

As explained below, none of defendants' and intervenors' diversions reveals any genuine ambiguity of Congressional intent with respect to the statutes at issue.  Some of these detours do not even merit a substantive response.  <u>See</u>, <u>e.g.</u>, Int. Mem. at 27 n.4 (suggesting that USDA

---

for categorical exclusion under specific circumstances).

[17]  Perhaps recognizing that its generic categorical exclusion argument is problematic, USDA also asserts that, "even assuming <u>arguendo</u>" that all FSIS programs may not automatically avoid NEPA analysis, USDA "<u>could reasonably determine</u>" that the rule could bypass such analysis for other reasons.  Def. Mem. at 27 (emphasis added).  Plainly, however, these are "<u>post</u> <u>hoc</u> rationalizations" on which the Court cannot rely to sustain the rule.  <u>Walter O. Boswell Mem. Hosp. v. Heckler</u>, 749 F.2d 788, 792 (D.C. Cir. 1984).

could simply exempt horses from the definition of "meat and meat products" along with "closed faced sandwiches").  But assuming _arguendo_ that defendants and intervenors _could_ convince this Court that the relevant Congressional mandates are somehow ambiguous, the statutory constructions proffered by defendants and intervenors are nonetheless unreasonable, and therefore entitled to no deference at _Chevron_ Step Two.

### 1.    The Final Rule Cannot Be Reconciled With the FY 2006 Amendment.

Neither defendants nor intervenors point to any ambiguity in the language of the Amendment itself, or in the multiple statements by the Amendment's sponsors _and_ opponents, all of whom recognized that the purpose was to halt horse slaughter.  Instead, they try to create confusion out of an obscure phrase in the Joint Explanatory Statement, which simply affirms the Conferees' "understanding" that USDA is "obliged under existing statutes to provide for inspection of _meat_ intended for human consumption," H.R. Rep. No. 109-255 at 107 (2005) (emphasis added).   As plaintiffs explained in their opening brief, this language is in fact consistent with the unequivocal intent of Congress to suspend horse slaughter.  _See_ Pfs. Mem. at 26 n.7. Surely, had the conferees intended to contradict the understanding of the sponsors as to the statute's meaning, they would have explicitly stated their intention to continue the inspection of _horse_ meat, as opposed to simply observing that the Department will continue to "provide for the inspection of meat intended for human consumption," which, of course, includes _other_ FMIA-listed species.

Defendants and intervenors also attempt to recast the de-funding mandate not as a "suspension" of duties USDA would otherwise have, _see_ Pfs. Mem. at 25 (citing _Burch v. U.S. Dep't of Treasury_, 120 F.3d 1087, 1090 (9th Cir. 1997)), but rather, as a permanent "repeal[ ] by

implication" that obligates the agency to go "find another means" by way of a substitute source of authority.  Int. Mem. at 24, 27;[18] <u>see also</u> Def. Mem at 21.  But a time-limited funding constraint is obviously not a permanent "repeal."  That is why the Courts of Appeals have held that a de-funding provision like the one at issue here is to be "interpreted as a <u>suspension</u>," which "does not repeal" the underlying duty, but <u>does</u> "prevent[ ] [the agency] from taking . . . action while the suspension is in effect."  <u>Burtch</u>, 120 F.3d at 1090; <u>see also</u> <u>Envtl. Defense Center v. Babbitt</u>, 73 F.3d 867, 871 (9th Cir. 1995).[19]

Nor do defendants or intervenors demonstrate any ambiguity as to the Amendment's purpose in the legislative history, which, as detailed in plaintiffs' opening brief, illustrates in unmistakable terms that Congress intended to "<u>stop the slaughter of horses for human consumption</u> by preventing taxpayer dollars from being used to inspect the horses intended for slaughter."  151 CONG. REC. S10,220 (statement of sponsor, Senator Byrd) (emphasis added).  Instead of pointing the Court to competing legislative history that would reflect any <u>other</u> purpose besides the one proffered by plaintiffs, intervenors assert that the sponsors' floor

---

[18] Intervenors state that "Plaintiffs rely on a minor series of cases challenging the Treasury Department's failure to act on applications to restore firearms licenses to former convicts.  <u>See</u> <u>McHugh v. Rubin</u>, 220 F.3d 53 (2nd Cir. 2000)," and then proceed at length to distinguish <u>McHugh</u> from the case at bar.  Plaintiffs did not cite <u>McHugh</u> in their brief.

[19] For this same reason, there is no merit to defendants' and intervenors' suggestion that Congress somehow put the USDA in a conflict between the Amendment and its obligations under the FMIA to inspect meat that could only be resolved by implementing a fee for service system.  <u>See</u> Int. Mem. at 24, 27; <u>see also</u> Def. Mem at 21.  Because Congress knowingly decided to suspend section 603's anti-mortem inspection mandate, the defendants' claim that this decision creates a conflict with the duty to conduct anti-mortem inspections under 603 (the same provision Congress intentionally de-funded) is simply a non-sequitur.  Indeed, defendants appear to suggest that Congress both sought to de-fund inspections under section 603, but also intended the agency to continue to carry out such inspections, a counterintuitive theory that finds no

statements are "less persuasive than the language in the Conference Report," which says nothing about why Congress passed this legislation. Int. Mem. at 22. Hence, where, as here, the floor statements are uncontested, and Committee "reports are silent on the point [at issue] and we have only the floor debate to illuminate the intent of Congress. . . statements by the sponsor or floor manager of a bill should be given weight." Ballerina Pen Co. v. Kunzig, 433 F.2d 1204, 1213 n.14 (D.C. Cir. 1970) (citing Allen v. State Bd. of Elections, 393 U.S. 544, 564-71 (1969)); see also Butler v. West, 164 F.3d 634, 642 (D.C. Cir. 1999) (rejecting a construction of a statute that "produce[s] a result demonstrably at odds with the intentions of its drafters").

Since defendants and intervenors have failed to show that the Amendment is "silent or ambiguous with respect to the specific issue," this Court need not proceed to Chevron's second step to determine whether the Final Rule "is based on a permissible construction of the statute." Nuclear Energy Inst., 373 F.3d at 1269 (quoting Chevron, 467 U.S. at 843). Even at Step Two, however, the Final Rule must fail, because the statutory construction urged by defendants and intervenors leads to a patently unreasonable, if not absurd, interpretation of the Amendment. Tellingly, USDA never says what it thinks Congress was attempting to accomplish with the legislation, and the best that intervenors can offer is the off-hand suggestion – unadorned by any citation – that the Amendment "changes only the funding arrangement." Int. Mem. at 5; see also id. at 33 (the Amendment "merely adjusts the funding arrangement"). But it is simply inconceivable, and there is not a stitch of evidence to support, that Congress went through all of this trouble "merely" to effect a funding change – a purpose that was never suggested during any part of the legislative process and was not even mentioned during the extensive legislative

_____

support anywhere in the legislative history, or the plain language of the Amendment, or basic

debates.  See Independent Ins. Agents of America, Inc. v. Hawke**,** 211 F.3d 638, 644 (D.C. Cir. 2000) (rejecting proposed construction of statute that required the Court to conclude that Congress enacted a "completely useless" law).  Accordingly, the Final Rule is based on an impermissible construction and could be set aside on this basis as well.

### 2.    The Final Rule Violates the FMIA.

Defendants and intervenors also fall short in their efforts to conjure up ambiguity with respect to the FMIA.  First, contrary to defendants' assertion, the Agricultural Marketing Act, 7 U.S.C. §§ 1622, 1624 ("AMA"), may not be used as a substitute source of authority to evade the FMIA's express requirement that inspections of FMIA-covered animals "shall" be carried out under that statute and paid for with federal funds.  See Def. Mem. at 24-25; see also Plf. Mem. at 23; 21 U.S.C. §§ 603, 610.  As discussed in plaintiffs' opening brief and unaddressed in either opposing brief, an agency "cannot rely on its general authority to make rules . . . when a specific statutory directive defines the relevant functions of [the agency] in a particular area."  Am. Petroleum Inst. v. EPA, 52 F.3d 1113, 1119 (D.C. Cir. 1995).  Here, "the relevant functions . . . in a particular area" are defined by the FMIA's requirements that ante-mortem inspections be conducted "as provided for in this chapter," i.e., the FMIA.  21 U.S.C. § 603(a); see also 21 U.S.C. § 610(a) (providing that "[n]o person, firm, or corporation shall . . . (a) slaughter any [enumerated species] . . . except in compliance with the requirements of this chapter").  Accordingly, the Amendment need not have expressly "terminate[d] or amend[ed] USDA's user

_____

notions of common sense.

fee authority under sections 1622 and 1624 of the AMA," Def. Mem. at 24 – the FMIA itself precludes inspection under the AMA of FMIA-listed species.[20]

Defendants and intervenors also fail to demonstrate how the Final Rule is consistent with the express ban on private payment for inspection in 21 U.S.C. § 695. Intervenors intimate that this section does not cover ante-mortem inspection because it applies to "meat and meat products," which, in intervenors' view, is limited to the carcasses of animals. Int. Mem at. 27 n.4. However, as the very title of 21 U.S.C. § 603 makes clear, the "inspection of meat and meat products" includes ante-mortem inspection of live animals. 21 U.S.C. § 603(a), (b). Notably, USDA affirms that the ante-mortem inspections mandated by section 603 are to "prevent adulterated meat and meat food products from entering interstate commerce." Def. Mem. at 3 (emphasis added).

Defendants also argue that that the ban on private payment for inspection in 21 U.S.C. § 695 may be ignored here because, while

> the legislative history states, '[m]eat inspection is clearly [and generally] for the benefit of the [American] consumer of meat products and [, thus] should be paid for by consumers as a whole through Federal funds. . . .' In certain cases, however, 21 U.S.C. § 695 contemplates that 'the benefit is to the person receiving the inspection,' and thus, this person should cover the cost of the inspection.

Def. Mem. at 6, 26 (emphasis added) (quoting H.R. Rep. No. 48-1852 [sic] (1948), reprinted in 1948 U.S.C.C.A.N. 1706, 1709. But defendants take liberties with the quoted language, inferring an exception for meat producers that would conflict with the statute itself. Put back

---

[20] Nor do defendants or intervenors address or even mention defendants' many policy statements, as listed in plaintiffs opening brief, confirming USDA's long-held view that voluntary fee-for-service inspections under the AMA are "to assist in the orderly marketing of various animal products and byproducts not subject to the FMIA." 61 Fed. Reg. 65, 459 (Dec. 13, 1996); Pfs.

into the context of the <u>entire</u> passage, the quoted language reveals an intent consistent with the statutory language:

> The committee believes that the true principle to be followed is that the cost of inspection should be paid for by those who receive the benefits of inspection.  <u>In the case of fruits and vegetables, and similar inspections, the benefit is to the person receiving the inspection-- in the grading and commercial standardization of his product.</u>  Meat inspection is clearly for the benefit of the consumer of meat products and <u>should be paid for by consumers as a whole through Federal funds-- if they are to continue to get the kind of meat inspection in which they can have confidence.</u>

H.R. Rep. 80-1852 (1948), reprinted in 1948 U.S.C.C.A.N. 1706, 1709.  Accordingly, since the horse slaughtering facilities produce meat rather than fruits and vegetables, they are not "beneficiaries" as the term is used in this paragraph, and contrary to defendants' assertion, "requiring them to pay for these inspections" is <u>not</u> "consistent with" either the plain language or "the principle set forth in the legislative history of 21 U.S.C. § 695."  Def. Mem. at 26.

As an alternate theory – which is nowhere to be found in the rule under review – defendants assert that the Final Rule can be reconciled with 21 U.S.C. § 695 because the Amendment "has merely created a new exception to the requirements of 21 U.S.C. § 695 for ante-mortem inspection of horses during the current fiscal year."  Def. Mem. at 25.  Not only is this proposition <u>post</u> <u>hoc</u> and unsupported by any authority, it also ignores the Court of Appeals' admonition that "appropriations acts, which on their surface only address funding matters, do not make changes in substantive law unless they do so explicitly."  <u>OSG Bulk Ships, Inc. v. United States</u>, 132 F.3d 808, 813 (D.C. Cir. 1998) (citing <u>Tenn. Valley Auth. v. Hill</u>, 437 U.S. 153, 190 (1978)).  In the absence of any express indication that Congress intended the Amendment to

---

Mem. at 29 n.10.  Indeed, USDA confirmed this position as recently as January 13, 2006, just over three weeks before the publication of the Final Rule.  <u>See</u> 71 Fed. Reg. 2135.

create a new exception to 21 U.S.C. § 695 that would allow USDA to proceed with development

of a fee-for-service system for FMIA-listed animals, this argument must be rejected.[21]

Finally, defendants' argument on behalf of intervenors' due process rights – not even

raised by intervenors themselves – is both post hoc and specious. Contrary to defendants'

portrayal, 21 U.S.C. § 671 is not an "obligation . . . to provide . . . an opportunity for a hearing

prior to withdrawing federal inspection services" that would be implicated by Congress's

decision to suspend ante-mortem inspection.[22] Def. Mem. at 23. Rather, this narrow provision

requires a hearing only if inspection services are withdrawn because the

> applicant or recipient, or anyone responsibly connected with the applicant or
> recipient, has been convicted, in any Federal or State court, of (1) any felony, or
> (2) more than one violation of any law, other than a felony, based upon the
> acquiring, handling, or distributing of unwholesome, mislabeled, or deceptively
> packaged food or upon fraud in connection with transactions in food.

21 U.S.C. § 671. Here, inspection services are being discontinued by Congress, and not because

of an individual determination by USDA as to the users' fitness for inspection. In such cases, the

---

[21] Defendants also make the odd, albeit irrelevant, claim that 21 U.S.C. § 695 "is not part of the
FMIA," Def. Mem. at 25, despite the fact that the authority cited by defendants' in their own
regulations implementing 21 U.S.C. § 603, see 9 C.F.R. §§ 309 et seq., is given as "21 U.S.C. §§
601-695." Intervenors allude to "a whole other program" establishing "a voluntary fee-for-
service program for the ante mortem inspection of horses" that is "already in place." Int. Mem.
24 n.2; id. at 17 (citing 9 C.F.R. §§ 350 et seq.). However, what Intervenors fail to inform the
Court is that these regulations cover only "non-official" facilities – i.e., facilities that do not
slaughter animals for human consumption and are thus not subject to the FMIA. As the Final
Rule itself makes clear, the fee-for-service program at issue is for "official establishments" such
as Intervenors. 71 Fed. Reg. 6,337.

[22] This section of the FMIA is also not mentioned in the Final Rule or its preamble. An
agency's statutory construction proffered in defense of its regulations that appears for the first
time in an agency's brief is an improper post hoc rationalization and is owed no deference under
Chevron. See Landmark Legal Found. v IRS, 267 F.3d 1132, 1135-36 (D.C. Cir. 2001);
Diamond Game Enterprises, Inc. v. Reno, 230 F.3d 365, 371 (D.C. Cir. 2000).

procedural due process requirement obviously does not "impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to a public benefit." Richardson v. Belcher, 404 U.S. 78, 81 (1971); see also Atkins v. Parker, 472 U.S. 115, 129-31 (1980) (holding that Congress has plenary power to define the scope of a program and to terminate the resources available to fund that program without a procedural due process requirement, because the "legislative determination provides all the process that is due," especially where there is a time delay in implementation).  In sum, the relevant statutory provisions of the FMIA – which plainly forecloses a private funding scheme for horse slaughter – are not ambiguous, and even if they were, defendants' and intervenors' creative constructions are not reasonable.[23]

## III.    THE COURT SHOULD GRANT RELIEF.

As discussed previously, the D.C. Circuit has made clear that, if the Court agrees that USDA has violated the APA for any of the reasons set forth above, the Court should, at minimum, vacate the rule and remand for further proceedings without a further consideration of

---

[23]    Now that all parties are in possession of "a true and complete copy of all materials considered by FSIS" in promulgating the Final Rule, see Administrative Record ("AR") at 1-2, it is also even clearer that in fact USDA ignored much of the evidence before it.  See Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43 (1983).  Specifically, the record confirms that USDA made no serious effort to address: (1) the December 7, 2005 letter to USDA from the legislative sponsors, expressing their "great concern" that USDA not "circumvent Congressional intent and allow horses and/or horsemeat to be inspected on a per-fee basis, thus permitting horse slaughter for human consumption to continue during FY 2006," AR at 150; (2) the seventeen-page legal letter sent to USDA by the organizational plaintiffs on January 5, 2006, AR at 133-149; and (3) the letter sent on January 17, 2006 to USDA by forty members of Congress admonishing USDA for its "inten[t] to engage in a complex regulatory maneuver to willfully circumvent legislation that was passed by an overwhelming majority," and also reminding defendants that "each and every one of our constituents is entitled to prior notice and a full opportunity to comment on the USDA's proposal before it is implemented," AR at 159-163 (underline added, italics in original).

irreparable injury.  See supra at 2-4.   But even if the equitable considerations are brought into play, plaintiffs must still prevail.  Once again, especially if the Court is inclined to agree with plaintiffs' reading of Congress's intent in enacting the 2006 Amendment – i.e., that the clear purpose of the Amendment was to suspend horse slaughter operations for this fiscal year – then it necessarily follows that Congress has made an explicit policy judgment that the public interest in preventing the inhumane treatment of horses and the concomitant harms to the local communities outweighs whatever economic disruption will ensue from implementation of the statute.  See Pfs. Mem. at  42-43.

In any event, none of defendants' or intervenors' specific arguments should dissuade the Court from awarding relief.  To begin with, intervenors' contention that "[p]laintiffs seek to turn the status quo 180 degrees, to the irreparable damage of three companies that continually have been in business for more than a decade," Interv. Mem. at 2, is simply sophistry.  Congress opted to alter the status quo by suspending all federal funding for these horse slaughter operations as of March 10.  Consequently, the Congressionally-mandated status quo – in the absence of the novel regulatory scheme concocted by intervenors and USDA – is a suspension of the slaughter operations.   Viewed from that vantage point, it is clearly intervenors who are seeking to dramatically change the status quo to the detriment of plaintiffs, who are among the intended beneficiaries of the legislation.

As for intervenors' asserted economic damages, not only were these expressly considered by Congress and ordinarily of little moment in the context of irreparable injury assessments, see Pfs. Mem. at 41, but intervenors have not even substantiated that the multinational businesses that own the slaughter plants will suffer substantial economic harm.  As set forth in the

accompanying affidavit of Charles R. Mahla, Ph.d, the businesses that own the plants are foreign-owned companies that evidently own <u>many</u> horse slaughter operations in various parts of the world.  <u>See</u> Pfs. Exh. 25 at ¶ 14.  Accordingly, the declarations submitted by intervenors present "[n]o evidence" to substantiate claims that suspending the three horse slaughter facilities, as Congress intended, would irreparably harm the "overall businesses."  <u>Id</u>. at ¶ 16.[24]

In addition, intervenors' and defendants' economic harm arguments are, at best, misleading, since they do not take into account the substantial <u>negative</u> economic impacts – <u>i.e.</u>, the "externalities" – associated with the slaughter operations.  Mahla Decl. at ¶ 10.  As explained by Dr. Mahla, such economic "externalities" include the "pollution in the form of odorous emissions from the slaughterhouses," the costs of which are "borne by local residents," as well as the depression in property values stemming from the plants.  <u>Id</u>. at ¶ 10.  Indeed, as explained by the Mayor of one of the local communities, the "plant has cost the community dearly," by, among other things, requiring it to spend thousands of dollars to contain a blood spill; compelling the local hospital to "put in filtering systems to keep the odor out," and requiring the City to spend millions of dollars on a new wastewater treatment plant.  Supp. Decl. Of Paula Bacon (Pfs. Exh. 26) at ¶ 7; <u>id</u>. ("Dallas Crown has a negative effect on the development of our city.  These costs to the City are greatly amplified when the aesthetic, health, recreational, and economic impacts wrought upon citizens who reside near the plant are taken into account.").[25]

_____

[24]     Along with this reply, plaintiffs are filing an unopposed motion to file two supplemental declarations for the sole purpose of rebutting intervenors' allegations of economic harm.

[25]     While neither defendants, nor intervenors, have submitted any declarations from workers at the plants, Mayor Bacon also addresses any concern that the relief sought by plaintiffs

While defendants and intervenors have presented, at best, a skewed view of the economic factors involved, they have largely ignored the injuries enumerated by plaintiffs. As noted, not only will a denial of relief as a practical matter nullify plaintiffs' statutory rights to participate in the rulemaking process – which is itself an irreparable injury, cf. John Doe Agency v. John Doe Corp., 488 U.S. 1306, 1309 (1989) (where denial of a stay would cause part of a case to become moot, the denial would impose irreparable injury) – but plaintiffs will also suffer the severe, ongoing injuries that Congress sought to suspend, i.e., the contamination of their communities, the impairment of their and their families' lives, and their exposure to the suffering and death of thousands of horses, including wild horses. See Pfs. Mem. at 37-40. Contrary to intervenors' strange notion of equity, the fact that "Plaintiffs and the people they purport to represent" have had to endure these severe harms in the past, Int. Mem. at 2, is hardly a justification for the Court to ignore or trivialize them, especially now that Congress itself has seen fit to rectify them.

## **CONCLUSION**

For the foregoing reasons, as well as those set forth in plaintiffs' opening brief, the Court should consolidate the preliminary injunction motion with a final ruling and set aside the rule under review. Alternatively, the Court should grant plaintiffs' motion for emergency injunctive relief.

---

will necessarily entail severe consequences for these people. She explains that, in recognition of the legislation passed by Congress, the "City of Kaufman has a process in place and has actively developed employment alternatives for the Dallas Crown employees in anticipation of the suspension of the plant's operation" (including a "job fair and placement program that will be instituted within weeks after the plant's suspension"); that there are equivalent job opportunities in the same general area; and that, if necessary, workers will also be eligible to apply for unemployment benefits. Supplemental Bacon Decl. at ¶ 4-6.

Respectfully submitted,


___/s/_____
Eric R. Glitzenstein
(D.C. Bar No. 358287)

Ethan Carson Eddy
(D.C. Bar No. 496406)

MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, DC  20009
(202) 588-5206


Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)

Jonathan R. Lovvorn
(D.C. Bar No. 461163)

THE HUMANE SOCIETY OF THE UNITED
STATES
2100 L. St., N.W.
Washington, DC  20037
(202) 676-2333

Counsel for Plaintiffs

March 1, 2006

36