UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY
OF THE UNITED STATES, *et al*.,

    Plaintiffs,

      v.

MIKE JOHANNS, *et al*.,

    Defendants.

Civil Action No. 06–265 (CKK)

**MEMORANDUM OPINION**
(March 14, 2006)

Presently before the Court is [4] Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction, and Request for a Hearing ("Motion for Preliminary Injunction"), requesting that the Court, "temporarily and preliminarily enjoi[n] and declar[e] unlawful a Final Rule just promulgated by the Food Safety and Inspection Service ("FSIS") of the U.S. Department of Agriculture ("USDA") that creates a "fee-for-service" inspection system designed to facilitate the continued transport and slaughter of American horses for human consumption abroad." Pls.' Mot. for Prelim. Inj. at 1. Plaintiffs bring their action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.* Upon a searching examination of the aforementioned Motion, Opposition, Reply, Sur-reply, and Response to Sur-reply, the Court shall DENY Plaintiffs' Motion for Preliminary Injunction. Furthermore, the Court shall *sua sponte*[1]

---

[1] "It is well established that a federal court cannot act in the absence of jurisdiction, and that jurisdictional issues may be raised by the court *sua sponte*." *Am. Library Ass'n v. Fed. Commc'ns Comm'n*, 401 F.3d 489, 492 (D.C. Cir. 2005) (internal citations omitted).

DISMISS Claims 1 and 2 of Plaintiffs' First Amended Complaint for lack of jurisdiction, as

Plaintiffs lack standing to bring these claims.

## I: BACKGROUND

At present, horses are slaughtered at three different foreign-owned facilities in the United

States to provide horse meat for human consumption abroad and for use in zoos and research

facilities domestically.  The instant case pertains to the web of legislation and regulations

pertaining to the inspection of such horses prior to slaughter.

On November 10, 2005, Section 794 of the FY 2006 Agricultural Appropriations Act was

signed into law.  Introduced by members of Congress as an amendment to the FY 2006

Agricultural Appropriations Act, the Amendment provides:

> Effective 120 days after the date of enactment of this Act, none of the funds made
> available in this Act may be used to pay the salaries or expenses of personnel to inspect
> horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. Sec. 603) or under
> the guidelines issued under section 903 of the Federal Agriculture Improvement and
> Reform Act of 1996.

*See* Pub. L. 109-97, § 794, 119 Stat. 2164 (AR 51).  The provision of the Federal Meat

Inspection Act ("FMIA"), 21 U.S.C. § 603, pertaining to the inspection of horses provides:  "For

the purpose of preventing the use in commerce of meat and meat food products which are

adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an

examination and inspection of all cattle, sheep, swine, goats, horses, mules, and other equines

before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or

similar establishment, in which they are to be slaughtered and the meat and meat food products

thereof are to be used in commerce . . . ."  21 U.S.C. § 603(a).  The provision of section 903 of

the Federal Agriculture Improvement and Reform (FAIR) Act of 1996 pertaining to the

inspection of horses relates to inspections during the transport of horses, which is not at issue in the instant case. Plaintiffs understand the FY 2006 Amendment to in effect prohibit the slaughter of horses for human consumption. Pls.' Mot. for Prelim. Inj. at 10.

On November 23, 2005, Beltex Corporation, Dallas Crown, Inc., and Cavel International (collectively the "Slaughter Facility Operators") filed a petition for "emergency rulemaking" with the USDA to create a "fee-for-service" inspection program with respect to ante-mortem horse inspections and transportation-related horse inspections. Pls.' Mot. for Prelim. Inj., Ex. 10 (Petition) at 1. On February 8, 2006, the Food Safety and Inspection Service ("FSIS") of the Department of Agriculture published in the Federal Register an amendment to 9 C.F.R. Pt. 352, "amending the Federal meat inspection regulations to provide for a voluntary fee-for-service program under which official establishments that slaughter horses will be able to apply for and pay for ante-mortem inspection." 71 Fed. Reg. 26 6337, 6337 (Feb. 8, 2006). The "interim final rule" was given an effective date of March 10, 2006; additionally, FSIS provided a shortened comment period "because it is issuing an interim final rule and finds that it is in the public interest for [FSIS] to receive comments on an expedited basis" before March 10, 2006, the date on which the 2006 Amendment to the Agricultural Appropriations Act would take effect. *Id.* at 6337, 6340. Elaborating on the need for immediate action, FSIS states: "[w]ith the passage of the FY 2006 Appropriations Act, if FSIS does not establish a means for official establishments that slaughter horses to obtain anti-mortem inspection, these establishments will not be able to operate and presumably will be forced out of business. This interim final rule is necessary to avoid disruption of operations at official establishments that slaughter horses. Therefore, the Administrator has determined that prior notice and opportunity for public comment are

3

impracticable and contrary to the public interest under 5 U.S.C. 553(b), and that there is good cause under 5 U.S.C. 553(d) for making the action effective as specified herein." *Id.* at 6340. FSIS further specified that it is "establishing this fee-for-service program under the Agricultural Marketing Act (AMA)." *Id.* at 6337.

In Plaintiffs' [3] First Amended Complaint, filed on February 21, 2006, Plaintiffs provide three claims for relief. First, Plaintiffs claim that the fee-for-service inspection system was created in violation of the Administrative Procedure Act, 5 U.S.C. § 553, because advance public notice and opportunity to comment was not provided. Pls.' Mot. for Prelim. Inj. ¶¶ 94, 95. Second, Plaintiffs claim that Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, principally by acting arbitrarily and capriciously in violation of both the 2006 Agricultural Appropriations Act Amendment and the Federal Meat Inspection Act ("FMIA"). Pls.' Mot. for Prelim. Inj. ¶¶ 96, 97. Finally, Plaintiffs claim that Defendants violated the National Environmental Policy Act ("NEPA") and its implementing regulations by acting arbitrarily and capriciously in violation of the Administrative Procedure Act, 5 U.S.C. § 706. Pls.' Mot. for Prelim. Inj. ¶¶ 98, 99.

Shortly after filing their First Amended Complaint, Plaintiffs filed [4] Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction, and Request for a Hearing ("Motion for Preliminary Injunction") on February 22, 2006. In their Motion, Plaintiffs reiterated the grounds for relief stated in their First Amended Complaint and furthermore requested that the Court preliminarily enjoin and declare unlawful the fee-for-service ante-mortem inspection program that would become effective on March 10, 2006 on the grounds that Plaintiffs have demonstrated likelihood of success on the merits, irreparable harm, lack of harm

4

to Defendants, and public interest factors necessary to obtain injunctive relief.  Pls.' Mot. for

Prelim. Inj.at 1–2.  In a telephone conference call between the Court and the Parties on February

22, 2006, at 5:00 p.m., the Parties agreed that the Court should consider the Motion for

Preliminary Injunction and Motion for a Temporary Restraining Order as one action in this case.

On February 24, 2006, Beltex Corporation, Cavel International, Inc., and Dallas Crown, Inc.

(collectively, the "Slaughter Facility Operators") filed an unopposed [7] Motion to Intervene as

of right as Defendants, which was granted by the Court on March 1, 2006.

Defendants USDA and FSIS filed their [10] Opposition on February 27, 2006.  In their

Opposition, Defendants argue that Plaintiffs do not have standing to bring the instant action, nor

have they sufficiently demonstrated that they meet the requirements necessary to obtain

preliminary injunctive relief if they were found to have standing.  The Slaughter Facility

Operators, as Defendant-Intervenors, also filed their [9] Opposition on February 27, 2006.

Plaintiffs filed a Reply on March 1, 2006.  The federal Defendants filed a Motion for Leave to

File Sur-Reply (accompanied by a Sur-Reply) on March 7, 2006, and Plaintiffs filed a Response

thereto on March 8, 2006, all of which have been considered by the Court.

## II: LEGAL STANDARD

In order to bring suit in federal court, Plaintiffs must satisfy the requirements of two

separate standing doctrines.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct.

2130, 119 L.Ed.2d 351 (1992).  Plaintiffs must show that they have prudential standing to sue, a

requirement rooted in "judicially self-imposed limits on the exercise of federal jurisdiction."  *See*

*Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting *Allen v.*

*Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).  Among these judicially

imposed limits is the condition "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett*, 520 U.S. at 162, 117 S.Ct. 1154.

The zone of interests test is generally considered not to be especially demanding, and "[a] plaintiff who is not itself the subject of the agency action is outside the zone of interests only if its interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Grand Council of the Crees v. Fed. Energy Regulatory Comm'n*, 198 F.3d 950, 955 (D.C. Cir. 2000) (internal citation and quotation marks omitted). While prudential standing requirements can be changed or abrogated by Congress, they apply unless "expressly negated." *Grand Council*, 198 F.3d at 954 (quoting *Bennett*, 520 U.S. at 163, 117 S.Ct. 1154).

Plaintiffs also must demonstrate Article III standing, an "'irreducible constitutional minimum' [that] consists of three elements." *Vermont Agency of Natural Resources v. United States, ex rel Stephens*, 529 U.S. 765, 771, 120 S. Ct. 1858, 146 L.Ed.2d 836 (2000) (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). To satisfy Article III standing requirements, plaintiffs must show that "(1) [they] ha[ve] suffered an 'injury in fact' that is (1) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lujan*, 504 U.S. at 560-61, 112 S.Ct. 2130).

The Court notes that its consideration of prudential standing and Article III standing with

respect to the Plaintiffs need not be done in any particular order. *See Grand Council*, 198 F.3d at 954 ("[I]t is entirely proper to consider whether there is prudential standing while leaving the question of constitutional standing in doubt, as there is no mandated 'sequencing of jurisdictional issues.'") (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999)).

It is also worth noting that standing must be demonstrated with respect to each claim for relief, but not necessarily with respect to each Plaintiff in the instant case. In *Friends of the Earth v. Laidlaw*, the Supreme Court reaffirmed that a Plaintiff must demonstrate standing for each form of relief sought. *Laidlaw*, 528 U.S. at 185, 120 S.Ct. 693. However, "[f]or each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); *Village of Arlington Heights v. Metro. Housing Dev. Corp*, 429 U.S. 252, 264 n.9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). *See also Am. Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 429 (D.C. Cir. 1998) ("We hold that . . . one of the individual plaintiffs [] has standing to sue. Accordingly, we need not pass on the standing of the other plaintiffs.").

### III: DISCUSSION

A.     *Plaintiffs do not have standing to bring their APA Claims[2] with respect to the*

---

[2]  The Court notes that Plaintiffs, in the first claim of their First Amended Complaint, bring a claim only under the APA without reference to any other statute based on Defendants alleged failure to abide by notice and comment procedures. "[T]he APA by its terms independently authorizes review only when 'there is no other adequate remedy in a court.' 5 U.S.C. § 704." *Bennett*, 520 U.S. at 161-62, 117 S.Ct. 1154. Even in the event that the Court relies on the APA to determine whether prudential standing can be upheld, "[i]n determining whether the [Plaintiffs] have standing under the zone-of-interests test to bring their APA claims, we look . . . to the substantive

*2006 Appropriations Act*

Plaintiffs do not have prudential standing with respect to their APA-based claims that Defendants' Interim Final Rule violates the 2006 Agricultural Appropriations Act provision at issue. "The classic formulation of the zone-of-interests test is set forth in *Data Processing*: 'whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Bennett*, 520 U.S. at 175, 117 S.Ct. 1154 (quoting *Assoc. of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)) (internal citation omitted). The provision of the Amendment to the 2006 Agricultural Appropriations Act invoked by Plaintiffs, as stated above, reads as follows:

> Effective 120 days after the date of enactment of this Act, none of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. Sec. 603) or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996.

*See* Pub. L. 109-97, § 794, 119 Stat. 2164 (AR 51). It is clear that this provision on its face effectuates only a change in federal funding which does not in itself invoke the environmental, aesthetic, informational, or economic interests raised by any of the Plaintiffs in the instant case. As such, Plaintiffs are unable to sustain their burden of demonstrating prudential standing with regard to their APA claim resting on the 2006 Amendment itself.

B.    *Plaintiffs do not have standing to bring their APA Claims with respect to the*

---

provisions of the [principal statute invoked], the alleged violations of which serve as the gravamen of the complaint." *Id.* at 175. Because Plaintiffs raise other grounds for relief by using the APA as a vehicle to analyze Defendants' alleged violations of various other statutes –one of which (NEPA) will ultimately be determined by the Court to provide a basis on which Plaintiffs have jurisdiction to litigate their claims–the Court is not authorized to hear an APA claim presented in a vacuum as is the case in Claim 1 of Plaintiffs' First Amended Complaint. As such, this claim must be dismissed.

*FMIA*

Plaintiffs do not have prudential standing with respect to their APA-based claims that Defendants' Interim Final Rule violates the FMIA section at issue. While the zone of interests test used to determine whether a party has prudential standing focuses on the statute at issue, the focus is not on the overall purpose of the statute but on the particular provision of the statute invoked by the Plaintiffs. "[T]he meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . ., but by reference to the particular provision of the law upon which the plaintiff relies." *Bennett*, 520 U.S. at 175-76, 117 S.Ct. 1154; *see also Lujan*, 497 U.S. at 883, 112 S.Ct. 2130 ("[T]he plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought be protected by the statutory *provision* whose violation forms the legal basis for his complaint." (emphasis added)).

The zone of interests inherent in the provision of the FMIA invoked by Plaintiffs (21 U.S.C. § 603) is made clear in its self-description as "[f]or the purpose of preventing the use in commerce of meat and meat food products which are adulterated." The purpose of this provision is clearly that of food safety–the provision was intended to ensure that only unadulterated horse (and other meat) entered the marketplace. None of the Plaintiffs in the instant case bring their claims as potential consumers or distributors of meat products harboring concerns regarding the effects of the Interim Final Rule at issue on the quality or safety of horse meat in conjunction with fee-for-service ante-mortem inspections. Plaintiffs invoke informational interests, interests related to the placement of their property next to slaughter facilities which allegedly produce negative externalities, and various related aesthetic interests. None of these interests, however, arguably falls within the zone of interests contemplated by the statute – namely, that of food

9

quality and the commerce of unadulterated meat products in the marketplace.

     C.     *Plaintiffs have standing to bring their APA Claims with respect to NEPA*

To bring a claim under NEPA, such claim must fall within the "zone of interests" which

NEPA seeks to protect. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883, 110 S.Ct. 3177, 111

L.Ed.2d 695 (1990). NEPA seeks to protect individual citizens from environmental harm

including loss of recreational use and aesthetic enjoyment of the environment. *Lujan*, 497 U.S. at

886, 110 S.Ct. 3177. More specifically, NEPA's requirement that agencies include an

environmental impact statement with every major federal action "significantly affecting the

quality of the human environment," NEPA § 102(2)(C) is meant to serve at least two

congressional purposes:

> First, it ensures that the agency will have access to "detailed information concerning
> significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490
> U.S. 332, 349, 109 S. Ct. 1835, 104 L.Ed.2d 351 (1980). Second, it serves the
> "informational role" of assuring the public "that the agency 'has indeed considered
> environmental concerns in its decisionmaking process.'" *id.* (quoting *Baltimore Gas &
> Electric Co. v. NRDC*, 462 U.S. 87, 97, 103 S. Ct. 2246, 76 L.Ed.2d 437 (1983)) and,
> "perhaps more significantly, provid[ing] a springboard for public comment." *Id.*

*Grand Council*, 198 F.3d at 958-59. The D.C. Circuit has referred to the list of interests intended

to be served by NEPA as "sweeping," and found in one case that the existence of economic

interests did not blight qualifying aesthetic and environmental interests. *Mountain States Legal

Found.*, 92 F.3d at 1235–36.

In the instant case, with the aforementioned principle in mind that standing need only be

demonstrated with respect to at least one Plaintiff in order to preserve standing for all Plaintiffs

with respect to a particular claim, the Court finds a number of the individual Plaintiffs providing

affidavits attesting to the negative environmental consequences of the operation of the slaughter

facilities near the land they own and/or lease have easily demonstrated interests which fall within the zone of interests contemplated by NEPA.  Furthermore, Defendants' own admission that they did not consider the environmental consequences of their decision to promulgate the interim final rule in question suggests that there is a nexus between the congressional purpose of NEPA and Plaintiffs' alleged harms to place Plaintiffs within the zone of interests sufficient to demonstrate prudential standing.

Since Plaintiffs have demonstrated prudential standing sufficient to bring their APA claims with respect to NEPA, the Court will turn to an analysis of Plaintiff's standing on Article III grounds.  While "[a] party has standing to challenge an agency's failure to abide by a procedural requirement only if the government act performed without the procedure in question will cause a distinct risk to the particularized interest of the plaintiff," in the instant case, Plaintiffs have sufficiently demonstrated a risk to their particular interests.  *Fund Democracy, LLC v. Sec. & Exch. Comm'n*, 278 F.3d 21 (D.C. Cir. 2002).  A violation of the procedural requirement under NEPA that an agency file an EIS alone is not an injury which confers standing.  *Chamber of Commerce v. Dept. of Interior*, 439 F. Supp. 762, 766 (D.D.C. 1977); *see also Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84 (D.C.Cir. 1991) (noting that the D.C. Circuit has never found standing due to a "informational injury" based on a claim that an organization could not inform its members of the environmental impact of the action without the EIS).  Therefore, "[s]tanding in an EIS matter focuses on whether appellants have shown a particularized environmental interest of theirs that will suffer demonstrably increased risk, and whether [the regulation at issue] promulgated by the defendant is substantially likely to cause that demonstrable increase in risk to their particularized interest." *Florida Audubon Soc'y v. Bentsen*,

94 F.3d 658, 665 (D.C. Cir. 1996).

However, the instant case demonstrates not simply an informational injury to Plaintiffs, but rather a specific injury to a particularized interest of various Plaintiffs whose human environment is impacted by the final interim rule at issue. In fact, the APA/NEPA claim raised by Plaintiffs falls into the mold of "the archetypal procedural injury: an agency's failure to prepare a statutorily required environmental impact statement before taking action with potential adverse consequences to the environment." *Nat'l Parks Conservation Assoc. v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005). With reference to *Lujan* and *Florida Audubon*, the D.C. Circuit further elaborates on the Article III injury in fact elements of standing with respect to the procedural rights at issue as follows:

> A common element in those cases is that the same actor was responsible for the procedural defect and the injurious final agency action. Under those circumstances, the case law relieves the plaintiff of the need to demonstrate that (1) the agency action would have been different but for the procedural violation, and (2) that court-ordered compliance with the procedure would alter the final result.

*Nat'l Parks Conservation Assoc.*, 414 F.3d at 5. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7, 112 S.Ct. 2130 (*cited by Florida Audubon Soc'y*, 94 F.3d at 668). Therefore, the Court concludes that Plaintiffs have sufficiently demonstrated both prudential and Article III standing in order to sustain their NEPA-based APA claim.

### D.    *Plaintiffs do not meet the requirements necessary to obtain a preliminary injunction in the instant case*

While the Court has determined that Plaintiffs do have standing with respect to their

claim under NEPA, Plaintiffs must make a required showing of four separate factors in order to

obtain a preliminary injunction with respect to this claim.  As the Supreme Court has stressed,

"[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties

until a trial on the merits can be held."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct.

1830, 68 L.Ed.2d 175 (2001).  The decision whether to grant preliminary injunctive relief under

Federal Rule of Civil Procedure 65(a) is reserved to the sound discretion of the Court.  *See* FED.

R. CIV. P. 65(a); *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989).  "An

injunction should only issue where the intervention of a court of equity 'is essential in order

effectually to protect property rights against injuries otherwise irremediable.'"  *Sea Containers*,

890 F.2d at 1208 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72

L.Ed.2d 91 (1982)) (citations omitted).  "A preliminary injunction is an extraordinary remedy

that should be granted only when the party seeking the relief, by a clear showing, carries the

burden of persuasion."  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citing *Mazurek v.

Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)).

In assessing whether to grant preliminary injunctive relief, which is considered an

extraordinary remedy in this circuit, *see Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir.

1969), a court must balance four factors: (1) whether the movant is substantially likely to succeed

on the merits; (2) whether the movant would suffer irreparable injury if the injunction were not

granted; (3) whether an injunction would substantially injure other interested parties; and (4)

whether the public interest would be furthered by the injunction.  *See Mova Pharm. Corp. v.

Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift

Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *Serono Labs, Inc. v. Shalala*, 158 F.3d 1313,

1317-18 (D.C. Cir. 1998).

"These factors interrelate on a sliding scale and must be balanced against each other. 'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in the other areas are rather weak.'" *Serono Labs*, 158 F.3d at 1318 (quoting *CityFed Fin. Corp.*, 58 F.3d at 746). Accordingly, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 746. Notwithstanding the fluid nature of this familiar four-part inquiry, "[i]t is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits." *Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085, 112 S.Ct. 2929, 120 L.Ed.2d 926 (1992)). If the movant fails to do so, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 366 (D.C. Cir. 1999).

In addition, a party seeking preliminary injunctive relief must demonstrate at least some irreparable injury because "the basis for injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)) (alterations omitted). In order to establish irreparable injury justifying preliminary injunctive relief, a plaintiff must establish injury that is great, certain, and actual, not merely theoretical. *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). "The injury must be of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976), *aff'd*, 548 F.2d 977 (D.C. Cir.

1976)) (emphasis in original).  As the United States Court of Appeals for the District of

Columbia has explained,

> The key word in this consideration is irreparable.  Mere injuries, however
> substantial, in terms of money, time and energy necessarily expended in the
> absence of a stay are not enough.  The possibility that adequate compensatory or
> other corrective relief will be available at a later date, in the ordinary course of
> litigation weighs heavily against a claim of irreparable harm.

*Id.* (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925

(1958)).  Importantly, "if the movant makes no showing of irreparable injury, 'that alone is

sufficient' for a district court to refuse to grant preliminary injunctive relief."  *Sociedad Anonima*

*Viña Santa Rita*, 193 F. Supp. 2d at 14 (quoting *CtyFed Fin.*, 58 F.3d at 747); *see also Wisconsin*

*Gas*, 758 F.2d at 674 ("We believe that analysis of [irreparable harm] disposes of these motions

and, therefore, address only whether the petitioners have demonstrated that in the absence of a

stay, they will suffer irreparable harm.").

Upon a searching examination of the arguments presented, the facts adduced, and the

relevant preliminary injunction factors, the Court concludes that Plaintiffs are unable to meet the

requirements necessary to obtain preliminary injunctive relief.

   1. <u>Substantial Likelihood of Success on the Merits</u>

    i. *The Parameters of NEPA*

As set forth *supra*, due to Plaintiffs' inability to establish standing on certain issues,

Plaintiffs' sole remaining claim is Count III of Plaintiffs' First Amended Complaint, which

alleges that

> [b]y creating a fee-for-service ante-mortem horse slaughter inspection system
> without first conducting any environmental review under the National
> Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, USDA has violated NEPA

> and the CEQ's implementing regulations, abused its discretion, and acted
> arbitrarily and capriciously in violation of the Administrative
> Procedure Act, 5 U.S.C. § 706(2).

*See* First Am. Compl. ¶ 98.  NEPA, "the basic national charter for protection of the

environment," 40 C.F.R. § 1500.1(a), requires that federal agencies take a "hard look" at the

environmental consequences of its projects before taking action.  42 U.S.C. § 4332(C); *Marsh v.*

*Or. Natural Res. Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989);

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76

L.Ed.2d 437 (1983).  Pursuant to NEPA, an environmental impact statement ("EIS") must be

prepared for "major Federal actions significantly affecting the quality of the human environment .

. . ."  42 U.S.C. § 4332(C); *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 371 (D.C. Cir.

1999).  The EIS must include "a detailed statement" regarding:

> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the
> proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the
> maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be
> involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C)(i)-(v).  In situations where an EIS is required, the agency is required to

prepare "a concise public record of decision" that describes the factors it considered in making its

decision, and must identify "all alternatives considered by the agency in reaching its decision,

specifying the alternative or alternatives which were considered . . . ."  40 C.F.R. § 1505.2;

*Corridor H*, 166 F.3d at 371.  The agency must "identify and discuss all such factors including

any essential considerations of national policy which were balanced by the agency in making its

decision . . . ." *Id.*

"[T]he statute requires that agencies assess the environmental consequences of federal projects by following certain procedures during the decision-making process." *Id.* Ultimately, NEPA has twin aims. "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co.*, 462 U.S. at 97, 103 S.Ct. 2246. "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Id.* Accordingly, NEPA's "mandate 'is essentially procedural.'" *City of Alexandria, VA v. Slater*, 198 F.3d 862, 866 (D.C. Cir. 1999) (citation omitted); *North Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980) (NEPA requirements are essentially procedural and a court should not substitute its own policy judgment for that of the agency). "NEPA merely prohibits uninformed – rather than unwise – agency action." *Robertson v. Methow Valley Citizen's Council*, 490 U.S. 332, 351, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Compliance with the procedural requirements themselves, however, is not discretionary and a court may review the decision to forego production of an EIS. *Kleppe v. Sierra Club*, 427 U.S. 390, 420, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

Because NEPA provides no private right of action, Plaintiffs claims have been brought under the APA. *See* 5 U.S.C. § 706(2)(A); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004); *Tulare Co. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). As such, "[t]he Court's role in reviewing a challenge to an agency's compliance with NEPA is limited to ensuring 'that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'" *Valley Ctmy. Pres. Comm'n v. Mineta*, 231 F. Supp. 2d 23, 39 (D.D.C. 2002) (quoting *Baltimore Gas &*

*Elec. Co.*, 462 U.S. at 97-98, 103 S.Ct. 2246). "While deferential, a court must thoroughly

review an agency's decision and may not 'rubber stamp' decisions that are inconsistent with

statutory mandate or congressional policy." *Gov't of the Province of Manitoba v. Norton*, 398 F.

Supp. 2d 41, 54 (D.D.C. 2005).

ii.    *The Arguments at Issue*

Here, Plaintiffs claim – and Defendants do not contest – that the USDA did not undertake

a NEPA review, nor did they prepare any NEPA document addressing the environmental impact

associated with its issuance of the Interim Final Rule. *See* Pls.' Mot. for Prelim. Inj. at 33-34;

Defs.' Opp'n at 26-27 & n.10; Pls.' Reply at 21-24. Plaintiffs contend that a NEPA review and

record of decision was required in this case, as the Interim Final Rule is "unquestionably a 'major

federal action' in that it creates an entirely new federal regulatory system for horse inspection that

will allow horse slaughter to continue past the date that Congress intended it to stop." Pls.' Mot.

for Prelim. Inj. at 33 (citing 40 C.F.R. § 1508.18 (requiring environmental analysis for "*new and

continuing activities*, including projects and programs entirely or partially financed, assisted,

conducted, regulated, or approved by federal agencies") (emphasis added by Plaintiffs).

Moreover, Plaintiffs suggest that the Interim Final Rule has "severe impacts on the 'quality of the

human environment'" by allowing the horse slaughter – including the slaughter of wild horses –

to continue, which affects "those who live near or adjacent to the plants, and who suffer severe

environmental, aesthetic, and health harms on a daily basis." *Id.* at 33-34.

In response, Defendants argue that pursuant to the USDA's NEPA implementing

regulations, specifically 7 C.F.R. § 1b.4(b)(6) (Exclusion of Agencies), "FSIS is excluded from

having to prepare any specific FSIS NEPA implementing regulations, but also, since all of FSIS'

18

actions are categorically excluded, FSIS is excluded from having to prepare an Environmental

Assessment ('EA') or an Environmental Impact Statement ('EIS') unless the Administrator of

FSIS determines that an agency action will have a significant environmental effect."  Defs.'

Opp'n at 26-27.  Section 1b.4 provides that "[t]he USDA agencies and agency units listed in

paragraph (b) of this section conduct programs and activities that have been found to have no

individual or cumulative impact on the human environment."  7 C.F.R. § 1b.4(a).  Subsection

(b)(6) lists the "Food and Safety Inspection Service" – the agency currently at issue in this case.

*See* 7 C.F.R. § 1b.4(b)(6).  USDA agencies and agency units such as the FSIS are specifically

"excluded from the requirements of preparing procedures to implement NEPA" and "are

categorically excluded from the preparation of an EA or EIS unless the agency head determines

that an action may have a significant environmental effect."  7 C.F.R. § 1b.4(a).  Accordingly,

Defendants contend that a NEPA review and EA or EIS would not be "arbitrary and capricious"

in this instance, as (1) "[h]istorically[] FSIS has never prepared an EA or EIS when determining

whether to grant, withdraw, or transfer a grant of Federal meat inspection"; (2) "the Agency

could still reasonably determine that, pursuant to that USDA NEPA implementing regulation, the

ante-mortem inspection Interim Final Rule at issue here would be categorically excluded from

environmental analysis since the Rule is concerned only with discretionary financial decisions,

i.e., how to pay the costs of such inspections and activities that deal solely with the funding of

programs, which are categorically excluded from the preparation of EA's and EIS's under 7

C.F.R. § 1b.3(a)(2)"; and (3) the FSIS Administrator could still appropriately evaluate and

determine that the Interim Final Rule has no individual or cumulative effects on the environment,

as it merely continues a long-standing program and activity, merely preserving the current

19

identical status quo with its negligible environmental impact. Defs.' Opp'n at 27 n.10.

iii.    <em>Analysis</em>

Upon a consideration of the arguments presented and the relevant case law, it is plain that

Plaintiffs cannot satisfy their burden to show a *substantial* likelihood of victory on the merits *at*

*this stage* for two central reasons. First, as a preliminary matter, the Court notes that "[w]hen a

party seeks review of agency action under the APA, the district court judge sits as an appellate

tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*,

269 F.3d 1077, 1083 (D.C. Cir. 2001) (citations omitted). Due to the district court's typical need

for a full and complete record, "[a]lthough a motion for preliminary injunction against an agency

is not always appropriate, the better course is to rule on the merits of the substantive issues at a

later date, particularly where allegations of irreparable injury are lacking at this stage." *Emily's*

*List v. Fed. Elec. Comm'n*, 362 F. Supp. 2d 43, 53 (D.D.C. 2005), *aff'd*, App. No. 05-5160 (D.C.

Cir. Dec. 22, 2005) (mandate affirming) (citing *Am. Bioscience, Inc.*, 269 F.3d at 1083-84 & nn.

7-8). While it is not true that "a motion for preliminary injunction against an agency is never

appropriate," *Am. Bioscience, Inc.*, 269 F.3d at 1084 n.7, a motion for a preliminary injunction is

best left to circumstances where the record is clear as to irreparable injury and where the agency

record is sufficiently complete, full, and uncontested such that a court can review the true extent

of the agency's decision-making process in light of the "arbitrary and capricious" standard.

Here, despite five filings by the parties currently before the Court, the record is quite

unclear in many respects. For instance, while it is clear that the FSIS did not prepare an EA or

EIS in conjunction with the Interim Final Rule, nor did the FSIS even consider the environmental

impact of the Interim Final Rule in any way given its position that its programs have no

20

individual or cumulative environmental impact, it is not clear (1) if and when the FSIS actually

made an affirmative decision that all of its programs were exempt from environmental analysis,

or (2) if pursuant to 7 C.F.R. § 1b.4(b)(6), the FSIS simply assumed that it was always exempt

from the requirements of NEPA. Defendants' argument seems to suggest that the FSIS at least

periodically considered whether its programs had a "significant environmental impact," and each

time rejected such a possibility. For instance, Defendants point out "FSIS has time and again

evaluated and determined that such programs and activities have no individual or cumulative

effect on the environment and thus are categorically excluded from the requirement related to

preparation of an EA or EIS." Defs.' Opp'n at 27 n.10; *see also* Defs.' Surreply at 3 ("The

critical point here is that the USDA has already made a determination that the FSIS's actions and

activities do not require any particular NEPA documentation because those actions and activities,

in fact, do not have any environmental consequences necessitating NEPA analysis.").

Accordingly, there appears to be at least some history and record of agency deliberation

regarding the environmental impact of its policies that is simply not before the Court at this time,

making any definitive assessment of the agency's conduct in light of an "arbitrary and

capricious" standard nearly impossible and prone to error. This gap in the record, which is

merely emblematic of other, larger gaps wherein relevant facts and argument are dealt with in a

more cursory manner due to the relevant time constraints, highlights the problems with Plaintiffs'

choice to style their action as a motion for a preliminary injunction and significantly dampens

their ability to make a showing of a substantial likelihood of victory on the merits.

   Second, given the limited briefing on the NEPA issue and the somewhat incomplete

record relating to the FSIS's actions with respect to NEPA, it is unclear at this time which party

will ultimately prevail with respect to this claim. However, what is clear at this time is that Plaintiffs have not shown a "substantial" likelihood of victory on the merits. Defendants are correct that the FSIS is typically excluded from the requirements of preparing procedures to implement NEPA and produce an EA or EIS, *see* 7 C.F.R. § 1b.4(b)(6); however, such an exemption is inappropriate if "the agency head determines that an action may have a significant environmental effect," *id.* § 1b.4(a). Defendants are also correct that the Interim Final Rule is similar to "[a]ctivities which deal solely with the funding of programs, such as program budget proposals, disbursements, and transfer or reprogramming of funds" – activities "which have been determined not to have a significant individual or cumulative effect on the human environment and are excluded from the preparation of" EA's or EIS's. *See* 7 C.F.R. § 1b.3(a)(2). However, such "categorical exclusions" are likewise inapplicable in certain circumstances, as "agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action." *Id.* § 1b.3(c). Indeed, the USDA's own regulations stress that "[a]gencies shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion." *Id.*

Upon a review of the arguments presented, it is clear that Plaintiffs are correct that, to the extent that Defendants seek shelter pursuant to 7 C.F.R. § 1b.3(a)(2), they cannot do so at this time. By Defendants' own admission, they did not even consider engaging in NEPA compliance irrespective of any potential impacts associated with the Interim Final Rule. *See* Defs.' Opp'n at 26-27 & n.27. As such, Defendants made no contemporaneous determinations as to whether the Interim Final Rule falls within or without any categorical exclusions under 7 C.F.R. § 1b.3. Courts have long held that invocation of the categorical exclusion for the first time by counsel

after a complaint is filed is a *post hoc* rationalization that is an inadequate basis for APA review. *See, e.g.*, *Edmonds Inst. v. Babbitt*, 42 F. Supp. 2d 1, 18-19 (D.D.C. 1999) (rejecting invocation of categorical exclusion where the agency "could not reasonably have found" that its action would have insignificant effects on the environment); *Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 481 (D.D.C. 1994) (rejecting categorical exclusion where administrative record failed to reflect justification for categorical exclusion was considered); *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 150-51 (D.D.C. 1993) (contemporaneous determination required, and *post hoc* rationalization cannot be considered for review); *see also California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) ("'An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious.' It is difficult for a reviewing court to determine if the application of an exclusion is arbitrary and capricious where there is no contemporaneous documentation to show that the agency considered the environmental consequences of its action and decided to apply a categorical exclusion to the facts of a particular decision.") (internal citation omitted). Therefore, while Defendants might well have accurately claimed that the ante-mortem Interim Final Rule at issue would have been categorically excluded from environmental analysis under 7 C.F.R. § 1b.3(a)(2) because the Rule is apparently concerned only with discretionary financial decisions, such a claim cannot be asserted at this time because it is uncontested that Defendants did not consider such an exemption at the time the Interim Final Rule was promulgated.

Aside from Defendants' 7 C.F.R. § 1b.3 argument, which Plaintiff has effectively refuted at this point, Plaintiff has yet to show a substantial likelihood of victory on the merits of two

central defenses put forth by the FSIS.  First, as noted above, 7 C.F.R. § 1b.4(b)(6) specifically

excludes the FSIS "from the requirements of preparing procedures to implement NEPA" and

from promulgating an EA or EIS "unless the agency head determines that an action may have a

significant environmental effect."  The question left unanswered by the parties following this

round of filings is the allocation of the burden under 7 C.F.R. § 1b.4 – specifically, does the

regulation presume exemption of the FSIS's programs and require no action whatsoever unless

and until the agency head makes an affirmative determination that an action may have a

significant environmental impact, or does 7 C.F.R. § 1b.4 simply allow the FSIS to escape

certain requirements[3] but still ensures that an agency head's affirmative or tacit determination

that no "significant impact" is likely can still be reviewed under the "arbitrary and capricious"

standard of review?  Neither party has provided a convincing, definitive answer regarding these

differing interpretations.  Second, Plaintiff has yet to effectively respond to Defendants'

argument that the Interim Final Rule simply maintains the status quo ante by continuing the

USDA's ongoing and long-standing requirement to do ante-mortem meat inspection through the

establishment of a fee-for-service program.  Numerous cases within this jurisdiction have held

that NEPA's procedural requirements are not triggered where an action simply maintains the

status quo.  *See, e.g.*, *Comm. for Auto Responsibility v. Solomon*, 603 F.2d 992, 1002-03 (D.C.

---

[3] For instance, should an agency initially determine under NEPA that there is a major
federal action but that the major action does not have a "significant impact" on the environment,
the agency must support that finding with a "concise public document" called an "environmental
assessment."  40 C.F.R. § 1501.4.  If the environmental assessment confirms that the action does
not have a "significant impact" on the environment, the agency must issue a Finding of No
Significant Impact ("FONSI").  40 C.F.R. § 1508.13.  It is possible to read 7 C.F.R. § 1b.4 as
simply allowing the FSIS and the other relevant agencies to avoid these steps if the agency head
does not make a determination that a significant environmental impact is likely.

Cir. 1979) (citing cases). For instance, in *Committee for Auto Responsibility*, the D.C. Circuit

held that:

> The duty to prepare an EIS normally is triggered when there is a proposal to
> change the status quo. GSA has clearly shown in the information provided in its
> environmental analysis that the current leasing of the Great Plaza area to a parking
> management firm does not alter the status quo ante. Without a change in parking
> policy concerning the Great Plaza area there is no proposal for major federal
> action significantly affecting the environment. To compel GSA to formulate an
> EIS under these circumstances would trivialize NEPA's EIS requirement and
> diminish its utility in providing useful analysis for major federal actions that truly
> affect the environment.

*Id.* Given that – at first glance – it appears that the Interim Final Rule essentially continues

FSIS's existing practice with respect to the relevant slaughterhouses, Plaintiffs have not at this

stage of the litigation provided an adequate response as to why a NEPA review is required in this

instance.

Ultimately, given the apparent gaps in the present agency record and significant questions

regarding the soundness of Plaintiffs' overall position with respect to the application of NEPA in

the present circumstances, the Court concludes that Plaintiffs are unable to establish a

"substantial likelihood of victory on the merits" at this time. Accordingly, Plaintiffs' ability to

obtain a preliminary injunction is significantly – if not fatally – weakened. *See Davenport*, 166

F.3d at 366.

2.    Irreparable Harm

The second, and perhaps most important, factor that a party must establish in order to

sustain a motion for a preliminary injunction is a showing of irreparable harm. *See CityFed Fin.*

*Corp.*, 58 F.3d at 747 ("the basis for injunctive relief in the federal courts has always been

irreparable harm"). Moreover, the irreparable harm at issue must not be theoretical; rather, it

must be both "certain and great." *Wisconsin Gas Co.*, 758 F.2d at 674-75.  The harm must be "of

such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable

harm." *CityFed Fin. Corp.*, 58 F.3d at 747 (citation omitted).  Upon a consideration of the

impact of the Interim Final Rule on Plaintiffs, it is clear that Plaintiffs cannot satisfy the stringent

standards necessary to meet the "irreparable harm" requirement.

Importantly, Plaintiffs' request for a preliminary injunction actually seeks to change the

status quo in this case – to end a program under which, for approximately thirty (30) years,

facilities in this country have engaged in the slaughter of horses and the processing of horsemeat

for consumption without the amendment or repeal of the underlying authorizing statute.  Such a

request for a preliminary injunction under these circumstances is highly atypical, as this Court

noted previously, pointing out that "[t]he purpose of a preliminary injunction is merely to preserve

the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas*, 451 U.S.

at 395, 101 S.Ct. 1830.  Indeed, if an injunction is not granted in this case, the existing system

continues as it has for decades.  Moreover, the sheer longevity of the existing program essentially

refutes Plaintiffs' irreparable injury arguments; while it might be true that the existing program

does ultimately have some environmental impact, Plaintiffs have been subjected to that impact

for nearly three (3) decades at present.  Given that the "harms" identified by Plaintiffs have

occurred as long as the identified slaughterhouse plants have been in operation, Plaintiffs' current

injuries for which they may have standing simply lack the kind of magnitude, immediacy, and

imminence as is necessary to establish the need for a preliminary injunction.

3.    <u>Harm to Defendants</u>

Moreover, a party seeking a preliminary injunction is charged with establishing that the

26

"preliminary injunction will harm neither the defendants nor any other interested party." *Cortez III Serv. Corp. v. Nat'l Aeronautics & Space Admin.*, 950 F. Supp. 357, 363 (D.D.C. 1996). Indeed, "courts should be hesitant to issue an injunction if such actions would have a harmful effect on other persons. 'Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents.'" *Mt. Airy Refining Co. v. Schlesinger*, 481 F. Supp. 257, 284 (D.D.C. 1979) (citing *Virginia Petroleum Jobbers Ass'n*, 259 F.2d at 925). Here, it is clear that a preliminary injunction in favor of Plaintiffs would cause substantial harm to both the Applicant Defendant-Intervenors and a myriad of third-parties.

Indeed, in contrast to Defendants' alleged harm, which has remained static for roughly thirty (30) years, Applicant Defendant-Intervenors face harm that is "both certain and great." The harm is certain: without ante-mortem inspection of horses, Applicant Defendant-Intervenors and others in their industry cannot slaughter the animals and legally ship their meat in this country or to their customers abroad. *See* Beltex Decl. ¶ 8; Dallas Crown Decl. ¶ 8; Cavel Decl. ¶ 7. Moreover, the harm is also great: Applicant Defendant-Intervenors face a significant financial loss if the existing program were to be enjoined. *See* Beltex Decl. ¶ 8; Dallas Crown Decl. ¶¶ 7-8; Cavel Decl. ¶¶ 6-7. Applicant Defendant-Intervenors operate multi-million dollar facilities which, while profitable, are also expensive to maintain – a financial burden that becomes even greater if the companies are forced to temporarily shut down operations. *See* Cavel Decl. ¶ 12; Beltex Decl. ¶ 10. Moreover, long-standing customers in Europe depend upon the meat and meat products that these companies provide and produce on a daily basis. *See* Beltex Decl. ¶ 3; Dallas Crown Decl. ¶¶ 3, 9-10. Moreover, none of these companies has the

27

ability to adapt its facilities to process, for instance, cattle or the ability to sustain its current operations if it were to attempt to process "exotic animals" such as elk, deer, or water buffalo. *See* Beltex Decl. ¶ 8; Cavel Decl. ¶ 8.

In addition to Applicant Defendant-Intervenors and others within their industry, numerous third parties would also be significantly injured by the issuance of a preliminary injunction in this case. For instance, hundreds of employees may well have their jobs affected or destroyed if a preliminary injunction is issued in this case. *See* Beltex Decl. ¶¶ 6-8; Cavel Decl. ¶ 10; Dallas Crown Decl. ¶ 11. Moreover, both zoos and research institutions would be negatively impacted. Zoos rely heavily on the products of Applicant Defendant-Intervenors' facilities to supplement animal diets across the country, and attach importance to sourcing their meat-based animal diets from USDA-inspected facilities because of the assurance that stringent animal welfare and food safety requirements have been met. *See* Beltex Decl. ¶ 3; Dallas Crown Decl. ¶¶ 3, 9-10. Pharmaceutical industries, universities, and other institutions also use Applicant Defendant-Intervenors' facilities for research, often conducting training for veterinary students and medical studies. *Id.* These parties, in addition to those within the industry itself, would also suffer significant harm were a preliminary injunction issued at this point halting existing operations. Given these real, certain, and substantial harms, it is clear that the balance of harms weighs in favor of denying at this time Plaintiffs' request for the extraordinary remedy of a preliminary injunction.

### 4.    Public Interest

The final factor that a Court weighing a motion for emergency injunctive relief must consider is whether the public interest would be furthered by the injunction. *See Mova Pharm.*

28

*Corp.*, 140 F.3d at 1066 (citing *CityFed Fin. Corp.*, 58 F.3d at 746).  Here, Plaintiffs contend that injunctive relief is in the public interest given the fact that it is in the public's interest to halt "the inhumane nature of horse slaughter and transport to slaughter."  Pls.' Mot. for Prelim. Inj. at 42. Thereafter, Plaintiffs and Defendants engage in a debate regarding the true intentions of Congress in amending the FY 2006 Agricultural Appropriations Act, and how to best serve those intentions.  *Compare id.* at 42-43 *with* Defs.' Opp'n at 37-38.

Ultimately, it appears that the public interest is in equipoise, with strong arguments on both sides.  Based on the evidence and declarations presented by Plaintiffs, it is clear that the current process is, in many ways, less than ideal, bringing with it significant issues regarding the conditions which these horses face and the humaneness with which their lives are ended.  On the other hand, the public certainly has an interest in ensuring that meat and meat products produced in this country are "wholesome, not adulterated, and properly marked, labeled and packaged."  42 U.S.C. § 602.  The public has an interest in ensuring that foreign markets, where they exist, are maintained and that livestock producers of meat, processors of meat, and consumers be treated in a fair and equitable manner with respect to their interests.  Given these factors, and the apparently competing interests between Congress, which has taken a half-step to eliminate the existing programs, and the USDA, which has acted to preserve those same schemes, the Court cannot say that Plaintiffs have established that the public interest would be best served through a preliminary injunction in this case.  Accordingly, Plaintiffs have once again failed to make a required element necessary to establish the basis for a preliminary injunction in this matter.  As such, given the numerous problems and inadequacies with Plaintiffs' position at present, the Court shall deny Plaintiffs' Motion for a Preliminary Injunction.

**IV: CONCLUSION**

For the aforementioned reasons, the Court shall DENY [4] Plaintiffs' Motion for a

Temporary Restraining Order and for a Preliminary Injunction, and Request for a Hearing.

Furthermore, the Court shall *sua sponte* dismiss Claim 1 and Claim 2 of Plaintiffs' [3] First

Amended Complaint for lack of jurisdiction.  An Order accompanies this Memorandum Opinion.


Date:  March 14, 2006


                                             /s/
                                    COLLEEN KOLLAR-KOTELLY
                                    United States District Judge