UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

**THE HUMANE SOCIETY**                )
**OF THE UNITED STATES, ET AL.**       )
                                        )
                                        )    Civ. No. 1:06CV00265 (CKK)
            Plaintiffs,                 )
       v.                               )
                                        )
**MIKE JOHANNS, ET AL.**                )
                                        )
            Defendants.                 )
_____)

**PLAINTIFFS' MOTION UNDER FED. R. CIV. P. 54(b) FOR
RECONSIDERATION OF THE COURT'S *SUA SPONTE* DISMISSAL OF CLAIMS
ONE AND TWO OR, IN THE ALTERNATIVE, FOR CERTIFICATION
OF THOSE CLAIMS FOR IMMEDIATE APPELLATE REVIEW,
<u>AND REQUEST FOR AN EXPEDITED HEARING</u>**

Pursuant to Fed. R. Civ. P. 54(b), plaintiffs hereby respectfully request that the Court

reconsider that aspect of its March 14, 2006 Memorandum Opinion and Order which dismissed *sua*

*sponte* plaintiffs' claims 1 and 2.  In the alternative, plaintiffs request that the Court certify the

dismissal of these claims for immediate appellate review.  The reasons for the motion are fully set

forth in the accompanying memorandum.  In addition, because the agency action at issue responds

to a statutory restriction that will expire at the end of this fiscal year, and because plaintiffs have not

previously had the opportunity to be heard regarding the specific reasons for the Court's dismissal

of claims 1 and 2, plaintiffs also respectfully request an expedited hearing on this motion.

Plaintiffs' counsel has conferred with counsel for defendants and intervenors concerning this

motion, and they have authorized plaintiffs' counsel to state the following positions.  Federal

defendants' counsel has indicated that federal defendants will present their position on this motion

within two days of the filing of the motion.  Intervenors' counsel has indicated that intervenors will

advise the Court regarding their position on the motion after reviewing the motion.

Respectfully submitted,


/s/_____
Eric R. Glitzenstein
D.C. Bar No. 358287
Ethan Carson Eddy
D.C. Bar No. 496406
Howard M. Crystal
D.C. Bar No. 446189

Meyer Glitzenstein & Crystal
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206

Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)

Jonathan R. Lovvorn
(D.C. Bar No. 461163)

The Humane Society of the
United States
2100 L St., N.W.
Washington, D.C.  20037
(202) 676-2333

March 24, 2006                              Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

THE HUMANE SOCIETY                    )
OF THE UNITED STATES, ET AL.          )
                                      )
                                      )       Civ. No. 1:06CV00265 (CKK)
            Plaintiffs,               )
      v.                              )
                                      )
MIKE JOHANNS, ET AL.                  )
                                      )
            Defendants.               )
_____)

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION UNDER
FED. R. CIV. P. 54(b) FOR RECONSIDERATION OF THE COURT'S *SUA SPONTE*
DISMISSAL OF CLAIMS ONE AND TWO OR, IN THE ALTERNATIVE,
FOR CERTIFICATION OF THOSE CLAIMS FOR IMMEDIATE APPELLATE
REVIEW, AND REQUEST FOR AN EXPEDITED HEARING**

Of Counsel:

REBECCA G. JUDD
JONATHAN R. LOVVORN
THE HUMANE SOCIETY OF THE UNITED
STATES
2100 L. St., N.W.
Washington, DC  20037
(202) 676-2333

ERIC R. GLITZENSTEIN
ETHAN CARSON EDDY
HOWARD M. CRYSTAL

MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, DC  20009
(202) 588-5206
(202) 588-5049 (fax)

**TABLE OF CONTENTS**

                                                                                        **PAGE**

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.      THE COURT SHOULD RECONSIDER ITS *SUA SPONTE*
        DISMISSAL UNDER RULE 54(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      Plaintiffs Are Not Only "Arguably" Within The "Zone
                Of Interests" Of The FY2006 Amendment, They Represent
                The Very Interests That The Authors And Sponsors Sought
                To Advance In Introducing And Explaining That Legislation.  . . . . . . . . 12

        B.      Plaintiffs Also Have Prudential Standing to Pursue Their
                Claim That USDA Violated the Notice and Comment
                Requirements of 5 U.S.C. § 553, Because § 553 Is Itself A
                Substantive Statute, The Violation Of Which Serves As the
                Gravamen of Plaintiffs' First Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        C.      Plaintiffs Are Also Within the Zone of Interests of the Federal
                Meat Inspection Act Provisions Whose Violations Form The Basis
                For Plaintiffs' Second Claim.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II.     IN THE ALTERNATIVE, THE COURT SHOULD CERTIFY THE
        DISMISSED CLAIMS FOR IMMEDIATE APPELLATE REVIEW
        UNDER RULE 54(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **PAGE**

Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,
    789 F.2d 931 (D.C. Cir. 1986) .................................................. 16, 27

Aiken v. Obledo,
    442 F. Supp. 628 (E.D. Cal. 1977) ............................................. 21

Air Courier Conference v. American Postal Workers Union,
    498 U.S. 517 (1991) ................................................................ 28

American Medical Association v. Reno,
    57 F.3d 1129 (D.C. Cir. 1995) ................................................... 20

Animal Legal Defense Fund v. Glickman,
    154 F.3d 426 (D.C. Cir. 1998) ......................................... 7, 10, 11, 12, 16, 27

Animal Welfare Institute v. Kreps,
    561 F.2d 1002 (D.C. Cir. 1977) .................................................. 26

A.S.P.C.A. v. Ringling Brothers And Barnum & Bailey Circus,
    317 F.3d 334 (D.C. Cir. 2003) ................................................... 10

Autolog Corp. v. Regan,
    731 F.2d 25 (D.C. Cir. 1984) .................................................... 11

Barlow v. Collins,
    397 U.S. 159 (1970) ................................................................ 13

Bennett v. Spear,
    520 U.S. 154 (1997) ........................................................ 2, 11, 22, 23, 25

Building Industrial Association of Superior California v. Babbitt,
    161 F.3d 740 (D.C. Cir. 1998) ................................................... 29, 30

Bowen v. Michigan Academy of Family Physicians,
    476 U.S. 667 (1986) ................................................................ 16

Career College Association v. Riley,
    74 F.3d 1265 (D.C. Cir. 1996) ................................................... 20

Center for Automobile Safety, Inc. v. National Highway Traffic Safety Admin.,
       342 F. Supp. 2d 1 (D.D.C. 2004) .................................................................. 19

Chocolate Manufacturers Association v. Block,
       755 F.2d 1098 (4th Cir. 1985) ................................................................... 20

Clarke v. Securities Industry Association,
       479 U.S. 388 (1987) .................................................................................. 11

Cobell v. Norton,
       224 F.R.D. 266 (D.D.C. 2004) .................................................................. 9

Department of Transportation v. Public Citizen,
       541 U.S. 752 (2004) .................................................................................. 24

Dismas Charities, Inc. v. U.S. Dep't of Justice,
       401 F.3d 666 (6th Cir. 2005) .................................................................... 20

Duke City Lumber Co. v. Butz,
       382 F. Supp. 362 (D.D.C. 1974) ............................................................... 24

Grand Council of the Crees v. FERC,
       198 F.3d 950 (D.C. Cir. 2000) .............................................................. 7, 10

Halverson v. Slater,
       206 F.3d 1205 (D.C. Cir. 2000) ................................................................ 16

JEM Broadcasting Co., Inc. v. Federal Communications Commission,
       22 F.3d 320 (D.C. Cir. 1994) .................................................................... 19

Judicial Watch, Inc. v. United States Senate,
       432 F.3d 359 (D.C. Cir. 2005) ............................................................ 11, 15

Lincoln v. Vigil,
       508 U.S. 182 (1993) .................................................................................. 20

Mistick PBT v. Chao,
       ___ F.3d ___, 2006 WL 664200 (D.C. Cir. March 17, 2006) ...................... 16

Mova Pharmaceutical Corp. v. Shalala,
       140 F.3d 1060 (D.C. Cir. 1998) ................................................................ 12

National Soft Drink Association v. Block,
       721 F.2d 1348 (D.C. Cir. 1983) ................................................................ 20

National Petrochemical & Refiners Association v. E.P.A.,
   287 F.3d 1130 (D.C. Cir. 2002) ................................................................... 28

National Wrestling Coaches Association v. U.S. Department of Education,
   263 F. Supp. 2d 82 (D.D.C. 2003) ............................................................... 19

Petties v. District of Columbia,
   227 F.3d 469 (D.C. Cir. 2000) ..................................................................... 29

Shrader v. CSX Transport, Inc.,
   70 F.3d 255 (2d Cir. 1995) ............................................................................ 9

Singh v. George Washington University,
   383 F. Supp. 2d 99 (D.D.C. 2005) ................................................................. 8

In re Ski Train Fire in Kaprun, Austria, on November 11, 2004,
   224 F.R.D. 543 (S.D.N.Y. 2004) .............................................................. 9, 10

South Hills Health System v.Bowen,
   864 F.2d 1084 (3d Cir. 1988) ...................................................................... 19

Spirit of the Sage Council v. Norton,
   294 F. Supp. 2d 67 (D.D.C. 2003) ............................................................... 24

Taylor v. Federal Deposit Insurance Co.,
   132 F.3d 753 (D.C. Cir. 1997) ..................................................................... 29

Yesler Terrace Community Council v. Cisneros,
   37 F.3d 442 (9th Cir. 1994) ........................................................... 21, 22, 23

## FEDERAL STATUTES

5 U.S.C. § 552 .................................................................................................. 21

5 U.S.C. § 553 ........................................................................................... passim

5 U.S.C. § 704 .................................................................................................. 24

5 U.S.C. § 706(2) ..................................................................................... 4, 22, 23

7 U.S.C. §§ 1901-1906 ..................................................................................... 27

16 U.S.C. § 1536(a)(2) ..................................................................................... 22

21 U.S.C. § 601 et seq .................................................................................................. 2

21 U.S.C. § 603 ............................................................................................ 25, 26, 27, 28

Pub. L. No. 85-765, 72 Stat. 862 (1958) ...................................................................... 27

Pub. L. No. 95-445, 92 Stat. 1069 (1978) .............................................................. 26, 27

Pub. L. 109-97, § 794, 119 Stat. 2164 (2005) .............................................................. 2

Fed. R. Civ. P. 54(b).........................................................................................1, 2, 3, 8, 9,
29

## LEGISLATIVE MATERIALS

151 Cong. Rec. S10,218 ........................................................................................... 13, 14

151 Cong. Rec. S10,219 ................................................................................................ 14

151 Cong. Rec. S10,220 ................................................................................................ 16

H.R. Rep. No. 95-1336 (1978), reprinted in 1978 U.S.C.C.A.N. 2650, 2653-55 ................. 27, 28

Humane Slaughtering of Livestock: Hearings on S. 1213, S. 1497 and H.R. 8303 Before the
Senate Committee on Agriculture and Forestry, 85th Cong. (1958) ................................... 27, 28

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
                                                        )
**THE HUMANE SOCIETY**                 )
**OF THE UNITED STATES, ET AL.**       )
                                                        )        Civ. No. 1:06CV00265 (CKK)
              Plaintiffs,                       )
       v.                                             )
                                                        )
**MIKE JOHANNS, ET AL.**                 )
                                                        )
              Defendants.                      )
———————————————————————— )

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION UNDER
FED. R. CIV. P. 54(b) FOR RECONSIDERATION OF THE COURT'S *SUA SPONTE*
DISMISSAL OF CLAIMS ONE AND TWO OR, IN THE ALTERNATIVE,
FOR CERTIFICATION OF THOSE CLAIMS FOR IMMEDIATE APPELLATE
REVIEW, AND REQUEST FOR AN EXPEDITED HEARING**

**INTRODUCTION**

In its March 14, 2006 Memorandum Opinion and accompanying Order, the Court dismissed

claims 1 and 2 of Plaintiffs' First Amended Complaint.  The Court decided that plaintiffs lack

prudential standing to pursue these claims based on specific reasons that were not advanced in the

briefs filed by federal defendants or intervenors.  Because the Court did not hold a hearing on

plaintiffs' motion for emergency injunctive relief, plaintiffs did not have an opportunity to address

the Court's concerns in an oral argument prior to the dismissal of their claims.

Pursuant to Fed. R. Civ. P. 54(b), plaintiffs now respectfully urge the Court to reconsider and

reinstate the dismissed claims.  The Court's ruling that plaintiffs do not even arguably fall within the

zone of interests of the statutes implicated by claims 1 and 2 overlooks important contrary precedents

and arguments.

As for claim 1 – which asserts a violation of the public notice and comment requirements of 5 U.S.C. § 553 – under that provision, any "interested person," id., may bring such a claim so long as it meets Article III requirements (as do plaintiffs here). Accordingly, plaintiffs have been unable to locate a single D.C. Circuit ruling that has ever dismissed, or affirmed the dismissal, of a notice and comment claim on "zone of interests" grounds.

As for claim 2 – which asserts that the final rule under review is arbitrary, capricious, or not in accordance with law in light of several substantive statutes – there is compelling evidence, unaddressed in the Court's ruling, that plaintiffs' interests fall not only "arguably," but squarely, within the zone of interests sought to be protected by the statutes invoked by plaintiffs. Bennett v. Spear, 520 U.S. 154, 175 (1997) (internal citation omitted). In particular, the legislative history of the recently enacted amendment, Pub. L. 109-97, § 794, 119 Stat. 2164 (2005), is replete with references to the Congressional authors' and sponsors' intentions to address the precise interests of the very plaintiffs who are before the Court – i.e., humane organizations as well as individuals and members of organizations who live in close proximity to the horse slaughter plants. Moreover, since the Federal Meat Inspection Act, 21 U.S.C. § 601 et seq. ("FMIA"), was enacted in part to promote the humane treatment of animals, see id. at § 603(b), plaintiffs fall within the zone of interests of that statute as well.

Nonetheless, while plaintiffs believe that the Court's dismissal overlooks important arguments and precedents, if, for whatever reason, the Court cannot consider plaintiffs' reconsideration request expeditiously, or denies that request, plaintiffs respectfully request that the Court, at minimum, direct the entry of final judgment as to claims 1 and 2 pursuant to Fed. R. Civ. P. 54(b), so that plaintiffs may take a prompt appeal of the Court's dismissal. Since these claims are

distinct from the claim that remains in the case – which involves an asserted violation of the National Environmental Policy Act ("NEPA") – and in view of the fact that the legislation at issue applies only during this fiscal year, there is "no just reason for delay" in permitting plaintiffs to at least pursue an appeal of the Court's dismissal of two of plaintiffs' claims.  Fed. R. Civ. P. 54(b).

Finally, plaintiffs request an expedited hearing on this motion.  The FY2006 legislation suspending funding for inspections – and hence the rule under review – only extends through the remainder of this fiscal year, i.e., October 1, 2006.  Accordingly, if the Court is incorrect regarding plaintiffs' standing to pursue claims 1 and 2, then plaintiffs can only effectively pursue any relief at all for these claims if they are reinstated in the near future.  Particularly since plaintiffs did not have an opportunity to address the Court's specific concerns prior to the dismissal of two of plaintiffs' claims, plaintiffs respectfully request such an opportunity before the Court decides this motion.[1]

## **BACKGROUND**

‾‾‾‾‾‾The overall background of this case is set forth in plaintiffs' memorandum in support of their Motion for a Temporary Restraining Order and for a Preliminary Injunction (Doc. No. 4) ("Pfs. PI Mem."), and the Court's March 14, 2006 Memorandum Opinion, and hence will not be repeated here.  Of pertinence to the present motion, plaintiffs' Amended Complaint (Doc. No. 3), sets forth three claims, the first of which is that, "[b]y creating a fee-for-service ante-mortem horse inspection system without providing advance public notice and an advance opportunity to comment, USDA has violated the Administrative Procedure Act, 5 U.S.C. § 553" ("APA").  Am. Compl. ¶ 94.  The

---

[1] If the Court reinstates claims 1 and 2, plaintiffs do not intend to revive their motion for emergency injunctive relief with regard to them.  Rather, given the short duration of the FY2006 Amendment and regulation issued as a result of it, plaintiffs will ask the Court to adopt an expedited summary judgment schedule.

Complaint also specifically sets forth the general requirements of section 553 that plaintiffs alleged were flagrantly violated here – i.e., that agencies must generally publish "notice of proposed rulemaking" and "give interested persons an opportunity to participate in the rulemaking" prior to adoption of a final rule, id. at ¶ 48 (emphasis added) – and also stressed that, under the APA, a reviewing court shall "'hold unlawful and set aside' rules adopted 'without observance of procedure required by law.'" Id. at ¶ 50 (quoting 5 U.S.C. § 706(2)(D)).

The second claim asserts that the rule "violates the requirements of both the [2006] Amendment and the" FMIA, and hence that the rule should be set aside under 5 U.S.C. § 706(2)(A) of the APA, which provides that courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Am. Compl. at ¶ 96. Importantly, in addition to arguing that the rule is, in fact, in violation of these laws, the second claim states that "USDA has also violated the APA by failing to furnish any coherent or sufficient explanation in the Final Rule regarding USDA's understanding of Congress's intent in passing the Amendment." Id. Hence, in dismissing this count, the Court also dismissed plaintiffs' basic APA claim that USDA was at least obligated to furnish, at the time the rule was issued, an explanation for how the rule was compatible with Congress's intent in enacting the FY2006 legislation.

Plaintiffs' third claim – the only one that has not been dismissed – alleges that USDA violated NEPA and the Council on Environmental Quality ("CEQ") implementing regulations and hence, for that reason, also acted arbitrarily and capriciously in violation of the APA. Id. at ¶ 98.

Plaintiffs' Amended Complaint sets forth extensive standing allegations for both the organizational and individual plaintiffs, see id. at ¶¶ 3-45, including that individual plaintiffs and

organizational members reside in the immediate vicinity of the horse slaughter operations, and are directly harmed by environmental degradation associated with the plants, as well as by being exposed to the pain and suffering inflicted on the horses.  Id. at ¶¶ 5, 6, 29-45.  Of particular relevance to the Court's dismissal, the organizational plaintiffs also specifically alleged that they were instrumental in working with the sponsors of the FY2006 Amendment to win passage of the legislation.  Id. at ¶¶ 4, 16, 20.

In moving for emergency injunctive relief, plaintiffs cited extensive legislative history from the authors,  sponsors, and opponents of the FY2006 legislation explaining that the elimination of funding for federal inspections was intended to suspend the horse slaughter operations and, more specifically, that the Congressional sponsors and authors took this step to address what they perceived as the cruel treatment of horses at the horse slaughter plants, as well as the environmental degradation suffered by communities in the vicinity of the plants.  See Pfs. PI Mem. at 9-13, 24-25. Plaintiffs also filed, along with their motion, standing declarations from the individual plaintiffs – who swore that the horse slaughter operations are polluting their air and water and ruining their quality of life, see Exhs. 6, 7, 8, 17, 18, 19, 20 in Supp. of Pfs. Mot. for a Prelim. Inj., – as well as affidavits from two of the organizational plaintiffs describing their role in advocating for passage of federal legislation designed to protect horses, including the FY2006 legislation.  See, e.g., Exh. 16 at ¶ 8, Exh. 15 at ¶¶ 7-12.

In response to plaintiffs' motion, intervenors raised no standing argument at all.  The government did raise a standing argument but, as noted, it did not even mention "zone of interests" or "prudential standing."  Rather, USDA argued only that plaintiffs lacked Article III standing to pursue their claims.  See Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining

Order and Preliminary Injunction ("Def. Opp.") (Doc. 10) at 15. In particular, USDA argued that plaintiffs had not asserted a sufficient injury in fact, that plaintiffs' injuries were not traceable to USDA's actions, and that the relief sought by plaintiffs would not redress their injuries. Id. at 16-20.

In fact, the only argument made by the government that could even be construed as a "zone of interests" defense is the following:

> [t]he individual plaintiffs claim that sights, sounds, and smells from the horse slaughter plants are nuisances that interfere with their ability to obtain the full use and enjoyment of their lands and drive down their property values. Am. Compl. ¶¶ 29 - 45 and 47. However, these allegations do not constitute claims that can be properly redressed under the FMIA, the substantive statute cited by Plaintiffs, and thus, cannot serve as a proper basis for standing. The FMIA, a meat safety statute, does not specifically recognize Plaintiffs' local nuisance and property claims and, for that matter, neither does the FY 2006 Appropriations Act, a federal funding statute.

Def. Opp. at 17-18 (emphasis added). Defendants cited no authority to support this argument; nor did they clarify what they meant by "specifically recogniz[ing]" plaintiffs' claims or what that has to do with any feature of plaintiffs' standing. In any event, defendants said nothing to suggest that this argument could somehow bar plaintiffs from at least pursuing their notice-and-comment claim under 5 U.S.C. § 553.

In their reply brief, plaintiffs extensively addressed the standing issue. See Plaintiffs' March 1, 2006 Reply Memorandum ("Pfs' Reply") (Doc. 14) at 6-15. Plaintiffs devoted most of their discussion to establishing that they easily satisfied injury in fact and other Article III standing requirements – since, once again, defendants had couched their argument only in Article III terms. However, plaintiffs also addressed the zone of interests issue, albeit briefly since it was not raised by defendants or intervenors.

Plaintiffs argued that they satisfy the "'generous'" test for prudential standing, id. at 11

(quoting Animal Legal Defense Fund v. Glickman, 154 F.3d 426, 444 (D.C. Cir. 1998) (en banc))

("ALDF"), for several reasons. First, plaintiffs pointed out that they are "indisputably 'interested

parties' within the meaning of the APA's requirement for advance public notice and comment,"

which is the explicit – and only – "zone of interest" requirement for a claim under 5 U.S.C. § 553.

Pfs. Reply at 11. Second, plaintiffs explained that their "interests in halting the degradation of the

communities near the slaughter plants, and in preventing the maltreatment of many thousands of

horses sent to slaughter, are precisely the kinds of concerns that motivated Congress to enact the

2006 Amendment." Id. at 12. Third, plaintiffs noted that defendants themselves conceded that the

"federally-funded inspections conducted pursuant to the FMIA are expressly intended to prevent

inhumane treatment of animals destined for slaughter, as well as to safeguard the food supply," id.

(citing Def. Mem. at 3 n. 2), and hence that "plaintiffs' interest in preventing the maltreatment of

horses falls easily within that statute's zone of interests, as well as all of the other statutory

provisions that undergird plaintiffs' APA claims." Id.

Nonetheless, in its March 14, 2006 Opinion, the Court dismissed claims 1 and 2 on

prudential standing grounds. While recognizing that a plaintiff fails on prudential standing grounds

only if its "'interests are so marginally related to or inconsistent with the purposes implicit in the

statute that it cannot reasonably be assumed that Congress intended to permit the suit,'" Mem. Op.

at 6 (emphasis added) (quoting Grand Council of the Crees v. FERC, 198 F.3d 950, 955 (D.C. Cir.

2000)), the Court held that plaintiffs could not satisfy even this "not . . especially demanding" test.

Id.

Thus, in a footnote, the Court held that plaintiffs could not pursue their notice and comment

claim on prudential standing grounds. The Court did not address whether plaintiffs are "interested

persons" within the meaning 5 U.S.C. § 553, but, rather, suggested that plaintiffs must fall within the zone of interests of some "other statute," id. at 7 n. 2 (emphasis added), in order to bring a notice-and-comment claim.

With respect to plaintiffs' second claim, the Court found that none of the plaintiffs' injuries is within the zone of interests of either the FY2006 Amendment or the FMIA. As for the former, the Court stated that "this provision on its face effectuates only a change in federal funding which does not itself invoke the environmental, aesthetic, informational, or economic interests raised by any of the Plaintiffs in the instant case." Id. at 8 (emphasis added). The Court, however, did not discuss the purposes of the funding change, as expressed by the statute's authors and sponsors.

With regard to the FMIA, the Court did discuss one "purpose" of one of the provisions relied on by plaintiffs, id. at 9 (discussing 21 U.S.C. § 603), and found that it was "clearly that of food safety – the provision was intended to ensure that only unadulterated horse (and other meat) entered the marketplace." Id. The Court did not address plaintiffs' argument that another purpose of that and other provisions of the FMIA relied on by plaintiffs was to ensure the humane treatment of animals slated for slaughter.

## ARGUMENT

### I.     THE COURT SHOULD RECONSIDER ITS *SUA SPONTE* DISMISSAL UNDER RULE 54(b).

Fed. R. Civ. P. 54(b) "governs reconsideration of orders that do not constitute final judgments in a case." Singh v. George Washington University, 383 F. Supp. 2d 99, 101 (D.D.C. 2005). In pertinent part, the Rule provides that:

> any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . is subject to revision

<u>at any time before the entry of judgment adjudicating all the claims</u> and the rights and liabilities of all the parties.

Fed. R. Civ. P. 54(b) (emphasis added).  Hence, the Court may make revisions to its prior rulings "as justice requires," <u>Cobell v. Norton</u>, 224 F.R.D. 266, 272 (D.D.C. 2004), and the courts have held that justice may require such revision where, among other reasons, the Court has "made a decision outside the adversarial issues presented to the Court by the parties," or "has made an error not of reasoning but of apprehension" of significant factors bearing on its ruling.  <u>Id.</u> (citing <u>Bank of Waunakee v. Rochester Cheese Sales, Inc.</u>, 906 F.2d 1185, 1191 (7th Cir. 1990)).  Such "errors of apprehension" may include the Court's failure to address "controlling decisions or data that . . . might reasonably be expected to alter the conclusion reached by the court." <u>Shrader v. CSX Transp., Inc.</u>, 70 F.3d 255, 257 (2d Cir. 1995).

When these principles are applied here, plaintiffs respectfully suggest that "[j]ustice requires" that the Court revisit its *sua sponte* dismissal of plaintiffs' claims.  <u>Cobell v. Norton</u>, 223 F.R.D. at 272.  To begin with, unlike the situation in which "litigants have once battled for the court's decision," and hence, "should neither be required, nor without good reason permitted, to battle for it again," <u>In re Ski Train Fire in Kaprun, Austria, on November 11, 2004</u>, 224 F.R.D. 543, 546 (S.D.N.Y. 2004), in this case, the parties have not previously briefed, or argued, the "zone of interests" issue.  Rather, the only briefing to date has concerned plaintiffs' entitlement to emergency injunctive relief; in their briefs on that matter, intervenors said nothing about standing, and the government, while raising Article III concerns, never specifically mentioned "zone of interests" or "prudential standing."  Consequently, under these circumstances, plaintiffs' burden in demonstrating the propriety of reconsideration is not as great as it would be if the parties had already vigorously

9

litigated the zone of interests issues addressed by the Court.  See id.[2]

In any case, the two claims at issue should not be dismissed on prudential standing grounds. To place this matter in legal context, it is important to stress that a Court should generally be disinclined to dismiss any claim at this very early stage of the proceedings, and that it should be especially reluctant to do so on prudential standing grounds.

As for the general point, since the Court dismissed plaintiffs' claims prior to any summary judgment motions being filed, the very lenient standard applicable to a motion to dismiss should be applied to the claims.   Thus, the Court must assume the accuracy of plaintiffs' factual allegations. See, e.g., A.S.P.C.A. v. Ringling Bros. And Barnum & Bailey Circus, 317 F.3d 334, 336 (D.C. Cir. 2003) (internal citation omitted).  Moreover, in resolving any standing issue, the Court must assume that plaintiffs are correct on the merits of their claims.   ALDF, 154 F.3d at 441 (accepting the "plaintiffs' legal theory of this case . . . for purposes of determining Mr. Jurnove's standing").

In addition to this generally lenient standard for evaluating any standing issue at the pleading stage, the prudential standing assessment is especially generous.  As the Court has recognized, the "zone of interests test is generally considered not to be especially demanding," and hence, "'[a] plaintiff who is not itself the subject of the agency action is outside the zone of interests only if its interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  Mem. Op. at 6 (emphasis added) (quoting Grand Council of the Crees, 198 F.3d at 955).

_____

[2]  While, as the Court noted in its ruling, it is "'well established that a federal court cannot act in the absence of jurisdiction, and that jurisdictional issues may be raised by the court sua sponte,,'" Mem. Op. at n. 1 (emphasis added) (internal citation omitted), here, the Court both "raised" the zone of interests issue sua sponte, and also resolved it without further briefing or argument.

Consequently, unless the "interests to be protected by the complainant" are not even "'<u>arguably</u> within the zone of interests to be protected or regulated by the statute'" at issue, Mem. Op. at 8 (emphasis added) (quoting <u>Bennett v. Spear</u>, 520 U.S. 154, 175 (1997)), a Court should not dismiss a claim on prudential standing grounds. Indeed, the D.C. Circuit has repeatedly reaffirmed, including in an <u>en</u> <u>banc</u> ruling, that there need merely be "<u>slight</u>" evidence of Congress's intent to benefit a particular plaintiff in order for a claim to survive the prudential standing test:

> '[T]he zone of interests tests require some indicia – <u>however slight</u> – that the litigant before the court was intended to be protected, benefitted or regulated by the statute under which suit is brought. <u>Courts should give broad compass to a statute's zone of interests in recognition that this test was originally intended to <em>expand</em> the number of litigants able to assert their rights in court.</u>'

<u>ALDF</u>, 154 F.3d at 444 (italics in original; underlining added) (quoting <u>Autolog Corp. v. Regan</u>, 731 F.2d 25, 29-30 (D.C. Cir. 1984)); <u>see also</u> <u>Judicial Watch, Inc. v. United States Senate</u>, 432 F.3d 359, 365 (D.C. Cir. 2005) (Williams, concurring) ("Of course the 'zone of interests' requirement of prudential standing poses the question whether the plaintiff's interest is <u>so incongruent with the statutory purposes as to preclude an inference that Congress might have intended such a party as a challenger</u>.") (emphasis added) (citing <u>Clarke v. Securities Industry Ass'n</u>, 479 U.S. 388, 395 (1987)).

Also of critical importance here, the D.C. Circuit has specifically instructed that, in discerning whether a particular plaintiff's interests are "arguably" within the interests that Congress sought to protect, a court must look to "logic, <u>legislative history</u>, and the structure of" a statute, in order to discern the apparent "<u>purpose</u>" of the provision at issue, <u>ALDF</u>, 154 F.3d at 444 (emphasis added), and, hence, whether a particular plaintiff's interests "are among those that Congress sought to benefit . . .." <u>Id</u>. at 445. In <u>ALDF</u>, for example, the Court considered whether an individual

11

observing animals in a zoo was within the zone of interests of Animal Welfare Act provisions establishing humane standards for such animals.  In finding that he was, the Court relied heavily on statements made by the legislation's Congressional authors and sponsors, as well as Congressional hearings attended by humane organizations and others concerned with the animals' welfare.  See, e.g., id. at 444-45.  Based on these indicia of legislative intent – as well as the fact that the legislation at issue made "no sense unless one takes the interests of [] human visitors into account" – the Court concluded that the interests of the plaintiff were "among those that Congress sought to benefit" through the statute, and that he was "certainly . . . one of the individuals 'who in practice can be expected to police the interests that the statute protects.'" Id. (emphasis added) (quoting Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1075 (D.C. Cir. 1998)).

If these principles are applied here, plaintiffs' first two claims should be reinstated so that plaintiffs may pursue them on the merits.  We will address each of the statutes discussed in the Court's opinion, although, for legal reasons that will become clear during the ensuing discussion, to reinstate the two claims, the Court need only, at this time, reconsider its ruling regarding the FY2006 Amendment.

> **A.    Plaintiffs Are Not Only "Arguably" Within The "Zone Of Interests" Of The FY2006 Amendment, They Represent The Very Interests That The Authors And Sponsors Sought To Advance In Introducing And Explaining That Legislation.**

While recognizing that the zone of interests test requires the Court to consider the "purposes implicit in the statute," Mem. Op. at 6 (emphasis added; internal citation omitted), the Court simply did not apply that analysis to the FY2006 Amendment.  Rather, the Court summarily stated that the Amendment "on its face effectuates only a change in federal funding which does not in itself invoke

the" various interests raised by the Plaintiffs in the instant case." Mem. Op. at 8 (emphasis added). The Court, however, did not address – at least in its "zone of interests" discussion – any of the "purposes implicit" in the funding restriction, and whether plaintiffs' interests "arguably" fall within those purposes. If that analysis is conducted, plaintiffs' first two claims should be permitted to proceed.

As ALDF and other controlling authorities provide, the critical focus for prudential standing purposes is not just the "face" of a statutory provision, but what Congress was "arguably" seeking to accomplish through the provision – which, as set forth in ALDF, necessitates consideration of the statements of the statute's authors and sponsors and other indicia of legislative intent. See also Barlow v. Collins, 397 U.S. 159, 164 (1970) (examining legislative history for zone of interest inquiry). When those matters are scrutinized here, the only reasonable conclusion is that plaintiffs – humane organizations vitally concerned with the fate of the horses, including wild horses, who will be slaughtered, as well as individuals who live adjacent to the facilities – fall not merely "arguably," but easily, within the Amendment's core zone of interests.

As plaintiffs have previously explained – with no rebuttal by either the government or intervenors – the legislation's authors and sponsors repeatedly stated, both before and after the legislation was enacted, that, in cutting off federal funding for inspections at the horse slaughter plants, their "goal" was "simple: to end the slaughter of America's horses for human consumption overseas." 151 Cong. Rec. S10,218 (daily ed. Sept. 20, 2005) (remarks of Senate co-sponsor Ensign) (Pfs. Exh. A).[3]

---

[3]    See also id. at S10,220 (remarks of Senate co-sponsor Byrd) ("Senators Ensign and I have offered an amendment to stop the slaughter of horses for human consumption by preventing taxpayers dollars from being used to inspect the horses intended for slaughter"); id. at H4249

In turn, the authors, sponsors, and supporters sought to de-fund the horse slaughter operations for two specific reasons reflected in the legislative history. First, they believed that the horse slaughter operations were fundamentally inhumane. See, e.g., id. at H4250 (Pfs. Exh. B) (remarks of Rep. Whitfield) (describing the "not humane" "process of the captive penetrating bolt being administered by low-skilled workers"); id. at H4247 (remarks of House co-sponsor Sweeney) (describing the horses' "unnecessary pain and suffering before death" at the slaughterhouses; id. at H4250 (remarks of Rep. Moran) ("[w]e have responsibility over these beautiful creatures. They ought not to be cut up in such an inhumane way.").

Second, Congress expressly took into account the interests of residents who live near the plants – such as individual plaintiffs here – and thus are exposed to what the Congressional sponsors thought was inhumane treatment of the horses, as well as the fumes and other forms of pollution from the plants. See 151 Cong. Rec. S10,219 (Pfs. Exh. A). Indeed, lest there be any doubt as to whether these interests were considered, the Senate sponsors read into the record a letter from Kaufman, Texas Mayor Paula Bacon – who has also submitted several declarations here – bemoaning the fact that children in that community must play "with the noise of horses being sent to their deaths in the background," and also urging that action be taken because of the pollution inflicted on the city's residents. Id.

Accordingly, if the Court considers why Congress passed an extraordinary ban on federal funding of inspections (as the Court must do in addressing prudential standing), the interests in humane animal treatment and avoidance of environmental degradation that plaintiffs seek to advance

---

(remarks of House sponsor Spratt) ("This amendment in simple terms will stop the slaughter [f]or human consumption of horses . . . [their] brutal slaughter . . . is the kind of slaughter that this bill will prohibit.").

14

not only are not "<u>incongruent with the statutory purposes</u>" – which is all the Court need find for zone of interests purposes, <u>Judicial Watch</u>, 432 F.3d at 365 (Williams, concurring) (emphasis added) – but they are the <u>very interests that prompted the Congressional authors and sponsors to act</u>. Indeed, elsewhere in its ruling, the Court evidently recognized this by referring to the "<u>competing interests between Congress</u>" in suspending the inspection program "and the USDA, which has acted to preserve those same schemes . . . ." Mem. Op. at 29 (emphasis added). This appears to be a recognition by the Court that Congress <u>was</u> motivated by a desire to suspend the horse slaughter operations for the very reasons that prompted plaintiffs to file suit – which, once again, is more than sufficient for the zone of interests tests.[4]

Plaintiffs have been unable to locate a single case – in this or any other Circuit – where the very interests highlighted in the legislative history were deemed insufficient to support prudential standing. Even further, however, as plaintiffs have explained in their affidavits – again with no rebuttal either by the government or intervenors – the plaintiff humane organizations played a central role in convincing Congress to adopt the funding restriction, including by educating and mobilizing the public concerning conditions at the horse slaughter plants, and working with members of Congress to craft and enact the legislation. Indeed, in explaining the legislation, Senator Ensign stressed that:

---

[4] In its ruling, the Court characterized Congress's action as a "half-step to eliminate the existing [inspection] programs." Mem. Op. at 29. As plaintiffs have argued, however, Congress clearly believed that its de-funding "step" was sufficient to suspend the program in view of the FMIA's preexisting statutory requirement that inspections at the horse slaughter facilities could <u>only</u> be funded by federal monies. In any event, whatever the ultimate <u>merits</u> of plaintiffs' claim, the fact that Congress took <u>any</u> step at all to further plaintiffs' interests – which the Court itself has appeared to recognize – is clearly adequate for prudential standing purposes.

[o]ur amendment is good for horses. <u>That is why it is supported by many animal protection groups. The Humane Society of the United States, the American Society for the Prevention of Cruelty to Animals, the Doris Day Animal League, the American Humane Association, and the Society for Animal Protective Legislation</u> – all support our legislation.

151 Cong. Rec. S10220 (emphasis added).

Thus, a Senate co-sponsor of the legislation specifically identified five of the organizational plaintiffs as playing key roles in advocating for the Amendment. <u>See also</u> Decl. of Christopher J. Heyde (Exh. 15 in Supp. of Pfs. PI Mot.) at ¶¶ 6-12 (recounting the efforts of plaintiffs Animal Welfare Institute, Society for Animal Protective Legislation, and Doris Day Animal League to win passage of the Amendment); Decl. of Michael Markarian (Exh. 16 in Supp. of Pfs. PI Mot.) at ¶ 11. Where, as here, the plaintiffs "participat[ed] in the passage of the statute at issue," the Court of Appeals has presumed that "Congress . . . thus had the interests of such organizations clearly in view when it adopted the legislation." <u>Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler</u>, 789 F.2d 931, 939 (D.C. Cir. 1986); <u>see also</u> <u>ALDF</u>, 154 F.3d at 445 (finding zone of interests to encompass humane interests because the "Congressmen responsible for including animal exhibitions within the AWA . . . <u>acknowledged that humane societies were the moving force behind the legislation</u>").[5]

---

[5] Along these lines, it appears that, under the Court's reasoning, if plaintiffs do not fall within the zone of interests of the FY2006 Amendment, then <u>noone</u> does. In other words, if the purposes for the legislation identified by plaintiffs – <u>i.e.</u>, the <u>only</u> objectives identified in the legislative history – may not be "invoke[d]" for purposes of prudential standing, Mem. Op. at 8, it seems to follow that there is <u>no</u> statutory "zone of interests" for prudential standing purposes, and hence noone "who in practice can be expected to police the interests that the statute protects." <u>ALDF</u>, 154 F.3d at 445. But not only does such a result contravene the Court of Appeals' admonition that "Congress cannot be presumed to do a futile thing," <u>Halverson v. Slater</u>, 206 F.3d 1205, 1207 (D.C. Cir. 2000), it essentially immunizes USDA from any judicial scrutiny regarding the agency's compliance with Congress's intent, contrary to the "'strong presumption that Congress intends judicial review of administrative action.'" <u>Mistick PBT v. Chao</u>, __ F.3d __, 2006 WL 664200 * 5 (D.C. Cir. March 17, 2006) (quoting <u>Bowen v. Michigan</u>

If, in light of the foregoing, the Court is willing to reconsider its ruling that plaintiffs do not even arguably fall within the zone of interests of the FY2006 Amendment, then the Court may reinstate claims 1 and 2 on that basis alone, and need not resolve any of the remaining issues presented in this motion.  As discussed previously, claim 2 is expressly based in part on the FY2006 Amendment; hence, if the Court were to agree that plaintiffs at least have prudential standing with respect to that statute, claim 2 should be reinstated and the claim should proceed to a resolution on the merits following summary judgment briefing.[6]

In addition, as discussed further below, the Court suggested that it was dismissing plaintiff's notice and comment claim (claim 1) arising under 5 U.S.C. § 553 because, to pursue that claim, plaintiffs needed to come within a "zone of interests" of some "other . . . substantive" statute. Mem. Op. at 7 n. 2 (internal citation omitted).  Accordingly, if the Court now agrees that plaintiffs arguably <u>do</u> come within the zone of interests of the FY2006 Amendment, then it would seem to follow, under the Court's analysis, that claim 1 should also be reinstated.  In any event, as we discuss next, there are additional legal problems with the Court's *sua sponte* dismissal of claims 1 and 2 that reinforce the propriety of reconsideration.

---

<u>Academy of Family Physicians</u>, 476 U.S. 667, 670 (1986)); <u>see</u> <u>generally</u> Kenneth Culp Davis, 3 Administrative Law, § 16.11, at 67 (explaining that the zone of interests test is expansive because "[p]ermitting any potentially affected individual to obtain judicial review of an agency decision furthers two related goals: (1) reduction of the risk that agencies will engage in lawless conduct and (2) reduction of the risk that agency decisionmaking will be infected by factional bias.").

[6] If the Court reinstates this claim, then defendants would be free, of course, to raise whatever defenses they wish to invoke in their summary judgment briefing, including prudential standing with regard to either the FY2006 Amendment or the FMIA.

**B.     Plaintiffs Also Have Prudential Standing to Pursue Their Claim That USDA Violated the Notice and Comment Requirements of 5 U.S.C. § 553, Because § 553 Is Itself A Substantive Statute, The Violation Of Which Serves As the Gravamen of Plaintiffs' First Claim.**

The Court dismissed plaintiffs' first claim that USDA violated the notice and comment requirements of 5 U.S.C. § 553 on the basis that plaintiffs "bring a claim only under the APA without reference to any other statute based on Defendants alleged failure to abide by notice and comment procedures."  Mem. Op. at 7-8 n. 2.  In so holding, the Court stated that an "APA claim presented in a vacuum as is the case in Claim 1. . . . must be dismissed," because, "'[i]n determining whether the [Plaintiffs] have standing under the zone-of-interests test to bring their APA claims, we look . . . to the substantive provisions of the [principal statute invoked], the alleged violations of which serve as the gravamen of the complaint.'"  Id. (citing Bennett v. Spear, 520 U.S. at 175).

Implicit in the Court's reasoning is the suggestion that a free-standing notice-and- comment claim based on violations of 5 U.S.C. § 553(b) is nonjusticiable unless it is paired with allegations that the agency also violated the "substantive provisions" of some other statute outside the APA.[7] The Court apparently concluded that the notice-and-comment requirements of 5 U.S.C. § 553, "the alleged violations of which serve as the gravamen of" plaintiffs' first claim, are not themselves "substantive provisions" for the purposes of prudential standing.[8]  Id.  Plaintiffs have been unable

---

[7]  Plaintiffs contest this premise, as explained further below.  However, even if the Court declines to revisit this part of its ruling, Plaintiffs' first two claims should nonetheless be reinstated, because, as demonstrated above, Plaintiffs are plainly within the zone of interests of the substantive provisions of a separate statute – namely, the FY2006 Amendment.  Plaintiffs are also within the zone of interests of the FMIA, as explained infra.

[8]  By this reasoning, other substantive provisions within the APA that place affirmative requirements and constraints upon agencies, such as the mandate that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule," 5 U.S.C. § 553(e), would similarly be beyond judicial review unless pled in conjunction with

to locate any decision from this Circuit dismissing a notice and comment claim on this basis. Indeed, plaintiffs have been unable to locate <u>any</u> prior Circuit ruling – either an appellate or a district court decision – in which a court declined to resolve the merits of a garden-variety notice-and-comment claim where, as here, the plaintiffs had clearly  demonstrated Article III standing.

Rather, the case law unequivocally establishes that, so long as a plaintiff has Article III standing and is an "interested person" within the meaning of 5 U.S.C. § 553 – as plaintiffs here surely are – then a notice-and-comment claim must be resolved on the merits. Thus, the D.C. Circuit has declared that, " "[i]n a case of this sort," where the plaintiff alleges a violation of the notice and comment provisions of 5 U.S.C. § 553, "<u>neither standing nor ripeness issues are of significant concern</u>," because "[w]e have held unequivocally that when a party complains of an agency's failure to provide notice and comment prior to acting, it is that failure which causes 'injury,' and interested parties are 'aggrieved' by the order promulgating the rules." <u>JEM Broadcasting Co., Inc. v. Federal Communications Comm'n</u>, 22 F.3d 320, 326 (D.C. Cir. 1994) (emphasis added) (citing <u>Natural Resources Defense Council</u>, 666 F.2d 595, 601 (D.C. Cir. 1981)).[9]

---

another, separate substantive statute.  This is contrary to cases that have examined standing, <u>e.g.</u>, in the context of 5 U.S.C. § 553(e).  <u>See</u> <u>National Wrestling Coaches Ass'n v. U.S. Dep't of Educ.</u>, 263 F. Supp. 2d 82, 126 (D.D.C. 2003) (finding standing based on allegations that agency violated petition provisions of 5 U.S.C. § 553, because "[a]ssuming plaintiffs' allegations to be true, as we must [on a motion to dismiss], an improper denial of a petition brought under 5 U.S.C. § 553(e) constitutes a concrete and particularized injury, directly caused by the agency to which the petition was addressed"); <u>see also</u> <u>South Hills Health System v.Bowen</u>, 864 F.2d 1084, 1094 (3d Cir. 1988) (finding that hospital had "standing . . . under § [553](e) of the Administrative Procedure Act" to challenge HHS Medicare cost report regulation).

[9] Although some cases in this Circuit have <u>found</u> prudential standing based on violations of substantive statutes other than 5 U.S.C. § 553 in cases where plaintiffs alleged violations of <u>both</u> 5 U.S.C. § 553 and other substantive statutes, <u>see</u>, <u>e.g.</u>, <u>Center for Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.</u>, 342 F. Supp. 2d 1 (D.D.C. 2004), plaintiffs have located no case that dismissed a notice-and-comment claim solely on prudential standing grounds.

Several other courts have expressly held that the relevant statute, when analyzing the zone of interests for an asserted notice-and-comment violation under 5 U.S.C. § 553, is section 553 itself. For example, in Dismas Charities, Inc. v. U.S. Dep't of Justice, the Sixth Circuit recently analyzed a notice-and-comment claim under 5 U.S.C. § 553 and stated that the proper prudential standing inquiry is whether the plaintiff is "within the zone of interests protected by the notice and comment rulemaking requirements of the APA," because "prudential standing to assert procedural protections depends on whom the procedural protections were designed to protect." 401 F.3d 666, 678 (6th Cir. 2005) (emphasis added) (citing Int'l Bhd. of Teamsters v. Pena, 17 F.3d 1478, 1483-84 (D.C. Cir. 1994)).  In so holding, the Court looked to the purpose and intent of 5 U.S.C. § 553 itself, and found that "one of the central purposes of the requirement of notice and comment is to give those with interests affected by the rule[ ] the chance to participate in the promulgation of the rule[ ]."  Id. (citing Nat'l Soft Drink Assn. v. Block, 721 F.2d 1348, 1353 (D.C. Cir. 1983) for the proposition that the "[section] 553 requirements ensure fair treatment for persons to be affected by regulations"). The Dismas court further observed that several Courts of Appeals, when presented with notice and comment claims under 5 U.S.C. § 553, had "never questioned the standing of the [plaintiffs] to insist on such procedures under the APA."  Id. at 679 (citing Chocolate Mfrs. Ass'n v. Block, 755 F.2d 1098 (4th Cir. 1985); Career College Ass'n v. Riley, 74 F.3d 1265, 1276 (D.C. Cir. 1996)).[10]

---

[10] See also American Medical Ass'n v. Reno,  57 F.3d 1129, 1134 (D.C. Cir. 1995) ("The APA's procedural requirements are enforceable apart from the reviewability of the underlying action, and, indeed, support several important functions wholly distinct from judicial review. The notice-and-comment requirement helps to ensure that the rule is subjected to thoroughgoing analysis and critique by interested parties and the agency. Whether or not these parties can ultimately bring suit in court, notice-and-comment gives them an opportunity to marshall what may be persuasive arguments before the agency.") (emphasis added) (internal citations omitted); cf. Lincoln v. Vigil, 508 U.S. 182 (1993) (stating that the relevant question, "quite apart from the matter of substantive reviewability," is whether the agency "was required to abide by the familiar

Other Courts of Appeals have also determined that the relevant zone of interests for a notice-and-comment violation under 5 U.S.C. § 553 emanates from section 553 itself. In <u>Yesler Terrace Community Council v. Cisneros</u>, the Ninth Circuit found that plaintiffs who had alleged a notice and comment violation under 5 U.S.C. § 553 had satisfied the zone of interests test because "the interests protected by the notice and comment rulemaking to which plaintiffs claim they are entitled are concrete and personal." 37 F.3d 442, 446 (9th Cir. 1994). The Court further found that the plaintiffs had standing "'to enforce a procedural requirement," namely, the notice and comment requirements of 5 U.S.C. § 553, "the disregard of which could impair a separate concrete interest." <u>Id.</u> (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 572 n.7 (1992)).

In <u>Yesler</u>, the plaintiffs alleged – and the Court accepted – that the agency's failure to provide advance notice and comment impaired plaintiffs' ability to protect their concrete interests because, "as a consequence of [the agency's] decision," which was made without the benefit of plaintiffs' comments, plaintiffs would be at increased risk of losing their subsidized housing. <u>Id.</u> In particular, the Court found that plaintiffs "live . . . in the very housing that [the agency's] decision affects. . . . Their geographical nexus to [the agency's] action is clear." <u>Id.</u>; <u>see also</u> <u>Aiken v. Obledo</u>, 442 F. Supp. 628, 645 (E.D. Cal. 1977) ("[t]he interest sought to be protected by [plaintiff] in the instant case is its interest in having notice of adopted and proposed regulations which affect its clients[,] [c]ertainly these are interests which are 'arguably' within the zone of interests sought to be protected by 5 U.S.C. §§ 552 and 553.").

Once again, in their briefing on the preliminary injunction motion, neither defendants nor intervenors argued that plaintiffs lacked prudential standing to pursue their notice-and-comment

notice-and-comment rulemaking provisions of the APA").

21

claim, presumably in recognition of the fact that no published Circuit precedent has, so far as plaintiffs can determine, ever dismissed a notice-and-comment claim on that basis. Moreover, <u>Bennett v. Spear</u>, the sole case cited by the Court in explaining the dismissal of plaintiffs' claim 1, <u>see</u> Mem. Op. at 7 n. 2., did not involve a claim under 5 U.S.C. § 553, and hence said nothing about prudential standing to pursue such a claim.

Rather, in that case, the plaintiffs had argued that an agency had violated section 7(a)(2) of the Endangered Species Act ("ESA") in making a final decision, <u>see</u> 16 U.S.C. § 1536(a)(2), and sought to set aside that decision under 5 U.S.C. § 706(2)(A) which, once again, authorizes a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or not in accordance with law."  In its extremely liberal application of the zone of interests test – in which the Court held that a property owner whose interests were facially antithetical to the "overall purpose" of the ESA nonetheless "arguably" fell within the zone of interests of the specific provision at issue, <u>Bennett</u>, 520 U.S. at 175 – the Court held that "[w]hether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined . . . <u>by reference to the particular provision of law upon which the plaintiff relies</u>."  <u>Id</u>. at 175-76 (emphasis added) (internal citation omitted); <u>id</u>. at 176 ("As we said with the utmost clarity . . . 'the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected *by the statutory provision whose violation forms the legal basis for his complaint*.'") (italics in original).

But far from supporting dismissal of plaintiffs' notice-and-comment claim, this analysis simply reinforces the conclusion that plaintiffs are entitled to a ruling on the merits.  Once again, the "particular provision of law upon which plaintiff relies" in claim 1 is the legal requirement imposed

on federal agencies to afford all "interested persons" the opportunity to comment on a "proposed rule" <u>before</u> the agency makes a final decision on the matter at hand. 5 U.S.C. § 553. Hence, as many courts have already held, if an "interested" plaintiff has Article III standing and a reviewing court agrees that an agency has violated the legal mandate embodied in 5 U.S.C. § 553, then the rule has been adopted "without observance of procedure required by law," and should, therefore, be deemed "unlawful and set aside." 5 U.S.C. § 706(2)(D).[11]

In sum, when authorities and considerations not addressed in the Court's ruling are considered, it is clear that plaintiffs, who are certainly "interested persons" within the meaning of 5 U.S.C. § 553, may pursue their notice-and-comment claim. Once again, if Plaintiffs had been afforded their statutory right to participate in the rule making at issue before it was completed, they would have had an opportunity to protect their concrete interests by way of participation in the rulemaking process. As in <u>Yesler</u>, in the instant case, USDA's notice-and-comment violations impaired plaintiffs' "concrete interests," including because individual plaintiffs here "live . . . in the very [area] that [the agency's] decision affects . . . . Their geographical nexus to [the agency's] action is clear." 37 F.3d at 446.

Indeed, this Court recognized as much in finding that plaintiffs had Article III standing to pursue their NEPA claim. <u>See</u> Mem. Op. at 11-12 (finding that "the instant case demonstrates not simply an informational injury to Plaintiffs, but rather a specific injury to a particularized interest

---

[11] The fact that 5 U.S.C. § 553 happens to be part of the APA does not mean that it is not the "particular provision of law upon which the plaintiff relies" within the meaning of <u>Bennett</u>, <u>i.e.</u>, that the Court must search for some <u>other</u> source of legal authority for purposes of the zone of interests analysis. Rather, it is just as much a "substantive provision" of law, <u>Bennett</u>, 520 U.S. at 175, as any other statutory requirement, and hence, as many courts have held, its violation may serve as the "gravamen of the complaint" without reference to any <u>other</u> statute. <u>Id.</u>

of various Plaintiffs whose human environment is impacted by the final interim rule at issue," based

on "negative environmental consequences of the operation of the slaughter facilities near the land

they own and/or lease"). Consequently, just as plaintiffs may pursue their NEPA claim, the pertinent

case law confirms that there is no legal barrier to their pursuit of a claim that their statutory rights

were violated when USDA adopted the rule under review without any advance public notice and

comment.[12]

---

[12] The Court's explanation for its dismissal of plaintiffs' notice-and-comment claim could also be construed to suggest that plaintiffs could not pursue their claim under 5 U.S.C. § 553 because the Court was allowing the NEPA claim to go forward, at least for the time being. Mem. Op. at 7-8 n. 2 (citing 5 U.S.C. § 704). Plaintiffs assume that this is not what the Court meant, since not only would it conflict with the Court's suggestion that a notice-and-comment claim can only be brought when it is paired with some other asserted statutory violation, but it is common practice in this Circuit for plaintiffs to bring notice-and-comment claims along with complementary claims arising under NEPA or other statutes. See, e.g., Spirit of the Sage Council v. Norton, 294 F. Supp. 2d 67 (D.D.C. 2003), vacated in part as moot on other grounds, 411 F.3d 225 (D.C. Cir. 2005) (setting aside regulation on 5 U.S.C. § 553 grounds, while declining to reach other claims asserting violations of the ESA); Duke City Lumber Co. v. Butz, 382 F. Supp. 362 (D.D.C. 1974) (finding standing where plaintiff asserted that regulation violated 5 U.S.C. § 553, NEPA, and several other statutes).

Moreover, plaintiffs' ability to pursue a NEPA claim, in conjunction with the APA, is certainly not an "adequate remedy," 5 U.S.C. § 704, that displaces a notice-and-comment claim under 5 U.S.C. § 553. As here, a NEPA claim is based primarily on the contention that a federal agency has failed adequately to address environmental considerations in its own decisionmaking process. See Dep't of Transp. v. Public Citizen, 541 U.S. 752 (2004). A notice-and-comment claim, on the other hand, focuses on the "interested" public's right to bring all pertinent considerations – environmental and otherwise – to the agency's attention before a final rule is issued. Here, for example, plaintiffs claim that they have been deprived of their legal right to bring to USDA's attention – before it implemented the rule – "significant issues" bearing on the lack of humane treatment of the horses slated for slaughter. See Mem. Op. at 29 ("Based on the evidence and declarations presented by Plaintiffs, it is clear that the current process is, in many ways, less than ideal, bringing with it significant issues regarding the conditions which these horses face and the humaneness with which their lives are ended") (emphasis added). Hence, the fact that plaintiffs may, or may not, prevail on their NEPA claim has no legal bearing on whether they are entitled to also participate in the rulemaking process in the specific manner that 5 U.S.C. § 553 dictates.

**C.     Plaintiffs Are Also Within the Zone of Interests of the Federal Meat Inspection Act Provisions Whose Violations Form The Basis For Plaintiffs' Second Claim.**

Plaintiffs allege that the Final Rule violates several provisions of the Federal Meat Inspection Act ("FMIA"), namely, 21 U.S.C. §§ 603 and 695.  Am. Compl. ¶¶ 48-50; Pfs.' PI Mem. at 4, 27-29. In its ruling, the Court found that plaintiffs fell outside the zone of interests of "21 U.S.C. § 603" because that provision "is made clear in its self-description as '[f]or the purpose of preventing the use in commerce of meat and meat food prducts which are adulterated,'" and plaintiffs did not assert interests relating to "food quality and the commerce of unadulterated meat products."  Mem. Op. at 9 (quoting 21 U.S.C. § 603(a)).  However, while preventing the adulteration of meat is certainly <u>one</u> of the purposes of the FMIA, 21 U.S.C. § 603, Congress specifically amended the FMIA – and section 603 in particular – in order to ensure that the inspection process required by the statute is <u>also</u> conducted "[f]or the <u>purpose</u> of <u>preventing the inhumane slaughter</u> of livestock."  21 U.S.C. § 603(b) (emphasis added); <u>see also</u> Am. Compl. ¶¶ 51-53, 96 (alleging that the Final Rule violates 21 U.S.C. § 603); Pfs.' PI Mem. at 4 (quoting 21 U.S.C. § 603(b)).  Indeed, even the federal defendants have conceded the dual purposes of the FMIA.  <u>See</u> Def. Opp. at 3 n. 2 (stating that, "<u>for the purposes of preventing inhumane slaughter</u>,"  the ante-mortem inspection provisions at 21 U.S.C. § 603(b) "reference the [Humane Methods of Slaughter Act].") (emphasis added).

Once again, therefore, <u>Bennett</u> strongly supports plaintiffs' prudential standing here, since, regardless of whether the "overall purpose" of the FMIA is arguably to prevent adulteration of meat, it is indisputable that an <u>additional</u> purpose of the statute – and specifically section 603, the "particular provision of law" discussed in the Court's ruling, 520 U.S. at 175-76 – is to prevent inhumane treatment of animals, the very interests with which many of plaintiffs here are centrally

concerned.  Indeed, if, as the Supreme Court held in <u>Bennett</u>, ranchers and irrigation districts that were seeking to <u>lessen</u> endangered species protection nonetheless fell within the zone of interests of the ESA because the particular provisions at issue reflected a concern with economic impacts, then it seems to necessarily follow that plaintiffs fall within the zone of interests of the FMIA (and section 603 in particular), where Congress has made clear that one central purpose of the entire inspection scheme is to ensure that horses and other animals covered by the statute are not treated in an inhumane fashion – which, plaintiffs maintain, is precisely what will continue to happen under the rule at issue.

Indeed, when Congress added several humane slaughter provisions to the FMIA in 1978, it made clear that, henceforth, humane considerations would be a critical objective of the inspection process.  <u>See</u> Pub. L. No. 95-445, 92 Stat. 1069 (1978).  In fact, in addition to expressly declaring that ensuring "[h]umane methods of slaughter" were required by the statutory scheme, 21 U.S.C. § 603(b), the 1978 Amendments to the FMIA also added provisions requiring slaughter facilities to employ "[h]umane methods of slaughter,"<u>id.</u> at § 610, and prohibiting import of meat or meat products unless the animals were humanely slaughtered.  <u>See</u> <u>id.</u> at § 620(a).  Plainly, humane slaughter considerations have thus become an additional statutory purpose of the FMIA, integral to not only the specific ante-mortem inspection provisions violated by the Final Rule, but also to the inspection scheme of the FMIA as a whole.

Once again, the Court of Appeals has held that, where "an [A]ct is expressly motivated by considerations of humaneness toward animals," "it strikes us as eminently logical to allow groups specifically concerned with animal welfare to invoke the aid of the courts in enforcing the statute." <u>Animal Welfare Inst. v. Kreps</u>, 561 F.2d 1002, 1007 (D.C. Cir. 1977) (reversing district court's

dismissal for lack of standing); see also ALDF, 154 F.3d at 445. As detailed in plaintiffs' First Amended Complaint and organizational affidavits, plaintiff organizations and their members, as well as some of the individual plaintiffs, are unquestionably "concerned with [horse] welfare." See, e.g., Am. Compl. ¶¶ 4, 9, 25.

Indeed, as with the FY2006 Amendment, the plaintiff organizations here specifically "participat[ed] in the passage of the statute at issue," and thus it should be presumed that "Congress . . . thus had the interests of such organizations clearly in view when it designed and adopted the legislation." Action Alliance of Senior Citizens, 789 F.2d at 939 (emphasis added); see also ALDF, 154 F.3d at 445. In particular, plaintiff organizations The Humane Society of the United States, the Society for Animal Protective Legislation, and the American Humane Association are specifically named in the House Report to the 1978 Act that added subsection (b) to 21 U.S.C. § 603, as having worked toward enactment of the amendment. See H.R. Rep. No. 95-1336, at 6-7 (1978), reprinted in 1978 U.S.C.C.A.N. 2650, 2653-55; Pub. L. No. 95-445, 92 Stat. 1069 (1978) (Pfs. Exh. C). The House Report also confirms that section (b) of 21 U.S.C. § 603 was added "out of concern for humane treatment of the animals . . . and in view of the abiding concern of numerous humane groups." Id. at 3 (emphasis added). Consequently, as in Action Alliance of Senior Citizens and ALDF, it would be anomalous to hold that the very groups who worked to ensure passage of the legislation in its present form, and whose concerns are specifically cited in the legislative history, lack prudential standing.[13]

_____

[13] As with the FY2006 Amendment and the 1978 legislation that added section (b) to 21 U.S.C. § 603, plaintiff organizations are also referred to by name in the legislative history of the Humane Methods of Slaughter Act of 1958, Pub. L. No. 85-765, 72 Stat. 862, codified at 7 U.S.C. §§ 1901-1906, which is incorporated by reference in 21 U.S.C. § 603(b). See Humane Slaughtering of Livestock: Hearings on S. 1213, S.1497 and H.R. 8303 Before the Senate

27

Finally, while the foregoing is more than sufficient to demonstrate that plaintiffs have prudential standing to pursue a claim that, in part, is based on a violation of the FMIA, it is also telling that Congress perceived an interrelationship between the twin statutory goals of preventing adulteration of food and ensuring humane treatment of animals. Hence, when Congress amended the FMIA in 1978, it specifically stressed that it

> does not accept the assumption that the method of slaughter does not affect the health of our people. Witnesses have <u>testified to having been sickened, physically as well as emotionally, upon learning of cruel abuses to livestock from which food they were eating or had eaten was derived</u>. Some changed diet . . . out of revulsion at the inhumane manner in which some livestock are handled. The Committee believes <u>that this bears directly on the health of American consumers</u>.

H.R. Rep. No. 95-1336 at 5 (emphasis added). Accordingly, not only is humane treatment of horses a Congressionally-mandated purpose that is now infused in the entire inspection scheme, but Congress has also made clear that humane concerns "bear[] an 'integral relationship'" with the meat safety objectives expressed by Congress in 21 U.S.C. § 603(a). <u>National Petrochemical & Refiners Ass'n v. E.P.A.</u>, 287 F.3d 1130, 1147 (D.C. Cir. 2002) (quoting <u>Air Courier Conference v. Am. Postal Workers Union</u>, 498 U.S. 517, 530 (1991)). For that reason as well, the Court should reconsider its ruling that plaintiffs' interests do not even "arguably" fall within the statute's zone of interests.

---

Committee on Agriculture and Forestry, 85th Cong. 18 (1958) (Senator Neuberger stating that "[i]t is the voices of the Humane Society of the United States, the American Humane Association, and many similar groups which have awakened the American conscience to these contemporary cruelties") (Pfs. Exh. D); <u>id.</u> at 77 (testimony of Animal Welfare Institute president Christine Stevens); <u>id.</u> at 66 (testimony of Society for Animal Protective Legislation director Madeleine Bemelmans); <u>id.</u> at 88 (testimony of American Society for the Prevention of Cruelty to Animals director Mrs. George Fielding Eliot).

## II.    IN THE ALTERNATIVE, THE COURT SHOULD CERTIFY THE DISMISSED CLAIMS FOR IMMEDIATE APPELLATE REVIEW UNDER RULE 54(b).

If, despite the foregoing, the Court is unwilling to reinstate claims 1 and 2 so that they may be resolved on the merits, plaintiffs respectfully request that the Court at least make an "express determination that there is no just reason for delay" so that plaintiffs may appeal the Court's dismissal of claims 1 and 2 expeditiously.  Fed. R. Civ. P. 54(b).  Under that rule, the Court may

> direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of final judgment.

Fed. R. Civ. P. 54(b).  The purpose of the rule is to allow parties to obtain "timely justice," Taylor v. Fed. Deposit Ins. Co., 132 F.3d 753, 760 (D.C. Cir. 1997) and, under the rule, the "district court [functions] as a dispatcher, determining in its sound discretion when a claim should proceed on to appellate resolution and when it should await its fellows." Petties v. District of Columbia, 227 F.3d 469, 472 (D.C. Cir. 2000) (internal quotations omitted).

The Court's dismissal of claims 1 and 2 obviously constitutes a "final" determination that plaintiffs are not entitled to relief on those claims, assuming the Court does not reinstate them.  Bldg. Indus. Ass'n of Super. Calif. v. Babbitt, 161 F.3d 740, 744 (D.C. Cir. 1998).  In addition, the issues raised by the dismissed claims are "separable" from the NEPA claim, both factually and legally, particularly since the Court has found that plaintiffs have prudential standing to pursue the NEPA claim, but not the others.  Id.

Finally, and most important, given the brief duration of the FY2006 Amendment and the rule under review, if plaintiffs are foreclosed from pursuing appellate review now, they may never have that opportunity.  Accordingly, especially under these circumstances, there are no "justifiable reasons

for delay[ing]" plaintiffs' ability to pursue an appeal, id., and, to the contrary, the interests of justice clearly favor allowing plaintiffs to do so.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court either reinstate claims 1 and 2 or, in the alternative, promptly make an express determination that there is no just reason for delay under the circumstances of this case and direct the entry of final judgment on those claims. Plaintiffs further request the opportunity to be heard before the Court resolves this motion.

Respectfully submitted,


/s/_____
Eric R. Glitzenstein
D.C. Bar No. 358287
Ethan Carson Eddy
D.C. Bar No. 496406
Howard M. Crystal
D.C. Bar No. 446189

Meyer Glitzenstein & Crystal
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206

Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)
Jonathan R. Lovvorn
(D.C. Bar No. 461163)

The Humane Society of the United States
2100 L St., N.W.
Washington, D.C.  20037
(202) 676-2333

March 24, 2006                          Counsel for Plaintiffs