# Plaintiffs' Exhibit A
# Civ. No. 02-0265 (CKK)

AMENDMENT NO. 1751

At the appropriate place in the bill (page 173 after line 24), insert the following new paragraphs:

"SEC. . (a) Hereafter, none of the funds made available by this Act or any other Act may be used to publish, disseminate, or distribute Agriculture Information Bulletin Number 787.

(b) Of the funds provided to the Economic Research Service, the Secretary of Agriculture shall enter into an agreement with the National Academy of Sciences to conduct a comprehensive report on the economic development and current status of the sheep industry in the United States."

AMENDMENT NO. 1752

On page 173, after line 24 insert the following:

"SEC. . The Secretary of Agriculture may establish a demonstration intermediate relending program for the construction and rehabilitation of housing for the Choctaw Nation: Provided, That the interest rate for direct loans shall be 1 percent: Provided further, That no later than one year after the establishment of this program the Secretary shall provide the Committees on Appropriations with a report providing information on the program structure, management, and general demographic information on the loan recipients."

The PRESIDING OFFICER. The Senator is recognized.

Mr. BENNETT. Mr. President, the first amendment is in regard to a study on the sheep industry in the United States by the National Academy of Sciences. The second authorizes a demonstration tribal housing program. And the third authorizes a land transfer in Mississippi from the Agricultural Research Service to Mississippi State University.

All three of these amendments have been considered carefully on both sides. They have been cleared on both sides. I ask that they be approved en bloc by a voice vote.

The PRESIDING OFFICER. Is there objection? Without objection, the question is on agreeing to the amendments en bloc.

The amendments (Nos. 1750, 1751, and 1752) were agreed to en bloc.

Mr. BENNETT. Mr. President, I ask that the vote be reconsidered and that reconsideration be laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BENNETT. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. ENSIGN. Mr. President, I ask unanimous consent that the order for the quorum call be dispensed with.

The PRESIDING OFFICER (Mr. VOINOVICH). Without objection, it is so ordered.

Mr. ENSIGN. Mr. President, I ask unanimous consent that the pending amendment be set aside.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. ENSIGN. Mr. President, I ask unanimous consent that I may offer an amendment dealing with horse inspection and that no second-degree amendments be in order.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

Mr. ENSIGN. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. ENSIGN. Mr. President, I ask unanimous consent that the order for the quorum call be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. ENSIGN. Mr. President, I withdraw my previous unanimous consent request and I call for the regular order with respect to amendment No. 1726.

The PRESIDING OFFICER. The amendment is now pending.

AMENDMENT NO. 1753 TO AMENDMENT NO. 1726

Mr. ENSIGN. Mr. President, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Nevada [Mr. ENSIGN], for himself, Mr. BYRD, Ms. LANDRIEU, Mr. LOTT, Mr. GRAHAM, Ms. STABENOW, Mr. DEMINT, Mrs. FEINSTEIN, and Mr. LAUTENBERG, proposes an amendment numbered 1753 to amendment numbered 1726.

Mr. ENSIGN. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To prohibit the use of appropriated funds to pay the salaries or expenses of personnel to inspect horses under certain authority or guidelines)

At the appropriate place, add the following:

SEC. ___. None of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. 603) or under the guidelines issued under section 903 the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 1901 note; Public Law 104-127).

Mr. ENSIGN. Mr. President, I rise, along with my colleagues, Senators BYRD, LANDRIEU, GRAHAM, LOTT, STABENOW, DEMINT, FEINSTEIN, and LAUTENBERG, to submit an amendment to the 2006 Senate Agriculture appropriations bill.

The goal of our amendment is simple: to end the slaughter of America's horses for human consumption overseas.

I graduated from Colorado State with a degree in veterinary medicine. I have been concerned with animal welfare since my earlier days as a youth and pursued those interests as a practicing veterinarian.

Our Nation's history and cultural heritage is strongly associated with horses. George Washington is pictured many places with horses. We are reminded of the legend of Paul Revere's ride and the Pony Express in the West. The Depression era race between Seabiscuit and War Admiral raised the morale of our country during desperate times.

The owners who sell their horses at auction are often unaware that those horses may be on their way to one of the three remaining horse slaughterhouses in America. These slaughterhouses—two in Texas and one in Illinois—are owned by French and Belgium companies. They slaughter American horses almost exclusively for one purpose—exporting the meat overseas for human consumption.

Workhorses, racehorses, and even pet horses—many young and healthy—are slaughtered for human consumption in Europe and Asia, where their meat is considered a delicacy. The profits, along with the product, are shipped overseas. These horses are slaughtered in America and shipped to Japan, France, Belgium, Italy, Germany for human consumption.

Last year, nearly 100,000 American horses were slaughtered for human consumption overseas. Sixty-five thousand of these were sent to three slaughterhouses in the United States, and more than 30,000 were shipped across our borders to Canada and Mexico for slaughter.

Our amendment effectively stops this practice. It restricts the use of Federal funds for the inspection of horses being sent to slaughterhouses for human consumption. Without these inspections, required under the Federal Meat Inspection Act, horses cannot be slaughtered, or exported for slaughter, for human consumption overseas.

Strong support for our amendment is reflected in the House of Representatives, where an identical measure was passed by a vote of 269 to 158 this past June.

We have several articles and editorials from around the country that have been written in support of our amendment. Articles have appeared in the Washington Times, the St. Petersburg Times, the Charleston Gazette, and the Louisville Courier-Journal, just to name a few. I ask unanimous consent to have these articles printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

[From the Washington Times, Sept. 15, 2005]

SAVE THE HORSES

Most Americans would sooner starve than eat fillet of horse with cranberry chutney, or however they do it in Europe. It might then come as a surprise that 66,000 horses were slaughtered for consumption in the United States last year, and 20,000 more were exported abroad for the same purposes. Even more so when one considers that nearly none of this horse flesh ends up on American platters—and for that we are thankful.

While cattle and poultry are bred specifically for food, horses are not. Many of those sold to slaughterhouses are privately owned or caught in the wild by the federal Bureau of Land Management, which then tries to find adoptive homes. When it cannot, the horses go to the highest bidder, in this case either to one of the three Belgian- or French-owned plants.

Fortunately, there is growing opposition in Congress to this kind of thing. In June, the House passed by a bipartisan majority an

amendment to the agriculture appropriations bill banning the use of federal funds in the slaughtering of horses. The Senate is schedule to vote on the amendment, sponsored by veterinarian Sen. John Ensign, next week. We encourage senators to support this ban.

Certain veterinary groups, rather ironically, oppose the amendment. They claim that it is humane to put aging or neglected horses out of their misery. But if anyone actually saw how these noble beasts are slaughtered—strung up by their hind legs and bled—they might think twice before supporting such conduct. The only problem with attaching the amendment to an appropriations bill is that it will expire next year.

So, Mr. Ensign has also introduced independent legislation that would ban the slaughter of horses entirely. Some critics contend an outright ban is an abuse of congressional power. But Cass Sunstein, the distinguished University of Chicago law professor, conclusively addressed those concerns a few years ago: "A ban on commercial slaughter of horses would be plainly within congressional authority, if accompanied by reasonable findings that such slaughter is often or generally a way of yielding products for interstate or international sale, and therefore has a substantial effect on interstate or international commerce." Few would argue that it doesn't.

We admit to a certain sentimentality in our appeal to ban horse slaughter. The horse has always held a hallowed place in our national identity, much like the bald eagle. And just as no American would consider ordering up a bald eagle, if only out of respect, so would none ask for a horse steak.

[From the Louisville Courier-Journal, Sept. 13, 2005]

HORSE SENSE IN SENATE

This week, the U.S. Senate may vote on an amendment to the agriculture appropriations bill that would outlaw the slaughter of horses for food. For most Kentuckians—in fact, for most Americans—it's shocking that such a vote would need to be taken. In this country, horses are raised to be companion animals. Most folks don't know that in three foreign-owned slaughterhouses within our borders, about 45,000 horses are killed each year.

The meat is then shipped to Japan and several European countries, where horse is served for dinner. In the international market, the meat of American horses is especially coveted, since most of them have been well fed and have received superior care.

This should be an easy vote for Sens. Mitch McConnell and Jim Bunning. Horses are central to Kentucky's culture. Our famous Bluegrass farms breed and raise them for higher purposes than ending up on some dinner table overseas.

And no horse is currently safe from that fate. Ferdinand, the 1986 Kentucky Derby winner, was killed in a Japanese slaughterhouse when his stud services were no longer needed. This past spring, 41 wild mustangs were slaughtered for food in a Texas plant after being purchased through a program meant to give them new homes.

That's why, in June, the U.S. House of Representatives overwhelmingly passed legislation identical to what the Senate is considering. Kentucky's own Rep. Ed Whitfield, R-1st District, led the effort.

Now the Senate should do the same, with Kentuckians again playing a leadership role.

[From the St. Petersburg Times, Sept. 13, 2005]

BRING AN END TO HORSE SLAUGHTER

Horse slaughter has no place in the United States. The House of Representatives confirmed that earlier this year by passing an amendment to the agriculture spending bill that would, in essence, stop the practice. Now it is the Senate's turn.

Currently, horses that are no longer wanted are sold to buyers who presumably seek them for recreation or as pets too often end up in slaughterhouses or in the hands of exporters who send them outside the country for slaughter. Sometimes the buyers hide their true intentions and make a profit by selling the horses for slaughter. Each year, nearly 100,000 horses are subjected to a cruel end to their lives.

Horse meat for human consumption hasn't been sold in the United States for decades and isn't even used in pet food here. If a horse is near the end of its useful life, there are more humane ways for an owner to get rid of it. Adoption groups offer horses a peaceful retirement, and if the horses need to be euthanized, it can be done painlessly and humanely for a couple hundred dollars.

The Senate vote could come up in the next few days, so those opposed to horse slaughter should contact their senators and tell them to support the amendment, which would deny the Agriculture Department taxpayer dollars for the inspection of horse meat. Without such inspections, legalized horse slaughter in this country will end. And good riddance.

[From the Charleston Gazette, Sept. 13, 2005]

SAVE HORSES—BILL WOULD STOP SLAUGHTER

Around 90,000 American horses are slaughtered each year for human consumption. Foreign-owned slaughterhouses on American soil kill about 50,000 of them; the other 20,000 are sent live to Mexico or Canada. Some are wild horses that still wander ranges of the West; others are unwanted, disposed of by their owners or unscrupulous dealers who promise they will go to good homes.

Many of these creatures undergo extreme suffering en route to their final destination. Transport law allows them to go for 24 hours without food, water or rest, even if they are badly injured or heavily pregnant.

West Virginia Sen. Robert Byrd plans an amendment to the Agriculture appropriations bill banning horse slaughter in the United States. All three of the state's representatives voted for a similar amendment in the House that passed, 269–158.

There are alternatives to the slaughter of unwanted horses. The recent auction of wild mustangs in Ronceverte resulted in new homes for horses trucked in and sold for a nominal amount. Many horse rescue operations work with retired racehorses, many of whom have tragically ended at slaughterhouses—even big-time steeds, including Kentucky Derby winner Ferdinand. The rescue organizations retrain them and find them new homes and careers. Horses that have truly come to the end of their useful or comfortable lives can be humanely euthanized, rather than having to endure the pain, panic and trauma of a trip to the slaughterhouse.

The bond between horses and humans is as close as the connection between dogs or cats and their owners. The horsemeat industry is not a vital part of the American economy. We hope the Senate will pass this humane amendment.

CITY OF KAUFMAN,
*Kaufman, TX, September 6, 2005.*

Re Support Congressional efforts to end horse slaughter.

DEAR SENATOR: As the Mayor of Kaufman, Texas, I am all too well acquainted with an issue that has been getting plenty of attention on Capitol Hill recently: horse slaughter.

Kaufman is "home" to Dallas-Crown, one of only three slaughterhouses that continue to operate in this country (the other plants are in Ft. Worth, TX and DeKalb, IL). Together, the plants killed more than 65,000 of our horses last year for human consumption abroad. All three plants, are foreign owned, and all three are out of step with American public opinion. Seventy-eight percent of Texans oppose horse slaughter and polls from other parts of the country reflect this sentiment. Both of the Texas plants operating in violation of state law which prohibits the sale of horsemeat for human consumption. And Dallas-Crown is operating in violation of a multitude of local laws pertaining to wastemanagement, air quality and other environmental concerns.

When the District Attorneys in the two Texas jurisdictions moved to prosecute under the state law, the plants filed suit and the District Attorneys were prevented from proceeding. Horses continued to be slaughtered while the case languished in federal court. Recently, the judge ruled in the plants' favor. The District Attorneys are considering an appeal.

When the city took action against the plant for releasing pollutants into the sewer system far in excess of legally acceptable limits, we ended up in court and are now forced to mediate on an issue that can't be mediated. Meanwhile, our municipal sewer system is overburdened, but we simply cannot afford to refurbish the system so that it can tolerate overload from Dallas-Crown. Nor should we have to.

Residents are also fed up with the situation. Long-established neighbors living adjacent to the plant cannot open their windows or run their air conditioners without enduring the most horrific stench. Children playing in their yards do so with the noise of horses being sent to their deaths in the background. Landowners have difficulty securing loans to develop their property. The residents have petitioned the city council to take corrective action against the plant. On August 15 the Kaufman City Council voted unanimously to implement termination proceedings against the plant.

But the ultimate remedy rests with the federal government, which has the authority—and opportunity—to close this shameful industry down. I urge you to cosponsor the American Horse Slaughter Prevention Act when it is introduced by Senator John Ensign, and to support the Ensign amendment to the Senate Agriculture Appropriations Bill for Fiscal Year '06 that will prohibit the use of federal funds to facilitate horses slaughter.

As a community leader where we are directly impacted by the horse slaughter industry, I can assure you the economic development return to our community is negative. The foreign-owned companies profit at our expense—it is time for them to go. If I can provide you with further information, please don't hesitate to contact me at 972–932–2856.

Sincerely,

PAULA BACON,
*Mayor of Kaufman, Texas.*

Mr. ENSIGN. Mr. President, the Ensign-Byrd amendment also has strong support from some of the people most familiar with the slaughterhouses. Paula Bacon, the mayor of Kaufman, TX, which is home to the Dallas Crown Slaughterhouse, recognized the importance of ending this slaughter.

She stated:

My city is little more than a doormat for a foreign-owned business that drains our resources, thwarts economic development and stigmatizes our community. There is no justification for spending American tax dollars to support this industry.

That is Paula Bacon, mayor of Kaufman, TX, home to the Dallas Crown horse slaughterhouse facility.

Members of the local community would like to see this slaughterhouse closed, as well.

Concerns have been raised about what will happen if this slaughter is ended. Many of these horses will be sold to a new owner. Some horses will be kept longer by their original owner, others will be euthanized humanely by a licensed veterinarian, and still others will be cared for by the horse rescue community. Efforts are underway to standardize practices for horse rescue organizations. Guidelines for this ever-growing sector have been developed by the animal protection community and embraced by sanctuaries.

Statistics do not support claims that this legislation will result in more abuse and neglect of unwanted horses. In Illinois, the number of abuse cases actually dropped from 2002 to 2004, when the State's only slaughterhouse was closed due to fire. In California, there has been no rise in neglect cases since the State passed a ban on slaughter for human consumption in 1998.

Furthermore, it is illegal to "turn out," neglect, or starve a horse, so this amendment will not lead to more orphaned horses. If a person attempts to turn his or her horses out, animal control agents can enforce humane laws. These animals still can be euthanized and disposed of by a veterinarian for about $225, a fraction of the cost to keep a horse. That cost is not too big of a burden to bear when no other options are available.

Our amendment is good for horses. That is why it is supported by many animal protection groups. The Humane Society of the United States, the American Society for the Prevention of Cruelty to Animals, the Doris Day Animal League, the American Humane Association, and Society for Animal Protective Legislation—all support our legislation. We have also received support from much of the horse industry and veterinarians nationwide. In fact, congressional measures to end horse slaughter are supported by Veterinarians for Equine Welfare, the National Thoroughbred Racing Association, Churchill Downs, Incorporated, and dozens of owners and trainers of champion racehorses, including Kentucky Derby winners.

The time to end this slaughter is now. Please join my colleagues and me in supporting this important amendment.

I yield the floor and suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. CONRAD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. THOMAS). Without objection, it is so ordered.

Mr. BENNETT. Mr. President, I ask unanimous consent that the Senator be recognized to speak as in morning business. We are under the Agriculture bill, and no one seems to be coming forward under the Agriculture bill, so I obviously have no objection, but I think, to be clear, it should be as in morning business; therefore, I ask unanimous consent that the Senator be given the opportunity to do that.

The PRESIDING OFFICER. Is there objection?

Hearing none, it is so ordered.

Mr. CONRAD. Mr. President, I thank my colleague from Utah for his graciousness, and my colleague from Wisconsin as well. I appreciate this opportunity to speak.

(The remarks of Mr. CONRAD pertaining to the introduction of S. 1730 are printed in today's RECORD under "Statements on Introduced Bills and Joint Resolutions.")

Mr. BYRD. Mr. President, Winston Churchill said, "when you are on a great horse, you have the best seat you will ever have." Indeed, throughout the ages, the horse has carried mankind across continents, helped forge civilizations, and has been that beloved beast of burden that has borne the human race on its back.

In America, the horse was the primary source of transportation of our founding fathers, the vehicle of our Revolutionary soldiers, and a symbol of the majestic strength and character that this great country was based upon. Our fledgling urban centers rose with the help of the horse's brawn. Our American frontier expanded farther and farther west, with families traveling by horse-drawn wagons across mountains and valleys, the plains and prairies. The American cowboy, an indelible image of the fierce and undying determination of the American spirit, was never without his trusty four-legged companion.

But each year, 65,000 horses are slaughtered in this country for human consumption in Europe and Asia, where horsemeat is considered a delicacy. Another 30,000 horses are shipped every year to Canada and Mexico to be slaughtered.

These horses often suffer unnecessarily while in transit to slaughterhouses. Horses can be shipped for more than 24 hours without food, water, or rest. They can be transported with broken legs, missing eyes, or while heavily pregnant. The horses are kept in cramped conditions, in trucks with ceilings so low that they prevent the horses from holding their heads in a normal, upright position. The cramped nature of their transport often results in trampling, with some horses arriving at the slaughterhouses seriously injured or dead.

Even more cruel than the suffering these animals endure while in transit is their often injurious end. Improper use of stunning equipment at the slaughterhouse can result in the animal having to endure repeated blows to head, meaning that horses sometime remain conscious throughout the slaughter process.

The market for horsemeat is not an American market. Horsemeat is shipped abroad. The three slaughterhouses in the U.S. are foreign-owned. Thus, American horses are sold to a foreign company, killed for consumption in a foreign market, and foreign-owned companies profit from the export of horse meat. Many Americans would be shocked to learn that our animals suffer such a fate, all in order to satisfy the tastes of those living in Europe and Asia. Indeed, many individuals who sell horses to slaughterhouses do so unwittingly. Slaughterhouses often send third parties, called "killer buyers," to auction to buy horses.

Senator ENSIGN and I have offered an amendment to stop the slaughter of horses for human consumption by preventing taxpayer dollars from being used to inspect the horses intended for slaughter. Without these inspections, which are paid for by the American taxpayer, it would be impossible for these companies to slaughter horses in the U.S., or to transport horses abroad for slaughter.

I ask my colleagues to support the Ensign-Byrd amendment to end the slaughter of one of the most precious American symbols.

The PRESIDING OFFICER. The Senator from Utah.

Mr. BENNETT. Mr. President, I understand the Senator from Hawaii has some amendments to the Agriculture appropriations bill.

The PRESIDING OFFICER. The Senator from Hawaii.

Mr. AKAKA. Mr. President, what is the pending order of business?

The PRESIDING OFFICER. The Bennett amendment is now pending.

Mr. AKAKA. I ask unanimous consent to set the pending amendment aside.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 1729

Mr. AKAKA. Mr. President, I have two amendments to offer. I call up amendment No. 1729 to H.R. 2744, the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies appropriations bill.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Hawaii [Mr. AKAKA] proposes an amendment numbered 1729.

Mr. AKAKA. I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To prohibit Federal funding of research facilities that purchase animals from Class-B dealers)

On page 173, after line 24, insert the following:

SEC. 7____. None of the funds made available by this Act may be used to provide funding to a research facility that purchases animals from a dealer that holds a Class B license under the Animal Welfare Act (7 U.S.C. 2131 et seq.).

aisle, and I believe we are now prepared to pass it on a voice vote.

The PRESIDING OFFICER. The question is on agreeing to the amendment.

The amendment (No. 1726) was agreed to.

Mr. BENNETT. Mr. President, I move to reconsider the vote and ask that that be laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BENNETT. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. TALENT. Mr. President, I ask unanimous consent that the order for the quorum call be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 1763

Mr. TALENT. Mr. President, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Missouri [Mr. TALENT], for himself and Mr. PRYOR, proposes an amendment No. 1763.

Mr. TALENT. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To prohibit the use of funds to close or relocate certain local offices of the Farm Service Agency)

On page 173, after line 24, insert the following:

SEC. 7____. None of the funds made available by this or any other Act may be used to close or relocate a county or local Farm Service Agency office unless or until the Secretary of Agriculture has determined the cost effectiveness and enhancement of program delivery of the closure or relocation, and report to the House and Senate Committees on Agriculture and Appropriations.

Mr. TALENT. Mr. President, this amendment, which I am offering on behalf of myself and Mr. PRYOR, the Senator from Arkansas, is an attempt to address a development within the Department of Agriculture. The Department is proposing closing about a quarter to a third of the Farm Service Agency's local offices around the country, including, as far as we can tell, around 30 out of the 90 offices in Missouri, the object, according to the Department, being to modernize and consolidate functions and to provide better service.

Certainly nobody is opposed to better service. But I want to emphasize something here. The key with regard to how we handle FSA offices has to be service to the agricultural community and to our producers. The idea is accessibility. The idea is responsiveness. The idea is not necessarily somebody's planning in Washington about how they would organize everything in the United States if they could do it exactly the way they wanted.

I am a little concerned about changing our FSA offices when, from what I am told back in Missouri, there has been little or no consultation either with local FSA people or with producer organizations, more particularly farmers or the affected communities. I don't know how we can do this in a way that emphasizes service, acceptability, and accountability without having to talk to the people whom we are trying to serve.

The amendment basically says hold up on this until we have an opportunity for that kind of accessibility and that kind of accountability.

Again, I am not saying—and I don't think Mr. PRYOR is saying either—that no consolidation is possible. I imagine it is possible in Missouri. We certainly want to look at how we can modernize these offices so we can perform better service. But we have to remember that these are the offices our producers have to go to any time they want to deal with any of the Government's various programs that affect them. Some of them in Missouri are already driving 30, 40 minutes, or more than that, and if they drive and they don't have all the forms they need, or they left something at home, they have to go all the way home, get it, and turn around and come back.

When you are proposing eliminating some of those offices when they are already difficult to access, in many cases, I think that is something we need to look at. I certainly believe we need more consolidation, at least in Missouri, than we have had now.

That is all this amendment says. I appreciate very much the bill managers working with us. I understand they are going to be willing to accept the amendment. I appreciate that. I pledge to work with them in conference.

This language isn't necessarily the be-all and end-all with regard to this issue. I think they see what Senator PRYOR and I are driving at, and I think everybody would agree this is something we want to do with consultation and discussions with the affected communities—in particular the affected producer and producer groups. They are not opposed to making the Farm Service Agency work better. We all know the problems that have sometimes occurred. But we have potentially disaster relief coming down the pike, and I certainly hope so for producers who have been affected negatively by the hurricane, or by drought. We have another farm bill that is not that far away. We need to do this right, if we are going to do it. That is what the amendment says.

I appreciate the support of the Senator from Utah, and certainly pledge to work with him and his ranking member in conference on this amendment.

I yield the floor.

Mr. BENNETT. Mr. President, I share the concern and frustration of the Senator from Missouri with the proposal. We have had some of that same concern and frustration in Utah. Charitably, I will say that the efforts to close these offices have been handled a little less wisely than might otherwise have been the case.

I hope that between now and the conference we can learn more about this proposal. I think the Senator's comments about getting information and input from those directly affected is very wise.

I pledge to work with all the Senators concerned on this issue between now and the time we get to conference. So knowing that this will be the vehicle whereby we can get to conference, I am willing to proceed now to a voice vote and urge Senators to support it. I understand it has been cleared on both sides.

The PRESIDING OFFICER. Is there further debate? If not, the question is on agreeing to the amendment.

The amendment (No. 1763) was agreed to.

AMENDMENT NO. 1753

Mr. BENNETT. Mr. President, as we are approaching the hour of 4:45, which has been set as the time for the vote on the Ensign amendment, I say to my colleagues that Senator ENSIGN outlined the reasons for his amendment. I have heard others who for one reason or another have already been opposed to it. But so far, none of them have come to the floor to express that opposition.

I make it clear to anyone who is following the proceedings that one of the reasons we have delayed the vote as we have and kept the afternoon as open as we have has been to allow those who may be opposed to the Ensign amendment the opportunity to present their proposals.

We now are at 4:45. I expect the time is far gone and the vote will proceed. I didn't want anyone thinking we had made any effort to prevent anybody from presenting a different point of view than what Senator ENSIGN laid out when he proposed his amendment this afternoon.

The PRESIDING OFFICER. The hour of 4:45 having arrived, the question is on agreeing to the amendment of the Senator from Nevada.

The yeas and nays have been ordered. The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE), the Senator from Louisiana (Ms. LANDRIEU), and the Senator from West Virginia (Mr. ROCKEFELLER) are necessarily absent.

The PRESIDING OFFICER (Mr. ALEXANDER). Are there any other Senators in the Chamber desiring to vote?

The result was anounced—yeas 68, nays 29, as follows:

[Rollcall Vote No. 237 Leg.]

YEAS—68

| Akaka | Bayh | Boxer |
| Alexander | Bennett | Bunning |
| Allen | Biden | Burr |

| Byrd | Hagel | Mikulski |
| Cantwell | Harkin | Murkowski |
| Carper | Hatch | Murray |
| Chafee | Hutchison | Nelson (FL) |
| Chambliss | Inouye | Nelson (NE) |
| Clinton | Isakson | Obama |
| Coleman | Jeffords | Reed |
| Collins | Kennedy | Reid |
| Dayton | Kerry | Santorum |
| DeMint | Kohl | Sarbanes |
| DeWine | Kyl | Schumer |
| Dodd | Lautenberg | Smith |
| Dole | Leahy | Snowe |
| Durbin | Levin | Specter |
| Ensign | Lieberman | Stabenow |
| Feingold | Lott | Sununu |
| Feinstein | Lugar | Vitter |
| Frist | Martinez | Warner |
| Graham | McCain | Wyden |
| Gregg | McConnell | |

NAYS—29

| Allard | Craig | Roberts |
| Baucus | Crapo | Salazar |
| Bingaman | Domenici | Sessions |
| Bond | Dorgan | Shelby |
| Brownback | Enzi | Stevens |
| Burns | Grassley | Talent |
| Coburn | Inhofe | Thomas |
| Cochran | Johnson | Thune |
| Conrad | Lincoln | Voinovich |
| Cornyn | Pryor | |

NOT VOTING—3

| Corzine | Landrieu | Rockefeller |

The amendment (No. 1753), as modified, was agreed to.

Mr. BENNETT. Mr. President, I move to reconsider the vote.

Mr. SUNUNU. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. BENNETT. Mr. President, I have been asked throughout the vote whether that is the last vote of the evening. That obviously is not my call. It is the responsibility of the leader to make that decision. At the moment, I don't know of any amendment that would require a vote. I would hope that our colleagues who have amendments would be aggressive in coming to the floor now and offering them. We could offer an amendment now, lay it down for a vote in the morning.

Mr. ROBERTS. Will the Senator yield?

Mr. BENNETT. I yield.

Mr. ROBERTS. I have an amendment. I would like to offer it.

Mr. BENNETT. The Senator from Kansas satisfies our request instantly. I am happy to yield the floor.

AMENDMENT NO. 1742

Mr. ROBERTS. Mr. President, I have an amendment pending at the desk numbered 1742. I ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Kansas [Mr. ROBERTS] proposes an amendment numbered 1742.

Mr. ROBERTS. I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To modify the conditions under which the Federal Crop Insurance Corporation may offer crop insurance to single producers)

On page 173, after line 24, insert the following:

SEC. 7____. Section 508(a)(4)(B) of the Federal Crop Insurance Act (7 U.S.C. 1508(a)(4)(B)) is amended by inserting "or similar commodities" after "the commodity".

Mr. ROBERTS. Mr. President, this amendment is very straightforward. It has been cleared by both the chairman and ranking member of the Agriculture Committee, and I have also received word that the Risk Management Agency is supportive of this change.

Very simply, the amendment amends the section of the Federal Crop Insurance Act regarding the use of written agreements for commodities in counties where the crop has not yet been approved for crop insurance purposes.

The problem is that 3 years of cropping history is needed in order to issue a written agreement for coverage. However, producers cannot get a history of planting because the banker won't lend the money if they can't get insurance coverage. Thus, it is an endless cycle.

We have many counties where coverage exists for sunflowers, and we would like to use that data to expand coverage to canola. The Risk Management Agency has indicated that this would be an acceptable practice. However, the current law says that data must be used from the same commodity for which the policy is being issued. This amendment simply changes that language to allow data from agronomically similar crops to be used in providing written agreements.

The amendment has been given a score of zero by the CBO, and I urge my colleagues to accept it.

I yield the floor.

The PRESIDING OFFICER. The Senator from Utah.

Mr. BENNETT. Mr. President, I have no objection to this amendment and believe we should move forward on a voice vote.

The PRESIDING OFFICER. Is there further debate on the current amendment?

Mr. BENNETT. Mr. President, I ask that we withhold from the vote, and I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. BENNETT. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BENNETT. Mr. President, we are now prepared to proceed to a voice vote on the Roberts amendment.

The PRESIDING OFFICER. If there is no further debate, the question is on agreeing to amendment No. 1742.

The amendment (No. 1742) was agreed to.

The PRESIDING OFFICER. The Senator from Wisconsin.

AMENDMENT NO. 1765

Mr. KOHL. Mr. President, on behalf of Senator HARKIN, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Wisconsin [Mr. KOHL], for Mr. HARKIN, proposes an amendment numbered 1765.

Mr. KOHL. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To require the Secretary of Agriculture to provide notice to Congress before initiating any structural change in a mission area of the Department)

On page 173, after line 24, insert the following:

SEC. 7 ___. 90 days before initiating any structural change in a mission area of the Department, the Secretary of Agriculture shall provide notice of the change to the Committees on Appropriations of the Senate and the House of Representatives.

Mr. KOHL. I ask for adoption of the amendment.

The PRESIDING OFFICER. Is there further debate? If not, the question is on agreeing to the amendment.

The amendment (No. 1765) was agreed to.

Mr. KOHL. I move to reconsider the vote, and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENT NO. 1766

Mr. KOHL. Mr. President, on behalf of Senator PRYOR, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Wisconsin [Mr. KOHL], for Mr. PRYOR, proposes an amendment numbered 1766.

Mr. KOHL. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To provide a technical correction for the community eligibility for rural utilities programs in Arkansas)

On page 154, line 10, insert ", Cleburne County, Arkansas," after "Montana".

Mr. KOHL. I ask for adoption of the amendment.

The PRESIDING OFFICER. If there is no further debate, the question is on agreeing to the amendment.

The amendment (No. 1766) was agreed to.

Mr. KOHL. I move to reconsider the vote, and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. KOHL. I yield the floor.

Mr. BENNETT. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. DAYTON. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

milk pricing plan operated by a State, to pay minimum class prices for the raw milk that is used for the milk dispositions or sales.

"(iii) OBLIGATION TO PAY MINIMUM CLASS PRICES.—For the purpose of clause (ii)(III), the Secretary may not consider a handler of Class I milk products to be obligated by a Federal milk marketing order to pay minimum class prices for raw milk unless the handler operates the plant as a fully regulated fluid milk distributing plant under a Federal milk marketing order.

"(iv) CERTAIN HANDLERS EXEMPTED.— Clause (i) does not apply to—

"(I) a handler (otherwise described in clause (ii)) that operates a nonpool plant (as defined in section 1000.8(e) of title 7, Code of Federal Regulations (as in effect on the date of enactment of this subparagraph));

"(II) a producer-handler (otherwise described in clause (ii)) for any month during which the producer-handler has route dispositions, and sales to other plants, of packaged fluid milk products equaling less than 3,000,000 pounds of milk; or

"(III) a handler (otherwise described in clause (ii)) for any month during which—

"(aa) less than 25 percent of the total quantity of fluid milk products physically received at the plant of the handler (excluding concentrated milk received from another plant by agreement for other than Class I use) is disposed of as route disposition or is transferred in the form of packaged fluid milk products to other plants; or

"(bb) less than 25 percent in aggregate of the route disposition or transfers are in a marketing area or areas located in 1 or more States that require handlers to pay minimum prices for raw milk purchases.

"(N) EXEMPTION FOR CERTAIN MILK HANDLERS.—Notwithstanding any other provision of this section, no handler with distribution of Class I milk products in the Arizona-Las Vegas marketing area (Order No. 131) shall be exempt during any month from any minimum milk price requirement established by the Secretary under this subsection if the total distribution of Class I products during the preceding month of any such handler's own farm production that exceeds 3,000,000 pounds.".

(b) Section 8c(11) of the Agricultural Adjustment Act (7 U.S.C. 608c(11)), reenacted with amendments by the Agricultural Marketing Agreement Act of 1937, is amended—

(1) in subparagraph (C), by striking the last sentence; and

(2) by adding at the end the following:

"(D) EXCLUSION OF NEVADA FROM FEDERAL MILK MARKETING ORDERS.—In the case of milk and its products, no county or other political subdivision located in the State of Nevada shall be within a marketing area covered by any order issued under this section.".

(c) Notwithstanding any other provision of this section or the amendments made by this section, a milk handler (including a producer-handler or producer operating as a handler) that is subject to regulation under this section or an amendment made by this section shall comply with any requirement under section 1000.27 of title 7, Code of Federal Regulations (or a successor regulation) relating to responsibility of handlers for records or facilities.

(d)(1) This section and the amendments made by this section take effect on the first day of the first month beginning more than 15 days after the date of enactment of this Act.

(2) To accomplish the expedited implementation schedule for the amendment made by subsection (a), effective on the date of enactment of this Act, the Secretary of Agriculture shall ensure that the pool distributing plant provisions of each Federal milk marketing order issued under section 8c(5)(B) of the Agricultural Adjustment Act (7 U.S.C. 608c(5)(B)), reenacted with amendments by the Agricultural Marketing Agreement of 1937, provides that a handler described in section 8c(5)(M) of the Agricultural Adjustment Act, reenacted with amendments by the Agricultural Marketing Agreement of 1937 (as added by subsection (a))), will be fully regulated by the order in which the distributing plant of the handler is located.

(3) Implementation of this section and the amendments made by this section shall not be subject to a referendum under section 8c(19) of the Agricultural Adjustment Act (7 U.S.C. 608c(19)), reenacted with amendments by the Agricultural Marketing Agreement Act of 1937.

────────

SA 1748. Mr. DURBIN (for Mr. INOUYE (for himself, Mr. AKAKA, and Mrs. FEINSTEIN)) proposed an amendment to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; as follows:

On page 101, line 10, before the period at the end insert the following: ": Provided further, That none of the funds may be used to demolish or dismantle the Hawaii Fruit Fly Production Facility in Waimanalo, Hawaii".

────────

SA 1749. Mr. DURBIN (for himself, Mr. ENZI, and Mr. KENNEDY and Mr. BINGAMAN) proposed an amendment to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; as follows:

On page 173, after line 24, insert the following:

SEC. 7__. (a) Subject to subsection (b), none of the funds made available in this Act may be used to—

(1) grant a waiver of a financial conflict of interest requirement pursuant to section 505(n)(4) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(n)(4)) for any voting member of an advisory committee or panel of the Food and Drug Administration; or

(2) make a certification under section 208(b)(3) of title 18, United States Code, for any such voting member.

(b) Subsection (a) shall not apply to a waiver or certification if—

(1) not later than 15 days prior to a meeting of an advisory committee or panel to which such waiver or certification applies, the Secretary of Health and Human Services discloses on the Internet website of the Food and Drug Administration—

(A) the nature of the conflict of interest at issue; and

(B) the nature and basis of such waiver or certification (other than information exempted from disclosure under section 552 of title 5, United States Code (popularly known as the Freedom of Information Act)); or

(2) in the case of a conflict of interest that becomes known to the Secretary less than 15 days prior to a meeting to which such waiver or certification applies, the Secretary shall make such public disclosure as soon as possible thereafter, but in no event later than the date of such meeting.

(c) None of the funds made available in this Act may be used to make a new appointment to an advisory committee or panel of the Food and Drug Administration unless the Commissioner of Food and Drugs submits a confidential report to the Inspector General of the Department of Health and Human Services of the efforts made to identify qualified persons for such appointment with minimal or no potential conflicts of interest.

────────

SA 1750. Mr. BENNETT proposed an amendment to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; as follows:

On page 93, line 9 at the end of the sentence insert the following:

"Provided further, That the Agricultural Research Service may convey all rights and title of the United States, to a parcel of land comprising 19 acres, more or less, located in Section 2, Township 18 North, Range 14 East in Oktibbeha County, Mississippi, originally conveyed by the Board of Trustees of the Institution of Higher Learning of the State of Mississippi, and described in instruments recorded in Deed Book 306 at pages 553–554, Deed Book 319 at page 219, and Deed Book 33 at page 115, of the public land records of Oktibbeha County, Mississippi, including facilities, and fixed equipment, to the Mississippi State University, Starkville, Mississippi, in their "as is" condition, when vacated by the Agricultural Research Service."

────────

SA 1751. Mr. BENNETT proposed an amendment to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; as follows:

On page 173 after line 24, insert the following new paragraphs:

"SEC. . (a) Hereafter, none of the funds made available by this Act or any other Act may be used to publish, disseminate, or distribute Agriculture Information Bulletin Number 787.

(b) Of the funds provided to the Economic Research Service, the Secretary of Agriculture shall enter into an agreement with the National Academy of Sciences to conduct a comprehensive report on the economic development and current status of the sheep industry in the United States."

────────

SA 1752. Mr. BENNETT proposed an amendment to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; as follows:

On page 173 after line 24 insert the following:

"SEC. . The Secretary of Agriculture may establish a demonstration intermediate re-lending program for the construction and rehabilitation of housing for the Choctaw Nation: Provided, That the interest rate for direct loans shall be 1 percent: Provided further. That no later than one year after the establishment of this program the Secretary shall provide the Committees on Appropriations with a report providing information on the program structure, management, and general demographic information on the loan recipients."

────────

SA 1753. Mr. ENSIGN (for himself, Mr. BYRD, Mr. GRAHAM, Mr. LOTT, Mr. DEMINT, Ms. LANDRIEU, Ms. STABENOW, Mrs. FEINSTEIN, Mr. LAUTENBERG, and Mr. CORZINE) proposed an amendment to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration,

and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; as follows:

At the appropriate place, add the following:

SEC. __. None of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. 603) or under the guidelines issued under section 903 the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 1901 note; Public Law 104–127).

SA 1754. Mr. SALAZAR submitted an amendment intended to be proposed by him to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; which was ordered to lie on the table; as follows:

On page 173, after line 24, insert the following:

SEC. 7__. Not later than 90 days after the date of enactment of this Act, the Secretary of Agriculture, in cooperation with the Secretary of Energy, shall provide to the Committee on Appropriations of the Senate and the Committee on Appropriations of the House of Representatives a report that describes the impact of increased prices of gas, natural gas, and diesel on agricultural producers, ranchers, and rural communities.

SA 1755. Mr. SALAZAR submitted an amendment intended to be proposed by him to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; which was ordered to lie on the table; as follows:

On page 173, after line 24, insert the following:

SEC. 7__. The Secretary of Agriculture (referred to in this section as the "Secretary") shall prepare a report for submission by the President to Congress, along with the fiscal year 2007 budget request under section 1105 of title 31, United States Code, that—

(1) identifies measures to address bark beetle infestation and the impacts of bark beetle infestation as the first priority for assistance under the Healthy Forests Restoration Act of 2003 (16 U.S.C. 6501 et seq.);

(2) describes activities that will be conducted by the Secretary to address bark beetle infestations and the impacts of bark beetle infestations;

(3) describes the financial and technical resources that will be dedicated by the Secretary to measures to address bark beetle infestations and the impacts of the infestations; and

(4) describes the manner in which the Secretary will coordinate with the Secretary of the Interior and State and local governments in conducting the activities under paragraph (2).

SA 1756. Mrs. BOXER submitted an amendment intended to be proposed by her to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; which was ordered to lie on the table; as follows:

On page 173, after line 24, insert the following:

SEC. 7__. Notwithstanding the proclamation by the President dated September 8, 2005, or any other provision of law, the provisions of subchapter IV of chapter 31 of title 40, United States Code (and the provisions of all other related Acts to the extent they depend upon a determination by the Secretary of Labor under section 3142 of such title, whether or not the President has the authority to suspend the operation of such provisions), shall apply to all contracts to which such provisions would otherwise apply that are entered into on or after the date of enactment of this Act, to be performed in the counties affected by Hurricane Katrina and described in such proclamation.

SA 1757. Mr. LUGAR (for himself and Mr. HARKIN) submitted an amendment intended to be proposed by him to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; which was ordered to lie on the table; as follows:

On page 85, line 15, strike "$128,072,000" and insert "$126,072,000".

On page 167, line 20, strike "$12,000,000" and insert "$14,000,000".

SA 1758. Mr. LUGAR submitted an amendment intended to be proposed by him to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; which was ordered to lie on the table; as follows:

On page 167, line 20, strike "$12,000,000" and insert "$14,000,000".

SA 1759. Mr. LUGAR submitted an amendment intended to be proposed by him to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; which was ordered to lie on the table; as follows:

On page 94, line 9, before the semicolon, insert the following: ", of which not less than $1,500,000 shall be used for special grants for agricultural research related to hardwood scanning".

On page 85, line 15, strike "$128,072,000" and insert "$126,572,000."

SA 1760. Mr. DURBIN submitted an amendment intended to be proposed by him to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; which was ordered to lie on the table; as follows:

On page 173, after line 24, insert the following:

SEC. 7__. (a)(1) Section 101 of division B of Public Law 108–324 (118 Stat. 1232) is amended—

(A) in subsection (a)(2)—
(i) by striking "the 2003, 2004, or 2005 crop (as elected by a producer), but limited to only one of the crop years listed" and inserting "the 2003 or 2004 crop (as elected by a producer) and the 2005 crop"; and

(ii) by striking "qualifying crop losses" and all that follows through "in this paragraph,"; and

(B) in subsection (c)(1), by striking "2004" and inserting "2005".

(2) The amounts made available by the transfer of funds in or pursuant to the amendments made by paragraph (1) are designated as an emergency requirement pursuant to section 402 of H. Con. Res. 95 (109th Congress).

(b)(1) Effective beginning on the date of enactment of this Act, the Secretary shall use funds of the Commodity Credit Corporation to carry out the 2002 Livestock Compensation Program announced by the Secretary on October 10, 2002 (67 Fed. Reg. 63070) for 2005 losses.

(2) In carrying out the Program, the Secretary shall—

(A) provide assistance to any applicant that—
(i) conducts a livestock operation that is physically located in a disaster county, including any applicant conducting a livestock operation with eligible livestock, as that term is used in carrying out the livestock assistance program under section 101(b) of division B of Public Law 108–324 (118 Stat. 1232); and
(ii) meets all other eligibility requirements established by the Secretary for the Program; and

(B) provide assistance to any applicant that—
(i) produces an animal described in section 10806(a)(1) of the Farm Security and Rural Investment Act of 2002 (21 U.S.C. 321d(a)(1)); and
(ii) meets all other eligibility requirements established by the Secretary for the Program.

SA 1761. Ms. STABENOW (for herself, Mr. LEVIN, Mr. DEWINE, Mr. BAYH, and Mr. VOINOVICH) submitted an amendment intended to be proposed by her to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; which was ordered to lie on the table; as follows:

On page 100, line 9, before the colon insert the following: "; of which $10,440,000 shall be used for the eradication of the emerald ash borer in the States of Michigan, Ohio, and Indiana".

SA 1762. Ms. STABENOW submitted an amendment intended to be proposed by her to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; which was ordered to lie on the table; as follows:

On page 173, after line 24, insert the following:

SEC. 7__. Section 10204(a) of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 8204(a)) is amended by inserting "per year" after "$75,000".

SA 1763. Mr. TALENT (for himself and Mr. PRYOR) proposed an amendment to the bill H.R. 2744, making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes; as follows: