| Doc. Number | Date | Description | Starting Bates Number |
|---|---|---|---|
| 1 | 3/5/70 | Executive Order 11514, Protection and Enhancement of Environmental Quality | AR0001 (1b.4) |
| 2 | 11/28/78 | Council on Environmental Quality's National Environmental Policy Act Regulations, 40 C.F.R. Parts 1500-1508 | AR0004 (1b.4) |
| 3 | 5/1/79 | U.S. Department of Agriculture, National Environmental Policy Act, Proposed Policies and Procedures; Proposed Rule (44 FR 25606) | AR0057 (1b.4) |
| 4 | 7/30/79 | U.S. Department of Agriculture, National Environmental Policy Act, Proposed Policies and Procedures; Final Rule (44 FR 44802) | AR0060 (1b.4) |
| 5 | 9/27/82 | U.S. Department of Agriculture, Revision of National Environmental Policy Act Policies and Procedures; Notice of Proposed Rulemaking (47 FR 42364) | AR0062 (1b.4) |
| 6 | 3/18/83 | U.S. Department of Agriculture, National Environmental Policy Act, Policies and Procedures; Final Rule (48 FR 11403) | AR0064 (1b.4) |
| 7 | 7/28/83 | Council on Environmental Quality Guidance Regarding NEPA Regulations (48 FR 34263) | AR0066 (1b.4) |
| 8 | 12/22/95 | U.S. Department of Agriculture, Departmental Proceedings, Judicial Proceedings, and NEPA Policy; Final Rule (60 FR 66479) | AR0072 (1b.4) |

# Executive Order No. 11514. Protection and Enhancement of Environmental Quality

By virtue of the authority vested in me as President of the United States and in furtherance of the purpose and policy of the National Environmental Policy Act of 1969 (Public Law No. 91-190, approved January 1, 1970), it is ordered as follows:

SECTION 1. *Policy.* The Federal Government shall provide leadership in protecting and enhancing the quality of the Nation's environment to sustain and enrich human life. Federal agencies shall initiate measures needed to direct their policies, plans and programs so as to meet national environmental goals. The Council on Environmental Quality, through the Chairman, shall advise and assist the President in leading this national effort.

SEC. 2. *Responsibilities of Federal agencies.* Consonant with Title I of the National Environmental Policy Act of 1969, hereinafter referred to as the "Act", the heads of Federal agencies shall:

(a) Monitor, evaluate, and control on a continuing basis their agencies' activities so as to protect and enhance the quality of the environment. Such activities shall include those directed to controlling pollution and enhancing the environment and those designed to accomplish other program objectives which may affect the quality of the environment. Agencies shall develop programs and measures to protect and enhance environmental quality and shall assess progress in meeting the specific objectives of such activities. Heads of agencies shall consult with appropriate Federal, State and local agencies in carrying out their activities as they affect the quality of the environment.

(b) Develop procedures to ensure the fullest practicable provision of timely public information and understanding of Federal plans and programs with environmental impact in order to obtain the views of interested parties. These procedures shall include, whenever appropriate, provision for public hearings, and shall provide the public with relevant information, including information on alternative courses of action. Federal agencies shall also encourage State and local agencies to adopt similar procedures for informing the public concerning their activities affecting the quality of the environment.

(c) Insure that information regarding existing or potential environmental problems and control methods developed as part of research, development, demonstration, test, or evaluation activities is made available to Federal agencies, States, counties, municipalities, institutions, and other entities, as appropriate.

(d) Review their agencies' statutory authority, administrative regulations, policies, and procedures, including those relating to loans, grants, contracts, leases, licenses, or permits, in order to identify any deficiencies or inconsistencies therein which prohibit or limit full compliance with the purposes and provisions of the Act. A report on this review and the corrective actions taken or planned, including such measures to be proposed to the President as may be necessary to bring their authority and policies into conformance with the intent, purposes and procedures of the Act, shall be provided to the Council on Environmental Quality not later than September 1, 1970.

(e) Engage in exchange of data and research results, and cooperate with agencies of other governments to foster the purposes of the Act.

(f) Proceed, in coordination with other agencies, with actions required by section 102 of the Act.

(g) In carrying out their responsibilities under the Act and this Order, comply with the regulations issued by the Council except where such compliance would be inconsistent with statutory requirements.

AR0001

[SEC. 2(g) added by Executive Order 11991.]

SEC. 3. *Responsibilities of Council on Environmental Quality.* The Council on Environmental Quality shall:

(a) Evaluate existing and proposed policies and activities of the Federal Government directed to the control of pollution and the enhancement of the environment and to the accomplishment of other objectives which affect the quality of the environment. This shall include continuing review of procedures employed in the development and enforcement of Federal standards affecting environmental quality. Based upon such evaluations the Council shall, where appropriate, recommend to the President policies of environmental quality and shall, where appropriate, seek resolution of significant environmental issues.

(b) Recommend to the President and to the agencies priorities among programs designed for the control of pollution and for enhancement of the environment.

(c) Determine the need for new policies and programs for dealing with environmental problems not being adequately addressed.

(d) Conduct, as it determines to be appropriate, public hearings or conferences on issues of environmental significance.

(e) Promote the development and use of indices and monitoring systems (1) to assess environmental conditions and trends, (2) to predict the environmental impact of proposed public and private actions, and (3) to determine the effectiveness of programs of protecting and enhancing environmental quality.

(f) Coordinate Federal programs related to environmental quality.

(g) Advise and assist the President and the agencies in achieving international cooperation for dealing with environmental problems, under the foreign policy guidance of the Secretary of State.

(h) Issue regulations to Federal agencies for the implementation of the procedural provisions of the Act (42 U.S.C. 4332(2)). Such regulations shall be developed after consultation with affected agencies and after such public hearings as may be appropriate. They will be designed to make the environmental impact statement process more useful to decisionmakers and the public; and to reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives. They will require impact statements to be concise, clear, and to the point, and supported by evidence that agencies have made the necessary environmental analyses. The Council shall include in its regulations procedures (1) for the early preparation of environmental impact statements, and (2) for the referral to the Council of conflicts between agencies concerning the implementation of the National Environmental Policy Act of 1969, as amended, and Section 309 of the Clean Air Act, as amended, for the Council's recommendation as to their prompt resolution.

[SEC. 3(h) revised by Executive Order 11991.]

(i) Issue such other instructions to agencies, and request such reports and other information from them, as may be required to carry out the Council's responsibilities under the Act.

(j) Assist the President in preparing the annual Environmental Quality Report provided for in section 201 of the Act.

AR0002

(k) Foster investigations, studies, surveys, research, and analyses relating to (i) ecological systems and environmental quality, (ii) the impact of new and changing technologies thereon, and (iii) means of preventing or reducing adverse effects from such technologies.

SEC. 4. Amendments of E.O. 11472.

RICHARD NIXON

The White House

March 5, 1970

AR0003

# PART 1500--PURPOSE, POLICY, AND MANDATE

Sec.    1500.1 Purpose.
1500.2 Policy.
1500.3 Mandate.
1500.4 Reducing paperwork.
1500.5 Reducing delay.
1500.6 Agency authority.

Authority: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and E.O. 11514, Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Source: 43 FR 55990, Nov. 28, 1978, unless otherwise noted.

## Sec. 1500.1 Purpose.

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork--even excellent paperwork--but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

## Sec. 1500.2 Policy.

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

AR0004

(b) Implement procedures to make the NEPA process more useful to decisionmakers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

(d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

## Sec. 1500.3 Mandate.

Parts 1500 through 1508 of this title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91-190, 42 U.S.C. 4321 et seq.) (NEPA or the Act) except where compliance would be inconsistent with other statutory requirements. These regulations are issued pursuant to NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.) section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977). These regulations, unlike the predecessor guidelines, are not confined to sec. 102(2)(C) (environmental impact statements). The regulations apply to the whole of section 102(2). The provisions of the Act and of these regulations must be read together as a whole in order to comply with the spirit and letter of the law. It is the Council's intention that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), or takes action that will result in irreparable injury. Furthermore, it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action.

## Sec. 1500.4 Reducing paperwork.

Agencies shall reduce excessive paperwork by:

(a) Reducing the length of environmental impact statements (Sec. 1502.2(c)), by means such as setting appropriate page limits (Secs.

AR0005

1501.7(b)(1) and 1502.7).

(b) Preparing analytic rather than encyclopedic environmental impact statements (Sec. 1502.2(a)).

(c) Discussing only briefly issues other than significant ones (Sec. 1502.2(b)).

(d) Writing environmental impact statements in plain language (Sec. 1502.8).

(e) Following a clear format for environmental impact statements (Sec. 1502.10).

(f) Emphasizing the portions of the environmental impact statement that are useful to decisionmakers and the public (Secs. 1502.14 and 1502.15) and reducing emphasis on background material (Sec. 1502.16).

(g) Using the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly (Sec. 1501.7).

(h) Summarizing the environmental impact statement (Sec. 1502.12) and circulating the summary instead of the entire environmental impact statement if the latter is unusually long (Sec. 1502.19).

(i) Using program, policy, or plan environmental impact statements and tiering from statements of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (Secs. 1502.4 and 1502.20).

(j) Incorporating by reference (Sec. 1502.21).

(k) Integrating NEPA requirements with other environmental review and consultation requirements (Sec. 1502.25).

(l) Requiring comments to be as specific as possible (Sec. 1503.3).
(m) Attaching and circulating only changes to the draft environmental impact statement, rather than rewriting and circulating the entire statement when changes are minor (Sec. 1503.4(c)).

(n) Eliminating duplication with State and local procedures, by providing for joint preparation (Sec. 1506.2), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (Sec. 1506.3).

(o) Combining environmental documents with other documents (Sec. 1506.4).

(p) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement (Sec. 1508.4).

AR0006

(q) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and is therefore exempt from requirements to prepare an environmental impact statement (Sec. 1508.13).

[43 FR 55990, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]


**Sec. 1500.5 Reducing delay.**

Agencies shall reduce delay by:

(a) Integrating the NEPA process into early planning (Sec. 1501.2).

(b) Emphasizing interagency cooperation before the environmental impact statement is prepared, rather than submission of adversary comments on a completed document (Sec. 1501.6).

(c) Insuring the swift and fair resolution of lead agency disputes (Sec. 1501.5).

(d) Using the scoping process for an early identification of what are and what are not the real issues (Sec. 1501.7).

(e) Establishing appropriate time limits for the environmental impact statement process (Secs. 1501.7(b)(2) and 1501.8).

(f) Preparing environmental impact statements early in the process (Sec. 1502.5).

(g) Integrating NEPA requirements with other environmental review and consultation requirements (Sec. 1502.25).

(h) Eliminating duplication with State and local procedures by providing for joint preparation (Sec. 1506.2) and with other Federal procedures by providing that an agency may adopt appropriate environmental documents prepared by another agency (Sec. 1506.3).

(i) Combining environmental documents with other documents (Sec. 1506.4).

(j) Using accelerated procedures for proposals for legislation (Sec. 1506.8).

(k) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment (Sec. 1508.4) and which are therefore exempt from requirements to prepare an environmental impact statement.

(l) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (Sec. 1508.13) and is therefore exempt from requirements to prepare an environmental impact statement.

AR0007

**Sec. 1500.6 Agency authority.**

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view traditional policies and missions in the light of the Act's national environmental objectives. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to insure full compliance with the purposes and provisions of the Act. The phrase "to the fullest extent possible" in section 102 means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible.

Back to Table of Contents

AR0008

# PART 1501—NEPA AND AGENCY PLANNING

Sec.     1501.1 Purpose.
         1501.2 Apply NEPA early in the process.
         1501.3 When to prepare an environmental assessment.
         1501.4 Whether to prepare an environmental impact statement.
         1501.5 Lead agencies.
         1501.6 Cooperating agencies.
         1501.7 Scoping.
         1501.8 Time limits.

Authority: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609, and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Source: 43 FR 55992, Nov. 29, 1978, unless otherwise noted.

## Sec. 1501.1 Purpose.

The purposes of this part include:

(a) Integrating the NEPA process into early planning to insure appropriate consideration of NEPA's policies and to eliminate delay.

(b) Emphasizing cooperative consultation among agencies before the environmental impact statement is prepared rather than submission of adversary comments on a completed document.

(c) Providing for the swift and fair resolution of lead agency disputes.

(d) Identifying at an early stage the significant environmental issues deserving of study and deemphasizing insignificant issues, narrowing the scope of the environmental impact statement accordingly.

(e) Providing a mechanism for putting appropriate time limits on the environmental impact statement process.

## Sec. 1501.2 Apply NEPA early in the process.

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

(a) Comply with the mandate of section 102(2)(A) to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment," as specified by Sec. 1507.2.

(b) Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses.

AR0009

Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

(d) Provide for cases where actions are planned by private applicants or other non-Federal entities before Federal involvement so that:

1.  Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

2.  The Federal agency consults early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations when its own involvement is reasonably foreseeable.

3.  The Federal agency commences its NEPA process at the earliest possible time.

## Sec. 1501.3 When to prepare an environmental assessment.

(a) Agencies shall prepare an environmental assessment (Sec. 1508.9) when necessary under the procedures adopted by individual agencies to supplement these regulations as described in Sec. 1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.

(b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

## Sec. 1501.4 Whether to prepare an environmental impact statement.

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in Sec. 1507.3) whether the proposal is one which:

1.  Normally requires an environmental impact statement, or

2.  Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (Sec. 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by Sec. 1508.9(a)(1).

AR00010

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (Sec. 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (Sec. 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

1. The agency shall make the finding of no significant impact available to the affected public as specified in Sec. 1506.6.

2. certain limited circumstances, which the agency may cover in its procedures under Sec. 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to Sec. 1507.3, or

(ii) The nature of the proposed action is one without precedent.

## Sec. 1501.5 Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:

1. Proposes or is involved in the same action; or

2. Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (Sec. 1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

1. Magnitude of agency's involvement.
2. Project approval/disapproval authority.
3. Expertise concerning the action's environmental effects.

AR00011

4. Duration of agency's involvement.
5. Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency. A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

1. A precise description of the nature and extent of the proposed action.
2. A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.

[43 FR 55992, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

**Sec. 1501.6 Cooperating agencies.**

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

1. Request the participation of each cooperating agency in the NEPA process at the earliest possible time.
2. Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.
3. Meet with a cooperating agency at the latter's request.

(b) Each cooperating agency shall:

1. Participate in the NEPA process at the earliest possible time.
2. Participate in the scoping process (described below in Sec. 1501.7).
3. Assume on request of the lead agency responsibility for

AR00012

developing information and preparing environmental analyses
including portions of the environmental impact statement
concerning which the cooperating agency has special
expertise.
4.  Make available staff support at the lead agency's request to
enhance the latter's interdisciplinary capability.
5.  Normally use its own funds. The lead agency shall, to the
extent available funds permit, fund those major activities or
analyses it requests from cooperating agencies. Potential lead
agencies shall include such funding requirements in their
budget requests.

(c) A cooperating agency may in response to a lead agency's request
for assistance in preparing the environmental impact statement
(described in paragraph (b)(3), (4), or (5) of this section) reply that
other program commitments preclude any involvement or the degree
of involvement requested in the action that is the subject of the
environmental impact statement. A copy of this reply shall be
submitted to the Council.

**Sec. 1501.7 Scoping.** There shall be an early and open process for
determining the scope of issues to be addressed and for identifying the
significant issues related to a proposed action. This process shall be termed
scoping. As soon as practicable after its decision to prepare an
environmental impact statement and before the scoping process the lead
agency shall publish a notice of intent (Sec. 1508.22) in the Federal
Register except as provided in Sec. 1507.3(e).

(a) As part of the scoping process the lead agency shall:

1.  Invite the participation of affected Federal, State, and local
agencies, any affected Indian tribe, the proponent of the
action, and other interested persons (including those who
might not be in accord with the action on environmental
grounds), unless there is a limited exception under Sec.
1507.3(c). An agency may give notice in accordance with Sec.
1506.6.
2.  Determine the scope (Sec. 1508.25) and the significant issues
to be analyzed in depth in the environmental impact
statement.
3.  Identify and eliminate from detailed study the issues which are
not significant or which have been covered by prior
environmental review (Sec. 1506.3), narrowing the discussion
of these issues in the statement to a brief presentation of why
they will not have a significant effect on the human
environment or providing a reference to their coverage
elsewhere.
4.  Allocate assignments for preparation of the environmental
impact statement among the lead and cooperating agencies,
with the lead agency retaining responsibility for the statement.
5.  Indicate any public environmental assessments and other
environmental impact statements which are being or will be
prepared that are related to but are not part of the scope of the
impact statement under consideration.
6.  Identify other environmental review and consultation
requirements so the lead and cooperating agencies may
prepare other required analyses and studies concurrently with,
and integrated with, the environmental impact statement as
provided in Sec. 1502.25.

**AR00013**

7. Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

1. Set page limits on environmental documents (Sec. 1502.7).
2. Set time limits (Sec. 1501.8).
3. Adopt procedures under Sec. 1507.3 to combine its environmental assessment process with its scoping process.
4. Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

**Sec. 1501.8 Time limits.**

Although the Council has decided that prescribed universal time limits for the entire NEPA process are too inflexible, Federal agencies are encouraged to set time limits appropriate to individual actions (consistent with the time intervals required by Sec. 1506.10). When multiple agencies are involved the reference to agency below means lead agency.

(a) The agency shall set time limits if an applicant for the proposed action requests them: Provided, That the limits are consistent with the purposes of NEPA and other essential considerations of national policy.

(b) The agency may:

1. Consider the following factors in determining time limits:

(i) Potential for environmental harm.
(ii) Size of the proposed action.
(iii) State of the art of analytic techniques.
(iv) Degree of public need for the proposed action, including the consequences of delay.
(v) Number of persons and agencies affected.
(vi) Degree to which relevant information is known and if not known the time required for obtaining it.
(vii) Degree to which the action is controversial.
(viii) Other time limits imposed on the agency by law, regulations, or executive order.

2. Set overall time limits or limits for each constituent part of the NEPA process, which may include:

(i) Decision on whether to prepare an environmental impact statement (if not already decided).
(ii) Determination of the scope of the environmental impact statement.
(iii) Preparation of the draft environmental impact

AR00014

statement.
(iv) Review of any comments on the draft environmental
impact statement from the public and agencies.
(v) Preparation of the final environmental impact
statement.
(vi) Review of any comments on the final environmental
impact statement.
(vii) Decision on the action based in part on the
environmental impact statement.

3.  Designate a person (such as the project manager or a person
    in the agency's office with NEPA responsibilities) to expedite
    the NEPA process.

(c) State or local agencies or members of the public may request a
Federal Agency to set time limits.

Back to Table of Contents

AR00015

# PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1 Purpose.
1502.2 Implementation.
1502.3 Statutory requirements for statements.
1502.4 Major Federal actions requiring the preparation of environmental impact statements.
1502.5 Timing.
1502.6 Interdisciplinary preparation.
1502.7 Page limits.
1502.8 Writing.
1502.9 Draft, final, and supplemental statements.
1502.10 Recommended format.
1502.11 Cover sheet.
1502.12 Summary.
1502.13 Purpose and need.
1502.14 Alternatives including the proposed action.
1502.15 Affected environment.
1502.16 Environmental consequences.
1502.17 List of preparers.
1502.18 Appendix.
1502.19 Circulation of the environmental impact statement.
1502.20 Tiering.
1502.21 Incorporation by reference.
1502.22 Incomplete or unavailable information.
1502.23 Cost-benefit analysis.
1502.24 Methodology and scientific accuracy.
1502.25 Environmental review and consultation requirements.

Authority: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Source: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

## Sec. 1502.1 Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

AR00016

**Sec. 1502.2 Implementation.**

To achieve the purposes set forth in Sec. 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (Sec. 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

**Sec. 1502.3 Statutory requirements for statements.**

As required by sec. 102(2)(C) of NEPA environmental impact statements (Sec. 1508.11) are to be included in every recommendation or report.

On proposals (Sec. 1508.23).
For legislation and (Sec. 1508.17).
Other major Federal actions (Sec. 1508.18).
Significantly (Sec. 1508.27).
Affecting (Secs. 1508.3, 1508.8).
The quality of the human environment (Sec. 1508.14).

**Sec. 1502.4 Major Federal actions requiring the preparation of environmental impact statements.**

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (Sec. 1508.25) to determine which proposal (s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact

AR00017

Case 1:06-cv-00265-CKK     Document 30-3     Filed 04/12/2006     Page 19 of 76

statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (Sec. 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

1. Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

2. Generically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

3. By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (Sec. 1501.7), tiering (Sec. 1502.20), and other methods listed in Secs. 1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

**Sec. 1502.5 Timing.**

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (Sec. 1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made (Secs. 1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements

AR00018

earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

## Sec. 1502.6 Interdisciplinary preparation.

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (Sec. 1501.7).

## Sec. 1502.7 Page limits.

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of Sec. 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

## Sec. 1502.8 Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

## Sec. 1502.9 Draft, final, and supplemental statements.

Except for proposals for legislation as provided in Sec. 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in Part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

AR00019

(b) Final environmental impact statements shall respond to comments as required in Part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

    1.  Shall prepare supplements to either draft or final environmental impact statements if:

          (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

          (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

    2.  May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.
    3.  Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.
    4.  Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.


**Sec. 1502.10 Recommended format.**

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

    (a) Cover sheet.
    (b) Summary.
    (c) Table of contents.
    (d) Purpose of and need for action.
    (e) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of the Act).
    (f) Affected environment.
    (g) Environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of the Act).
    (h) List of preparers.
    (i) List of Agencies, Organizations, and persons to whom copies of the statement are sent.
    (j) Index.
    (k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in Secs. 1502.11 through 1502.18, in any appropriate format.

AR00020

**Sec. 1502.11 Cover sheet.**

The cover sheet shall not exceed one page. It shall include:

> (a) A list of the responsible agencies including the lead agency and any cooperating agencies.

> (b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

> (c) The name, address, and telephone number of the person at the agency who can supply further information.

> (d) A designation of the statement as a draft, final, or draft or final supplement.

> (e) A one paragraph abstract of the statement.

> (f) The date by which comments must be received (computed in cooperation with EPA under Sec. 1506.10).

The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

**Sec. 1502.12 Summary.**

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives). The summary will normally not exceed 15 pages.

**Sec. 1502.13 Purpose and need.**

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

**Sec. 1502.14 Alternatives including the proposed action.**

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (Sec. 1502.15) and the Environmental

AR00021

Consequences (Sec. 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

## Sec. 1502.15 Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

## Sec. 1502.16 Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under Sec. 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The

AR00022

discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in Sec. 1502.14. It shall include discussions of:

(a) Direct effects and their significance (Sec. 1508.8).

(b) Indirect effects and their significance (Sec. 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See Sec. 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under Sec. 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under Sec. 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

## Sec. 1502.17 List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (Secs. 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in

background papers, shall be identified. Normally the list will not exceed two pages.

## Sec. 1502.18 Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

> (a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (Sec. 1502.21)).

> (b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

> (c) Normally be analytic and relevant to the decision to be made.

> (d) Be circulated with the environmental impact statement or be readily available on request.

## Sec. 1502.19 Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in Sec. 1502.18(d) and unchanged statements as provided in Sec. 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

> (a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

> (b) The applicant, if any.

> (c) Any person, organization, or agency requesting the entire environmental impact statement.

> (d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment,

AR00024

the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

## Sec. 1502.20 Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (Sec. 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

## Sec. 1502.21 Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

## Sec. 1502.22 Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable

AR00025

significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

1. A statement that such information is incomplete or unavailable;

2. a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

3. a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and

4. the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the Federal Register on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]


## Sec. 1502.23 Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a

AR00026

Case 1:06-cv-00265-CKK    Document 30-3    Filed 04/12/2006    Page 28 of 76

monetary cost-benefit analysis and should not be when there are
important qualitative considerations. In any event, an environmental
impact statement should at least indicate those considerations,
including factors not related to environmental quality, which are
likely to be relevant and important to a decision.

## Sec. 1502.24 Methodology and scientific accuracy.

Agencies shall insure the professional integrity, including scientific
integrity, of the discussions and analyses in environmental impact
statements. They shall identify any methodologies used and shall
make explicit reference by footnote to the scientific and other sources
relied upon for conclusions in the statement. An agency may place
discussion of methodology in an appendix.

## Sec. 1502.25 Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft
environmental impact statements concurrently with and
integrated with environmental impact analyses and related
surveys and studies required by the Fish and Wildlife
Coordination Act (16 U.S.C. 661 et seq.), the National Historic
Preservation Act of 1966 (16 U.S.C. 470 et seq.), the
Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.), and
other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all
Federal permits, licenses, and other entitlements which must be
obtained in implementing the proposal. If it is uncertain
whether a Federal permit, license, or other entitlement is
necessary, the draft environmental impact statement shall so
indicate.

Back to Table of Contents

AR00027

# PART 1503--COMMENTING

Sec.    1503.1 Inviting comments.
1503.2 Duty to comment.
1503.3 Specificity of comments.
1503.4 Response to comments.

Authority: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Source: 43 FR 55997, Nov. 29, 1978, unless otherwise noted.

## Sec. 1503.1 Inviting comments.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

1. Obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

2. Request the comments of:

> (i) Appropriate State and local agencies which are authorized to develop and enforce environmental standards;

> (ii) Indian tribes, when the effects may be on a reservation; and

> (iii) Any agency which has requested that it receive statements on actions of the kind proposed.

Office of Management and Budget Circular A-95 (Revised), through its system of clearinghouses, provides a means of securing the views of State and local environmental agencies. The clearinghouses may be used, by mutual agreement of the lead agency and the clearinghouse, for securing State and local reviews of the draft environmental impact statements.

AR00028

3. Request comments from the applicant, if any.

4. Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under Sec. 1506.10.

## Sec. 1503.2 Duty to comment.

Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority. Agencies shall comment within the time period specified for comment in Sec. 1506.10. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.

## Sec. 1503.3 Specificity of comments.

(a) Comments on an environmental impact statement or on a proposed action shall be as specific as possible and may address either the adequacy of the statement or the merits of the alternatives discussed or both.

(b) When a commenting agency criticizes a lead agency's predictive methodology, the commenting agency should describe the alternative methodology which it prefers and why.

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or entitlements.

(d) When a cooperating agency with jurisdiction by law objects to or expresses reservations about the proposal on grounds of environmental impacts, the agency expressing the objection or reservation shall specify the mitigation measures it considers

AR00029

Case 1:06-cv-00265-CKK    Document 30-3    Filed 04/12/2006    Page 31 of 76

necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences.

## Sec. 1503.4 Response to comments.

(a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:

1. Modify alternatives including the proposed action.

2. Develop and evaluate alternatives not previously given serious consideration by the agency.

3. Supplement, improve, or modify its analyses.

4. Make factual corrections.

5. Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

(b) All substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous), should be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement.

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a)(4) and (5) of this section, agencies may write them on errata sheets and attach them to the statement instead of rewriting the draft statement. In such cases only the comments, the responses, and the changes and not the final statement need be circulated (Sec. 1502.19). The entire document with a new cover sheet shall be filed as the final statement (Sec. 1506.9).

Back to Table of Contents

AR00030

# PART 1504--PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.     1504.1 Purpose.
         1504.2 Criteria for referral.
         1504.3 Procedure for referrals and response.

Authority: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Source: 43 FR 55998, Nov. 29, 1978, unless otherwise noted.

## Sec. 1504.1 Purpose.

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").

(c) Under section 102(2)(C) of the Act other Federal agencies may make similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews must be made available to the President, the Council and the public.

## Sec. 1504.2 Criteria for referral.

Environmental referrals should be made to the Council only after concerted, timely (as early as possible in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental impacts, considering:

(a) Possible violation of national environmental standards or policies.

(b) Severity.

(c) Geographical scope.

(d) Duration.

AR00031

(e) Importance as precedents.

(f) Availability of environmentally preferable alternatives.

## Sec. 1504.3 Procedure for referrals and response.

(a) A Federal agency making the referral to the Council shall:

1. Advise the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached.
2. Include such advice in the referring agency's comments on the draft environmental impact statement, except when the statement does not contain adequate information to permit an assessment of the matter's environmental acceptability.
3. Identify any essential information that is lacking and request that it be made available at the earliest possible time.
4. Send copies of such advice to the Council.

(b) The referring agency shall deliver its referral to the Council not later than twenty-five (25) days after the final environmental impact statement has been made available to the Environmental Protection Agency, commenting agencies, and the public. Except when an extension of this period has been granted by the lead agency, the Council will not accept a referral after that date.

(c) The referral shall consist of:

1. A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it, and requesting that no action be taken to implement the matter until the Council acts upon the referral. The letter shall include a copy of the statement referred to in (c)(2) of this section.

2. A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:
   (i) Identify any material facts in controversy and incorporate (by reference if appropriate) agreed upon facts,

   (ii) Identify any existing environmental requirements or policies which would be violated by the matter,

   (iii) Present the reasons why the referring agency believes the matter is environmentally unsatisfactory,

   (iv) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason,

   (v) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at

AR00032

the earliest possible time, and

(vi) Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(d) Not later than twenty-five (25) days after the referral to the Council the lead agency may deliver a response to the Council, and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

1. Address fully the issues raised in the referral.

2. Be supported by evidence.

3. Give the lead agency's response to the referring agency's recommendations.

(e) Interested persons (including the applicant) may deliver their views in writing to the Council. Views in support of the referral should be delivered not later than the referral. Views in support of the response shall be delivered not later than the response. (f) Not later than twenty-five (25) days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

1. Conclude that the process of referral and response has successfully resolved the problem.

2. Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

3. Hold public meetings or hearings to obtain additional views and information.

4. Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

5. Determine that the issue should be further negotiated by the referring and lead agencies and is not appropriate for Council consideration until one or more heads of agencies report to the Council that the agencies' disagreements are irreconcilable.

6. Publish its findings and recommendations (including where appropriate a finding that the submitted evidence does not support the position of an agency).

7. When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(g) The Council shall take no longer than 60 days to complete the actions specified in paragraph (f)(2), (3), or (5) of this section.

(h) When the referral involves an action required by statute to be

AR00033

determined on the record after opportunity for agency hearing, the referral shall be conducted in a manner consistent with 5 U.S.C. 557(d) (Administrative Procedure Act).

[43 FR 55998, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

Back to Table of Contents

AR00034

# PART 1505—NEPA AND AGENCY DECISIONMAKING

Sec.      1505.1 Agency decisionmaking procedures.
          1505.2 Record of decision in cases requiring environmental
          impact statements.
          1505.3 Implementing the decision.

Authority: NEPA, the Environmental Quality Improvement Act of 1970, as
amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as
amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by
E.O. 11991, May 24, 1977).

Source: 43 FR 55999, Nov. 29, 1978, unless otherwise noted.

## Sec. 1505.1 Agency decisionmaking procedures.

Agencies shall adopt procedures (Sec. 1507.3) to ensure that decisions are
made in accordance with the policies and purposes of the Act. Such
procedures shall include but not be limited to:

(a) Implementing procedures under section 102(2) to achieve the
requirements of sections 101 and 102(1).

(b) Designating the major decision points for the agency's principal
programs likely to have a significant effect on the human environment
and assuring that the NEPA process corresponds with them.

(c) Requiring that relevant environmental documents, comments, and
responses be part of the record in formal rulemaking or adjudicatory
proceedings.

(d) Requiring that relevant environmental documents, comments, and
responses accompany the proposal through existing agency review
processes so that agency officials use the statement in making
decisions.

(e) Requiring that the alternatives considered by the decisionmaker
are encompassed by the range of alternatives discussed in the
relevant environmental documents and that the decisionmaker
consider the alternatives described in the environmental impact
statement. If another decision document accompanies the relevant
environmental documents to the decisionmaker, agencies are
encouraged to make available to the public before the decision is
made any part of that document that relates to the comparison of
alternatives.

## Sec. 1505.2 Record of decision in cases requiring environmental
impact statements.

At the time of its decision (Sec. 1506.10) or, if appropriate, its
recommendation to Congress, each agency shall prepare a concise public
record of decision. The record, which may be integrated into any other
record prepared by the agency, including that required by OMB Circular A-
95 (Revised), part I, sections 6(c) and (d), and Part II, section 5(b)(4), shall:

AR00035

(a) State what the decision was.

(b) Identify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors including any essential considerations of national policy which were balanced by the agency in making its decision and state how those considerations entered into its decision.

(c) State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation.

## Sec. 1505.3 Implementing the decision.

Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (Sec. 1505.2(c)) and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency. The lead agency shall:

(a) Include appropriate conditions in grants, permits or other approvals.

(b) Condition funding of actions on mitigation.

(c) Upon request, inform cooperating or commenting agencies on progress in carrying out mitigation measures which they have proposed and which were adopted by the agency making the decision.

(d) Upon request, make available to the public the results of relevant monitoring.

Back to Table of Contents

AR00036

# PART 1506—OTHER REQUIREMENTS OF NEPA

Sec.    1506.1 Limitations on actions during NEPA process.
        1506.2 Elimination of duplication with State and local procedures.
        1506.3 Adoption.
        1506.4 Combining documents.
        1506.5 Agency responsibility.
        1506.6 Public involvement.
        1506.7 Further guidance.
        1506.8 Proposals for legislation.
        1506.9 Filing requirements.
        1506.10 Timing of agency action.
        1506.11 Emergencies.
        1506.12 Effective date.

Authority: NEPA, the Environmental Quality Improvement Act of 1970, as
amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as
amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by
E.O. 11991, May 24, 1977).

Source: 43 FR 56000, Nov. 29, 1978, unless otherwise noted.

## Sec. 1506.1 Limitations on actions during NEPA process.

(a) Until an agency issues a record of decision as provided in Sec.
1505.2 (except as provided in paragraph (c) of this section), no action
concerning the proposal shall be taken which would:

1.  Have an adverse environmental impact; or
2.  Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-Federal
entity, and is aware that the applicant is about to take an action within
the agency's jurisdiction that would meet either of the criteria in
paragraph (a) of this section, then the agency shall promptly notify
the applicant that the agency will take appropriate action to insure
that the objectives and procedures of NEPA are achieved.

(c) While work on a required program environmental impact
statement is in progress and the action is not covered by an existing
program statement, agencies shall not undertake in the interim any
major Federal action covered by the program which may significantly
affect the quality of the human environment unless such action:

1.  Is justified independently of the program;
2.  Is itself accompanied by an adequate environmental impact
    statement;
    and
3.  Will not prejudice the ultimate decision on the program. Interim
    action prejudices the ultimate decision on the program when it
    tends to determine subsequent development or limit
    alternatives.

(d) This section does not preclude development by applicants of plans or
designs or performance of other work necessary to support an application

AR00037

for Federal, State or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

## Sec. 1506.2 Elimination of duplication with State and local procedures.

(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

1. Joint planning processes.
2. Joint environmental research and studies.
3. Joint public hearings (except where otherwise provided by statute).
4. Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

## Sec. 1506.3 Adoption.

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to

AR00038

recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under Part 1504, or when the statement's adequacy is the subject of a judicial action which is not final, the agency shall so specify.

### Sec. 1506.4 Combining documents.

Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.

### Sec. 1506.5 Agency responsibility.

(a) Information. If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (Sec. 1502.17). It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

(b) Environmental assessments. If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) Environmental impact statements. Except as provided in Secs. 1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under Sec. 1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from

AR00039

Case 1:06-cv-00265-CKK    Document 30-3    Filed 04/12/2006    Page 41 of 76

requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

## Sec. 1506.6 Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

1. In all cases the agency shall mail notice to those who have requested it on an individual action.
2. In the case of an action with effects of national concern notice shall include publication in the Federal Register and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the 102 Monitor. An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.
3. In the case of an action with effects primarily of local concern the notice may include:

   (i) Notice to State and areawide clearinghouses pursuant to OMB Circular A- 95 (Revised).

   (ii) Notice to Indian tribes when effects may occur on reservations.

   (iii) Following the affected State's public notice procedures for comparable actions.

   (iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

   (v) Notice through other local media.

   (vi) Notice to potentially interested community organizations including small business associations.

   (vii) Publication in newsletters that may be expected to reach potentially interested persons.

   (viii) Direct mailing to owners and occupants of nearby or affected property.

   (ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:

AR00040

1.  Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.

2.  A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance (unless the purpose of the hearing is to provide information for the draft environmental impact statement).

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

## Sec. 1506.7 Further guidance.

The Council may provide further guidance concerning NEPA and its procedures including:

(a) A handbook which the Council may supplement from time to time, which shall in plain language provide guidance and instructions concerning the application of NEPA and these regulations.

(b) Publication of the Council's Memoranda to Heads of Agencies.

(c) In conjunction with the Environmental Protection Agency and the publication of the 102 Monitor, notice of:

1.  Research activities;
2.  Meetings and conferences related to NEPA; and
3.  Successful and innovative procedures used by agencies to implement NEPA.

## Sec. 1506.8 Proposals for legislation.

(a) The NEPA process for proposals for legislation (Sec. 1508.17) significantly affecting the quality of the human environment shall be integrated with the legislative process of the Congress. A legislative environmental impact statement is the detailed statement required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement

AR00041

shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(b) Preparation of a legislative environmental impact statement shall conform to the requirements of these regulations except as follows:

1. There need not be a scoping process.
2. The legislative statement shall be prepared in the same manner as a draft statement, but shall be considered the "detailed statement" required by statute; Provided, That when any of the following conditions exist both the draft and final environmental impact statement on the legislative proposal shall be prepared and circulated as provided by Secs. 1503.1 and 1506.10.

> (i) A Congressional Committee with jurisdiction over the proposal has a rule requiring both draft and final environmental impact statements.
> (ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 et seq.) and the Wilderness Act (16 U.S.C. 1131 et seq.)).
> (iii) Legislative approval is sought for Federal or federally assisted construction or other projects which the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.
> (iv) The agency decides to prepare draft and final statements.

(c) Comments on the legislative statement shall be given to the lead agency which shall forward them along with its own responses to the Congressional committees with jurisdiction.


**Sec. 1506.9 Filing requirements.**

Environmental impact statements together with comments and responses shall be filed with the Environmental Protection Agency, attention Office of Federal Activities (A-104), 401 M Street SW., Washington, DC 20460. Statements shall be filed with EPA no earlier than they are also transmitted to commenting agencies and made available to the public. EPA shall deliver one copy of each statement to the Council, which shall satisfy the requirement of availability to the President. EPA may issue guidelines to agencies to implement its responsibilities under this section and Sec. 1506.10.


**Sec. 1506.10 Timing of agency action.**

AR00042

(a) The Environmental Protection Agency shall publish a notice in the Federal Register each week of the environmental impact statements filed during the preceding week. The minimum time periods set forth in this section shall be calculated from the date of publication of this notice.

(b) No decision on the proposed action shall be made or recorded under Sec. 1505.2 by a Federal agency until the later of the following dates:

1.  Ninety (90) days after publication of the notice described above in paragraph (a) of this section for a draft environmental impact statement.
2.  Thirty (30) days after publication of the notice described above in paragraph (a) of this section for a final environmental impact statement. An exception to the rules on timing may be made in the case of an agency decision which is subject to a formal internal appeal. Some agencies have a formally established appeal process which allows other agencies or the public to take appeals on a decision and make their views known, after publication of the final environmental impact statement. In such cases, where a real opportunity exists to alter the decision, the decision may be made and recorded at the same time the environmental impact statement is published.

This means that the period for appeal of the decision and the 30-day period prescribed in paragraph (b)(2) of this section may run concurrently. In such cases the environmental impact statement shall explain the timing and the public's right of appeal. An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety, may waive the time period in paragraph (b)(2) of this section and publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement as described in paragraph (a) of this section.

(c) If the final environmental impact statement is filed within ninety (90) days after a draft environmental impact statement is filed with the Environmental Protection Agency, the minimum thirty (30) day period and the minimum ninety (90) day period may run concurrently. However, subject to paragraph (d) of this section agencies shall allow not less than 45 days for comments on draft statements.

(d) The lead agency may extend prescribed periods. The Environmental Protection Agency may upon a showing by the lead agency of compelling reasons of national policy reduce the prescribed periods and may upon a showing by any other Federal agency of compelling reasons of national policy also extend prescribed periods, but only after consultation with the lead agency. (Also see Sec. 1507.3(d).) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

[43 FR 56000, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

**Sec. 1506.11 Emergencies.**

AR00043

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

**Sec. 1506.12 Effective date.**

The effective date of these regulations is July 30, 1979, except that for agencies that administer programs that qualify under section 102(2)(D) of the Act or under section 104(h) of the Housing and Community Development Act of 1974 an additional four months shall be allowed for the State or local agencies to adopt their implementing procedures.

(a) These regulations shall apply to the fullest extent practicable to ongoing activities and environmental documents begun before the effective date. These regulations do not apply to an environmental impact statement or supplement if the draft statement was filed before the effective date of these regulations. No completed environmental documents need be redone by reasons of these regulations. Until these regulations are applicable, the Council's guidelines published in the Federal Register of August 1, 1973, shall continue to be applicable. In cases where these regulations are applicable the guidelines are superseded. However, nothing shall prevent an agency from proceeding under these regulations at an earlier time.

(b) NEPA shall continue to be applicable to actions begun before January 1, 1970, to the fullest extent possible.

Back to Table of Contents

AR00044

# PART 1507--AGENCY COMPLIANCE

Sec.    1507.1 Compliance.
1507.2 Agency capability to comply.
1507.3 Agency procedures.

Authority: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Source: 43 FR 56002, Nov. 29, 1978, unless otherwise noted.

## Sec. 1507.1 Compliance.

All agencies of the Federal Government shall comply with these regulations. It is the intent of these regulations to allow each agency flexibility in adapting its implementing procedures authorized by Sec. 1507.3 to the requirements of other applicable laws.

## Sec. 1507.2 Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements enumerated below. Such compliance may include use of other's resources, but the using agency shall itself have sufficient capability to evaluate what others do for it. Agencies shall:

(a) Fulfill the requirements of section 102(2)(A) of the Act to utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on the human environment. Agencies shall designate a person to be responsible for overall review of agency NEPA compliance.

(b) Identify methods and procedures required by section 102(2)(B) to insure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c) Prepare adequate environmental impact statements pursuant to section 102(2)(C) and comment on statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. This requirement of section 102(2)(E) extends to all such proposals, not just the more limited scope of section 102(2)(C)(iii) where the discussion of alternatives is confined to impact statements.

(e) Comply with the requirements of section 102(2)(H) that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

AR00045

(f) Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102 (2)(I), of the Act and of Executive Order 11514, Protection and Enhancement of Environmental Quality, Sec. 2.

**Sec. 1507.3 Agency procedures.**

(a) Not later than eight months after publication of these regulations as finally adopted in the Federal Register, or five months after the establishment of an agency, whichever shall come later, each agency shall as necessary adopt procedures to supplement these regulations. When the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall confine themselves to implementing procedures. Each agency shall consult with the Council while developing its procedures and before publishing them in the Federal Register for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants. The procedures shall be adopted only after an opportunity for public review and after review by the Council for conformity with the Act and these regulations. The Council shall complete its review within 30 days. Once in effect they shall be filed with the Council and made readily available to the public. Agencies are encouraged to publish explanatory guidance for these regulations and their own procedures. Agencies shall continue to review their policies and procedures and in consultation with the Council to revise them as necessary to ensure full compliance with the purposes and provisions of the Act.

(b) Agency procedures shall comply with these regulations except where compliance would be inconsistent with statutory requirements and shall include:

1. Those procedures required by Secs. 1501.2(d), 1502.9(c)(3), 1505.1, 1506.6(e), and 1508.4.

2. Specific criteria for and identification of those typical classes of action:

   (i) Which normally do require environmental impact statements.

   (ii) Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (Sec. 1508.4)).

   (iii) Which normally require environmental assessments but not necessarily environmental impact statements.

(c) Agency procedures may include specific criteria for providing limited exceptions to the provisions of these regulations for classified proposals. They are proposed actions which are specifically authorized under criteria established by an Executive Order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order or statute. Environmental assessments and environmental impact statements which address classified proposals may be safeguarded and restricted from public dissemination in accordance

AR00046

with agencies' own regulations applicable to classified information. These documents may be organized so that classified portions can be included as annexes, in order that the unclassified portions can be made available to the public.

(d) Agency procedures may provide for periods of time other than those presented in Sec. 1506.10 when necessary to comply with other specific statutory requirements.

(e) Agency procedures may provide that where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the notice of intent required by Sec. 1501.7 may be published at a reasonable time in advance of preparation of the draft statement.

Back to Table of Contents

AR00047

# PART 1508--TERMINOLOGY AND INDEX

Sec.     1508.1 Terminology.
         1508.2 Act.
         1508.3 Affecting.
         1508.4 Categorical exclusion.
         1508.5 Cooperating agency.
         1508.6 Council.
         1508.7 Cumulative impact.
         1508.8 Effects.
         1508.9 Environmental assessment.
         1508.10 Environmental document.
         1508.11 Environmental impact statement.
         1508.12 Federal agency.
         1508.13 Finding of no significant impact.
         1508.14 Human environment.
         1508.15 Jurisdiction by law.
         1508.16 Lead agency.
         1508.17 Legislation.
         1508.18 Major Federal action.
         1508.19 Matter.
         1508.20 Mitigation.
         1508.21 NEPA process.
         1508.22 Notice of intent.
         1508.23 Proposal.
         1508.24 Referring agency.
         1508.25 Scope.
         1508.26 Special expertise.
         1508.27 Significantly.
         1508.28 Tiering.

Authority: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

Source: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

## Sec. 1508.1 Terminology.

The terminology of this part shall be uniform throughout the Federal Government.

## Sec. 1508.2 Act.

"Act" means the National Environmental Policy Act, as amended (42 U.S.C. 4321, et seq.) which is also referred to as "NEPA."

## Sec. 1508.3 Affecting.

"Affecting" means will or may have an effect on.

## Sec. 1508.4 Categorical exclusion.

AR00048

"Categorical exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (Sec. 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in Sec. 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

## Sec. 1508.5 Cooperating agency.

"Cooperating agency" means any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in Sec. 1501.6. A State or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

## Sec. 1508.6 Council.

"Council" means the Council on Environmental Quality established by Title II of the Act.

## Sec. 1508.7 Cumulative impact.

"Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

## Sec. 1508.8 Effects.

"Effects" include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic,

AR00049

historic, cultural, economic, social, or health, whether direct, indirect, or
cumulative. Effects may also include those resulting from actions which may
have both beneficial and detrimental effects, even if on balance the agency
believes that the effect will be beneficial.


## Sec. 1508.9 Environmental assessment.

"Environmental assessment":

(a) Means a concise public document for which a Federal agency is
responsible that serves to:

1. Briefly provide sufficient evidence and analysis for determining
   whether to prepare an environmental impact statement or a
   finding of no significant impact.

2. Aid an agency's compliance with the Act when no
   environmental impact statement is necessary.

3. Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of
alternatives as required by section 102(2)(E), of the environmental
impacts of the proposed action and alternatives, and a listing of
agencies and persons consulted.


## Sec. 1508.10 Environmental document.

"Environmental document" includes the documents specified in Sec. 1508.9
(environmental assessment), Sec. 1508.11 (environmental impact
statement), Sec. 1508.13 (finding of no significant impact), and Sec.
1508.22 (notice of intent).


## Sec. 1508.11 Environmental impact statement.

"Environmental impact statement" means a detailed written statement as
required by section 102(2)(C) of the Act.


## Sec. 1508.12 Federal agency.

"Federal agency" means all agencies of the Federal Government. It does
not mean the Congress, the Judiciary, or the President, including the
performance of staff functions for the President in his Executive Office. It
also includes for purposes of these regulations States and units of general
local government and Indian tribes assuming NEPA responsibilities under
section 104(h) of the Housing and Community Development Act of 1974.


## Sec. 1508.13 Finding of no significant impact.

"Finding of no significant impact" means a document by a Federal agency
briefly presenting the reasons why an action, not otherwise excluded (Sec.
1508.4), will not have a significant effect on the human environment and for

AR00050

which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (Sec. 1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.


## Sec. 1508.14 Human environment.

"Human environment" shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (Sec. 1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.


## Sec. 1508.15 Jurisdiction by law.

"Jurisdiction by law" means agency authority to approve, veto, or finance all or part of the proposal.


## Sec. 1508.16 Lead agency.

"Lead agency" means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.


## Sec. 1508.17 Legislation.

"Legislation" includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. Proposals for legislation include requests for ratification of treaties. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.


## Sec. 1508.18 Major Federal action.

"Major Federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (Sec. 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative

AR00051

proposals (Secs. 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

1. Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

2. Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

3. Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

4. Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

**Sec. 1508.19 Matter.**

"Matter" includes for purposes of Part 1504: (a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609). (b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

**Sec. 1508.20 Mitigation.**

"Mitigation" includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

AR00052

(e) Compensating for the impact by replacing or providing substitute
resources or environments.


## Sec. 1508.21 NEPA process.

"NEPA process" means all measures necessary for compliance with the
requirements of section 2 and Title I of NEPA.


## Sec. 1508.22 Notice of intent.

"Notice of intent" means a notice that an environmental impact statement
will be prepared and considered. The notice shall briefly:

    (a) Describe the proposed action and possible alternatives.

    (b) Describe the agency's proposed scoping process including
whether, when, and where any scoping meeting will be held.

    (c) State the name and address of a person within the agency who
can answer questions about the proposed action and the
environmental impact statement.


## Sec. 1508.23 Proposal.

"Proposal" exists at that stage in the development of an action when an
agency subject to the Act has a goal and is actively preparing to make a
decision on one or more alternative means of accomplishing that goal and
the effects can be meaningfully evaluated. Preparation of an environmental
impact statement on a proposal should be timed (Sec. 1502.5) so that the
final statement may be completed in time for the statement to be included in
any recommendation or report on the proposal. A proposal may exist in fact
as well as by agency declaration that one exists.


## Sec. 1508.24 Referring agency.

"Referring agency" means the federal agency which has referred any matter
to the Council after a determination that the matter is unsatisfactory from the
standpoint of public health or welfare or environmental quality.


## Sec. 1508.25 Scope.

Scope consists of the range of actions, alternatives, and impacts to be
considered in an environmental impact statement. The scope of an
individual statement may depend on its relationships to other statements
(Secs.1502.20 and 1508.28). To determine the scope of environmental
impact statements, agencies shall consider 3 types of actions, 3 types of
alternatives, and 3 types of impacts. They include:

    (a) Actions (other than unconnected single actions) which may be:

        1. Connected actions, which means that they are closely related
and therefore should be discussed in the same impact

AR00053

statement. Actions are connected if they:

> (i) Automatically trigger other actions which may require
> environmental impact statements.

> (ii) Cannot or will not proceed unless other actions are
> taken previously or simultaneously.

> (iii) Are interdependent parts of a larger action and
> depend on the larger action for their justification.

2. Cumulative actions, which when viewed with other proposed
actions have cumulatively significant impacts and should
therefore be discussed in the same impact statement.

3. Similar actions, which when viewed with other reasonably
foreseeable or proposed agency actions, have similarities that
provide a basis for evaluating their environmental
consequencies together, such as common timing or
geography. An agency may wish to analyze these actions in
the same impact statement. It should do so when the best way
to assess adequately the combined impacts of similar actions
or reasonable alternatives to such actions is to treat them in a
single impact statement.

(b) Alternatives, which include:

1. No action alternative.
2. Other reasonable courses of actions.
3. Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

## Sec. 1508.26 Special expertise.

"Special expertise" means statutory responsibility, agency mission, or
related program experience.

## Sec. 1508.27 Significantly.

"Significantly" as used in NEPA requires considerations of both context and
intensity:

> (a) Context. This means that the significance of an action must be
> analyzed in several contexts such as society as a whole (human,
> national), the affected region, the affected interests, and the locality.
> Significance varies with the setting of the proposed action. For
> instance, in the case of a site-specific action, significance would
> usually depend upon the effects in the locale rather than in the world
> as a whole. Both short- and long-term effects are relevant.

> (b) Intensity. This refers to the severity of impact. Responsible
> officials must bear in mind that more than one agency may make
> decisions about partial aspects of a major action. The following
> should be considered in evaluating intensity:

AR00054

1. Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

2. The degree to which the proposed action affects public health or safety.

3. Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

4. The degree to which the effects on the quality of the human environment are likely to be highly controversial.

5. The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

6. The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

7. Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

8. The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

9. The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

10. Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]


**Sec. 1508.28 Tiering.**

"Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or

AR00055

Case 1:06-cv-00265-CKK     Document 30-3     Filed 04/12/2006     Page 57 of 76

analyses is:

    (a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site- specific statement or analysis.

    (b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

Back to Table of Contents

AR00056

## DEPARTMENT OF AGRICULTURE

### Office of the Secretary

[7 CFR Part 3100]

### National Environmental Policy Act; Proposed Policies and Procedures

**AGENCY:** United States Department of Agriculture (USDA).

**ACTION:** Proposed Rule.

**SUMMARY:** This action proposes Departmental policies and procedures for compliance with the National Environmental Policy Act (NEPA), as amended, 42 U.S.C. 4321 et seq.; and the Council on Environmental Quality's (CEQ) National Environmental Policy Act Regulations (40 C.F.R. Parts 1500–1508). This rule creates Chapter XXXI, Part 3100 of Subtitle B, 7 C.F.R. Subpart B—National Environmental Policy Act, is set forth in this proposed rule. Subpart A—Office of Environmental Quality Activities is reserved for later action. USDA adopts the CEQ regulations and sets forth in this rule general directives for USDA agencies in fulfilling their requirements under this rule and those of CEQ.

**DATE:** Comments due: June 15, 1979.

**ADDRESS:** Comments to: Barry R. Flamm, Coordinator, Office of Environmental Quality Activities. USDA, Washington, D.C. 20250.

**FOR FURTHER INFORMATION CONTACT:** Dr. Rado J. Kinzhuber, Chairman, Ad Hoc Working Group, Office of the Secretary, USDA, Washington, D.C. 20250, Phone (202) 447–5685.

**SUPPLEMENTARY INFORMATION:** On October 25, 1974, Secretary of Agriculture Memorandum No. 1695, Supplement 4, Revised, was issued to establish guidelines for the preparation of environmental impact statements and compliance with other procedural requirements of Section 102(2) of the National Environmental Policy Act (NEPA). Executive Order 11991 and the recently promulgated regulations of the Council on Environmental Quality (CEQ) necessitate rules to replace this memorandum. These rules address policy as well as procedure in order to assure compliance with the spirit and substantive intent of NEPA. Accordingly, in this proposed rule USDA reaffirms and codifies its continuing policy for achieving the goals encompassed by Section 101 of NEPA through implementation of adequate procedures for the planning, development and implementation of agency programs and activities.

It is the intent of this rule to set forth general policy and procedural directives to assist the individual agencies of USDA in complying with the mandates of NEPA and the CEQ regulations. Each USDA Agency is responsible for preparing more specific procedures, in light of these broad directives, the provisions of NEPA and CEQ's regulations, which are tailored to the specific programs and activities of that agency. Those agencies whose programs and activities are of such a nature as to not come within the types of actions covered by Section 102(2) of NEPA should consult with OEQA regarding the need for developing specific implementation procedures.

In addition to the above, this rule sets forth the role of the Office of Environmental Quality Activities (OEQA) with regard to the NEPA process and procedures. Further, it explains the coordination between the NEPA and the Regulatory Impact Analysis review processes.

This action has been determined to be significant for purposes of Secretary's Memorandum No. 1955.

An approved Environmental Assessment and Draft Impact Analysis Statement is available from Dr. Rado J. Kinzhuber, at the address provided above.

This rule supersedes Secretary of Agriculture Memorandum No. 1695, Supplement No. 4, Revised (October 25, 1974).

Comments on this proposed rule are invited. To be considered in the preparation of a final rule, comments must be received by June 15, 1979.

Dated: April 26, 1979.

Jim Williams,
*Acting Secretary.*

**Authority:** National Environmental Policy Act (NEPA), as amended, 42 U.S.C. 4321 et seq.; Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977); 5 U.S.C. 301; 40 C.F.R. 1507.3.

Title 7 of the Code of Federal Regulations is amended by adding new Chapter XXXI, consisting of Part 3100 to read as set forth below:

## CHAPTER XXXI—CULTURAL AND ENVIRONMENTAL QUALITY

## PART 3100—ENVIRONMENTAL MATTERS

### Subpart A—Reserved

### Subpart B—National Environmental Policy Act

Sec.
3100.20  Purpose.
3100.21  Policy.
Sec.
3100.22  Categorical Exclusions.
3100.23  Lead Agency Disputes.
3100.24  Public Involvement.
3100.25  Interagency and Interdepartmental Cooperation.
3100.26  Time and Page Limits.
3100.27  Extra-Agency Expertise.
3100.28  Supplements.
3100.29  Distribution.
3100.30  Distribution to OEQA.
3100.31  When to Prepare an EIS.
3100.32  Impact Analysis.
3100.33  Tiering.
3100.34  Problems in Response to Comments.
3100.35  Implementation of Agency Determination.
3100.36  Emergencies.

Authority: National Environmental Policy Act (NEPA), as amended, 42 U.S.C. 4321, et seq.

### Subpart A—Reserved

### Subpart B—National Environmental Policy Act

#### § 3100.20. Purpose.

(a) This subpart supplements the regulations for implementing the procedural provisions of NEPA, which regulations were published by the Council on Environmental Quality (CEQ) in 40 CFR Parts 1500–1508. This subpart incorporates and adopts these regulations.

(b) Words used in the provisions of this subpart shall have the same meaning as they have in the regulations of CEQ at 40 CFR Part 1508.

(c) References are made in these regulations to appropriate sections of 40 CFR 1500–1508. This has been done to direct the attention of USDA agencies to specific provisions for guidance in the development of agency procedures or to provisions of the CEQ regulations which are the basis for the pertinent section. The Office of Environmental Quality Activities (OEQA), in cooperation with Environmental Quality Committee, will develop a NEPA process to be used by the Office of the Secretary in reviewing, implementing and planning its activities, determinations and policies.

#### § 3100.21. Policy.

(a) All policies and programs of the various USDA agencies shall be planned, developed and implemented so as to achieve the policies declared by NEPA in order to assure responsible stewardship of the environment for present and future generations.

(b) Each USDA agency is responsible for compliance with the provisions of this subpart, the regulations of CEQ and the provisions of NEPA. Compliance will include the preparation and implementation of specific procedures

and processes relating to the programs and activities of the individual agency, as necessary. (§§ 1501.2, 1501.3, 1507).

(c) The Coordinator, OEQA, shall review agencies implementing procedures to show consistency with CEQ's NEPA regulations and will coordinate environmental assessment activities for the Office of the Secretary which come under the purview of NEPA.

(d) Each agency shall develop appropriate procedures and processes in a style which will promote understanding at the field staff level.

§ 3100.22.  Categorical Exclusions.

(a) In general, every agency recommendation or report on a proposal for legislation or other major agency action which significantly affects the quality of the human environment entails certain NEPA review procedures. However, the following are categories of agency activities which have been determined not to have a significant individual or cumulative adverse effect on the human environment and are excluded from the NEPA review process, unless individual agency procedures prescribe otherwise (§ 1508.4):

(1) Policy development, planning and implementation which relates to routine activities such as personnel, organizational changes or similar administrative functions;

(2) Activities which deal solely with the funding of programs, such as program budget proposals disbursement, transfer, or reprogramming of funds;

(3) Inventories, research activities and studies, such as resource inventories and routine data collection when such actions are clearly limited in context and intensity (§ 1508.27);

(4) Educational and informational programs and activities;

(5) Civil and criminal law enforcement activities;

(6) Activities which are advisory and consultative to other agencies, public and private entities such as legal counselling and representation;

(7) Activities related to trade representation, and market development activities overseas.

(b) Agencies will identify in their own procedures the activities which normally would not require an environmental assessment or environmental impact statement. (§ 1508.4)

(c) Any activity which would normally fall within one of the categories listed in paragraph (a) of this section, or in a category identified in agency procedures, but which is determined to have a potential for significant impact on the human environment shall not be

eligible for exclusion from the NEPA process. Agencies shall adopt procedures to assure continuous scrutiny of activities to determine continued eligibility for categorical exclusion.

§ 3100.23.  Lead Agency Disputes.

The OEQA will coordinate, upon request, the resolution of lead agency disputes. (§ 1501.5(e))

§ 3100.24.  Public Involvement.

All NEPA processes developed and followed by USDA agencies shall provide for public involvement. The OEQA will consult with the Office of Policy Analysis and Public Participation to coordinate between agencies in carrying out this section. (§§ 1501.4(e)(2), 1506.06, 1508.10)

§ 3100.25.  Interagency and Interdepartmental Cooperation.

(a) The USDA and its agencies shall, to the fullest extent possible, cooperate with other agencies, departments, bureaus, as well as state and local units of government to fulfill their responsibility under NEPA, utilizing memorandum of understanding or other instruments of agreement where possible.

(b) If a USDA agency is unable to cooperate to the extent formally requested by a lead agency, that agency shall reply to the lead agency that other program commitments preclude full involvemnet. Any such reply shall be referred to the Coordinator, OEQA, within 10 working days of receipt of the request for submission to the lead agency and CEQ. §§ 1501.6(c))

§ 3100.26.  Time and Page Limits.

The individual USDA agencies will establish, through their scoping processes, appropriate page limits and time limits with due regard to the guidance provided by the CEQ regulations. (§§ 1500.5(e), 1501.1(e), 1501.7(7)(b), 1501.8)

§ 3100.27.  Extra-Agency Expertise

The OEQA will work with USDA agencies to identify sources of technical and editorial expertise necessary to supply interdisciplinary needs which have been identified in the scoping process and for which expertise is not available within that particular agency.

§ 3100.28.  Supplements.

A decision to prepare a supplement to an environmental document will be made by the affected agency. New findings and information relating to the decision-making process, including advice from the OEQA shall be

considered in such a decision. (§ 1502.9(c))

§ 3100.29.  Distribution.

All USDA agencies shall develop and maintain a distribution list for dissemination of decision documents and notices. Agencies may make distributions in addition to those prescribed in the CEQ regulations. To guide agencies in this regard, Appendix II of 40 CFR Part 1500, published in Federal Register, Vol. 38, No. 147, pages 20557–20562, on August 1, 1973, or other such list as promulgated by CEQ, will serve as reference.

§ 3100.30.  Distribution to OEQA.

A monthly summary of agency activity in the NEPA process shall be forwarded to the OEQA. A negative report is not required.

§ 3100.31.  When to Prepare an EIS

(a) In addition to those agency activities identified in § 3100.22(b), USDA agencies shall identify those classes of their activities which normally require an EIS. (§ 1507.3(b))

(b) Agency activities not covered by paragraph (a) of this section shall require an environmental assessment, to support an agency determination of the need for an EIS. (§§ 1501.3, 1501.4)

§ 3100.32.  Impact Analysis.

(a) All environmental assessments and impact statements prepared by an agency regarding legislative proposals or program regulations shall incorporate applicable components of Impact Analysis (see Secretary's Memorandum No. 1955; Executive Order No. 12044; 40 CFR § 1506.8).

(b) Incorporation of Impact Analysis procedures into agency NEPA processes is to be coordinated between the OEQA, the Department's Policy Analysis and Public Participation staff and the implementing agency (see Secretary's policy guidance to USDA agencies: Guidelines for Impact Analysis and Environmental Impact Statements, September 25, 1978).

§ 3100.33  Tiering.

Tiering, as set forth in 40 C.F.R. 1502.20, shall be incorporated by agencies in their NEPA procedures. The OEQA will assist agencies regarding specific questions concerning tiering.

§ 3100.34  Problems in Responses to Comments.

Problems concerning the appropriate response to comments on environmental impact statements shall be resolved, if possible, at the agency staff level. Problems between USDA agencies not

resolved by the final EIS shall be submitted to the heads of respective agencies for resolution with mediation. if necessary, by OEQA. OEQA will also be informed of agency problems with agencies outside USDA and will be available to help resolve disputes as necessary. (§§ 1503.2, 1503.3, 1503.4)

### § 3100.35 Implementation of Agency Determination.

Each agency shall develop NEPA implementing procedures and other appropriate internal procedures to provide for mitigation, monitoring or any other actions or conditions necessary to properly carry out the determinations established during their NEPA process. (§ 1505.3)

### § 3100.36 Emergencies.

The procedures developed by each agency shall include those NEPA review actions necessary in relation to agency responses to emergency situations. (§ 1506.11)

[FR Doc. 79-13529 Filed 5-01-79; 8:45 a.m]

**BILLING CODE 3410-01-M**

AR00059

## DEPARTMENT OF AGRICULTURE

### Office of the Secretary

**7 CFR Part 3100**

**National Environmental Policy Act; Final Policies and Procedures**

**AGENCY:** United States Department of Agriculture (USDA).

**ACTION:** Final rule.

**SUMMARY:** On May 1, 1979, the Department of Agriculture, Office of the Secretary, published at 44 FR 25606–25608, proposed rules, setting forth proposed policies and procedures for compliance with the National Environmental Policy Act (NEPA), as amended, 42 U.S.C. 4321 *et seq.*; and the Council on Environmental Quality's (CEQ) National Environmental Policy Act Regulations (40 CFR Parts 1500–1508).

USDA did not receive any comments on the proposed rules. Minor modifications for clarity were made in the final rule, based on suggestions from within the Department.

This rule supercedes Secretary of Agriculture Memorandum No. 1695, Supplement No. 4, Revised (October 25, 1974). This final rule has been reviewed under the USDA criteria established to implement Executive Order 12044, "Improving Government Regulations," and has been classified "significant." An Approved Final Impact Statement is available from the Office of Environmental Quality, USDA, Room 412–A.

**EFFECTIVE DATE:** July 30, 1979.

**FOR FURTHER INFORMATION CONTACT:** Barry R. Flamm, Director, Office of Environmental Quality, USDA, Washington, D.C. 20250, Phone (202) 447–3965.

Dated: July 26, 1979.

Jim Williams,

*Acting Secretary.*

**SUPPLEMENTARY INFORMATION:** Title 7 of the Code of Federal Regulations is amended by adding new Chapter XXXI, consisting of Part 3100 to read as set forth below:

## CHAPTER XXXI—CULTURAL AND ENVIRONMENTAL QUALITY

### PART 3100—ENVIRONMENTAL MATTERS

**Subpart A [Reserved]**

**Subpart B—National Environmental Policy Act**

Sec.
3100.20  Purpose.
3100.21  Policy.
3100.22  Categorical Exclusions.
3100.23  Lead Agency Disputes.
3100.24  Public Involvement.
3100.25  Interagency and Interdepartmental Cooperation.
3100.26  Extra-Agency Expertise.
3100.27  Supplements.
3100.28  Distributions.
3100.29  Distribution to OEQ.
3100.30  When to Prepare an EIS.
3100.31  Impact Analysis.
3100.32  Tiering.
3100.33  Problems in Responses to Comments.
3100.34  Implementation of Agency Determination.
3100.35  Emergencies.

**Authority:** National Environmental Policy Act (NEPA), as amended, 42 U.S.C. 4321 et seq.; Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977); U.S.C. 301; 40 CFR 1507.3.

### Subpart A [Reserved]

### Subpart B—National Environmental Policy Act

**§ 3100.20  Purpose.**

(a) This subpart supplements the regulations for implementing the procedural provisions of NEPA, which regulations were published by the Council on Environmental Quality (CEQ) in 40 CFR Parts 1500–1508. This subpart incorporates and adopts these regulations.

(b) Words used in the provisions of this subpart shall have the same meaning as they have in the regulations of CEQ at 40 CFR Part 1508.

(c) References are made in these regulations to appropriate sections of 40 CFR 1500–1508. This has been done to direct the attention of USDA agencies to specific provisions for guidance in the development of agency procedures or to provisions of the CEQ regulations which are the basis for the pertinent section.

**§ 3100.21  Policy.**

(a) All policies and programs of the various USDA agencies shall be planned, developed and implemented so as to achieve the goals declared by NEPA in order to assure responsible stewardship of the environment for present and future generations.

(b) Each USDA agency is responsible for compliance with the provisions of this subpart, the regulations of CEQ and the provisions of NEPA. Compliance will include the preparation and implementation of specific procedures and processes relating to the programs and activities of the individual agency, as necessary. Those agencies whose programs and activities are of such a nature as to not come within the types of actions covered by Section 102(2) of NEPA should consult with Office of Environmental Quality (OEQ) regarding the need for developing specific implementation procedures.

(§§ 1501.2, 1501.3, 1507)

(c) The Director, OEQ, shall review agencies implementing procedures to show consistency with CEQ's NEPA regulations and will coordinate environmental assessment activities for the Office of the Secretary which come under the purview of NEPA. OEQ, in cooperation with Environmental Quality Committee, will develop the necessary processes to be used by the Office of the Secretary in reviewing, implementing and planning its activities, determinations and policies.

(d) Each agency shall develop appropriate procedures and processes in a style which will promote understanding at the field staff level.

**§ 3100.22  Categorical exclusions.**

(a) In general, every agency recommendation or report on a proposal for legislation or other major agency action which significantly affects the quality of the human environment entails certain NEPA review procedures. However, the following are categories of agency activities which have been determined not to have a significant individual or cumulative adverse effect on the human environment and are excluded from the NEPA review process, unless individual agency procedures prescribe otherwise (§ 1508.4):

(1) Policy development, planning and implementation which relates to routine activities such as personnel,

organizational changes or similar administrative functions;

(2) Activities which deal solely with the funding of programs, such as program budget proposals, disbursement, transfer, or reprogramming of funds;

(3) Inventories, research activities and studies, such as resource inventories and routine data collection when such actions are clearly limited in context and intensity (1508.27);

(4) Educational and informational programs and activities;

(5) Civil and criminal law enforcement activities;

(6) Activities which are advisory and consultative to other agencies, public and private entities such as legal counselling and representation;

(7) Activities related to trade representation, and market development activities overseas.

(b) Agencies will identify in their own procedures the activities which normally would not require an environmental assessment or environmental impact statement. (§ 1508.4)

(c) Any activity which would normally fall within one of the categories listed in paragraph (a) of this section, or in a category identified in agency procedures, but which is determined to have a potential for significant impact on the human environment shall not be eligible for exclusion from the NEPA process. Agencies shall adopt procedures to assure continuous scrutiny of activities to determine continued eligibility for categorical exclusion.

§ 3100.23  Lead agency disputes.

The OEQ will coordinate, upon request, the resolution of lead agency disputes. (§ 1501.5(e))

§ 3100.24  Public involvement.

All NEPA processes developed and followed by USDA agencies shall provide for public involvement. The OEQ will consult with the Office of Policy Analysis and Public Participation in coordinate between agencies in carrying out this section.
(§ 1501.4(e)(2), 1506.6, 1506.10)

§ 3100.25  Interagency and interdepartmental cooperation.

(a) The USDA and its agencies shall, the fullest extent possible, cooperate with other agencies, departments, bureaus, as well as State and local units of government to fulfill their responsibility under NEPA, utilizing memorandum of understanding or other instruments of agreement where possible.

(b) If a USDA agency is unable to cooperate to the extent formally requested by a lead agency, that agency shall reply to the lead agency that other program commitments preclude full involvement. Any such reply shall be referred to the Director, OEQ, within 10 working days of receipt of the request for submission to the lead agency and CEQ (§§ 1501.6(c))

§ 3100.26  Extra-agency expertise.

The OEQ will work with USDA agencies to identify sources of technical and editorial expertise necessary to supply interdisciplinary needs which have been identified in the scoping process and for which expertise is not available within that particular agency.

§ 3100.27  Supplements.

A decision to prepare a supplement to an environmental document will be made by the affected agency. New finding and information relating to the decisionmaking process shall be considered in such a decision. The agency may seek advice from OEQ, and such advice shall also be considered in making the determination to prepare a supplement. (§ 1502.9(c))

§ 3100.28  Distribution.

All USDA agencies shall develop and maintain a distribution list for dissemination of decision documents and notices. Agencies may make distributions in addition to those prescribed in the CEQ regulations. To guide agencies in this regard, Appendix II of 40 CFR Part 1500, published in Federal Register, Vol. 38, No. 147, pages 20557–20562, on August 1, 1973, or other such list as promulgated by CEQ, will serve as reference.

§ 3100.29  Distribution to OEQ.

A monthly summary of significant agency activity in the NEPA process shall be forwarded to the OEQ. A negative report is not required.

§ 3100.30  When to prepare an EIS.

(a) In addition to those agency activities identified in § 3100.22(b), USDA agencies shall identify those classes of their activities which normally require an EIS. (§ 1507.3(b))

(b) Agency activities not covered by paragraph (a) of this section shall require an environmental assessment, to support a finding of no significant impact or an agency decision to prepare EIS. (§§ 1501.3, 1501.4)

§ 3100.31  Impact analysis.

(a) All environmental assessments and impact statements prepared by an

agency regarding legislative proposals or program regulations shall incorporate applicable components of Impact Analysis (see Secretary's Memorandum No. 1955; Executive Order No. 12044; 40 CFR 1506.8).

(b) Incorporation of Impact Analysis procedures into agency NEPA processes is to be coordinated between the OEQ, the Department's Policy Analysis and Public Participation staff and the implementing agency (see Secretary's policy guidance to USDA agencies: Guidelines for Impact Analysis and Environmental Impact Statements, September 25, 1978).

§ 3100.32  Tiering.

Tiering, as set forth in 40 CFR 1502.20, shall be incorporated by agencies in their NEPA procedures. The OEQ will assist agencies regarding specific questions concerning tiering.

§ 3100.33  Problems in response to comments.

Problems concerning the appropriate response to comments on environmental impact statements shall be resolved, if possible, at the agency staff level. Problems between USDA agencies not resolved by the final EIS shall be submitted to the heads of respective agencies for resolution with mediation, if necessary, by OEQ. OEQ will also be informed of agency problems with agencies outside USDA and will be available to help resolve disputes as necessary. (§§ 1503.2, 1503.3, 1503.4)

§ 3100.34  Implementation of Agency determination.

Each agency shall develop NEPA implementing procedures and other appropriate internal procedures to provide for mitigation, monitoring or any other actions or conditions necessary to properly carry out the determinations established during their NEPA process. (§ 1505.3)

§ 3100.35  Emergencies.

The procedures developed by each agency shall include those NEPA review actions necessary in relation to agency responses to emergency situations. (§ 1506.11)

[FR Doc. 79-23623 Filed 7-27-79; 9:43 am]
BILLING CODE 3410-01-M

AR00061

# Proposed Rules

Federal Register

Vol. 47, No. 187

Monday, September 27, 1982

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## DEPARTMENT OF AGRICULTURE

### Office of the Secretary

### 7 CFR Parts 1b and 1c

### Revision of National Environmental Policy Act (NEPA) Policies and Procedures

**AGENCY:** Department of Agriculture.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** On July 30, 1979, the Department of Agriculture (USDA) published rules setting forth policies and procedures for compliance with the National Environmental Policy Act (NEPA), as amended, and the Council on Environmental Quality's (CEQ) implementing regulations (40 CFR Part 1500–1508).

On September 30, 1981, (46 FR 47747), the USDA published a final rule which revised delegations of authority within the Department. In these revisions, the Office of Environmental Quality was abolished and the Assistant Secretary for Natrual Resources and Environment (NR&E) was delegated the authority to administer NEPA implementation for the Department. It has been determined that effective NEPA implementation can best be achieved by reliance on individual USDA agency NEPA regulations for detailed implementation procedures. It has been further determined that a Departmental statement of policy regarding assisting agency implementation is an effective means of assisting agency implementation. This proposed regulation sets forth this policy.

**DATES:** Comments must be received on or before November 26, 1982.

**ADDRESSES:** Submit written comments to David E. Ketchum, Co-chairman of the Environmental Issues Working Group, U.S. Department of Agriculture, Forest Service, P.O. Box 2417, Washington, D.C. 20013. All written comments made pursuant to this notice will be available for public inspection at the above address.

**FOR FURTHER INFORMATION CONTACT:** Peter F. Smith, Executive Secretary of the Environmental Issues Working Group, Room 6154 South Building, U.S. Department of Agriculture, Washington, D.C. 20250. Telephone: (202) 447–5166.

**SUPPLEMENTARY INFORMATION:** This proposed rule has been reviewed under procedures established in Secretary's Memorandum 1512–1 and Executive Order 12291 and has been classified as nonmajor. The proposed rule will not have—

(a) An annual effect on the economy of $100 million or more; or

(b) Any increased costs or prices to consumers; individual industries; Federal, State, or local government agencies; or geogrphaic regions; or

(c) A significant adverse effect on competition, employment, investment, productivity, innovation, or the ability of United States-based enterprises to compete with foreign-based enterprises in domestic or export markets.

I have determined that this action will not have a significant economic impact on a substantial number of small entities because it imposes on direct or indirect costs on small entities, it requries no paperwork or recordkeeping, it does not affect the competitive position of small entities in relation to large entities, it does not affect the cash flow or liquidity of small entities, it does not affect the ability of a small entity to stay in the market, and it does not require that small entities obtain professional assistance to meet regulatory requirements.

Alternatives to this proposed rulemaking have been considered. The alternative of not amending the regulation was considered. This was not recommended for several reasons. The exising regulation relies on the now abolished Office of Environmental Quality for implementation. The existing regulation does not incorporate the Department's statement concerning the exclusion of some USDA agencies from the need to prepare implementing procedures. The existing regulation does not reflect recent agency reorganizations and title changes.

Another alternative considered was the cancellation of the existing regulation. This alternative is not recommended because it was decided to be desirable to maintain a Departmental statement of policy and procedures regarding NEPA and because

cancellation would have requ[...] amendment of the NEPA reg[...] several USDA agencies whi[...] the Departmental regulation[...]

The proposed action will pr[...] USDA policy statement regar[...] and environmental matters; in[...] responsibilities for environm[...] effects abroad; a list of USD[...] categorically excluded from t[...] preparation of environmental assessments and environment[...] statements and a list of USDA[...] which have been excluded fro[...] requirements to prepare imple[...] procedures. The latter two pr[...] represent only minor change[...] USDA's existing NEPA regula[...] proposed action modifies the [...] regulation by eliminating cert[...] procedural requirements whi[...] formerly carried out by the Of[...] Environmental Quality.

### List of Subjects in 7 CFR Part [...]

Environmental impact state[...], Historic preservation, Foreig[...]

Therefore, it is proposed th[...] Subtitle A of the Code of Fede[...] Regulations be amended as fo[...]

1. A new part 1c is added a[...] reserved to read as follows:

### PART 1c—CULTURAL RESO[...] [RESERVED]

2. A new part 1b is added t[...] follows:

### PART 1b—NATIONAL ENVIRONMENTAL POLICY A[...]

Sec.
1b.1  Purpose.
1b.2  Policy.
1b.3  Categorical exclusions.
1b.4  Exclusion of agencies.

Authority: National Environment[...] Act (NEPA), as amended, 42 U.S.C[...] seq.; E.O. 11514, 34 FR 4247, as ame[...] E.O. 11991, 42 FR 26927; E.O. 1211[...] 1957; 5 U.S.C. 301; 40 CFR 1507.3.

### § 1b.1  Purpose.

(a) This part supplements the[...] regulations for implementation[...] National Environmental Policy[...] (NEPA), for which regulations [...] published by the Council on [...] Environmental Quality (CEQ) in[...] Parts 1500–1508. This part inco[...] and adopts those regulations.

(b) This part sets forth Depar[...] policy concerning NEPA, establi[...] categorical exclusions of action[...]

the Department and its agencies, set forth those USDA agencies are excluded from the ...ment to prepare procedures ...enting NEPA.

**Policy.**

USDA agencies carry out programs ...purposes of encouraging ...nt and efficient production of ...ber, and forest products; proper ...ement and conservation of the ...'s natural resources; and the ...ion of consumers through ...tion services. Programs to meet ...ssion are carried out through ...; education; technical and ...al assistance to landowners and ...ers, producers, and consumers; ...agement of the National Forest ...

...ll policies and programs of the ... USDA agencies shall be ...d, developed, and implemented ... achieve the goals and to follow ...dures declared by NEPA in ...assure responsible stewardship ...nvironment for present and ...nerations.

...ch USDA agency is responsible ...liance with the provisions of ...bpart, the regulations of CEQ, and ...visions of NEPA. Compliance will ...the preparation and ...entation of specific procedures ...cesses relating to the programs ...ctivities of the individual agency, ...essary, including those involving ...mental effects abroad.

...he Assistant Secretary, Natural ...ces and Environment [NR&E], is ...sible for ensuring that agency ...enting procedures are consistent ...EQ's NEPA regulations and for ...nating NEPA compliance for the ...ment (7 CFR Part 2819(b)]. The ...nt Secretary, through the USDA ...l Resources and Environment ...ttee, will develop the necessary ...es to be used by the Office of the ...ry in reviewing, implementing, ...anning its NEPA activities, ...nations, and policies.

**Categorical exclusions.**

...he following are categories of ...ties which have been determined ...ave a significant individual or ...tive adverse effect on the human ...ment and are excluded from the ...tion of environmental ...nents (EA's) or environmental ...tatements (EIS's), unless ...al agency procedures prescribe ...ise.

...icy development, planning, and ...ntation which relates to routine ...such as personnel.

organizational changes, or similar administrative functions;

(2) Activities which deal solely with the funding of programs, such as program budget proposals, disbursements, transfer, or reprogramming of funds;

(3) Inventories, research activities, and studies, such as resource inventories and routine data collection when such actions are clearly limited in context and intensity;

(4) Educational and informational programs and activities;

(5) Civil and criminal law enforcement and investigative activities;

(6) Activities which are advisory and consultative to other agencies and public and private entities such as legal counselling and representation;

(7) Activities related to trade representation and market development activities abroad.

(b) Agencies will identify in their own procedures the activities which normally would not require an environmental assessment or environmental impact statement.

(c) Notwithstanding the exclusions listed above and in § 16.4, or exclusions identified in agency procedures, agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action. Agencies shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion.

**§ 1b.4   Exclusions of agencies.**

The USDA agencies listed below carry out programs and activities which have been found to have no individual or cumulative effect on the human environment. These agencies are excluded from the requirements to prepare implementing procedures. Actions of these agencies are categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect.

(a) Agricultural Cooperative Service.
(b) Agricultural Marketing Service.
(c) Extension Service.
(d) Economic Research Service.
(e) Federal Crop Insurance Corporation.
(f) Federal Grain Inspection Service.
(g) Food and Nutrition Service.
(h) Food Safety and Inspection Service.
(i) Foreign Agricultural Service.
(j) Office of Transportation.
(k) Packers and Stockyards Administration.
(l) Statistical Reporting Service.
(m) Office of General Counsel.

(n) Office of Inspector General.
(o) National Agricultural Library.
**John B. Crowell, Jr.,**
*Assistant Secretary, Natural Resources and Environment.*
[FR Doc. 82-26387 Filed 9-24-82; 8:45 am]
**BILLING CODE 3410-01-M**

## Agricultural Marketing Service

### 7 CFR Part 60

### Market News Reports

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Proposed rule.

**SUMMARY:** The Agricultural Marketing Service (AMS) proposes to amend the interim final rule published on July 8, 1982, at 47 FR 29643–29645, which established the collection of fees for the distribution upon request of copies of market news reports to the general public. The proposal would require all media, whether trade publication or general news media, to pay for mailed market news reports, thereby eliminating the exemption for news media presently contained in the interim final rule.

**EFFECTIVE DATES:** Comments due on or before October 27, 1982.

**ADDRESS:** Send comments to William T. Manley, Deputy Administrator, Marketing Program Operations, Agricultural Marketing Service, Room 3071, South Building, United States Department of Agriculture, Washington, D.C. 20250. Comments will be available for public inspection at this location during the hours of 8:00 a.m. to 4:30 p.m., Monday through Friday.

**FOR FURTHER INFORMATION CONTACT:** Dairy reports: Silvio Capponi, Chief, Market Information Branch, Dairy Division, AMS, USDA, Washington, D.C. 20250, (202) 447–7461. Fruit and vegetable reports: Clay J. Ritter, Chief, Market News Branch, Fruit and Vegetable Division, AMS, USDA, Washington, D.C. 20250, (202) 447–2745. Livestock and grain reports: James A. Ray, Chief, Market News Branch, Livestock, Meat, Grain and Seed Division, AMS, USDA, Washington, D.C. 20250, (202) 447–6231. Poultry reports: Raymond S. Wruk, Chief, Market News Branch, Poultry Division, AMS, USDA, Washington, D.C. 20250, (202) 447–6911.

**SUPPLEMENTARY INFORMATION:** The Department proposes to amend the interim final rule published on July 8, 1982, at 47 FR 29643–29645 to require that all news media, whether trade publication or general news media, to

AR00063

] *Agreement.* If the parties agree to [...]ive the dispute without an [...]tration award, the settlement [...]ement will be the final and binding [...]lution of the appeal and the [...]itrator will dismiss the appeal with [...]judice.

[...] The terms of the settlement [...]ement may be recorded by the [...]trator, signed by both parties and [...]de a part of the arbitration record, in [...]h case the Board will retain [...]diction to ensure compliance with [...]settlement agreement;

[...] If the agreement is not entered into [...]bitration record, the Board will not [...]n jurisdiction to ensure compliance.

**[...].217 Arbitration award.**

[...]settlement is not reached, the [...]rator will adjudicate the appeal and [...]a written decision within 15 days [...] the record is closed. The award will [...]de a summary of the basic issues, [...]ings of fact and conclusions of law, [...]ding affirming, reversing or [...]ifying the appealed action and order [...]ropriate relief.

[...]peals arbitration decisions are not [...]dential.

[...]e award will become final after 35 [...] if no petition for review is filed.

**[...]ns for review**

**[...]18 Petitions for review.**

[...]Any party may file a petition for [...]w with the Board of the arbitrator's [...]d.

[...]Petitions for review must be filed [...]35 days from the date of the [...]ation award. Supportive briefs [...]accompany the petitions for review [...] limited to 15 pages. Opposition [...] must be received by the Board [...] 15 days from the date of the [...] forwarding of a copy of the [...]n for review to the opposing party [...] limited to 10 pages.

**[...]219 Standard of review.**

[...]Board will grant a petition for [...]w which establishes:

[...]emonstrated harmful procedural [...]arity in the proceedings before the [...]rator, or

[...]lear error of law.

**[...]20 Final Decision.**

[...] Board will issue a final decision [...]er than 15 days from the close of [...]spondent's filing deadline.

**[...]21 Judicial review.**

[...]mployee or applicant for [...]yment adversely affected by a [...]rder or decision of the Board may [...] judicial review under the [...]ions of 5 U.S.C. 7703.

Dated: March 10, 1983.
For the Board.
**Herbert E. Ellingwood,**
*Chairman.*
[FR Doc. 83–6873 Filed 3–17–83; 8:45 am]
**BILLING CODE 7400–01–M**

---

**DEPARTMENT OF AGRICULTURE**

**Office of the Secretary**

**7 CFR Parts 1b and 1c**

**National Environmental Policy Act (NEPA) Policies and Procedures**

**AGENCY:** Agriculture Department.

**ACTION:** Final rule.

**SUMMARY:** This rule prescribes the Department of Agriculture (USDA) policies and procedures for compliance with the National Environmental Policy Act (NEPA), as amended, and the Council on Environmental Quality (CEQ) implementing regulations (40 CFR Parts 1500–1508). It has been determined that effective NEPA implementation can best be achieved by reliance on individual USDA agency NEPA regulations for detailed implementation procedures. It has been further determined that a Departmental statement of policy regarding NEPA is an effective means of assisting agency implementation. This regulation sets forth this policy.

**EFFECTIVE DATE:** March 18, 1983.

**FOR FURTHER INFORMATION CONTACT:** Peter F. Smith, Executive Secretary of the Environmental Issues Working Group, Room 6154 South Building, U.S. Department of Agriculture, Washington, D.C. 20250. Telephone: (202) 447–5166.

**SUPPLEMENTARY INFORMATION:** On September 27, 1982, (47 FR 42364) the USDA proposed rules setting forth policies and procedures for compliance with NEPA and the CEQ implementing regulations (40 CFR Parts 1500–1508). This action constitutes final rulemaking stemming from that proposed rule. The final rule provides a USDA policy statement regarding NEPA and environmental matters, including responsibilities for environmental effects abroad; a list of USDA actions categorically excluded from the preparation of environmental assessments and environmental impact statements; and a list of USDA agencies which have been excluded from the requirements to prepare implementing procedures.

The final rule repeals and replaces the previous regulation, eliminating certain procedural requirements which were

formerly performed by the Office of Environmental Quality.

This final rule has been reviewed under procedures established in Secretary's Memorandum 1512–1 and Executive Order 12291 and has been classified as nonmajor. The rule will not have—

(a) An annual effect on the economy of $100 million or more; or

(b) Any increased costs or prices to consumers; individual industries; Federal, State, or local government agencies; or geographic regions; or

(c) A significant adverse effect on competition, employment, investment, productivity, innovation, or the ability of United States-based enterprises to compete with foreign-based enterprises in domestic or export markets.

This action will not have a significant economic impact on a substantial number of small entities because it imposes no direct or indirect costs on small entities, it requires no paperwork or recordkeeping, it does not affect the competitive position of small entities in relation to large entities, it does not affect the cash flow or liquidity of small entities, it does not affect the ability of a small entity to stay in the market, and it does not require that small entities obtain professional assistance to meet regulatory requirements.

During the 60-day comment period, one comment was received; and it was considered in developing the final rule. The principal point raised in the comment was the suggestion that a distinction be made between compliance policies for NEPA and Executive Order 12114, "Environmental Effects Abroad of Major Federal Actions." This comment has been incorporated by establishing a new subsection to discuss separate policies for Executive Order 12114 compliance.

**List of Subjects in 7 CFR Parts 1b and 1c**

Environmental policy statements, Historic preservation, Foreign relations.

Accordingly, Title 7 of the Code of Federal Regulations, is amended as follows:

1. A new Part 1b, Subtitle A, is added to read as follows:

**PART 1b—NATIONAL ENVIRONMENTAL POLICY ACT**

Sec.
1b.1    Purpose.
1b.2    Policy.
1b.3    Categorical exclusions.
1b.4    Exclusion of agencies.

Authority: National Environmental Policy Act (NEPA), as amended, 42 U.S.C. 4321 et seq.; E.O. 11514, 34 FR 4247, as amended by

AR00064

E.O. 11991, 42 FR 26927; E.O. 12114, 44 FR 1957; 5 U.S.C. 301; 40 CFR 1507.3.

§ 1b.1  Purpose.

(a) This subpart supplements the regulations for implementation of the National Environmental Policy Act (NEPA), for which regulations were published by the Council of Environmental Quality (CEQ) in 40 CFR Parts 1500 through 1508. The subpart incorporates and adopts those regulations.

(b) This subpart sets forth Departmental policy concerning NEPA, establishes categorical exclusions of actions carried out by the Department and its agencies, and sets forth those USDA agencies which are excluded from the requirement to prepare procedures implementing NEPA.

§ 1b.2  Policy.

(a) USDA agencies carry out programs for the purpose of encouraging sufficient and efficient production of food, fiber, and forest products; proper management and conservation of the Nation's natural resources; and the protection of consumers through inspection services. Programs to meet this mission are carried out through research, education; technical and financial assistance to landowners and operators, producers, and consumers; and management of the National Forest System.

(b) All policies and programs of the various USDA agencies shall be planned, developed, and implemented so as to achieve the goals and to follow the procedures declared by NEPA in order to assure responsible stewardship of the environment for present and future generations.

(c) Each USDA agency is responsible for compliance with the provisions of this subpart, the regulations of CEQ, and the provisions of NEPA. Compliance will include the preparation and implementation of specific procedures and processes relating to the programs and activities of the individual agency, as necessary.

(d) The Assistant Secretary, Natural Resources and Environment (NR&E), is responsible for ensuring that agency implementing procedures are consistent with CEQ's NEPA regulations and for coordinating NEPA compliance for the Department (7 CFR 2.19(b)). The Assistant Secretary, through the USDA Natural Resources and Environment Committee, will develop the necessary processes to be used by the Office of the Secretary in reviewing, implementing, and planning its NEPA activities, determinations, and policies.

(e) In connection with the policies and requirements set forth in this subpart, all

USDA agencies are responsible for compliance with Executive Order 12114, "Environmental Effects Abroad of Major Federal Actions." Compliance will include the preparation and implementation of specific procedures and processes relative to the programs and activities of the individual agencies, as necessary. Agencies shall consult with the Department of State; and the Council on Environmental Quality; and the Assistant Secretary, NR&E, prior to placing procedures and processes in effect.

§ 1b.3  Categorical exclusions.

(a) The following are categories of activities which have been determined not to have a significant individual or cumulative effect on the human environment and are excluded from the preparation of environmental assessment (EA's) or environmental impact statement (EIS's), unless individual agency procedures prescribed otherwise.

(1) Policy development, planning and implementation which relate to routine activities, such as personnel, organizational changes, or similar administrative functions;

(2) Activities which deal solely with the funding of programs, such as program budget proposals, disbursements, and transfer or reprogramming of funds;

(3) Inventories, research activities, and studies, such as resource inventories and routine data collection when such actions are clearly limited in context and intensity;

(4) Educational and informational programs and activities;

(5) Civil and criminal law enforcement and investigative activities;

(6) Activities which are advisory and consultative to other agencies and public and private entities, such as legal counselling and representation;

(7) Activities related to trade representation and market development activities abroad.

(b) Agencies will identify in their own procedures the activities which normally would not require an environmental assessment or environmental impact statement.

(c) Notwithstanding the exclusions listed above and in 1b.4, or identified in agency procedures, agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action. Agencies shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion.

§ 1b.4  Exclusions of agencies.

(a) The USDA agencies listed below carry out programs and activities which have been found to have no individual or cumulative effect on the human environment. These agencies are excluded from the requirements to prepare implementing procedures. Actions of these agencies are categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect.

(1) Agricultural Cooperative Service,
(2) Agricultural Marketing Service,
(3) Extension Service,
(4) Economic Research Service,
(5) Federal Crop Insurance Corporation,
(6) Federal Grain Inspection Service,
(7) Food and Nutrition Service,
(8) Food Safety and Inspection Service,
(9) Foreign Agricultural Service,
(10) Office of Transportation,
(11) Packers and Stockyards Administration,
(12) Statistical Reporting Service,
(13) Office of General Counsel,
(14) Office of Inspector General,
(15) National Agricultural Library.

2. A new Part 1c, Subtitle A, is added and reserved to read as follows:

PART 1c—CULTURAL RESOURCES [RESERVED]

Subparts A and B—[Removed]

3. Subpart A—[Reserved] and Subpart B—National Environmental Policy Act of Part 3100, Subtitle B are revoked and removed.

John B. Crowel, Jr.,
*Assistant Secretary, Natural Resources and Environment.*

March 14, 1983.

[FR Doc. 83-7203 Filed 3-17-83; 8:45 am]

BILLING CODE 3410-01-M

7 CFR Part 10

Classification, Declassification, and Safeguarding of Classified Information

**AGENCY:** Department of Agriculture.

**ACTION:** Final rule.

**SUMMARY:** These regulations implement the provisions of Executive Order 12356 (April 6, 1982, 47 FR 14874) and the Information Security Oversight Office Directive (47 FR 27836, June 25, 1982) relating to national security information. The Executive Order prescribes a uniform information security system and establishes a monitoring system to

[right column partially cut off]

§ 1b.4  Exclusions of agencies.

... also
... un
... wh
... int

EFF

FOR
Wi
Sec
Dep
D.C

SUPPLEMENTARY ... this ... man 5 U.S.C. ... that ... with ... con ... cau ... effe ... pub ... fina ... Exe ... dete ... This ... econ ... num ... regu ... Infor

List

Ac
proc

Ac
to re

PAR
DEC
SAFE
INFO

Sec.
10.1
10.2
    s
    c
10.3
10.4
10.5
10.6
10.7
10.8
    c
10.9
    c
10.10
Aut
14874
Infor
Direc

§ 10.1

(a)
12356
(b)
line c
head
equiv
Depu
Assis

With respect to San Diego County, all reports, applications, submittals, and other communications pertaining to the above listed NSPS source category should be directed to the EPA, Region 9 Office at the address shown in the "**FOR FURTHER INFORMATION CONTACT:**" section of this notice.

The Office of Management and Budget has exempted this rule from the requirements of Section 3 of Executive Order 12291.

This Notice is issued under the authority of Section 111 of the Clean Air Act, as amended (42 U.S.C. 1857, et seq.).

Dated: July 12, 1983.

John Wise,

*Acting Regional Administrator.*

[FR Doc. 83-20322 Filed 7-27-83; 8:45 am]

**BILLING CODE 6560-50-M**

---

## COUNCIL ON ENVIRONMENTAL QUALITY

### 40 CFR Part 1500

### Guidance Regarding NEPA Regulations

**AGENCY:** Council on Environmental Quality, Executive Office of the President.

**ACTION:** Information Only, Publication of Memorandum to Agencies Containing Guidance on Agency Implementation of NEPA Regulations.

**SUMMARY:** The Council on Environmental Quality, as part of its oversight of implementation of the National Environmental Policy Act, on August 14, 1981 requested comments from the public on how the various federal agencies are implementing the regulations promulgated by the Council in 1978 (40 CFR 1500 et seq.). The Council received 142 comments. Sixty-nine commenters represented business groups; forty represented state and local governments; fifteen represented environmental groups; thirteen represented federal agencies; and, five represented other interest groups or individuals. The Council staff summarized the comments received in a document which was subsequently made available to the public. On July 12, 1982 the Council published notice of the availability of this summary document in the Federal Register. The summary document identified a number of areas in which the comments indicate that agencies need to better manage the NEPA process.

On August 12, 1982 the Council held a public meeting to discuss the issue areas identified in the summary document. At that time representatives of environmental groups, industry groups, other federal agencies and individuals testified. Subsequent to the meeting the Council received several additional comments addressing the problem areas identified in the summary document.

Based on the public comments received during this process, the Council is issuing the following guidance document to help officials manage the NEPA process in a more efficient fashion.

**DATE:** July 22, 1983.

**FOR FURTHER INFORMATION CONTACT:** Dinah Bear, General Counsel, Council on Environmental Quality, 722 Jackson Place, NW., Washington, D.C. 20009. (202) 395-5754.

A. Alan Hill,

*Chairman.*

### Executive Office of the President

*Council on Environmental Quality*

722 Jackson Place, N.W.

Washington, D.C. 20006

July 22, 1983.

*Memorandum*

For: Heads of Federal Agencies
From: A. Alan Hill, Chairman
Re: Guidance Regarding NEPA Regulations

The Council on Environmental Quality (CEQ) regulations implementing the National Environmental Policy Act (NEPA) were issued on November 29, 1978. These regulations became effective for, and binding upon, most federal agencies on July 30, 1979, and for all remaining federal agencies on November 30, 1979.

As part of the Council's NEPA oversight responsibilities it solicited through an August 14, 1981, notice in the Federal Register public and agency comments regarding a series of questions that were developed to provide information on the manner in which federal agencies were implementing the CEQ regulations. On July 12, 1982 the Council announced the availability of a document summarizing the comments received from the public and other agencies and also identifying issue areas which the Council intended to review. On August 12, 1982, the Council held a public meeting to address those issues and hear any other comments which the public or other interested agencies might have about the NEPA process. The issues addressed in this guidance were identified during this process.

There are many ways in which agencies can meet their responsibilities under NEPA and the 1978 regulations. The purpose of this document is to provide the Council's guidance on various ways to carry out activities under the regulations.

### Scoping

The Council on Environmental Quality (CEQ) regulations direct federal agencies which have made a decision to prepare an environmental impact statement to engage in a public scoping process. Public hearings or meetings, although often held, are not required; instead the manner in which public input will be sought is left to the discretion of the agency.

The purpose of this process is to determine the scope of the EIS so that preparation of the document can be effectively managed. Scoping is intended to ensure that problems are identified early and properly studied, that issues of little significance do not consume time and effort, that the draft EIS is thorough and balanced, and that delays occasioned by an inadequate draft EIS are avoided. The scoping process should identify the public and agency concerns; clearly define the environmental issues and alternatives to be examined in the EIS including the elimination of nonsignificant issues; identify related issues which originate from separate legislation, regulation, or Executive Order (e.g. historic preservation or endangered species concerns); and identify state and local agency requirements which must be addressed. An effective scoping process can help reduce unnecessary paperwork and time delays in preparing and processing the EIS by clearly identifying all relevant procedural requirements.

In April 1981, the Council issued a "Memorandum for General Counsels, NEPA Liaisons and Participants in Scoping" on the subject of Scoping Guidance. The purpose of this guidance was to give agencies suggestions as to how to more effectively carry out the CEQ scoping requirement. The availability of this document was announced in the Federal Register at 46 FR 25461. It is still available upon request from the CEQ General Counsel's office.

The concept of lead agency (§ 1508.16) and cooperating agency (§ 1508.5) can be used effectively to help manage the scoping process and prepare the environmental impact statement. The lead agency should identify the potential cooperating agencies. It is incumbent upon the lead agency to identify any agency which may ultimately be involved in the proposed action, including any subsequent permitting

AR00066

actions. Once cooperating agencies have been identified they have specific responsibility under the NEPA regulations (40 CFR 1501.6). Among other things cooperating agencies have responsibilities to participate in the scoping process and to help identify issues which are germane to any subsequent action it must take on the proposed action. The ultimate goal of this combined agency effort is to produce an EIS which in addition to fulfilling the basic intent of NEPA, also encompasses to the maximum extent possible all the environmental and public involvement requirements of state and federal laws, Executive Orders, and administrative policies of the involved agencies. Examples of these requirements include the Fish and Wildlife Coordination Act, the Clean Air Act, the Endangered Species Act, the National Historic Preservation Act, the Wild and Scenic Rivers Act, the Farmland Protection Policy Act, Executive Order 11990 (Protection of Wetlands), and Executive Order 11998 (Floodplain Management).

It is emphasized that cooperating agencies have the responsibility and obligation under the CEQ regulations to participate in the scoping process. Early involvement leads to early identification of significant issues, better decisionmaking, and avoidance of possible legal challenges. Agencies with "jurisdiction by law" must accept designation as a cooperating agency if requested (40 CFR 1501.6).

One of the functions of scoping is to identify the public involvement/public hearing procedures of all appropriate state and federal agencies that will ultimately act upon the proposed action. To the maximum extent possible, such procedures should be integrated into the EIS process so that joint public meetings and hearings can be conducted. Conducting joint meetings and hearings eliminates duplication and should significantly reduce the time and cost of processing an EIS and any subsequent approvals. The end result will be a more informed public cognizant of all facets of the proposed action.

It is important that the lead agency establish a process to properly manage scoping. In appropriate situations the lead agency should consider designating a project coordinator and forming an interagency project review team. The project coordinator would be the key person in monitoring time schedules and responding to any problems which may arise in both scoping and preparing the EIS. The project review team would be established early in scoping and maintained throughout the process of preparing the EIS. This review team would include state and local agency representatives. The review team would meet periodically to ensure that the EIS is complete, concise, and prepared in a timely manner.

A project review team has been used effectively on many projects. Some of the more important functions this review team can serve include: (1) A source of information, (2) a coordination mechanism, and (3) a professional review group. As an information source, the review team can identify all federal, state, and local environmental requirements, agency public meeting and hearing procedures, concerned citizen groups, data needs and sources of existing information, and the significant issues and reasonable alternatives for detailed analysis, excluding the non-significant issues. As a coordination mechanism, the team can ensure the rapid distribution of appropriate information or environmental studies, and can reduce the time required for formal consultation on a number of issues (e.g., endangered species or historic preservation). As a professional review group the team can assist in establishing and monitoring a tight time schedule for preparing the EIS by identifying critical points in the process, discussing and recommending solutions to the lead agency as problems arise, advising whether a requested analysis or information item is relevant to the issues under consideration, and providing timely and substantive review comments on any preliminary reports or analyses that may be prepared during the process. The presence of professionals from all scientific disciplines which have a significant role in the proposed action could greatly enhance the value of the team.

The Council recognizes that there may be some problems with the review team concept such as limited agency travel funds and the amount of work necessary to coordinate and prepare for the periodic team meetings. However, the potential benefits of the team concept are significant and the Council encourages agencies to consider utilizing interdisciplinary project review teams to aid in EIS preparation. A regularly scheduled meeting time and location should reduce coordination problems. In some instances, meetings can be arranged so that many projects are discussed at each session. The benefits of the concept are obvious: timely and effective preparation of the EIS, early identification and resolution of any problems which may arise, and elimination, or at least reduction of, the need for additional environmental

studies subsequent to the approval of the EIS.

Since the key purpose of scoping is identify the issues and alternatives for consideration, the scoping process should "end" once the issues and alternatives to be addressed in the EI have been clearly identified. Normally this would occur during the final stag of preparing the draft EIS and before is officially circulated for public and agency review.

The Council encourages the lead agency to notify the public of the rest of the scoping process to ensure that issues have been identified. The lead agency should document the results of the scoping process in its administrat record.

The NEPA regulations place a new and significant responsibility on agencies and the public alike during t scoping process to identify all significant issues and reasonable alternatives to be addressed in the EI Most significantly, the Council has found that scoping is an extremely valuable aid to better decisionmaking Thorough scoping may also have the effect of reducing the frequency with which proposed actions are challenge in court on the basis of an inadequate EIS. Through the techniques identifie this guidance, the lead agency will be able to document that an open public involvement process was conducted, that all reasonable alternatives were identified, that significant issues wer identified and non-significant issues eliminated, and that the environment public involvement requirements of a agencies were met, to the extent possible, in a single "one-stop" proce

## Categorical Exclusions

Section 1507 of the CEQ regulation directs federal agencies when establishing implementing procedure identify those actions which experier has indicated will not have a signific environmental effect and to categorically exclude them from NEF review. In our August 1981 request fc public comments, we asked the ques "Have categorical exclusions been adequately identified and defined?".

The responses the Council received indicated that there was considerabl belief that categorical exclusions we not adequately identified and define number of commentators indicated th agencies had not identified all categories of actions that meet the categorical exclusion definition (§ 1508.4) or that agencies were over restrictive in their interpretations of categorical exclusions. Concerns we expressed that agencies were requiri

too much documentation for projects that were not major federal actions with significant effects and also that agency procedures to add categories of actions to their existing lists of categorical exclusions were too cumbersome.

The National Environmental Policy Act and the CEQ regulations are concerned primarily with those "major federal actions significantly affecting the quality of the human environment" (42 U.S.C. 4332). Accordingly, agency procedures, resources, and efforts should focus on determining whether the proposed federal action is a major federal action significantly affecting the quality of the human environment. If the answer to this question is yes, an environmental impact statement must be prepared. If there is insufficient information to answer the question, an environmental assessment is needed to assist the agency in determining if the environmental impacts are significant and require an EIS. If the assessment shows that the impacts are not significant, the agency must prepare a finding of no significant impact. Further stages of this federal action may be excluded from requirements to prepare NEPA documents.

The CEQ regulations were issued in 1978 and most agency implementing regulations and procedures were issued shortly thereafter. In recognition of the experience with the NEPA process that agencies have had since the CEQ regulations were issued, the Council believes that it is appropriate for agencies to examine their procedures to insure that the NEPA process utilizes this additional knowledge and experience. Accordingly, the Council strongly encourages agencies to re-examine their environmental procedures and specifically those portions of the procedures where "categorical exclusions" are discussed to determine if revisions are appropriate. The specific issues which the Council is concerned about are (1) the use of detailed lists of specific activities for categorical exclusions, (2) the excessive use of environmental assessments/findings of no significant impact and (3) excessive documentation.

The Council has noted some agencies have developed lists of specific activities which qualify as categorical exclusions. The Council believes that if this approach is applied narrowly it will not provide the agency with sufficient flexibility to make decisions on a project-by-project basis with full consideration to the issues and impacts that are unique to a specific project. The Council encourages the agencies to consider broadly defined criteria which

characterize types of actions that, based on the agency's experience, do not cause significant environmental effects. If this technique is adopted, it would be helpful for the agency to offer several examples of activities frequently performed by that agency's personnel which would normally fall in these categories. Agencies also need to consider whether the cumulative effects of several small actions would cause sufficient environmental impact to take the actions out of the categorically excluded class.

The Council also encourages agencies to examine the manner in which they use the environmental assessment process in relation to their process for identifying projects that meet the categorical exclusion definition. A report(1) to the Council indicated that some agencies have a very high ratio of findings of no significant impact to environmental assessments each year while producing only a handful of EIS's. Agencies should examine their decisionmaking process to ascertain if some of these actions do not, in fact, fall within the categorical exclusion definition, or, conversely, if they deserve full EIS treatment.

As previously noted, the Council received a number of comments that agencies require an excessive amount of environmental documentation for projects that meet the categorical exclusion definition. The Council believes that sufficient information will usually be available during the course of normal project development to determine the need for an EIS and further that the agency's administrative record will clearly document the basis for its decision. Accordingly, the Council strongly discourages procedures that would require the preparation of additional paperwork to document that an activity has been categorically excluded.

Categorical exclusions promulgated by an agency should be reviewed by the Council at the draft stage. After reviewing comments received during the review period and prior to publication in final form, the Council will determine whether the categorical exclusions are consistent with the NEPA regulations.

## Adoption Procedures

During the recent effort undertaken by the Council to review the current NEPA regulations, several participants indicated federal agencies were not utilizing the adoption procedures as authorized by the CEQ regulations. The concept of adoption was incorporated into the Council's NEPA Regulations (40 CFR 1506.3) to reduce duplicative EISs prepared by Federal agencies. The

experiences gained during the 1970's revealed situations in which two or more agencies had an action relating to the same project; however, the timing of the actions was different. In the early years of NEPA implementation, agencies independently approached their activities and decisions. This procedure lent itself to two or even three EISs on the same project. In response to this situation the CEQ regulations authorized agencies, in certain instances, to adopt environmental impact statements prepared by other agencies.

In general terms, the regulations recognize three possible situations in which adoption is appropriate. One is where the federal agency participated in the process as a cooperating agency. (40 CFR 1506.3(c)). In this case, the cooperating agency may adopt a final EIS and simply issue its record of decision.(2) However, the cooperating agency must independently review the EIS and determine that its own NEPA procedures have been satisfied.

A second case concerns the federal agency which was not a cooperating agency, but is, nevertheless, undertaking an activity which was the subject of an EIS. (40 CFR 1506.3(b)). This situation would arise because an agency did not anticipate that it would be involved in a project which was the subject of another agency's EIS. In this instance where the proposed action is substantially the same as that action described in the EIS, the agency may adopt the EIS and recirculate (file with EPA and distribute to agencies and the public) it as a final EIS. However, the agency must independently review the EIS to determine that it is current and that its own NEPA procedures have been satisfied. When recirculating the final EIS the agency should provide information which identifies what federal action is involved.

The third situation is one in which the proposed action is not substantially the same as that covered by the EIS. In this case, any agency may adopt an EIS or a portion thereof by circulating the EIS as a draft or as a portion of the agency's draft and preparing a final EIS. (40 CFR 1506.3(a)). Repetitious analysis and time consuming data collection can be easily eliminated utilizing this procedure.

The CEQ regulations specifically address the question of adoption only in terms of preparing EIS's. However, the objectives that underlie this portion of the regulations—i.e., reducing delays and eliminating duplication—apply with equal force to the issue of adopting other environmental documents. Consequently, the Council encourages agencies to put in place a mechanism for

AR00068

adopting environmental assessments prepared by other agencies. Under such procedures the agency could adopt the environmental assessment and prepare a Finding of No Significant Impact based on that assessment. In doing so, the agency should be guided by several principles:

—First, when an agency adopts such an analysis it must independently evaluate the information contained therein and take full responsibility for its scope and content.

—Second, if the proposed action meets the criteria set out in 40 CFR 1501.4(e)(2), a Finding of No Significant Impact would be published for 30 days of public review before a final determination is made by the agency on whether to prepare an environmental impact statement.

## Contracting Provisions

Section 1506.5(c) of the NEPA regulations contains the basic rules for agencies which choose to have an environmental impact statement prepared by a contractor. That section requires the lead or cooperating agency to select the contractor, to furnish guidance and to participate in the preparation of the environmental impact statement. The regulation requires contractors who are employed to prepare an environmental impact statement to sign a disclosure statement stating that they have no financial or other interest in the outcome of the project. The responsible federal official must independently evaluate the statement prior to its approval and take responsibility for its scope and contents.

During the recent evaluation of comments regarding agency implementation of the NEPA process, the Council became aware of confusion and criticism about the provisions of Section 1506.5(c). It appears that a great deal of misunderstanding exists regarding the interpretation of the conflict of interest provision. There is also some feeling that the conflict of interest provision should be completely eliminated.[3]

### Applicability of § 1506.5(c)

This provision is only applicable when a federal lead agency determines that it needs contractor assistance in preparing an EIS. Under such circumstances, the lead agency or a cooperating agency should select the contractor to prepare the EIS.[4]

This provision does not apply when the lead agency is preparing the EIS based on information provided by a private applicant. In this situation, the private applicant can obtain its information from any source. Such

sources could include a contractor hired by the private applicant to do environmental, engineering, or other studies necessary to provide sufficient information to the lead agency to prepare an EIS. The agency must independently evaluate the information and is responsible for its accuracy.

### Conflict of Interest Provisions

The purpose of the disclosure statement requirement is to avoid situations in which the contractor preparing the environmental impact statement has an interest in the outcome of the proposal. Avoidance of this situation should, in the Council's opinion, ensure a better and more defensible statement for the federal agencies. This requirement also serves to assure the public that the analysis in the environmental impact statement has been prepared free of subjective, self-serving research and analysis.

Some persons believe these restrictions are motivated by undue and unwarranted suspicion about the bias of contractors. The Council is aware that many contractors would conduct their studies in a professional and unbiased manner. However, the Council has the responsibility of overseeing the administration of the National Environmental Policy Act in a manner most consistent with the statute's directives and the public's expectations of sound government. The legal responsibilities for carrying out NEPA's objectives rest solely with federal agencies. Thus, if any delegation of work is to occur, it should be arranged to be performed in as objective a manner as possible.

Preparation of environmental impact statements by parties who would suffer financial losses if, for example, a "no action" alternative were selected, could easily lead to a public perception of bias. It is important to maintain the public's faith in the integrity of the EIS process, and avoidance of conflicts in the preparation of environmental impact statements is an important means of achieving this goal.

The Council has discovered that some agencies have been interpreting the conflicts provision in an overly burdensome manner. In some instances, multidisciplinary firms are being excluded from environmental impact statements preparation contracts because of links to a parent company which has design and/or construction capabilities. Some qualified contractors are not bidding on environmental impact statement contracts because of fears that they themselves may be excluded from future design or construction contracts. As a result of the selection

and disclosure provisions to project proponents who wish to have the contractor for providing environmental information. The result of these misunderstandings has been reduced competition in bidding for EIS preparation contracts, unnecessary delays in selecting a contractor and preparing the EIS, and confusion and resentment about the requirements. Council believes that a better understanding of the scope of § 1506.5(c) by agencies, contractors and project proponents will eliminate these problems.

Section 1506.5(c) prohibits a person or entity entering into a contract with a federal agency to prepare an EIS when that party has at that time and during the life of the contract pecuniary or other interests in the outcomes of the proposal. Thus, a firm which has an agreement to prepare an EIS for a construction project cannot, at the same time, have an agreement to perform the construction, nor could it be the owner of the construction site. However, where there are no such separate interest arrangements, and if the contract for EIS preparation does not contain any incentive clauses or guarantees of any future work on the project, it is doubtful that an inherent conflict of interest would exist. Further, § 1506.5(c) does not prevent an applicant from submitting information to an agency. The lead federal agency should evaluate potential conflicts of interest prior to entering any contract for the preparation of environmental documents.

### Selection of Alternatives in Licensing and Permitting Situations

Numerous comments have been received questioning an agency's obligation, under the National Environmental Policy Act, to evaluate alternatives to a proposed action developed by an applicant for a federal permit or license. This concern arises from a belief that projects conceived and developed by private parties should not be questioned or second-guessed by the government. There has been discussion of developing two standards to determining the range of alternatives to be evaluated: The "traditional" standard for projects which are initiated and developed by a federal agency and a second standard of evaluating only those alternatives presented by an applicant for a permit or license.

Neither NEPA nor the CEQ regulations make a distinction between actions initiated by a Federal agency and by applicants. Early NEPA case law, while emphasizing the need for rigorous examination of alternatives,

specifically address this issue. In fact, the Council addressed the question in its document, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations".(5) The answer indicated that the emphasis in determining the scope of alternatives should be on what is "reasonable". The Council said that, reasonable alternatives include those that are *practical or feasible* from the technical and economic standpoint and using common sense rather than simply desirable from the standpoint of the applicant."

Since issuance of that guidance, the Council has continued to receive requests for further clarification of this question. Additional interest has been generated by a recent appellate court decision. *Roosevelt Campobello International Park Commission v. E.P.A.*(6) dealt with EPA's decision of whether to grant a permit under the National Pollutant Discharge Elimination System to a company proposing a refinery and deep-water terminal in Maine. The court discussed both the criteria used by EPA in its selecting of alternative sites to evaluate, and the substantive standard used to evaluate the sites. The court determined that EPA's choice of alternative sites "focused by the primary objectives of the permit applicant . . ." and that EPA had limited its consideration of sites to only those sites which were considered feasible, given the applicant's stated goals. The court found that EPA's criteria for selection of alternative sites was sufficient to meet NEPA responsibilities. . . . . This decision is in keeping with the concept that an agency's responsibilities to examine alternative sites has always been "bounded by some notion of feasibility" to avoid NEPA from becoming "an exercise in frivolous boilerplate".(7) NEPA has never been interpreted to require examination of purely conjectural possibilities whose implementation is deemed remote and speculative. Rather, the agency's duty is to consider "alternatives as they exist and are likely to exist."(8) In the *Roosevelt Campobello* case, for example, EPA examined three alternative sites and two alternative configurations of the project at the preferred alternative site. Other factors are developed during the scoping process—comments received from the public, other government agencies and institutions, and development of the agency's own environmental data— would certainly be incorporated into the selection of which alternatives to seriously evaluate in the EIS. There is,

however, no need to disregard the applicant's purposes and needs and the common sense realities of a given situation in the development of alternatives.

## Tiering

Tiering of environmental impact statements refers to the process of addressing a broad, general program, policy or proposal in an initial environmental impact statement (EIS), and analyzing a narrower site-specific proposal, related to the initial program, plan or policy in a subsequent EIS. The concept of tiering was promulgated in the 1978 CEQ regulations; the preceding CEQ guidelines had not addressed the concept. The Council's intent in formalizing the tiering concept was to encourage agencies, "to eliminate repetitive discussions and to focus on the actual issues ripe for decisions at each level of environmental review."(9)

Despite these intentions, the Council perceives that the concept of tiering has caused a certain amount of confusion and uncertainty among individuals involved in the NEPA process. This confusion is by no means universal; indeed, approximately half of those commenting in response to our question about tiering (10) indicated that tiering is effective and should be used more frequently. Approximately one-third of the commentators responded that they had no experience with tiering upon which to base their comments. The remaining commentators were critical of tiering. Some commentators believed that tiering added an additional layer of paperwork to the process and encouraged, rather than discouraged, duplication. Some commentators thought that the inclusion of tiering in the CEQ regulations added an extra legal requirement to the NEPA process. Other commentators said that an initial EIS could be prepared when issues were too broad to analyze properly for any meaningful consideration. Some commentators believed that the concept was simply not applicable to the types of projects with which they worked; others were concerned about the need to supplement a tiered EIS. Finally, some who responded to our inquiry questioned the courts' acceptance of tiered EISs.

The Council believes that misunderstanding of tiering and its place in the NEPA process is the cause of much of this criticism. Tiering, of course, is by no means the best way to handle all proposals which are subject to NEPA analysis and documentation. The regulations do not require tiering; rather, they authorize its use when an agency determines it is appropriate. It is an

option for an agency to use when the nature of the proposal lends itself to tiered EIS(s).

Tiering does not add an additional legal requirement to the NEPA process. An environmental impact statement is required for proposals for legislation and other major Federal actions significantly affecting the quality of the human environment. In the context of NEPA, "major Federal actions" include adoption of official policy, formal plans, and programs as well as approval of specific projects, such as construction activities in a particular location or approval of permits to an outside applicant. Thus, where a Federal agency adopts a formal plan which will be executed throughout a particular region, and later proposes a specific activity to implement that plan in the same region, both actions need to be analyzed under NEPA to determine whether they are major actions which will significantly affect the environment. If the answer is yes in both cases, both actions will be subject to the EIS requirement, whether tiering is used or not. The agency then has one of two alternatives: Either preparation of two environmental impact statements, with the second repeating much of the analysis and information found in the first environmental impact statement, or tiering the two documents. If tiering is utilized, the site-specific EIS contains a summary of the issues discussed in the first statement and the agency will incorporate by reference discussions from the first statement. Thus, the second, or site-specific statement, would focus primarily on the issues relevant to the specific proposal, and would not duplicate material found in the first EIS. It is difficult to understand, given this scenario, how tiering can be criticized for adding an unnecessary layer to the NEPA process; rather, it is intended to streamline the existing process.

The Council agrees with commentators who stated that there are stages in the development of a proposal for a program, plan or policy when the issues are too broad to lend themselves to meaningful analysis in the framework of an EIS. The CEQ regulations specifically define a "proposal" as existing at, "that stage in the development of an action when an agency subject to [NEPA] has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing the goal *and the effects can be meaningfully evaluated.*"(11) Tiering is not intended to force an agency to prepare an EIS before this stage is reached; rather, it is a technique to be used once meaningful analysis can

be performed. An EIS is not required before that stage in the development of a proposal, whether tiering is used or not.

The Council also realizes that tiering is not well suited to all agency programs. Again, this is why tiering has been established as an option for the agency to use, as opposed to a requirement.

A supplemental EIS is required when an agency makes substantial changes in the proposed action relevant to environmental concerns, or when there are significant new circumstances or information bearing on environmental concerns bearing on the proposed action, and is optional when an agency otherwise determines to supplement an EIS.[12] The standard for supplementing an EIS is not changed by the use of tiering; there will no doubt be occasions when a supplement is needed, but the use of tiering should reduce the number of those occasions.

Finally, some commentators raised the question of courts' acceptability of tiering. This concern is understandable, given several cases which have reversed agency decisions in regard to a particular programmatic EIS. However, these decisions have never invalidated the concept of tiering, as stated in the CEQ regulations and discussed above. Indeed, the courts recognized the usefulness of the tiering approach in case law before the promulgation of the tiering regulation. Rather, the problems appear when an agency determines not to prepare a site-specific EIS based on the fact that a programmatic EIS was prepared. In this situation, the courts carefully examine the analysis contained in the programmatic EIS. A court may or may not find that the programmatic EIS contains appropriate analysis of impacts and alternatives to meet the adequacy test for the site-specific proposal. A recent decision by the Ninth Circuit Court of Appeals [13] invalidated an attempt by the Forest Service to make a determination regarding wilderness and non-wilderness designations on the basis of a programmatic EIS for this reason. However, it should be stressed that this and other decisions are not a repudiation of the tiering concept. In these instances, in fact, tiering has not been used; rather, the agencies have attempted to rely exclusively on programmatic or "first level" EISs which did not have site-specific information. No court has found that the tiering process as provided for in the CEQ regulations is an improper manner of implementing the NEPA process.

In summary, the Council believes that tiering can be a useful method of reducing paperwork and duplication when used carefully for appropriate types of plans, programs and policies which will later be translated into site-specific projects. Tiering should not be viewed as an additional substantive requirement, but rather a means of accomplishing the NEPA requirements in an efficient manner as possible.

Footnotes

(1) Environmental Law Institute, NEPA In Action Environmental Offices in Nineteen Federal Agencies, A Report To the Council on Environmental Quality, October 1981.

(2) Records of decision must be prepared by each agency responsible for making a decision, and cannot be adopted by another agency.

(3) The Council also received requests for guidance on effective management of the third-party environmental impact statement approach. However, the Council determined that further study regarding the policies behind this technique is warranted, and plans to undertake that task in the future.

(4) There is no bar against the agency considering candidates suggested by the applicant, although the Federal agency must retain its independence. If the applicant is seen as having a major role in the selection of the contractor, contractors may feel the need to please both the agency and the applicant. An applicant's suggestion, if any, to the agency regarding the choice of contractors should be one of many factors involved in the selection process.

(5) 46 FR 18026 (1981).

(6) 684 F.2d 1041 (1st Cir. 1982).

(7) Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 551 (1978).

(8) Monarch Chemical Works, Inc. v. Exon, 466 F.Supp. 639, 650 (1979). quoting Carolina Environmental Study Group v. U.S., 510 F.2d 796, 801 (1975).

(9) Preamble, FR, Vol. 43, No. 230, p. 55984, 11/29/78.

(10) "Is tiering being used to minimizes repetition in an environmental assessment and in environmental impact statements?", 46 FR 41131, August 14, 1981.

(11) 40 CFR 1508.23 (emphasis added).

(12) 40 CFR 1502.9(c).

(13) California v. Block, 18 ERC 1149 (1982).

[FR Doc. 83-20322 Filed 7-27-83; 8:45 am]

BILLING CODE 3125-01-M

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

### 43 CFR Public Land Order 6447

[WASH-03047, OR-22052 (WASH), OR-22058 (WASH), OR-22059 (WASH)]

### Washington; Revocation of Secretarial Orders of December 22, 1905, September 18, 1916, and April 21, 1920, and Public Land Order No. 2342

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Public Land Order.

**SUMMARY:** This order revokes thre Secretarial orders and a public lar order affecting 6,557.22 acres of la withdrawn for the Yakima Project action will open 3,416.62 acres of l surface entry and mining. Of the balance, 1,657.94 acres have been conveyed from Federal ownership a reservation of oil and gas; 163.46 are included in other existing land withdrawals; and 1,319.20 acres w restored to State indemnity select only, and will not be opened to su entry or mining. To the extent tha minerals remain in Federal owner the lands have been and will rema open to mineral leasing, except fo 163.46 acres that remain withdraw

**EFFECTIVE DATE:** August 24, 1983.

**FOR FURTHER INFORMATION CONTA** Champ C. Vaughan, Jr., Oregon St Office, 503-231-6905.

By virtue of the authority vester Secretary of the Interior by Sectio of the Federal Land Policy and Management Act of 1976, 90 Stat. 43 U.S.C. 1714, it is ordered as foll

1. The Secretary's First Form Reclamation Withdrawal Order o December 22, 1905, which withdre following described land for the Y Project, is hereby revoked:

Willamette Meridian

Public Lands

T. 9 N., R. 27 E.,
  Sec. 4, SW¼;
  Sec. 10, S½;
  Sec. 14;
  Sec. 20, NE¼, E½NW¼, NE¼SW¼, N½NW¼SW¼, SE¼NW¼SW¼, NE¼NE¼SW¼SW¼, N½SE¼S NE¼SW¼SE¼SW¼, SE¼SE¼S and N½SE¼;
  Sec. 22, N½;
  Sec. 24.
T. 10 N., R. 27 E.,
  Sec. 34, SW¼NW¼.
T. 8 N., R. 28 E.,
  Sec. 2, lots 1 and 2, S½NE¼, and SE
  Sec. 12, N½, N½SW¼, N½NW¼SW¼SW¼, S½SW¼SW SE¼SW¼, and SE¼.
T. 9 N., R. 28 E.,
  Sec. 18, fractional NW¼SW¼.
T. 11 N., R. 28 E.,
  Sec. 10, SE¼.
T. 8 N., R. 30 E.,
  Sec. 36, lot 4.
T. 7 N., R. 31 E.,
  Sec. 6, lot 3.

Non-Federal Lands

T. 9 N., R. 27 E.,
  Sec. 20, NW¼SW¼SE¼SW¼, and SE¼SW¼SE¼SW¼.
T. 8 N., R. 28 E.,
  Sec. 12, S½N½SW¼SW¼.
T. 9 N., R. 28 E.,

**66479**

# Rules and Regulations

Federal Register

Vol. 60, No. 246

Friday, December 22, 1995

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

## DEPARTMENT OF AGRICULTURE

### Office of the Secretary

### 7 CFR Parts 1 and 1b

### Departmental Proceedings, Judicial Proceedings, and NEPA Policy

**AGENCY:** Office of the Secretary of Agriculture, USDA.

**ACTION:** Final rule.

**SUMMARY:** We are amending the Administrative Regulations—Departmental Proceedings, the Administrative Regulations—Judicial Proceedings, and the National Environmental Policy Act regulations as part of the United States Department of Agriculture's (USDA) regulatory reinvention initiative to improve its regulations. This final rule updates and corrects references to statutes, regulations, USDA agencies, and USDA officials; removes gender specific references; removes unnecessary regulations; and makes minor nonsubstantive changes for clarity.

**EFFECTIVE DATE:** This final rule is effective January 22, 1996.

**FOR FURTHER INFORMATION CONTACT:** William Jenson, Senior Counsel, Regulatory Division, Office of the General Counsel, USDA, room 2422, South Building, 14th Street and Independence Avenue SW., Washington, DC 20250, (202) 720–2453.

**SUPPLEMENTARY INFORMATION:**

### Background

The President directed the heads of all departments and agencies to review all regulations and eliminate or revise those that are outdated or otherwise in need of reform. The Department completed its review and submitted a report on the review to the Office of Management and Budget on June 1, 1995. The review included USDA's Administrative Regulations—

Departmental Proceedings (7 CFR, part 1, subpart B); Administrative Regulations—Judicial Proceedings (7 CFR, part 1, subpart C); and National Environmental Policy Act regulations (7 CFR, part 1b). The Department found that these regulations contain outdated and incorrect references to statutes, regulations, USDA agencies, and USDA officials; unnecessary provisions; gender specific references; and provisions that could be clarified by making minor nonsubstantive changes. This final rule updates and corrects references to statutes, regulations, USDA agencies, and USDA officials; removes gender specific references; removes unnecessary regulations; and makes minor nonsubstantive changes for clarity.

### 7 CFR, Part 1, Subpart B

This final rule amends 7 CFR, part 1, subpart B, by adding a citation to the statutory authority for the subpart. This final rule also amends §§ 1.26, 1.27, 1.28, and 1.29 in 7 CFR, part 1, subpart B.

Section 1.26(c) provides that "[c]hapter 11 of title 18, United States Code prohibits employees and former employees from representing others under certain circumstances. See § 0.735–41 of this subtitle for illustrations." Section 1.26(c) is unnecessary and has no effect and is therefore removed. In addition, this final rule makes minor nonsubstantive amendments to 7 CFR 1.26 (a), (b)(2), and (b)(3) for clarity and to remove gender specific references.

Section 1.27 sets forth the Department policy with respect to the availability of written submissions in response to certain notices published by the Department. Sections 1.27 (a) through (d) appear by their terms to apply only to written submissions in response to notices of proposed rulemaking published by the Department. However, § 1.27(e) provides that, despite the limiting language in § 1.27 through (d), the policy annunciated in § 1.27 applies to written submissions in response to any published notice which solicits, or affords interested members of the public an opportunity to submit, written views with respect to any proposed action relating to any program administered by the Department regardless of the fact that the issuance of a rule may not be contemplated.

Further, this final rule amends the provisions regarding the confidentiality of written submissions. Sections 1.27 (c) and (d) provide for confidentiality if making the submission public would have an adverse effect on the submitter by reason of: (1) Disclosing trade secrets, processes, operations, style of work or apparatus; (2) disclosing the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures; or (3) exposing the submitter to substantial disadvantage in business or employment. This confidentiality provision was written before the enactment of the Freedom of Information Act. The confidentiality provision in § 1.27 (c) and (d) includes agency records that the Department may not be able to withhold under the Freedom of Information Act. Therefore, § 1.27 is amended to provide that confidentiality may be given to written submissions only if they may be withheld under the Freedom of Information Act.

Further still, this final rule amends § 1.27 by setting forth the scope of the Department policy at the beginning of § 1.27, eliminating the inaccurate limiting language currently found in § 1.27 (a) through (d), and making other minor nonsubstantive changes for clarity.

Section 1.28 contains an inaccurate reference to a provision of the Administrative Procedure Act. This final rule amends § 1.28 to correct that inaccurate reference.

Section 1.29(a) provides that the "Administrator, Agricultural Marketing Service may delegate the authority to issue subpoenas in connection with investigations being conducted under the Packers and Stockyards Act, as amended and supplemented (7 U.S.C. 181–229), to the Deputy Administrator, Packers and Stockyards, Agricultural Marketing Service." Since § 1.29(a) was issued, the Department has been reorganized and the references to Department officials in § 1.29(a) are no longer accurate. This final rule amends this provision within § 1.29(a) to correct the references to Department officials.

In addition, this final rule amends other provisions in § 1.29(a), and §§ 1.29(b)(1)(iii), (b)(2), and (b)(3) for clarity and to remove gender-specific references and surplusage.

### 7 CFR, Part 1, Subpart C

This final rule amends 7 CFR, part 1, subpart C, by adding a citation to the statutory authority for the subpart. This final rule also amends § 1.41 in 7 CFR, part 1, subpart C, to remove a gender-specific reference and to remove a provision that requires service of process to be made upon the General Counsel to enforce child support or alimony payments owed by employees of the Department. This provision is removed because the regulations related to service of legal process for the enforcement of child support and alimony owed by Department employees are set forth in 5 CFR, part 581.

### 7 CFR, Part 1b

This final rule amends the authority citation for 7 CFR, part 1b, to remove inaccurate references to the **Federal Register**.

Section 1b.1 contains inaccurate references to regulations and an inaccurate reference to the Council on Environmental Quality. This final rule corrects those inaccuracies.

Section 1b.2(a) describes the purposes of some of the Department's programs and the methods by which some of these programs are conducted. Section 1b.2(a) is unnecessary and has no effect and is therefore removed. In addition, this final rule makes minor nonsubstantive amendments to 7 CFR 1b.2 paragraphs (c), (d), and (e) for clarity; to remove inaccurate references to regulations, the Under Secretary, Natural Resources and Environment, and the Agricultural Council on Environmental Quality; and to remove surplusage.

Section 1b.3(c) is amended to correct a cross reference.

Section 1b.4 lists agencies that are excluded from the requirement to prepare procedures to implement the National Environmental Policy Act and categorically excluded from the preparation of environmental assessments and environmental impact statements unless the agency head determines that an action may have a significant environmental effect. Since § 1b.4 was published, the Department has been reorganized and some of the listed agencies no longer exist. This final rule corrects the list of Department agencies in § 1b.4 and makes minor nonsubstantive changes for clarity.

### Notice and Comment

This rule makes only minor nonsubstantive amendments to the regulations in order to update and correct incorrect references, remove gender-specific references, remove unnecessary provisions, and clarify existing regulations. The rule will not have any effect on the public and no public participation is expected. Therefore, notice and public procedure with respect to this rule are unnecessary, and there is good cause under 5 U.S.C. 553 to make this rule effective without opportunity for public participation.

### Executive Order 12866 and Regulatory Flexibility Act

This rule has been reviewed under Executive Order 12866. The rule has been determined to be not significant for the purposes of Executive Order 12866 and, therefore, has not been reviewed by the Office of Management and Budget.

This final rule updates and corrects references to statutes, regulations, USDA agencies, and USDA officials; removes gender-specific references; removes unnecessary provisions; and makes minor nonsubstantive changes for clarity. This final rule will not have any economic impact.

Under these circumstances, the Secretary has determined that this action will not have a significant economic impact on a substantial number of small entities.

### Executive Order 12778

This rule has been reviewed under Executive Order 12778, Civil Justice Reform. This rule: (1) Preempts all state and local laws and regulations that are inconsistent with this rule; (2) has no retroactive effect; and (3) does not require administrative proceedings before parties may file suit in court challenging this rule.

### Paperwork Reduction Act

This final rule contains no information collection or recordkeeping requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.).

### List of Subjects

*7 CFR Part 1*

Administrative practice and procedure, Agriculture, Antitrust, Blind, Claims, Concessions, Cooperatives, Equal access to justice, Federal buildings and facilities, Freedom of information, Lawyers, Privacy.

*7 CFR Part 1b*

Environmental policy statements.

Accordingly, 7 CFR parts 1 and 1b are amended as follows:

## PART 1—ADMINISTRATIVE REGULATIONS

1. The authority citation for part 1 continues to read as follows:

   **Authority:** 5 U.S.C. 301, unless otherwise noted.

### § 1.26 [Amended]

2–3. Section 1.26 is amended as follows:

a. In paragraph (a), by removing the words "The provisions of this section apply" and by adding the words "This section applies" in their place; and by removing the words "such provisions, or any part thereof" and by adding the words "this section, or any part of this section" in their place.

b. In paragraph (b)(2), by removing the word "he" and adding the words "the Secretary" in its place each time it appears; and by removing the word "him" and adding the words "the person" in its place.

c. In paragraph (b)(3), by removing the words "his employment he" and adding the words "employment with the Department the employee or former employee" in their place; and by removing the word "him" and adding the words "the employee or former employee" in its place.

d. By removing paragraph (c).

### § 1.27 [Amended]

4. Section 1.27 is revised to read as follows:

### § 1.27 Rulemaking and other notice procedures.

(a) This section shall apply to:

(1) Notices of proposed rulemaking;

(2) Interim final rules;

(3) Advance notices of proposed rulemaking; and

(4) Any other published notice that solicits, or affords interested members of the public an opportunity to submit, written views with respect to any proposed action relating to any program administered in the Department regardless of the fact that the issuance of a rule may not be contemplated.

(b) Each notice identified in paragraph (a) of this section shall indicate the procedure to be followed with respect to the notice, unless the procedure is prescribed by statute or by published rule of the Department. Each notice shall contain a statement that advises the public of the policy regarding the availability of written submissions by indicating whether paragraph (c), (d), or (e) of this section is applicable to written submissions made pursuant to the notice.

(c) All written submissions made pursuant to the notice shall be made

AR00073

available for public inspection at times and places and in a manner convenient to the public business.

(d)(1) Any written submission, pursuant to a notice, may be held confidential if the person making the submission requests that the submission be held confidential, the person making the submission has shown that the written submission may be withheld under the Freedom of Information Act, and the Department official authorized to issue the notice determines that the submission may be withheld under the Freedom of Information Act.

(2) If a request is made in accordance with paragraph (d)(1) of this section for confidential treatment of a written submission, the person making the request shall be informed promptly in the event the request is denied and afforded an opportunity to withdraw the submission.

(3) If a determination is made to grant a request for confidential treatment under paragraph (d)(1) of this section, a statement of the specific basis for the determination that will not be susceptible of identifying the person making the request will be made available for public inspection.

(e) If the subject of the notice is such that meaningful submissions cannot be expected unless they disclose information that may be withheld under the Freedom of Information Act, the notice shall so indicate and contain a statement that written submissions pursuant to the notice will be treated as confidential and withheld under the Freedom of Information Act. *Provided,* That the policy regarding availability of written submissions set forth in this paragraph may only be used with the prior approval of the Secretary, or the Under Secretary or Assistant Secretary that administers the program that is the subject of the notice.

### § 1.28   [Amended]

5. Section 1.28 is amended by removing the phrase "the provisions of section 4(d) of the Administrative Procedure Act (60 Stat. 239; 5 U.S.C. 1003(d))" and adding the reference "5 U.S.C. 553(e)" in its place.

### § 1.29   [Amended]

6. Section 1.29 is amended as follows:
a. By revising paragraph (a) to read as set forth below.

b. In paragraph (b)(1)(iii), by adding the word ", her," immediately after the word "his".

c. In paragraph (b)(2), by adding the words "or she" immediately after the word "he"; and by removing the word "therein" and adding the words "in the subpoena" in its place.

d. In paragraph (b)(3), by removing the reference "(5 U.S.C. 301).".

### § 1.29   Subpoenas relating to investigations under statutes administered by the Secretary of Agriculture.

(a) *Issuance of subpoena.* (1) When the Secretary is authorized by statute to issue a subpoena in connection with an investigation being conducted by the Department, the attendance of a witness and the production of evidence relating to the investigation may be required by subpoena at any designated place, including the witness' place of business. Upon request of any representative of the Secretary involved in connection with the investigation, the subpoena may be issued by the Secretary, the Inspector General, or any Department official authorized pursuant to part 2 of this title to administer the program to which the subpoena relates, if the official who is to issue the subpoena is satisfied as to the reasonableness of the grounds, necessity, and scope of the subpoena. Except as provided in paragraph (a)(2) of this section, the authority to issue subpoenas may not be delegated or redelegated by the head of an agency.

(2) The Administrator, Grain Inspection, Packers and Stockyards Administration, may delegate the authority to issue subpoenas in connection with investigations being conducted under the Packers and Stockyards Act (7 U.S.C. 181–229), to the Deputy Administrator, Packers and Stockyards Programs.

*    *    *    *    *

### § 1.41   [Amended]

7–8. Section 1.41 is amended as follows:
a. In the third sentence, by removing the word "he" and adding the words "the officer" in its place.

b. By removing the last sentence.

## PART 1b—NATIONAL ENVIRONMENTAL POLICY ACT

9. The authority citation for part 1b is revised to read as follows:

**Authority:** 5 U.S.C. 301; 42 U.S.C. 4321 *et seq.*; E.O. 11514, 3 CFR, 1966–1970 Comp., p. 902, as amended by E.O. 11991, 3 CFR, 1978 Comp., p. 123; E.O. 12114, 3 CFR, 1980 Comp., p. 356; 40 CFR 1507.3.

### § 1b.1   [Amended]

10. Section 1b.1 is amended as follows:
a. In paragraph (a), by removing the words "This subpart" and adding the words "This part" in their place; by removing the words "Council of" and adding the words "Council on" in their place; and by removing the words "The

subpart" and adding the words "This part" in their place.

b. In paragraph (b), by removing the word "subpart" and adding the word "part" in its place.

### § 1b.2   [Amended]

11. Section 1b.2 is amended as follows:
a. By removing paragraph (a).

b. In paragraph (c), by removing the words "the provisions of this subpart" and adding the words "this part" in their place; and by removing the words "the provisions of NEPA" and adding the word "NEPA" in their place.

c. In paragraph (d), the first sentence, by removing the word "Assistant" and adding the word "Under" in its place; and by removing the reference "(7 CFR 2.19(b))".

d. In paragraph (d), the second sentence, by removing the words "Assistant Secretary, through the USDA Natural Resources and Environment Committee" and adding the words "Under Secretary, NR&E, through the Agricultural Council on Environmental Quality" in their place.

e. In paragraph (e), the first sentence, by removing the word "subpart" and adding the word "part" in its place.

f. In paragraph (e), the third sentence, by removing the word "Assistant" and adding the word "Under" in its place.

g. By redesignating paragraphs (b), (c), (d), and (e) as paragraphs (a), (b), (c), and (d), respectively.

### § 1b.3   [Amended]

12. In § 1b.3, paragraph (c) is amended by removing the words "above and in" and adding the words "in paragraphs (a) of this section and" in their place.

13. Section 1b.4 is revised to read as follows:

### § 1b.4   Exclusion of agencies.

(a) The USDA agencies and agency units listed in paragraph (b) of this section conduct programs and activities that have been found to have no individual or cumulative effect on the human environment. The USDA agencies and agency units listed in paragraph (b) of this section are excluded from the requirements of preparing procedures to implement NEPA. Actions of USDA agencies and agency units listed in paragraph (b) of this section are categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect.

(b)(1) Agricultural Marketing Service

(2) Economic Research Service
(3) Extension Service
(4) Federal Corp Insurance Corporation
(5) Food and Consumer Service
(6) Food Safety and Inspection Service
(7) Foreign Agricultural Service
(8) Grain Inspection, Packers and Stockyards Administration
(9) National Agricultural Library
(10) National Agricultural Statistics Service
(11) Office of the General Counsel
(12) Office of the Inspector General

Done in Washington, DC, this 8th day of December, 1995.

**Dan Glickman,**
*Secretary of Agriculture.*
FR Doc. 95–30674 Filed 12–21–95; 8:45 am]
**BILLING CODE 3410–01–M**

**Food Safety and Inspection Service**

**9 CFR Part 310**

**[Docket No. 95–048DF]**

**RIN 0583–AC03**

**Use of the Fast Antimicrobial Screen Test for Bob Veal Calves**

**AGENCY:** Food Safety and Inspection Service, USDA.

**ACTION:** Direct final rule.

**SUMMARY:** The Food Safety and Inspection Service (FSIS) is amending the Federal meat inspection regulations to permit the use of the Fast Antimicrobial Screen Test (FAST) in its bob veal calf residue testing program. Under FSIS' residue testing program, carcasses of bob veal calves are subject to specific regulatory requirements for residue testing by FSIS inspectors to assure that adulterated meat does not enter human food channels. Until recently, the Calf Antibiotic and Sulfonamide Test (CAST) was the only official test authorized for use in the bob veal calf residue testing program. FSIS has now developed FAST, which is an enhanced and equally effective version of CAST that provides results after 6 hours of incubation, compared to 18–24 hours of incubation for CAST. This action will permit the use of FAST in lieu of CAST under FSIS' bob veal calf residue testing program.

**DATES:** This rule will be effective on February 20, 1996, unless we receive written adverse comments or written notice of intent to submit adverse comments on or before January 22, 1996. If FSIS receives adverse comments or notice of intent to submit adverse comments, FSIS will withdraw this rule and publish a proposed rule for public comment.

**ADDRESSES:** Send an original and two copies of written comments to: FSIS Docket Clerk, Docket #95–048DF, Room 4352, South Agriculture Building, Food Safety and Inspection Service, U.S. Department of Agriculture, Washington, DC 20250.

**SUPPLEMENTARY INFORMATION:**

**Background**

In June 1984, as a result of findings of increased levels of sulfonamide and antibiotic residues in young calves, FSIS promulgated an interim rule (49 FR 23602; affirmed 50 FR 32162) that amended the Federal meat inspection regulations (9 CFR parts 309, 310 and 318) by establishing an intensified residue testing program for bob veal calves (calves up to 3 weeks in age or 150 pounds in weight). FSIS was concerned with findings of increased levels of sulfonamide and antibiotic residues in young calves, and undertook an emergency rulemaking to decrease the likelihood that adulterated meat would enter into human food channels. FSIS determined that carcasses and parts thereof from bob veal calves are adulterated under the Federal Meat Inspection Act if they bear or contain sulfonamide or antibiotic residues other than in accordance with tolerances established by the Food and Drug Administration.

In the interim rule, FSIS stated that CAST, a swab bioassay test, would be the official test used to screen carcasses of bob veal calves. In trial testing, FSIS had found CAST to be extremely reliable in detecting violative levels of antibiotics and sulfonamides in animal tissues.

FSIS has recently developed a new test that, like CAST, is designed to detect the presence of sulfonamide and antibiotic residues in animal tissues. FAST is similar to and is performed in a similar manner to CAST. The major advantage of FAST is that test results can be obtained in 6 hours, instead of the 18–24 hour period required for CAST. FSIS' in-plant trial testing of FAST has shown that FAST is equivalent to CAST in detecting sulfonamide and antibiotic residues in animal tissues.[1]

Therefore, FSIS is amending § 310.21 to add FAST as an alternative to CAST for use by inspectors in testing carcasses and parts of bob veal calves for sulfonamide and antibiotic residues.

[1] Results of the in-plant trial for FAST are available for review in the Office of the FSIS Docket Clerk, Room 4352, South Agriculture Building, Food Safety and Inspection Service, U.S. Department of Agriculture, Washington, DC 20250.

**Effective Date**

This rule is being published without a prior proposal because this action is viewed as noncontroversial, and FSIS does not anticipate any adverse public comments will be received. This rule will be effective 60 days after the date of publication in the **Federal Register** unless FSIS receives written adverse comments or written notice of intent to submit adverse comments within 30 days of the date of publication of this rule in the **Federal Register**.

If FSIS receives adverse comments or notice of intent to submit adverse comments, FSIS will withdraw this rule and publish a proposed rule for public comment.

If no adverse comments are received, FSIS will publish a notice in the **Federal Register** confirming that the rule is effective on the date indicated.

**Executive Order 12866**

This rule is considered not significant and therefore has not been reviewed by the Office of Management and Budget.

**Effect on Small Entities**

The Administrator, FSIS, has determined that this rule will not have a significant impact on a substantial number of small entities. The rule permits the use of an alternate test, which can provide results in less than half the time than the original test. Carcasses that test negative could be released on the day of slaughter, which will modestly benefit the meat industry.

**Executive Order 12778**

This rule has been reviewed under Executive Order 12778, Civil Justice Reform. This rule (1) preempts all State and local laws and regulations that are inconsistent with this rule; (2) has no retroactive effect; and (3) does not require administrative proceedings before parties may file suit in court challenging this rule.

**List of Subjects in 9 CFR part 310**

Meat inspection, Residue testing.

For the reasons discussed in the preamble, FSIS is amending part 310 of the Federal meat inspection regulations (9 CFR Part 310) as follows:

**PART 310—[AMENDED]**

1. The authority citation for part 310 continues to read as follows:
   **Authority:** 21 U.S.C. 601–695; 7 CFR 2.17, 2.55.

2. The introductory text and footnote to paragraph (c) of § 310.21 are revised to read as follows:

AR00075