UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                                    )
**THE HUMANE SOCIETY**                              )
**OF THE UNITED STATES, ET AL.**                    )
                                                    )        Civ. No. 1:06CV00265 (CKK)
            Plaintiffs,                              )
    v.                                              )
                                                    )
**MIKE JOHANNS, ET AL.**                            )
                                                    )
            Defendants.                             )
———————————————————————)

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION
## FOR RECONSIDERATION OR CERTIFICATION

As plaintiffs explained in their opening Memorandum, this Court should reinstate plaintiffs' First and Second Claims in this suit, because an inquiry into the purpose of each of the statutory provisions, "the violation[s] of which serve as the gravamen of the complaint," Bennett v. Spear, 520 U.S. 154, 175 (1997) – i.e., (a) Section 553 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq.; (b) Section 794 of the 2006 Agricultural Appropriations Act ("FY2006 Amendment"), Pub. Law 109-97, 119 Stat. 2164; and (c) Sections 603 and 695 of the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601, et seq. – demonstrates that these claims should not be dismissed on prudential standing grounds. Nothing in defendants' submissions suggests otherwise. To the contrary, defendants' half-hearted effort to defend the Court's prudential standing ruling only further demonstrates that plaintiffs should be permitted to pursue these claims on the merits, or, at minimum, appeal their dismissal at this time.

## ARGUMENT

**A.    Plaintiffs Have Prudential Standing To Pursue Claim One, Which Challenges Defendants' Violation Of The APA By Failing To Provide <u>Notice And Comment Before Promulgating The Final Rule</u>.**

Tellingly, as in their Opposition to Plaintiffs' Motion for a Preliminary Injunction, defendants once again <u>do not argue</u> that plaintiffs' notice and comment claim (Claim One) should have been dismissed for lack of prudential standing.  <u>See</u> Defendants' Opposition to Plaintiffs' Motion for Reconsideration ("Def. Opp.") at 11-14.  As plaintiffs explained in their Motion for Reconsideration ("Pl. Mot.") – and defendants implicitly acknowledge by their silence – plaintiffs <u>have</u> prudential standing to pursue this claim under 5 U.S.C. § 553, independently of their prudential standing to pursue violations of <u>other</u> statutory provisions. Thus, as plaintiffs have explained, as long as a plaintiff has Article III standing and is an "interested person" within the meaning of Section 553 of the APA, that plaintiff may pursue a notice and comment claim, because the <u>purpose</u> of this Section of the APA is to "ensure that the rule is subjected to thoroughgoing analysis and critique by interested parties and the agency," by giving those parties "an opportunity to marshal what may be persuasive arguments before the agency."  <u>American Medical Assn. v. Reno</u>, 57 F.3d 1129, 1134 (D.C. Cir. 1995); <u>see also</u> Pl. Mot. at 19-24 (citing cases).[1]

--------

[1]    The cases also make clear that a plaintiffs may present a claim <u>solely</u> over a notice and comment violation, without also claiming a violation of another statute.  <u>See</u>, <u>e.g.</u> <u>Reno</u>, 57 F.3d at 1134 (explaining that the APA's "procedural requirements are enforceable apart from the reviewability of the underlying action"); <u>see</u> <u>also</u> <u>Chrysler Corp. v. Brown</u>, 441 U.S. 281, 317, n.47 (1979) ("Jurisdiction to review agency action under the APA is found in 28 U.S.C. § 1331").  This is presumably why defendants have also not sought to defend the Court's suggestion that plaintiffs were not permitted to present their notice and comment claim at all. <u>See</u> Memorandum Opinion at 8, n.2 (finding that Claim 1 "must be dismissed" because the Court "is not authorized to hear an APA claim presented in a vacuum").  Nonetheless, if the Court were

Instead of defending the Court's ruling as to Claim One, or responding to plaintiffs' motion, defendants ask the Court to revisit several <u>merits</u> arguments defendants made in opposing plaintiffs' motion for a preliminary injunction – specifically, that defendants' *post-hoc* comment period satisfies the agency's obligations under Section 553, or that, in the alternative, defendants had "good cause" to not put the regulations out for notice and comment. Def. Opp. at 11-13. These arguments do not provide a basis for denying plaintiffs' motion for reconsideration, for several reasons.

First, the only motion presently before the Court is plaintiffs' request that the Court reinstate Claims One and Two so that plaintiffs may <u>pursue</u> those claims on the merits. The Court has already denied plaintiffs' motion for a preliminary injunction, and no party has yet moved for summary judgment on these claims. Therefore, it is certainly premature – particularly in the context of plaintiffs' motion for reconsideration – for the Court to consider, and rule upon, the <u>merits</u> of plaintiffs' claims. Rather, the <u>only</u> issue now before the Court is whether the Court correctly found that it lacked <u>jurisdiction</u> over Claim One.

As defendants note, Def. Opp. at 13, plaintiffs did suggest – in their Reply in Support of their Motion for a Preliminary Injunction ("Pl. PI Reply"), at 2 – that the Court consolidate the preliminary injunction motion with a final ruling on the merits. However, the Court declined that suggestion on the grounds that the Administrative Record appeared incomplete. If the Court determines that plaintiffs <u>have</u> prudential standing to pursue Claim One (and/or Claim Two), then expedited summary judgment motions should be filed on these claims, as the Court has

to conclude that plaintiffs also must demonstrate prudential standing with regard to another statute, they satisfy that requirement as well. <u>See</u> <u>infra</u> at B.

already Ordered with regard to the remaining NEPA claim.  At the very least, even if the Court were to conclude that the Record and briefing already before the Court is sufficient to resolve Claims One and Two, plaintiffs request an opportunity for an oral argument before the Court resolves the <u>merits</u> of these claims.

As plaintiffs have argued, if the Court does consider the merits of plaintiffs' notice and comment claim at this time, plaintiffs plainly should prevail on that Claim.  Regarding defendants' *post-hoc* comment period, <u>see</u> Def. Opp. at 11, since, to date, defendants have not taken any *post-hoc* steps that even purport to demonstrate that the agency actually considered and addressed comments submitted during the *post-hoc* comment period, there are no conceivable grounds to rule for defendants on that basis, even if a *post-hoc* comment period could otherwise be reconciled with the APA.  <u>See</u>, <u>e.g.</u>, <u>State of New Jersey v. U.S. E.P.A.</u>, 626 F.2d 1038, 1049-50 (D.C. Cir. 1980); <u>see also</u> Plaintiffs' Preliminary Injunction Memorandum ("Pl. PI Mem.") at 17-18 (citing additional cases).[2]

Finally, as plaintiffs argued extensively in their preliminary injunction memorandum, the "good cause" exception to notice and comment clearly is not applicable in this case.  <u>See</u> Pl. PI Mem. at 19-22; Pl. PI Reply at 16-18.  While plaintiffs will not repeat those arguments at this juncture –  which, again, concerns only plaintiffs' motion to reinstate this Claim – plaintiffs note that defendants continue to misstate the facts by claiming that there was "insufficient time to complete the notice and comment period . . . ."  Def. Opp. at 12.  Indeed, the additional Record materials defendants have just released show that as early as November 2005 – a full <u>three</u>

---

[2]     And certainly, in the event defendants <u>do</u> attempt to repromulgate the regulations, plaintiffs are entitled to an opportunity to brief whether such a step actually moots plaintiffs' Claim One, before the Court resolves the matter.

months before the regulations were issued – the agency had <u>already decided exactly how it was going to proceed</u>. <u>See</u> Regulatory Review Workplan (AR 202-205) at 3 ("FSIS is establishing a program under which official establishments that wish to slaughter horses can pay for ante-mortem inspection").[3]

Defendants are similarly off the mark in continuing to assert that the slaughter plants' <u>financial</u> interests are sufficient to excuse the agency from its notice and comment obligations. Def. Opp. at 13. Given the many members of the public who <u>oppose</u> the Final Rule, certainly the overall public interest was not well-served by eliminating any opportunity for advance public comment. Moreover, as plaintiffs have previously explained, under defendants' rationale an agency could <u>always</u> be excused from notice and comment in order to advance a narrow economic interest. <u>See</u> <u>Envtl. Defense Fund v. EPA</u>, 716 F.2d 915, 920 (D.C. Cir. 1983) (regulated industry's financial interests are not a "legitimate reason" to forego public comment); <u>see also</u> Pl. PI Mem. at 21-22 and Pl. PI Reply at 18-19 (citing additional cases). In any case, all of these <u>merits</u> arguments afford no basis for the Court's denial of plaintiffs' request that the Court reconsider its prudential standing ruling as to Claim One.

---

[3]    Contrary to defendants' assertion, Def. Opp. at 12, the recent ruling in <u>National Women, Infants and Children Grocer's Assn. v. Food and Nutr. Serv.</u>, 416 F. Supp. 2d 93 (D.D.C. 2006) does not support defendants' use of the "good cause" exception here. In that case Congress had specifically authorized the agency to promulgate "interim rules;" the rules were necessary to insure continuation of a "multi-billion dollar federal program that directly affects the health and nutrition of millions of Americans"; and – in stark contrast to defendants here – in the preamble to the interim rules the agency had represented that it would <u>repromulgate</u> the rule after considering public comment. <u>Id.</u> at 104-108. None of these elements is present here.

**B.      Plaintiffs Have Prudential Standing To Pursue Claim Two, Which Challenges Defendants' Violations Of the FY2006 Amendment and The FMIA In Promulgating The Final Rule.**

With regard to plaintiffs' Claim Two – which alleges violations of the FY2006 Amendment and the FMIA – defendants similarly fail to demonstrate that plaintiffs somehow fall beyond the "broad compass" of the generous prudential standing test, which, once again, merely requires a plaintiff to point to "some indicia – however slight – that the litigant before the court was intended to be [ ] benefitted" by the statutory provision that plaintiff alleges defendant has violated. ALDF v. Glickman, 154 F.3d 426, 444 (D.C. Cir. 1998) (emphasis added).

As for the FY2006 Amendment, the critical fact that defendants continue to ignore is that, in making this inquiry into Congressional "purpose," a reviewing Court must evaluate not only the actual language of the provision of law at issue, but also the statute's "logic [and] legislative history . . . ." Id. (emphasis added); Barlow v. Collins, 397 U.S. 159, 164 (1970). Thus, while, as defendants note, the Supreme Court in Bennett emphasized that the prudential standing inquiry focuses on the purpose of the particular provision of law at issue, rather than the overall purpose of the statute, Def. Opp. at 7, nothing in Bennett – or any other case defendants cite – remotely suggests that, as defendants assert, there is something "contrary to law," id., for the Court to consider the particular provision's legislative history in evaluating its purpose; to the contrary, the cases make clear that reference to legislative history – and especially statement by the authors and supporters of the statute – is not only appropriate, but necessary in ascertaining whether there are "some indicia" that plaintiffs were among the statute's intended beneficiaries. ALDF, 154 F.3d at 444.

6

Here, defendants do not – and cannot – dispute that even a cursory review of the legislative history of the FY2006 Amendment demonstrates that the measure was enacted specifically to benefit plaintiffs, by at least temporarily preventing the slaughter of horses.  Pl. Mot. at 13-16.  Indeed, defendants' suggestion that the sole "objective" of the FY2006 Amendment was to change the manner in which inspectors are paid when they inspect horses not only lacks a scintilla of support in the legislative history, it also defies all "logic,"  ALDF, 154 F.3d at 444; if, in fact, Congress was merely trying to save public funds – which, again, is nowhere indicated in any of the legislative history – it certainly would have expanded the prohibition beyond horses to more commonly slaughtered species, such as cattle, as well.  In short, the minimal – if any – funds the measure actually saves the taxpayer, and the overwhelming amount of legislative history showing that the Amendment was designed to halt the slaughter of horses, demonstrate that, at bare minimum, plaintiffs must be deemed to be "arguably within the zone of interests" of the Amendment.  Bennett, 520 U.S. at 175 (emphasis added).[4]

_____

[4]    Defendants' further effort to have the Court ignore this legislative history because it mostly concerns statements of individual members, including the Amendments' sponsors, is also unavailing.  Def. Opp. at 7, n.1.  Especially where, as here, statements from individual members, including sponsors, constitute the bulk of the pertinent legislative history, it is entirely appropriate for the Court to rely on such statements to discern Congressional intent.  See, e.g., Ballerina Pen Co. v. Kunzig, 433 F.2d 1204, 1213 n.14 (D.C. Cir. 1970) (where "reports were silent on the point [at issue] and we have only the floor debate to illuminate the intent of Congress. . . statements by the sponsor or floor manager of a bill should be given weight");  see also, e.g., NorthHaven Bd. of Ed. v. Bell, 456 U.S. 512, 526-27 (1982) ("Although the statements of one legislator made during debate may not be controlling . . .those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction") (emphasis added).

Moreover, whatever role legislative history may appropriately play in determining the specific meaning of statutory provisions, the issue here is whether the purpose of the FY2006

As for the FMIA, defendants also largely ignore plaintiffs' extensive argument that they fall within the zone of interests of Sections 695 and 603 of that statute. Pl. Mot. at 25-28. Defendants do not dispute that one of the <u>purposes</u> of these FMIA provisions is to address the humane slaughter of horses. Def. Opp. at 9-10. Instead, apart from their irrelevant point that plaintiffs themselves are not the regulated entities here, Def. Opp. at 10, defendants' only argument on this score is that plaintiffs somehow are not within the zone of interests of a statute promoting humane treatment because plaintiffs' "objective is to stop the slaughtering of horses altogether . . . ." <u>Id.</u> at 10.

This approach makes no sense, since plaintiffs' position – evidently now supported by Congress – is that the slaughtering of horses is <u>necessarily</u> inhumane. Accordingly, in arguing that the humane purposes of the FMIA may only be accomplished by halting the slaughter operations altogether, plaintiffs obviously fall within the zone of interests of the statute.[5]

Moreover, under defendants' reasoning, the Humane Society of the United States ("HSUS") would not have had prudential standing to pursue its claims under the Migratory Bird Treaty Act, 16 U.S.C. § 703, <u>et</u> seq., in <u>HSUS v. Glickman</u>, No. 98-1510 (CKK), 1999 U.S. Dist. LEXIS 19759 (D.D.C. July 6, 1999), <u>aff'd</u> 217 F.3d 882 (D.C. Cir. 2000). Although, as here, in

---

Amendment "arguably" included benefitting plaintiffs' interests. Certainly, this legislative history – which includes statements specifically indicating that plaintiffs were the <u>precise</u> groups and individuals whose interests members of Congress were seeking to benefit, <u>see</u> Pl. PI Mem. at 11-13 – is highly relevant, and indeed dispositive, of this inquiry, as the D.C. Circuit made clear in <u>ALDF</u>, which relied on functionally identical statements in evaluating the zone of interests test. <u>See</u> 154 F.3d at 444.

[5]    Indeed, Section 603(b), 21 U.S.C. § 603(b), specifically authorizes defendants to <u>suspend</u> inspections where animals are not being slaughtered in the manner required by 7 U.S.C. §§ 1901-1906 – which, in turn specifically requires "humane" slaughter. 7 U.S.C. § 1902(a).

that case the plaintiffs were seeking to stop the killing of certain animals altogether, while the

statutory provision at issue, like Section 603(b) of the FMIA here, provided for the agency to

allow that killing to take place under certain circumstances, neither this Court, nor the D.C.

Circuit, suggested that the plaintiffs might not be within the zone of interests of the MBTA.   In

short, because (a) it is not disputed that humane treatment is one of the purposes of the FMIA

provisions plaintiffs allege have been violated, and (b) plaintiffs are interested in ensuring the

humane treatment of horses – which, of course, includes not killing them at all if their slaughter

is inhumane – plaintiffs fall well within the zone of interests of this statute as well.[6]

Finally, defendants argue that plaintiffs do not have Article III standing to pursue their

FMIA claim because their injuries are not "traceable to any action undertaken by the USDA

pursuant to" the FMIA.  Def. Opp. at 9 (emphasis added).  This argument – which was not the

reason why the Court dismissed this claim – entirely misses the point of plaintiffs' Claim Two.

Indeed, HSUS v. Glickman, 217 F.3d 882, is instructive in this regard as well, for, in that case, as

here, the agency was not acting under the MBTA but, rather, claimed that the statute did not

apply to its actions.  Yet, plaintiffs plainly had Article III standing for their claim that the agency

was violating the MBTA by killing birds without a permit to do so.  217 F.3d at 888.

Similarly, here, there is no dispute among the parties that, in issuing the Final Rule,

defendants were not purporting to be acting under the FMIA.  However, plaintiffs allege that the

Rule violates the FMIA because, while, in order to both protect against "adulterated" meat, 21

---

[6]      Similarly, the plaintiffs in Bennett had prudential standing, even though their
"objective," Def. Opp. at 10, was plainly to prevent any water from being made available for
endangered species, 520 U.S. at 159 – a result that certainly was at odds with the overall
purposes of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et. seq.

U.S.C. § 603(a) and "prevent[ ] inhumane slaughter[ ]," id. § 603(b), Section 695 of the FMIA

expressly requires that "[t]he cost of inspection rendered . . . under the [FMIA] shall be borne by

the United States," id. § 695, under the Final Rule these inspectors at the horse slaughter plants

are now being paid with funds from the slaughter plants themselves.  As the Supreme Court has

made clear, in pursuing an APA claim, plaintiffs may surely argue that defendants have violated

any statute, not merely the one the agency claims to be acting under.  See, e.g., FCC v. Nextwave

Personal Communications, 537 U.S. 293, 300 (2003) (The APA "requires courts to set aside

federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A) – which means,

of course, any law") (italics in original).

     Moreover, plaintiffs' injuries – which include both aesthetic and concrete public health

threats and environmental harm, see Pl. PI. Mem. at 37-40 – are undisputably "traceable to," Def.

Opp. at 9, defendants' Final Rule because it is also undisputed that, but for the Rule, on March

10, 2006 the slaughter of horses at these plants would have ceased.  Irrespective of whether those

injuries demonstrate the kind of irreparable harm necessary to obtain a preliminary injunction,

there can be no debate that these ongoing injuries – which, since March 10, 2006, have been the

direct result of the Final Rule – satisfy Article III standing requirements.  And the fact that the

regulated entities are directly "causing" the injuries also does not change this outcome, since,

again, there is no dispute that, absent the Final Rule, they would no longer be slaughtering

horses.  See ALDF, 154 F.3d at 440-41 ("a plaintiff satisfies the causation prong of constitutional

standing by establishing that the challenged agency rule permitted the activity that allegedly

injured her, when that activity would allegedly have been illegal otherwise").

**C.    At Minimum, The Court Should Certify Its Dismissal Of These Claims
For Appeal At This Time.**

As regards plaintiffs' alternative request – that, in the event the Court declines to reinstate

Claims One and Two, or, for whatever reason, cannot consider the request at this time, the Court

direct entry of final judgment on these Claims so that plaintiffs can seek an immediate appeal –

defendants also offer no sound basis for the Court not to accede to this modest proposal.  Indeed,

on this point the defendants contradict each other, with Defendant-Intervenors arguing that the

Court should let the present motion sit until the NEPA claim is resolved – on the theory that,

since the relief would be the same under either claim, the reconsideration motion will become

moot at that point (Defendant-Intervenors' Opposition to Plaintiffs' Motion for Reconsideration

("Int. Opp.") at 2) – while the federal defendants argue, correctly, that the remedies may not be

the same.  Def. Opp. at 13, n.3.

In any event, the Court should reject defendants and defendant-intervenors' overall

argument – as to which they remain perfectly aligned – that, for whatever reasons, the Court

should delay a resolution of plaintiffs' entitlement to pursue Claims One and Two as long as

possible.  Id. at 14, n.4; Int. Opp. at 3-7.  It is plaintiffs' position that since March 10, 2006,

thousands of horses, including wild horses, have been slaughtered illegally, and that plaintiffs'

ongoing injuries have been the direct result of the Final Rule.  Accordingly, since Claims One

and Two are legally and conceptually distinct from the NEPA claim, and particularly given the

time-sensitive nature of this action, plaintiffs seek to have their entitlement to pursue Claims One

and Two resolved – here, or in the Court of Appeals – expeditiously, in order to reach the merits,

and seek to stem these ongoing injuries, as quickly as possible.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court either reinstate Claims One and Two, or certify the dismissed claims for immediate appeal.

Respectfully submitted,


_____/s/_____
Howard M. Crystal
D.C. Bar. No. 446189
Eric R. Glitzenstein
D.C. Bar No. 358287
Ethan Carson Eddy
D.C. Bar No. 496406

Meyer Glitzenstein & Crystal
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206

Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)

Jonathan R. Lovvorn
(D.C. Bar No. 461163)

The Humane Society of the
United States
2100 L St., N.W.
Washington, D.C.  20037
(202) 676-2333

Counsel for Plaintiffs

April 19, 2006

12