UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| **THE HUMANE SOCIETY** | ) | |
| **OF THE UNITED STATES, ET AL.,** | ) | |
| | ) | |
| | ) | Civ. No. 1:06CV00265 (CKK) |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| **MIKE JOHANNS, ET AL.,** | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs The Humane Society

of the United States, et al., move for summary judgment in this case under the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 702, 706, and the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4321 et seq., on the grounds that the defendants United States Department

of Agriculture ("USDA"), et al., have violated NEPA by promulgating an "Interim Final Rule"

creating new regulations that establish a "fee-for-service" inspection system designed to facilitate

the continued transport and slaughter of American horses for human consumption abroad, without

preparing either an Environmental Impact Statement or an Environmental Assessment, as required

by NEPA.  Plaintiffs also move for summary judgment on the grounds that defendants unlawfully

invoked a "categorical exclusion" under NEPA without explaining their decision to do so in the

administrative record.

In support of this motion, plaintiffs rely on the accompanying Memorandum in Support of

Plaintiffs' Motion for Summary Judgment, Plaintiffs' Statement of Material Facts Not in Genuine

Dispute, and certain affidavits, exhibits, and attachments plaintiffs filed previously along with their Motion for a Preliminary Injunction, which have been cited in and incorporated by reference into the accompanying Memorandum in Support of Plaintiffs' Motion for Summary Judgment, and upon which plaintiffs continue to rely at this stage.  See Fed. R. Civ. P. 65(a)(2) ("any evidence received upon an application for a preliminary injunction . . . becomes part of the record on the trial and need not be repeated upon the trial").

Respectfully submitted,

/s/
Eric R. Glitzenstein
D.C. Bar No. 358287
Ethan Carson Eddy
D.C. Bar No. 496406
Howard M. Crystal
D.C. Bar No. 446189

Meyer Glitzenstein & Crystal
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206

Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)

Jonathan R. Lovvorn
(D.C. Bar No. 461163)

The Humane Society of the
United States
2100 L St., N.W.
Washington, D.C.  20037
(202) 676-2333

May 1, 2006                                                      Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
**THE HUMANE SOCIETY**                        )
**OF THE UNITED STATES, ET AL.,**             )
                                              )    Civ. No. 1:06CV00265 (CKK)
            Plaintiffs,                        )
      v.                                       )
                                              )
**MIKE JOHANNS, ET AL.,**                      )
                                              )
            Defendants.                        )
_____)


**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Of Counsel:

REBECCA G. JUDD
JONATHAN R. LOVVORN
THE HUMANE SOCIETY OF THE UNITED
STATES
2100 L. St., N.W.
Washington, DC  20037
(202) 676-2333

ERIC R. GLITZENSTEIN
ETHAN CARSON EDDY
HOWARD M. CRYSTAL

MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, DC  20009
(202) 588-5206
(202) 588-5049 (fax)

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES................................................................................................ii

INTRODUCTION..........................................................................................................1

BACKGROUND............................................................................................................2

A.    NEPA And Implementing Regulations.............................................................2

B.    Factual Background.......................................................................................5

C.    Prior Legal Proceedings...............................................................................10

ARGUMENT.............................................................................................................17

USDA VIOLATED NEPA BY ADOPTING THE RULE WITHOUT PREPARING
EITHER AN EIS OR AN EA, AND WITHOUT EXPLAINING ITS INVOCATION
OF A CATEGORICAL EXCLUSION IN THE ADMINISTRATIVE RECORD......................17

A.    Since, Without The Rule, The Horse Slaughter Operations – And The
      Environmental Impacts Associated With Them – Would Cease Pursuant To
      The FY 2006 Amendment, NEPA's Purposes Would Be Furthered Through
      Issuance Of An EIS, Or At Least An EA........................................................18

B.    Since USDA's Discretionary Decision To Grant Intervenors' Rulemaking
      Petition Will Result In Environmental Impacts That Have Never Been
      Addressed  In Any NEPA Document And Would Not Occur In The Absence
      Of The Rule, The Rule Is A "Major Federal Action" For Which There
      Must Be Some NEPA Review.......................................................................23

C.    USDA Cannot Lawfully Rely On A Categorical Exclusion Here To Avoid
      NEPA Review of the Pollution And Other Adverse Environmental Impacts
      Resulting From Its Decision To Grant The Rulemaking Petition.......................32

D.    Since Defendants Have Violated NEPA, The Rule Should Be Vacated............41

CONCLUSION...........................................................................................................41

i

## TABLE OF AUTHORITIES

**PAGE**

**FEDERAL CASES**

Alaska Center for the Environment v. U.S. Forest Service,
     189 F.3d 851 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

Alaska State Snowmobile Association, Inc. v. Babbitt,
     79 F. Supp. 2d 1116 (D. Alaska 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

American Bioscience, Inc. v. Thompson,
     269 F.3d 1077 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

American Horse Protection Association, Inc. v. Andrus,
     608 F.2d 811 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Anacostia Watershed Society v. Babbitt,
     871 F. Supp. 475 (D.D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 34, 35

Anderson v. Evans,
     371 F.3d 475 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 18, 19, 24

Blue Mountains Biodiversity Project v. Blackwood,
     161 F.3d 1208 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

California ex rel. California Coastal Commission v. Norton,
     150 F. Supp. 2d 1046 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33, 35

California v. Norton,
     311 F.3d 1162 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35, 36

Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Commission,
     449 F.2d 1109 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 26

City of Williams v. Dombeck,
     151 F. Supp. 2d 9 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Committee for Automobile Responsibility v. Solomon,
     603 F.2d 992 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29, 30, 31, 38

ii

Confederated Tribes and Bands of the Yakima Indian Nation v. Federal Energy Regulatory
     Commission, 746 F.2d 466 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Edmonds Institute v. Babbitt,
     42 F. Supp. 2d 1 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 32, 34

FCC v. Nextwave Personal Communications,
     537 U.S. 293 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

First National Bank of Homestead v. Watson,
     363 F. Supp. 466 (D.D.C. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

Fund for Animals v. Clark,
     27 F. Supp. 2d 8 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 26

Fund for Animals v. Espy,
     814 F. Supp. 142 (D.D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

Fund for Animals v. Mainella,
     283 F. Supp. 2d 418 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Fund for Animals v. Norton,
     281 F. Supp. 2d 209 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Fund for Animals v. Thomas,
     127 F.3d 80 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28, 29

Grand Canyon Trust v. FAA,
     290 F.3d 339 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Greenpeace U.S.A. v. Evans,
     688 F. Supp. 579 (W.D. Wash. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

Heartwood, Inc. v. U.S. Forest Service,
     73 F. Supp. 2d 962 (S.D. Ill. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Jones v. Gordon,
     792 F.2d 821 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33, 35, 39

National Mining Association v. U.S. Army Corps of Engineers,
     145 F.3d 1399 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

Oregon Natural Desert Association v. Green,
    953 F. Supp. 1133 (D. Or. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Public Citizen v. Department of Transport,
    316 F.3d 1002 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Public Interest Research Group of New Jersey, Inc. v. Federal Highway Admin.,
    884 F. Supp. 876 (D.N.J. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Riverhawks v. Zepeda,
    228 F. Supp. 2d 1173 (D. Or. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Robertson v. Methow Valley Citizens Council,
    490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 27

State of Mississippi ex rel. Moore v. Marsh,
    710 F. Supp. 1488 (S.D. Miss. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Tomac v. Norton,
    240 F. Supp. 2d 45 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Town of Cave Creek, Arizona v. FAA,
    325 F.3d 320 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Utah Environmental Congress v. Bosworth,
    ___ F.3d ___ (10th Cir. Apr. 6, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Wilderness Watch v. Mainella,
    375 F.3d 1085 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Young v. GSA,
    99 F. Supp. 2d 59 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## FEDERAL STATUTES

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 41

7 U.S.C. § 1621 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

16 U.S.C. § 1331 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

21 U.S.C. § 603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

21 U.S.C. § 695 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

42 U.S.C. § 4321 <u>et</u> <u>seq.</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

42 U.S.C. § 4332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 31, 39

Pub. L. 109-97, § 794, 119 Stat. 2164 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

Fed. R. Civ. P. 65(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 7

**FEDERAL REGULATIONS**

7 C.F.R. § 1b.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 5, 24, 37

7 C.F.R. § 1b.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 37

7 C.F.R. § 1b.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 34, 38

7 C.F.R. § 1b.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16, 17, 33,
                                                                    34, 35, 40

9 C.F.R. § 352.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

9 C.F.R. § 352.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

40 C.F.R. § 1500.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 39

40 C.F.R. § 1500.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 22

40 C.F.R. § 1500.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 C.F.R. § 1501.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

40 C.F.R. § 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

40 C.F.R. § 1506.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

40 C.F.R. § 1508.18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 24, 32

40 C.F.R. § 1508.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

40 C.F.R. § 1508.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

40 C.F.R. § 1508.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

40 C.F.R. § 1508.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

35 Fed. Reg. 4,247 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

60 Fed. Reg. 66,480 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

71 Fed. Reg. 6,337 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

71 Fed. Reg. 6,338 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

71 Fed. Reg. 6,340 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Exec. Order No. 11,514 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## LEGISLATIVE MATERIALS

151 Cong. Rec. S10,219  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11

H.R. Rep. No. 80-1852 (1948), 1948 U.S.C.C.A.N. 1706, 1708  . . . . . . . . . . . . . . . . . . . . . 21

**INTRODUCTION**

Plaintiffs are entitled to summary judgment on the grounds that the federal defendants violated the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"), in promulgating the regulation at issue, which "creates a 'fee-for-service' inspection system designed to facilitate the continued transport and slaughter of American horses for human consumption abroad.'" March 14, 2006 Memorandum Opinion ("Mem. Op.") at 1 (internal citation omitted). It is undisputed that, but for the regulation – which was issued in response to recent legislation terminating federal funding for ante-mortem inspections of horses destined for slaughter, id. at 2 – the transport and slaughter of horses at "three different foreign-owned facilities in the United States to provide horse meat for human consumption abroad" would cease. Id.

It is also "clear that the [Food Safety and Inspection Service ("FSIS")] did not prepare an [Environmental Assessment ("EA")] or [Environmental Impact Statement ("EIS")] in conjunction with the Interim Final Rule, nor did the FSIS even consider the environmental impact of the Interim Final Rule in any way," id. at 20, although the slaughter of horses at the facilities will, in fact, have adverse environmental effects, including on local communities near the facilities. However, both case law and regulations issued by the Council on Environmental Quality ("CEQ") require NEPA compliance for "new and continuing activities," including newly adopted "regulations" that may have adverse environmental effects never previously analyzed by the agency. 40 C.F.R. § 1508.18 (emphasis added).

The CEQ regulations also require that agencies seeking to invoke "categorical exclusions" from NEPA shall "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." Id. at § 1508.4 (emphasis added). Nonetheless, the supplemental Administrative Record the Court ordered defendants to file contains no indication that

any agency decisionmaker ever even considered whether such "extraordinary circumstances" are present here. Accordingly, defendants' invocation of a sweeping categorical exclusion for every action undertaken by FSIS must be rejected as contrary to the CEQ regulations, as well as to the overriding purpose of NEPA.

## BACKGROUND

### A.   NEPA And Implementing Regulations

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). The statute "requires that federal agencies take a 'hard look' at the environmental consequences of [their] projects before taking action." Mem. Op. at 16 (citing 42 U.S.C. § 4332(c); Marsh v. Or. Natural Res. Council, 490 U.S. 360, 374 (1989)). The vital purposes of the statute are to "insure that environmental information is available to public officials and citizens before . . . actions are taken," and to "help public officials make decisions that are based on understanding of environmental consequences." 40 C.F.R. § 1500.1(b)-(c). Hence, NEPA "prohibits uninformed – rather than unwise – agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989).

To accomplish these purposes, NEPA requires all federal agencies to prepare a "detailed statement" – an EIS – regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must describe, among other items, (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," and (4) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." Id. §§ 4332(c)(i)-(iii), (v).

2

The CEQ has issued implementing regulations that must be followed by all federal agencies. See 40 C.F.R. § 1500.3 ("Parts 1500 through 1508 of this title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions" of NEPA); see also Exec. Order No. 11,514, 35 Fed. Reg. 4,247 (Mar. 5, 1970), Supplemental Administrative Record ("Supp. AR") at AR0001 ("the heads of federal agencies shall . . . [i]n carrying out their responsibilities under the Act and this Order, comply with the regulations issued by" CEQ).

NEPA, as well as the CEQ regulations, mandates that "[f]ederal agencies shall to the fullest extent possible . . . [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects . . .upon the quality of the human environment," and "[u]se all practicable means . . . to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 40 C.F.R. §§ 1500.2(a), (f) (emphasis added). The CEQ regulations further provide that, when an agency proposes to undertake any "action," the agency must first determine "whether the action is one that normally requires" the preparation of an EIS. 40 C.F.R. § 1501.4(a). If the agency is uncertain whether an EIS is required, it must ordinarily first prepare an EA, which must discuss the need for the proposed action, evaluate alternatives that would entail fewer environmental impacts, and provide sufficient information to support the agency's determination of whether an EIS should be prepared. See id. In evaluating the action's "effects," the agency must consider both the "direct effects" "caused by the action and occur at the same time and place," id. § 1508.8, as well as "indirect effects" "caused by the action and [which] are later in time or farther removed in distance, but are still reasonably foreseeable." Id. Such "indirect effects" are expressly defined to include "effects on air and water and other natural systems . . . ." Id.

3

(emphasis added).

Under the CEQ regulations, an agency may bypass preparation of an EIS or EA only when the action has been "categorically excluded" from NEPA review.  See id. § 1501.4(a).  The regulations define a "categorical exclusion" as a

> category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in regulations adopted by a Federal agency in implementation of these regulations and for which, therefore, neither an [EA] nor an [EIS] is required . . . Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

Id. § 1508.4 (emphasis added).  Accordingly, the CEQ regulations impose a duty on agency officials to ensure that categorical exclusions are not invoked in situations in which "normally excluded actions" nonetheless have a "significant environmental effect."

The United States Department of Agriculture ("USDA") has issued NEPA regulations that "supplement[]" the CEQ regulations and expressly "incorporate[] and adopt" those regulations.  7 C.F.R. § 1b.1(a) (emphasis added).  The USDA regulations provide that "[a]ll policies and programs of the various USDA agencies shall be planned, developed, and implemented so as to achieve the goals and to follow the procedures declared by NEPA in order to assure responsible stewardship of the environment for present and future generations."  Id. § 1b.2(b) (emphasis added).

USDA's NEPA regulations set forth seven "categories of activities" that have "been determined not to have a significant individual or cumulative effect on the human environment and are excluded from the preparation" of an EA or EIS.  Id. § 1b.3(a) (emphasis added).  In addition, the USDA regulations assert that twelve USDA "agencies" – including FSIS – "carry out programs and activities which have been found to have no individual or cumulative effect on the human

4

environment." Id. at § 1b.4 ("Exclusion of agencies") (emphasis added). The regulations state that these "agencies . . . are excluded from the requirements to prepare procedures to implement NEPA," and that "[a]ctions of [these] agencies . . . are categorically excluded from the preparation of an EA or EIS <u>unless the agency head determines that an action may have a significant environmental effect</u>." Id. (emphasis added).

In adopting this regulation, USDA did not explain how "the agency head" would "determine[] that an action" carried out by an exempt agency "may have a significant effect," especially if the agency was <u>also</u> entirely "excluded from the requirements to prepare procedures to implement NEPA." However, presumably to ensure compliance with the CEQ regulations' requirement that agencies "shall provide for extraordinary circumstances" under which normally excluded actions require preparation of an EIS or EA, USDA's regulations broadly provide that:

> Notwithstanding the exclusions listed above [i.e., the excluded "categories of activities"] and in 1b.4 [i.e., the excluded "agencies"], or identified in agency procedures, agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action. <u>Agencies shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion.</u>"

Id. at § 1b.3(c) (emphasis added). Hence, the USDA regulations impose a burden on agencies such as FSIS to "continue to scrutinize their activities" to ensure that particular activities actually warrant a categorical exclusion rather than preparation of an EIS or EA.

## B.    <u>Factual Background</u>

In 2005, Congress passed, and the President signed into law, section 794 of the FY 2006 Agricultural Appropriations Act ("FY 2006 Amendment"). That statute provided that:

> Effective 120 days after the date of enactment of this Act, <u>none of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act</u> (21 U.S.C. Sec. 603) or under the guidelines

issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996. Pub. L. 109-97, § 794, 119 Stat. 2164, Administrative Record (AR 51) (emphasis added).

In explaining the legislation, all of the Senate and House authors and sponsors of the FY 2006 Amendment stated that it was designed to halt the slaughter of horses for human consumption. See Plaintiffs' February 22, 2006 Memorandum in Support of their Motion For a Temporary Restraining Order and for a Preliminary Injunction ("Pfs. PI Mem.") at 9-13. Of particular relevance to plaintiffs' NEPA claim, the sponsors made clear that they were acting, in part, to ameliorate the environmental impacts on residents who live near the facilities, and who have been exposed to pollution emanating from the plants, as well as the suffering of the horses. For example, the Amendment's sponsors read into the record a letter from Kaufman, Texas Mayor Paula Bacon, who described the adverse effects that the horse slaughter plant is having on her community. See 151 Cong. Rec. S10,219. That letter specifically advised the members of Congress that "Dallas-Crown is operating in violation of a multitude of local laws pertaining to waste management, air quality and other environmental concerns." Attachment 2 to Feb. 20, 2005 Decl. of Paula Bacon (Exh. 9 to Prel. Inj. Mot.).[1]

The letter cited by the Amendment's sponsors also explained that "[c]hildren playing in their yards do so with the noise of horses being sent to their deaths in the background," that "[l]ong-established neighbors living adjacent to the plant cannot open their windows or run their air conditions without enduring the most horrific stench," and that the city was forced to take "action

---

[1] In the interests of judicial economy, plaintiffs incorporate by reference all of the exhibits and affidavits filed along with their motion for emergency injunctive relief and on which they continue to rely at this stage. See Fed. R. Civ. P. 65(a)(2) ("any evidence received upon an application for a preliminary injunction . . . becomes part of the record on the trial and need not be repeated upon the trial").

against the plant for releasing pollutants into the sewer system far in excess of legally acceptable

limits . . . ." Id.; see also id. (September 15, 2005 Letter from Mayor Kaufman to Senators Ensign

and Byrd explaining that city officials had reported on "odor and wastewater effluen[t] violations"

at the plant; that "Dallas Crown has a very long history of violations [of] their industrial waste

permit, 'loading' the capacity of the wastewater treatment plant," and that "[o]dor problems resulting

from the outside storage of offal and hides over several days persist not only in [a] traditionally

African-American neighborhood known as 'Boggy Bottom,' but at the nearby Presbyterian Hospital,

the daycare center, and surrounding areas").

Shortly after the Amendment was signed into law, intervenors – companies that slaughter

horses in the United States for human consumption abroad – submitted a petition for "emergency

rulemaking" to USDA, asking it to create, for the first time in the history of the horse slaughter

operations, a "fee-for-service" inspection system for the horse slaughter and transport to slaughter.

See Exh. 10 to Prel. Inj. Mot. at 1. The petition acknowledged that, in the absence of such a new

federal regulatory scheme, the horse slaughter operations would – as Congress anticipated – "likely"

cease. Id. at 1 ("If USDA should fail to provide ante-mortem inspection . . . affected establishments

would likely be forced out of operation"). While the petition specifically asked USDA to dispense

with advance public notice and comment, id. at 7, it said nothing about the agency's obligations to

engage in NEPA review in connection with the regulatory change sought.

Following submission of the petition, and in response to indications by USDA that it was

considering granting the petition, forty members of the Senate and House who had sponsored and

supported the legislation wrote to USDA, stating that they were "shocked and deeply upset to learn

that the agency has apparently decided that it need not carry out Congress' clearly expressed intent

7

to halt horse slaughter for human consumption in FY 2006, but, rather, intends to engage in a complex regulatory maneuver to willfully circumvent legislation that was passed by an overwhelming majority in both the House and Senate." Exh. 14 to Prel. Inj. Mot. at 1. The Congressional authors and sponsors stressed the "bipartisan . . .expression of Congress' intent to *stop*, and not just alter the funding mechanism for, horse slaughter for human consumption," and hence that failure to "cease inspection of horses for slaughter" would "constitute[] willful disregard of clear Congressional intent on the part of USDA." Id. at 1-3 (italics in original). The letter further pointed out that, "[e]ach year an estimated 90,000 horses are slaughtered and processed for human consumption in foreign countries," and that, due to the "widespread public support" and "significant national interest" in ending this controversial practice, it was especially important that "each and every one of our constituents [be given] prior notice and a full opportunity to comment on the USDA's proposal *before* it is implemented." Id. at 1-2 (emphasis in original).

Although USDA refused to provide for the public comment opportunity specifically requested by members of Congress, the organizational plaintiffs also wrote to USDA, stressing the controversial nature of the rule sought by intervenors. See Exh. 13 to Prel. Inj. Mot. Plaintiffs explained that, not only was it clear that Congress itself had desired to terminate the horse slaughter operations, but that there was tremendous public opposition to the practice, both nationally and in the communities directly affected by the plants. Id. at 8-9. Plaintiffs' letter specifically mentioned concerns about "threat[s] to the environment or human health," id. at 14, and directed USDA's attention to the fact that one of the Senate sponsors (Senator Ensign) had read into the Congressional record Mayor Bacon's letter recounting the many adverse effects of the slaughter plant near her community, including on the children "living near the Dallas Crown plant . . . ." Id. at 9.

8

Nearly eighty days after first receiving the petition, USDA announced, on February 8, 2006, that it had granted the petition for emergency rulemaking, thus allowing the horse slaughter operations to proceed, despite Congress's curtailment of federal funding for inspections effective March 10, 2006. See 71 Fed. Reg. 6,337 (Exh. 1 to Prel. Inj. Mot.). USDA not only adopted the rule without exposing it to prior public comment, but the Federal Register Notice also made no mention of NEPA compliance, nor did it allude to any of the impacts of the slaughter operations on the local communities. The USDA did, however, declare that "if FSIS does not establish a means for official establishments that slaughter horses to obtain ante-mortem inspection, these establishments will not be able to operate" – which, once again, is exactly what the authors and supporters of the FY 2006 Amendment intended – and, accordingly, the new rule "is necessary to . . . operations at official establishments that slaughter horses." 71 Fed. Reg. 6,340 (emphasis added). The rule provides, therefore, that, for the first time in the history of implementation of the FMIA, USDA is authorizing the regulated industry itself to pay for federal inspections for one of the animal species enumerated in the FMIA. Id. at 6,339.[2]

---

[2] Both to prevent "adulterated" meats from passing into the human food supply, and to prevent "inhumane slaughtering" of animals, 21 U.S.C. §§ 603(a), 603(b), the FMIA prohibits meat from specifically enumerated species – including horses – from entering interstate commerce unless both pre-slaughter (ante-mortem) and post-slaughter (post-mortem) inspections are conducted pursuant to the FMIA itself. See id. at §§ 601(w), 603, 604 (defining "amenable species" as "those species subject to the provisions of the Act on the day before the enactment of the [] Act," including "cattle, sheep, swine, goats, horses, mules, and other equines"); 71 Fed. Reg. 6,338 ("horses slaughtered for use as human food in commerce are an 'amenable species' and continue to be subject to applicable provisions of the FMIA").

The FMIA also expressly requires that the costs of ante-mortem and post-mortem inspections, with narrow exceptions, "shall be borne by the United States." Id at § 695 (emphasis added). Accordingly, in promulgating the rule at issue, USDA acted under an entirely different statutory scheme, the Agricultural Marketing Act of 1946, 7 U.S.C. § 1621 et seq. ("AMA"). Although USDA has previously employed its authority under that law to provide for voluntary

### C.    **Prior Legal Proceedings**

Plaintiffs – animal protection organizations, as well as individuals who live adjacent to the horse slaughter operations – filed this lawsuit six days after publication of the rule. Shortly thereafter, plaintiffs moved for emergency injunctive relief in an effort to prevent horses from being slaughtered in violation of Congress's apparent intent in enacting the FY 2006 Amendment, as well as in contravention of NEPA and other federal laws. Along with their motion, plaintiffs filed "affidavits attesting to the negative environmental consequences of the operation of the slaughter facilities near they land they own and/or lease . . . ." Mem. Op. at 10-11.

In particular, individual plaintiffs who reside in the vicinity of the plants submitted affidavits swearing that they must "endure the severe stench on a daily basis," Decl. of Robert Eldridge (Exh. 6 to Prel. In. Mot. ), at ¶ 3; that there are "blood spills and animal parts" that harm their neighborhoods, id. at ¶ 5; that their family members are "awakened most nights by the upsetting sounds of horses screaming and whining," Decl. of Tonja Runnels (Exh. 7 to Prel. Inj. Mot.) at ¶¶ 7-9; that the "repugnant odor" from the plants "makes it difficult to breathe" and makes them "concerned for [their] children's health," Decl. of Yolanda Salazar (Exh. 8 to Prel. Inj. Mot.), at ¶¶ 3, 4; that they are exposed to horse "blood in [their] bathtubs, sinks, and toilets," Decl. of Juanita Smith (Exh. 18 to Prel. Inj. Mot.), at ¶ 6; that they cannot visit with family members because of the fumes from the plants, id. at ¶ 8; and that their "kids are unable to play outside" because of the "noxious odor[s]," Decl. of Margarita Garcia (Exh. 20 to Pfs. Inj. Mot.), at ¶ 4. Once again, these

---

inspection, for a fee, of certain animals such as reindeer, elk, antelope, and water buffalo – i.e., species that are not covered by the express terms of the FMIA, see 9 C.F.R. §§ 352.2, 352.10 – the agency has never previously invoked the AMA as a basis for adopting such a system for the animals that are specifically covered by the FMIA, such as cattle and pigs.

10

are the kinds of environmental impacts that Congress took into account in enacting the FY 2006

Amendment, see 151 Cong. Rec. S10,219, and that ordinarily require consideration in a NEPA

document.  See 40 C.F.R. § 1508.8 (defining "effects" that must be analyzed in NEPA documents

to include "effects on air and water," as well as other "aesthetic," "social," and "health" effects,

"whether direct, indirect, or cumulative").

    In addition to individual attestations of direct exposure to environmental harms, plaintiffs

also filed an affidavit from Kaufman, Texas Mayor Paula Kaufman – the same public official whose

letter was read into the Congressional Record when Congress was debating the FY 2006

Amendment.  Mayor Bacon again explained that the Dallas Crown plant "has caused massive . . .

environmental problems since its inception," and has also "violated, and is currently in violation of,

a multitude of local laws pertaining to waste management, air and water quality, and other

environmental concerns."  Exh. 9 to Prel. Inj. Mot., at ¶ 5.  In addition to receiving "twenty-nine

citations for wastewater violations," contributing to the need for an upgrade of the city's wastewater

treatment plant, id., Mayor Bacon reported that the city was required to respond to "600-800 gallons

of blood spilled on the service road and into the ditches fronting the plant," id. at ¶ 6, and that:

> [t]he odor of the plant has permeated the community and adversely affected our citizens who continuously complain about the odor deriving from the plant.  The Presbyterian Hospital, daycare center, and neighborhoods near the plant are subjected to odor problems resulting from the outside storage of offal and hides.  A physician, who has been in practice in the City of Kaufman for 18 years, recently wrote me a letter, stating, 'On repeated occasions we have had terrible foul odors emanating from [the Dallas Crown] slaughterhouse reaching all the way to my office building . . . I myself and my office staff have been nauseated and sick with this smell.  Our patients have also been sick with this smell and have complained about this on various occasions.'  Other doctors have also complained about the odors emanating from the plant, and the President of Presbyterian Hospital of Kaufman has advised that the 'pollution caused by Dallas Crown is causing a health threat that [a]ffects the emotional and physical well being of our patients and families.'

Id. at ¶ 8 (citing id., Attachment 1) (emphasis added).

Plaintiffs' affidavits also highlighted other potential environmental impacts associated with USDA's decision to keep the plants operating despite Congress's ban on federal funding. In particular, plaintiffs submitted official records from the Bureau of Land Management ("BLM") reflecting that over 2,500 wild horses – i.e., horses removed from areas managed by BLM in the west – were sent to slaughter at the plants and, in "just the 12 month period between August 1, 2004, and July 31, 2005, approximately 600" wild horses were slaughtered at the facilities. Decl. of Alan Rutberg (Exh. 4 to Prel. Inj. Mot.), at ¶ 13. Plaintiffs explained that this killing of wild horses affects the interests of the public in enjoying wild horses in their natural habitat, both by reducing the number of wild horses available for viewing, and by impairing the public's ability to enjoy remaining animals. Decl. of Michael Markarian at ¶ 17 (Exh. 16 to Prel. Inj. Mot.).[3]

Shortly after plaintiffs moved for a preliminary injunction, USDA filed – at plaintiffs' urging – the Administrative Record. This Record – which the FSIS certified was a "true and complete copy of all documents and materials considered by FSIS in reaching the decisions at issue in this matter,"

---

[3] In opposing plaintiffs' motion for a preliminary injunction, USDA asserted, relying on affidavits submitted by the slaughter plants, that the plants ceased killing wild horses in 2005. See Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Def. Opp'n to Prel. Inj.") at 32. This is false. As reflected by the most recent official records supplied by BLM itself and attached to one of plaintiffs' affidavits, contrary to the sworn declarations on which USDA relied but evidently never investigated, hundreds of wild horses with official BLM "freezemarks" continued to be slaughtered throughout 2005 at the specific plants at issue here. See Rutberg Decl. at ¶ 13 and Attachment (2/08/06 Mortality Report). Indeed, the official records reflect that wild horses were slaughtered at the Beltex plant as recently as January 25, 2006. Id. If USDA were to prepare a NEPA document, it would, among other things, have to address this discrepancy between the actual facts reported by BLM records and the erroneous declarations submitted by the slaughter plants. See 40 C.F.R. § 1506.5(a) (agencies preparing NEPA documents "shall independently evaluate the information submitted" to them by applicants and petitioners).

AR at 2 (Doc. 10) – contained no NEPA documentation in connection with the rule or petition, nor any indication that any USDA official had ever given any consideration to whether an EIS or EA should be prepared. Nonetheless, in their legal memorandum, defendants asserted that they <u>did</u> comply with NEPA because, in view of USDA's general categorical exclusion for FSIS functions, "<u>all of the programs and activities of FSIS</u> have been found to have no individual or cumulative effect on the human environment . . . ." Def. Opp'n to Prel. Inj. at 26 (emphasis added).

Yet, evidently recognizing that a wholesale exemption for anything and everything ever done by an entire agency would be difficult to harmonize with NEPA, federal defendants also advised the Court that, "[h]istorically, FSIS has never prepared an EA or EIS when determining whether to grant, withdraw, or transfer a grant of Federal meat inspection <u>since FSIS has time and again evaluated and determined that such programs and activities have no cumulative effect on the environment and thus are categorically excluded from the requirement related to preparation of an EA or EIS</u>." <u>Id</u>. at 27 n.10 (emphasis added). Hence, defendants suggested to the Court that the FSIS has <u>repeatedly</u> revisited whether any of its activities have adverse environmental impacts – and consistently found that they do not – although none of these reviews was documented in the certified Record. In a subsequent "surreply," defendants further represented that the USDA had made an affirmative determination that all of the FSIS's "actions and activities . . . <u>in fact</u>, do not have <u>any</u> environmental consequences necessitating NEPA analysis," although USDA again cited to nothing in the Record reflecting where USDA had, "in fact," made such a finding. Def. Sur-Reply in Supp. of Opp'n to Prel. Inj. at 3.

In its March 14, 2006, Memorandum Opinion denying plaintiffs' motion for a preliminary injunction, the Court relied on these representations in finding that plaintiffs had not yet

13

demonstrated a "*substantial* likelihood of victory on the merits *at this stage*," and specifically found

that "[t]his gap in the record . . . significantly dampens [plaintiffs]' ability to make a showing of a

substantial likelihood of success on the merits." Mem. Op. at 20-21 (italics in original). The Court

explained that, "while it is clear that the FSIS did not prepare an EA or EIS in conjunction with the

Interim Final Rule, nor did the FSIS even consider the environmental impact of the Interim Final

Rule in any way," it is "not clear (1) if and when the FSIS actually made an <u>affirmative decision</u> that

all of its programs were exempt from environmental analysis, or (2) if pursuant to 7 C.F.R. §

1b.4(b)(6), the FSIS <u>simply assumed that it was always exempt from the requirements of NEPA</u>."

<u>Id</u>. at 21 (emphasis added).

    While suggesting that such a blanket "assum[ption]" would be problematic – indeed, as

discussed below, such an approach to NEPA is impossible to harmonize with the statute or

implementing regulations – the Court construed the representations in defendants' briefs as

supporting the more legally defensible proposition that FSIS had in fact periodically made

"affirmative decision[s]" that none of its activities had any environmental impact, and that these

decisions somehow subsumed the rule under review. Thus, the Court reasoned that:

> Defendants' argument <u>seems to suggest that the FSIS at least periodically considered whether
> its programs had a 'significant environmental impact', and each time rejected such a
> possibility</u>. For instance, Defendants point out 'FSIS has time and again evaluated and
> determined that such programs and activities have no individual or cumulative effect on the
> environment and thus are categorically excluded from the requirement related to preparation
> of an EA or EIS.' . . . <u>Accordingly, there appears to be at least some history and record of
> agency deliberation regarding the environmental impact of its policies that is simply not
> before the Court at this time, making any definitive assessment of the agency's conduct in
> light of an 'arbitrary and capricious' standard nearly impossible and prone to error</u>.

Mem. Op. at 21 (emphasis added) (internal citation omitted).

    In view of defendants' implication that there was a "gap" in the agency's own Administrative

14

Record that, when filled, would buttress the agency's position that FSIS need not prepare an EIS or EA under any circumstances, the Court found that it was "unclear at this time which party will ultimately prevail with respect to this claim." Mem. Op. at 21-22. The Court did, however, refine the NEPA issues for future resolution, noting that "USDA's own regulations stress that '[a]gencies shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion,'" id. at 22 (quoting 7 C.F.R. § 1b.3(c)), and that "[b]y Defendants' own admission, they did not even consider engaging in NEPA compliance irrespective of any potential impacts associated with the Interim Final Rule." Id. Consequently, "Defendants made no contemporaneous determinations as to whether the Interim Final Rule falls within or without any categorical exclusion under 7 C.F.R. § 1b.3" – which, once again, exempts specific "activities" from NEPA review – and "Courts have long held that invocation of the categorical exclusion for the first time by counsel after a complaint is filed is a *post hoc* rationalization that is an inadequate basis for APA review." Id. at 22-23 (citing, e.g., Edmonds Inst. v. Babbitt, 42 F. Supp. 2d 1, 18-19 (D.D.C. 1999); Anacostia Watershed Soc'y v. Babbitt, 871 F. Supp. 475, 481 (D.D.C. 1994)).[4]

Nonetheless, the Court explained that plaintiffs had "yet to show a substantial likelihood of victory" on two additional defenses raised by defendants. First, the Court found that the

> question left unanswered by the parties following this round of filings is the allocation of the burden under 7 C.F.R. § 1b.4 [the regulation that generally excludes FSIS from NEPA] – specifically, does the regulation presume exemption of the FSIS's programs and require no action whatsoever unless and until the agency head makes an affirmative determination that an action may have a significant environmental impact, or does 7 C.F.R. § 1b.4 simply allow the FSIS to escape certain requirements, but still ensures that an agency head's affirmative

---

[4] Hence, the Court specifically held that defendants could not rely on 7 C.F.R. § 1b.3(a)(2) – which applies to "budget proposals, disbursements, and transfer or reprogramming of funds" – because defendants admittedly had not considered or applied that regulation before adopting the rule. Mem. Op. at 22.

or tacit determination that no 'significant impact' is likely can still be reviewed under the 'arbitrary and capricious' standard of review?

Id. at 24.  Second, the Court found that plaintiffs have "yet to effectively respond to Defendants' argument that the Interim Rule simply maintains the status quo by continuing the USDA's ongoing and long-standing requirement to do ante-mortem meat inspection through the establishment of a fee-for-service program."  Id.

Shortly after the Court's ruling, plaintiffs' counsel wrote to defendants asking USDA to "advise the parties as quickly as possible whether there are, in fact, additional record materials [bearing on the NEPA claim] along the lines" suggested in defendants' briefs.  March 24, 2006 Letter from Ethan Carson Eddy to Beverly M. Russell (attached as Pfs. Exh. 1).  In a subsequently filed status report, federal defendants' "position" was that, notwithstanding what they had previously advised the Court, there "might be additional record materials regarding the NEPA claim."  March 28, 2006 Joint Status Report (Doc. 25), at 1 (emphasis added).

Shortly thereafter, the Court ordered defendants to promptly "file any supplemental administrative record materials . . . with a focus on NEPA-related issues."  April 5, 2006 Minute Order.  However, while defendants did file a "Supplement to the Administrative Record" on April 12, See Doc. 30, that record did not contain anything remotely close to what defendants had represented to the Court in their briefs.  Thus, there is nothing in the "supplement" demonstrating that "FSIS at least periodically considered whether its programs had a 'significant environmental impact,' and each time rejected such a possibility."  Mem. Op. at 21.  Indeed, beyond the initial, cursory Federal Register Notices proposing and adopting the categorical exclusion for the FSIS in 1982 and 1983, see Supp. AR 62- 65, there is no indication that either USDA or FSIS has ever

16

"evaluated and determined that such programs and activities have no individual or cumulative effect on the environment," let alone that they did so "time and again," as defendants had advised the Court. Def. Opp'n to Prel. Inj. at 21.[5]

## ARGUMENT

### USDA VIOLATED NEPA BY ADOPTING THE RULE WITHOUT PREPARING EITHER AN EIS OR AN EA, AND WITHOUT EXPLAINING ITS INVOCATION OF A CATEGORICAL EXCLUSION IN THE ADMINISTRATIVE RECORD

The Administrative Procedure Act ("APA") governs judicial review of agency decisions under NEPA, i.e., the Court must assess whether the agency's decision to proceed with the rule without preparing an EIS or EA is "'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.'" Anderson v. Evans, 371 F.3d 475, 486 (9th Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)); see also Town of Cave Creek, Arizona v. FAA, 325 F.3d 320, 327 (D.C. Cir. 2003). More specifically, the Court must assess whether the agency took the "'hard look' at the environmental consequences'" of the proposed project that NEPA mandates. Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998). While courts reviewing agencies' compliance with NEPA defer to findings that are "fully informed and well-considered,"

---

[5] In fact, other than documents adopting the FSIS exclusion more than two decades ago, the Administrative Record "supplement" consists entirely of the CEQ regulations, see Supp. AR at 4-56; Executive Order No. 11514 on "Protection and Enhancement of Environmental Quality," id. at 1-3; 1979 USDA regulations that say nothing about FSIS, id. at 57-61; a 1983 CEQ document entitled "Guidance Regarding NEPA regulations," id. at 66-71; a 1995 Federal Register Notice that removes several USDA agencies from 7 C.F.R. § 1b.4, because they "no longer exist," 60 Fed. Reg. 66,480, and makes no affirmative findings about FSIS's impact on the environment or anything else, Supp. AR at 72-75; a general FSIS "Directive" that simply reiterates that "FSIS has been granted a categorical exclusion from NEPA requirements by USDA regulation," id. at 201; and a USDA "Workplan" for the rule under review, which contains no discussion of whether the rule will have environmental impacts, but does state that the rule itself is "significant" because it "affects all official establishments that slaughter horses . . . ." Id. at 205.

courts "need not rubber stamp a 'clear error of judgment.'" Anderson, 371 F.3d at 487 (quoting Blue Mountains, 161 F.3d at 1211). If the record reflects that the agency failed to take the requisite "hard look" at potentially significant impacts, its decision is necessarily arbitrary, capricious, and contrary to law. Town of Cave Creek, 325 F.3d at 327; Grand Canyon Trust v. FAA, 290 F.3d 339, 340-41 (D.C. Cir. 2002).

When these principles are applied here in light of the Administrative Record and "supplement" that have been filed with the Court – and that demonstrate that defendants gave no consideration whatsoever to compliance with NEPA, although there are, in fact, environmental impacts associated with the rule under review – it is clear that plaintiffs are entitled to summary judgment on their NEPA claim. See City of Williams v. Dombeck, 151 F. Supp. 2d 9, 12 (D.D.C. 2001) ("Summary judgment is appropriate where . . . review is on the administrative record.").

**A.    Since, Without The Rule, The Horse Slaughter Operations – And The Environmental Impacts Associated With Them – Would Cease Pursuant To The FY 2006 Amendment, NEPA's Purposes Would Be Furthered Through Issuance Of An EIS, Or At Least An EA.**

Before turning to the two specific legal questions pinpointed by the Court, it is first important to emphasize that, in light of the overarching purposes of NEPA, this appears to be exactly the kind of situation that cries out for some kind of NEPA review. Indeed, under the CEQ regulations, the adoption of a new federal regulatory scheme, but for which various potentially significant environmental impacts could not and would not occur, would appear to demand a full-fledged EIS, although USDA has failed to prepare even a more cursory EA.

Hence, the CEQ regulations provide that the assessment of whether environmental impacts are "significant" – and thus should be evaluated in an EIS – "requires considerations of both context

18

and intensity." 40 C.F.R. § 1508.27. "Context" "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the <u>affected region . . . and the locality</u>." <u>Id.</u> at § 1508.27(a) (emphasis added); <u>see also</u> <u>Anderson</u>, 371 F.3d at 492 (determining that an EIS was required regarding a whale hunt because, although the hunt would not impact the overall gray whale population, there were "'substantial questions' as to the significance of the effect on the *local* area") (italics in original). "Intensity" "refers to the severity of impact," and requires consideration of various factors that agencies must address in evaluating whether impacts are sufficiently serious to warrant preparation of an EIS. 40 C.F.R. § 1508.27(b).

Based on these criteria, defendants' decision to grant intervenors' petition appears tailor-made for an EIS. Indeed, although "courts have found that '[t]he presence of one or more of [the CEQ significance] factors should result in an agency decision to prepare an EIS,'" <u>Fund for Animals v. Norton</u>, 281 F. Supp. 2d 209, 218 (D.D.C. 2003) (quoting <u>Public Citizen v. Dep't of Transp.</u>, 316 F.3d 1002, 1023 (9th Cir. 2003)), and that an EIS should be prepared on an action that may be significant in <u>either</u> a national <u>or</u> a local context, <u>Anderson</u>, 371 F.3d at 492, in this case, <u>many</u> of the CEQ significance criteria are implicated, and the action under review affects <u>both</u> "society as a whole," as well as the "localit[ies]" where the specific slaughter plants are located. 40 C.F.R. § 1508.27(a).

First, the action plainly "affects public health or safety," 40 C.F.R. § 1508.27(b)(2), since, once again, but for the new inspection scheme, the residents living in close proximity to the horse slaughter facilities would no longer be exposed to the degradation of their air and water resources that is detailed in plaintiffs' affidavits and that, in part, motivated Congress to enact the FY 2006 Amendment. <u>See</u>, <u>e.g.</u>, <u>Tomac v. Norton</u>, 240 F. Supp. 2d 45, 51 (D.D.C. 2003) (finding EA

inadequate because it did not adequately address impact of decision on "air and water" quality in affected area); Young v. GSA, 99 F. Supp. 2d 59, 83 (D.D.C. 2000) (sustaining EIS because it adequately addressed "air quality" impacts). Second, by the same token, the action entails "unique or unknown risks," id. at § 1508.27(b)(5), since, although there is evidence that local residents – including a nearby "daycare center" and a hospital, Exh. 9 to Prel. Inj. Mot., at Attachs. 1, 2 – will be exposed to air and water degradation as a consequence of USDA's decision facilitating operation of the slaughter plants, no NEPA document has ever analyzed the actual health "risk" that this pollution poses to the community. Id.

Third, "the effects" of the rule "on the quality of the human environment" are certainly "highly controversial," id. at § 1508.27(b)(4), particularly in light of Congress's extraordinary decision to cut off federal funding for inspections of horse slaughter facilities. Fourth, the "action threatens a violation of Federal, State, or local law." 40 C.F.R. § 1508.27(b)(10). Indeed, not only does defendants' decision to adopt a scheme by which private companies pay for horse inspections at the very least "threaten" a violation of Congress's intent in passing both the FY 2006 Amendment and the prohibition on privately financed inspections in the FMIA, see 21 U.S.C. § 695, but, in view of the slaughter plants' unfortunate history of repeated "violations of local laws pertaining to waste management, air and water quality, and other environmental concerns." Exh. 9 to Prel. Inj. Mot., it is almost certain to lead to future violations of local environmental restrictions as well.

Fifth, as noted previously, the rule clearly "establish[es] a precedent for future actions with significant effects or represents a decision in principle about a future consideration," 40 C.F.R. § 1508.27(b)(6), since this is the first time in the history of USDA's implementation of the FMIA that, notwithstanding 21 U.S.C. § 695 – which mandates that most of the costs of both ante- and post-

mortem inspections "shall be borne by the United States," 21 U.S.C. § 695 – the agency has allowed private parties to pay entirely for their own inspections with regard to one of the "amenable species" specifically covered by the FMIA. See supra at n. 2. Plainly, under the "precedent" established by this rule, there is nothing to prevent USDA from adopting an identical approach with regard to the other species covered by the FMIA, including cows and pigs. Since the FMIA's restriction on privately-funded inspections was designed to avoid inspectors' conflicts of interests, and hence grew out of the "principle" that the inspectors on whom consumers "rely for their purity and wholesomeness of their meat should be paid by the consumers themselves, through the Federal government, and not by those whose products they were inspecting," H.R. Rep. No. 80-1852 (1948), as reprinted in 1948 U.S.C.C.A.N. 1706, 1708, defendants' decision has serious precedential implications that could bear on public health and welfare in the very manner that Congress sought to avoid when it enacted the FMIA. See also Prel. Inj. Mem. at 4, 27-29.

Sixth, the action may also affect unique "historic or cultural resources," 40 C.F.R. § 1508.27(b)(3), i.e., wild horse populations. Indeed, in passing the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331 et seq., Congress "declare[d] that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," but that "they are fast disappearing from the American scene" and hence should be "protected from capture, branding, harassment, or death." Id. at § 1331. Accordingly, the potential impact of the slaughter operations on wild horses and horse populations is, at least, an "indirect" effect of the rule that also counsels in favor of an EIS. See, e.g., American Horse Protection Ass'n, Inc. v. Andrus, 608 F.2d 811, 814 (9th Cir. 1979) ("It cannot be denied that removal of a substantial number of wild horses will affect the quality of the human environment as that quality is viewed by Congress.").

21

Where, as here, at least <u>six</u> of the CEQ's "significance" criteria appear to apply to the action at issue, USDA should have prepared a full EIS before granting intervenors' request for a new approach to the funding of inspections subject to the FMIA. Nonetheless, plaintiffs' more modest NEPA claim, at this stage, is merely that USDA should have undertaken <u>some</u> form of NEPA review before adopting an unprecedented inspection system, in the absence of which the horse slaughter operations – and their attendant environmental impacts – would <u>not</u> have occurred. If USDA <u>had</u> prepared a NEPA document, it would have been obligated to consider, <u>e.g.</u>, reasonable "alternatives" to the granting of intevenors' petition, including the "no action" alternative, 40 C.F.R. § 1502.14(d), <u>i.e.</u>, the environmental benefits associated with <u>not</u> granting the petition and allowing the horse slaughter operations to cease on March 10, 2006, as Congress contemplated in enacting the FY 2006 Amendment. <u>See</u> 40 C.F.R. § 1500.2(e) ("Federal agencies shall to the fullest extent possible . . . [u]se the NEPA process to identify and assess the reasonable alternatives to the proposed actions that will avoid or minimize adverse effects upon the quality of the human environment."). USDA could also have taken a "hard look" at alternatives that could have mitigated or avoided some of the adverse environmental impacts associated with the horse slaughter facilities, <u>e.g.</u>, by conditioning granting the petition on the slaughter facilities' willingness to address these or other concerns raised by the affected public. <u>See</u> <u>id.</u>

Yet, by its own concession, <u>see</u> Mem. Op. at 20, the federal government did not take even a sideways glance, let alone a "hard look," at the environmental consequences of its decision to adopt, in the face of Congress's action, a new funding mechanism for the horse slaughter plants. Consequently, there can be no dispute that NEPA's important purpose – <u>i.e.</u>, "'assuring the public that the agency has indeed considered environmental concerns in its decisionmaking process,'" <u>id.</u>

22

at 10 (quoting <u>Baltimore Gas & Electric Co. v. NRDC</u>, 462 U.S. 87, 97 (1983)) (other internal

citations omitted) – has not been fulfilled here.  As plaintiffs discuss next, defendants also cannot

justify their failure to consider such "environmental concerns" on the basis of the legal rationales

they previously proffered.

**B.      Since USDA's Discretionary Decision To Grant Intervenors' Rulemaking Petition Will Result In Environmental Impacts That Have Never Been Addressed In Any NEPA Document And Would Not Occur In The Absence Of The Rule, The Rule Is A "Major Federal Action" For Which There Must <u>Be Some NEPA Review.</u>**

As noted, defendants have previously argued that none of NEPA's requirements is triggered

here because the rule "simply maintains the status quo ante by continuing the USDA's ongoing and

long-standing requriement to do ante-mortem meat inspection through the establishment of a fee-for-

service program."  Mem. Op. at 24.  As plaintiffs explain below, under the circumstances of this

case, the CEQ regulations and cases construing NEPA compel rejection of this argument.  To put

these authorities in context, however, it is important to stress several undisputed facts which, in

plaintiffs' view, dictate the outcome of this issue.

**First**, it is undisputed that, <u>but for</u> USDA's discretionary decision to grant the petition for

rulemaking, <u>the horse slaughter operations</u> – and hence all of the environmental impacts associated

with them – would have ceased on March 10, 2006, by operation of the FY 2006 Amendment.  In

other words, in view of the Congressional enactment that eliminated federal funding for the horse

slaughter operations, the <u>only</u> reason why the local residents, including individual plaintiffs, and

other members of the public are <u>now</u> being exposed to the environmental effects enumerated

previously is because of the USDA decision under review.

**Second**, it is undisputed that federal defendants have <u>never previously analyzed the</u>

environmental effects associated with the horse slaughter facilities in any NEPA document, i.e., this is not a situation in which the agency did prepare a NEPA document at some stage, and the question is whether another NEPA document is necessary to address the ongoing effects of the previously analyzed action.

**Third,** it is undisputed that USDA has never previously adopted, or otherwise authorized, a fee-for-inspection funding system for the slaughter of animals covered by the FMIA. Accordingly, USDA's position that it is merely "maintain[ing] the status quo ante . . . through the establishment of a fee-for-service program" that, in fact, has never previously existed, Mem. Op. at 24, is simply an oxymoron. In other words, since defendants are admittedly adopting a new "fee-for-service program" – which, as noted above, itself creates a dangerous precedent that has never been assessed in any NEPA document, see, e.g., Anderson, 371 F.3d at 493 (requiring an EIS based on potential precedential effects of agency action) – defendants, by definition, did not simply "maintain[] the status quo."

When NEPA's requirements are applied to these facts, it is clear that defendants do indeed have NEPA obligations that were triggered by USDA's consideration of the intervenors' petition. To begin with, once again, the CEQ regulations – which have been expressly "incorporate[d] and adopt[ed]" by USDA, 7 C.F.R. § 1b.1(a) (emphasis added) – define "major agency actions" for which NEPA must be followed as including both "new and continuing activities," including "new or revised agency rules" and the "[a]doption of programs." 40 C.F.R. § 1508.18. Accordingly, the new fee-for-inspection system appears to be a "new or revised agency rule[]" and/or the "adoption" of a new "program" – since it did not exist before USDA implemented it in March 2006 – but even if it is characterized as a "continuing activit[y]," it still falls squarely within the definition of a

24

"major federal action" for which NEPA review must be conducted.

Pertinent case law supports the conclusion that USDA could not grant the rulemaking petition without evaluating environmental impacts. As the D.C. Circuit has explained in a seminal NEPA case:

> [c]ompliance to the 'fullest' possible extent would seem to demand that environmental issues be considered . . . <u>at every stage where an overall balancing of environmental and non-environmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs</u>.

<u>Calvert Cliffs' Coord. Comm., Inc. v. U.S. Atomic Energy Comm'n</u>, 449 F.2d 1109, 1118 (D.C. Cir. 1971) (emphasis added). Plainly, USDA's consideration of intervenors' request for an entirely new funding scheme that was integral to the operation of the horse slaughter facilities was a "stage where an overall balancing of environmental and non-environmental factors" was, at the least, "appropriate," particularly since, once again, none of the pertinent environmental consequences of that course of action had <u>ever</u> been analyzed in any NEPA document.

Indeed, courts applying this principle articulated in <u>Calvert Cliffs</u> have reached the same conclusion in circumstances similar to those before the court here. For example, in <u>Fund for Animals v. Clark</u>, 27 F. Supp. 2d 8 (D.D.C. 1998), the Court addressed NEPA's applicability to a Fish and Wildlife Service ("FWS") management program for wildlife, elements of which had been occurring for more than a decade, but had never been subjected to NEPA review. <u>Id</u>. at 10. Relying on <u>Calvert Cliffs</u>, the court explained that, "[a]s a threshold matter, <u>it is clear that NEPA does apply to ongoing agency actions affecting wildlife and the environment</u>, such as the elk and bison feeding programs," because, "[i]n order for NEPA to be effective, it is essential that all agency functions, where possible, comply with its mandates." <u>Id</u>. at 13 (emphasis added) (citing <u>Calvert Cliffs</u>, 449

25

F.2d at 1114-18).  The court further reasoned that:

> the term 'action' in the CEQ regulations implementing NEPA is defined as encompassing both 'new and continuing' activities.  Here, the FWS makes a decision every year whether to feed or not feed the elk, how much to feed them and where to place the feeding lines.  <u>Such action is 'continuing' and does allow for a 'balancing of environmental and non-environmental factors' when the agency decides annually how that years' [sic] feeding program will progress</u>.  Accordingly, it cannot credibly be argued that the elk supplemental feeding program does not lend itself to compliance with NEPA's environmental assessment requirements.

27 F. Supp. 2d at 13 (emphasis added) (quoting <u>Calvert Cliffs</u>, 449 F.2d at 1114-18; other internal

citations omitted).

Likewise, in <u>Confederated Tribes and Bands of the Yakima Indian Nation v. Federal Energy

Regulatory Commission</u>, 746 F.2d 466, 469-73 (9th Cir. 1984), the court rejected the Federal Energy

Regulatory Commission's ("FERC") argument that its relicensing of a hydroelectric dam could avoid

NEPA review on the grounds that "the dam has been in operation for fifty years," and hence that no

EIS "was required prior to licensing because the continued operation of the project did not involve

any changes in the status quo" and was simply a "phase in an essentially continuous activity."  <u>Id.</u>

at 468, 474-75.  Instead, although an EIS <u>had</u> been prepared when "modifications to the dam" were

first proposed, the Court concluded that NEPA compliance was necessary at the relicensing stage,

both because it would entail the "new commitment of the resource," and because "FERC still retains

several options" bearing on potential environmental effects, including <u>whether</u> to relicense at all and,

if so, "what conditions to attach to a new license" to avoid or mitigate such effects.  <u>Id.</u> at 475-76.

Of particular pertinence to this case, the court also stressed that Congress itself had decided to limit

the length of hydroelectric licenses, and hence had "contemplat[ed] much more than a mere

continuation of the status quo when the decision is made to relicense."  <u>Id.</u> at 476.

In brief, these and related precedents stand for the common-sense proposition that, where an agency makes a new, discretionary decision to authorize an action that will have environmental effects that have <u>never previously been analyzed in any NEPA document</u>, the agency cannot, consistent with NEPA's mandate, put on "blinders to [those] effects," <u>Marsh</u>, 490 U.S. at 371, merely by maintaining that it is continuing the <u>status</u> <u>quo</u>.  Once again, this principle applies with particular force here, where USDA has not only affirmatively decided to <u>continue</u> a prior program with previously unanalyzed consequences – which would be sufficient for NEPA to apply – but has even gone so far as to adopt a <u>new</u> inspection scheme in order to sidestep a Congressional funding ban designed to suspend the horse slaughter operations.  Putting aside whether USDA could lawfully make this decision at all, it surely could not ignore NEPA compliance in doing so.  <u>See also</u> <u>Fund for Animals v. Mainella</u>, 283 F. Supp. 2d 418, 430 (D. Mass. 2003) ("An agency is required to examine the environmental consequences of ongoing federal programs that began before NEPA, <u>but never received NEPA review</u>.") (emphasis added); <u>Oregon Natural Desert Ass'n v. Green</u>, 953 F. Supp. 1133, 1147 (D. Or. 1997) ("The court does not agree that the [Bureau of Land Management's] decision to continue cattle grazing was simply 'a phase in an essentially continuous activity'" because the new decision "involves distinctly different considerations from prior decisions to allow grazing," including new legal ramifications).[6]

_____

[6] Indeed, under these circumstances, even if USDA <u>had</u> previously prepared an EA addressing some of the environmental effects of the horse slaughter operations, it would still have been obligated to "determine if conditions have so changed, either with respect to the action or with respect to the environment in question, that a new EA is required."  <u>Fund for Animals</u>, 283 F. Supp. 2d at 431 (citing <u>Marsh</u>, 490 U.S. at 372) (federal agencies have a duty to take a "hard look" at their proposed actions even after they have received initial approval and must supplement prior NEPA documents where there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts") (internal citation omitted).

On the other side of the coin, the cases in which courts <u>have</u> found that agencies were not obligated to prepare EIS's in connection with ongoing actions only serve to underscore why plaintiffs must prevail on their NEPA claim here. Simply put, in those cases, the agencies <u>did</u> prepare EA's, but concluded – on the basis of the information presented in the EA – that the continuation of the action would not have impacts sufficient to warrant preparation of an EIS.

For example, in <u>Fund for Animals v. Thomas</u>, 127 F.3d 80 (D.C. Cir. 1997), the Court concluded that a Forest Service "policy" that "leaves regulation of game 'baiting' on National Forest System[] lands to the states in which the lands lie" did not constitute a "'major federal action' triggering NEPA's EIS requirement. . . . ." <u>Id</u>. at 81. In that case, the Forest Service had prepared <u>several</u> NEPA documents – including two EA's – concerning the effects of baiting on Forest System lands, the most recent of which had concluded that an EIS was unnecessary because the decision at issue simply "implement[ed] the existing federal policy of leaving bating regulation to the states," and hence could have no significant impacts. <u>Id</u>. at 83. The Court sustained that conclusion because the agency's latest EA had specifically found that the effects of the policy would be "negligible" – since virtually all of the adverse effects of baiting would continue whether the policy was adopted or not – and the Court found that there was "substantial support" for that conclusion "<u>in the administrative record</u>." <u>Id</u>. (emphasis added).

Of vital importance to this case, in finding that the policy essentially "maintained the substantive status quo," the Court went to pains to compare, based on data in the Administrative Record, how baiting would be regulated under the policy <u>with how the practice would proceed if the policy had never been issued</u>. <u>Id</u>. at 84. Since, at the time the policy was promulgated, the record specifically reflected that the policy would have "<u>no effect</u> outside Wyoming" and only a "minimal"

28

effect in Wyoming – because the "substantive requirements of Wyoming's regulations vary only insignificantly from those of the federal special use permits they replaced," id. at 83 – the D.C. Circuit sustained the Forest Service's decision not to prepare an EIS.

In sharp contrast, here, USDA never prepared any EA analyzing any environmental effects, either before or at the time the rule was promulgated, and hence there is nothing in the Record that could possibly be invoked by the agency to support a conclusion that the rule's effects will be inconsequential. Even more important, under the circumstances here, the agency could not possibly support that conclusion since, once again, the parties agree that, in the absence of the rule, the horse slaughter operations will cease as a consequence of new legislation enacted by Congress, whereas in Fund for Animals, the Court specifically found that, with "negligible" differences, exactly the same environmental "effects" would continue, regardless of the existence of the policy. In other words, since, in view of Congress's elimination of federal funding, the decision to adopt a new funding program is now necessary for the slaughter operations to occur, the action at issue here does affect the "substantive status quo" in precisely the manner the court deemed pertinent in Fund for Animals.

Likewise, the analytical approach employed in Committee for Auto Responsibility v. Solomon, 603 F.2d 992 (D.C. Cir. 1979) – the case defendants previously cited to the Court – also compels the conclusion that USDA could not ignore NEPA when deciding whether to grant the petition. In that case, the Court considered whether a decision to lease a parking facility to a new parking management firm required preparation of an EIS. Once again, the agency at issue – the General Services Administration ("GSA") – did prepare an "Environmental Analysis" (i.e., an EA) that did analyze the environmental consequences of the leasing decision (including potential

29

pollution impacts) and set forth detailed reasons why its "decision to lease the Great Plaza area to a parking management firm was not major federal action significantly affecting the environment." Id. at 1002.  One of the reasons set forth in the administrative record was that GSA would fully consider the environmental impacts associated with parking operations at federal buildings, but would do so in connection with specific building activities "on a case-by-case basis."  Id.

In reviewing GSA's decision not to prepare an EIS based on the EA, the Court of Appeals explained that, while an "[a]gency commencing federal action has the initial and primary responsibility for ascertaining whether an EIS is required," a "court is obligated to make sure that the agency took a ' hard look' at the environmental consequences of its decision."  Id. at 1002 (emphasis added).  However, the court found that GSA did, in fact, take the required "hard look" and did "clearly show[] in the information provided in its environmental analysis that current leasing of the Great Plaza area to a parking management firm does not alter the status quo ante."  Id. at 1003 (emphasis added).  In reaching this conclusion, the Court not only stressed GSA's representation that it would actually consider the future environmental effects of parking activities "on a case-by-case basis," id. at 1002 ("An agency decision to jointly consider the environmental consequences of a federal project and its adjacent parking facility is not an unreasonable interpretation of the NEPA mandate") (emphasis added), but also that

> [t]o ensure the agency's understanding of the statutory standards and its adequate consideration of the problem, we deem it important that the agency state its reasons for not preparing an EIS . . . .  Here we find the information provided by the GSA in its Environmental Analysis sufficient to meet this demand.

Id. at 1003 n. 46 (emphasis added).

Plainly, therefore, defendants can rely on this ruling to support its failure to engage in any

NEPA review at all only by taking snippets of the ruling completely out of context.  On close inspection, the decision, like <u>Fund for Animals</u>, stands for the unexceptional proposition that, where an agency taking an action <u>does</u> prepare an EA that takes a "hard look" at environmental consequences and <u>does</u> convincingly demonstrate to a court, based on the EA and the data within it, that a particular action will <u>not</u> have significant environmental consequences that will forever escape NEPA review, <u>then</u> the Court will not second-guess the agency's determination.

That proposition compels rejection of USDA's complete failure to engage in NEPA analysis here, where the agency has <u>never</u> prepared even an EA; the record reflects <u>no</u> agency consideration of any environmental ramifications of the decision under review; and the decision <u>will</u> have environmental consequences that have never been – and, if the agency's position is sustained, never will be – analyzed in any NEPA document.  Even further, the decision under review does in fact entail, at the least, a "change in . . . policy," <u>Committee for Auto Responsibility</u>, 603 F.2d at 1003, and "a revision . . . of an agency program," <u>id</u>. at 1003 n.47, since, once again, USDA has adopted an entirely new fee-for-service program, without which the environmental consequences of concern to plaintiffs would and could not occur.  Hence, if the Court were to rule that defendants may <u>completely</u> bypass any NEPA review in connection with this rule, such a decision would not only go far beyond any Circuit precedent, but would, as a legal and practical matter, create a gaping loophole in NEPA's mandate that agencies scrutinize – to the "fullest extent possible," 42 U.S.C. § 4332 – the environmental implications of their programs and decisions.[7]

---

[7] Along these lines, plaintiffs note that <u>Committee for Auto Responsibility</u> does not address at all the CEQ regulations, apparently because they were promulgated after oral argument in that case and it does not appear that the plaintiffs brought them to the D.C. Circuit's attention. In any event, if this Court were to rule that the rule under review does not come within the category of "new and continuing activities" with previously unexamined environmental

**C.    USDA Cannot Lawfully Rely On A Categorical Exclusion Here To Avoid NEPA Review of the Pollution And Other Adverse Environmental Impacts <u>Resulting From Its Decision To Grant The Rulemaking Petition.</u>**

Since the rule falls within the ambit of NEPA, defendants' conceded failure even to <u>consider</u> any of the environmental ramifications of the Final Rule at the time of decision clearly violates NEPA and is arbitrary and capricious and not in accordance with law. <u>See</u>, <u>e.g.</u>, <u>Edmonds Inst.</u>, 42 F. Supp. at 18 (in the NEPA context, "[t]he agency makes the initial determination of what level of [agency] review is appropriate for any particular action, <u>subject to judicial review under an arbitrary-and-capricious standard</u>") (emphasis added). Indeed, the findings the Court has already made – combined with the fact that the Administrative Record and "supplement" in no way support defendants' prior representation to the Court that the USDA has "time and again" ensured that FSIS activities never have significant environmental effects, Def. Opp'n to Prel. Inj. at 27 n.10 – compels the conclusion that defendants have failed to carry out their legal duties under NEPA to take a "hard look" at all agency actions that may significantly affect the environment.

Once again, the Court has already held that it is "clear that the FSIS did not prepare an EA or EIS in conjunction with the Interim Final Rule, nor did the FSIS even consider the environmental impacts of the Interim Final Rule in any way . . . ." Mem. Op. at 20. There is nothing in the Record "supplement" that undercuts that finding in any way, nor is there anything that even suggests that any USDA official gave any thought to whether the rule should be categorically excluded from NEPA review under the unusual circumstances of this case, or whether extraordinary circumstances may be present. In particular, there is no evidence whatsoever that the "agency head" – or any

_____

consequences, 40 C.F.R. § 1508.18(a), it is difficult to imagine what agency action involving an ongoing activity would fall in that category.

USDA official – even <u>contemplated</u> whether the rule "may have a significant environmental effect" that should be considered in an EA or EIS, 7 C.F.R. § 1b.4, let alone made an affirmative contemporaneous determination that this exception to the general categorical exclusion for all FSIS programs should <u>not</u> apply here.

Consequently, unless the Court is prepared to rule that an agency may comply with NEPA based on a sweeping categorical exclusion that applies literally to <u>everything</u> done by an agency by simply declining to even consider potential environmental impacts, and where there is no evidence in the Record that the possibility of more particularized NEPA consideration was ever even entertained by the agency, plaintiffs must prevail on their NEPA claim. Stated differently, the "question [previously] left unanswered by the parties regarding the "allocation of the burden" – <u>i.e.</u>, does USDA's categorical exclusion (1) "presume exemption of the FSIS's programs and <u>require no action whatsoever</u> unless and until the agency head makes an affirmative determination that an action may have a significant impact" or, rather, (2) does the exclusion "simply allow the FSIS to escape certain requirements, but still ensure that an agency head's <u>affirmative or tacit determination</u> that no 'significant impact' is likely can still be reviewed under the 'arbitrary or capricious' standard of review," Mem. Op. at 24 (emphasis added; internal citation omitted) – must be answered by the second option in the Court's query. As the overwhelming majority of Courts to address the issue have found, this "burden" is on the <u>agency</u>, which "must provide a reasoned explanation for its reliance on the categorical exclusion and <u>explain the *in*applicability of the extraordinary circumstances exceptions</u>." <u>California ex rel. California Coastal Comm'n v. Norton</u>, 150 F. Supp. 2d 1046, 1056 (N.D. Cal. 2001) (emphasis added); <u>see</u> <u>also</u> <u>Jones v. Gordon</u>, 792 F.2d 821, 828 (9th Cir. 1986) (reviewing courts deem categorical exclusion claims "deficient [if] [the agency] fails to

33

explain why [the action] <u>does not fall within an exception</u> to the categorical exclusions") (emphasis

added).  Indeed, if USDA insists that it does <u>not</u> have any such burden under its categorical

exclusion, then the exclusion, at least as applied to this case, is impossible to reconcile not only with

a formidable body of precedent, outlined further below, but also with the CEQ regulations, the

USDA's own NEPA rules, the vital role of judicial review in ensuring that agencies take a "hard

look" at the environmental consequences of their decisions and, most important, the overriding

purposes of NEPA itself.  Plaintiffs will address each of these authorities in turn.

First, precedent makes clear that agencies have the burden to document, in the Administrative

Record, that a particular action is properly subject to a categorical exclusion, <u>including</u> that some

contemporaneous consideration was given to whether the action falls within an <u>exception</u> to a broad

categorical exclusion.  To begin with, the precedents cited by the Court for the proposition that

agencies must document a "contemporaneous determination" as to whether a categorical exclusion

may be invoked for a particular activity, Mem. Op. at 22, apply as forcefully to USDA's reliance on

the exclusions in 7 C.F.R. § 1b.4, as they do to the exclusions in 7 C.F.R. § 1b.3.

The general principle underlying these precedents is that a "<u>post</u> <u>hoc</u> invocation of a

categorical exclusion during litigation cannot justify a failure to prepare an EA or EIS," and that

"[o]n this basis alone," a reviewing court should "find[] that the defendants' failure to prepare an EA

or EIS was arbitrary and capricious."  <u>Edmonds Inst.</u>, 42 F. Supp. 2d at 18; <u>see also</u> <u>Fund for</u>

<u>Animals v. Espy</u>, 814 F. Supp. 142, 151 (D.D.C. 1993) (finding "[d]ispositive . . . the virtual

admission of counsel for the defendant that neither defendant nor any authorized subordinate made

any contemporaneous determination as to whether the study falls within or without a categorical

exclusion"); <u>Anacostia Watershed Soc'y</u>, 871 F. Supp. at 481 (where an agency "fail[s] to invoke

34

a categorical exclusion under section 1501.4 of the NEPA regulations . . . prior to approving agency action," the agency "is precluded from doing so at this time").  Similarly, the two-fold rationale underlying these decisions – i.e., that courts cannot engage in meaningful judicial review in the absence of a record-based explanation for an agency's application of a categorical exclusion, and that such an explanation is also necessary to assure the public that the agency was at least cognizant of environmental concerns when it acted – also apply to USDA's invocation of 7 C.F.R. § 1b.4 here. See California v. Norton, 311 F.3d 1162, 1176 (9th Cir. 2002) (describing the "difficult[y]" encountered by a reviewing court when attempting "to determine if the application of the exclusion is arbitrary and capricious where there is no contemporaneous determination"); Anacostia Watershed Soc'y, 871 F. Supp. at 483 ("[b]ecause there will be no subsequent [agency] decision for future NEPA analysis to inform, the time for the [agency] to have advised itself and the public of the environmental effects of and alternatives to its decision . . . was at the time of [the decision]").

In addition, defendants cannot justify a departure from this well-established principle on the grounds that it is self-evident that the rule falls within the general categorical exclusion for FSIS programs because, as in many cases challenging categorical exclusions, the critical issue is whether, under the unusual circumstances here, the rule comes within an exception to a broad exclusion. Particularly where, as here, there are indicia that an agency action may indeed entail environmental impacts that would otherwise go unstudied, reviewing courts deem categorical exclusion claims "deficient [if] [the agency] fails to explain why [the action] does not fall within an exception to the categorical exclusions." Jones, 792 F.2d at 828; see also California ex rel. California Coastal Comm'n, 150 F. Supp. 2d at 1056 ("[t]he [agency] must provide a reasoned explanation for its reliance on the categorical exclusion and explain the inapplicability of the extraordinary

35

circumstances exceptions") (emphasis added); <u>Riverhawks v. Zepeda</u>, 228 F. Supp. 2d 1173, 1190 (D. Or. 2002) (agency improperly invoked its categorical exclusion and violated NEPA by failing to "<u>negate</u> the presence of extraordinary circumstances" before proceeding with its proposed action) (emphasis added); <u>Greenpeace U.S.A. v. Evans</u>, 688 F. Supp. 579, 585 (W.D. Wash. 1987) (ruling for plaintiff where agency "provided no reasoned explanation – indeed, no explanation at all – of how [mitigating] conditions would prevent application of an exception to the categorical exclusions"); <u>Alaska State Snowmobile Ass'n, Inc. v. Babbitt</u>, 79 F. Supp. 2d 1116, 1136-37 (D. Alaska 1999) (agency "abused its discretion" by merely "restat[ing] the categorical exclusion," and holding that the agency should, "at a minimum, explain its decision that no exceptions applied"), <u>vacated as moot on other grounds</u>, 2001 WL 770442, at *1 (9th Cir. Jan 10, 2001); <u>cf</u>. <u>California</u>, 311 F.3d at 1170 ("[w]hen extraordinary circumstances are present, the agency must prepare environmental documentation despite the fact that the activity in question falls within a categorical exclusion").

In this case, however, although USDA was certainly taking an extraordinary action – <u>i.e.</u>, adopting a new funding mechanism in order to circumvent a Congressional funding ban designed to halt the horse slaughter operations – the Record contains no hint that USDA ever even considered whether the "extraordinary circumstances" criteria applied to its decision. As a result, the pertinent case law compels the conclusion that USDA has, but has failed to sustain, the burden of demonstrating that it may invoke a categorical exclusion here.

Second, any notion that USDA may avoid NEPA review simply by <u>failing</u> even to consider whether a normally excluded action may have a significant environmental impact flies in the face of the CEQ regulations. Once again, recognizing the utility, but also the potential for abuse, of the

categorical exclusion concept, the CEQ regulations mandate that agencies "shall provide for extraordinary circumstances in which a normally excluded action may have a significant effect," and hence require evaluation in an EA and/or EIS.  40 C.F.R. § 1508.4 (emphasis added).  Hence, this regulation emphatically places the burden on agencies to at least consider (and thus reflect their consideration in the record) whether an exception to a broad categorical exclusion is appropriate in a particular situation.  An agency is surely not meeting this legal mandate if its officials have unfettered discretion even to address whether the "extraordinary circumstances" criteria apply to a particular action.

Third, USDA's own NEPA rules also compel rejection of any approach that would allow the agency to escape judicial review merely by failing to address whether a "normally excluded action" should be reviewed in a NEPA document.  Not only do those rules explicitly "incorporate[] and adopt" all of the CEQ regulations, 7 C.F.R. § 1b.1(a), but they also expressly state that "[a]ll policies and programs of the various USDA agencies shall be planned, developed, and implemented so as to achieve the goals and to follow the procedures declared by NEPA in order to assure responsible stewardship of the environment for present and future generations."  Id. at § 1b.2(b) (emphasis added).  USDA could not "achieve the goals" of NEPA and "assure responsible stewardship of the environment" by turning a blind eye to whether a "normally excluded" action warrants NEPA analysis.  Here, for example, USDA could not possibly achieve these "goals" by totally disregarding the effect of its rule on the local communities harmed by the horse slaughter plants, the ongoing killing of wild horses at the plants, or the other environmental consequences described earlier.

Moreover, USDA's own NEPA rules specifically reject any notion that agency officials have no burden to affirmatively address the propriety of invoking a categorical exclusion in a situation

37

like this one.  Once again, those rules broadly require that <u>all</u> USDA "[a]gencies <u>shall continue to</u> <u>scrutinize their activities to determine continued eligibility for categorical exclusion</u>."  7 C.F.R. § 1b.3(c) (emphasis added).  Importantly, the paragraph embodying this obligation applies not only to the excluded "categories <u>of activities,</u>" but <u>also</u> to the "exclusions listed . . . <u>in 1b.4</u>," –  the separate provision that excludes various "agencies," including FSIS.  <u>Id</u>. (emphasis added).  It is apparent, therefore, that USDA, presumably in an effort to harmonize its own rules with the CEQ regulations, <u>did</u> impose a burden on its constituent agencies to "scrutinize their activities" on an ongoing basis and to engage in NEPA review on particular activities not "eligibl[e] for categorical exclusion."  <u>Id</u>.  Accordingly, USDA's failure to document any such "scrutiny" with regard to FSIS activities underscores its violation of its own regulations, and not that defendants may avoid judicial review simply by looking the other way.

Fourth, related to the foregoing point, if USDA's categorical exclusion is construed as allowing the exclusion to be invoked with no evidence that the agency ever even considered the need for an EIS or EA, then this would completely undermine meaningful judicial review, which the courts have recognized as essential to furtherance of NEPA's purposes.  As noted previously, it is well-established that courts are "<u>obligated</u> to make sure that the agency took a 'hard look' at the environmental consequences of its decision."  <u>Committee for Auto Responsibility</u>, 603 F.2d at 1002 (emphasis added).  That vital judicial review function cannot possibly be performed unless the agency is required to at least explain its own "hard look" – or lack thereof – at the environmental ramifications of a particular decision.[8]

_____

[8] <u>See</u>, <u>e.g.</u> <u>Alaska Center for the Environment v. U.S. Forest Service</u>, 189 F.3d 851, 859 (9th Cir. 1999) ("[w]hen an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision"); <u>First Nat'l Bank of Homestead v.</u>

Fifth, especially in view of the vast scope of the categorical exclusion at issue – applying to every action ever undertaken by FSIS – a construction of USDA's NEPA rules as not imposing a burden on USDA to explain why "extraordinary circumstances" do not apply here would put those regulations in irreconcilable conflict with NEPA itself.  Once again, the statute mandates that all federal agencies evaluate the environmental impacts of their actions "to the fullest extent possible," 42 U.S.C. § 4332, so that agencies will "make decisions that are based on [an] understanding of environmental consequences."  40 C.F.R. § 1500.1(c).

Plainly, a reading of USDA's categorical exclusion regulations as meaning that (a) everything that FSIS ever does is presumptively categorically excluded from NEPA review and yet (b) the agency can, in effect, simply ignore whether "extraordinary circumstances" are present in a particular case, would fly in the face of these statutory purposes – especially in view of the absence of any evidence that USDA has, in the last two decades, ever actually revisited the environmental impact of FSIS programs.  This court should avoid that counterintuitive, unnecessary, and unlawful

_____

Watson, 363 F. Supp. 466, 472 (D.D.C. 1973) ("[c]ertainly, the burden is on the agency to prove there will be no environmental impact as a result of its actions"); Jones, 792 F.2d at 828 ("[a]n agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment. . . . Instead, an agency must provide a reasoned explanation of its decision") (citations omitted); Heartwood, Inc. v. U.S. Forest Service, 73 F. Supp. 2d 962, 976 (S.D. Ill. 1999) ([t]he agency "is mandated to consider these cumulative effects [extraordinary circumstances] prior to the implementation of a [categorical exclusion] not afterward"); id. (finding the agency's invocation of a categorical exclusion "not sufficient" where the agency "did not provide any rationale for why [the action] would not have a significant effect of [sic] the environment"); Wilderness Watch v. Mainella, 375 F.3d 1085, 1096 (11th Cir. 2004) ("[a]t a minimum, the agency should have recognized that these exceptions 'may' apply.  Courts of Appeals have, on occasion, reversed agency invocations of categorical exclusions that failed to consider the relevant [extraordinary circumstances] exceptions") (citing cases); cf. Utah Envtl. Congress v. Bosworth, ___ F.3d ___, No. 05-4102, slip op. at 21-22 (10th Cir. Apr. 6, 2006) (upholding categorical exclusion based on agency's ongoing helicopter surveys and "monitoring" which the court found would "trigger an extraordinary circumstance" when appropriate).

construction of the regulation, as have other courts in comparable circumstances.[9]

For example, in <u>State of Mississippi ex rel. Moore v. Marsh</u>, 710 F. Supp. 1488 (S.D. Miss. 1989), the court found that the agency had unlawfully applied its categorical exclusion regulations by failing "to be alert to th[e] possibility" that a typically excluded action may have an environmental impact. <u>Id</u>. at 1507. Enjoining the project pending completion of an EIS, the court admonished the agency that:

> [t]he language of NEPA requires that the [agency's actions] conform to its terms. A contrary [agency] regulation exempting the [action], a major Federal project which will significantly impact the human environment, through categorical exclusion would have to be set aside. <u>When alternative interpretations of a regulation exist, the Court will apply that interpretation which upholds the validity of the regulations, as it does today. In summary, the Court finds that a characterization of the [action] as categorically excluded from environmental assessment under NEPA is clearly erroneous</u>.

<u>Id.</u> (emphasis added).

Likewise, here, the Court should construe 7 C.F.R. § 1b.4 in a manner that is consonant with NEPA and the CEQ regulations, and therefore, which places the burden on the <u>agency</u> to demonstrate that extraordinary circumstances requiring NEPA review are not present here. Since, based on the Administrative Record before the Court, defendants have not, and cannot, sustain that burden, the Court must grant summary judgment for plaintiffs' on their NEPA claim.[10]

---

[9] If USDA argues – and the Court agrees – that this reading of the regulation is the correct one, then plaintiffs should still prevail on their NEPA claim, since, under those circumstances, defendants' application of the regulation so as to avoid any NEPA review here would clearly be arbitrary, capricious, and contrary to law.

[10] Even if the Court were to find that plaintiffs had an initial burden to demonstrate that there are potential environmental effects that should have been addressed by USDA, plaintiffs have surely shouldered that burden here. <u>See</u> <u>Public Interest Research Group of New Jersey, Inc. v. Federal Highway Admin.</u>, 884 F. Supp. 876, 888 (D.N.J. 1995), <u>aff'd per curiam</u>, 65 F.3d 163 (3rd Cir. 1995) (so long as a plaintiff can "establish a deficiency in the administrative record,"

**D.    Since Defendants Have Violated NEPA, The Rule Should Be Vacated.**

The APA provides that where final agency action is "arbitrary, capricious, an abuse of discretion, [or] not in accordance with law," 5 U.S.C. § 706(2)(A), or was adopted "without observance of procedure required by law," id. at § 706(2)(D), the decision under review "shall" be "set aside" pending completion of the remanded proceedings. Id. at § 706(2) (emphasis added). Accordingly, the D.C. Circuit has construed section 706 as providing that "[i]f a[] [party] has standing" and "prevails on its APA claim, it is entitled to relief under that statute, which normally will be [ ] vacatur." American Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (emphasis added) (citing Ass'n of Battery Recyclers, Inc. v. EPA, 208 F.3d 1047, 1061 (D.C. Cir. 2000)); see also FCC v. Nextwave Personal Communications, 537 U.S. 293, 300 (2003) (The APA "requires federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A) – which means, of course, *any* law") (italics in original); Nat'l Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (the "ordinary result" is that regulations adopted in violation of the APA are "vacated"). American Bioscience, 269 F.3d at 1086 ("we are convinced that the FDA's order, in this case, was arbitrary and capricious and must be vacated" without any consideration of irreparable injury or balancing of equities).

## CONCLUSION

For the foregoing reasons, the Court should grant plaintiffs' motion for summary judgment and set aside the rule under review.

---

the agency has the burden to demonstrate that no extraordinary circumstances apply).

41

Respectfully submitted,


/s/
Eric R. Glitzenstein
D.C. Bar No. 358287
Ethan Carson Eddy
D.C. Bar No. 496406
Howard M. Crystal
D.C. Bar No. 446189

Meyer Glitzenstein & Crystal
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206

Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)

Jonathan R. Lovvorn
(D.C. Bar No. 461163)

The Humane Society of the
United States
2100 L St., N.W.
Washington, D.C.  20037
(202) 676-2333

Counsel for Plaintiffs

May 1, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————
                                              )
**THE HUMANE SOCIETY**                        )
**OF THE UNITED STATES, ET AL.**              )
                                              )        Civ. No. 1:06CV00265 (CKK)
             Plaintiffs,                       )
       v.                                     )
                                              )
**MIKE JOHANNS, ET AL.**                      )
                                              )
             Defendants.                       )
—————————————————————                         )

## PLAINTIFFS' STATEMENT OF MATERAL FACTS
## <u>NOT IN GENUINE DISPUTE</u>

1.  In 2005, Congress passed, and the President signed into law, section 794 of the FY 2006

Agricultural Appropriations Act ("FY 2006 Amendment").  That statute provided that:

> Effective 120 days after the date of enactment of this Act, none of the funds made available
> in this Act may be used to pay the salaries or expenses of personnel to inspect horses under
> section 3 of the Federal Meat Inspection Act (21 U.S.C. Sec. 603) or under the guidelines
> issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996.

Pub. L. 109-97, § 794, 119 Stat. 2164, Administrative Record ("AR") (AR 51).

2.  In explaining the legislation, all of the Senate and House authors and sponsors of the FY

2006 Amendment stated that it was designed to halt the slaughter of horses for human consumption.

<u>See</u> Plaintiffs' February 22, 2006 Memorandum in Support of their Motion For a Temporary

Restraining Order and for a Preliminary Injunction ("Pfs. PI Mem.") at 9-13.  The Amendment's

sponsors acted in part to respond to the concerns of residents who live near the horse slaughter

facilities, and who have been exposed to pollution emanating from the plants, as well as the suffering

of the horses.  <u>See</u> 151 Cong Rec. S10,219.

3.  The Amendment's sponsors read into the record a letter from Kaufman, Texas Mayor Paula Bacon, who described the adverse effects that the horse slaughter plant is having on her community.  See id.  That letter specifically advised the members of Congress that "Dallas-Crown is operating in violation of a multitude of local laws pertaining to waste management, air quality and other environmental concerns." Attachment 2 to Feb. 20, 2005 Decl. of Paula Bacon (Exh. 9 to Prel. Inj. Mot.).

4.  The letter from Paula Bacon cited by the Amendment's sponsors also explained that "[c]hildren playing in their yards do so with the noise of horses being sent to their deaths in the background," that "[l]ong-established neighbors living adjacent to the plant cannot open their windows or run their air conditions without enduring the most horrific stench," and that the city was forced to take "action against the plant for releasing pollutants into the sewer system far in excess of legally acceptable limits . . . ." Id.; see also id. (September 15, 2005 Letter from Mayor Kaufman to Senators Ensign and Byrd explaining that city officials had reported on "odor and wastewater effluen[t] violations" at the plant; that "Dallas Crown has a very long history of violations [of] their industrial waste permit, 'loading' the capacity of the wastewater treatment plant," and that "[o]dor problems resulting from the outside storage of offal and hides over several days persist not only in [a] traditionally African-American neighborhood known as 'Boggy Bottom,' but at the nearby Presbyterian Hospital, the daycare center, and surrounding areas").

5.  Shortly after the Amendment was signed into law, intervenors – the companies that slaughter horses in the United States for human consumption abroad – submitted a petition for "emergency rulemaking" to USDA, asking it to create, for the first time in the history of the horse slaughter operations, a "fee-for-service" inspection system for the horse slaughter and transport to

slaughter.  Exh. 10 to Prel. Inj. Mot.  The petition specifically acknowledged that, in the absence of such a new federal regulatory scheme, the horse slaughter operations would – as Congress anticipated – "likely" cease.  Id. at 1 ("If USDA should fail to provide ante-mortem inspection . . . affected establishments would likely be forced out of operation").  While the petition specifically asked USDA to dispense with advance public notice and comment, id. at 7, it said nothing whatsoever about the agency's obligations to address the environmental consequences of the regulatory action intervenors were seeking.

6.  Following submission of the petition, and in response to indications by USDA that it was considering granting the petition, forty members of the Senate and House who had written, sponsored, and supported the legislation wrote the Secretary of Agriculture, stating that they were "shocked and deeply upset to learn that the agency has apparently decided that it need not carry out Congress' clearly expressed intent to halt horse slaughter for human consumption in FY 2006, but, rather, intends to engage in a complex regulatory maneuver to willfully circumvent legislation that was passed by an overwhelming majority in both the House and Senate."  Exh. 14 to Prel. Inj. Mot. The Congressional authors and sponsors stressed the "bipartisan and overwhelming expression of Congress' intent to *stop*, and not just alter the funding mechanism for, horse slaughter for human consumption," and hence that failure to "cease inspection of horses for slaughter" would "constitute[] willful disregard of clear Congressional intent on the part of USDA."  Id. (italics in original).  The letter further pointed out that, "[e]ach year an estimated 90,000 horses are slaughtered and processed for human consumption in foreign countries," and that, due to the "widespread public support" and "significant national interest" in ending this controversial practice, it was especially important that "each and every one of our constituents [be given] prior notice and a full opportunity

to comment on the USDA's proposal before it is implemented." Id. at 1-2.

7.    Although USDA refused to provide for any public comment opportunity, the organizational plaintiffs also wrote to USDA, stressing the controversial nature of the rule sought by intervenors.  Exh. 13 to Prel. Inj. Mot.  Plaintiffs explained that, not only was it clear that Congress itself had desired to terminate the horse slaughter operations, but that there was overwhelming public opposition to the practice, both nationally and in the communities directly affected by the plants.  Id. at 8-9.  Plaintiffs' letter specifically mentioned concerns about "threat[s] to the environment or human health," id. at 14, and directed USDA's attention to the fact that one of the Senate sponsors (Senator Ensign) had read into the Congressional record Mayor Bacon's letter recounting the many adverse effects of the slaughter plant near her community, including on the children "living near the Dallas Crown plant . . . ." Id. at 9.

8.    Nearly eighty days after first receiving the petition, USDA announced, on February 8, 2006, that it had granted the petition for emergency rulemaking, thus allowing the horse slaughter operations to proceed, despite Congress's curtailment of federal funding for inspections effective March 10, 2006.  71 Fed. Reg. 6,337 (Exh. 1 to Prel. Inj. Mot.).  USDA not only adopted the rule without exposing it to prior public comment, but the Federal Register Notice also made no mention of NEPA compliance, nor did it allude to any of the impacts of the slaughter operations on the local communities.  The USDA did, however, declare that "if FSIS does not establish a means for official establishments that slaughter horses to obtain ante-mortem inspection, these establishments will not be able to operate" – which, once again, is exactly what the authors and supporters of the FY 2006 Amendment intended – and, accordingly, the rule "is necessary to avoid disruption of operations at official establishments that slaughter horses." 71 Fed. Reg. 6,340.  The rule provides, therefore, that,

4

for the first time in USDA's history of its implementation of the FMIA, USDA is authorizing the regulated industry itself to pay for federal inspections for one of the animal species enumerated in the FMIA. Id.

9. Plaintiffs – animal protection organizations, as well as individuals who live adjacent to the horse slaughter operations – filed this lawsuit six days after publication of the rule. Shortly thereafter, plaintiffs moved for emergency injunctive relief in an effort to prevent horses from being slaughtered in violation of Congress's apparent intent in enacting the FY 2006 Amendment, as well as in contravention of NEPA and other federal laws.

10. Along with their preliminary injunction motion, plaintiffs filed "affidavits attesting to the negative environmental consequences of the operation of the slaughter facilities near the land they own and/or lease . . . ." March 14, 2006 Mem. Op. at 11. For example, individual plaintiffs who reside in the vicinity of the plants submitted affidavits swearing that they must "endure the severe stench on a daily basis," Decl. of Robert Eldridge (Exh. 6 to Prel. In. Mot. ), at ¶ 3; that there are "blood spills and animal parts" that harm their neighborhoods, id. at ¶ 5; that their family members are "awakened most nights by the upsetting sounds of horses screaming and whining," Decl. of Tonja Runnels (Exh. 7 to Prel. Inj. Mot.) at ¶¶ 7-9; that the "repugnant odors" from the plants "makes it difficult to breathe" and makes them "concerned for [their] children's health," Decl. of Yolanda Salazar (Exh. 8 to Prel. Inj. Mot.), at ¶¶ 3, 4; that they are exposed to horse "blood in [their] bathtubs, sinks, and toilets," Decl. of Juanita Smith (Exh. 18 to Prel. Inj. Mot.), at ¶ 6; that they cannot visit with family members because of the fumes from the plants, id. at ¶ 8; and that their "kids are unable to play outside" because of the "noxious odor[s]," Decl. Of Margarita Garcia (Exh. 20 to Pfs. Inj. Mot.), at ¶ 4.

11. In addition to individual attestations of direct exposure to environmental harms, plaintiffs also filed an affidavit from Kaufman, Texas Mayor Paula Kaufman – the same public official whose letter was read into the Congressional Record when Congress was debating the FY 2006 Amendment. Mayor Bacon again explained that the Dallas Crown plant "has caused massive . . . environmental problems since its inception," and has also "violated, and is currently in violation of, a multitude of local laws pertaining to waste management, air and water quality, and other environmental concerns." Exh. 9 to Prel. Inj. Mot., at ¶ 5. In addition to receiving "twenty-nine citations for wastewater violations," contributing to the need for an upgrade of the city's wastewater treatment plant, id. at ¶ 5, Mayor Bacon reported that the city had been required to respond to "600-800 gallons of blood spilled on the service road and into the ditches fronting the plant," id. at ¶ 6, and that:

> [t]he odor of the plant has permeated the community and adversely affected our citizens who continuously complain about the odor deriving from the plant. The Presbyterian Hospital, daycare center, and neighborhoods near the plant are subjected to odor problems resulting from the outside storage of offal and hides. A physician, who has been in practice in the City of Kaufman for 18 years, recently wrote me a letter, stating, 'On repeated occasions we have had terrible foul odors emanating from [the Dallas Crown] slaughterhouse reaching all the way to my office building . . . I myself and my office staff have been nauseated and sick with this smell. My patients have also been sick with this smell and have complained about this on various occasions.' Other doctors have also complained about the odors emanating from the plant, and the President of Presbyterian Hospital of Kaufman has advised that the 'pollution caused by Dallas Crown is causing a health threat that [a]ffects the emotional and physical well being of our patients and families.'

Id. at ¶ 8 (citing id., Attachment 1).

12. Plaintiffs have also filed official records from the Bureau of Land Management ("BLM") reflecting that over 2,500 wild horses – i.e., horses removed from areas managed by BLM in the west – were sent to slaughter at the plants and, in "just the 12 month period between August 1, 2004, and

6

July 31, 2005, approximately 600" wild horses were slaughtered at the facilities. Decl. of Alan Rutberg at ¶ 13 (Exh. 4 to Prel. Inj. Mot.). Plaintiffs explained that this ongoing slaughter of wild horses affects the interests of the public, including members of the plaintiff organizations, in observing and enjoying wild horses in their natural habitat, both by reducing the number of wild horses available for viewing, and by impairing the public's ability to enjoy the remaining animals. Decl. of Michael Markarian at ¶ 17 (Exh. 16 to Prel. Inj. Mot.).

13. Shortly after plaintiffs moved for a preliminary injunction, USDA filed – at plaintiffs' urging – the Administrative Record for the rule. This Record – which the FSIS certified was a "true and complete copy of all documents and materials considered by FSIS in reaching the decisions at issue in this matter," AR at 2 (Doc. 10) – contained no NEPA documentation in connection with the rule or petition, nor any indication that any USDA official had ever given any consideration to whether an EIS or EA should be prepared for this particular activity.

14. In their response to the preliminary injunction motion, defendants advised the Court that, "[h]istorically, FSIS has never prepared an EA or EIS when determining whether to grant, withdraw, or transfer a grant of Federal meat inspection since FSIS has time and again evaluated and determined that such programs and activities have no cumulative effect on the environment and thus are categorically excluded from the requirement related to preparation of an EA or EIS." Def. Prel. Inj. Mem. at 27 n.10.

15. Shortly after the Court's ruling, plaintiffs' counsel wrote to defendants asking USDA to "advise the parties as quickly as possible whether there are, in fact, additional record materials [bearing on the NEPA claim] along the lines" suggested in defendants' briefs so that the parties could address that matter in a joint status report required by the Court. March 24, 2006 Letter from

Ethan Carson Eddy to Beverly M. Russell.  Exh. 1 to Pfs. Mot. for Summ. J.  In the subsequently filed status report, federal defendants' "position" was that, notwithstanding what they had previously advised the Court, there "might be additional record materials regarding the NEPA claim."  March 28, 2006 Joint Status Report (Doc. 25), at 1.

16.  The Court ordered defendants to promptly "file any supplemental administrative record materials . . . with a focus on NEPA-related issues." April 5, 2006 Minute Order.  While defendants did file a "Supplement to the Administrative Record" on April 12, See Doc. 30, that record does not demonstrate that "FSIS at least periodically considered whether its programs had a 'significant environmental impact,' and each time rejected such a possibility."  Mem. Op. at 21.  Beyond the initial, cursory Federal Register Notices proposing and adopting the categorical exclusion for the FSIS in 1982 and 1983, see Supp. AR 62-65, there is no indication in the record that either USDA or FSIS has ever "evaluated and determined that such programs and activities have no individual or cumulative effect on the environment," or that they did so "time and again," as defendants had advised the Court.  Def. Prel. Inj. Mem. at 21.

17.  But for USDA's discretionary decision to grant the petition for rulemaking, the horse slaughter operations – and hence all of the environmental impacts associated with them – would have ceased on March 10, 2006, by operation of the FY 2006 Amendment.

18.  The federal defendants have never previously analyzed the environmental effects associated with the horse slaughter facilities in any NEPA document or otherwise.

Respectfully submitted,


/s/ _____
Eric R. Glitzenstein
D.C. Bar No. 358287
Ethan Carson Eddy
D.C. Bar No. 496406
Howard M. Crystal
D.C. Bar No. 446189

Meyer Glitzenstein & Crystal
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206

Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)

Jonathan R. Lovvorn
(D.C. Bar No. 461163)

The Humane Society of the
United States
2100 L St., N.W.
Washington, D.C.  20037
(202) 676-2333

Counsel for Plaintiffs

May 1, 2006

9