UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY OF THE        )
 UNITED STATES, et al.,          )
                                 )
              Plaintiffs         )
                                 )
     v.                          )
                                 ) Civil Action No. 06-0265(CKK)
MIKE JOHANNS, Secretary,         )
   United States Department      )
   of Agriculture, et al.,       )
                                 )
              Defendants.        )
_____)

DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In their motion for summary judgment, plaintiffs
unpersuasively attempt to use a procedural environmental statute,
i.e., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §
4321, et seq., as a means of precluding defendants, Mike Johanns,
Secretary, U.S. Department of Agriculture ("USDA"), and Barbara
J. Masters, Administrator, Food Safety and Inspection Service
("FSIS"), from carrying out a long-standing statutory requirement
pursuant to the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. §
601, et seq., to inspect meat and meat food products to ensure
their safety for human consumption.  On February 8, 2006, the
USDA published an Interim Final Rule establishing a voluntary
fee-for-service program under the Agricultural Marketing Act of
1946, as amended, 7 U.S.C. § 1622 and 1624, to allow official
establishments that slaughter horses and process their meat for
human consumption to pay for and continue to receive ante-mortem

inspection.  <u>See</u> Ante-Mortem Inspection of Horses, 71 Fed. Reg. 6337 (Feb. 8, 2006)(to be codified at 9 C.F.R. pt. 352)(attached to Defs.' Op. to Pls.' Mot. for a T.R.O. or Prelim. Inj. as Ex. 7).  The Interim Final Rule was promulgated in response to the Fiscal Year ("FY") 2006 Agricultural Appropriations Act which contained a provision prohibiting USDA from using FY 2006 appropriated funds to pay the salaries or expenses of personnel to conduct ante-mortem inspection of horses to be slaughtered for human consumption.  The Conference Report for the Appropriations Act makes clear that the Department is nevertheless <u>obligated</u> to provide for such inspection without any identified exception. <u>See</u> FY 2006 Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, Pub. L. 109-97, § 794, 119 Stat. 2120 (Nov. 10, 2005)(attached to Defs.' Op. to Pls.' Mot. for a T.R.O. or Prelim. Inj. as Ex. 2); H.R. Rep. No. 109-255, p. 107 (2005)(attached to Defs.' Op. to Pls.' Mot. for a T.R.O. or Prelim. Inj. as Ex. 3).  Notably, the Appropriations Act did not repeal or modify the USDA's statutory obligations under the FMIA. <u>Id.</u>

Plaintiff's objective in this suit is to have the Court exercise its equitable powers to preclude the USDA from effectuating the Interim Final Rule notwithstanding that the Rule was promulgated pursuant to and consistent with the Agency's statutory mandate.  Plaintiffs, in their motion for summary

2

judgment, evidently believe that NEPA is a convenient means of advancing their overriding goal, i.e., stopping the slaughter of horses, not recognizing that the statute is ill-suited for such collateral use as a matter of law.  Indeed, plaintiffs' motion for summary judgment should be denied for three fundamental reasons.  First, the Interim Final Rule does not a constitute "major federal action" for purposes of triggering NEPA procedural requirements.  Second, by law, the FSIS is categorically excluded from the requirements of NEPA, and has been for approximately twenty-three years.  See 7 C.F.R. § 1b.  AR00064 - 65.  Additionally, any challenge to that regulation is time-barred.  Third, NEPA must ultimately yield to the substantive provisions of the FMIA.  Accordingly, for these reasons as further discussed below, plaintiffs' motion for summary judgment should be denied.

## I.    BACKGROUND

For purposes of the issue before the Court, a brief summary of the FMIA's mandatory meat inspection provisions and NEPA's procedural requirements is appropriate.

### A.    FSIS's Mandatory Obligations Under the FMIA

The underlying purpose of the FMIA's meat inspection provisions is to prevent adulterated meat and meat food products from entering interstate commerce for human consumption.  21 U.S.C. §§ 603 and 604. To accomplish this objective, Congress mandated that all livestock (cattle, sheep, swine, goats, horses,

mules, and other equines) must be examined and inspected before they are allowed to enter any slaughtering, packing, meat-canning, rendering, or other similar establishment, in which they are to be slaughtered for meat and meat food products for human consumption.  21 U.S.C. § 603. Post-mortem examination and inspection of carcasses and parts thereof that are processed for human consumption are also mandated.  21 U.S.C. § 604.

The FMIA describes the circumstances under which the USDA may refuse or withdraw inspection services. 21 U.S.C. § 671. Specifically, the USDA may deny or withdraw inspection services where the applicant for or recipient of such services has been declared unfit to engage in any business requiring inspection services based upon the applicant's or recipient's conviction "of (1) any felony, or (2) more than one violation of any law, other than a felony, based upon the acquiring, handling, or distributing of unwholesome, mislabeled, or deceptively packaged food or upon fraud in connection with transactions in food." 21 U.S.C. § 671.  However, the USDA must provide the applicant for or recipient of inspection services an opportunity for a hearing when considering withholding or withdrawing inspection services.  Id.  The applicant or recipient is entitled to judicial review of the USDA's order denying inspection services. Id.

4

**B.    NEPA's Application to "Major Federal Actions" Only**

NEPA's procedural requirements are triggered only by "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(emphasis added).  Specific guidance for complying with NEPA is provided by regulations promulgated by the Council on Environmental Quality ("CEQ"). 40 C.F.R. § 1500 - 1508.  The CEQ regulations provide guidance on when an action constitutes "major federal action" triggering NEPA's procedural requirements.  The pertinent regulation, 40 C.F.R. § 1508.18, states that "[m]ajor Federal action [are those] with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18 (emphasis added).

Under CEQ regulations, federal agencies must prepare either an environmental assessment ("EA") or an environmental impact statement ("EIS") for any "major federal action" that is not "categorically" excluded from NEPA procedural requirements. 40 C.F.R. § 1501.4. An EA is a "concise public document" that "briefly provides" sufficient evidence and analysis for determining whether a full EIS is required. 40 C.F.R. § 1508.9. If, on the basis of an EA, an agency determines that a full EIS is not required, the agency may make a finding of no significant impact ("FONSI"), briefly explaining why an action will not have a significant effect. 40 C.F.R. § 1501.4(e) & 1508.13.

An EIS, in contrast to an EA, is a detailed report subject
to extensive regulations regarding format, content, and
methodology. See 40 C.F.R., Part 1502.  As indicated above,
federal agencies prepare an EIS where a "major federal action"
significantly affects the quality of the human environment. 42
U.S.C. § 4332(2)(C); see also 40 C.F.R. §1502.3. The purpose of
an EIS is to serve as an action-forcing device to insure that the
policies and goals defined in NEPA are infused into the ongoing
programs and actions of the Federal Government.  The EIS must
provide full and fair discussion of significant environmental
impacts and shall inform decisionmakers and the public of the
reasonable alternatives which would avoid or minimize adverse
impacts or enhance the quality of the human environment. 40
C.F.R. § 1501(1).  NEPA, however, neither compels particular
results nor imposes substantive environmental obligations upon
federal agencies. See Strycker's Bay Neighborhood Council, Inc.
v. Karlen, 444 U.S. 223, 227-228 (1980) (per curiam).

CEQ's regulations also instruct agencies to identify classes
of actions -- referred to as "categorical exclusions" -- that
normally do not result in significant environmental impacts
(either individually or cumulatively) and thus presumably do not
require preparation of an EIS. See 40 C.F.R. § 1507.3(b)(2)(ii).
Neither an EIS nor an EA is required for actions categorically
excluded from NEPA review. See 40 C.F.R. § 1507.3(b)(2)(ii).

6

Because NEPA contains no private right of action, federal courts review claims that an agency has violated this statute via the Administrative Procedure Act ("APA"). <u>See</u> <u>Public Citizen v. United States Trade Representative</u>, 5 F.3d 549, 551 (D.C.Cir. 1993). The APA allows a court to "hold unlawful and set aside" agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2). The Act does not, however, authorize a court to "substitute its judgment for that of the agency." <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971).

## II. ARGUMENT

### A. The Interim Final Rule on Ante-Mortem Inspection of Horses is Fully Consistent with the Express Will of Congress as Set Forth in the FY 2006 Agriculture Appropriations Act and the FMIA.

The objective of the Interim Final Rule on ante-mortem horse inspection is narrow and ministerial in nature.  Specifically, the Rule simply identifies a means by which the FSIS will carry out its statutory obligations under the FMIA - obligations which were unaffected by the FY 2006 Appropriations Act. Although plaintiffs advocate that the Appropriations Act's provision prohibiting the use of appropriated funds for ante-mortem inspections had the broader purpose of banning the slaughter of horses, and allege that the Interim Final Rule contradicts this objective, Pls.' Mem. In Support. Mot. Summ. J., at 5-6, their

7

argument in this regard is both legally and factually without
merit.

First, plaintiffs rely exclusively on floor statements and
letters by individual members of Congress to support their
argument that the de-funding provision for ante-mortem
inspections was a de facto ban on horse slaughter.  However, in
Garcia v. United States, 469 U.S. 70, 75(1984), the Supreme Court
stated that, "[i]n surveying legislative history we have
repeatedly stated that the authoritative source for finding the
Legislator's intent lies in the Committee Reports on the bill ...
we have eschewed reliance on the passing comments of one member
... and casual statements from floor debates."  Emphasis added.
Consistent with the Supreme Court's decision in Garcia,
plaintiffs' argument regarding Congressional intent based on the
statements of individual members of Congress lacks legal
significance.

Plaintiffs' argument is factually-nullified by the fact that
Congress introduced bills expressly and unambiguously banning
horse slaughter in the United States and the exporting of U.S.-
origin horses for slaughter in 2001, 2002, 2003, 2004, and 2005,
but did not obtain sufficient votes to pass any of them.  See
Defs.' Op. to Pls.' Mot. for a T.R.O. or Prelim. Inj., Ex. 5.  It
is simply illogical to read into the FY 2006 Appropriations Act a

broader Congressional motive when factual circumstances evidence the clear impropriety of that view.

What is clear is that the FSIS has a longstanding statutory duty under the FMIA to conduct ante- and post-mortem inspections of meat and meat food products intended for human consumption, yet it is prohibited from using appropriated funds to pay the costs and expenses associated with ante-mortem inspection of horses during the current fiscal year.  The Interim Final Rule is simply an administrative means of fulfilling FSIS's duty under the FMIA with respect to horses while complying with the current prohibition on the use of appropriated funds for that purpose.

**B.    The Interim Final Rule is Not a "Major Federal Action."**

**1.    FSIS Exercises No Operational Control Over Horse Slaughter Facilities.**

Since NEPA's purpose is "to assure that federal agencies are fully aware of the effect" on the environment of decisions they propose to undertake, Weinberger v. Catholic Action, 454 U.S. 139, 143 (1981), a reviewing agency should undertake NEPA analysis only for those projects over which it is able to exercise significant influence or control.  See Save Barton Creek Association v. Federal Highway Admin., 950 F.2d 1129, 1134 (5th Cir. 1992) (noting that the "distinguishing feature" of federal agency involvement is "the ability to influence or control the outcome in material respects"), cert. denied, 112 S. Ct. 3029 (1992); Sierra Club v. Hodel, 848 F.2d 1068, 1089 (10th Cir.

9

1988) ("[T]he federal agency must possess actual power to control the nonfederal activity"; "touchstone" of federal action "is an agency's authority to influence significant nonfederal activity"); <u>Ringsred v. City of Duluth</u>, 828 F.2d 1305, 1308 (8th Cir. 1987); <u>NRDC v. U.S. EPA</u>, 822 F.2d 104, 127-30 (D.C. Cir. 1987); <u>Atlanta Coalition v. Atlanta Regional Commission</u>, 599 F.2d 1333, 1347 (5th Cir. 1979); <u>NAACP v. Medical Center, Inc.</u>, 584 F.2d 619, 628-29 (3d Cir. 1978) (ministerial approval for expenditure did not trigger NEPA).

In the present case, neither USDA's action in allowing ante-mortem inspection of horses at horse slaughter plants to be funded via a fee-for-service program, nor the ante-mortem inspections themselves, constitute "a 'proposal for major [F]ederal action' subject [to] an environmental document" because neither activity demonstrates "any significant federal involvement" in the approval and operation of the plants.  <u>Save Barton Creek Association</u>, 950 F.2d 1129, 1133-34 (5th Cir. 1992).

All the material decisions and resulting actions regarding a horse slaughter facility that can or may have environmental effects on the human environment cannot be influenced or controlled by FSIS.  The nonfederal horse slaughter companies unilaterally decide the design, construction, size, location, and hours of operations of their horse slaughter plants.  Thus, FSIS has no influence or control over those nonfederal actions and

thereby no NEPA obligation to analyze or evaluate the environmental effects of those non-federal decisions.

In fact, the design and location of the horse slaughter plants were determined, and their construction approved, decades ago under laws not administered by FSIS (presumably under state and local laws). Their operations likewise were licensed and approved under laws unrelated to FSIS's statutory obligations. All construction, licensing, and operating costs were and continue to be borne by the parent companies of the horse slaughter plants themselves. Throughout this process, "no federal funds [were] requested or spent, and no federal approvals [were] given." Id. at 1135. The USDA became involved only after the horse slaughter plants were built and ready to commence operations, and even then only after the plants themselves applied to USDA for a grant of Federal meat inspection services under the FMIA.

Likewise, the Interim Final Rule merely provides for the horse slaughter plants themselves to pay for ante-mortem inspection of horses via a fee-for-service program and does not constitute federal approval of the plants' operations, nor does it constitute significant federal involvement in or control over their operations except for the specific operations that must comply with federal meat inspection requirements. The action merely switches the funding of such inspections from a public

11

source (i.e., federal appropriated funds) to a private source
(i.e., the horse slaughter plants) to maintain a longstanding
program[1], and does not license, approve, or in any way authorize
the continuing operations of those plants.  The Rule also does
not mandate that the horse slaughter plants avail themselves of
federal inspection services.  Additionally, FSIS has no stake or
interest in whether or not the plants choose to remain in
operation.  The Rule merely makes federal inspection services
available to the plants if they choose to pay for them.

Therefore, USDA has given the horse slaughter plants "no
approvals-whether it be approval of a final EIS, approval of
design, approval of location, or approval of funding" and "there
has been no 'major Federal action' in connection with" the horse
slaughter plants' operations.  Id. at 1138.  Nothing that USDA
did with respect to the original grant of Federal meat inspection
services or has done to enable such inspections to continue in
the current fiscal year constitutes a major federal action that
triggers NEPA.

### 2.    FSIS Is Categorically Excluded from NEPA Procedural Requirements.

USDA has promulgated regulations implementing NEPA in 7
C.F.R. § 1b. In 7 C.F.R. § 1b.4, USDA has listed agencies, the

---

[1]See also Fund for Animals, Inc. v. Thomas, 127 F.3d 80, 83
(D.C. Cir. 1987)(In instances where the agency's action does
nothing more than maintain the substantive status quo, "it cannot
be characterized as a 'major federal action' under NEPA.").

programs and activities of which have been found to "have no individual or cumulative effect on the human environment," and thus, "are excluded from the requirements of preparing procedures to implement NEPA."  Specifically, agencies listed in 7 C.F.R. § 1b.4 "are categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect."  FSIS is one of the agencies listed in 7 C.F.R. § 1b.4.

In its March 14, 2006 Memorandum Opinion in this suit, the Court posed a specific question on the NEPA claim at issue here, i.e., "does [7 C.F.R. § 1b.4] presume exemption of the FSIS's programs and require no action whatsoever unless and until the agency head makes an affirmative determination that an action may have a significant impact, or does 7 C.F.R. § 1b.4 simply allow the FSIS to escape certain requirements but still ensures that an agency head's affirmative or tacit determination that 'no significant' impact is likely can still be reviewed under the arbitrary and capricious' standard?"  Mem. Op. at 24.  The pertinent query is the former and the USDA's response is in the affirmative.

Furthermore, the first part of the Court's query reflects the USDA's longstanding interpretation of the agency-wide exclusion set forth in 7 C.F.R. § 1b.4, and USDA's interpretation should be accorded "controlling weight."  <u>Alaska State Snowmobile</u>

Ass'n, Inc. v. Babbitt, 79 F.Supp.2d 1116, 1136 (D.Alaska 1999),
quoting, Alaska Center for the Environment v. U.S. Forest
Service, 189 F.3d 851, 857 (9th Cir. 1999)("In the specific
context of applying categorical exclusions, 'an agency's
interpretation of the meaning of its own categorical exclusion
should be given controlling weight unless plainly erroneous or
inconsistent with the terms used in the regulation.'"); see
generally United States v. Mead, 533 U.S. 218, 227-28 (2001);
Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994);
Sierra Club v. Leavitt, 355 F.Supp.2d 544, 548 (D.D.C. 2005).

In their Motion for Summary Judgment, plaintiffs repeatedly
assert that defendants have not analyzed the environmental
effects of its activities in any NEPA document. Pls.' Mem. In
Support. Mot. Summ. J., at 18 - 31.  Plaintiffs' argument is
misplaced.  The USDA satisfied its obligation under NEPA pursuant
to its categorical exclusion.  Beyond that, it has no obligation
to prepare an EA and EIS.  Bicycle Trails Council of Marin v.
Babbitt, 82 F.3de 1445, 1457 (9th Cir. 1996).

Further, like the plaintiffs in Bicycle Trails Council of
Marin, plaintiffs in this suit appear to assail or attack the
validity of the regulation adopting the categorical exclusion
itself.  Id. at 1456, n. 5;  Pls.' Mem. In Support. Mot. Summ.
J., at 18 - 31. The USDA promulgated its regulation in 1983.  See
48 Fed. Reg. 11,403(March 18, 1983). The Ninth Circuit's

14

rationale for rejecting the collateral attack on the categorical
exclusion by the plaintiffs in <u>Bicycle Trails Council of Marin</u>
applies with equal force here.  Specifically, the Court stated,

> Plaintiffs did not challenge [the regulations at the
> time they were promulgated] and plaintiffs are time-
> barred in any event from challenging [the] promulgation
> now.  28 U.S.C. section 2401(a).  These categorical
> exclusions are therefore indisputably valid regulations
> under NEPA. . .

82 F.3d at 1456, n. 5.

Accordingly, plaintiffs' arguments ignoring the USDA's
categorical exclusion and advocating for the requirement of an EA
or EIS is unavailing.

   **C.   NEPA Must Yield to the FMIA.**

Even if the Court were to decide that the Interim Final Rule
is a major federal action that triggers NEPA requirements,
"[c]ompliance with NEPA is excused when there is a statutory
conflict with the agency's authorizing legislation that prohibits
or renders compliance impossible[,]" as there is here.  <u>See</u>
<u>Catron County Board of Commissioners, New Mexico v. U.S. Fish and</u>
<u>Wildlife Service</u>, 75 F.3d 1429, 1435 (10th Cir. 1996)(citations
omitted).  As indicated above, the FMIA, the FSIS's authorizing
statute, obligates the FSIS to inspect livestock, including
horses, intended for human consumption.

The FSIS can withhold inspection services only where the
applicant for or recipient of such services has been convicted of
a felony, or multiple convictions of crimes, other than a felony,

15

relating to its handling of food.  21 U.S.C. § 671.  If a horse slaughter facility that requests inspection services is found to meet all food safety and sanitation requirements under the FMIA and there is no evidence of criminal wrongdoing to justify withholding inspection services pursuant to the FMIA, 21 U.S.C. § 671, the FSIS has a duty to provide such inspection.  The FSIS has no control over horse slaughter facilities beyond its inspection obligations, and thus, has no authority to compel these private parties to operate in a manner to minimize the facilities' environmental impacts.  Stated another way, any attempt by USDA personnel to enforce federal, state or local environmental standards by refusing to grant inspection services to a plant or attempting to shut down a plant which otherwise meets all the requirements of the FMIA is and would be *ultra vires*, NEPA notwithstanding.[2]  Thus, given that the FSIS's

_____

[2]To the extent that the individual plaintiffs are aggrieved by the operations at the horse slaughter facilities, their claims should be brought as nuisance claims pursuant to applicable state and local law.  See, e.g. Allen v. Wright, 468 U.S. 737, 751 (1984).  Any governmental control that exists over the horse slaughter plants' operations and can be exerted against them to have an effect on the human environment jurisdictionally lies outside the provisions of USDA's statutes and rules.  In fact, local action has been taken with respect to at least one of the horse slaughter plants, Dallas Crown.  Ex. 7(attached hereto). An Associated Press report dated March 10, 2006, indicated that the zoning board in Kaufman, Texas, recently voted unanimously to order Dallas Crown to close by September 30, 2006, due to concerns about the impact of its operations on local public health and safety.  The report also noted that Dallas Crown was appealing the determination.  Id. However, what the press report
(continued...)

provision of inspection services under the FMIA does not allow for the withholding of such services for environmental purposes, NEPA's purpose must necessarily yield to the food safety law. Flint Ridge Dev. Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 788 (1978), quoting United States v. SCRAP, 412 U.S. 669, 694 (1973)("NEPA was not intended to repeal by implication any other statute.")

## III. CONCLUSION

For reasons stated herein, and in defendants' motion to dismiss, or alternatively, for summary judgment, plaintiffs' motion for summary judgment should be denied.[3]

---

[2](...continued)
suggests is the appropriateness of a forum besides this one for purposes of considering plaintiffs' environmental allegations.

[3]Plaintiffs have requested that the court vacate or set aside the Interim Final Rule on ante-mortem inspection of horses if it determines that the rule is a major federal action that triggers NEPA requirements and that FSIS improperly relied upon its agency-wide exemption in failing to prepare an EA or EIS. Such an outcome would be against the public interest because it would penalize the horse slaughter plants for an error of omission on the part of the agency. This outcome also "would place the USDA in the unavoidable position of undermining a statutorily-protected right afforded to [the horse slaughter plants] (i.e., the right to an inspection which can only be denied, after an opportunity for hearing, for those safety and welfare reasons contemplated by the FMIA)." See Defs.' Op. to Pls.' Mot. T.R.O. and Prelim. Inj. at 37. Therefore, if the Court finds that the interim final rule is a major Federal action that may significantly affect the human environment and thus required the preparation an EA or an EIS, then it should allow the rule to remain in operation while FSIS prepares the EA or EIS. Fund for Animals v. Mainella, 283 F.Supp. 2d 418, 434 (D.Mass. 2003) (Court denied plaintiff's request to enjoin agency

(continued...)

Date: May 10, 2006                    Respectfully Submitted,


                                      /s/ Kenneth L. Wainstein /kvm
                                      _____
                                      KENNETH L. WAINSTEIN, D.C. BAR # 451058
                                      United States Attorney


                                      /s/ Rudolph Contreras
                                      _____
                                      RUDOLPH CONTRERAS, D.C. BAR #434122
                                      Assistant United States Attorney


                                      /s/ Beverly M. Russell
                                      _____
Of Counsel:                           BEVERLY M. RUSSELL, D.C. Bar #454257
Thomas Bolick, Esq./                  Assistant United States Attorney
Rick Herndon, Esq.                    U.S. Attorney's Office for the
U.S. Dept. of Agriculture               District of Columbia
                                      555 4th Street, N.W., Rm. E-4915
                                      Washington, D.C.  20530
                                      Ph:  (202) 307-0492

_____

    [3](...continued)
program for failure to comply with NEPA procedural requirements,
concluding that "[t]he most equitable and prudent solution is to
allow the status quo to continue during the pendancy of the
environmental review.").

18