UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
**THE HUMANE SOCIETY**                       )
**OF THE UNITED STATES, ET AL.,**            )
                                                      )    Civ. No. 1:06CV00265 (CKK)
                 Plaintiffs,                    )
        v.                                         )
                                                      )
**MIKE JOHANNS, ET AL.,**                    )
                                                      )
                 Defendants.                     )
_____)


**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

Of Counsel:

REBECCA G. JUDD
JONATHAN R. LOVVORN
THE HUMANE SOCIETY OF THE UNITED STATES
2100 L. St., N.W.
Washington, DC 20037
(202) 676-2333

ERIC R. GLITZENSTEIN
ETHAN CARSON EDDY
HOWARD M. CRYSTAL
MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, DC 20009
(202) 588-5206
(202) 588-5049 (fax)

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      FEDERAL DEFENDANTS' DECISION TO GRANT INTERVENORS'
        RULEMAKING PETITION FOR A NEW INSPECTION PROGRAM – WHICH
        DEFENDANTS SAID WAS NECESSARY FOR THE HORSE SLAUGHTER
        OPERATIONS TO OCCUR – IS EXACTLY THE KIND OF DISCRETIONARY
        "FEDERAL ACTION" THAT WARRANTS NEPA REVIEW. . . . . . . . . . . . . . . . . . 3

        A.      Granting A Rulemaking Petition Is A Fundamentally Discretionary Agency
                Action That Must Be Accompanied By NEPA Review. . . . . . . . . . . . . . . . . . 3

        B.      Even If The Rulemaking Had Been Initiated By FSIS Itself, Rather Than In
                Response To A Petition, Adoption Of The Rule Would Still Constitute A
                Federal Action Requiring NEPA Review. .. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.     THERE IS NO "STATUTORY CONFLICT" BETWEEN NEPA AND THE FMIA
        THAT RENDERS NEPA COMPLIANCE IMPOSSIBLE. . . . . . . . . . . . . . . . . . . . 14

III.    USDA'S <u>POST</u> <u>HOC</u> INVOCATION OF THE CATEGORICAL EXCLUSION
        IS DUE NO DEFERENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.     REMAND AND VACATUR IS THE APPROPRIATE REMEDY. . . . . . . . . . . . . . . 21

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                    **PAGE**

Alpine Lakes Protection Society v. Schlapfer,
        518 F.2d 1089 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

American Bioscience, Inc. v. Thompson,
        269 F.3d 1077 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

American Horse Protection Association v. Lyng,
        812 F.2d 1 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Amoco Production Company v. Village of Gambell, Alaska,
        480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Atkinson v. Inter-American Development Bank,
        156 F.3d 1335 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission,
        599 F.2d 1333 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14

Biderman v. Morton,
        497 F.2d 1141 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 23

Born Free USA v. Norton,
        278 F. Supp. 2d 5 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Bowen v. Georgetown University Hospital,
        488 U.S. 204 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Burlington Truck Lines, Inc. v. United States,
        371 U.S. 156 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

California ex rel. California Coastal Commission v. Norton,
        150 F. Supp. 2d 1046 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cellnet Communications, Inc. v. FCC,
        965 F.2d 1106 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Citizens Against Rails-to-Trails v. Surface Transportation Board,
        267 F.3d 1144 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20

Citizens Alert Regarding the Environment v. U.S. EPA,
     259 F. Supp. 2d 9 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Defenders of Wildlife v. Andrus,
     627 F.2d 1238 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Department of Transportation v. Public Citizen,
     541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Environmental Defense Center v. Babbitt,
     73 F.3d 867 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Environmental Defense Fund, Inc. v. Mathews,
     410 F. Supp. 336 (D.D.C.1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Environmental Defense Fund v. Andrus,
     596 F.2d 848 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Environmental Rights Coalition v. Austin,
     780 F. Supp. 584 (S.D. Ind. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

FEA v. Algonguin SNG, Inc.,
     426 U.S. 548 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Flint Ridge Development Co. v. Scenic Rivers Association,
     426 U.S. 776 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Foundation on Economic Trends v. Heckler,
     756 F.2d 143 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fund For Animals v. Babbitt,
     2 F. Supp. 2d 562 (D. Vt. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fund for Animals v. Espy,
     814 F. Supp. 142 (D.D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fund for Animals v. Norton,
     281 F. Supp. 2d 209 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Grand Canyon Trust v. F.A.A.,
     290 F.3d 339 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Greater Yellowstone Coalition v. Bosworth,
    209 F. Supp. 2d 156 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Helfand v. Gerson,
    105 F.3d 530 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Jones v. Gordon,
    792 F.2d 821 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

Landmark West! v. United States Postal Service,
    840 F. Supp. 994 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Lathan v. Brinegar,
    506 F.2d 677 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Macht v. Skinner,
    916 F.2d 13 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 23

Massachusetts v. E.P.A.,
    415 F.3d 50 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Metcalf v. Daley,
    214 F.3d 1135 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Mineral Policy Center v. Norton,
    292 F. Supp. 2d 30 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12, 20

National Mining Association v. U.S. Army Corps of Engineers,
    145 F.3d 1399 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

National Organization for the Reform of Marijuana Laws v. U.S. Department of State,
    452 F. Supp. 1226 (D.D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

National Association for the Advancement of Colored People v. Medical Center, Inc.,
    584 F.2d 619 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

New Hampshire v. Maine,
    532 U.S. 742 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

North Haven Board of Education v. Bell,
    456 U.S. 512 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

iv

Port of Astoria v. Hodel,
   595 F.2d 467 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Progressive Animal Welfare Society v. Department of Navy,
   725 F. Supp. 475 (W.D. Wash. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Public Citizen v. U.S. Department of Health and Human Services,
   332 F.3d 654 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Restore: The North Woods v. United States Department of Agriculture,
   968 F. Supp. 168 (D. Vt. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Ringsred v. City of Duluth,
   828 F.2d 1305 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12

Robertson v. Methow Valley Citizens Council,
   490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Save the Bay, Inc. v. United States Army Corps of Engineers,
   610 F.2d 322 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 17

Save the Yaak Committee v. Block,
   840 F.2d 714 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Scientists' Institute for Public Information v. Atomic Energy Commission,
   481 F.2d 1079 (D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Sierra Club v. Hodel,
   848 F.2d 1068 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Sierra Club v. Marsh,
   872 F.2d 497 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 24

Sierra Club v. Morton,
   514 F.2d 856 (D.C. Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Sierra Club v. U.S. Forest Service,
   843 F.2d 1190 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Thomas v. Peterson,
   753 F.2d 754 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Timpinaro v. SEC,
      2 F.3d 453 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Utah Environmental Congress v. Bosworth,
      443 F.3d 732 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Village of Los Ranchos De Albuquerque v. Marsh,
      956 F.2d 970 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

WHHT, Inc v. FCC,
      656 F.2d 807 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Western Land Exchange Project v. U.S. Bureau of Land Management,
      315 F. Supp. 2d 1068 (D. Nev. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Winnebago Tribe of Nebraska v. Ray,
      621 F.2d 269 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Young v. General Services Administration,
      99 F. Supp. 2d 59 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## FEDERAL STATUTES

7 U.S.C. § 1622 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7 U.S.C. § 1624 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

21 U.S.C. § 671 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

21 U.S.C. § 695. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 7, 8, 14, 16

42 U.S.C. § 4332 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

## FEDERAL REGULATIONS

7 C.F.R. § 1b.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

7 C.F.R. § 1b.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9 C.F.R. § 307.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

9 C.F.R. § 311.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9 C.F.R. § 314.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

9 C.F.R. § 416.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

40 C.F.R. § 1500.5(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

40 C.F.R. § 1508.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

40 C.F.R. § 1508.18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9

71 Fed. Reg. 6,337 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 9, 10, 12, 14

## INTRODUCTION

In their earlier summary judgment memoranda, plaintiffs explained that the decision of the United States Department of Agriculture ("USDA") to grant intervenors' rulemaking petition for a new fee-for-service horse slaughter inspection program was subject to the National Environmental Policy Act, 42 U.S.C. § 4332 et seq. ("NEPA"), and that this decision could not be categorically excluded from any NEPA review. Plaintiffs also emphasized that, contrary to the government's prior representations to the Court, federal defendants have produced no Administrative Record materials supporting the proposition that the Food Safety and Inspection Service ("FSIS") has "time and again evaluated and determined" that its "programs and activities" never have environmental impacts that warrant NEPA review. Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Def. Opp. to Prel. Inj.") at 27 n. 10.

Tellingly, in their latest briefs, defendants devote relatively little space to the reasons that they initially proffered to the Court for why USDA, in deciding to grant a rulemaking petition, could avoid preparation of an Environmental Impact Statement ("EIS") or even an Environmental Assessment ("EA"). Indeed, once again, federal defendants make no effort to buttress their prior representations to the Court "suggest[ing] that FSIS at least periodically considered whether its programs had a 'significant environmental impact,' and each time rejected such a possibility." March 14, 2006 Memorandum Opinion ("Mem. Op.") at 21. To the contrary, the government broadly asserts that any and every activity undertaken by "FSIS is categorically excluded from the requirements of NEPA, and has been for approximately twenty-three years." Federal Defendants' Opposition to Plaintiffs' Motion for Summary Judgment ("Fed. Def. Opp.") at 3 (emphasis added). In view of that sweeping position, it is unsurprising that the Administrative Record, even as supplemented, neither reflects that federal defendants have ever actually revisited whether any FSIS

activities should be subject to NEPA review, nor, most importantly, whether they gave any <u>actual</u> consideration to the need for NEPA review under the unusual circumstances here.[1]

Nor have defendants even attempted to rebut the formidable body of precedent with which plaintiffs directly answered the inquiry posed in the Court's Memorandum Opinion as to the "allocation of the burden" under NEPA to ensure that "no 'significant impact' is likely" that would require environmental review of an otherwise excluded action. Mem. Op. at 24. As plaintiffs illiustrated, <u>see</u> Plaintiffs' Memorandum in Support of their Motion for Summary Judgment (Doc. 39) ("Pfs. Mem.") at 32-36, every court to consider this issue has held it is the agency's affirmative burden to "explain the <u>in</u>applicability of the extraordinary circumstances exceptions." <u>Calif. ex rel. Calif. Coastal Comm'n v. Norton</u>, 150 F. Supp. 2d 1046, 1056 (N.D. Cal. 2001); <u>Jones v. Gordon</u>, 792 F.2d 821, 828 (9th Cir. 1986).

Instead, and while also failing to address plaintiffs' contention that at least six of the Council on Environmental Quality's ("CEQ's") "significance" criteria appear to be satisfied here, thus triggering an EIS, <u>see</u> Pfs. Mem. at 18-23, defendants now advance several new rationales for bypassing any NEPA review. In particular, federal defendants now contend that granting intervenors' rulemaking petition was a "narrow and ministerial" act, Fed. Def. Opp. at 7, which does not even involve sufficient "'federal involvement' in the approval and operation of the plants" to warrant NEPA review. <u>Id</u>. at 10 (internal citation omitted). The government now even goes so far as to argue that it <u>could not</u> comply with NEPA because "there is a statutory <u>conflict</u>" between

---

[1] While USDA has filed a number of documents reiterating the fact that all FSIS activities are categorically excluded from NEPA review, none of these documents reflects any actual "history and record of agency deliberation regarding the environmental impact of [FSIS] policies . . . ." Mem. Op. at 21.

2

NEPA and the Federal Meat Inspection Act ("FMIA"), the "FSIS's authorizing statute," id. at 15 (emphasis added), which somehow precluded USDA from considering environmental factors in determining whether to grant intervenors' petition.

As discussed below, these additional arguments are also baseless. USDA's decision to grant intervenors' rulemaking petition is the quintessential discretionary federal action for which NEPA review must be conducted. In addition, there was certainly no statutory impediment – in the FMIA or any other law – to USDA informing itself, through the NEPA process, of the environmental ramifications of its action before deciding whether to establish a new inspection funding scheme in the face of Congress's decision to withdraw all federal funding.

I.  **FEDERAL DEFENDANTS' DECISION TO GRANT INTERVENORS' RULEMAKING PETITION FOR A NEW INSPECTION PROGRAM – WHICH DEFENDANTS SAID WAS NECESSARY FOR THE HORSE SLAUGHTER OPERATIONS TO OCCUR – IS EXACTLY THE KIND OF DISCRETIONARY "FEDERAL ACTION" THAT WARRANTS NEPA REVIEW.**

A.  **Granting A Rulemaking Petition Is A Fundamentally Discretionary Agency Action That Must Be Accompanied By NEPA Review.**

As noted, federal defendants now argue that the "objective of the Final Rule on ante-mortem horse inspection is narrow and ministerial in nature," Fed. Def. Opp. at 7 (emphasis added), and that "neither USDA's action in allowing ante-mortem inspection of horses at horse slaughter plants to be funded via a fee-for-service program, nor the ante-mortem inspections themselves, constitute a 'proposal for major Federal action' subject [to] an environmental document' because neither activity demonstrates 'any significant federal involvement' in the approval and operation of the plants." Id. at 10 (internal citation omitted). It is unclear to plaintiffs what it means for an agency's "objective" to be "ministerial," or why, in federal defendants' view, the agency's "objective" has anything to do

3

with whether NEPA review is required. Plaintiffs are also uncertain exactly what distinction defendants are drawing between federal "approval" – which defendants evidently concede <u>does</u> mandate NEPA review – and federal oversight of the horse slaughter operations here, without which horses could not be killed for human consumption.

The Court, however, need not delve deeply into these distinctions to reject the government's notion that the formal rulemaking before the Court is not even a "federal action" subject to NEPA. To begin with, it is necessary to characterize accurately the precise agency "action" that is before the Court. Importantly, plaintiffs have not brought some free-floating challenge to USDA's generic implementation of one of its inspection programs.

Rather, plaintiffs' claim is targeted at federal defendants' discrete, affirmative decision to <u>grant a rulemaking petition</u> for the adoption of a substantive regulation, without which the horse slaughter operations would not be occurring. <u>See</u> 71 Fed. Reg. 6,337, 6,338. Once again, the Council on Environmental Quality ("CEQ") regulations expressly define federal "actions" subject to NEPA to include "<u>new or revised agency rules</u>" and "regulations," and further stress that "[f]ederal actions tend to fall within one of the following categories: (1) Adoption of official policy, <u>such as rules, regulations,</u> and interpretations adopted pursuant to the Administrative Procedure Act . . ." 40 C.F.R. § 1508.18(a), (b)(1) (emphasis added). Accordingly, it could hardly be clearer that the granting of a petition for issuance of a formal regulation is the quintessential "federal action" for which NEPA review is ordinarily required.

Moreover, the government's suggestion that USDA's response to the rulemaking petition was somehow a "ministerial" act – <u>i.e.</u>, that USDA had no choice but to <u>grant</u> intervenors' petition – for which NEPA review would be a pointless exercise, makes no legal sense. Indeed, it is not only well-

established that agencies are vested with broad discretion to deny rulemaking petitions, <u>see</u>, <u>e.g.</u>,

<u>Mass. v. E.P.A.</u>, 415 F.3d 50, 73 (D.C. Cir. 2005) (agency was "within its discretion in denying the

petition for rulemaking"), but that such denials are overturned by courts "only in the rarest and most

compelling of circumstances."  <u>WHHT, Inc v. FCC</u>, 656 F.2d 807, 818 (D.C. Cir. 1981); <u>see</u> <u>also</u>

<u>Timpinaro v, SEC</u>, 2 F.3d 453, 461 (D.C. Cir. 1993) (same); <u>American Horse Protection Ass'n v.</u>

<u>Lyng</u>, 812 F.2d 1, 4-6 (D.C. Cir. 1987) (denials of rulemaking petitions are entitled to "high end"

of range of deference).  Indeed, the D.C. Circuit has stated that "an agency's refusal to initiate a

rulemaking is evaluated with deference so broad as to make the process akin to non-reviewability."

<u>Cellnet Communications, Inc. v. FCC</u>, 965 F.2d 1106, 1111 (D.C. Cir. 1992).

Federal defendants' implication that their granting of a rulemaking petition was somehow

"ministerial" – and hence could avoid NEPA review on that basis – is particularly far-fetched under

the circumstances here.  Once again, intervenors did not submit their petition because Congress had

directed USDA to promulgate new inspection regulations for horse slaughter operations, but USDA

had neglected to do so.  To the contrary, intervenors submitted their petition because Congress had

deliberatively cut off federal funding for the horse slaughter operations in the reasonable belief that

this would terminate the operations, based on the FMIA's requirements that such inspections be done

pursuant to that statute and paid for with federal funds.  <u>See</u> 21 U.S.C. §§ 603, 695.  While

defendants continue to insist that the Court should disregard all of the statements of the legislation's

authors, sponsors, and supporters in ascertaining Congress's purpose in enacting the FY 2006

Amendment, <u>see</u> Fed. Def. Opp. at 8, defendants have, yet again, failed to advise the Court <u>why</u>, in

their view, Congress took the extraordinary step of completely defunding federal inspections of the

horse slaughter facilities – a step that Congress did <u>not</u> take with regard to any <u>other</u> slaughter

operations.  As plaintiffs have argued in support of their claim that USDA's decision to grant the petition was arbitrary and capricious, the only purpose reflected in the legislative history of the FY2006 Amendment is the one to which plaintiffs have pointed, i.e., that Congress desired to halt, at least for this fiscal year, the slaughtering of horses for human consumption -- including because of the impacts of the slaughter plants on local communities.  See Plaintiffs' February 22, 2006 Memorandum in Support of their Motion for a Preliminary Injunction ("Pfs. Prel. Inj. Mem."), at 9-13; see also Public Citizen v. U.S. Dep't of Health and Human Servs., 332 F.3d 654, 671 (D.C. Cir. 2003) (finding "wholly unpersuasive" interpretation of statute that would render it "little more than an empty gesture").[2]

In any event, at least for the purposes of plaintiffs' NEPA claim, the Court need not make a definitive determination of Congress's intent in enacting the FY 2006 Amendment.  Rather, for the claim presently before the Court, it is enough that USDA was surely not compelled to respond to Congress's action by granting intervenors' rulemaking petition for an entirely new funding mechanism for the horse slaughter plants.  Congress never directed USDA to engage in any such rulemaking, nor did it ever instruct federal defendants to adopt a fee-for-inspection program

---

[2] Especially under these circumstances, the government's contention that the uniform explanation of the legislation's authors and sponsors "lacks legal significance," Fed. Def. Opp. at 8, is groundless.  As plaintiffs have previously explained, courts rely heavily on such statements when they are the only available indicia of Congressional purpose, and especially where, as here, that purpose is uncontested, even by the bill's opponents.  See, e.g., North Haven Board of Ed. v. Bell, 456 U.S. 512, 527 (1982) (statements of a bill's sponsor "are an authoritative guide to the statute's construction," especially where it is the "only authoritative indication[] of congressional intent"); FEA v. Algonquin SNG, Inc., 426 U.S. 548, 564 (1976) (statement of sponsor "deserves to be accorded substantial weight").   Such statements are certainly entitled to far more weight than the fact that Congress did not adopt different legislation regarding the horse slaughter operations, see Fed. Def. Opp. at 8, since courts attach no meaning whatsoever to Congress's non-adoption of legislation.  See, e.g., Atkinson v. Inter-American Dev. Bank, 156 F.3d 1335, 1342 (D.C. Cir. 1998) ("Congress does not express its intent by a failure to legislate.").

concerning the slaughter of horses for human consumption.

If anything, as plaintiffs have stressed, Congress did precisely the opposite – it provided, in the FMIA, that the costs of both ante- and post-mortem horse inspections "shall be borne by the United States," 21 U.S.C. § 695, and Congress did so precisely because it was concerned about the conflict of interest inherent in allowing the industry to pay for its own inspections. See Pfs. Summ. Judg. Opp. at 21. Therefore, regardless of how the Court might resolve the issue of whether USDA could lawfully grant a rulemaking petition that appeared to fly in the face of Congress's clear intent in several statutes, defendants have no serious argument that USDA was required to do so.[3]

---

[3] Federal defendants' implication that they had such a duty despite Congress's funding ban is an exemplar of circuitous reasoning. The government asserts that "[t]he Interim Final Rule is simply an administrative means of fulfilling FSIS's duty under the FMIA with respect to horses while complying with the current prohibition on the use of appropriated funds for that purpose." Fed. Def. Opp. at 9 (emphasis added). Plainly, however, since Congress "prohibit[ed]" FSIS from using any appropriated funds, and also, in the FMIA itself, foreclosed industry-funded inspections, any "duty" FSIS may have arguably had under the FMIA was purposefully suspended by Congressional action, at least during this fiscal year. See, e.g., Environmental Defense Center v. Babbitt, 73 F.3d 867, 871 (9th Cir. 1995) (holding that Congress's prohibition on the use of appropriated funds to list endangered species resulted in a suspension of the Interior Department's duties under the Endangered Species Act); see also Fed. Def. March 7, 2006 Sur-reply in Support of Opp. to Prel. Inj. Mot. (Doc. 18), at 1 n.1 ("Environmental Defense Center[] does suggest that a Congressionally-mandated de-funding provision can act as a suspension of a federal program").

Indeed, this is why, when the final rule was adopted, FSIS did not cite the FMIA as the source of legal authority for the rule but, instead, relied on the Agricultural Marketing Act, 7 U.S.C. §§ 1622, 1624 ("AMA"), a general statute that allows (but does not require) USDA to adopt rules for the slaughter of species other than those covered by the FMIA. See 71 Fed. Reg. 6,337 ("FSIS is establishing this fee-for-service [inspection] program under the Agricultural Marketing Act") (emphasis added). Even assuming that FSIS could lawfully rely on the AMA to do an end run around the funding limitations embodied in both the FY 2006 Amendment and the FMIA – and plaintiffs have vigorously argued that it could not, see, e.g., Pfs. March 1, 2006 Reply Mem. in Supp. of their Mot. for Prel. Inj., at 28-29 – FSIS surely cannot, with any pretense of consistency, insist that it remains bound by very same statute that it is intentionally circumventing. Simply put, in adopting the rule, either FSIS was constrained by the provisions of the FMIA or it was not; if it was, then the agency was obligated to comply with the funding

Since USDA's decision to <u>grant</u> intervenors' rulemaking petition was unquestionably a discretionary agency action, it necessarily follows that the decision should have been informed by NEPA review concerning the environmental implications of the decision. <u>See</u> <u>Sierra Club v. Hodel</u>, 848 F.2d 1068, 1089 (10th Cir. 1988) ("[c]ases finding 'federal' action emphasize authority to exercise discretion over the outcome"); <u>overruled on other grounds by</u> <u>Village of Los Ranchos De Albuquerque v. Marsh</u>, 956 F.2d 970, 971 (10th Cir. 1992). Once again, agencies may avoid NEPA review only when they have "no discretion to prevent" the environmental harms associated with their decisions. <u>Department of Transportation v. Public Citizen</u>, 541 U.S. 752, 770 (2004). Here, however, USDA possessed more than "sufficient discretion to affect the outcome," most obviously by <u>denying</u> the rulemaking petition submitted to it, and thereby allowing the Congressional funding cutoff to take effect without interference. <u>Citizens Against Rails-to-Trails v. Surface Trans. Bd.</u>, 267 F.3d 1144, 1151 (D.C. Cir. 2001). Before granting the petition, therefore, USDA/FSIS could not refuse to take the "hard look" at environmental effects that NEPA demands.[4]

> **B.**    **Even If The Rulemaking Had Been Initiated By FSIS Itself, Rather Than In Response To A Petition, Adoption Of The Rule Would Still Constitute A <u>Federal Action Requiring NEPA Review.</u>**

Even aside from USDA's inherently discretionary act of granting a rulemaking petition – <u>i.e.</u>, even if USDA had not been responding to a third party request for issuance of a regulation – the

---

restriction in 21 U.S.C. § 695; if it was not, then USDA cannot now invoke the FMIA as the source of any statutory "duty" that compelled it to grant the rulemaking petition without complying with NEPA.

[4] As discussed further below, <u>see</u> <u>infra</u> at 17-18, in addition to simply denying the petition, USDA is also authorized by its own regulations to impose conditions on the granting of the petition that would ameliorate or mitigate some of the environmental impacts of the slaughter operations.

promulgation of a new rule under the circumstances here would still be a classic agency action for which NEPA review is mandated. As plaintiffs have previously explained, see Pfs. Opp. at 16 n.6, for NEPA purposes it makes no difference that the slaughter plants themselves are not federal entities. Rather, it is well established that "there is 'Federal action' within the meaning of the statute . . . whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment." Scientists' Institute for Public Information v. Atomic Energy Comm'n, 481 F.2d 1079, 1088-89 (D.C. Cir. 1973) (emphasis added); see also Atlanta Coalition on the Transp. Crisis, Inc. v. Atlanta Regional Comm'n, 599 F.2d 1333, 1347 (5th Cir. 1979) (federal action inquiry looks to agency's "involvement with" underlying activity having environmental impacts).[5]

Hence, the CEQ regulations define "major federal action" to include all "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a) (emphasis added); id. at § 1508.18(b)(4) (defining "projects" to include all actions "approved by permit or other regulatory decison"); see also Mineral Policy Center v. Norton, 292 F. Supp. 2d 30, 54 (D.D.C. 2003) ("[i]n determining what constitutes a 'major Federal action,'" the court should "first look to the regulations implementing NEPA").

These definitions apply squarely to the final rule, which was adopted precisely because federal approval of the horse slaughter operations is "necessary to . . . operations at official establishments that slaughter horses" for human consumption. 71 Fed. Reg. 6,340 (emphasis added). Indeed, both intervenors' petition for the rule, and USDA's decision to grant it, stressed that the rule

---

[5] As discussed further below, see infra at n. 12, although plaintiffs could, under the circumstances here, seek injunctive relief directly against intervenors, see, e.g., Biderman v. Morton, 497 F.2d 1141, 1147 (2d Cir. 1974), plaintiffs are only seeking the standard APA relief against federal defendants, i.e., to have the rule itself remanded and set aside.

was being adopted because, in the absence of federal inspections and approvals of the slaughter operations, the slaughter operations could not lawfully exist. Id. ("if FSIS does not establish a means for official establishments that slaughter horses to obtain ante-mortem inspection these establishments will not be able to operate") (emphasis added); Exh. 10 to Prel. Inj. Mot. at 1 (rulemaking petition stating that "[i]f USDA should fail to provide ante-mortem inspections . . . affected establishments would likely be forced out of operations"). Thus, based on defendants' own description of the rule as legally and factually "necessary" to the horse slaughter operations, FSIS's adoption of the rule is, once again, precisely the kind of federal action for which NEPA review is required.[6]

---

[6] Remarkably, although the specific rationale for the rule was that federal inspection and approval of the slaughter operations is in fact needed for them to operate, and despite the fact that defendants strenuously argued that same position at the preliminary injunction stage, defendants now imply that the opposite is true. Compare, e.g., Fed. Def. Opp. to Prel. Inj. Mot., at 33 ("[b]ecause all livestock, including horses, intended for human consumption, must be inspected by the FSIS prior to slaughter, withholding such services will force the companies to cease their operations unless the fee-for-service inspection program is implemented as intended by the USDA and provided for in the Interim Final Rule") (emphasis added) with Fed. Def. Opp., at 12 (asserting that the rule "does not . . . in any way authorize the continuing operations of those plants"); see also Interv. Opp. at 7 (asserting that it is "plainly not the case" that the "Interim Final Rule 'authorizes' or 'allows' the slaughter operations to continue").

Defendants make no effort to reconcile, or even acknowledge, these facially contradictory positions. In any case, having sought and adopted the rule on the express rationale that it was essential to the horse slaughter operations, and having advanced that same position at the preliminary injunction stage, defendants should not be permitted to now adopt an inconsistent, post hoc position in response to plaintiffs' NEPA claim. See, e.g., New Hampshire v. Maine, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position."); Helfand v. Gerson, 105 F.3d 530, 534 (9th Cir. 1997) (a party may not "play[] fast and loose with the courts" by "gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position").

Consistent with the CEQ regulations, where, as here, a federal agency's action is necessary – in both a practical and legal sense – for third party conduct that affects the environment, the courts, unsurprisingly, have consistently found that the action must be preceded by NEPA review. For instance, in <u>Progressive Animal Welfare Soc'y v. Dep't of Navy</u>, 725 F. Supp. 475, 479 (W.D. Wash. 1989), the court rejected an agency's argument that its "letter of concurrence," which was both the practical and legal prerequisite to the capture of dolphins to be used for military purposes, was not a "federal action" simply because it was only a "letter" and not an official "permit." <u>Id.</u> Specifically, the court held that "the absence of a permit requirement does not imply that NEPA need not be followed . . . . the letter of concurrence is an affirmative act that triggers NEPA," without which the underlying action "cannot go forward." <u>Id.</u> (citing <u>Sierra Club v. Morton</u>, 514 F.2d 856, 875 (D.C. Cir. 1975); <u>Defenders of Wildlife v. Andrus</u>, 627 F.2d 1238, 1244 (D.C. Cir. 1980)); <u>see also</u> <u>Macht v. Skinner</u>, 916 F.2d 13, 20 (D.C. Cir. 1990) (federal action includes situation where a non-federal entity "<u>contract[s] with a federal agency to obtain</u> goods, <u>services</u>, or financing") (emphasis added).

Moreover, the authorities cited by defendants simply reinforce that the final rule is a "federal action" within the meaning of NEPA. <u>See</u> Interv. Opp. at 6-7; Fed. Def. Opp. at 9-10. For example, in <u>Ringsred v. City of Duluth</u>, 828 F.2d 1305, 1308 (8th Cir. 1987), the Eighth Circuit rejected a NEPA challenge to the Interior Department's decision not to conduct an environmental assessment on its review of a contract between a city and a Native American tribe to build a parking ramp, on the basis that "[n]o federal action is a <u>legal condition precedent</u> to the construction of the parking ramp." <u>Id.</u> (emphasis added). Specifically, the court found that "[t]he city itself could exercise its . . . powers" and decide whether or not to construct the parking ramp "without federal approval or

11

assistance." Id.

Here, in sharp contrast, the slaughter facilities could not lawfully engage in the horse slaughter operations "without [the] federal approval" – the "legal condition precedent" – that now exists because of the Final Rule. See 21 U.S.C. § 603(a) (prohibiting facilities from slaughtering animals for human consumption without the inspection and approval described in "this subchapter"). Indeed, the rule actually entails two levels of federal "approval" of the slaughter operations. First, in view of the FY 2006 Amendment, the rule itself constitutes approval of a new funding scheme sought by intervenors, without which the slaughter plants could not operate. Second, the rule expressly provides that "official establishments that slaughter horses will be required to submit an application for ante-mortem inspection" under the new rule. 71 Fed. Reg. 6,340 (emphasis added). By its plain terms, therefore, the rule makes clear that the federal government must approve each establishment's "application" before horses may be slaughtered under the new inspection scheme. Consequently, this case involves the very features of federal involvement that Ringsred suggested would necessitate NEPA review.

Likewise, in Citizens Alert Regarding the Environment v. U.S. EPA, 259 F. Supp. 2d. 9, 17 (D.D.C. 2003), another case cited by defendants, the court found that the agency's decision whether to make a grant for initial feasibility studies of a sewage pipeline was not a "major federal action" for NEPA purposes because the "undisputed evidence" demonstrated that "the project will go ahead as planned" regardless of the agency's decision. In so holding, the court made clear that an agency's action is "federal action" where "the cessation of federal involvement would control the destiny of some aspect of the project." Id. at 20 (emphasis added) (quoting Envtl. Rights Coalition v. Austin, 780 F. Supp. 584, 594-95 (S.D. Ind. 1991)); see also Mineral Policy Center, 292 F. Supp. 2d at 55

12

("federal action" standard examines "whether the federal agency must undertake 'affirmative conduct' before the non-federal actor may act") (internal citations omitted).[7]

In this case, once again, the rulemaking petition is expressly predicated on the proposition that the "cessation of federal involvement" would "control the outcome" of the horse slaughter operations, because horses cannot be slaughtered for human consumption without federal oversight and approval. Hence, as the government has previously advised the Court, "unless the fee-for-service inspection program is implemented as intended by the USDA and provided for in the Interim Final Rule," the Amendment passed by Congress "will force the companies to cease their operations." Fed. Def. Opp. to Prel. Inj. at 33. Accordingly, Citizens Alert also clearly supports the conclusion that the Final Rule is a "major federal action" requiring at least some NEPA review. In sum, even aside from the fact that it was adopted in response to a rulemaking petition, the regulation at issue is plainly a "major federal action," as it is both the factual "but for" cause, and also the legal condition precedent, without which the horse slaughter would have halted on March 10, 2006 by operation of the Amendment passed by Congress.[8]

_____

[7] See also National Ass'n for the Advancement of Colored People v. Medical Center, Inc., 584 F.2d 619, 634 (3d Cir. 1978) (citing 40 C.F.R. § 1500.5(a)(2) for the proposition that "[w]hen the agency 'enables' another to impact on the environment, the court must ascertain whether the agency action is a legal requirement for the other party to affect the environment and whether the agency has any discretion to take environmental considerations into account before acting").

[8] The other cases cited by defendants are equally unhelpful to them. See Interv. Opp. at 6-7; Fed. Def. Opp. at 9-10. For instance, intervenors rely on Born Free USA v. Norton, 278 F. Supp. 2d 5, 19 (D.D.C. 2003), but that ruling was vacated by the D.C. Circuit, see No. 03-5216, 2004 WL 180263 (D.C. Cir. Jan. 21, 2004) (per curiam), and, in any event, the court there "look[ed] to whether federal approval [was] the prerequisite to the action taken by the private actors and whether the federal agency possesses some form of authority over the outcome." Id. at 18 (internal citation omitted); id. ("[a] non-federal project is considered a federal action if it cannot begin or continue without prior approval by a federal agency") (emphasis added). These

## II.    THERE IS NO "STATUTORY CONFLICT" BETWEEN NEPA AND THE FMIA THAT RENDERS NEPA COMPLIANCE IMPOSSIBLE.

Federal defendants also make the completely groundless assertion that FSIS is excused from NEPA compliance because "there is a statutory conflict" between NEPA and "the FMIA, the FSIS's authorizing statute." Fed. Def. Opp. at 15. As a threshold matter, defendants have invoked the wrong statute against which to measure any purported "conflict." As previously noted, see supra at n. 3, because the Final Rule could not be adopted pursuant to the FMIA – since that statute flatly prohibits the kind of private funding scheme that is embodied in the rule – FSIS stated that it was "establish[ing] this fee-for-service [inspection] program under the Agricultural Marketing Act (AMA)." 71 Fed. Reg. 6,337 (emphasis added). Once again, therefore, having opted to sidestep the FMIA in an effort to bypass the funding restriction in 21 U.S.C. § 695, federal defendants cannot turn around and invoke that same statute as the source of some "conflict" with NEPA. And defendants do not even attempt to argue that the AMA, the statute under which FSIS did act, poses the kind of "clear conflict of statutory authority" that could excuse NEPA compliance. Flint Ridge Development Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 791 (1976).[9]

---

factors support application of NEPA here. See also Landmark West! v. United States Postal Service, 840 F. Supp. 994, 1005-06 (S.D.N.Y. 1993) (no federal action where agency had no "ability to influence or control the outcome" of the particular development plans of subsequent tenants); Save the Bay, Inc. v. United States Army Corps of Engineers, 610 F.2d 322, 327 (5th Cir. 1980) (agency action was neither legal prerequisite nor factual prerequisite to project with environmental impacts); Winnebago Tribe of Nebraska v. Ray, 621 F.2d 269, 272 (8th Cir. 1980) (agency action was not "legal condition precedent"); Fund For Animals v. Babbitt 2 F. Supp. 2d 562, 568 (D. Vt. 1996) (underlying action would "never be subject to review or approval by a federal agency"); Atlanta Coalition on the Transp. Crisis, Inc. v. Atlanta Regional Comm'n, 599 F.2d 1333, 1347 (5th Cir. 1979) (no federal action where the activity causing environmental impacts "will never be submitted to a federal agency for review or approval").

[9]    As previously explained, the AMA is a general statute that sets forth the overall aims of USDA with respect to promoting trade in agricultural commodities. See Pfs. Prel. Inj. Mem. at

Even putting this statutory sleight of hand aside, defendants' "conflict" argument is devoid of merit. The courts have made clear that genuine "conflict[s] of statutory authority" with NEPA are extremely rare, because "Congress intended NEPA to be a supplemental, and not a superseding, statute." Young v. General Servs. Admin., 99 F. Supp. 2d 59, 71 (D.D.C. 2000) (quoting Environmental Defense Fund, Inc. v. Mathews, 410 F. Supp. 336, 337 (D.D.C.1976)) ("NEPA does not supersede other statutory duties, but, to the extent that it is reconcilable with those duties, it supplements them"). In other words, since NEPA is simply designed to prevent "uninformed – rather than unwise – decisions," Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989), an agency must shoulder a heavy burden indeed to demonstrate that simply informing itself about the environmental consequences of its actions somehow "conflicts" with Congress's intent in enacting a different statute.

Defendants have surely not met that burden here. Indeed, even if the FMIA were the correct statute for the purposes of this inquiry, defendants make no serious effort to explain why they cannot comply with NEPA and that statute at the same time. Rather, defendants' argument on this point suggests that a conflict arises because FSIS compliance with NEPA might lead to a decision by FSIS to "withhold inspection services," and "[t]he FSIS can withhold inspection services only where the applicant for or recipient of such services has been convicted of a felony, or [various other crimes]." Fed. Def. Opp. at 15-16 (citing 21 U.S.C. § 671) (emphasis added); id. at 16 ("FSIS has . . . no authority to compel these private parties to operate in a manner to minimize the facilites' environmental impacts"). This argument must fail for several reasons.

---

5-6 (describing and setting forth text of statute). There is nothing in that statute that even remotely conflicts with USDA's duty to comply with NEPA when it adopts regulations or takes any other action.

First, since, as defendants themselves have acknowledged, "NEPA is a procedural statute, the purpose of which is to ensure informed agency decision making, and not a particular substantive decision," Fed. Def. Mem. at 4-5 (citing <u>Robertson</u>, 490 U.S. at 350), it could not conceivably "conflict" with the FMIA for FSIS simply to <u>inform</u> its own decision on the petition by comparing, <u>e.g.</u>, the environmental consequences associated with granting intervenors' petition with the environmental consequences flowing from the alternative of denying it and letting the FY 2005 Amendment take effect. <u>See</u> Pfs. Mem. at 22 (explaining agencies' obligation to consider the "no action" alternative).[10]

Second, in addition to seriously scrutinizing the "no action" alternative, it is also clear that, contrary to defendants' implication, nothing in the FMIA would preclude the FSIS from considering alternatives that would ameliorate or mitigate environmental harms associated with the horse slaughter operations, including, <u>e.g.</u>, by requiring intervenors to take steps to ensure that wild horses

---

[10]  While the Court certainly need not venture this far simply to find that there is no "conflict" that forecloses NEPA compliance here, even if FSIS were to ultimately determine that the relative environmental impacts counseled <u>against</u> granting the petition, nothing in 21 U.S.C. § 671, or any other provision in the FMIA, would conflict with that determination (assuming, once again, that FSIS had even acted pursuant to the FMIA). 21 U.S.C. § 671 simply establishes the process for an FSIS decision to "refuse to provide, or withdraw" generally available inspection services from a <u>particular</u> establishment because the "applicant or recipient . . . has been convicted" of a crime. <u>Id</u>. (emphasis added). A decision by FSIS <u>not</u> to create a new fee-for-inspection system for the entire class of horse slaughter facilities because of environmental concerns – or, <u>e.g.</u>, because of the purpose of the FY 2006 Amendment, the funding restriction in 21 U.S.C. § 695, or any other policy rationale – would obviously not implicate 21 U.S.C. § 671. Indeed, that provision itself makes clear that, even if the FY 2006 Amendment had never been passed and FSIS had simply decided to "withdraw" inspection services from all of the horse slaughter facilities because they are contaminating the surrounding communities with horse blood and other unsanitary waste materials, nothing in 21 U.S.C. § 671 would have precluded such a step. <u>See id</u>. ("This section shall not affect in any way other provisions of this chapter for <u>withdrawal of inspection services . . . from establishments failing to maintain sanitary conditions</u> . . . .") (emphasis added).

do not continue to be destroyed, or that local residents will not suffer degradation of their air and water resources.  As a general legal matter, unless expressly precluded by law from doing so, agencies may condition approvals for requested federal actions or services on the regulated entities' compliance with federal, state, and local environmental standards.  See, e.g., Western Land Exchange Project v. U.S. Bureau of Land Mgmt., 315 F. Supp. 2d 1068, 1089 (D. Nev. 2004) (noting that BLM contemplated expressly conditioning its approval of land transfer on the bidders' compliance with local land use laws); Restore: The North Woods v. United States Dep't of Agriculture, 968 F. Supp. 168, 175 (D. Vt. 1997) (nothing in authorizing statute prohibited USDA from "impos[ing]" "terms and conditions" regarding environmental compliance as part of agency action); Save the Bay, Inc. v. United States Corps of Engineers, 610 F.2d 322, 324 (5th Cir. 1980) (conditioning building permit on compliance with water pollution laws).

Nothing prevents USDA from doing so here.  Indeed, contrary to federal defendants' unsupported implication that they are powerless to impose any restrictions that could "minimize the [horse slaughter] facilities' environmental impacts," Fed. Def. Opp. at 16, FSIS's own regulations make clear that FSIS in fact has already asserted direct regulatory authority over multiple aspects of "the operation of meat processing facilities" that are contributing to the environmental and public health impacts attested to by the individual plaintiffs here.  See, e.g., 9 C.F.R. § 416.2(a) (setting forth requirements for "a pest management program to prevent the harborage and breeding of pests on the grounds and within establishment facilities"); id. § 416.2(d) (requiring "control [of] odors [and] vapors"); id. § 416.2(e) (setting forth requirements to "[p]roperly convey sewage and liquid disposable waste from the establishment," and "prevent back-flow conditions"); id. § 307.2 (requiring facilities to provide for "proper drainage," and "sanitary disposal of floor liquids"); id. §

17

311.1 (regulating the disposal of carcasses); id. § 314.4 (requiring disposal equipment to be "operated in a manner that will suppress odors").[11]

At bottom, therefore, not only would NEPA analysis of the pollution and other impacts associated with the plants in no way "conflict" with USDA's ability to carry out its statutory and regulatory responsibilities, it would actually enhance the agency's capacity to evaluate whether its own regulations are being violated. In any case, since defendants have certainly not demonstrated that NEPA compliance was foreclosed by some other statute, this additional rationalization for non-compliance must also be rejected.

## III.    USDA'S POST HOC INVOCATION OF THE CATEGORICAL EXCLUSION IS DUE NO DEFERENCE.

Defendants urge that USDA's "interpretation of the agency-wide exclusion set forth in 7 C.F.R. § 1b.4" – i.e., that the agency's NEPA regulations do in fact exempt everything that FSIS has ever done, or ever will do, from NEPA review, Fed. Def. Mem. at 11 ("the Agency met its obligation under the NEPA by issuing a proposed and final rule categorically excluding FSIS activities and programs from NEPA requirements") (emphasis added), and yet impose no obligation on the agency ever to explain why, or even consider whether, an "extraordinary circumstance" exception applies in a particular situation – be accorded "'controlling weight.'" Fed. Def. Opp. at 13-14 (quoting, e.g.,

---

[11] Compare, e.g., Decl. of Robert Eldridge (Exh. 6 to Prel. Inj. Mot. ), at ¶ 5 ("animal parts left outside to rot on Dallas Crown's property . . . . attract[ ] many vermin and insects to the neighborhood and to my properties"); Decl. of Juanita Smith (Exh. 18 to Prel. Inj. Mot.), at ¶ 6 (attesting to exposure to horse "blood in my bathtubs, sinks, and toilets" because the "plant's blood spills clog up the local wastewater treatment plant"); Decl. of Margarita Garcia (Exh. 20 to Prel. Inj. Mot.), at ¶ 4 (stating that her "kids are unable to play outside" because of the "noxious odor[s]"); Decl. of Paula Bacon (Exh. 9 to Prel. Inj. Mot., at ¶ 8 (citing id., Attachment 1)) (describing "odor problems resulting from the outside storage of offal and hides"); id. at ¶ 6 (explaining how city had to pay for the containment and disposal of "600-800 gallons of blood spilled on the service road and into the ditches fronting the plant").

United States v. Mead, 533 U.S. 218, 227-28 (2001)); see also Interv. Opp. at 11.  While plaintiffs have previously explained that this position, if sustained, would simply take defendants out of the legal frying pan and into the fire – because such an interpretation would, as applied here, render the regulation in irreconcilable conflict with NEPA itself – USDA's plea for "deference" should nonetheless be rejected.

First, this post hoc interpretation of the regulation as imposing no duty on the FSIS even to affirmatively address the propriety of NEPA review in a particular situation appears for the first time in the agency's briefs in this case.  As the Supreme Court has made clear, no deference is due to government counsel's interpretation where, as here, the "agency itself has articulated no position on the question," since "'Congress has delegated to the administrative official and not to [agency] counsel the responsibility for elaborating and enforcing statutory commands.'" Bowen v. Georgetown University Hosp., 488 U.S. 204, 212 (1988) (internal citations omitted); id. at 213 ("[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate"); see also Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962) (admonishing that "courts may not accept [agency] counsel's post hoc rationalizations for agency [actions]").

As plaintiffs have stressed, not only did USDA fail to "ma[k]e any contemporaneous determination as to whether the [action] falls within or without a categorical exclusion," Pfs. Mem. at 34 (quoting Fund for Animals v. Espy, 814 F. Supp. 142, 151 (D.D.C. 1993)) – a failure which is in and of itself "dispositive" of plaintiffs' NEPA claim, id. – but USDA did not even mention NEPA in the Final Rule, nor did it explain there or anywhere else in the Administrative Record that it was declining to consider NEPA review for the reasons set forth for the first time in the briefs filed

19

in this litigation. Accordingly, for that reason alone, defendants' interpretation is due no deference.

Second, as the Court of Appeals has made clear, "[t]he court owes no deference to the [agency's] interpretation of NEPA or the CEQ regulations because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to the [USDA] alone." Grand Canyon Trust v. F.A.A., 290 F.3d 339, 342 (D.C. Cir. 2002) (citing Citizens Against Rails-to-Trails, 267 F.3d at 1150); see also Mineral Policy Center, 292 F. Supp. 2d at 54 (holding that "Interior's NEPA determination 'is not entitled to the deference that courts must accord to an agency's interpretation of its governing statute' and is instead 'a question of law, subject to de novo review'") (internal citations omitted)). Federal defendants' contention that they may take "no action whatsoever unless and until the agency head makes an affirmative determination that an action may have a significant impact," Fed. Def. Mem. at 10, is, necessarily, an interpretation not only of USDA's own regulations, but also the CEQ regulations governing agencies' use of categorical exclusions, since, once again, USDA concedes that it is bound by those regulations as well. Defendants have yet to explain how their passive approach to NEPA compliance for everything that FSIS does, or ever will do, is compatible with 40 C.F.R. § 1508.4 (mandating that agencies "shall provide for extraordinary circumstances in which a normally excluded action may have a significant effect") (emphasis added), or even with the plain terms of USDA's own NEPA regulations, which mandate that all USDA agencies "shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion." 7 C.F.R. § 1b.3(c) emphasis added). In any event, defendants' interpretation of the CEQ regulations or, for that matter, NEPA itself is entitled to no "deference"

20

whatsoever.[12]

Finally, and most important, nothing in defendants' opposing memoranda reconciles FSIS's novel approach to NEPA with either the extensive contrary precedent cited by plaintiffs, NEPA's judicial review requirements, or the statute's central purposes. As plaintiffs have explained in detail in prior briefs, defendants' approach is patently unlawful because it unilaterally relieves FSIS of its burden to "explain why [the action] does not fall within an exception to the categorical exclusions," Jones, 792 F.2d at 828, even where, as here, defendants had been advised that there are "extraordinary circumstances" counseling in favor of NEPA review. See Pfs. Mem. at 8. Defendants' latest round of briefing again fails to explain how defendants' approach to the CEQ regulations will ensure that NEPA review will be conducted so as to ensure that a "normally excluded action" with potentially significant effects will not bypass NEPA review. See Pfs. Opp at 13; Utah Envtl. Congress v. Bosworth 443 F.3d 732, 741 (10th Cir. 2006).

## IV.    REMAND AND VACATUR IS THE APPROPRIATE REMEDY.

Once again, by failing to comply with NEPA, defendants have violated the APA, which provides that reviewing courts "shall" set aside agency action adopted "without observance of

---

[12] Intervenors continue to insist that the Administrative Record here somehow reflects that FSIS did consider whether to prepare an EIS or EA here – and, indeed, "considers the potential applicability of NEPA in every rulemaking action," Interv. Opp. at 10. Once again, however, intervenors' sole support for that proposition is that there is a "box" pertaining to "Environmental Impact Assessment" on USDA's "Regulatory Review Workplan" and, here, the "box is notably unchecked." Id. at 12. As plaintiffs have previously explained, however, this "dog that did not bark" argument merely underscores the absence of any real evidence in the record that any official from FSIS ever actually considered whether NEPA compliance was appropriate under the unusual circumstances of this case. Rather, in light of the government's legal position, the apparent reason why the box is not "checked" is simply that FSIS never checks or even considers whether to check the box because its officials automatically assume that everything the agency does is immune from NEPA review.

procedure required by law." Id. § 706(2)(D); see also Lathan v. Brinegar, 506 F.2d 677, 693 (9th Cir. 1974) (assessing NEPA compliance as "a procedural question, governed by § 706(2)(D)"); Port of Astoria v. Hodel, 595 F.2d 467, 479 (9th Cir. 1979) (setting aside contract that agency entered into with private entity in violation of NEPA because "it was the act of entering into the contract that was 'without observance of procedure required by law'") (quoting 5 U.S.C. § 706(2)(D)). As plaintiffs have also previously stressed – with no rebuttal from defendants – the law of this Circuit is that "[i]f a[] [party] has standing" and "prevails on its APA claim, it is entitled to relief under that statute, which normally will be [ ] vacatur." American Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001); Nat'l Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (the "ordinary result" is that regulations adopted in violation of the APA are "vacated").

Rather than address American Bioscience or explain why it does not dictate the result here, federal defendants erroneously intimate that some sort of equitable balancing is necessary before a court may simply vacate an unlawfully promulgated rule. See Fed. Def. Opp. at 17 n.3 (asking the Court to adopt defendants' views of what comprises "the public interest" in crafting a remedy). The Court of Appeals, however, has specifically held that the presumptive remedy of vacatur does not require a balancing of equitable considerations in the same manner that a separate injunction would entail. See American Bioscience, 269 F.3d at 1086 ("we are convinced that the FDA's order, in this case, was arbitrary and capricious and must be vacated"). Accordingly, courts applying American Bioscience in NEPA cases have reached the same result urged by plaintiffs here. The Court, in Greater Yellowstone Coalition v. Bosworth, 209 F. Supp. 2d 156, 163 (D.D.C. 2002), after finding that the defendant agency "violated NEPA by failing to conduct a timely NEPA analysis" on cattle permits it issued, stated:

> [a]s a general matter, an agency action that violates the APA must be set aside.  As
> this Circuit explained in <u>American Bioscience, Inc. v. Thompson</u>, 269 F.3d 1077
> (D.C. Cir. 2001), if a plaintiff 'prevails on its APA claim, it is entitled to relief under
> that statute, which normally will be a vacatur of the agency's order.' <u>Id.</u> at 1084.
> <u>Based on this authority, I shall vacate the permit</u>. . . .

<u>Id.</u> (emphasis added); <u>see</u> <u>also</u> <u>Save the Yaak Comm. v. Block</u>, 840 F.2d 714, 717 (9th Cir. 1988)

("agency action taken without observance of the procedure required by [NEPA] will be set aside").

For identical reasons, the final rule should be vacated and set aside pending defendants' compliance

with NEPA.[13]

Finally if, as federal defendants suggest, the Court were to find that FSIS violated NEPA,

but nonetheless allow the rule "to remain in operation while FSIS prepares the EA or EIS," Fed. Def.

---

[13]  If this Court should nonetheless decide that an equitable balancing is necessary in
crafting appropriate relief, plaintiffs note that "[c]ourts have not hesitated to enjoin agency action
that was taken in violation of NEPA."  <u>Greater Yellowstone Coalition</u>, 209 F. Supp. 2d at 163;
<u>see</u> <u>also</u> <u>Fund for Animals v. Espy</u>, 814 F. Supp. 142, 152 (D.D.C. 1993) ("a public interest
expressed by Congress was frustrated by approval of this project with likely environmental
consequences, without NEPA compliance"); <u>Sierra Club v. Marsh</u>, 872 F.2d 497, 504 (1st Cir.
1989) ("the risk implied by a violation of NEPA is that real environmental harm will occur
through inadequate foresight and deliberation"); <u>Amoco Prod. Co. v. Village of Gambell, Alaska</u>,
480 U.S. 531, 545 (1987) ("[e]nvironmental injury, by its nature, can seldom be adequately
remedied by money damages and is often permanent or at least of long duration").

Indeed, although plaintiffs seek a remedy targeted at the defendant agency's unlawful
action, rather than the activities of defendant-intervenors, plaintiffs would be well within their
rights to seek an injunction directly against the defendant-intervenors, because "judicial power to
enforce NEPA extends to private parties where 'non-federal action cannot lawfully begin or
continue without the prior approval of a federal agency.'"  <u>Found. on Econ. Trends v. Heckler</u>,
756 F.2d 143, 155 (D.C. Cir. 1985) (quoting <u>Biderman v. Morton</u>, 497 F.2d 1141, 1147 (2d Cir.
1974)).  More specifically, "'non-federal parties may be enjoined, pending completion of an EIS,
where those non-federal entities have entered into a partnership or joint venture with the Federal
Government,' . . . . <u>by contracting with a federal agency to obtain</u> goods, <u>services</u>, or financing."
<u>Macht</u>, 916 F.2d at 20 (emphasis added) (quoting <u>Biderman</u>, 497 F.2d at 1141).  In legal and
practical effect, that is precisely what has occurred here.  Nonetheless, plaintiffs are merely
seeking to have the unlawfully promulgated rule set aside pending compliance with NEPA.

Opp. at 17 n.3, this would not only contravene Circuit precedent on the ordinary relief in an APA case, but would obviously render NEPA compliance here a totally make-work exercise, rather than the genuine "hard look" that NEPA contemplates. This is precisely why courts routinely prevent the action under scrutiny from proceeding while NEPA review is occurring. See, e.g., Fund for Animals v. Norton, 281 F. Supp. 2d 209, 229 (D.D.C. 2003) (enjoining mute swan killing program pending NEPA compliance because allowing the permits to remain in place "during the performance of the EA" would impermissibly "swing[ ] the balance decidedly in favor" of the agency's original decision) (internal citation omitted); Metcalf v. Daley, 214 F.3d 1135, 1146 (9th Cir. 2000) ("suspend[ing] implementation" of the agency's action pending NEPA compliance in order to ensure that the agency's "planning and decisions reflect environmental values").[14] There is no compelling justification for taking a different approach in this case.[15]

---

[14] See also Nat'l Org. for the Reform of Marijuana Laws v. U.S. Dep't of State, 452 F. Supp. 1226, 1233-34 (D.D.C. 1978) (court must act to "preserve . . . at least [the] 'possibility' that the agency will 'change its plans in ways of benefit to the environment'") (quoting Jones v. District of Columbia Redevelopment Land Agency, 499 F.2d 502, 513 (D.C. Cir. 1974)); Sierra Club v. U.S. Forest Service, 843 F.2d 1190, 1196 (9th Cir. 1988) (stopping agency action that had already commenced in order "to prevent further irreparable harm to the environment") (emphasis added); Environmental Defense Fund v. Andrus, 596 F.2d 848, 853 (9th Cir. 1979) (observing that the longer the agency's program is allowed to go forward without a proper environmental analysis, "it is likely that more environmental harm will be tolerated" in the ultimate NEPA document than would be otherwise) (emphasis added); Thomas v. Peterson, 753 F.2d 754, 760 (9th Cir. 2000) (allowing agency action to continue pending NEPA compliance "swings the balance decidedly in favor of [the agency action]," thereby impairing the objectivity of the ultimate environmental analysis); Metcalf, 214 F.3d at 1142 ("the comprehensive 'hard look' mandated by Congress . . . must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made"); Sierra Club v. Marsh, 872 F.2d 497, 503 (1st Cir. 1989) ( "as time goes on, it will become ever more difficult to undo an improper decision (a decision that in the presence of adequate environmental information, might have come out differently)").

[15] Only in very unusual circumstances do courts leave an agency action in place despite discerning a NEPA violation, e.g., where halting the action will do more environmental harm

**<u>CONCLUSION</u>**

For the foregoing reasons, as well as those previously set forth, plaintiffs respectfully request that the Court grant their motion for summary judgment and set aside the regulation at issue.

Respectfully submitted,

/s/
Eric R. Glitzenstein
D.C. Bar No. 358287

Ethan Carson Eddy
D.C. Bar No. 496406

Howard M. Crystal
D.C. Bar No. 446189

Meyer Glitzenstein & Crystal
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009

(202) 588-5206


Of Counsel:

Rebecca G. Judd
(Member of Maryland Bar)
Jonathan R. Lovvorn
(D.C. Bar No. 461163)

The Humane Society of the
United States
2100 L St., N.W.
Washington, D.C.  20037
(202) 676-2333

May 26, 2006                                             Counsel for Plaintiffs

_____

than good.  See Alpine Lakes Protection Soc'y v. Schlapfer, 518 F.2d 1089 (9th Cir. 1975) (declining to enjoin logging permit pending NEPA compliance because the trees at issue were infested and there was danger that the disease would spread to adjacent forest areas during NEPA compliance).  Defendants point to no such circumstances here.

25