# Plaintiffs' Attachment 1
# Civ. No. 06-0265 (CKK)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ———————————————— | ) | |
| **THE HUMANE SOCIETY OF THE** | ) | |
| **UNITED STATES,** *et al.*, | ) | |
|  | ) | |
| **Plaintiffs,** | ) | |
|  | ) | |
| **v.** | ) | **Civil Action No. 05-1392 (ESH)** |
|  | ) | |
| **DEPARTMENT OF COMMERCE,** | ) | |
| *et al.*, | ) | |
|  | ) | |
| **Defendants.** | ) | |
| ———————————————— | ) | |

## MEMORANDUM OPINION

Plaintiffs The Humane Society of the United States, Will Anderson and Sharon Young have sued Carlos M. Gutierrez, Secretary of the United States Department of Commerce; Conrad C. Lautenbacher, Administrator of the National Oceanic and Atmospheric Administration; William T. Hogarth, Assistant Administrator of the National Marine Fisheries Service; and the National Marine Fisheries Service, claiming violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*; the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1374 *et seq.*; and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.* They challenge the issuance and amendment of various permits that authorize research on threatened and endangered populations of Steller sea lions. Pending before the Court are plaintiffs' Motion for Summary Judgment and defendants' Cross-Motion for Summary Judgment. For the reasons discussed below, the Court grants plaintiffs' motion with respect to their NEPA claims.

## BACKGROUND

Following a dramatic decline in the Alaskan population of Steller sea lions over thirty years, they were first classified as threatened in 1990. *See* Listing of Steller Sea Lions as Threatened Under the Endangered Species Act, 55 Fed. Reg. 49,204, 49,208 (Nov. 26, 1990) (final rule) (noting that the number of Steller sea lions living from Kenai Peninsula to Kiska Island, Alaska declined by 82 percent between 1960 and 1989). (*See also* AR 259 at 338 ("Th[e] species has experienced a marked decline from an estimated 240,000-300,000 individuals in the 1960s . . . to an estimated 116,000 individuals in 1989. Population numbers in the United States have declined by about 75% over the past 20 years . . . with most of the decline occurring in the western stock.").) In the wake of this classification, two distinct populations of Steller sea lions were identified in their range along the North Pacific Rim: an eastern stock, including all animals distributed from central California northward to Cape Suckling, Alaska, and a western stock, including all animals distributed from Cape Suckling to Hokkaido, Japan. *See* Change in Listing Status of Steller Sea Lions Under the Endangered Species Act, 62 Fed. Reg. 24,345, 24,346 (May 5, 1997); Listing of Steller Sea Lions as Threatened Under the Endangered Species Act, 55 Fed. Reg. 29,793, 29,795 (Jul. 20, 1990) (proposed rule). In 1997, after determining that the subsequent two decades would be crucial to the western population's survival, the Department of Commerce's National Marine Fisheries Service ("NMFS") reclassified the western stock as endangered, maintaining the eastern stock's threatened classification. 62 Fed. Reg. at 24,346-347 (noting that one model "predicted a 100 percent probability of extinction [for the western population segment] within 100 years from the 1985-94 trend data, and a 65 percent probability of extinction within 100 years if the 1989-94 trend continue[d]").

2

While researchers began investigating the decline of the Steller sea lion with its identification in the 1980s, funding for such research remained modest for more than a decade. *See* 62 Fed. Reg. at 24,346 (discussing research); 55 Fed. Reg. at 29,795 (same).  (Answer ¶ 59 ("NOAA . . . research funding during the 1990s was less than $1 million.").)  This changed with the passage of the Consolidated Appropriations Act of 2001, which declared that "the western population of Steller sea lions ha[d] substantially declined over the last 25 years" and thus "scientists should closely research and analyze all possible factors relating to such decline . . . ." Pub. L. No. 106-554, § 209(a)(1)-(2), 114 Stat. 2763, 2763A-176 (2000).  In furtherance of this research, Congress appropriated more than $40 million for studies regarding "available prey species . . . [,] predation by other marine mammals . . . [,] interactions between fisheries and Steller sea lions . . . [,] regime shift, climate change, and other impacts associated with changing environmental conditions in the North Pacific and Bering Sea . . . [,] juvenile and pup survival rates . . . [,] nutritional stress" and other potential factors contributing to the sea lions' decline. *Id.* §§ 206, 209, 114 Stat. at 2763A-176; *see also* Steller Sea Lion Research Initiative (SSLRI), 66 Fed. Reg. 15,842 (Mar. 21, 2001) (notice of availability of funds).  This amount was augmented by an almost identical sum the following year.  (*See* AR 406 at 7-8, 53 (summarizing the various federal appropriations for Steller sea lion research).)  The resulting research fund was the largest ever dedicated to a single species.  (Compl. ¶ 59; Answer ¶ 59.)

After receiving numerous applications for permits and permit amendments authorizing research relating to the threatened and endangered Steller sea lion populations,[1] NMFS opened

---

[1] Permits are required for invasive research on Steller sea lion populations under the MMPA and ESA.  In 1972, the MMPA established a moratorium on the "tak[ing]" of marine mammals -- a term broadly defined as including "harass[ing], hunt[ing], captur[ing], or kill[ing], or attempt[ing] to harass, hunt, capture, or kill any marine mammal."  16 U.S.C. §§ 1362(13), 1371(a); *see also id.* § 1362(18)(A) (defining "harassment" as "any act of pursuit, torment, or annoyance which . . . has the potential to injure a marine mammal or marine mammal stock in the wild" or "has the potential to disturb a marine mammal or marine mammal stock in the wild

an investigation into the potential effects of the proposed studies on the environment in 2002.

(*See* AR 406 at 11.)  In a June 2002 Environmental Assessment ("EA") and Finding of No

Significant Impact ("FONSI"), the agency concluded that authorization of the requested studies

through 2004,[2] with certain mitigating measures, would not significantly affect the human

environment.  (*Id.* at 12-13.)  A November 2002 Biological Opinion ("BO") determined that the

permits were "not likely to jeopardize the continued existence of the endangered western

population of Steller sea lions or the threatened eastern population of Steller sea lions."  (AR 389

at 73 (Nov. 12, 2002 BO).)  Based on these findings, NMFS issued research permits and permit

amendments allowing the "harassment" of sea lion populations through aerial and boat-based

surveys; ground counts; scat, blood and biopsy collection; capture and restraint; tagging and

branding; tooth extraction; attachment of scientific instruments; and other research activities.

(*See* AR 406 at 79-83; AR 389 at 10-31.)  The permits also authorized stated amounts of

"incidental mortality."  (*Id.*)[3]

---

by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering").  The Act, however, provides for the issuance of permits authorizing the taking of marine mammals "for scientific research purposes" when an applicant demonstrates "that the taking is required to further a bona fide scientific purpose[.]" *Id.* § 1374(c)(3)(A)-(B); *see also id.* § 1362(22) (defining "bona fide research" as that with results that "likely would be accepted for publication in a referred scientific journal;" that "are likely to contribute to the basic knowledge of marine mammal biology or ecology;" or that "are likely to identify, evaluate, or resolve conservation problems").  If the targeted stock is depleted, the Secretary must also determine "that the results of such research will directly benefit that species or stock, or that such research fulfills a critically important research need."  *Id.* Similarly, the ESA bars the "tak[ing]" of listed species, but provides for the issuance of permits authorizing takes "for scientific purposes or to enhance the propagation or survival of the affected species."  *Id.* §§ 1538(a)(1), 1539(a)(1)(A); *see also id.* § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.").

[2] The permits were later extended through December 31, 2005, by a "minor amendment" not subject to environmental review.  (*See* AR 406 at 23.)

[3] NMFS later prepared a June 2003 Supplemental EA addressing the potential effects of two proposed amendments to permits held by Dr. Glenn VanBlaricom and the Alaska SeaLife

On April 4, 2005, NMFS published notice that eight individuals or institutions had

submitted applications for five-year permits or three-year permit extensions authorizing further

research of a similar character.  (*See* AR 395 at 1 (Marine Mammals, 70 Fed. Reg. 17,072 (Apr.

4, 2005)).)  In the same notice, the agency indicated that a related draft EA, which concluded

that an Environmental Impact Statement ("EIS") need not be prepared as the proposed research

would not have a significant effect on the human environment, was also available for review and

comment.  (*See* AR 395 at 3; AR 406.)  The "scope" of the draft assessment included six

environmental impact issues:

> (1) Is NMFS able to coordinate research under the various permits
> and ensure that activities are not unnecessarily duplicative and do
> not result in significant adverse impacts on threatened and
> endangered Steller sea lions? (2) Is NMFS able to adequately
> monitor the effects of the overall research program on Steller sea
> lions? (3) Can NMFS coordinate and synthesize the data generated
> by this research program in a way that is useful or meaningful for
> conservation of Steller sea lions? (4) Are all of the research
> proposals consistent with permit issuance criteria under the
> MMPA and ESA, such as whether all of the projects are likely to
> contribute to conservation of Steller sea lions? (5) Does the
> amount of incidental mortality to be authorized represent a
> significant adverse impact on Steller sea lions? (6) What are the
> potential effects of various research activities, either individually
> or cumulatively, on Steller sea lions as a species?

(AR 395 at 3.)

Pursuant to federal regulations, NMFS was required to submit the permit applications for

review by an independent federal agency, the Marine Mammal Commission ("MMC"), which

had been established to provide oversight of the government's marine mammal conservation

policies and programs.  *See* 16 U.S.C. § 1401; 50 C.F.R. § 216.33(d)(2) (providing that permit

applications must be forwarded to the MMC "for comment" and "[i]f no comments are received

Center.  (*See* AR 390 at 3 (June 2003 Supplemental EA).)  The agency determined that the
activities authorized under the amended permits would not have a significant effect on the
human environment and issued the amendments.  (*See* AR 406 at 12 (2005 EA).)

within 45 days . . . the Office Director will consider the Commission to have no objection to

issuing a permit").  On May 19, 2005, the MMC submitted a five-page set of "preliminary

comments" in response to the agency's request that it "expedite . . . review of the[] permit

applications because of a pressing need to issue the permits."  (Barrett Decl. Ex. 1 at 1.)  While

noting its "expect[ation]" that the agency would "defer final action on the applications" until it

had had an opportunity to "complete [a] full review of the[] applications . . . in consultation with

the Committee of Scientific Advisors as required under the Marine Mammal Protection Act," the

MMC recommended that NMFS reconsider its finding and either offer additional explanation for

its conclusion that the research would not have a significant impact on the environment, reduce

the scope of the approved research projects, or prepare an EIS.  (*Id.* at 5.)  This recommendation,

the MMC indicated, was essentially identical to that it had made following a review of the

agency's 2002 EA and related permit applications.  (*Id.*)

On May 24, 2005, prior to the MMC's completion of its final comments on the action,[4]

NMFS issued its Final EA, a FONSI declaring that "preparation of an Environmental Impact

Statement . . . [was] not required by . . . the National Environmental Policy Act[,]" and a BO (the

"2005 BO") concluding that "the research program, as proposed, [was] not likely to jeopardize

the continued existence of the endangered western population of Steller sea lions or the

threatened eastern population of Steller sea lions."  (AR 404 at 1 (FONSI); AR 406 (EA); AR

407 at 69 (BO).)  Soon thereafter, the agency issued the requested permits and amendments,

authorizing the repeated taking of more than 200,000 sea lions in the course of annual vessel and

aerial surveys; the taking of more than 140,000 sea lions during ground-based research; an

annual incidental mortality of up to 60 sea lions, including up to 20 from the endangered western

---

[4] The MMC provided NMFS with final comments affirming its preliminary recommendation on
June 10, 2005.  (Barrett Decl. Ex. 2.)

stock; the annual capture or restraint of more than 3,000 sea lions; the branding of more than

2,900 sea lions; the annual attachment of scientific instruments to more than 700 sea lions; and

various other research activities.  (*See* Answer ¶ 69 (indicating that the agency issued the first of

the permits on May 27, 2005); AR 113 at 1 (June 16, 2005 Federal Register notice of permit and

permit amendment issuance); AR 406 App. E (activity tables for proposed action); Defs.' Opp'n

at 7-8 ("In 2005, NMFS increased the maximum number of animals that could be studied during

this research to 527,690 western and eastern sea lions, an increase of approximately 59

percent.").)  The action increased the number of issued permits, extended the duration of the

permitted research, authorized new research methods,[5] and raised both the number of annual

takes and their frequency.  (AR 406 at 27-30, 43.)  The permits did not, however, authorize the

intentional killing of any Steller sea lions as part of any scientific study.  (*See id.* 53, 103-119.)

Following the conclusion of the agency's inquiry into the ecological impacts of the

various permit applications, Assistant Administrator for Fisheries William T. Hogarth met with

representatives of The Humane Society in order to discuss the Society's objections to the

agency's issuance of the permits.  (*See* Barrett Decl. Ex. 3 (Hogarth letter); AR 402 (Society's

May 17, 2005 letter to Hogarth).)  In a June 27, 2005 letter to the Society's counsel, Hogarth

stated that NMFS "share[d] [the Society's] concerns over the scope of the research on Steller sea

lions" and indicated that the agency had accordingly "decided to prepare an environmental

impact statement . . . on the effects of scientific research on this species."  (Barrett Decl. Ex. 3.)

This decision was announced publicly on December 28, 2005, when NMFS published notice of

its "intent to prepare an Environmental Impact Statement . . . to analyze the environmental

impacts of administering grants and issuing permits associated with research on endangered and

---

[5] The newly-authorized activities included the surgical implantation of transmitters, an activity
the EA characterized as having "an inherent risk of serious injury and mortality in the short term
and an unknown risk of long-term effects on fitness and survival."  (AR 406 at 43.)

threatened Steller sea lions (*Eumetopias jubatus*) and depleted northern fur seals (*Callorhinus ursinus*)." Notice of Intent to Prepare an Environmental Impact Statement on Impacts of Research on Steller Sea Lions and Northern Fur Seals Throughout Their Range in the United States, 70 Fed. Reg. 76,780 (Dec. 28, 2005). "Based on comments received on Environmental Assessments prepared in 2002 and 2005 for permitting research on Steller sea lions," the agency identified the following six issues for public comment and later consideration in its EIS: the "[t]ypes of research methods and protocols permitted[;]" the "[l]evel of research effort" required for management and conservation, and potential means of limiting takes; the "[c]oordination of research" among various individuals and institutions; the "[e]ffects of research" on animal populations; the "[q]ualification of researchers" operating under permits; and possible "[c]riteria for allowing modifications or amendments to existing grants and permits[,] for denying permit amendments[,] and for suspending or revoking permits." *Id.* at 76,781-82.

On July 12, 2005, and prior to the agency's Federal Register notice announcing its intent to prepare an EIS, plaintiffs filed suit alleging that defendants had violated NEPA by declining to prepare an EIS and by relying on an EA that failed to satisfy the statute's requirements; that their 2005 BO contravened the ESA by failing to properly evaluate the direct, indirect and cumulative impacts on Steller sea lions from the research activities authorized by the permits; and that they had violated the MMPA by failing to follow regulations requiring that they not issue permits until the MMC had completed its comments and by authorizing incidental mortalities that would exceed the Steller sea lion's Potential Biological Removal level ("PBR level"). Defendants respond by arguing that the agency's EA, FONSI and 2005 BO constitute a thorough analysis of the environmental factors; that the permits, which do not authorize a level of mortality sufficient to significantly impair the recovery of the western stock, were issued only

after NMFS had the benefit of the MMC's comments; and, in any event, that the plaintiffs'

challenge to the 2005 BO is now moot since a revised BO (the "2006 BO") was issued on March

3, 2006.[6]

# ANALYSIS

## I.  Standard of Review

Under the judicial review provisions of the APA, an administrative action may be set

aside only where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  *See* 5 U.S.C. § 706(2)(A)-(D);  *Marsh v. Oregon Natural Res. Council*,

490 U.S. 360, 375 (1989).  The question is therefore one of reasonableness -- "this court will not

second guess an agency decision or question whether the decision made was the best one."  *C &

W Fish Co., Inc. v. Fox, Jr.*, 931 F.2d 1556, 1565 (D.C. Cir. 1991).  While agency actions are

presumed valid and granted substantial deference, especially in cases involving a scientific

determination within an agency's area of expertise, *see Baltimore Gas & Elec. Co. v. NRDC*, 462

U.S. 87, 103 (1983), they are not spared a "thorough, probing, in-depth review."  *Citizens to

Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *see also Marsh*, 490 U.S. at 378 (A

court's review of administrative action "must be searching and careful," though "the ultimate

standard of review is a narrow one.") (internal quotations omitted).  Agencies must consider the

relevant information and provide a satisfactory explanation for their actions, including a

---

[6] In their opposition, defendants also challenged plaintiffs' standing, contending that the
allegations of injury made in their complaint were insufficient and plaintiffs had otherwise
"failed to provide affidavits or other evidence demonstrating that they have suffered actual
injury." (Defs.' Opp'n at 17-18.)  Plaintiffs, however, have since supplied declarations
documenting their injuries -- Anderson as an observer of the species with plans to travel to
Washington and Oregon before the end of the year, and Young as an active Steller sea lion
observer and advocate.  (Pls.' Rep. Exs. 1 and 2.)  Defendants have correctly omitted any further
argument regarding standing from their reply.  *See Communities for a Great Northwest, Ltd. v.
Clinton*, 112 F.Supp. 2d 29, 33 (D.D.C. 2000) ("The trial court may allow plaintiffs the
opportunity to supply by affidavits further particularized allegations of fact in support of
standing[.]").

"rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). When reviewing an agency's explanation, courts must "'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

> Normally, an agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* When an agency has proceeded in such a manner, the resulting action must be abandoned, for courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

## II. NEPA

Under NEPA, an agency proposing a "major Federal action[] significantly affecting the quality of the human environment" is required to prepare an EIS giving thorough consideration to, among other things, the ecological impacts of the action and any available alternatives to the proposal. 42 U.S.C. § 4332(2)(C). "'If *any* "significant" environmental impacts might result from the proposed agency action then an EIS must be prepared *before* agency action is taken.'" *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 340 (D.C. Cir. 2002) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (emphasis in original)). As defined by regulations issued by the Council on Environmental Quality, significance is a function of both the "context" and "intensity" of the proposed action. 40 C.F.R. § 1508.27. In considering the

context of an action, an agency is to address its impact upon "society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a).  The question of an action's "intensity" is a more complex inquiry, turning on such factors as potential "[i]mpacts that may be both beneficial and adverse[;]" the "degree to which the proposed action affects public health or safety[;]" any "[u]nique characteristics of the geographic area" in which the action is to be taken; the "degree to which the effects on the quality of the human environment are likely to be highly controversial[;]" the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks[;]" the "degree to which the action may adversely affect an endangered or threatened species[;]" the "degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration[;]" and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* at 1508.27(b); *see also Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1023 (9th Cir. 2003) ("The presence of one or more of these factors should result in an agency decision to prepare an EIS.").

As the ecological significance of administrative actions are often less than self-evident, agencies may begin their evaluation of a proposed action by preparing an EA -- "a concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).  If the agency concludes, on the basis of its assessment, that the action is not one "significantly affecting the quality of the human environment," it may prepare a FONSI and thereby avoid preparation of an EIS.  *Id.* §§ 1501.4(e), 1508.13.  The standard for evaluating such a finding is well established in this Circuit:

> First, the agency must have accurately identified the relevant
> environmental concern.  Second, once the agency has identified
> the problem, it must have taken a "hard look" at the problem in
> preparing the EA.  Third, if a finding of no significant impact is
> made, the agency must be able to make a convincing case for its
> finding.  Last, if the agency does find an impact of true
> significance, preparation of an EIS can be avoided only if the
> agency finds that changes or safeguards in the project sufficiently
> reduce the impact to a minimum.

*Sierra Club v. Dep't of Transportation*, 753 F.2d 120, 127 (D.C. Cir. 1985).

Plaintiffs argue that the issuance of the research permits was an action from which

"'significant' environmental impacts might result," *Sierra Club*, 717 F.2d at 1415, thus requiring

the preparation of an EIS.  A number of arguments are made in support of this contention: (1) the

agency has conceded the need to prepare an EIS; (2) the permitted research will result in

mortality levels exceeding the western stock's PBR level, making the agency's approval of the

permits a significant action; and (3) the effects of the permitted research are highly controversial,

highly uncertain, and cumulatively significant, again making the agency's approval of the

permits a significant action.  (Pls.' Mem. at 14-24.)  The Court will now address each of these

claims.

### A.  NMFS's Admission of the Need for an EIS

Plaintiffs' argument that NMFS has conceded the need for an EIS cannot be addressed

without first resolving another question: whether Assistant Administrator Hogarth's June 27,

2005 letter to the Society and the agency's later announcement of an EIS may be considered in

reviewing the agency's authorization of the contested permits.

### 1.  Supplementation of the Administrative Record

"It is well settled that judicial review of agency action is normally confined to the full

administrative record before the agency at the time the decision was made."  *Envtl. Def. Fund,*

*Inc. v. Castle*, 657 F.2d 275, 284 (D.C. Cir. 1981). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The D.C. Circuit, however, has recognized a number of exceptions to this rule, indicating that additional evidence may be considered where "the agency failed to consider factors which are relevant to its final decision[,]" the "agency considered evidence which it failed to include in the record[,]" "evidence arising after the agency action shows whether the decision was correct or not" or "in cases arising under the National Environmental Policy Act[.]" *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989); *see also Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 369 n.56 (D.C. Cir. 1981) ("Allegations that an impact statement fails to consider serious environmental consequences or realistic alternatives raise issues sufficiently important to warrant introduction of new evidence in the District Court."); *Suffolk County v. Sec'y of Interior*, 562 F.2d 1368, 1384-85 (2d Cir. 1977) ("[A]llegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept 'stubborn problems or serious criticism . . . under the rug' . . . raise issues sufficiently important to permit the introduction of new evidence in the district court . . . in suits attacking [a FONSI].").

As defendants emphasize, this is not a case where extra-record evidence is appropriately considered as proof of an environmental factor inappropriately excluded from consideration by the assessing agency. (*See* Defs.' Opp'n to Pls.' Mot. to Supplement at 2-3, 5 (citing cases); *see also id.* at 5-6 ("[A]n admission by itself is not a recognized exception to the rule limiting review to the record unless it also transmits or documents a discrete environmental factor that NMFS must consider under federal law but did not consider previously in the record.").) This

argument, however, does not resolve the matter for, as explained herein, Assistant Administrator

Hogarth's letter and the subsequent Federal Register notice outlining the scope of NMFS's

pending EIS have a direct bearing on the correctness of the agency's decision, speaking to both

the degree to which the effects of the research were "likely to be highly controversial" and the

degree to which they were "likely to be highly uncertain."  *See* 40 C.F.R. § 1508.27(b) (outlining

"significance" factors).  The Court will therefore permit the record to be supplemented as the

documents are directly relevant to a determination of whether an EIS is required in this case.

### 2.  The Announcement of the Pending EIS

In announcing the availability of its 2005 EA for review and comment, NMFS

characterized the draft as addressing "six environmental impact issues" relating to the issuance

of the permits -- among them, the coordination of research activities, monitoring of the research's

effects, and the resulting impact on Steller sea lion populations.[7]  In his June 27, 2005 letter,

Assistant Administrator Hogarth responded to The Humane Society's questions regarding the

agency's decision not to prepare an EIS by stating that the agency "share[d] [the Society's]

concerns over the scope of the research on Steller sea lions" and would therefore "prepare an

environmental impact statement . . . on the effects of scientific research on this species."  (*See*

Barrett Decl. Ex. 3 (Hogarth letter); AR 402 (Society's May 17, 2005 letter to Hogarth).)

---

[7] The issues were identified as (1) the agency's ability "to coordinate research under the various
permits and ensure that activities are not unnecessarily duplicative and do not result in
significant adverse impacts on threatened and endangered Steller sea lions[;]" (2) the agency's
ability to "adequately monitor the effects of the overall research program on Steller sea lions[;]"
(3) the agency's ability to "coordinate and synthesize the data generated by this research program
in a way that is useful or meaningful for conservation of Steller sea lions[;]" (4) whether the
various research proposals were "consistent with permit issuance criteria under the MMPA and
ESA, such as whether all of the projects are likely to contribute to conservation of Steller sea
lions[;]" (5) whether the level of incidental mortality authorized under the permits "represent[ed]
a significant adverse impact on Steller sea lions[;]" and (6) "the potential effects of various
research activities, either individually or cumulatively, on Steller sea lions as a species[.]"  (AR
395 at 3.)

Hogarth's letter was followed by a December 28, 2005 Federal Register notice stating that

NMFS would prepare an EIS "analyz[ing] the environmental impacts of administering grants

and issuing permits associated with research on endangered and threatened Steller sea lions" and

identifying six issues for public comment -- among them, the coordination of research activities,

monitoring of the research's effects, and the resulting impact on Steller sea lion populations.[8]

  As evidenced by the timing and substance of these documents, defendants' attempt to

characterize the Assistant Administrator's letter and the agency's subsequent notice as an

unremarkable announcement of a broadened, programmatic review is belied by the record.  (*See*

Defs.' Opp'n at 21-22; Defs.' Rep. at 16-17.)  Defendants' acknowledgment that the agency

remained concerned with the "scope" of Steller sea lion research and its "effects" on the species

contradicts the FONSI issued over Hogarth's signature less than a month earlier, indicates a

continuing lack of confidence in the agency's prior determination regarding the significance of

the permitted activities, and evidences the "highly uncertain" and "controversial" nature of the

studies' effects on endangered and threatened populations.  *See* 40 C.F.R. § 1508.27(b).

Similarly, the agency's December 28, 2005 announcement, which raises concerns that are

substantially the same as those stated in the April 4, 2005 Federal Register notice outlining the

scope of the Service's draft assessment (*compare* note 7 *with* note 8), reflects a recognition that

the issues ostensibly resolved in NMFS's Final EA still remain to be studied.  While defendants

---

[8] The issues identified for public comment were: (1) the varieties of "research methods and
protocols" to be authorized; (2) the appropriate "[l]evel of research effort" and the available
means of establishing limits, including the sufficiency of "current methods to assess and
document numbers of different 'takes'" resulting from permitted conduct; (3) the "[c]oordination
of research[,]" including possible mechanisms for ensuring cooperation among researchers in
order to reduce the adverse impact on the species as well as methods allowing the compilation of
information from different sources; (4) the "[e]ffects" of the various authorized research methods
on the populations; (5) the "[q]ualification of researchers" operating under permits; and (5) any
possible "[c]riteria for allowing modifications or amendments to existing grants and permits[,]
for denying permit amendments[,] and for suspending or revoking permits."  70 Fed. Reg. at
76,781-82.

reiterate that the pending EIS pertains not only to the contested permits but rather the "entire program of both administrating congressional sea lion research grants and issuing related research permits" (Defs.' Rep. at 17), this does not demonstrate its irrelevance here. In determining whether the issuance of the contested permits and permit amendments would significantly affect the environment, NMFS was required to consider the cumulative impacts of the action -- "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7; *see also id.* § 1508.27(b)(7).

Thus, the question before the agency in evaluating the significance of the proposed research was considerably broader than defendants' argument suggests, for Hogarth's letter and the agency's subsequent announcement of its intent to prepare an EIS clearly suggest the need to complete an EIS prior to the issuance of the contested permits.

## B. PBR Level

With the passage of the MMPA, Congress declared that "species and population stocks of marine mammals . . . should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part[.]" 16 U.S.C. § 1361(1). The Act accordingly provides, "consistent with this major objective," that marine mammal populations "should not be permitted to diminish below their optimum sustainable population" -- "the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." *Id*. §§ 1361(1), 1362(9). Among the statute's mechanisms for achieving this end is a requirement that the Secretary of Commerce

prepare an annual or triennial stock assessment for each species that, among other things, describes the range of the stock; estimates the stock's minimum population and present productivity rates; estimates the amount of mortality and serious injury suffered by the stock as a result of human activity; discusses the impact of the stock's interaction with commercial fisheries; and categorizes the stock as either likely or unlikely to be reduced below its optimum sustainable population level by human-caused mortality and serious injury. *Id.* § 1386(a)(1)-(5). As a means of measuring the impact of human activity, each assessment must also estimate the PBR level for the relevant stock -- "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id.* §§ 1362(20); 1386(a)(6).

According to plaintiffs, the PBR level established for the western stock of Steller sea lions by NMFS is "an undeniable litmus test" for judging the significance of the agency's action, and this test was unreasonably ignored in the EA. (Pls.' Mem. at 21.) The most recent assessment of the western stock, plaintiffs note, established a PBR level of 208. (Pls.' Mem. at 19 (citing AR 401 at 4 (Society comments).) Because an estimated 171 western sea lions are killed each year as a result of native subsistence harvests and more than 29 perish annually as an incident to commercial fishing (*see* AR 401 at 4), plaintiffs contend that the potential annual research-related mortality of 20 western sea lions clearly exceeds the stock's PBR level and therefore involves a significant adverse impact requiring the preparation of an EIS. (Pls.' Mem. at 19 (citing Answer ¶ 74 ("Federal defendants admit that the annual mortality resulting from research activities may, in combination with other human-caused sources of mortality, exceed the PBR for the species, but deny that the impact to the species is per se significant and potentially irreversible.").)

While defendants debate the relevance of the western stock's PBR level and the accuracy

of plaintiffs' calculations (*see* Defs.' Opp'n at 23-26; Defs.' Rep. at 12, 20-21), the merits of their

arguments are irrelevant, for the issue is not addressed in the agency's EA.  *See W. Res., Inc. v.*

*FERC*, 9 F.3d 1568, 1576 (D.C. Cir. 1993) ("[A] reviewing court 'must judge the propriety of

[the agency's] action solely by the grounds invoked by the agency.'") (quoting *Chenery Corp.*,

332 U.S. at 194).  Though the comments of The Humane Society stressed the significance of

authorizing further research with a potential for incidental mortalities that would meet or exceed

the PBR level of the western population (*see* AR 401 at 4), NMFS failed to address this

important issue in the Final EA.[9]  In the absence of such analysis, one cannot conclude that the

---

[9] Moreover, in comparing the agency's 2002 and 2005 assessments, it is evident that discussions of the populations' PBR levels were removed without explanation from otherwise identical sections of the latter document.  For instance, in its discussion the impacts of commercial fishing on Steller sea lion populations, the 2002 EA states:

> Commercial fisheries can directly affect Steller sea lions by capturing, injuring, or killing them incidental to fishing operations. Estimates of rates of entanglement through the early 1980s suggest that mortalities from entanglement were a contributing factor in the decline of Steller sea lions in the Bering Sea, Aleutian Islands, and Gulf of Alaska.  The relative impact of mortalities to marine mammals occurring incidental to commercial fisheries is estimated under the MMPA by comparing minimum annual mortality rate [sic] to a Potential Biological Removal (PBR) level.  Recent estimates of the numbers of sea lions killed incidental to commercial fisheries is low (28.3/year for the western stock and 16/year for the eastern stock).  The estimate of incidental takes in the eastern stock is considered negligible being significantly less than 10% of the PBR for that stock (PBR = 1,395 animals) and is not considered to have a significant effect on Steller sea lion population dynamics.  The relative impact of Steller sea lion incidental mortality in commercial fisheries in the western population is approximately equal to 10% of PBR for that population and may increase as the western population declines, even if the rate of incidental takes remains constant.

(AR 384 at 40.)

In NMFS's 2005 assessment, all references to the populations' PBR levels were deleted:

agency took the requisite "hard look" at the mortality issue.  *See Sierra Club*, 753 F.2d at 127;

*U.S. Satellite Broad. Co., Inc. v. FCC*, 740 F.2d 1177, 1188 (D.C. Cir. 1984) (noting an agency's

obligation to "respond[] in a reasoned manner to significant comments received" during the

rulemaking process).  The agency's failure is compounded by the EA's omission of an alternate

metric by which to evaluate the significance of the incidental mortalities authorized under the

various research permits. While separate sections of the document quantify the mortalities

stemming from individual human activities, the assessment fails to provide a meaningful context

for the figures, relying instead upon conclusory assertions of insignificant impact.[10]  (*See*, *e.g.*,

AR 406 at 58 ("While there was a low number of Steller sea lion mortalities incidental to the

---

> Commercial fisheries can directly affect Steller sea lions by capturing, injuring, or killing them incidental to fishing operations. Estimates of rates of entanglement through the early 1980's suggest that mortalities from entanglement were a contributing factor in the decline of Steller sea lions in the Bering Sea, Aleutian Islands, and Gulf of Alaska.  However, recent estimates of the numbers of sea lions killed incidental to commercial fisheries is low (28.3/year for the western stock and 16/year for the eastern stock) and is not considered to have a significant effect on Steller sea lion population dynamics.  However, the relative impact of incidental mortality fisheries may increase as the population declines, even if the rate of incidental takes remains constant.

(AR 406 at 52.)

[10] In their reply, defendants contend that the record reflects sufficient consideration of the western stock's PBR level since "the agency specifically addressed PBR in its 2003 supplemental EA" and "[a] review of the 2002 EA reflects that the mitigation measure for accidental mortality . . . was derived based on the PBR of the western stock."  (Defs.' Rep. at 10.)  Defendants also note that "the 2005 EA incorporates by reference the 2000 and 2001 annual stock assessment reports for Steller sea lions, which discuss the methodology used to determine PBR and set forth the PBR levels for the western and eastern stocks."  (*Id.* (offering no citations to the EA).)  While NMFS was not precluded from incorporating relevant analysis from its previous evaluations, *see Sierra Club*, 753 F.2d at 127 (affirming a finding of no significant impact based in large part on the agency's prior EIS), it did not do so here.  As shown in note 9, *supra*, the agency excised the prior discussion of the populations' PBR levels from its EA, relying instead on conclusory declarations of insignificance.  Thus, defendants' attempt to incorporate a prior PBR analysis into the contested EA and FONSI cannot succeed.

research over the past two years, the total number was within that authorized by the permits and would not have a population level impact.  Further, there was no evidence of an accelerated population decline as a result of research activities."); *id.* at 59 ("The proposed action is not expected to have a significant adverse impact on endangered or threatened species of marine mammal populations.  The adverse effects of the proposed permits would be limited to effects on individual marine mammals.").)

In short, NMFS has not made a "convincing case" that the fatalities that may result from the expanded research program are unlikely to have a significant environmental effect.  *See Sierra Club*, 753 F.2d at 127; *see also Citizens Exposing Truth About Casinos v. Norton*, 2004 U.S. Dist. Lexis 27498, *23 (D.D.C. 2004) ("The Court . . . finds most troubling . . . the absence of any convincing explanation or 'evidence and analysis' for why the[] [catalogued] impacts are not to be regarded as significant.").

## C.  Controversial Effects

Among the factors an agency must consider in determining whether a proposed action is likely to have a significant impact is "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4).  "'The term "controversial" refers to cases where a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use.'"  *Town of Cave Creek, Ariz. v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir. 1982)) (emphasis removed).

Defendants reject plaintiffs' allegations of controversy, arguing that they have demonstrated nothing more than "opposition" or public criticism.  (Defs.' Opp'n at 29.)  In doing so, however, defendants mischaracterize the record.  In its preliminary comments to the agency,

20

the MMC indicated that it "remain[ed] concerned" -- nearly three years after challenging the

impact of the permits authorized in 2002 -- "that the cumulative effects of the proposed research,

in combination with other factors that are affecting the western population of Steller sea lions,

could have significant adverse impacts on the population." (Barrett Decl. Ex. 1 at 5.)[11]

Similarly, The Humane Society's May 4, 2005 comments challenged as "unsupported" the draft

assessment's finding that the proposed research would not have adverse affects and argued that

the permits should not be issued prior to the preparation of an EIS "fully evaluat[ing] the

individual and cumulative impacts of the proposed research and weigh[ing] its contribution to

cumulative effects on the stocks from combined mortality and serious injury resulting from

fisheries-related mortality and native harvest." (AR 401 at 3, 25.) This is not the "heckl[ing]"

defendants describe. (*See* Defs.' Opp'n at 28 (citing *N.C. v. FAA*, 957 F.2d 1125, 1133-34 (4th

Cir. 1995) ("This circuit long ago rejected 'the suggestion that "controversial" must necessarily

be equated with opposition.' Otherwise . . . [t]he outcome would be governed by a 'heckler's

veto.'") (internal citations omitted)).) Moreover, in stating that the agency "share[d] [the

Society's] concerns over the scope of the research on Steller sea lions" and would therefore

"prepare an environmental impact statement . . . on the effects of scientific research on this

species" (Barrett Decl. Ex. 3), Assistant Administrator Hogarth's June 27, 2005 letter itself

evidences an appreciation of the degree of controversy surrounding the impact of the research on

Steller sea lions. *See Friends of the Earth, Inc. v. United States Army Corps of Engineers*, 109

F.Supp. 2d 30, 43 (D.D.C. 2000) (concluding that an EIS must be prepared where the

controversial nature of the proposed project's impact was apparent in comments from other

---

[11] While the MMC's preliminary comments were not included in the Administrative Record, defendants acknowledge that they should have been. (*See* Defs.' Opp'n to Pls.' Mot. to Supp. at 6.) Plaintiffs' Motion to Supplement the Administrative Record will therefore be granted with respect to these comments. *See Esch*, 876 F.2d at 991 (supplementation appropriate where the agency "considered evidence which it failed to include in the record").

agencies, the public, and defendant's own leadership).  The highly controversial nature of the permits' effects is, in short, readily apparent from the record.

What does not appear is a "hard look" from the agency.   In a rather flippant summation of the issue, the EA declares that "[t]here is no significant controversy regarding the effects of the proposed action on the human environment[,]" explaining that while "NMFS received comments from the public in opposition to the issuance of the proposed permits, the activities are similar to research conducted over the past two years during which time NMFS did not receive objections and there was no evidence of adverse population level impacts."  (AR 406 at 58.)  This language is entirely at odds with the EA's prior acknowledgment of a "substantive disagreement over the likely effects of . . . certain . . . research activities" and "controversy over the adequacy of NMFS [sic] finding of no significant impact in issuance of the previous Steller sea lion research permits."  (*See id.* at 17.)  No attempt is made to reconcile these statements. Moreover, as earlier discussed, the EA ignores the western population's PBR level, a central aspect of the debate.  In light of this controversy, the agency has not "made a convincing case" that the impact of the authorized research will be insignificant.  *See Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982).

### D.  Uncertain Effects and Unknown Risks

In determining the significance of a proposed action, an agency is also required to consider "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks."  40 C.F.R. § 1508.27(b)(5).  Based on the record, there can be no doubt that NMFS authorized research where the effects were both uncertain and unknown.  The EA, in fact, is replete with references to the uncertainty inherent in the program, recognizing that "[t]here have been no studies dedicated to documenting and assessing the

effects of research on Steller sea lion stocks or populations" and that "[t]he cumulative effects of various research activities on Steller sea lions, including the possibility of cumulative effects that may not become evident for some time, are uncertain."[12]   (AR 406 at 120.)  Given the EA's candid recognition of these uncertainties, defendants' contention that the agency took a "hard look" at the issue by considering available studies and adopting various measures to mitigate the research's impact must be rejected.  *See Nat'l Parks & Conservation Assoc. v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001)  ("[T]he Parks Service's repeated generic statement that the effects are unknown does not constitute the requisite 'hard look' mandated by the statute if preparation of an EIS is to be avoided.").  (*See* Defs.' Opp'n at 26, 29-30; Defs.' Rep. at 18.)  In its concluding statement of findings, NMFS declares that:

> The effects of the proposed action are not highly uncertain nor do
> they involve unique or unknown risks.  While there was a low
> number of Steller sea lion mortalities incidental to the research

---

[12] *See also* AR 406 at 18 (noting that "there has been insufficient information collected since the 2002 EA to resolve all the information gaps identified in [its effects] analysis"); *id*. at 41 ("There have been no studies dedicated to documenting and assessing the effects of research on Steller sea lions or other marine mammals at a population level, nor on the synergistic or cumulative effects of various research activities and other human-related impacts on individual marine mammals or populations."); *id.* at 42 ("[A] lack of observable or otherwise detectable response to a research activity should not, in the absence of supporting documentation, be taken as a lack of effect."); *id.* ("The number of observed and reported mortalities may or may not represent the number of actual mortalities."); *id.* at 43 ("There is an increased risk of serious injury or mortality associated with some of the proposed research activities that are part of the Proposed Action . . . . For example, the proposed surgical implantation of transmitters has . . . an unknown risk of long-term effects on fitness and survival."); *id.* at 44 ("There is insufficient information to assess the likely duration or extent of ultimate impacts of the Proposed Action relative to the No Action" though "it is reasonable to assume ultimate effects of the Proposed Action would continue further in time than those of the No Action because the activities themselves would occur over a longer period."); *id.* at 52 ("The effects of research on the Steller sea lion population are uncertain, but some research techniques and activities are known to adversely affect individual animals[.]"); *id.* at 52-53 ("It is not known whether research activities themselves have had a significant adverse impact on the Steller sea lion population, or if the disturbance and incidental mortality associated with research activities have been a factor in the decline."); *id.* at 54 ("Given the number of permits and associated takes, repeated disturbance of individual sea lions must occur.  It is difficult to assess the effects of such repeated, and potentially chronic disturbance.").

> over the past two years, the total number was within that
> authorized by the permits and would not have a population
> level impact. Further, there is no evidence of an accelerated population
> decline as a result of research activities.

(*Id.* at 58.) This is a *non sequitur*, not reasoned analysis. In reaching this conclusion, the agency

contradicts the EA's numerous citations to the action's uncertain effects and unknown risks;

ignores numerous statements regarding the possibility of unobserved injuries and mortalities;

offers no analysis regarding to the possibility of population-level impacts from an expanded

research program; and makes no mention of the ameliorative measures relied upon here by

defendants. Accordingly, in terms of the research's uncertain effects, the agency's case for

insignificance is far from convincing. *See State of Idaho*, 35 F.3d at 596 ("Without the requisite

hard look, we cannot determine whether [defendant] 'made a convincing case that the impact was

insignificant[.]'").

### E.  Cumulatively Significant Impacts

The last of the factors relied upon by plaintiffs is cumulative significance -- "[w]hether

the action is related to other actions with individually insignificant but cumulatively significant

impacts." 40 C.F.R. § 1508.27(b)(7) ("Significance exists if it is reasonable to anticipate a

cumulatively significant impact on the environment. Significance cannot be avoided by terming

an action temporary or by breaking it down into small component parts."); *see also id.* § 1508.7

("'Cumulative impact' is the impact on the environment which results from the incremental

impact of the action when added to other past, present, and reasonably foreseeable future actions

regardless of what agency (Federal or non-Federal) or person undertakes such other actions.").

Plaintiffs contend that the cumulatively significant impact of the permitted research is evident,

again, in its potential for incidental mortalities exceeding the western stock's PBR level and that

the agency failed in its analysis of the issue by resting on "several pages of conclusory remarks

and summaries of future actions." (Pls.' Mem. at 24.)  According to defendants, plaintiffs' have

not met their burden of identifying potentially-significant cumulative impacts that the agency did

not include in its discussion.  (Defs.' Opp'n at 30.)

      As in *Friends of the Earth*, "it is apparent that, while the [agency] dedicated nine or ten

pages [of its assessment] . . . to cumulative impacts, the discussion provides no analysis" of the

actions' combined effects.  *See* 109 F.Supp. 2d at 42 ("All three EAs merely recite the history of

development along the Mississippi coast and then conclude that the cumulative direct impacts

'have been minimal.'  There is no actual analysis, only that conclusory statement.") (internal

citation omitted); *see also Defenders of Wildlife v. Babbitt*, 130 F.Supp. 2d 121, 138 (D.D.C.

2001) (remanding an EIS "[b]ecause the discussion of cumulative impacts consists only of

'conclusory remarks [and] statements that do not equip a decisionmaker to make an informed

decision about alternative courses of action, or a court to review the Secretary's reasoning'")

(quoting *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 298 (D.C. Cir. 1988)).  While

offering a "brief summary of the past, present, and future human-related activities affecting the

marine mammals, particularly the Steller sea lion, within the action area" (AR 406 at 51-59),

those activities are not analyzed in combination.  *See Grand Canyon Trust*, 290 F.3d at 345 ("[A]

meaningful cumulative impact analysis must identify . . . the overall impact that can be expected

if the individual impacts are allowed to accumulate."); *Defenders of Wildlife*, 130 F.Supp. 2d at

138 ("While the section is entitled 'cumulative impacts,' there is no discussion of the incremental

impact of this effect 'when added to other past, present, and reasonably foreseeable future actions

regardless of what agency (Federal or non-Federal) or person undertakes such other actions.'")

(quoting 40 C.F.R. § 1508.7).

      Once again, NMFS's ultimate finding on the issue is revealing:

> There are no individually insignificant but cumulatively significant impacts of the proposed action. While there are a low number of Steller sea lion mortalities incidental to the research, the total number was within that authorized by the permits. Further, there is no evidence of an accelerated population decline as a result of research activities. In addition, all permits would contain mitigation measures, including a requirement for the researchers to develop a research monitoring plan.

(*Id.* at 59.) Though the agency's preceding summary describes three categories of human activity that result in sea lion mortality -- subsistence harvests, commercial fishing, and scientific research -- its finding of "no . . . cumulatively significant impacts" is made without reference to non-research-related deaths. Moreover, in focusing on the impacts of previously-authorized research activities, the agency leaves unanswered the question of whether those actions would have a cumulatively significant impact on the environment when combined with the "incremental impact" of the expanded research program. *See* 40 C.F.R. § 1508.7; *id.* § 1508.27(b)(7). As NMFS did not fulfill its obligation to thoroughly consider the combined effects of human activity on the environment, it is not relevant whether plaintiffs have identified potential impacts that should have been included. *See City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1161 (9th Cir. 1997) (rejecting defendants' contention that plaintiff had not met its burden of identifying an action the contested EIS "fail[ed] to consider" as the agency had "failed first" in failing to sufficiently detail the cumulative effects of existing projects).

### F. Conclusion

In its haste, NMFS neglected to take a "hard look" at the relevant environmental issues and thereby failed to make a "convincing case" that the authorized research will not have a significant impact on the environment. *See Sierra Club*, 717 F.2d at 1413. The agency's failure is not surprising on this record. Since NMFS has decided, after the fact, to prepare an EIS that will address Steller sea lion research, and in light of the relationship between potential research-

related deaths and the western stock's PBR level, the substantial controversy regarding the

research's effects, the unknown risks and uncertain effects stemming from the approved

activities, and the possibility of a cumulatively significant impact on the environment, the Court

concludes that "'significant' environmental impacts might result" from the issuance of the

contested permits.  *See id.* at 1415.  As an EIS was therefore required "before the action [was]

taken[,]" *see id.*, the Court will vacate the contested permits and remand the case to NMFS for

preparation of an EIS.[13]

---

[13] Given the Court's conclusion that an EIS is required, it need not resolve the many arguments that plaintiffs raise regarding the sufficiency of defendants' EA.  It nonetheless bears noting that plaintiffs' contention that defendants failed to give adequate consideration to potential alternatives to the proposed research appears to provide further justification for a remand.  (*See* Pls.' Mem. at 25-26.)  Although the portion of the EA regarding the "Proposed Action" and its alternatives describes  five possibilities, only two -- the "Proposed Action" and "No Action alternative" -- were worthy of "detailed study" according to the agency.  (AR 406 at 30.)  The EA states that the possibility of a temporary moratorium on all Steller sea lion research was "not considered further because it would not allow collection of information on population distribution and abundance trends (such as that from aerial surveys) or vital rates" -- information important to the monitoring of the species.  (*Id.* at 31.)  The option of authorizing only nonintrusive research was similarly summarily rejected on the grounds that "permit holders and applicants . . . indicated it is important for them to conduct the intrusive activities to obtain information on the physiology, foraging behavior, health and reproductive status of individual sea lions." (*Id.* at 32.)  Finally, the option of limiting most intrusive research to eastern Steller sea lions and surrogate species "was not considered further because various permit holders and applicants . . . indicated it is either not logistically feasible for them to conduct their activities with species or populations other than those they have requested" or "because the nature of the population decline ma[de] it important to conduct their investigations in the population experiencing the decline." (*Id.* at 33.)

Such a discussion of alternatives cannot satisfy the requirements of NEPA.  In evaluating the environmental consequences of a proposed project, federal agencies are required to "study [and] develop . . . appropriate alternatives to recommended courses of action."  42 U.S.C. § 4332(2)(E); *see also* 40 C.F.R. § 1508.9(b).  An agency's consideration of alternatives "must be more than a *pro forma*[] ritual.  Considering environmental costs means seriously considering alternative actions to avoid them." *Southern Utah Wilderness Alliance v. Norton*, 237 F.Supp. 2d 48, 52 (D.D.C. 2002).

Serious consideration of alternatives was not undertaken here; rather defendants deferred to the views of permit holders, ignoring comments that challenged the sufficiency of the draft EA's alternatives section and indicated that one of the rejected options was both reasonable and less invasive.  (*See* AR 406 at 31-33; AR 401 at 7-8 (Society's May 4, 2005 comments).)  *See Oceana, Inc. v. Evans*, 384 F.Supp. 2d 203, 241 (D.D.C. 2005) ("[A]gencies have a duty to consider 'significant and viable alternatives' identified through public comments.") (citation

## III. ESA

Under Section 7(a)(2) of the Endangered Species Act, all federal agencies are required "to insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [any critical] habitat of such species[.]" 16 U.S.C. § 1536(a)(2). When an agency determines that its proposed action "may affect listed species or critical habitat[,]" it must engage in formal consultation with the federal resource agency responsible for the species at issue, which in the case of the Steller sea lion is NMFS. *See* 50 C.F.R. § 402.14(a). Consultation concludes with the issuance of a BO "detailing how the agency action affects the species or its critical habitat" and indicating whether the proposed action is likely to jeopardize the species' continued existence. 16 U.S.C. § 1536(b)(3)(A). When a jeopardy determination is reached, the BO may indicate any "reasonable and prudent" alternatives to the action under review. *Id.*; 50 C.F.R. § 402.14(h)(3). When it is determined that the action and "any resultant incidental take" of the species will not jeopardize the species, NMFS must provide a statement specifying "reasonable and prudent measures . . . necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4); *see also id.* § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."). After the initiation of a required consultation, Section 7(d) of the Act prohibits "any irreversible or irretrievable commitment of resources with respect

---

omitted). As in *Southern Utah Wilderness Alliance*, the agency here failed in its duty to "study, develop, and describe appropriate alternatives to recommended course[] of action" by relying wholly on the "self-serving statements of the project applicants." 237 F.Supp. 2d at 53; *see also* 42 U.S.C. § 4332(2)(E); *Idaho v. ICC*, 35 F.3d 585, 596 (D.C. Cir. 1994) (agency may not defer to the judgment of other agencies and the licensee in evaluating environmental impact of an application to engage in salvage activities); *Illinois Commerce Comm'n v. ICC*, 848 F.2d 1246, 1258 (D.C. Cir. 1988) (An agency "may not delegate to parties . . . its own responsibility to independently investigate and assess the environmental impact of the proposal before it."). The deficiencies of the EA's alternatives discussion must be remedied in the agency's EIS.

to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate [Section 7(a)(2)]." *Id.* § 1536(d).

On May 24, 2005, NMFS's Office of Protected Resources issued a BO concluding that "the research program, as proposed, [was] not likely to jeopardize the continued existence of the endangered western population of Steller sea lions or the threatened eastern population of Steller sea lions." (AR 407 at 1.) Though research permits were issued shortly thereafter, NMFS subsequently concluded that it was appropriate to "revisit" the opinion in order to "remedy any internal inconsistencies in the effects analysis of the biological opinion," to "clarify the basis for its determination that the permitted activities would not reasonably be expected to appreciably reduce the species' likelihood of surviving and recovering in the wild[,]" and to "reconsider the cumulative effects of future state, tribal, local or private actions that are reasonably certain to occur in the action area." (Defs.' Opp'n Ex. 5 at 2 (Declaration of James H. Lecky, Director of the Office of Protected Resources).) The agency's revised BO was issued on March 3, 2006, nearly eight months after this suit was initiated. (*See* Defs.' Rep. Ex. 6 (Revised BO).) Once again, the 2006 BO concluded that the research program was unlikely to jeopardize the existence of either Steller sea lion population. (*Id.* at 59.)

Plaintiffs challenge the sufficiency of the agency's 2005 BO, asserting that it fails to consider both the effects of the proposed action in light of the environmental baseline and the cumulative impact of human activity on the species. (*See* Pls.' Mem. at 28-36.) In response to defendants' contention that their challenge has been mooted by the 2006 BO (Defs.' Rep. at 4), plaintiffs argue that the 2006 BO cannot serve as legal justification for the agency's issuance of the contested permits, which were premised on the finding of the 2005 BO. (Pls.' Surrep. at 5.)

29

To hold otherwise, plaintiffs contend, would endorse a practice by which agencies evade judicial review through a "cycle" of inadequate but "short-lived" BOs.  (Pls.' Rep. at 28.)

Plaintiffs' concerns are legitimate.  In the present case, NMFS authorized extensive research involving endangered and threatened populations of Steller sea lions on the basis of a BO it later characterized as both opaque and internally inconsistent.  (*See* Defs.' Opp'n Ex. 5 at 2.)  The agency's decision to "revisit" the opinion following the issuance of the permits is difficult to reconcile with its obligation "to insure that [the] action . . . [was] not likely to jeopardize the continued existence of any endangered species or threatened species . . . ."  *See* 16 U.S.C. § 1536(a)(2).  As a result of the Court's decision to vacate the contested permits, however, there is no reason to resolve the issue of whether the issuance of the 2006 BO mooted plaintiffs' arguments related to the defects in the 2005 BO.  Even if NMFS determines, upon completing an EIS, that it is appropriate to reissue the permits in their present form, that action will not be premised on the 2005 BO challenged in plaintiffs' complaint.  Accordingly, there is no reason to resolve plaintiffs' ESA claims.

## IV.  MMPA

Plaintiffs also contend that NMFS violated the MMPA by completing its environmental evaluation and issuing the contested permits without allowing the MMC to provide final comments on the action, and by failing to analyze the permit applications in light of both the Steller sea lions' PBR levels and the availability of less invasive research methods.  (Pls.' Mem. at 37-38.)  Since NMFS will have to prepare an EIS, it will have opportunity to consider, among other things, the MMC's comments, the populations' PBR levels, and available alternatives to the proposed research activities, and therefore, there is also no need to decide plaintiffs' MMPA claims.

**CONCLUSION**

For the foregoing reasons, the Court will grant plaintiffs' Motion for Summary Judgment on the basis that defendants have failed to comply with NEPA by not preparing an EIS, vacate the contested permits and remand the case to the agency for preparation of an EIS.


_____
          s/
ELLEN SEGAL HUVELLE
United States District Judge


Date: May 26, 2006