UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY
OF THE UNITED STATES, *et al.*,

    Plaintiffs,

      v.

MIKE JOHANNS, *et al.*,

    Defendants.

Civil Action No. 06–265 (CKK)

**MEMORANDUM OPINION**
(August 28, 2006)

On March 14, 2006, the Court issued an [21] Order and accompanying [22] Memorandum Opinion denying Plaintiffs' request for a preliminary injunction and dismissing Claims One and Two of Plaintiffs' Amended Complaint for lack of prudential standing. Presently before the Court is [23] Plaintiffs' Motion Under Fed. R. Civ. P. 54(b) for Reconsideration of the Court's *Sua Sponte* Dismissal of Claims One and Two or, In the Alternative, for Certification of Those Claims for Immediate Appellate Review, and Request for an Expedited Hearing, which Plaintiffs filed on March 24, 2006. Federal Defendants and Defendant-Intervenors both filed Oppositions to Plaintiff's Motion to Reconsider. Plaintiffs submitted a Reply thereto. After considering the aforementioned filings, pleadings, and relevant statutes and case law, the Court shall grant in part and deny in part Plaintiffs' [23] Motion to Reconsider. More specifically, the Court shall grant Plaintiffs' [23] Motion to Reconsider with respect to the Court's dismissal of Claim One of the Amended Complaint, but shall deny Plaintiffs' Motion with respect to Claim Two of the Amended Complaint. Furthermore, the

Court shall deny Plaintiffs' request for certification for immediate appellate review with respect

to Claim Two.  Finally, considering the length of the filings presently submitted to the Court

discussing Plaintiffs' standing pursuant to Claims One and Two of the Amended Complaint, the

Court shall deny Plaintiffs' request for a hearing as unnecessary and counter to the interests of

judicial economy without further analysis.

## I.  BACKGROUND

A.    *Factual History*[1]

At the time Plaintiffs filed the instant action, horses were slaughtered at three different

foreign-owned facilities in the United States to provide horse meat for human consumption

abroad and for use in zoos and research facilities domestically.  The instant case pertains to the

web of legislation and regulations pertaining to the inspection of such horses prior to slaughter.

On November 10, 2005, Section 794 of the FY 2006 Agricultural Appropriations Act

(hereinafter, "the Amendment" or "FY 2006 Amendment") was signed into law.  Introduced by

members of Congress as an amendment to the FY 2006 Agricultural Appropriations Act, the

Amendment provides:

> Effective 120 days after the date of enactment of this Act, none of the funds made
> available in this Act may be used to pay the salaries or expenses of personnel to inspect
> horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. Sec. 603) or under
> the guidelines issued under section 903 of the Federal Agriculture Improvement and
> Reform Act of 1996.

*See* Pub. L. 109-97, § 794, 119 Stat. 2164 (AR 51).  The provision of the Federal Meat

Inspection Act ("FMIA"), 21 U.S.C. § 603(a), pertaining to the ante-mortem inspection of horses

---

[1]  The Court shall repeat the factual predicate set out in its March 14, 2006, Memorandum
Opinion related to Plaintiffs' Motion for Preliminary Injunction.  *See* [22] P.I. Mem. Op. at 2–4.

at issue in this case provides:  "For the purpose of preventing the use in commerce of meat and

meat food products which are adulterated, the Secretary shall cause to be made, by inspectors

appointed for that purpose, an examination and inspection of all cattle, sheep, swine, goats,

horses, mules, and other equines before they shall be allowed to enter into any slaughtering,

packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered

and the meat and meat food products thereof are to be used in commerce . . . ."  21 U.S.C. §

603(a).  The provision of section 903 of the Federal Agriculture Improvement and Reform

(FAIR) Act of 1996 pertaining to the inspection of horses relates to inspections during the

transport of horses, which is not at issue in the instant case.  Plaintiffs understand the FY 2006

Amendment to in effect prohibit the slaughter of horses for human consumption.  Pls.' Mot. for

Prelim. Inj. at 10.

On November 23, 2005, Beltex Corporation, Dallas Crown, Inc., and Cavel International

(collectively the "Slaughter Facility Operators") filed a petition for "emergency rulemaking" with

the USDA to create a "fee-for-service" inspection program with respect to ante-mortem horse

inspections and transportation-related horse inspections.  Pls.' Mot. for Prelim. Inj., Ex. 10

(Petition) at 1.  On February 8, 2006, the Food Safety and Inspection Service ("FSIS") of the

Department of Agriculture published in the Federal Register an amendment to 9 C.F.R. Pt. 352,

"amending the Federal meat inspection regulations to provide for a voluntary fee-for-service

program under which official establishments that slaughter horses will be able to apply for and

pay for ante-mortem inspection."  71 Fed. Reg. 26 6337, 6337 (Feb. 8, 2006).  The "interim final

rule" was given an effective date of March 10, 2006; additionally, FSIS provided a shortened

comment period "because it is issuing an interim final rule and finds that it is in the public

3

interest for [FSIS] to receive comments on an expedited basis" before March 10, 2006, the date

on which the 2006 Amendment to the Agricultural Appropriations Act would take effect. *Id.* at

6337, 6340.  Elaborating on the need for immediate action, FSIS states: "[w]ith the passage of

the FY 2006 Appropriations Act, if FSIS does not establish a means for official establishments

that slaughter horses to obtain anti-mortem inspection, these establishments will not be able to

operate and presumably will be forced out of business.  This interim final rule is necessary to

avoid disruption of operations at official establishments that slaughter horses.  Therefore, the

Administrator has determined that prior notice and opportunity for public comment are

impracticable and contrary to the public interest under 5 U.S.C. 553(b), and that there is good

cause under 5 U.S.C. 553(d) for making the action effective as specified herein." *Id.* at 6340.

FSIS further specified that it is "establishing this fee-for-service program under the Agricultural

Marketing Act (AMA)." *Id.* at 6337.

       B.    *Procedural History*

       In Plaintiffs' [3] First Amended Complaint, filed on February 21, 2006, Plaintiffs made

three claims for relief.  First, Plaintiffs claimed that the fee-for-service inspection system was

created in violation of the Administrative Procedure Act, 5 U.S.C. § 553, because advance public

notice and opportunity to comment was not provided.  Am. Compl. ¶¶ 94, 95.  Second, Plaintiffs

claimed that Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706,

principally by acting arbitrarily and capriciously in violation of both the 2006 Agricultural

Appropriations Act Amendment and the Federal Meat Inspection Act ("FMIA").  Am. Compl. ¶¶

96, 97.  Finally, Plaintiffs claimed that Defendants violated the National Environmental Policy

Act ("NEPA") and its implementing regulations by acting arbitrarily and capriciously in violation

of the Administrative Procedure Act, 5 U.S.C. § 706.  Am. Compl. ¶¶ 98, 99.

Shortly after filing their First Amended Complaint, Plaintiffs filed [4] Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction, and Request for a Hearing ("Motion for Preliminary Injunction") on February 22, 2006.  In their Motion, Plaintiffs reiterated the grounds for relief stated in their First Amended Complaint and furthermore requested that the Court preliminarily enjoin and declare unlawful the fee-for-service ante-mortem inspection program that would become effective on March 10, 2006, on the grounds that Plaintiffs had demonstrated a likelihood of success on the merits, irreparable harm, lack of harm to Defendants, and public interest factors necessary to obtain injunctive relief.  Pls.' Mot. for Prelim. Inj.at 1–2.  On February 24, 2006, Beltex Corporation, Cavel International, Inc., and Dallas Crown, Inc. (collectively, the "Slaughter Facility Operators") filed an unopposed [7] Motion to Intervene as of right as Defendants, which was granted by the Court on March 1, 2006.

On March 14, 2006, the Court issued an [21] Order and [22] Memorandum Opinion denying Plaintiffs' request for a preliminary injunction and dismissing Claims One and Two of Plaintiffs' Amended Complaint.  Plaintiffs filed the instant Motion to Reconsider pursuant to Federal Rule of Civil Procedure 54(b), asking the Court to reconsider its *sua sponte* dismissal of Claims One and Two, which had been made on the Court's finding that Plaintiffs lacked prudential standing to pursue the claims set forth in these two Claims.  Pls.' Mot. Reconsider at 1.  Plaintiffs further request that the in the alternative, the Court certify Claims One and Two for immediate appellate review.  *Id.*  Finally, Plaintiffs request a hearing related to their Motion to Reconsider.  *Id.*

## II.  LEGAL STANDARD

5

Pursuant to Rule 54(b), when more than one claim is presented to the court,

> the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Fed. R. Civ. P. 54(b). Accordingly, without express direction by the court for the entry of judgment on particular claims under Rule 54(b), court action which terminates fewer than all claims in a case is considered an interlocutory rather than a final decision and subject to revision at any time. *See also Hill v. Henderson*, 195 F.3d 671, 672 (D.C. Cir. 1999) (holding that a district court order dismissing one of several claims without making an explicit determination under Rule 54(b) is not a final decision subject to appellate review); *Lewis v. United States*, 290 F. Supp. 2d 1, 3 (D.D.C. 2003) (stating that a motion to reconsider dismissal of claims related to one of two parties was properly brought under Rule 54(b) rather than Rule 60).

The Court has broad discretion to hear a motion for reconsideration brought under Rule 54(b): "Unlike Rule 60(b) which contains a reasonableness provision, Rule 54(b) allows a court to reconsider its interlocutory decisions 'at any time' prior to a final judgment." *Lewis*, 290 F. Supp. 2d at 3 (quoting Rule 54(b)). The standard for determining whether or not to grant a motion to reconsider brought under Rule 54(b) is the "as justice requires" standard espoused in *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005), which requires "determining, within the Court's discretion, whether reconsideration is necessary under the relevant circumstances." *Id. See also Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005). Considerations a court may take into account under the "as justice requires" standard include

6

whether the court "patently" misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or whether a controlling or significant change in the law has occurred.  *See Singh,* 383 F. Supp. 2d at 101. Furthermore, the party moving to reconsider carries the burden of proving that some harm would accompany a denial of the motion to reconsider:  "In order for justice to require reconsideration, logically, it must be the case that, some sort of 'injustice' will result if reconsideration is refused. That is, the movant must demonstrate that some harm, legal or at least tangible, would flow from a denial of reconsideration."  *Cobell*, 355 F. Supp. 2d at 540.

    *Cobell* also suggests that even if justice does not "require" reconsideration of an interlocutory ruling, a decision to reconsider is nonetheless within the court's discretion:  "[E]ven if the appropriate legal standard does not indicate that reconsideration is warranted, the Court may nevertheless elect to grant a motion for reconsideration if there are other good reasons for doing so."  *Id.* at 540.  However, the efficient administration of justice requires that a court at the very least have good reason to reconsider an issue which has already been litigated by the parties: "'The district court's discretion to reconsider a non-final ruling is, however, limited by the law of the case doctrine and "subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."'" *Singh*, 383 F. Supp. 2d at 101 (quoting *In re Ski Train Fire in Kaprun, Austria, on November 11, 2004*, 224 F.R.D. 543, 546 (S.D.N.Y. 2004) (quoting *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*, 322 F.3d 147, 167 (2d Cir. 2003))).  Thus if the court chooses to reconsider a motion even if justice does not so require, there must be a "good reason" underlying the parties' re-addressing an already decided issue.

# III.  DISCUSSION

*A.*      *Claim One of the Amended Complaint–Plaintiffs' Notice-and-Comment Claim pursuant to 5 U.S.C. § 553*

The instant Court dismissed Claim One of the Amended Complaint on the grounds that Plaintiffs did not have prudential standing to pursue their notice-and-comment claim pursuant to 5 U.S.C. § 553 of the APA.  *See* [22] P.I. Mem. Op. at 7–8 n. 2; Am. Compl. ¶¶ 94, 95. Plaintiffs urge the Court to reconsider its position that Plaintiffs lack standing to pursue their notice-and-comment claim.  Plaintiffs state in their Motion to Reconsider that the notice-and-comment requirements of 5 U.S.C. § 553 should be allowed to serve as the substantive provision by which the Court should measure whether Plaintiffs fall within the zone of interests for the purposes of determining prudential standing.  Pls.' Mem. Reconsider at 18.  Consequently, Plaintiffs argue that as the Court recognized with respect to Plaintiffs' NEPA claim, Plaintiffs "are clearly interested persons within the meaning of 5 U.S.C. § 553," as "USDA's notice-and-comment violations impaired plaintiffs' concrete interests, including because individual plaintiffs here live . . . in the very [area] that [the agency's] decision affects . . . ."  Pls.' Mem. Reconsider at 23 (internal quotations and citations omitted).

Upon further examination of the applicable case law and Plaintiffs' arguments raised in their Motion and accompanying Memorandum to Reconsider, the Court agrees that the interests of justice require reconsideration of the Court's dismissal of Claim One of Plaintiffs' Amended Complaint.  As such, the Court shall reinstate Claim One of the Amended Complaint and order further briefing on the merits with respect to Plaintiffs' notice-and-comment claim.

The Court notes as an initial matter that it shall not reconsider reinstating either of Plaintiffs Claims on the basis of Plaintiffs' suggestion that Defendants and Defendant-

Intervenors did not directly address prudential standing in explicit terms in their legal briefs. *See* Pls.' Mem. Reconsider at 9–10. The Court is not simply entitled to, but rather required to determine if Plaintiffs have standing prior to considering arguments on the merits in a particular case, even if such arguments are not initially raised as such by Defendants. "It is well established that a federal court cannot act in the absence of jurisdiction, *see B & J Oil & Gas v. FERC,* 353 F.3d 71, 74–75 (D.C. Cir. 2004), and that jurisdictional issues may be raised by the court *sua sponte, see, e.g., Lee's Summit, Mo. v. Surface Transp. Bd.,* 231 F.3d 39, 41 (D.C. Cir. 2000)." *American Library Ass'n v. F.C.C.*, 401 F.3d 489, 492 (D.C. Cir. 2005); *ANR Pipeline Co. v. F.E.R.C.*, 205 F.3d 403, 407–408 (D.C. Cir. 2000) ("Although neither FERC nor the intervenor has questioned ANR's standing to raise this claim, we are obliged to do so sua sponte."). *See also Int'l Ladies Garment Workers' Union v. Donovan*, 722 F.2d 795, 806 (D.C. Cir. 1983) ("Because 'the question of standing goes to this court's jurisdiction, we must decide the issue' in spite of waiver arguments raised by the appellants. *Southern Mutual Help Assoc. v. Califano*, 574 F.2d 518, 522 (D.C. Cir. 1977)."). Thus, the Court properly examined the issue of prudential standing in adjudicating Plaintiffs' Motion for Preliminary Injunction in the instant case.[2] With

---

[2] Furthermore, the Court notes that Plaintiffs, who themselves addressed the issue of standing in detail in their Reply to their Motion for Preliminary Injunction in response to Defendants' arguments regarding Plaintiffs lack of standing, would have been well-served to brief the issue of prudential standing with respect to their notice-and-comment claim at that time. Since the Court is required to assure itself that Plaintiffs have met all standing requirements before proceeding to examine the merits of a case, Plaintiffs should not have contented themselves with simply responding to specific standing arguments raised by Defendants and Defendant-Intervenors when it was clear that the issue of standing was salient to the success or failure of their claims. Plaintiffs legally unsupported statement that "[Plaintiffs] are indisputably 'interested parties' within the meaning of the APA's requirement for advance public notice and comment, 5 U.S.C. § 553," Pls.' Reply (P.I.), was not particularly useful to the Court. A more developed argument with legal support as set out by Plaintiffs in their Motion to Reconsider would have obviated the necessity for a second briefing.

respect to Claim One, the Court, upon further examination of the somewhat liberal contours of standing as applied to claims made pursuant to the notice-and-comment requirements set forth in 5 U.S.C. § 553, holds that it should err on the side of caution in allowing Plaintiffs to present the merits of their notice-and-comment claim and recognize their claim as within the zone of interests delineated by § 553 itself.

The instant circuit has held that "The APA's procedural requirements are enforceable apart from the reviewability of the underlying action, and, indeed, support several important functions wholly distinct from judicial review. The notice-and-comment requirement helps to ensure that the rule is subjected to thoroughgoing analysis and critique by interested parties and the agency. Whether or not these parties can ultimately bring suit in court, notice-and-comment gives them an opportunity to marshall what may be persuasive arguments before the agency." *American Medical Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995). A liberal view toward standing with respect to alleged notice-and-comment violations is further exemplified in the limited test used to ascertain whether such plaintiffs have Article III standing. *See Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 12 (D.D.C. 2002) ("[A] special standing doctrine [] applies when litigants attempt to vindicate their 'procedural rights,' such as their right to have notice of proposed regulatory action and to offer comments on such proposal. . . . Because procedural rights are special, the courts have relaxed the standing rules applicable to such challenges, particularly in relation to redressability. The Supreme Court has held that 'where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs,' they can establish standing 'without meeting all the normal standards for redressability and immediacy.' *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 n.7, 112 S.

Ct. 2130, 119 L. Ed. 2d 351 (1992).").

However, emphasis on the "derivative" nature of the "zone of interests" related to a procedural violation creates some confusion with respect to claims brought pursuant to 5 U.S.C. § 553, in that the notice-and-comment provision appears to be a procedural requirement, suggesting that the Court should look to some alternate "substantive" legal basis in determining a whether a party falls within the "zone of interests." *See Int'l Broth. of Teamsters v. Pena*, 17 F.3d 1478, 1483–84 (D.C. Cir. 1994) ("the petitioner may assert violations of any procedures designed to protect [the] threatened *concrete interest* of his that is the basis of his standing." *Defenders of Wildlife,* 504 U.S. at ---- n. 8, 112 S. Ct. at 2143 n. 8. Standing to assert procedural protections is thus derivative; a party within the zone of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing exercise of that authority, at least if the procedure is intended to enhance the quality of the substantive decision.") (emphasis added). However, because the instant Court has already ascertained that the Interim Final Rule itself does threaten a "concrete interest" of Plaintiffs in determining that Plaintiffs had standing to pursue their NEPA claim, *see* [22] P.I. Mem. Op. at 10–12, the Court shall allow Plaintiffs to pursue their claim that Defendants violated the notice-and-comment procedures set forth in 5 U.S.C. § 553 on the merits and shall reinstate this claim henceforth. If in fact "procedural requirements are intended to assist judicial review and to insure fair treatment for *persons to be affected* by the regulations so promulgated," *Nat'l Soft Drink Assoc. v. Block*, 721 F.2d 1348, 1353 (D.C. Cir. 1983), the Court cannot in good faith assert that Plaintiffs are unaffected by the Interim Final Rule at issue. *See also Dismas Charities, Inc. v. Dep't of Justice*, 401 F.3d 666, 678 (6th Cir. 2005) ("The notice and comment rulemaking requirements were

intended to 'assure fairness and mature consideration of rules of general application.' *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 764, 89 S. Ct. 1426, 22 L. Ed. 2d 709 (1969) (plurality opinion). In addition, one of the central purposes of the requirement of notice-and-comment is to give those with interests *affected* by rules the chance to participate in the promulgation of the rules. Thus the D.C. Circuit explained in *National Soft Drink Assn. v. Block,* 721 F.2d 1348, 1353 (D.C. Cir. 1983), that the § 553 requirements ensure fair treatment for persons to be affected by regulations." (emphasis added)); *Iyengar*, 233 F. Supp. 2d at 12–13 ("Thus, while would-be litigants' standing to assert violations of procedural rights is undoubtedly connected to their standing to assert violations of the substantive rights threatened by the denial of those procedural protections, the standard for establishing the former is less stringent than for the latter. In addition to a particularized injury (not just an abstract desire to see the government follow its own procedural rules), a plaintiff asserting a procedural violation must show 'a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest.' *Fla. Audubon Soc'y,* 94 F.3d at 664; *see also Am. Farm Bureau v. EPA,* 121 F. Supp. 2d 84, 97 (D.D.C. 2000).").

    B.    *Claim Two of the Amended Complaint*

    In Claim Two of the Amended Complaint, Plaintiffs allege that Defendants violated the requirements and purpose of both the FY 2006 Amendment and the FMIA in creating the fee-for-service ante-mortem horse inspection system at issue. Am. Compl. ¶¶ 96, 97. The Court dismissed Claim Two of Plaintiffs' Amended Complaint, holding that Plaintiffs lacked prudential standing to pursue the claims set forth therein, as Plaintiffs' interests do not fall within the "zone of interests" protected or regulated by either of the applicable provisions of the

aforementioned legislation and statute.  *See* [22] P.I. Mem. Op. at 7–10.  The Court shall address

Plaintiffs' arguments as to why the Court should reconsider its position with respect to each

claim separately, ultimately concluding that reconsideration of the Court's original position is

unwarranted.  As such, the Court upholds its dismissal of Claim Two of the Amended

Complaint.

### 1.    FY 2006 Agriculture Appropriations Act Amendment

Plaintiffs ask the Court to reconsider its holding that Plaintiffs lack prudential standing to

pursue their APA-based claim that the Defendants' Interim Final Rule violates the Amendment at

issue.  Citing the text of the Amendment ("Effective 120 days after the date of the enactment of

this Act, none of the funds made available in this Act may be used to pay the salaries or expenses

of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. Sec.

603) or under the guidelines issued under section 903 of the Federal Agriculture Improvement

and Reform Act of 1996."), the Court concluded that "[i]t is clear that this provision on its face

effectuates only a change in federal funding which does not in itself invoke the environmental,

aesthetic, informational, or economic interests raised by any of the Plaintiffs in the instant case."

[22] P.I. Mem. Op. at 8.

In their Motion to Reconsider, Plaintiffs claim that "a court must look to 'logic,

*legislative history*, and the structure of' a statute, in order to discern the apparent '*purpose*' of the

provision at issue, *ALDF*, 154 F.3d at 444 (emphasis added), and, hence, whether a particular

plaintiff's interests 'are among those that Congress sought to benefit . . . .' *Id.* at 445."  Pls.'

Mem. Reconsider at 11 (quoting *Am. Legal Defense Fund v. Glickman,* 154 F.3d 426, 444–445

(D.C. Cir. 1998) (en banc)).  However, Plaintiffs overreach and misconstrue in their application

of *ALDF* to the case at hand. First of all, the Court in *ALDF* stated that "[in] *this case*, logic, legislative history, and the structure of the AWA, all indicate that [plaintiff's] injury satisfies the zone of interests test." *Id.* at 444. It is clear that the court in *ALDF* used traditional methods of statutory interpretation in order to determine Congress' intent with respect to the Animal Welfare Act. However, traditional methods of statutory interpretation indicate that if the plain text of the statutory provision at issue is fully indicative of congressional intent, a Court should not look to legislative history, as the text of the provision speaks for itself. The "first step" in the canon of statutory construction is to "begin with a 'plain language' analysis of the statutory text." *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004). That is, the Court is to assume "that the legislative purpose is expressed by the ordinary meaning of the words used." *Sec. Indus. Ass'n v. Bd. of Governors*, 468 U.S. 137, 149, 104 S. Ct. 2979, 2986, 82 L. Ed. 2d 107 (1984) (internal quotation and citations omitted). "Where [] the plain language of the statute is clear, the court generally will not inquire further into its meaning." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995). *See also Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998) ("Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter."). *ALDF* is easily distinguishable from the instant case, in that the statutory provision invoked by plaintiffs–the Animal Welfare Act–was a complex statutory scheme which defies a "plain text" reading rather than a one-sentence amendment to an appropriations provision containing explicit funding instructions and no other stated purpose in its text. While Plaintiffs point to statements made by various congressional proponents of the Amendment, the instant circuit recently acknowledged "the principle that statutory text enacted by the Congress trumps the views expressed by one of its committees. *See*

*Neosho R-V Sch. Dist.,* 315 F.3d at 1032 ('Absent some ambiguity in the statute, we have no

occasion to look to legislative history.') . . . As we said last term, 'there would be no need for a

rule–or repeated admonition from the Supreme Court–that there should be no resort to legislative

history when language is plain and does not lead to an absurd result, if the rule did not apply

precisely when plain language and legislative history may seem to point in opposite directions.'

*United States ex rel. Totten v. Bombardier Corp.,* 380 F.3d 488, 494–95 (D.C. Cir. 2004)."

*Goldring v. District of Columbia,* 416 F.3d 70, 74 –75 (D.C. Cir. 2005) (internal footnote

omitted).

The nature of the Amendment that Plaintiffs invoke in the instant case, an Amendment to

a Fiscal Year Agricultural Appropriations Act–further precludes the beyond-plain text

interpretation that Plaintiffs attempt to apply to it.  The Amendment itself reads in its entirety as

follows:

> Effective 120 days after the date of the enactment of this Act, none of the funds
> made available in this Act may be used to pay the salaries or expenses of personnel to
> inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. Sec. 603) or
> under the guidelines issued under section 903 of the Federal Agriculture Improvement
> and Reform Act of 1996.

The Amendment explicitly eliminates funding to two federal inspection programs, the first of

which is at issue in the instant case (inspection pursuant to the FMIA).  Plaintiffs, however, in

bringing the instant suit, do not intend to protest or support the elimination of federal funding for

horse inspections pursuant to the FMIA.  Plaintiffs, rather, argue that Congress via the

Amendment intended to effectively prohibit the slaughter of horses by enacting this Amendment

to the FY 2006 Agricultural Appropriations Act.

Absent an explicit statement of this purported congressional purpose in the Amendment

itself–and such purpose clearly does not reside in the text–the Court cannot rightly construe that Congress intended to execute such a prohibition using an appropriations amendment, particularly considering that the FMIA recognizes the legality of procedures relating to the slaughter of horses for meat pursuant to 21 U.S.C. § 603. "[I]t is well settled that repeal by implication is disfavored, and the doctrine applies with full vigor when, as here, the subsequent legislation is an appropriations measure, and when the prior Act is to continue in its general applicability, as construed by the courts, but the claim is made that it is to be subject to a particularized legislative exception." *Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783, 785 (D.C. Cir. 1971) (internal footnote omitted). An appropriations provision must be explicit in stating its purpose other than that of allotting or precluding the provision of funds to particular government programs for the Court to construe otherwise, particularly in the face of contrary legislation. "The doctrine disfavoring repeals by implication . . . applies with even greater force when the claimed repeal rests solely on an Appropriations Act. We recognize that both substantive enactments and appropriations measures are 'Acts of Congress,' but the latter have the limited and specific purpose of providing funds for authorized programs." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190, 98 S. Ct. 2279, 2300, 57 L. Ed. 2d 117 (1978). *See also id.* at 191 ("'*[No] provision in any [general appropriations] bill or amendment thereto changing existing law [shall] be in order.*'" (quoting House Rule XXI(2) (emphasis added in opinion)); *Public Citizen v. Stockman*, 528 F. Supp. 824 at n.1 (D.D.C. 1981) (holding that an act providing an emergency funding mechanism pending approval of a comprehensive appropriations package was enacted "to safeguard Congress' interests, not those of private citizens [such that] plaintiffs do not have standing under the APA to challenge defendant's withholdings . . . ."). As such, the "interests

16

that the authors and sponsors [of the Amendment] sought to advance in introducing and

explaining that legislation," see Pls.' Mem. Reconsider at 12, are simply not relevant to the

Court's assessment of the interests invoked by this appropriations provision. Since the

Amendment at issue does not contain in its plain language the stated purpose of altogether

prohibiting the slaughter of horses for consumption-related purposes, and since Plaintiffs'

interests are not affected by how FMIA-related ante-mortem inspections are funded (as

Defendant-Intervenors' interests would be[3]), but rather *by the horse slaughter operations*

*themselves*,[4] Plaintiffs do not fall within the zone of interests circumscribed by the Amendment

to the 2006 FY Agricultural Appropriations Act.

2.      FMIA

Plaintiffs also ask the Court to reconsider its holding that Plaintiffs lack prudential

standing with respect to their APA-based claim that Defendants' Interim Final Rule violates the

FMIA section at issue. The Court held that "[t]he zone of interests inherent in the provision of

the FMIA invoked by Plaintiffs (21 U.S.C. § 603) is made clear in its self-description as "[f]or

the purpose of preventing the use in commerce of meat and meat food products which are

adulterated." [22] P.I. Mem. Op. at 9.

The purpose of this provision is clearly that of food safety–the provision was
intended to ensure that only unadulterated horse (and other meat) entered the

---

[3]  *Compare B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 718–20 (2d Cir. 1983)
(holding that unsuccessful bidders were within the "zone of interests" contemplated by an
appropriations act which specifically required that contracts let under the statute be awarded to
the lowest bidder). Because the Amendment at issue in the instant case specifically eliminates
funding to inspections for Defendant-Intervenors, Defendant-Intervenors would have been within
the "zone of interests" circumscribed by the Amendment itself.

[4]  "[P]laintiffs' position . . . is that the slaughtering of horses is *necessarily* inhumane."
Pls.' Reply at 8.

marketplace.  None of the Plaintiffs in the instant case bring their claims as potential consumers or distributors of meat products harboring concerns regarding the effects of the Interim Final Rule at issue on the quality or safety of horse meat in conjunction with fee-for-service ante-mortem inspections.  Plaintiffs invoke informational interests, interests related to the placement of their property next to slaughter facilities which allegedly produce negative externalities, and various related aesthetic interests.  None of these interests, however, arguably falls within the zone of interests contemplated by the statute – namely, that of food quality and the commerce of unadulterated meat products in the marketplace.

*Id.* at 9–10.

Plaintiffs argue that the Court mistakenly cited only one of the purposes of the FMIA, elaborating that 21 U.S.C. § 603(b) includes the purpose of "preventing the inhumane slaughter of livestock" in its text.  Pls.' Mem. Reconsider at 25.  However, it is clear from the agency action challenged in this case that Plaintiffs necessarily are not invoking 21 U.S.C. § 603(b), but *only* 21 U.S.C. § 603(a) in their challenge of *ante-mortem* inspection procedures, and as such, do not fall within the zone of interests set forth in 21 U.S.C. § 603(a).

As the Court stated in its [22] Memorandum Opinion, "'[T]he meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . , but by reference to the particular provision of the law upon which the plaintiff relies.'  *Bennett*, 520 U.S. at 175-76, 117 S. Ct. 1154; *see also Lujan*, 497 U.S. at 883, 112 S. Ct. 2130 ('[T]he plaintiff must establish that the injury he complains of . . . falls within the "zone of interests" sought be protected by the statutory *provision* whose violation forms the legal basis for his complaint.' (emphasis added))."  [22] P.I. Mem. Op. at 9.  In the instant case, the only provisions of the FMIA relied upon by Plaintiffs relevant to the case at hand are 21 U.S.C. § 603(a) and 21 U.S.C. § 695 (the latter of which is not addressed by Plaintiffs in their Motion to Reconsider but addresses the costs of inspection rather than the underlying purpose).

Pursuant to 21 U.S.C. § 603:

(a) Examination of animals before slaughtering; diseased animals slaughtered separately and carcasses examined

For the purpose of preventing the use in commerce of meat and meat food products which are adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce; and all amenable species found on such inspection to show symptoms of disease shall be set apart and slaughtered separately from all other amenable species, and when so slaughtered the carcasses of said amenable species shall be subject to a careful examination and inspection, all as provided by the rules and regulations to be prescribed by the Secretary, as provided for in this subchapter.

(b) Humane methods of slaughter

For the purpose of preventing the inhumane slaughtering of livestock, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of the method by which amenable species are slaughtered and handled in connection with slaughter in the slaughtering establishments inspected under this chapter. The Secretary may refuse to provide inspection to a new slaughtering establishment or may cause inspection to be temporarily suspended at a slaughtering establishment if the Secretary finds that any amenable species have been slaughtered or handled in connection with slaughter at such establishment by any method not in accordance with the Act of August 27, 1958 (72 Stat. 862; 7 U.S.C. 1901-1906) until the establishment furnishes assurances satisfactory to the Secretary that all slaughtering and handling in connection with slaughter of livestock shall be in accordance with such a method.

21 U.S.C. § 603. It is clear to the Court that the Interim Final Rule, which creates an alternate

funding mechanism for ante-mortem inspection of horses to be slaughtered, pertains not to the

actual slaughter of horses or inspections conducted in conjunction therewith, but rather to the

*ante-mortem* inspection of such horses. Only 21 U.S.C. § 603(a), and not 21 U.S.C. § 603(b),

pertains to ante-mortem inspections. Thus, "[w]hile the Plaintiffs did mention that the FMIA

also serves to prevent 'inhumane slaughtering' in their [Motion for Preliminary Injunction], they

did not *rely* on this particular provision of law in asserting their APA claim based upon FMIA."

19

Def.-Intervs' Opp'n at 10. The Court thus finds no basis under which to reconsider its finding

that Plaintiffs are not within the zone of interests of the provision of the FMIA they rely upon to

make their APA claim–namely, 21 U.S.C. § 603(a).

### 3.    Certification for Appellate Review

Pursuant to Federal Rule of Civil Procedure 54(b), "the court may direct the entry of a

final judgment as to one or more but fewer than all of the claims or parties only upon an express

determination that there is no just reason for delay and upon an express direction for the entry of

judgment." Fed. R. Civ. P. 54(b). Since the Court, via this Opinion and an accompanying Order,

reinstates Claim One of Plaintiffs' Amended Complaint, Plaintiffs' request that the Court certify

its dismissal of claims for immediate appellate review applies only to Claim Two.

"Rule 54(b) mediates between the sometimes antagonistic goals of avoiding piecemeal

appeals and giving parties timely justice. *See Curtiss-Wright Corp. v. General Elec. Co.,* 446

U.S. 1, 8, 100 S. Ct. 1460, 1464–65, 64 L. Ed. 2d 1 (1980)." *Taylor v. FDIC*, 132 F.3d 753, 760

(D.C. Cir. 1997). "The rule thus permits the district court to 'function[ ] as a dispatcher,

determining in its sound discretion when a claim should proceed on to appellate resolution and

when it should await its fellows.' *Taylor v. FDIC,* 132 F.3d 753, 760 (D.C. Cir. 1997)." *Petties

v. District of Columbia*, 227 F.3d 469, 472 (D.C. Cir. 2000) (internal quotations and citations

omitted). However, despite the ample discretion given to a district court with respect to

certifying a dismissed claim for immediate appellate review, "Rule 54(b) 'did not ⋯ purport to

amend or dilute the fundamental rule against splitting a cause of action and deciding appellate

cases piecemeal.'" *Tolson v. United States*, 732 F.2d 998, 1001–1002 (D.C. Cir. 1984) (quoting

*Page v. Preisser,* 585 F.2d 336, 339 (8th Cir. 1978) (citations omitted)). *See also Curtiss-Wright*

*Corp. v. General Elec. Co.*, 446 U.S. 1, 8, 100 S. Ct. 1460, 1465, 64 L. Ed. 2d 1(1980):

> Not all final judgments on individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims. . . . It is left to the sound judicial discretion of the district court to determine the appropriate time when each final decision in a multiple claims action is ready for appeal. This discretion is to be exercised in the interest of sound judicial administration. Thus, in deciding whether there are no just reasons to delay the appeal of individual final judgments in [a] setting such as this, a district court must take into account judicial administrative interests as well as the equities involved. Consideration of the former is necessary to assure that application of the Rule effectively preserves the historic federal policy against piecemeal appeals.

*Id.* (internal citations and quotations omitted).

Plaintiffs' multiple claims that the Interim Final Rule adopted by Defendants should be invalidated all stem from the Administrative Procedure Act. Because outstanding arguments remain with respect to Plaintiffs' NEPA and notice-and-comment claims, which could result in a remand to the agency should Plaintiffs succeed on the merits on either of these claims, the Court shall deny Plaintiffs' request that the Court certify its dismissal of Claim Two for immediate appellate review in order to avoid piecemeal appellate review and in the interests of judicial economy. Were the instant Court to certify Claim Two for immediate appellate review, and the appellate court to determine that Plaintiffs indeed have standing to pursue their claims pursuant to Claim Two, remand of that decision to the instant Court at this juncture would only further delay adjudication of the merits of Plaintiffs' claims.

### IV. CONCLUSION

Based on the aforementioned reasoning, the Court shall GRANT IN PART and DENY IN PART Plaintiffs' Motion to Reconsider. The Court shall grant Plaintiffs' Motion to Reconsider with respect to Claim One of Plaintiffs' Amended Complaint and shall order the Parties to submit to the following expedited briefing schedule with respect to Plaintiffs' claim pursuant to

the notice-and-comment provisions of the APA, 5 U.S.C. § 553: Plaintiffs' Motion for Summary Judgment shall be filed with the Court by September 8, 2006; Defendants' Opposition shall be filed with the Court by September 19, 2006; and any Reply by Plaintiffs shall be filed with the Court by September 26, 2006. The Court will address Plaintiffs' NEPA claim (Claim Three) at the same time it addresses briefing with respect to Claim One. The Court shall deny Plaintiffs' Motion to Reconsider with respect to Claim Two of Plaintiffs' Amended Complaint. The Court shall further deny Plaintiffs' request that the Court certify its dismissal of Claim Two for immediate appellate review. An appropriate Order accompanies this Memorandum Opinion.

Date:   August 28, 2006

                                                 /s/
                                          COLLEEN KOLLAR-KOTELLY
                                          United States District Judge