IN THE UNITED STATES DISTRICT COURT
FOR THE DISTICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF<br>THE UNITED STATES, et al.<br>    Plaintiffs,<br><br>v.<br><br><br>MIKE JOHANNS, Secretary<br>United States Department of Agriculture, et al.<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) Civ. No. 1:06cv00265 (CKK)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT-INTERVENORS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM ONE**

James P. Murphy, Esq. (D.C. Bar No. 380857)
Katherine L. Halpin, Esq. (D.C. Bar No. 494139)
SQUIRE, SANDERS & DEMPSEY L.L.P.
1201 Pennsylvania Ave., N.W.
Suite 500
Washington, DC  20004
Telephone:  202.626.6600
Fax:  202.626.6780

Date:  September 19, 2006                    *Attorneys for Defendant-Intervenors*

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................................ 1

II. PROCEDURAL HISTORY ................................................................................................. 2

III. ARGUMENT ........................................................................................................................ 4

    A. The FSIS Had "Good Cause" to Promulgate the Interim Final Rule Without Notice and Comment ................................................................................ 5

        1. Delay in the Rulemaking Would Have Caused Real, Irreversible Harm to Slaughter Facilities ............................................................................ 5

    B. The Good Cause Exception was Correctly Employed to Ensure That the USDA and FSIS were In Compliance with the FMIA ......................................... 7

IV. CONCLUSION .................................................................................................................. 10

# TABLE OF AUTHORITIES

**PAGE**

**FEDERAL CASES**

*Am. Fed'n of Gov't Employees v. Block*, 655 F.2d 1153 (D.C. Cir. 1981)..........................4

*Chamber of Commerce v. SEC,* 443 F.3d 890 (D.C. Cir. 1981)..........................................4

*C&K Mfg. & Sales Co. v. Yeutter*, 749 F.Supp. 8 (D.D.C. 1990)........................................9

*Hawaii Helicopter Operators Ass'n v. FAA*, 51 F.3d 212 (9th Cir. 1995).........................4

*Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004)......................................................................4

*MacFarland v. Washington, A.&M. v. R.Co.*, No. 1089 1901 U.S.App. LEXIS 5079 (D.C. Cir. June 18, 1901) ..........................................................................................9

*New Jersey v. EPA*, 626 F.2d 1038 (D.C. Cir. 1980)........................................................2, 4

*Universal Health Services of McAllen, Inc. v. Sullivan*, 770 F. Supp. 704 (D.C. 1991) ...............................................................................................................................5

*Woods Psychiatric Inst. V. United States*, 20 Cl. Ct. 324 (Cl. Ct. 1990)............................5

**FEDERAL STATUTES**

5 U.S.C. § 500 *et seq.*...........................................................................................................2

5 U.S.C. § 553 ...................................................................................................................4, 8

7 U.S.C. § 1901 note.............................................................................................................2

21 U.S.C. § 601 *et seq.* ........................................................................................................2

21 U.S.C. § 602.....................................................................................................................9

21 U.S.C. § 603 ..................................................................................................................2, 8

**FEDERAL REGULATIONS**

9 C.F.R. § 352 .......................................................................................................................1

71 Fed. Reg. 6,337 .....................................................................................................1, 3, 4, 8

TABLE OF AUTHORITIES

**PAGE**

**LEGISLATIVE MATERIALS**

Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act of November 10, 2005, Pub.L. 109-97......................................................................................................... 2-3

Federal Agriculture Improvement and Reform Act of 1996, Pub. L. 104-127 .................... 2

H.R. Rep. No. 109-255 ................................................................................................. 3, 7

S. Doc. No. 248, 79th Cong., 2d Sess. 200, 258 (1946) ...................................................... 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF <br> THE UNITED STATES, et al. <br>     Plaintiffs, <br><br> v. <br><br><br> MIKE JOHANNS, Secretary <br> United States Department of Agriculture, et al. <br><br>     Defendants. | Civ. No. 1:06cv00265 (CKK) |

**DEFENDANT-INTERVENORS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM ONE**

**I.  INTRODUCTION**

On February 8, 2006, the Food Safety Inspection Service ("FSIS") of the United States Department of Agriculture ("USDA") promulgated an Interim Final Rule to "provide for a voluntary fee-for-service program under which official establishments that slaughter horses will be able to apply for and pay for ante-mortem inspection." 71 *Fed. Reg.* 6,337, 6,341 (Feb. 8, 2006)(to be codified at 9 C.F.R. § 352).

The agency promulgated this rule without prior notice and comment because there was good cause for doing so. First, without immediately establishing a program by which USDA inspectors could perform ante-mortem inspections of horses, Beltex Corporation ("Beltex"), Cavel International, Inc. ("Cavel") and Dallas Crown, Inc. ("Dallas Crown") (collectively "Defendant-Intervenors") would be forced to cease their entire business operations, a consequence far more dramatic and serious than a mere imposition on their "economic interests,"

as Plaintiffs suggest. *See* Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment on Claim One (hereinafter "Plaintiffs' Motion") at 2. Second, without ensuring that there existed some mechanism by which to conduct ante-mortem inspection of horses, Government Defendants would have been in violation of the mandate of the Federal Meat Inspection Act, 21 U.S.C. § 601, *et. seq.* ("FMIA) which requires that federal inspectors examine all species, including horses, before they enter any slaughtering facility.

Together, these two reasons for promulgating the Interim Final Rule without notice and comment more than satisfy this "narrowly construed" exception to the Administrative Procedures Act ("APA"), 5 U.S.C. § 500, *et. seq. New Jersey v. EPA,* 626 F. 2d 1038, 1045 (D.C. Cir. 1980). This brief focuses on the "good cause" established by the USDA and FSIS when promulgating the Interim Final Rule without prior notice and comment. Defendant-Intervenors adopt the Government Defendants' response to Plaintiffs' second argument that the *post-hoc* comment period provided was insufficient to comply with the APA.

## II. PROCEDURAL HISTORY

The procedural history of this case has been reviewed at length in other memoranda submitted by Defendant-Intervenors, and by this Court, most recently in its Opinion of August 28, 2006. *See* Memorandum Opinion, dated August 28, 2006 ("Memorandum Opinion"). The following is a short summary of the points relevant to this Motion.

On November 10, 2005, President Bush signed the Fiscal Year 2006 Agricultural Appropriations Act which prohibited the FSIS from using appropriated funds to pay the "salaries or expenses of personnel to inspect horses under Section 3 of the Federal Meat Inspection Act (21 U.S.C. § 603) or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 1901 note; Public Law 104-127)." Agriculture,

Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act of November 10, 2005, Pub. L. 109-97, § 794 ("Appropriations Act").

The effect of this language was to prohibit the FSIS from funding those ante-mortem inspections explicitly required by the FMIA. As House and Senate conferees of the Appropriations Act acknowledged, however, "the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and exported)." H.R. Rep. No. 109-255 at 107 (2005).

In response to (a) the dictates of the FMIA and the Conference Report which accompanied the Appropriations Act, and (b) the November 23, 2005 Petition submitted by the Defendant-Intervenors, who, without ante-mortem inspection of horses, would be precluded from operating their businesses, the FSIS promulgated an interim final rule on February 8, 2006. The rule provided for a "voluntary fee-for-service program under which official establishments that slaughter horses will be able to apply for and pay for ante-mortem inspection." 71 *Fed. Reg.* at 6,340. Acting within the authority granted by the APA, the agency adopted the Final Interim Rule without notice and comment, finding that "prior notice and opportunity for public comment are impracticable and contrary to the public interest." *Id.* at 6,340.

In the section of the *Federal Register* notice entitled "Need for Immediate Action," the FSIS found that "adoption of this interim final rule without prior notice and an opportunity to comment is appropriate and necessary following the enactment of the FY 2006 Appropriations Act" for *two* separate and independent reasons, one of which the Plaintiffs ignore entirely in their motion. *Id.* First, the Interim Final Rule was promulgated without notice and comment to ensure that Defendant-Intervenors' operations were not disrupted by the Appropriations Act coming into effect on March 10, 2006. Second, while the Appropriations Act prohibited the use

of federal funds for ante-mortem inspection of horses, "horses slaughtered for human food continue to be subject to all requirements of the FMIA, including the requirements for ante-mortem inspection...." 71 *Fed. Reg.* at 6,340. Both of these reasons are well-founded and more than sufficient to satisfy the "good cause" exception to the APA.

### III.  ARGUMENT

The "good cause" exception set forth in §553(b)(B) of the APA authorizes an agency to dispense with notice and comment rulemaking procedures where it establishes "for good cause" that the requirements are "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553 (b)(B). While Plaintiffs are correct that this exception to normal rulemaking procedures is "narrowly construed," *New Jersey v. EPA,* 626 F. 2d at 1045, the exception is not nearly as limited as Plaintiffs suggest. *See* Plaintiffs' Motion at 2.

The exception "excuses notice and comment in emergency situations or where delay could result in serious harm." *Jifry v. FAA,* 370 F. 3d 1174, 1179 (D.C. Cir. 2004) (internal citations omitted). Courts have held that "emergency situations" include those that would result in severe economic harm and disruption to private industry, *see Chamber of Commerce v. SEC,* 443 F. 3d 890, 908 (D.C. Cir. 2006) (citing *Am. Fed'n of Gov't Employees v. Block,* 655 F.2d 1153, 1156 (D.C. Cir. 1981)) (hereinafter *Block*). Furthermore, the exception will be allowed in those cases where an agency acts to protect public safety and public interests against serious harm. *Jifry,* 370 F. 3d at 1179 (citing *Hawaii Helicopter Operators Ass'n v. FAA,* 51 F.3d 212, 214 (9th Cir. 1995)). The two reasons provided for promulgation of the Interim Final Rule without notice and comment fit squarely within both of these rationales for the existence of the "good cause" exception.

### A.     The FSIS Had "Good Cause" to Promulgate the Interim Final Rule Without Notice and Comment.

Courts "must review the Secretary's invocation of the good cause exception in light of the circumstances under which the guidelines were promulgated," *Universal Health Services of McAllen, inc. v. Sullivan,* 770 F. Supp. 704, 721 (D.C. 1991). Given the circumstances facing the FSIS following the enactment of the Appropriations Act, case law indicates that the agency was well within its authority to find that "good cause" existed because prior notice and comment would be both "impracticable" and "contrary to the public interest."

### 1.     Delay in the Rulemaking Would Have Caused Real, Irreversible Harm to Slaughter Facilities

The "public interest" exception to notice and comment rulemaking permits an agency to fulfill its duty and prevent "real harm" to affected parties in emergency situations. "[G]ood cause is evident when the delay created by notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Inst. v. United States,* 20 Cl. Ct. 324, 333 (Cl. Ct. 1990) (citation omitted). Such important interests include "the potential harm to *all* the parties involved," including the regulated industry. *Id.* (emphasis added). Without a fee-for-service program in place on March 10, 2006, Defendant-Intervenors were threatened with closure of their facilities. Threat of closure was more than sufficient cause for promulgating the Final Interim Rule without prior notice and comment. *See* Declaration of Dallas Crown, Inc., attached as Exhibit 1; Declaration of Beltex Corporation, attached as Exhibit 2; Declaration of Cavel Inc., attached as Exhibit 3.

While Plaintiffs attempt to limit "emergency situations" to those drastic and rare circumstances in which this country's national security is threatened, courts have approved the use of the "good cause" exception for numerous reasons, including those where an industry

would otherwise be irrevocably harmed. For instance, in *Block*, the United States Court of Appeals for the District of Columbia Circuit affirmed the district court's decision that the Secretary of Agriculture correctly employed the "good cause" exception in response to an emergency situation threatening the efficient operation of the poultry industry. *Block*, 655 F.2d at 1157.[1]

In *Block*, certain unions brought suit against the Secretary to challenge new inspection rates in poultry processing plants because, allegedly, the USDA did not follow the rulemaking procedures required by the APA. *Id.* at 1155. The Department countered that it had "good cause" to forego the notice and comment requirement because it was faced with an emergency situation: a prior regulation establishing the maximum allowable inspection rates in various regions of the country was enjoined by a federal district court in Arkansas on the basis that it was discriminatory. Without putting a new inspection regime quickly into place, the Department would have been forced to rely on "antiquated guidelines, thereby creating confusion among field administrators, and caus[ing] economic harm and disruption to those northeastern processors whose inspection lines ran at varying speeds." *Id.* at 1157. The District of Columbia Court of Appeals agreed that the "issuance of emergency regulations to ameliorate this expected harm [to the regulated industry]…did not violate section 553 of the Administrative Procedure Act." *Id.*

Also informative is the position in which the USDA found itself in *Block*: while under no mandate to take action to comply with the federal district court's injunction, the USDA had to act immediately to ensure continued inspection and supply of poultry to consumers. *See id.* Similarly, in this case, the FSIS was under no explicit mandate to promulgate a rule to provide

---

[1] The Court of Appeals did modify the district court's decision as to the permanence of the regulations. It found that the regulations would have more appropriately been issued in the form of an interim rule, which of course, is exactly the approach the FSIS took in the above-captioned case. *Block*, 655 F.2d at 1157-1158.

for the continued ante-mortem inspection of horses, but contrary to Plaintiffs' charge, the agency's doing so was not "discretionary." The FSIS was, at the very least, implicitly charged (see the language in the Conference Report) with the obligation "under existing statutes to provide for the inspection of meat intended for human consumption," H.R. Rep. No. 109-255 at 107, and to adopt a regulation to ensure that these inspections continue in light of the changed funding scheme.

Though Plaintiffs persist in arguing to the contrary, on its face the Appropriations Act affected only a change in federal funding. It did not prohibit the slaughter of horses. *See* Memorandum Opinion at 15-17. Considering the purpose of the Appropriations Act, the direction contained in the accompanying Conference Report, and the FMIA's mandate that the agency provide ante-mortem inspection of horses, it would have been improper to *not* utilize the "good cause" exception of the APA's rulemaking procedures to ensure that, when Section 794 of the Appropriations Act took effect, a program was in place to provide for the continued ante-mortem inspection of horses.

**B.     The Good Cause Exception was Correctly Employed to Ensure that the USDA and FSIS were in Compliance with the FMIA**

The exception to normal notice and comment procedures may be employed in circumstances where "immediate promulgation of a rule is necessary to comply with a specific Congressional mandate." Plaintiffs' Motion at 2. This is exactly the situation that faced the Government Defendants following the enactment of the Appropriations Act.

In fact, the legislative situation that presented itself to the USDA after the Appropriations Act was signed into law, which included both the imminent discontinuation of federal funding for the ante-mortem and transportation-related inspection of horses and the continuing mandate of the FMIA that such inspections be performed, created an "impracticable situation" for

purposes of Section 553(b)(B) of the APA. While "impracticable" is not defined by the APA, the legislative history of the impracticability standard reveals that Congress intended this exemption to operate when "the due and required execution of the agency functions would be prevented by its [the agency's] undertaking public rulemaking proceedings." S. Doc. No. 248, 79th Cong., 2d Sess. 200, 258 (1946).

Plaintiffs again insist that the FSIS was under no obligation to act at all, and that the "only consequence would have been that that funding ban would have gone into effect, and thus the slaughter plants would no longer have been permitted to slaughter horses for human consumption...." Plaintiffs' Motion at 10. Setting aside the fact that this Court already has found that Congress did not intend to "execute such a prohibition using an appropriations amendment," Memorandum Opinion at 16, Plaintiffs have handily chosen to ignore the agency's obligations under the FMIA to inspect all "amenable species," including horses, prior to slaughter. 21 U.S.C. § 603. Therefore, a significant consequence of inaction would have been the failure of the agency to fulfill its statutory obligations. To address this situation, the Government Defendants relied upon the "good cause" exception to the APA. *See* 71 *Fed Reg.* 6,340 ("The FY 2006 Appropriations Act prohibits the use of appropriated funds for ante-mortem inspection of horses.... Nevertheless, horses slaughtered for human food continue to be subject to all requirements of the FMIA, including requirements for ante-mortem inspection.").

Dispensing with notice and comment also allowed the FSIS to continue to serve the public interest. Plainly, the mission of the Food Safety Inspection Service is to ensure the safety of food for consumption, whether domestic or foreign. Therefore, the agency's programs and its continued inspection of livestock prior to slaughter serve many more constituencies than just the

industries it regulates. It also serves, for example, consumers, the public welfare and the marketplace. *See* 21 U.S.C. § 602.

The public has a great interest in ensuring that laws pertaining to public health and safety are enforced. *See MacFarland v. Washington, A.&M. v. R. Co.,* No. 1089, 1901 U.S. App. LEXIS 5079, at *1 (D.C. Cir. June 18, 1901) ("a statute or regulation looking to the public interest and safety will be upheld by the courts unless it is plain that it has no real or substantial relation to those objects...."). The FMIA is such a law, and the FSIS is charged with the enforcement of it. Without immediately establishing the voluntary fee-for-service program to ensure continued inspection of horses, the public's strong interest in seeing that the "FSIS is able to do its job," *C&K Mfg. & Sales Co. v. Yeutter,* 749 F. Supp. 8, 14 (D.D.C. 1990) would have been stifled, *i.e.*, the consequences of non-enforcement of the law clearly impinge upon the public welfare:

> "Meat and meat food products are an important source of the Nation's total supply of food.... It is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged. Unwholesome, adulterated, or misbranded meat or meat food products impair the effective regulation of meat and meat food products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged meat and meat food products, and result in sundry losses to livestock producers and processors of meat and meat food products, as well as injury to consumers."

21 U.S.C. § 602.

If the USDA had not relied on the "good cause" exception to establish fee-for-service programs on March 10, 2006, (a) real harm would have occurred to the regulated industry and the USDA and (b) FSIS would not have been capable of fulfilling its statutory obligations to perform ante-mortem inspections of horses or ensure the humane transport of equines. Thus, the

Rule was properly issued, without prior notice and comment, to protect the important "public interests" at stake.

## IV.   CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that the Plaintiffs' Motion for Summary Judgment on Claim One be denied.

Respectfully submitted,

/s/ James P. Murphy
James P. Murphy, Esq. (D.C. Bar No. 380857)
Katherine L. Halpin, Esq. (D.C. Bar No. 494139)
SQUIRE, SANDERS & DEMPSEY L.L.P.
1201 Pennsylvania Ave., N.W.
Suite 500
Washington, DC  20004
Telephone:  202.626.6600
Fax:  202.626.6780

Date:  September 19, 2006          *Attorneys for Defendant-Intervenors*