## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE<br> UNITED STATES, et al.,<br><br>       **Plaintiffs**<br><br>   v.<br><br><br>MIKE JOHANNS, Secretary,<br> United States Department<br> of Agriculture, et al.,<br><br>       **Defendants.**<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>) **Civil Action No. 06-0265(CKK)**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### DEFENDANTS' OPPOSITION TO PLAINTIFFS'
### MOTION FOR SUMMARY JUDGMENT ON CLAIM ONE
### AND DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY,
### FOR SUMMARY JUDGMENT ON THIS CLAIM

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants, Mike Johanns, Secretary, U.S.

Department of Agriculture, and Barbara J. Masters, Administrator, Food Safety and

Inspection Service, by and through their undersigned attorneys, respectfully move to

dismiss Claim One of Plaintiffs' Amended Complaint. Alternatively, pursuant to Fed. R.

Civ. P. 56, Defendants move for summary judgment on this claim because there are no

genuine factual issues in dispute and Defendants are entitled to judgment as a matter of

law. Further, Defendants oppose Plaintiffs' Motion for Summary Judgment on this claim.

Pursuant to Local Rules 7(a) and 7(c), respectively, a memorandum of points and

authorities supporting this motion and a statement of genuine issues as to which there is

no dispute are attached. Consistent with the Court's March 1, 2006 Order in this matter, a

proposed Order does not accompany this opposition and motion.

Respectfully Submitted,


/s/ Kenneth L. Wainstein /dvh
_____
KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney


/s/ Rudolph Contreras
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


/s/ Beverly M. Russell
_____
Of Counsel:                    BEVERLY M. RUSSELL, D.C. Bar #454257
Thomas Bolick, Esq./           Assistant United States Attorney
Rick Herndon, Esq.             U.S. Attorney's Office for the
U.S. Dept. of Agriculture       District of Columbia
                               555 4th Street, N.W., Rm. E-4915
                               Washington, D.C.  20530
                               Ph:  (202) 307-0492

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY OF THE )
  UNITED STATES, et al., )
                       )
       **Plaintiffs** )
                       )
   **v.** )
                       ) **Civil Action No. 06-0265(CKK)**
MIKE JOHANNS, Secretary, )
  United States Department )
  of Agriculture, et al., )
                       )
       **Defendants.** )
_____ )

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
### DEFENDANTS' OPPOSITION TO PLAINTIFFS'
### MOTION FOR SUMMARY JUDGMENT ON CLAIM ONE
### AND DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY,
### FOR SUMMARY JUDGMENT ON THIS CLAIM

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., establishes

certain procedural requirements with which an agency generally must comply in

promulgating a regulation (5 U.S.C. § 553(b)- (d)), including published notice of

proposed rulemaking, opportunity for public comment, and publication of a final rule.

However, an agency is excused from providing notice and opportunity for comment on a

proposed rule "when the agency for good cause finds (and incorporates the finding and a

brief statement of reasons therefore in the rules issued) that notice and public procedure

thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C.§

553(b)(B).

Relying on the APA, 5 U.S.C. § 553, Plaintiffs object to the United States

Department of Agriculture's ("USDA") publication of an Interim Final Rule providing

"for a voluntary fee-for-service program under which official establishments that

slaughter horses [could] apply and pay for ante-mortem inspection," see 71 Fed. Reg.

6337 (Feb. 8, 2006), on grounds that, although incontrovertibly given opportunity to

comment, they should have been provided an advance opportunity to comment.  Pls.'

First Am. Compl. ¶ 94. Plaintiffs' claim, however, lacks merit because they were, in fact,

afforded the opportunity to comment on the rule, and additionally, the USDA properly

relied on the "good cause" exception to excuse advance notice and comment.

Accordingly, Defendants Mike Johanns, Secretary, USDA, and Barbara J. Masters,

Administrator, Food Safety and Inspection Service ("FSIS"), by and through their

undersigned attorneys, herein oppose Plaintiffs' Motion for Summary Judgment on Claim

One of their Complaint and request that this Court dismiss Count One of Plaintiffs'

Complaint, or alternatively, grant Defendants summary judgment on this claim.

## BACKGROUND

The relevant regulation and statutory provisions are described below.[1]

### A.    The Federal Meat Inspection Act, 21 U.S.C. § 601, et seq.

The Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601, et seq., was enacted

in 1907 to ensure that meat and meat products are "wholesome, not adulterated, and

---

[1]For convenience of the Court and the Parties, the regulatory background section
from Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order
and Preliminary Injunction is repeated herein, in part.

properly marked, labeled, and packaged." 21 U.S.C. § 602; <u>see also</u> H.R. Rep. No. 48-1852 (1948), <u>reprinted in</u> 1948 U.S.C.C.A.N. 1706, 1711 (<u>see</u>, R. 10, Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, Ex. 1). Congress considered "[t]he inspection of meat and meat products to assure [their] purity and wholesomeness" as "a proper function" of the Federal government to protect the health and welfare of the American people, and to ensure consumer confidence in meat purchased or otherwise obtained in the United States.  <u>Id.</u>

To that end, the Act mandates that the USDA inspect the sanitary conditions of meat-processing plants and "prescribe the rules and regulations of sanitation under which such establishments shall be maintained." 21 U.S.C. § 608. The Act provides that FSIS inspectors shall have access to all parts of a plant at all times. 21 U.S.C. § 606.

Products that are subject to inspection under the Act may not be sold or offered for sale in commerce unless they have been inspected and deemed satisfactory. 21 U.S.C. § 610(c). Where the sanitary conditions of a plant are such that the meat has been "rendered adulterated," USDA must withhold the mark of inspection. 21 U.S.C. § 608.

To prevent adulterated meat and meat food products from entering interstate commerce, the FMIA requires that FSIS inspectors conduct both ante-mortem and post-mortem examinations and inspections.  21 U.S.C. §§ 603 and 604.  Specifically, all livestock (cattle, sheep, swine, goats, horses, mules, and other equines) must be examined and inspected before they are allowed to enter any slaughtering, packing, meat-canning,

3

rendering, or other similar establishment in which they are to be slaughtered for meat and

meat food products for human consumption.  21 U.S.C. § 603. Post-mortem examination

and inspection of carcasses and parts thereof that are processed for human consumption

are also mandated.[2]  21 U.S.C. § 604.

The FMIA provides that the USDA may refuse or withdraw inspection services

under circumstances where the applicant for or recipient of such services has been

declared unfit to engage in any business requiring inspection services. 21 U.S.C. § 671.

The USDA may deny inspection services based upon a recipient's or applicant's

conviction of (1) any felony or (2) more than one  conviction of crimes other than a

felony based upon unlawful "acquiring, handling, or distributing of unwholesome,

mislabeled, or deceptively packaged food or upon fraud in connection with transactions in

food."  21 U.S.C. § 671.[3]  However, the USDA must provide the applicant for or recipient

of inspection services an opportunity for a hearing when considering withdrawing

---

[2]The Humane Methods of Slaughter Act ("HMSA"), 7 U.S.C. § 1901 et seq., requires that humane methods be used for handling and slaughtering livestock, including horses. The ante-mortem inspection provisions of the FMIA reference the HMSA and provide that, for the purposes of preventing inhumane slaughter of livestock, the Secretary of Agriculture will assign inspectors to examine and inspect the methods by which livestock are slaughtered and handled in connection with slaughter in slaughtering establishments subject to inspection.  21 U.S.C. § 603(b).

[3]Other provisions of the FMIA provide additional reasons for withdrawal of inspection services by FSIS after opportunity for hearing.  These reasons are summarized in FSIS' Rules of Practice, 9 C.F.R. § 500.6.

inspection services.  Id.  The applicant or recipient is entitled to judicial review of the

USDA's order denying inspection services.  Id.

**B.      The Federal Agriculture Improvement and Reform Act, 7 U.S.C. § 1901 note**

Sections 901-905 of the Federal Agriculture Improvement and Reform Act of 1996

(FAIR)[4] concern the commercial transportation of equine to slaughter, and were codified

as 7 U.S.C. § 1901 note.[5]  Section 903(a) of this statute authorizes the Secretary of

Agriculture to "issue guidelines for the regulation of the commercial transportation of

equine for slaughter by persons regularly engaged in that activity within the United

States."  Accordingly, the USDA's Animal and Plant Health Inspection Service

("APHIS") promulgated 9 C.F.R. pt. 88, which applies to owner/shippers (defined in

9 C.F.R. § 88.1 as "any individual, partnership, corporation, or cooperative association

———————————————

[4]Pub. L. 104-127, Title IX, Subtitle A, April 4, 1996, 110 Stat. 1184.

[5]7 U.S.C. § 1901 note is not part of or an amendment to the HMSA (see n. 2 above). Rather, it is a stand-alone statute that Congress passed in recognition of "the unique and special needs of equine being transported to slaughter."  7 U.S.C. § 1901 note. This statutory provision authorizes the USDA to regulate the humane transport of horses to slaughter for any purpose, not just slaughter for human consumption. See 9 C.F.R. § 88.1 (definition of slaughter facilities).
    Thus, under Plaintiffs' interpretation of the Appropriations Act (i.e., the Act bans all inspections of horses slaughtered for purposes of human consumption, First Am. Compl. ¶¶ 1 and 68), section 794 creates a gap in the laws related to the humane slaughter of horses for meat and meat products because if ante-mortem inspection of horses intended for human consumption is prohibited, and funding for inspections under 7 U.S.C. § 1901 note is also prohibited, then the horses that are subject to slaughter in the United States for purposes other than human consumption (such as pet or zoo food purposes), or are transported outside the United States for slaughter, no longer have the protections afforded by USDA humane-related inspections under 7 U.S.C. § 1901 note.

that engages in the commercial transportation of more than 20 equines per year to slaughtering facilities") and sets forth standards for the conveyances used to transport horses to slaughter, requirements for the safe handling of horses during such transportation, and certain paperwork requirements. This regulation also requires owner-shippers to allow any duly authorized APHIS employee to inspect horses being commercially transported to slaughter, the means of conveyance used for said transportation, and any required paperwork at any point from the time the horses are loaded onto the means of conveyance to the time the horses are unloaded at the slaughter facility.  Unlike the FMIA, which is concerned solely with protecting public safety by ensuring the wholesomeness and purity of meat food products, and the HMSA, which is concerned with the use of humane methods to slaughter livestock generally, 7 U.S.C. § 1901 note, and the regulation promulgated thereunder are concerned solely with ensuring the humane treatment of horses while they are being commercially transported to slaughter.

**C.      The Agricultural Marketing Act of 1946, 7 U.S.C. § 1621, et seq.**

The Agricultural Marketing Act ("AMA") provides the USDA with authority to prescribe rules and regulations for the inspection and certification of the condition of agricultural products including the assessment and collection of fees to cover the costs of these services from those who volunteer to pay for the services.  7 U.S.C. §§ 1622(h) and 1624.

D.      **Fiscal Year 2006 Appropriations Act**

The Fiscal Year ("FY") 2006 Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act ("Appropriations Act"), Pub. L. 109-97, 119 Stat. 2120 (2005), was enacted on November 10, 2005. Section 794 of the Appropriations Act states that, effective 120 days after the date of enactment, none of the FY 2006 appropriated funds may be used to pay the salaries or expenses of personnel to inspect horses under the FMIA, 21 U.S.C. § 603, or the guidelines issued under section 903 of the FAIR. See Pub. L. 109-97, § 794, 119 Stat. 2164.  Although the Appropriations Act specifically prohibits the use of appropriated funds for ante-mortem inspection of horses (Pub. L. 109-97, § 794, 119 Stat. 2164), it does not preclude the use of FY 2006 appropriated funds for post-mortem inspection of horse carcasses and parts thereof or other inspection services authorized by the FMIA, see id.; see also 21 U.S.C. § 604.  The Conference Report accompanying the FY 2006 Appropriations Act states, "[i]t is the understanding of the conferees that the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and exported)." H.R. Rep. No. 109-255, p. 107 (2005)(emphasis added)(AR[6] 112). Contrary to Plaintiffs' argument (Pls.' Mot. Summ. J. On Claim One, at 4, 8, 17-18), neither the Appropriations Act nor the Conference report states that ante-mortem inspection and examination of horse meat or meat products for human consumption are

---

[6]"AR" refers to the Administrative Record.  See R. 10.

7

excluded from this requirement.  Id.  Stated another way, Congress, in the Appropriations Act, did not repeal, amend or modify 21 U.S.C. § 603 obligating the USDA to conduct ante-mortem inspections of meat products, including horse meat and meat products, processed for human consumption.  Notably, the Appropriations Act includes no constraints or limitation on the USDA's ability to establish a voluntary fee-for-service program for purposes of meeting this obligation.[7]  See generally H.R. Rep. No. 109-255 (AR 7 - 114).

### E.    The Petition for Emergency Rulemaking and Interim Final Rule

#### 1.    Petition for Emergency Rulemaking

On November 23, 2005, the USDA received a petition on behalf of the Beltex Corporation, Dallas Crown, Inc., and Cavel International, Inc. (collectively "Petitioners"), the three official establishments processing horse meat and meat products in the United States, requesting that FSIS promulgate an interim final rule to provide for voluntary, fee-for-service ante-mortem inspection of horses under the AMA.  See Ante-Mortem

---

[7]The Appropriations Act demonstrates that Congress amended the FMIA only when it expressly intended  to do so.  Specifically, section 798 of the FY 2006 Appropriations Act amends the FMIA by striking the phrase "cattle, sheep, swine, goats, horses, mules, and other equines" each place it appears and replacing it with the phrase "amenable species."  Pub. L. 109-97, § 798, 119 Stat. 2164, 2166 (AR 53).  Section 798 defines "amenable species" as "those species subject to the provisions of the. . .[FMIA] on the day before the date of the enactment of" the Appropriations Act and "any additional species of livestock that the Secretary considers appropriate."  Id.  Horses slaughtered in official establishments were subject to the provisions of the FMIA on the day before the FY 2006 Appropriations Act was passed.  Id.

8

Inspection of Horses, 71 Fed. Reg. 6337 (Feb. 8, 2006)(to be codified at 9 C.F.R. pt.

352)(AR 177); Petition of Beltex Corp., Dallas Crown, Inc., and Cavel International, Inc.,

for Emergency Rulemaking to Provide for Voluntary, Ante-Mortem Inspection of Horses

and Related Relief ("Petition"), Nov. 23, 2005 (AR 115).  The Petition also requested that

the USDA provide for voluntary, fee-for-service transportation-related inspection of

equines under the AMA.  71 Fed. Reg. 6337, 6338 (AR 178); Petition, at 1 (AR 115).

The Petition reflected that completion of notice-and-comment rulemaking prior to

March 10, 2006, would have been practically impossible. Petition, at 7 (AR 123).

Petitioners stated that, if USDA failed to provide ante-mortem inspections as mandated by

21 U.S.C. § 603, each affected establishment would be forced to close, with substantial

adverse economic impact to the establishment and the local economy.  Id.; see also R. 10,

Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and

Preliminary Injunction, Ex. 2, Declaration of James Tucker, Cavel International, Inc. ¶ 7

(Feb. 22, 2006);  Ex. 3, Declaration of Christophe Soenen, Dallas Crown, Inc. ¶ 8 (Feb.

24, 2006); Ex. 4, Declaration of Richard Garcia, Beltex Corporation ¶ 8 (Feb. 24, 2006).

### 2.     The Interim Final Rule

Because the FY 2006 Appropriations Act prohibits FSIS from using FY 2006

appropriated funds for the salaries or expenses of personnel to conduct ante-mortem

inspection of horses and because the Conference Report makes clear that the Department

is nevertheless obligated to provide for such inspection, FSIS established a voluntary fee-

for-service program under the AMA, 7 U.S.C. § 1622 and 1624, in which official

establishments that process horse meat and meat products for human consumption could

apply and pay for ante-mortem inspection.  See Ante-Mortem Inspection of Horses, 71

Fed. Reg. 6337 (AR 177 - 181).  Although the Rule provides that these establishments

may voluntarily receive ante-mortem inspection services pursuant to the fee-for-service

program governed by the AMA, all other inspection services conducted at such

establishments, including post-mortem inspection of horse carcasses, parts thereof, and

horse meat food products, were to continue to be rendered pursuant to, and in accordance

with the requirements of the FMIA. Id.

## ARGUMENT

**A.    Plaintiffs' Interpretation of the Appropriations Act Is Legally Unsupported and Unsupportable.**

As an initial matter, in contravention to well-established law on statutory

construction, Plaintiffs continue to argue that the intent of the appropriations provision

was to prevent the commercial slaughter of horses in the United States, although neither

the Appropriations Act nor the accompanying Conference Report expressly reflected such

legislative intent.  Pls.' Mot. Summ. J. at 4.  Instead of pointing to any law or appropriate

legislative history to support this contention, Plaintiffs again rely on expressions of

interest and a letter from individual members of Congress to the USDA.  Id.  at 4 - 5.

10

However, as discussed in Defendants' Opposition to Plaintiffs' Motion for a
Temporary Restraining Order and Preliminary Injunction and repeated herein, if Congress
wanted to ban the commercial slaughter of horses by amending section 3 of the FMIA (21
U.S.C. § 603) to repeal USDA's ante-mortem inspection obligations with respect to
horses, it would have expressly done so in the Appropriations Act or, at the very least, it
would have stated in the conference report that, notwithstanding the USDA's obligation
to provide for ante-mortem inspections generally, the objective of section 794 was to
repeal section 3 of the FMIA as applied to horses.  Instead, Congress, in the conference
report accompanying the FY 2006 Appropriations Act, reiterated its "understanding" that
the USDA is "obliged under existing statutes to provide for inspection of meat intended
for human consumption (domestic and exported[8])" and stated this "understanding"
without any qualification, exception, or exemption for horse meat produced for this
purpose.  H.R. Rep. No. 109-255, p. 107 (2005)(emphasis added)(AR 112).

Accordingly, what the legislative history actually evidences is that the USDA
retains its statutory obligation to conduct inspection of all animals that are  slaughtered
for the purpose of producing carcasses, meat, and meat food products intended for human
consumption, and the FY 2006 Appropriations Act did not change, qualify, except or

_____

[8]There is no domestic market for horse meat intended for human consumption and
all meat produced in the United States for that purpose is exported.  See R. 10,
Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and
Preliminary Injunction, Ex. 2, Tucker Decl. ¶ 8; Ex. 3, Soenen Decl. ¶ 9; Ex. 4, Garcia
Decl. 3; Petition, at 8 (AR 124).

amend this statutory obligation to exempt or exclude the ante-mortem inspection of horses. See generally Pub. L. 109-97, § 794, 119 Stat. 2164; H.R. Rep. No. 109-255, p. 107 (2005)(AR 7 - 114).  "While Congress may [certainly] amend or repeal a statute by means of an appropriations bill, its intention to do so must be clear."  Auburn Housing Authority v. Martinez, 277 F.3d 138 (2d Cir. 2002); see also Tennessee Valley Authority v. Hill, 437 U.S. 153, 191 (1978)(The Supreme Court stated, "The doctrine disfavoring repeals by implication...applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act.  We recognize that both substantive enactments and appropriations measures are 'Acts of Congress,' but the latter have the limited and specific purpose of providing funds for authorized programs.")(emphasis in original).

Here, there is simply no express indication from Congress, either in the Appropriations Act or the accompanying conference report, of an intent to ban the commercial slaughter of horses in the United States by repealing the USDA's obligation to conduct ante-mortem inspections of horses pursuant to section 3 of the FMIA (21 U.S.C. § 603).[9]  Therefore, the sole purpose of section 794 of the Act is to prevent

---

[9]Indeed, Plaintiffs' contention that Congress intended section 794 to terminate the commercial slaughter of horses in the United States for human consumption is contradicted by the fact that Congress introduced bills expressly and unambiguously banning horse slaughter in the United States and the exportation of U.S.-origin horses for slaughter in 2001, 2002, 2003, 2004, and 2005, but did not obtain sufficient votes to pass any of them.  See R. 10, Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, Ex. 5.  The House did recently pass a similar bill, H.R. 503, on September 7, 2006 and a companion bill is now pending in the
...

appropriated funds from being used to pay the salaries and expenses associated with

inspections of horses pursuant to the FMIA, 21 U.S.C. § 603, and 7 U.S.C. § 1901 note.

This is the only clear expression of intent expressed by Congress in this section.

Furthermore, section 794 did not prohibit the use of appropriated funds for post-mortem

inspection of horse carcasses under 21 U.S.C. § 604, and thus, the USDA continues to use

appropriated funds for this purpose.

Of additional significant import, and as indicated above, the Appropriations Act

did not terminate or amend the USDA's obligation under 21 U.S.C. § 671 to provide meat

and meat product processors, including Petitioners, an opportunity for a hearing prior to

withdrawing federal inspection services.  If Plaintiffs' interpretation of the de-funding

provision of the Appropriations Act had prevailed or were to prevail, the Petitioners could

be denied their due process rights for reasons not contemplated by the FMIA, thereby

possibly subjecting the de-funding provision itself to a potentially viable constitutional

challenge.  Indeed, a constitutional challenge could provide the district court with the

jurisdiction to avoid the enforcement of the de-funding provisions of the Appropriations

Act.  Community-Service Broadcasting of Mid-America, Inc. v. F. C. C., 593 F.2d 1102,

1113 (D.C. Cir. 1978)("To be sure, Congress is generally free to change its mind; in

---

[9]...

Senate.  However, this recent legislative activity tellingly underscores that Congress still
has not expressed an intent - either in legislation or accompanying reports - consistent
with that advanced by Plaintiffs.

amending legislation Congress is not bound by the intent of an earlier body. But it is

bound by the Constitution."); <u>United States v. Simpson</u>, 927 F.2d 1088, 1091 (9th Cir.

1991) (court may not impose its will upon Congress unless the behavior of Congress is

unconstitutional); <u>United States v. Mexico Feed and Seed Co., Inc.</u>, 980 F.2d 478, 484 n.5

(8th Cir. 1992).

The more legally-sound interpretation of and approach to the Appropriations Act

has been presented by the USDA.  The Department's approach does not put the 2006

funding provision in conflict with the longstanding meat inspection and due process

provisions of the FMIA.  Indeed, the USDA's interpretation regards both the

Appropriations Act and the FMIA as effective and reconcilable, an approach which is

clearly judicially preferred.  <u>Tennessee Valley Authority v. Hill</u>, 437 U.S. at 192; <u>see also</u>

<u>Morton v. Mancari</u>, 417 U.S. 535 (1974)("[t]he courts are not at liberty to pick and

choose among congressional enactments, and when two statutes are capable of co-

existence, it is the duty of the courts, absent a clearly expressed congressional intention to

the contrary, to regard each as effective."); <u>United States v. Menasche</u>, 348 U.S. 528, 538

(1955)(stating that "'the cardinal principle of statutory construction is to save and not to

destroy.'".)(quoting <u>National Labor Relations Bd. v. Jones & Laughlin Steel Corp.</u>, 301

U.S. 1, 30 (1937).

One final critical note -  Plaintiffs either missed or blithely ignored that this Court

has already addressed Plaintiff's "legally wanting" congressional intent argument.  In its

14

August 28, 2006 Memorandum Opinion, this Court, relying in part on Tenn. Valley

Auth., cited and quoted above, states, "[a]bsent an explicit statement of this purported

congressional purpose [i.e., a ban on the commercial slaughter of horses in the United

States] in the Amendment itself-and such purpose clearly does not reside in the text-the

Court cannot rightly construe that Congress intended to execute such a prohibition using

an appropriations amendment, particularly considering that the FMIA recognizes the

legality of procedures relating to the slaughter of horses for meat pursuant to 21 U.S.C. §

603." Humane Society of the United States v. Johanns, Civil Action No. 06-

00265(CKK)(D.D.C. August 28, 2006)(mem. op.).

Accordingly, Plaintiffs' argument regarding the legislative "purpose" of section

794 is legally unsupported and unsupportable.

**B.    USDA's Actions Comported with APA Procedural Requirements.[10]**

As indicated above, there are "three basic requirements for agency rulemaking"

under the APA: "first, the public must be given notice of the proposed rulemaking;

second the public must be given an opportunity to comment on the proposed rule, either

orally or in writing; and third, the agency must include with the final rule a statement of

the rule's basis and purpose." Emily's List v. Federal Election Comm'n,, 362 F.Supp.2d

---

[10]Again, Defendants are incorporating arguments from their opposition to
Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction in
opposing Plaintiffs' Motion for Summary Judgment on Claim One and moving to
dismiss, or for summary judgment, on this claim.

43,53 (D.D.C. 2005), citing 5 U.S.C. § 553; <u>see also</u> <u>Jifry v. Federal Aviation</u>

<u>Administration</u>, 370 F.3d 1174, 1178 (D.C. Cir. 2004).

"The 'good cause' exception [of the APA]," provides that an agency "need not

engage in notice and comment" when the procedure is determined to be "'impracticable,

unnecessary, or contrary to the public interest.'"  <u>Jifry</u>, 370 F.3d at 1178, citing 5 U.S.C. §

553(b)(3)(B).   This exception to the requirement for advance notice and comment, which

is to be narrowly construed, nevertheless "excuses notice and comment in emergency

situations. . . or where delay could result in serious harm." <u>Id.</u> at 1179 (citations omitted);

<u>see also</u> <u>Riverbend Farms, Inc. v. Madigan</u>, 958 F.2d 1479, 1484, n.2 (9th Cir. 1992).

The USDA was justified in issuing the Interim Final Rule without prior notice or

comment because it expressly made a determination under the good cause exception of the

APA, 5 U.S.C. § 553(b)(B), that it was impracticable and contrary to the public interest to

require said notice and comment with respect to this particular Rule.  <u>See</u> 71 Fed. Reg. 6337,

6340 (AR 180).   Requiring a prior notice and comment period for this Rule was

impracticable because there was insufficient time to complete the notice and comment period

prior to the effective date of section 794 and still meet the requirements of USDA's rule-

making process. <u>Id.</u>   USDA's Departmental Regulation, DR 1512-1, Regulatory Decision-

Making Requirements, sets forth a deliberative rule-making process that requires review of

all regulations by a variety of offices within USDA prior to publication in the Federal

Register (http://www.ocio.usda.gov/directives/files/dr/DR1512-001.pdf).  This particular rule

had to be reviewed by the Office of the General Counsel, the Deputy Administrator, the

Administrator, the Office of Budget and Program Analysis, and the Undersecretary for Food

Safety. Id. In addition, Executive Order 12866 requires that all rules issued by USDA

undergo review by the Office of Management and Budget. See 58 Fed. Reg. 51735 (Sept.

30, 1993). Each of these procedural steps took time from an already narrow window

beginning with November 10, 2005, the date on which the Appropriations law was enacted,

to March 10, 2006, the date on which, pursuant to the law, appropriated funds could no

longer be used for ante-mortem inspections of horse meat and meat product facilities. See R.

18, Defendants' Surreply, Ex. 6, Declaration of Philip S. Derfler, March 6, 2006); see also

National Women, Infants, and Children Grocers Ass'n v. Food and Nutrition Service, 416

F.Supp.2d 92, 104-07 (D.D.C. 2006)(discussing favorably the invocation of the "good cause"

exception to the requirement for advance notice and comment under the Administrative

Procedure Act, 5 U.S.C. § 701 et seq., where the Agency, with less of a time constraint than

presented in this case, demonstrated that it worked diligently to complete its interim final rule

and proffered that it would have been difficult to set aside a period to undertake advance

notice and comment.)

 The time limitation was not the only reason for the Interim Final Rule. See Asiana

v. Federal Aviation Admin., 134 F.3d 393, 398 (D.C. Cir. 1998)("Statutory language

imposing strict deadlines, *standing alone*, does not constitute good cause" justifying

departure from standard notice and comment.)(emphasis in original). Requiring a notice

and comment period prior to the effective date of section 794 also would have been impracticable[11] and contrary to the public interest because it would have delayed the implementation of the interim final rule and caused significant, immediate, and concrete financial and economic harm to the Petitioners, *their employees, and their suppliers and customers*.[12] See Petition (AR 122 - 125); 71 Fed. Reg. at 6340.  See also National Fed'n

---

[11]An agency, like the USDA, is excused from the notice requirements of the APA when it determines, on the basis of impracticality, that "due and timely execution of its functions would be impeded by" such notice.  See Utility Solid Waste Activities Group v. EPA, 236 F.3d 749, (D.C. Cir. 2001); State of N. J., Dept. of Environmental Protection v. U.S. Environmental Protection Agency, 626 F.2d 1038, 1046 (D.C. Cir. 1980)(The District of Columbia Circuit stated, "'Impracticable' means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings.  S.Doc. No. 248, 79th Cong., 2d Sess. 200 (1946).").  It should be noted that Plaintiffs distort the holding in State of N. J., Dept. of Environmental Protection v. U.S. Environmental Protection Agency.  Pls.' Mot. Summ. J., at 9 - 10, by stating that agencies invoke impracticability "only where 'the due and required execution of the agency functions would be unavoidably prevented by' providing advance notice and comment."  The word "only" is added by the Plaintiffs perhaps indulging in adjudicative invention to give the impression, albeit an incorrect one, that the holding in this case is far more limiting than it actually is.

[12]It should be noted further that Plaintiffs' assertion that Defendants should not consider the significant economic impacts on the Intervenors in invoking the "good cause" exception for purposes of publishing the Rule here as an "Interim Final Rule" lacks merit and legal support.  Pls.' Mot. Summ. J., at 12.   Plaintiffs cite Jifry v. FAA, 370 F.3d 1174 (D.C. Cir. 2004), cert. denied, 543 U.S. 1146 (2005), in support of this assertion, but they continue to mis-characterize the holding of this case as defining or limiting the application of the "good cause" exception only to situations where the public health, national security, or similar public interests will be harmed.  Pls.' Mot. Summ. J., at 2; see also Pls.' Reply at 18.  The Jifry holding is not as limiting as Plaintiffs assert, as it also recognizes that the "good cause" exception may be invoked to excuse advance notice and comment in (1) emergency situations and (2) where delay could result in serious harm.  370 F.3d at 1179.  The exception as defined does not exclude and can encompass consideration of significant adverse economic impact as presented in this case.
...

18

of Fed. Employees v. Devine, 671 F.2d 607, 610-11 (D.C. Cir. 1982)(finding good cause

for regulation postponing "open season," during which federal employees may enroll in or

switch health plans, when "the resulting actuarial disarray" of a timely open season

"might have posed a serious threat to the financial stability of the benefit program.").

For example, as set forth in the Petition, Petitioners estimated that the combined

direct economic of their affected facilities would exceed $41 million annually, including a

combined payroll exceeding $11 million. (AR 117). Petitioners Dallas Crown, Inc., and

Beltex Corporation spend $6 million annually on airfreight services at Dallas-Fort Worth

International Airport (DFW) and their combined use of airfreight services makes them the

single largest airfreight customer for DFW. Id. The combined overhead expenses of

Dallas Crown and Beltex of approximately $27 million are mostly spent in the Dallas-

---

[12]...

Second, the USDA has not done anything unusual here in considering the economic
impact on a Party when publishing a Rule in advance of comment, and indeed, has relied
on private concerns of adverse economic consequences in publishing previous Rules. See,
e.g. Karnal Bunt; Compensation for Custom Harvesters in Northern Texas, Interim rule
and request for comments, 69 Fed. Reg. 24909 (effective date May 5, 2004; comments
accepted until July 6, 2004; regulations "provide for the payment of compensation to
custom harvesters for losses they incurred", id. at 24909); Irradiation of Sweet Potatoes
from Hawaii, Interim rule and request for comments, 68 Fed. Reg. 37931 (effective date
June 26, 2003; comments accepted until August 23, 2003; "Immediate action is warranted
to alleviate the negative economic effects that Hawaiian growers and shippers face as a
result of . . . our regulations . . . ," id. at 37392); Spring Viremia of Carp; Payment of
Indemnity, Interim rule and request for comments, 69 Fed. Reg. 27823 (effective date
May 12, 2004; comments accepted until July 16, 2004; regulations amended "to provide
for the payment of indemnity to owners for fish destroyed because of spring viremia of
carp," id. at 27823).

Fort Worth Metroplex.  Id.  Cavel International, Inc., spends approximately $8 million annually to purchase livestock from farmers throughout the Midwest and Western United States and spends another $1.4 million annually in the local economy for purchase of goods and services.  Id.  Cavel also pays transportation companies approximately $1.5 million annually to transport livestock to its facility in DeKalb, Illinois, and spends an additional $2.5 million annually to ship its finished meat products abroad.  Id.  Thus, if fee-for-service inspection had not been permitted to be established, the approximately $41 million that petitioners contribute to their local economies would have disappeared.  Id.

Additionally, Cavel employs 56 workers from the DeKalb, Illinois area.  R. 10, Defs.' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, Ex. 2, Tucker Decl.  ¶ 10.  If the fee-for-service inspection program had not been permitted to be established, these workers would have lost their livelihood.  Id.  Additionally, in order to run an efficient, productive business Cavel maintains and has supplied itself with such items as electricity and packaging and shipping supplies well into the future.  Id. ¶ 11.  For instance, around the beginning of Fiscal Year 2006, Cavel had over $127,000 worth of supplies stored at its facility in anticipation of future shipments of horse meat.  Id.  The company also had a contract on utility purchases, which must be honored.  Id.  If the fee-for-service inspection program had not been implemented, not only would Cavel had lost the value of its stockpiled supplies, it would have also been required to honor a utility contract for which the

company would have had no need.  Id.  Finally, Cavel operations are housed in a state-of-the-art, modern facility, which was rebuilt over two years ago.  Id. ¶ 12.  This is a valuable piece of property for which Cavel pays over $12,000 per month in rent.  Id.  Cavel is required to maintain the property and ensure that its value does not decline, and it would have been obligated to pay rent and maintenance fees, as well as property taxes, even if the fee-for-inspection program had not proceeded.  Id.  This is a significant cost which would have severely impinged upon the company's financial well-being in the event it had not been permitted to continue to process horsemeat and earn revenue.  Id.

Dallas Crown customers consist of foreign businesses that import and sell horsemeat for human consumption; zoos that require a high standard nutritional program for their large animals, including protected species; and pharmaceutical industries and universities that purchase by-products to find new treatments and teach the next generation of veterinarians. R. 10, Defs.' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, Ex. 3, Soenen Decl. ¶ 9.  Even a temporary shutdown of Dallas Crown's facility would have had a severe detrimental impact on the business.  Id. ¶ 10. Customers would have been required to turn to alternative products losing their confidence in the company's ability to supply them in the future. Id.  In addition, the company's zoo customers would have been required to change their animals' feeding programs, and protected species are very sensitive to any change in their diet. Id.

21

Dallas Crown employs 52 workers from the Kaufman area.  Id. ¶ 11.  If the USDA's fee-for-service inspection program had not been permitted to be established, these workers would have lost their livelihood. Id. ¶ 11. In order to run an efficient, productive business, Dallas Crown maintains and has supplied itself with such items as electricity and packaging and shipping supplies well into the future.  Id. ¶ 12.  The company has different contracts on utility purchases that must be honored.  Id.  If the fee-for-service inspection program had not been implemented, Dallas Crown would have lost the value of the stockpiled supplies and would have been required to honor contracts for which the company would have had no need.  Id.

Beltex is a meat processing facility that processes fresh and frozen meat for export. R. 10, Defs.' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, Ex. 4, Garcia Decl. ¶ 3.  Beltex exports approximately 5,000 tons of horsemeat each year and sells 1,000 tons of horsemeat annually domestically to zoos; these domestic customers require their product be USDA inspected to comply with their specially certified diets for large animals.  Id.  Beltex is a significant employer and contributor of tax revenues in the Dallas-Fort Worth Metroplex.  Id. ¶ 6.  The company employs approximately 100 workers from around the region. Id.   Its total payroll was in excess of $5 million in 2005.  Id.  Because livestock, including horses, intended for human consumption must be inspected by the FSIS prior to slaughter, withholding such service would have forced Beltex to curtail its operations.  Id. ¶ 8.   The result of the

22

cessation of these operations would have been to halt sales and shipping and force the layoff of nearly all, if not all, Beltex employees.  Id.  Beltex would have had no means to immediately replace the business that would have been shut down in the absence of the Interim Final Rule going into effect on March 10, 2006.  Id.  The losses would therefore have been  irreparable.  Id.  In addition to these direct irreparable economic impacts on Beltex, there would have been indirect economic effects on the Dallas-Fort Worth Metroplex if the Interim Rule had not become effective on March 10, 2006.  Id. ¶ 10.  Beltex estimated these economic impacts on the order of $25 million annually.  Id.

The USDA, of course, followed the APA by accepting comments on the ante-mortem horse inspection rule between February 8, 2006, the date the rule was published, and March 10, 2006, the date the rule became effective.  71 Fed. Reg. 6337 (AR 177).  The USDA thus balanced Plaintiffs' interests to participate in the rule-making process against the real harm to  the Petitioners, their employees, and their suppliers and customers that would have occurred if the ante-mortem horse inspection rule had not become effective on March 10, 2006.  Nevertheless, Plaintiffs attack the sufficiency of FSIS's notice and comment period, which was held between the publication of the interim final rule and its effective date, by citing several cases in support of the proposition that "the Courts view with considerable skepticism an agency argument that it has cured a notice and comment violation through a *post-hoc* consideration of comments." Pls.' Mot. Summ. J., at 14-15.  However, as Plaintiffs themselves concede, the cases to which they cite are inapposite because all of them concern agencies' *post facto* solicitation of

comments on final rules following their effective dates, whereas the present matter

concerns FSIS's solicitation of comments on an interim final rule prior to its effective

date. Id. at 15 ("However, in this case the Court is not even faced with this question

because . . . FSIS has yet to promulgate a Final Rule . . . ").

Plaintiffs also denigrate FSIS's notice and comment period for the interim final

rule by suggesting that FSIS has exercised undue delay in reviewing the comments

received and preparing a final rule,[13] or even worse, has no intention of ever promulgating

such a rule, based solely on the fact that FSIS has not done so within six months

following the close of the notice and comment period. Ignoring Plaintiffs' presumption

that they can and should be able to dictate FSIS' priorities and timetables, it should be

noted that, once again, FSIS has not done anything unusual, either by soliciting comments

following publication of an interim final rule, or by failing to prepare a final rule within

six months after the close of the notice and comment period.[14]

---

[13] In her declaration of September 8, 2006, Rebecca G. Judd states that she visited USDA's Docket Room on June 8, 2006. Judd Decl., ¶ 4. Ms. Judd further states, "In my visit to the USDA Docket Room, I did not see any evidence that FSIS had begun to review or consider the nearly 60,000 public comments that were received in response to the Interim Final Rule." Id., ¶. 9. The FSIS Docket Room is open to the public for anyone wishing to view comments that FSIS has received in response to agency items published in the Federal Register. This room is not the work location of the analyst who is reviewing and developing responses to the comments. Further, this developing material is pre-decisional and is not available to the public until such time as the agency chooses or does not choose to go forward with a final rule. Therefore, it is appropriate that Ms. Judd would not have seen any evidence that FSIS had begun to review or consider the comments.

[14] See, e.g., Food Labeling: Nutrient Content Claims, Definition of the Term:
...

However, even assuming *arguendo* there were some defect in the manner in which the Interim Final Rule was adopted, the APA requires the Court to take "due account * * * of the rule of prejudicial error." 5 U.S.C. § 706. This rule "requires the party asserting error to demonstrate prejudice from the error." Air Canada v. DOT, 148 F.3d 1142, 1156 (D.C. Cir. 1998).   A demonstration of prejudice by Plaintiffs is essential to prevent application of the harmless error rule embodied in APA section 706.  See, e.g. Utility Solid Waste Activities Group v. EPA, 236 F.3d 749, (D.C. Cir. 2001); see also Gerber v. Norton, 294 F.3d 173, 184 (D.C. Cir. 2002)(D.C. Circuit emphasized, "[t]o show that error was prejudicial, a plaintiff must indicate with reasonable specificity what portions of the documents it objects to and how it might have responded if given the opportunity")(citations and internal quotation marks omitted).  Plaintiffs have utterly failed to show how they were prejudiced particularly in light of the fact that the Interim Final Rule was simply a means for the USDA to continue a longstanding meat inspection

---

[14]...

"Healthy," Interim Final Rule, 71 F.R.1683 (published January 11, 2006; comments received until February 10, 2006; 7 comments received; final rule not yet published); Prohibition of the Use of Certain Stunning Devices Used to Immobilize Cattle During Slaughter, Interim Final Rule and request for comments, 69 F.R. 1885 (published January 12, 2004; comments received until April 12, 2004; 2 comments received; final rule not yet published); Meat Produced by Advanced Meat/Bone Separation Machinery and Meat Recovery (AMR) Systems, Interim Final Rule and request for comments, 69 F.R. 1874 (published January 12, 2004; comments received until April 12, 2004; 29 comments received; final rule not yet published); Prohibition of the Use of Specified Risk Materials for Human Food and Requirements for the Disposition of Nom-Ambulatory Disabled Cattle, Interim Final Rule and request for comments, 69 F.R. 1861 (published January 12, 2004; comments received until April 12, 2004; 25,000 comments received; final rule not yet published); and Mandatory Inspection of Ratites and Squabs, interim final rule, 66 F.R. 22899 (published May 7, 2001; comments received until July 2, 2001; 4 comments received; final rule published at 67 F.R. 13253 on March 22, 2002).

25

program which the Fiscal Year 2006 Appropriations Act did not modify[15] and Plaintiff's

were, in fact, provided opportunity to comment on the Interim Final Rule.

## CONCLUSION

For reasons stated herein, Defendants respectfully request that this Court deny

Plaintiffs' Motion for Summary Judgment, and dismiss Count One of Plaintiffs'

Amended Complaint or alternatively grant summary judgment to Defendants on this

claim.

Respectfully Submitted,

/s/ Kenneth L. Wainstein /dvh

_____

KENNETH L. WAINSTEIN, D.C. BAR #451058
United States Attorney

---

[15]Plaintiffs attempt to characterize the Interim Final Rule as "discretionary." Pls.' Mot. Summ. J., p. 10. Plaintiffs characterization is inapposite. As indicated herein, the FY 2006 Appropriations Act did not change, repeal or qualify the USDA's statutory obligations related to inspection of meat intended for human consumption. See generally Pub. L. 109-97, § 794, 119 Stat. 2164; H.R. Rep. No. 109-255, p. 107 (2005)(AR 7 - 114). Since the statutory obligation remained, it would have been inappropriate for the Department of Agriculture to remove or deny inspection services for the sole purpose of terminating an entire industry in the absence of Congressional intent. Accordingly, the Department appropriately complied with both its longstanding, mandatory and unmodified statutory obligation and the Fiscal Year 2006 Appropriations Act, reconciling these statutory obligations. United States v. Menasche, 348 U.S. at 538(stating that "'the cardinal principle of statutory construction is to save and not to destroy.'")(quoting National Labor Relations Bd. v. Jones & Laughlin Steel Corp., 301 U.S. at 30.

/s/ Rudolph Contreras

_____

RUDOLPH CONTRERAS, D.C. BAR #434122

Assistant United States Attorney


/s/ Beverly M. Russell

_____

Of Counsel:                    BEVERLY M. RUSSELL, DC Bar #454257

Thomas Bolick, Esq.            Assistant United States Attorney

Rick Herndon, Esq.             U.S. Attorney's Office for the

U.S. Dept. of Agriculture      District of Columbia, Civil Division

                               555 4th Street, N.W., Rm. E-4915

                               Washington, D.C.  20530

                               Ph:  (202) 307-0492

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing *Defendants' Opposition to Plaintiffs'*

*Motion for Summary Judgment on Claim One and Defendants' Motion to Dismiss, or*

*Alternatively, for Summary Judgment on this Claim* was sent by the Court's Electronic Case

Filing System, this <u>20th</u> day of September, 2006 to:

Eric R. Glitzenstein, Esq.

Howard M. Crystal, Esq.

Meyer Glitzenstein & Crystal

1601 Connecticut Avenue, N.W., Suite 700

Washington, D.C.  20009

eric@meyerglitz.com

howardcrystal@meyerglitz.com


James P. Murphy, Esq.

Squire, Sanders & Dempsey L.L.P.

1201 Pennsylvania Ave., N.W., Suite 500

Washington, DC  20004

JMurphy@ssd.com


/s/ Beverly M. Russell

_____

BEVERLY M. RUSSELL

Assistant United States Attorney