**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE HUMANE SOCIETY OF THE UNITED STATES, et al.** )))) | |
| **Plaintiffs,** )) | |
| **v.** ) | **Civ. No. 1:06cv00265** |
| )) | |
| **MIKE JOHANNS, Secretary United States Department of Agriculture, et al.** )))) | |
| **Defendants.** )) | |

## DEFENDANT-INTERVENOR'S EMERGENCY MOTION FOR A STAY OF THE COURT'S MARCH 28, 2007 ORDER

Pursuant to Rule 8(a)(1) of the Federal Rules of Appellate Procedure, Defendant-Intervenor Cavel International, Inc. hereby respectfully moves this Court for a stay of the March 28, 2007 Order pending Cavel's imminent appeal of that decision.    A memorandum in support of this motion is attached.

Cavel International, Inc. has contacted the Plaintiffs' counsel.  They have advised Cavel that Plaintiffs will oppose any motion for a stay.  Cavel has placed a call to the Federal Defendants.  We will advise the court promptly when we hear of their position.

Due to the gravity of the situation facing Cavel, Defendant-Intevenor also requests that the Court order an expedited briefing schedule on this motion.  Cavel proposes that any response to its motion be due by no later than close of business Thursday, April 5, 2007.

Respectfully Submitted,

/s/ James P. Murphy
James P. Murphy, Esq. (D.C. Bar No.
380857)
Katherine L. Halpin, Esq. (D.C. Bar No.
494139)
SQUIRE, SANDERS & DEMPSEY L.L.P.
1201 Pennsylvania Ave., N.W., Suite 500
Washington, DC 20004
Telephone: 202.626.6600
Fax: 202.626.6780

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al. | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civ. No. 1:06cv00265 ) |
| MIKE JOHANNS, Secretary United States Department of Agriculture, et al. | ) ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANT-INTERVENOR'S MEMORANDUM IN SUPPORT OF ITS EMERGENCY MOTION FOR A STAY OF THE COURT'S MARCH 28, 2007 ORDER**

James P. Murphy, Esq. (D.C. Bar No. 380857)
Katherine L. Halpin, Esq. (D.C. Bar No. 494139)
SQUIRE, SANDERS & DEMPSEY L.L.P.
1201 Pennsylvania Ave., N.W., Suite 500
Washington, DC 20004
Telephone: 202.626.6600
Fax: 202.626.6780

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND........................................... 2

    A.    Cavel International................................................................ 2

    B.    Procedural Background.......................................................... 3

III.  ARGUMENT ................................................................................... 6

    A.    Failure to Grant a Stay Will Cause Substantial Harm to Defendant-
        Intervenor and Other Third Parties ........................................... 7

    B.    Conversely, Plaintiffs Will Not Suffer Substantial Harm if a Stay is
        Granted.......................................................................... 10

    C.    Cavel Has a Substantial Likelihood of Success on Appeal ..................... 12

    D.    The Public Interest Will Be Served by a Stay of the March 28
        Order ............................................................................ 25

IV.   CONCLUSION ................................................................................ 27

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Alaska Ctr. for Environment v. U.S. Forest Serv.*, 189 F.3d 851 (9th Cir. 1999)..17, 19, 23

*Anacostia Watershed Society v. Babbitt*, 871 F.Supp. 475 (D.D.C. 1994)........................18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................................21, 23

*Ashland Oil, Inc. v. FTC, 409 F. Supp. 297,* (D.D.C. 1976), *aff'd* 548 F. 2d 977
(D.C. Cir. 1976) ............................................................................................................7

*Auburn Housing Authority v. Martinez*, 277 F.3d 138 (2d Cir. 2002)..............................26

*Back Country Horsemen of America v. Johanns*, 424 F.Supp.2d 89
(D.D.C. 2006) ..................................................................................................... *passim*

*Belco Petroleum Corp. v. FERC,* 519 F.2d 680 (D.C. Cir. 1978) .....................................19

*Citizens Coal Council v. Babbitt*, No. 00-0274, 2002 U.S.Dist. LEXIS 26462
(June 5, 2002 D.D.C.) ...................................................................................................12

*City of Olmsted Falls v. FAA*, 292 F.3d 261 (D.C. Cir. 2002)..........................................23

*Cortez III Service Corp. v. NASA*, 950 F.Supp. 357 (D.D.C. 1996).....................................9

*Cuomo v. United States Nuclear Regulatory Commission*, 772 F.2d 972 (D.C. Cir.
1995) ...........................................................................................................................7, 13

*Edmonds Institute v. Babbitt*, 42 F.Supp.2d 1 (D.D.C. 1999) ...........................................18

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326 (5th
Cir. 2007) .......................................................................................................................3

*Fund for Animals, Inc. v. Espy*, 814 F.Supp. 142 (D.D.C. 1993) .....................................18

*International Center for Tech. Assess. v. Johanns*, No. 03-00020, 2007 U.S.Dist.
LEXIS 7773 (Feb. 5, 2007 D.D.C.) ...............................................................................22

*Lightfoot v. District of Columbia*, No. 01-1484, 2006 U.S.Dist. LEXIS 4633 (Jan.
24, 2006 D.D.C.)............................................................................................................10

*Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193 (D.C. Cir. 2000)....................................23

*National Trust for Historic Preserv. in the U.S. v. Dole*, 828 F.2d 776 (D.C. Cir.
1987) ...............................................................................................................17, 18, 23

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Sampson v. Murray,* 415 U.S. 61 (1974) ............................................................7

*Sociedad Anonima Vina Santa Rita v. United States Department of the Treasury,* 193 F.Supp.2d 6 (D.D.C. 2001) ...................................................................6

*Tao v. Freeh,* 27 F.3d 635 (D.C. Cir. 1994) .................................................21, 23

*The Fund for Animals v. Mainella,* 294 F.Supp.2d 46 (D.D.C. 2003).............11

*Utah Environmental Congress v. Bosworth,* 443 F.3d 732 (10th Cir. 2006) ...................19

*Virginia Petroleum Jobbers Association v. FPC,* 259 F.2d 921 (D.C. Cir. 1958) ............6

*Washington Gas Co. v. FERC,* 758 F.2d 669 (D.C. Cir. 1985) .......................7, 8

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841 (D.C. Cir. 1977) ..................................................................... *passim*

*Washington Post Co. v. United States Department of Health and Human Services,* 865 F.2d 320 (D.C. Cir. 1989) ...................................................21, 23

## FEDERAL STATUTES

5 U.S.C. § 553 .................................................................................................5

21 U.S.C. § 603 ...............................................................................................3

42 U.S.C. § 4321 *et seq*...................................................................................2

## FEDERAL REGULATIONS

7 C.F.R. § 1b.3 ...............................................................................................17

7 C.F.R. § 1b.4 ...........................................................................17, 18, 21, 22

40 C.F.R. § 1500...........................................................................................13, 14

40 C.F.R. § 1507.......................................................................................13, 14, 15

40 C.F.R. § 1508...........................................................................................13, 15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

### OTHER

Agriculture, Rural Development, Food and Drug Administration, and Related
Agencies Appropriations Act of November 10. 2005, Pub. L. 109-97 ........................3, 26

71 Fed.Reg. 6,337 (Feb. 8, 2006) ................................................................................4, 25

48 Fed.Reg. 34,263 (July 28, 1983)...................................................................................14

48 Fed.Reg. 11,403 (Mar. 18, 1983).........................................................................21, 24

60 Fed.Reg. 66,479 (Dec. 22, 1995) .........................................................................21, 24

H.R. Rep. No. 109-255 (2005)...........................................................................................26

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE HUMANE SOCIETY OF**<br>**THE UNITED STATES, et al.** | )<br>)<br>) |
| **Plaintiffs,** | )<br>)<br>) |
| **v.** | )  **Civ. No. 1:06cv00265**<br>) |
| | )<br>) |
| **MIKE JOHANNS, Secretary**<br>**United States Department of Agriculture, et al.** | )<br>)<br>) |
| **Defendants.** | )<br>) |

**DEFENDANT-INTERVENOR'S MEMORANDUM IN SUPPORT OF ITS
EMERGENCY MOTION FOR A STAY OF THE
COURT'S MARCH 28, 2007 ORDER**

**I.     INTRODUCTION**

Pursuant to Rule 8(a)(1) of the Federal Rules of Appellate Procedure, Defendant-Intervenor Cavel International, Inc. ("Cavel" or "Defendant-Intervenor") respectfully requests this Court to stay its March 28, 2007 Order ("Order") pending the appeal of that Order.[1]

The March 28 Order resulted in a major sea change in the status quo that has, already, within just days of its entry, inflicted significant injury upon Defendant-Intervenor and other third parties.  Cavel has ceased to operate and fifty production workers have lost their livelihoods.  Such drastic consequences, which are a direct result of this Court's Order, demonstrate that the Defendant-Intervenor's request for a stay fits squarely within the purpose of such "protective" relief which is appropriate when its

---

[1] Cavel International, Inc. will file an appeal of the March 28, 2007 Order promptly.

denial would otherwise "inflect irreparable injury on the movant." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C. Cir. 1977).

The other three factors that courts in this Circuit consider when determining whether to grant a stay of an order pending appeal also compel granting Cavel's motion. Cavel has made a strong showing that it is likely to prevail on its argument that the United States Department of Agriculture ("USDA") and the Food Safety and Inspection Service ("FSIS") did not violate the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA") in promulgating the Interim Final Rule to establish a fee-for-service program for the ante-mortem inspection of horses.  Second, Plaintiffs will not suffer irreparable harm if the stay is granted.  As this Court found a year ago, "[g]iven that the harms identified by Plaintiffs have occurred as long as the identified slaughterhouse plants have been in operation, Plaintiffs' current injuries…simply lack the kind of magnitude, immediacy, and imminence as is necessary to establish the need for a preliminary injunction."  Preliminary Injunction Memorandum Opinion dated March 14, 2006 ("P.I. Mem. Op.") at 26.  Finally, public interest concerns will be furthered by granting the stay.  The public interest -- which certainly includes the interests of those citizens who have recently lost their jobs, as well as those of the USDA which has continually acted to ensure the continued, lawful operation of the facility -- weighs in favor of granting Cavel's motion.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    <u>Cavel International</u>

Cavel International, Inc. is a meat processing facility that has lawfully operated in DeKalb, Illinois for twenty years.  *See* Declaration of Luc Van Damme ("Van Damme Decl.") at ¶¶ 2, 3, attached as Exhibit 1.  It is currently the only slaughterhouse in this

country which processes fresh and frozen horsemeat for those foreign markets where horse meat is purchased for human consumption.[2] The Defendant-Intervenor employs 56 workers from the DeKalb, Illinois area, and contributes significantly to the local economy. *See* Declaration of James Tucker ("Tucker Decl.") at ¶ 5, attached as Exhibit 2. It spends more than $1 million in the local community to service and supply its operations, *id.* at ¶ 6, and it pays state and local sales taxes of approximately $50,000. *Id.* at ¶ 5. Of course, Cavel also pays millions of dollars to buyers and individual horse owners throughout the Western and Midwestern United States to purchase their livestock. *Id.* at ¶ 6.

### B.    Procedural Background

The procedural history of this case is long and somewhat complex, and has been described in numerous memoranda by the Defendant-Intervenor and by this Court. For purposes of this motion, the following is relevant.

On November 10, 2005, the President signed into law the Fiscal Year 2006 Appropriations Act, which changed the funding arrangement for ante-mortem and transportation-related inspection of horses. Section 794 of the Appropriations Act provides:

> Effective 120 days after the date of enactment of this Act, none of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under Section 3 of the Federal Meat Inspection Act (21 U.S.C. 603) or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 1901 note, Public Law 104-127).

Appropriations Act § 794.

---

[2] Following a decision by the United States Court of Appeals for the Fifth Circuit which affirmed a Texas law prohibiting horse slaughter for human consumption, Beltex Corporation and Dallas Crown, Inc. no longer produce horse meat for human consumption. *See Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry,* 476 F.3d 326 (5th Cir. 2007)

In essence, this language prohibited federal funding of the ante-mortem inspections necessary to slaughter a horse for purposes of human consumption.[3] To address this situation, Cavel petitioned the USDA to promulgate an Interim Final Rule to create a program whereby it, and the formerly operating facilities in Texas, could pay for ante-mortem inspections. On February 8, 2006, the USDA promulgated an Interim Final Rule to provide "for a voluntary fee-for-service program under which official establishments that slaughter horses will be able to apply for and pay for ante-mortem inspection." 71 *Fed. Reg.* 6,337, 6,341 (Feb. 8, 2006) (codified at C.F.R. § 352.19). The promulgation of the Interim Final Rule permitted Cavel to continue its operations uninterrupted.

Thereafter, Plaintiffs filed this lawsuit, alleging, among other counts, that in enacting the Interim Final Rule, the USDA violated NEPA. On February 22, 2006, Plaintiffs filed a Motion for a Temporary Restraining Order and for a Preliminary Injunction, requesting an order declaring the Interim Final Rule unlawful and prohibiting the establishment of the fee-for-service ante-mortem inspection program. The USDA and FSIS ("Federal Defendants") and Defendant-Intervenors opposed this motion.

On March 14, 2006, the Court denied Plaintiffs' request for a temporary restraining order and a preliminary injunction. This Court found that Plaintiffs did not make the requisite showing necessary to obtain such relief. First, it was not substantially likely Plaintiffs would succeed on the merits of their case. Second, Plaintiffs did not establish the "most important" factor to sustain a motion for a preliminary injunction: that

---

[3] On February 15, 2007, the President signed Public Law 110-5, a Joint Resolution of Congress making further continuing appropriations for Fiscal Year 2007 under the same conditions provided for in Fiscal Year 2006. Therefore, the prohibition against federal funding of equine ante-mortem inspection will now expire in six months, on September 30, 2007.

they would suffer irreparable injury if the injunction were denied.  P.I. Mem. Op. at 25. This was particularly so when balanced against the "substantial harm" that was "both certain and great" facing both Defendant-Intervenors and a "myriad of third parties," including the "hundreds of employees [that] may well have their jobs affected or destroyed if a preliminary injunction is issued in this case." *Id.* at 27, 28.  Finally, Plaintiffs did not establish that the "public interest would be best served through a preliminary injunction in this case." *Id.* at 29.

Following this decision, the parties proceeded to brief Plaintiffs' claims.  On March 28, 2007, this Court issued an order which granted Plaintiffs' Motion for Summary Judgment on its NEPA claim, Count III in Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief ("Complaint").[4]  The Court also vacated the Interim Final Rule and enjoined the FSIS from implementing the Interim Final Rule.  The substantive effect of finding that the USDA and FSIS failed to follow a procedural rule resulted in immediate and irreparable harm in Illinois: Cavel was forced to cease operation of a twenty-year-old lawful business and its employees lost their livelihood. *See* Mem. Op. at 45 ("NEPA's 'mandate is essentially procedural.'") (citation omitted).

---

[4] Plaintiffs' Complaint included three counts.  On March 14, 2006, this Court dismissed Plaintiffs' first claim that the Federal Defendants violated the Administrative Procedure Act's ("APA") notice and comment provisions, *see* 5 U.S.C. § 553, as well as their second claim that the Federal Defendants violated § 706 of the APA by acting arbitrarily and capriciously in violation of the law.  *See* P.I. Mem. Op. Plaintiffs filed a motion requesting that the Court reconsider its *sua sponte* dismissal of these claims, and on August 28, 2006, the Court reinstated Plaintiffs' "notice and comment" claim.  The Court found it unnecessary to decide that claim in the March 28, 2007 Memorandum Opinion ("Mem. Op.").

### III.    ARGUMENT

The relief afforded by a stay pending appeal is "preventative, or protective; it seeks to maintain the status quo pending a final determination of the merits of the suit." *Holiday Tours, Inc.,* 559 F.2d at 844. The effect of the March 28 Order, however, was to turn the status quo 180 degrees, both legally and practically. Legally, it vacated the Interim Final Rule. Practically, it prohibited the federal inspection of horses at Cavel without which horses may not be slaughtered for human consumption. The consequences of this change in the status quo are that a twenty-year-old business has been forced to close its doors and people have lost their jobs. To alleviate such extreme hardship, Cavel respectfully requests this Court to stay its March 28 Order pending the decision's appeal.

The four factors which govern whether a stay should be granted are the same as those the Court considered when assessing Plaintiffs' request for a preliminary injunction:

> (1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal?...(2) Has the petitioner shown that without such relief, it will be irreparably injured...(3) Would the issuance of a stay substantially harm other parties interested in the proceedings?...(4) Where lies the public interest?...."

*Holiday Tours, Inc.,* 559 F.2d at 843 (citing *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C. Cir. 1958)). Just as courts in this Circuit employ a "sliding scale" when analyzing these factors in light of a request for a preliminary injunction, they take the same analytic approach when assessing a request for a stay. *Sociedad Anonima Vina Santa Rita v. United States Dep't of the Treasury,* 193 F. Supp. 2d 6, 13 (D.D.C. 2001) (citation omitted); *see also Holiday Tours,* 559 F.2d at 843 ("when confronted with a case in which the other three factors strongly favor interim relief [we hold a court] may exercise its discretion to grant a stay if the movant has made a substantial case on the

merits."). Thus, a "stay may be granted with either a high probability of success and some injury, or *vice versa*." *Cuomo v. United States Nuclear Regulatory Commission*, 772 F.2d 972, 974 (D.C. Cir. 1985) (emphasis added).

Here, Cavel seeks relief that is in keeping with the purpose of a stay pending appeal. *See Holiday Tours, Inc.,* 559 F.2d at 844. A stay will ensure the maintenance of the status quo: the continued operation of the voluntary fee-for-service program, the continued federal ante-mortem inspection of horses, and the continued operation of Cavel's facility, which, in turn, will protect Defendant-Intervenor and other third parties from catastrophic injury.

## A. Failure to Grant a Stay Will Cause Substantial Harm to Defendant-Intervenor and Other Third Parties

The basis for injunctive relief in the federal courts has always been irreparable harm…." *Sampson v. Murray*, 415 U.S. 61, 68 (1974). In this Circuit, injury is irreparable if it is "both certain and great." *Washington Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The harm must be "actual and not theoretical" and of such "imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (quoting *Ashland Oil, Inc. v. FTC,* 409 F. Supp. 297, 307 (D.D.C. 1976), *aff'd* 548 F.2d 977 (D.C. Cir. 1976)).

In its memorandum opinion denying Plaintiffs' request for injunctive relief, this Court held that "it is clear that a preliminary injunction in favor of Plaintiffs would cause substantial harm to both the [] Defendant-Intervenors and a myriad of third parties." P.I. Memo. Op. at 27. The harm facing Cavel and other third parties now, one year later, is no less substantial. In fact, the harm is even more certain and great: the harm that

Defendant-Intervenors feared at that time has come to pass in light of the March 28 Order. *Id.*

### 1.    Harm to Cavel

The March 28 Order forced Cavel to cease its operations immediately upon issuance of the Order. This is not a case where injunctive relief is being sought "against something merely feared as liable to occur at some indefinite time." *Washington Gas Co.,* 758 F.2d at 673-674 (citation omitted). The events of the past several days are proof enough that the harm is "certain." *Id.* at 674. Because the March 28 Order vacated the Interim Final Rule, which permitted the continued inspection of horses to occur on a fee-for-service basis, Cavel has closed its doors. *See* Tucker Decl. at ¶ 7; Van Damme Decl. at ¶ 5.

The harm that Cavel faces is also great. *Washington Gas Co.,* 758 F.2d at 674. Cessation of a business is clearly an "irreparable harm." *Id.* (holding that "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business"); *see also Holiday Tours, Inc.,* 559 F.2d at 843 n.2 ("The destruction of a business is, of course, an essentially economic injury. It is not, however, one of the 'mere' economic injuries which under *Virginia Petroleum Jobbers* are insufficient to warrant a stay.").

Cavel suffers not a mere economic or monetary loss for which it can be easily compensated. The company operates a multi-million dollar facility, which is profitable but also expensive to maintain, particularly when the company has been forced to shut down. *See* Tucker Decl. at ¶¶ 11, 13; Van Damme Decl. at ¶¶ 9, 10. Moreover, long-standing Cavel customers in Europe depend upon the supply of meat from Cavel's operations in Illinois. They will now turn to other North American suppliers for their

meat.  *See* Van Damme Decl. at ¶¶ 7, 8.  It will be very difficult, even if the March 28 Order is overturned on appeal some months from now, for Cavel to ever regain its customers from its Canadian competitors.  Likewise, Cavel will lose long-term, qualified employees if the stay is not granted.[5]  *See* Tucker Decl. at ¶ 11.

Finally, Cavel has no other avenue to even temporarily ensure the continued operation of the slaughterhouse or employment of its workers.  Its state-of-the-art facility was designed specifically for the slaughter of horses.  It is too small to adapt to the slaughter of cattle, and it cannot operate profitably by slaughtering other "exotic animals," such as deer or elk or supplying horse meat to zoos, pharmaceutical companies or universities.  *See* Tucker Decl. at ¶¶ 8, 9, 10.

## 2.    Harm to Third Parties

In addition to the harm caused Cavel absent a stay, third parties are also adversely affected by the March 28 Order.  Most significantly, fifty production workers have lost their positions.  *See* Tucker Decl. at ¶ 11.  Loss of employment has been held to be an "irreparable injury" for the party seeking injunctive relief, and such injury should be avoided when third parties face the same loss.  For example, in *Cortez III Service Corp. v. NASA,* 950 F. Supp. 357, 363 (D.D.C. 1996), plaintiffs challenged NASA's decision to offer a contract under a certain program at the Small Business Administration, which provides preferential awards of contracts for small and minority-owned businesses, rather than offering the contract under full-and-open competition.  *Id.* at 358-59.  The plaintiffs met the "irreparable injury" requirement to successfully enjoin the contract offering

---

[5] Failing to grant a stay here is doubly pernicious because Cavel will be forced out of business now, even though this entire dispute will become moot upon adoption of the Fiscal Year 2008 appropriations for the USDA.  Barring the insertion of language similar to that included in the Fiscal year 2006 Appropriations Act, the federal government will once again fund the ante-mortem inspection of horses.

because they showed that "as the incumbent contractor, plaintiff corporation employs more than 500 individuals...[and] the CLASS-II contract represents 35 percent of the corporation's total business." *Id.* at 363.

While the vast majority of its customers are foreign businesses that import and sell horsemeat, *see* Tucker Decl. at ¶ 8, other industries rely upon Cavel's continued operation. For example, Cavel sells paracaria for use in making prosthetic heart valves and horse ovaries for reproductive research. *Id.* Colleges and universities will no longer benefit from other horse byproducts to conduct research and educate students. *Id.* Thus, "[g]iven these real, certain, and substantial harms, it is clear that the balance of harms weights in favor of" granting Cavel's request for a stay of the Order pending appeal. P.I. Mem. Op. at 28.

**B.    Conversely, Plaintiffs Will Not Suffer Substantial Harm if a Stay is Granted**

In sharp contrast to the certain harm that Cavel and third parties will suffer if a stay is not granted, any potential harm to Plaintiffs is merely theoretical. *See Lightfoot v. District of Columbia*, No. 01-1484, 2006 U.S. Dist. LEXIS 4633, at *31 (Jan. 24, 2006, D.D.C.) (holding that potential harms caused to other parties as a result of a stay must also be tested for "substantiality, likelihood of occurrence, and adequacy of proof").

In their Complaint, Plaintiffs claim two types of injuries. The first is injury caused by the USDA's failure to comply with the APA and NEPA, which has allegedly affected the animal advocacy organizations' ability to engage in educational, legislative and advocacy activities. Complaint at ¶¶ 7, 10, 14, 18, 21, 26 and 28. In addition, individual Plaintiffs claim an aesthetic injury that results from the fee-for service

program, which allegedly inhibits their ability to observe, photograph, and otherwise appreciate horses. *Id.* at ¶¶ 5, 6, 13, and 30.

As addressed in Section C, *infra,* Defendant-Intervenor will establish on appeal that the USDA and FSIS did not violate NEPA in promulgating the Interim Final Rule, the only claim addressed by this Court in its Memorandum Opinion. And, standing alone, Plaintiffs' alleged "harms" do not tip the scale in their favor, particularly when considering the great and certain harm that Cavel and third parties suffer absent a stay. *See The Fund for Animals v. Mainella,* 294 F. Supp. 2d 46, 57-58 (D.D.C. 2003) (noting that where the plaintiffs failed to establish a likelihood of success on the merits of their claims, the court is "hard-pressed to conclude that plaintiffs have established an irreparable injury" based upon alleged aesthetic injuries).

First, it is not the purpose of the fee-for-service program to "eradicate or even significantly reduce the [horse] population." *Id.* at 58. For approximately the past 30 years during which facilities in this country have engaged in the slaughter of horses for human consumption, Plaintiffs have been able to enjoy observing thousands of horses. The operation and continued operation of the fee-for-service program does not prevent Plaintiffs from having any more – or less – access to horses than they have had over the past three decades. As this Court noted, "the sheer longevity of the existing program essentially refutes Plaintiffs' irreparable injury arguments; while it might be true that the existing program does ultimately have some environmental impact, Plaintiffs have been subjected to that impact for nearly three (3) decades at present." P.I. Mem. Op. at 26.

Furthermore, to the extent that individual Plaintiffs allegedly endure aesthetic or environmental harms due to the continued operation of Cavel,[6] those harms "are cabined by statutory and regulatory provisions that require" Cavel to comply with environmental, sanitary and animal protection laws. *See Citizens Coal Council v. Babbitt,* No. 00-0274, 2002 U.S. Dist. LEXIS 26462, at *3 (June 5, 2002 D.D.C.) (staying an order vacating a final rule regarding surface coal mining after balancing the impact of its decision upon defendant-intervenors, who would suffer a reduction or termination of mining operations, with the relatively minor risk of injury to the plaintiffs).

In summary, Plaintiffs simply will not be irreparably harmed by a stay of the March 28 Order. The alleged harm to them is neither substantial nor certain, particularly when balanced with the irreparable harm facing Defendant-Intervenor.[7] As this Court noted, in the end "the 'harms' identified by Plaintiffs have occurred as long as the identified slaughterhouse plants have been in operation, Plaintiffs' current injuries…simply lack…magnitude, immediacy, and imminence." P.I. Mem. Op. at 26.

## C.    Cavel Has a Substantial Likelihood of Success on Appeal

In order to justify a stay pending appeal, a movant need not demonstrate a "mathematical probability" of prevailing on the merits. *Holiday Tours, Inc.,* 559 F.2d at 843. This Circuit has held that when the other three factors (*i.e.,* irreparable injury to

---

[6] The only individual plaintiff in this action who alleges any injury as a result of Cavel's operations is Ms. Gail Vacca. Ms. Vacca lived in DeKalb from 1999 to 2005, when she operated a twenty acre horse farm within two miles of Cavel. *See* Complaint at ¶ 31. Notably, *Ms. Vacca has not lived in DeKalb for approximately 18 months* so could not possibly suffer any health risks, environmental hazards or aesthetic injuries as a result of Cavel's operation. *Id.* Rather, her alleged injury is her inability to move back to DeKalb in light of Cavel's continuing operation. *Id.* at ¶ 33. How Cavel (or the fee-for-service program, for that matter) could possibly be responsible for Ms. Vacca's decision to leave DeKalb and not return is a mystery, even more so considering Ms. Vacca presumably *chose* to establish herself in DeKalb in 1999, at a time when Cavel was fully operational.

[7] Nor is Plaintiffs' argument with respect to the environmental impacts of the slaughter operations proven: "whether Plaintiffs' assessment of the 'significance' of such impacts is correct is not presently subject to review…." Order at 16.

movant, no substantial harm to other interested parties and the public interest) strongly

favor interim relief, a stay may be granted "if the movant has made a substantial case on

the merits." *Id.* at 843.  A court may grant a stay "even though its own approach may be

contrary to the movant's view of the merits." *Id.*  More recently, this Circuit has ruled:

> To justify the granting of a stay, the movant need not always establish a
> high probability of success on the merits.  Probability of success is
> inversely proportional to the degree of irreparable injury evidenced.  A
> stay may be granted with either a high probability of success and some
> injury, *or vice versa.*

*Cuomo,* 772 F.2d at 974 (emphasis added).

The Council on Environmental Quality's ("CEQ's") regulations expressly provide

that "NEPA's purpose is not to generate paperwork".  40 C.F.R. § 1500.1(c) (AR0004).

To that end, CEQ regulations provide for federal agencies to establish their own

"categorical exclusions", defined as:

> categor[ies] of actions which do *not* individually or cumulatively have a
> *significant effect on the human environment* and which *have been found* to
> have *no such effect* in procedures adopted by a Federal agency in
> implementation of these regulations (Sec. 1507.3) and *for which,*
> *therefore, neither an environmental assessment nor an environmental*
> *impact statement is required*. .... Any *procedures* under this section shall
> provide for *extraordinary circumstances* in which a normally excluded
> action may have a significant environmental effect.

40 C.F.R. § 1508.4 (AR00048-49)(emphasis added).

A federal agency is required to "consult with the Council while developing its

procedures and before publishing them in the Federal Register for comment.  .... The

procedures shall be adopted only after an opportunity for public review and after review

by the Council for conformity with the Act and these regulations." 40 C.F.R. § 1507.3(a)

(AR00046).  Consequently, although it is up to each federal agency to establish its own

regulatory procedures for compliance with NEPA, such procedures must undergo CEQ review for "conformity with the Act" and CEQ's regulations prior to their adoption.[8]

So important are categorical exclusions to NEPA's regulatory scheme that CEQ regulations *mandate* their adoption no fewer than three separate times. *See* 40 C.F.R. § 1500.4(p) ("Agencies *shall* reduce excessive paperwork by: .... (p) Using categorical exclusions to define categories of actions ... which are ... exempt from requirements to prepare an environmental impact statement) (AR0005-6) (emphasis added); 40 C.F.R. § 1500.5(k) ("Agencies *shall* reduce delay by: .... (k) Using categorical exclusions to define categories of actions ... which are ... exempt from requirements to prepare an environmental impact statement) (AR0007) (emphasis added); 40 C.F.R. § 1507.3(b) ("Agency procedures ... *shall* include: .... 2. Specific criteria for and identification of those typical classes of action: .... (ii) Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (Sec. 1508.4)).") (AR00046) (emphasis added).

In July 1983, CEQ issued formal guidance to federal agencies "to help officials manage the NEPA process in a more efficient fashion." 48 Fed. Reg. 34263 (July 28, 1983) (AR00066). This guidance noted that Section 1507 of the CEQ regulations "directs" federal agencies to "identify those actions which experience has indicated will not have a significant environmental effect and to categorically exclude them from NEPA review." *Id.* at 34264 (AR00067). "The Council encourages the agencies to consider *broadly defined criteria* which characterize types of actions that, based on the agency's

---

[8] *See also* CEQ Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34263, 34265 (July 28, 1983) (AR00068) ("After reviewing comments received during the review period and prior to publication in final form, *the Council will determine whether the categorical exclusions are consistent with the NEPA regulations*.") (emphasis added).

experience, do not cause significant environmental effects." *Id.* at 34265 (AR00068) (emphasis added).  Furthermore, "the Council *strongly discourages* procedures that would require the preparation of *additional paperwork* to document that an activity has been categorically excluded." *Id.* (emphasis added).

Accordingly, in March 1983 and again in December 1995, the USDA promulgated its own NEPA regulations at 7 C.F.R. Part 1b.  In accordance with CEQ mandates, these USDA regulations established categorical exclusions, both for specified categories of activities and more broadly for programs and activities conducted by certain USDA agencies (including the FSIS), which "have been found to have no individual or cumulative effect on the human environment."  As required by 40 C.F.R. § 1508.4, these USDA procedures provide for "extraordinary circumstances" in which an agency head *may* determine that the normally excluded actions may have a "significant environmental effect."  And pursuant to 40 C.F.R. § 1507.3(a), all of these USDA procedures were required to undergo review by CEQ "for conformity with" NEPA and CEQ regulations prior to their adoption.

In granting summary judgment to Plaintiffs on their NEPA challenge to the Interim Final Rule, however, this Court's Memorandum Opinion denied effect to USDA's CEQ-approved categorical exclusions and procedures.  This ruling essentially imposes new and additional documentation preconditions upon USDA's categorical exclusions which are inconsistent with the procedures established by USDA and contrary to USDA's interpretation of its own regulations for the last 24 years.  Furthermore, these additional paperwork requirements are contrary to the express purposes and directives of both NEPA and CEQ's implementing regulations thereunder.

Respectfully, Cavel believes that it has a substantial likelihood of prevailing on the merits of its appeal of this Court's ruling that "*[t]he Categorical Exclusion was arbitrarily and capriciously applied in this case*" (Mem. Op. at p. 35) based upon at least the following grounds:

(1)    This Court failed to give "controlling weight" to FSIS's interpretation of its own categorical exclusion regulations and appropriate deference to FSIS's determination of no "extraordinary circumstances," as required by judicial precedent binding upon this Court;

(2)    Even though it had no legal obligation to do so, FSIS did in fact determine that there were no "extraordinary circumstances" in which the Interim Final Rule "may have a significant environmental impact," and this was clearly reflected in the Administrative Record; and

(3)    Plaintiffs utterly failed to meet their burden of proving that the Interim Final Rule "may have a significant environmental impact" sufficient to support a determination that FSIS's determination of no "extraordinary circumstances" was arbitrary and capricious.

### 1.    FSIS Determined that its Categorical Exclusion Applied and No "Extraordinary Circumstances" Were Present, and These Determinations are Entitled to "Controlling Weight."

FSIS's Interim Final Rule established a new "fee-for-service" funding mechanism under the Agricultural Marketing Act for the continuation of ante-mortem horse inspections at establishments that slaughter horses.  Horse inspections have been conducted continuously by FSIS inspectors for decades, until they were suddenly and immediately halted by this Court's Order.  Promulgation of the Interim Final Rule did not result in any new inspection activities by FSIS.

USDA's NEPA regulations provide for not one but two separate categorical exclusions clearly applicable to the Interim Final Rule. The first is under 7 C.F.R. § 1b.3(a), which specifies "categories of activities which have been determined not to have a significant individual or cumulative effect on the human environment." Categorical exclusion 7 C.F.R. § 1b.3(a)(2) applies to "[a]ctivities which deal solely with the funding of programs," such as the Interim Final Rule. Notwithstanding this categorical exclusion, 7 C.F.R. § 1b.3(c) provides that "agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action." This categorical exclusion regulation, which was required to undergo review by CEQ "for conformity with" NEPA and CEQ regulations prior to its adoption, does not require any documentation of the agency's determinations thereunder.

The second is under 7 C.F.R. § 1b.4(a), which lists USDA agencies which "conduct programs and activities that have been found to have no individual or cumulative effect on the human environment." The actions of these USDA agencies "are categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect." *Id.* FSIS is one of these USDA agencies listed under this categorical exclusion. 7 C.F.R. § 1b.4(b)(6). Once again, this categorical exclusion regulation, which was required to undergo review by CEQ "for conformity with" NEPA and CEQ regulations prior to its adoption, does not require any documentation of the agency's determinations thereunder.[9]

---

[9] CEQ certainly is entitled to deference concerning its interpretation of its own regulations, including its required determination that the USDA categorical exclusion regulations are consistent with CEQ's regulations under NEPA. *See, e.g., National Trust for Historic Preserv. in the U.S. v. Dole,* 828 F. 2d 776, 781 (D.C. Cir. 1987) (per curiam) ("The administrative interpretation is controlling, 'unless it is plainly erroneous and inconsistent with the regulation'") (citations omitted); *Back Country Horsemen of Am. v. Johanns,* 424 F. Supp. 2d 89, 99 (D.D.C. 2006); *Alaska Ctr. for Env't v. U.S. Forest Serv.,* 189 F.3d 851, 857 (9th Cir. 1999).

FSIS determined that the Interim Final Rule was excluded from the NEPA requirement to prepare an environmental assessment or an environmental impact statement by virtue of the categorical exclusion in 7 C.F.R. § 1b.4(a)&(b)(6). Given the fact that this categorical exclusion applies to all "programs and activities" conducted by FSIS, there is no question that the Interim Final Rule falls within its scope.[10]

In *National Trust for Historic Preserv. in the U.S.*, 828 F. 2d at 781, the Federal Highway Administration ("FHWA") determined that the construction of suicide prevention barriers on a bridge was exempt from NEPA under a categorical exclusion ("CE"). The D.C. Circuit affirmed the district court's ruling that FHWA's determination was not arbitrary and capricious. The Court noted that the district court "correctly utilized the 'arbitrary and capricious' standard of review" in reviewing the agency's determination that a CE applied. *Id*. at 780. It made clear that the four-party *Mid-Tex* test (*i.e.*, whether the agency took a "hard look" at the problem, etc.) "is not applicable to the review of the CE decision which was before the court. *Id*.

The Court explained that "[b]y definition, CE's are categories of actions that have been predetermined not to involve significant environmental impacts, and *therefore require no further agency analysis absent extraordinary circumstances*." *Id*. (emphasis

---

[10] By contrast, the district court decisions followed by this Court in support of its March 28, 2007 summary judgment ruling involved substantial questions concerning whether or not the agency action at issue fell within the scope of the agency's categorical exclusion or else a complete lack of any reference to the exclusion in the record. *See, e.g. Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142 (D.D.C. 1993) ("the defendant is not likely to establish that the exclusion applies" and "[d]ispositive here, however, is the virtual admission of counsel for the defendant that neither defendant … made any contemporaneous determination as to whether the study falls within or without a categorical exclusion"); *Edmonds Inst. v. Babbitt*, 42 F. Supp. 2d 1, 18 n. 11 (D.D.C. 1999) ("The Court simply holds that a post hoc assertion of a CE during litigation, _unsupported_ by _any_ evidence in the administrative record or elsewhere that such a determination was made at the appropriate time, cannot justify a failure to prepare either an EA or an EIS.") (emphasis added); *Anacostia Watershed Society v. Babbitt*, 871 F. Supp. 475, 481 (D.D.C. 1994) (agency "failed to invoke a categorical exclusion"). By contrast, the comprehensive breadth of the FSIS's categorical exclusion under 7 C.F.R. § 1b.4, along with the evidence in the Administrative Record documenting FSIS's reliance on this categorical exclusion when it promulgated the Interim Final Rule, fundamentally distinguish this case from those district court decisions.

added).[11]  It found that "FHWA determined the project was excluded from NEPA under

CE No. 14, and that no extraordinary circumstances existed warranting further

evaluation." *Id.* at 781.  The Court also ruled that the district court had "properly

deferred to the agency's interpretation of its own regulations." *Id.* at 782.  It noted that

"'courts owe great deference to the interpretation adopted by the agency and will uphold

that interpretation if it is reasonable and consistent with the regulation.'" *Id.* (*quoting*

*Belco Petroleum Corp. v. FERC*, 589 F.2d 680, 685 (D.C. Cir. 1978)).  It further stated

that "[t]he administrative interpretation is controlling, 'unless it is plainly erroneous and

inconsistent with the regulation.'" *Id.* (citations omitted).  *Accord, Back Country*

*Horsemen of Am.,* 424 F. Supp. 2d at 99 ("the agency's interpretation of the scope of one

of its own CE's is 'given controlling weight unless plainly erroneous or inconsistent with

the terms used in the regulation.'") (*quoting Alaska Ctr. for Env't,* 189 F.3d at 857) (other

citations omitted)).  Consequently, FSIS' determination that its categorical exclusion

regulation applies to the Interim Final Rule likewise is entitled to "great deference" and

"controlling weight."

This Court's grant of summary judgment for Plaintiffs on their NEPA challenge

was predicated entirely upon an assumption that FSIS "fail[ed] to give any consideration

as to whether or not the Interim Final Rule invoked 'extraordinary circumstances' such

that it 'may have a significant environmental effect.'"  Mem. Op. at 40.  However, this

conclusion is erroneous, and refuted by the Administrative Record.

The Regulatory Review Workplan prepared by FSIS in connection with the

Interim Final Rule contains a section titled "<u>Required Analysis:</u>  (check all that apply)".

---

[11] *Accord, Utah Envt'l Congress v. Bosworth,* 443 F.3d 732, 740 (10th Cir. 2006) (plaintiff's argument that
a preliminary analysis should be performed by the agency prior to use of a categorical exclusion "would
effectively render useless the purpose of categorical exclusions").

(AR0202-06). This section requires the agency head to consider each of eight different analyses, and indicate which ones the agency head determines are necessary. One of these potential analyses is "Environmental Impact Assessment". (AR0205). Affirmative determinations are indicated by a check mark in the appropriate box; negative determinations are indicated by an unchecked box. The agency head then affixes his or her signature under the section titled "Agency Head Approval:". (AR0206). In the case of the Interim Final Rule, the Workplan indicates that the agency head made a positive determination with respect to "Regulatory Impact Analysis" by checking its box, and a *negative* determination concerning the need for an "Environmental Impact Assessment" by leaving its box unchecked and then signing the Workplan. (AR0205). This determination was made contemporaneously with the promulgation of the Interim Final Rule, not "twenty years ago" as suggested in the Memorandum Opinion. *See* p. 41.

The agency head's negative determination on extraordinary circumstances in the Workplan also refutes the Memorandum Opinion's suggestion that FSIS feels it "may ignore NEPA entirely" (p. 37) and "for[e]go any consideration of NEPA altogether" (p. 39) based upon its categorical exclusion. If this were indeed the case, then there would have been no need to include "Environmental Impact Assessment" under the "Required Analysis: (check all that apply)" section of the Workplan at all. The reason "Environmental Impact Assessment" is listed on the Workplan is precisely to insure that the agency head gives consideration to whether "extraordinary circumstances" exist in a particular instance which might warrant further environmental evaluation. By making a determination that extraordinary circumstances are not present, the FSIS agency head is

not "ignoring NEPA" any more than a highway patrolman is ignoring the speed limit if he or she determines that a passing automobile is not speeding.

In addition to the Workplan, the Administrative Record contains other evidence that FSIS duly "invoked" its categorical exclusion under 7 C.F.R. §1b.4(b)(6) *prior to* promulgation of the Interim Final Rule, contrary to the suggestion in the Memorandum Opinion that FSIS did so only "post hoc." *See, e.g.*, FSIS Directive (11/20/01, AR0192-201) ("FSIS has been granted a categorical exclusion from NEPA requirements by USDA regulation (7 CFR 1b.4) unless 'the agency head determines that an action may have a significant environmental effect.'"); General Counsel Memorandum from D. Bear to R. Stafko (12/07/87; last page of Ex. 6 to DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT) (describing categorical exclusion for FSIS under 7 C.F.R. § 1b.4(b)(6)); USDA Final Rule, 60 Fed. Reg. 66479, 66481 (Dec. 22, 1995) (AR00072) (FSIS "conduct[s] programs and activities that have been found to have no individual or cumulative effects on the human environment."); USDA Final Rule, 48 Fed. Reg. 11403, 11404 (Mar. 18, 1983) (AR00065) (same); etc.[12]

In the recent case of *Back Country Horsemen of Am.*, 424 F. Supp. 2d at 99, the court rejected a claim by a plaintiff horse group that the U.S. Forest Service's reliance on a categorical exclusion was merely a "'post-hoc' rationalization because there was 'no documentation' relating to the basis for the agency's decision." The court held: "Such an

---

[12] In order to obtain summary judgment, Plaintiffs were required to show that "there is no genuine issue as to any material fact". *See* Fed. R. Civ. Pro. 56(c). Moreover, in considering Plaintiffs' motion for summary judgment, this Court was required to view all evidence and inferences therefrom in the light most favorable to the Defendants. *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994) ("all inferences must be viewed in the light most favorable to the non-moving party."). Indeed, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Washington Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). Given the evidence in the Administrative Record indicating that the FSIS did indeed give consideration to whether extraordinary circumstances were present, it is difficult to see how Plaintiffs could have met this summary judgment standard.

argument fails because the CE in question is one for which 'no decision memorandum is required.' ... Therefore, the agency had no obligation to formally document its decision."[13]

Consequently, because the categorical exclusion for FSIS in 7 C.F.R. § 1b.4 does not require any such decision document to support its application, FSIS was under no obligation to formally document its determination of no extraordinary circumstances decision (despite the fact that it did so in the Workplan). Consequently, it was inappropriate for this Court to find a NEPA violation due to the lack of documentation which was not, in any event, required in the first place.

### 2. Plaintiffs Failed to Prove that the Interim Final Rule "May Have Significant Environmental Impact" Necessary to Prove that FSIS's Determination Was Arbitrary and Capricious.

As noted above, by completing and signing the Regulatory Review Workplan, FSIS's agency head determined that there were no "extraordinary circumstances" that

---

[13] Likewise, in *International Center for Tech. Assess. v. Johanns*, No. 03-00020, 2007 U.S. Dist. LEXIS 7773 (Feb. 5, 2007 D.D.C.), the plaintiffs argued that the Animal Plant Health and Inspection Service ("APHIS") had failed to adequately document its determination that field tests of genetically engineered ("GE") grasses were subject to a NEPA categorical exclusion. This Court ruled:

> The record contains no explicit findings that the ... field trials fell under this exemption, but the court concludes that *such findings were not necessary.* Both the language and promulgation history of the exemption make it clear that it was created specifically to cover *all* (and only) permits and acknowledgements resulting from the PPA notification process. .... That is, *any* field test of GE organisms and/or products allowed (i.e., acknowledged or permitted) by APHIS pursuant to the PPA inherently falls under the "confined field release" NEPA exemption. *No further determination is required.*

*Id.* at *50 (emphasis added). Ultimately, the Court ruled that APHIS had failed to comply with NEPA because (1) the "record is devoid of any evidence" that APHIS considered whether an exception to the CE applies; and (2) "[t]he record contains substantial evidence that the field tests may have had the potential to affect significantly the quality of the human environment". *Id.* at **51-52. Those factors fundamentally distinguish that case from the instant proceeding. As noted above, the Regulatory Review Workplan for the Interim Final Rule documents that the FSIS agency head determined that no extraordinary circumstances are present and, as discussed *infra*, the Administrative Record in this case contains absolutely no evidence that the Interim Final Rule may significantly affect the environment.

"may have a significant environmental effect" in connection with the Interim Final Rule. In order to prevail on their NEPA claim, Plaintiffs were required to prove that this no extraordinary circumstances determination was "arbitrary and capricious," a highly deferential standard of review. *National Trust for Historic Preserv. in the U.S.,* 828 F. 2d at 780; *Back Country Horsemen of Am.*, 424 F. Supp. 2d at 99; *Alaska Ctr. for Env't*, 189 F.3d at 857. As noted above, this determination by FSIS is entitled to "great deference" and "controlling weight" by a reviewing court. *Id.* at 782.

Furthermore, "[t]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 272 (D.C. Cir. 2002); *accord, Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000) (where plaintiff failed to present "affirmative evidence in support of its contention" that an agency's action was arbitrary and capricious, it had failed to met its burden). Indeed, "even assuming [the agency] made missteps … the burden is on petitioners to demonstrate that the [agency's] ultimate conclusions are unreasonable." *City of Olmstead Falls, supra,* at 272. Moreover, in order to prevail on summary judgment, Plaintiffs must overcome all of these hurdles despite the fact that the court is required to view all inferences in the light most favorable to Defendants[14]—a very difficult task.

In order to meet their enormous burden, Plaintiffs were obliged to come forward with evidence from the Administrative Record demonstrating that the Interim Final Rule, which did nothing more than alter the funding mechanism for FSIS horse inspections that had been conducted continuously for decades, "may have a significant environmental

---

[14]  *See, e.g., Tao*, 27 F.3d at 638 ("all inferences must be viewed in the light most favorable to the non-moving party."); *Liberty Lobby, Inc.*, 477 U.S. at 255 ("the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); *see also, Washington Post Co.*, 865 F.2d at 325.

effect." *See, e.g., Back Country Horsemen of Am.*, 424 F. Supp. 2d at 99 (rejecting plaintiff's argument that agency's reliance on categorical exclusion was arbitrary and capricious—"this argument obviously fails because it is not the scope of the agency action, but rather whether it 'significantly affects the quality of the human environment' that determines whether an EA or EIS is required.").

However, Plaintiffs have failed to adduce even a scintilla of evidence of any such "significant environmental effect" resulting from the Interim Final Rule.[15]  Rather, they have offered nothing more than a mere "argument" in an attempt to meet the exacting arbitrary and capricious standard. *See* Mem. Op. at p. 16.

This Court never even reached, let alone determined, the issue of whether the Interim Final Rule has any "significant" impact on the environment: "However, whether Plaintiffs' assessment of the 'significance' of such impacts is correct *is not presently subject to review*, as it is clear that the related-NEPA [sic] analysis was never conducted by the agency in the first instance." *Id.* (emphasis added).  As noted above, however, the Administrative Record contains ample evidence that FSIS's agency head did indeed determine that no extraordinary circumstances existed in connection with promulgation of the Interim Final Rule.  *See, e.g.*, Regulatory Review Workplan (indicating "Environmental Impact Assessment" was not required) (AR0205); FSIS Directive (11/20/01, AR0192-201); General Counsel Memorandum from D. Bear to R. Stafko (12/07/87; last page of Ex. 6 to DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT); USDA Final Rule, 60 Fed. Reg. 66479, 66481 (Dec. 22, 1995) (AR00072); USDA Final Rule, 48 Fed. Reg. 11403, 11404 (Mar. 18, 1983)

---

[15]  The Interim Final Rule went into effect on March 10, 2006, and was in effect for over a year.  Surely any such significant environmental effect (if any) should have become manifest by now.

(AR00065); etc.  Moreover, the Administrative Record reflects that the Interim Final Rule affected only "three small official establishments" in the U.S., and that the rule itself was determined to be "non-significant" by the Office of Management and Budget, which supports FSIS's determination.  FSIS Interim Final Rule, 71 Fed. Reg. 6337, 6339 (Feb. 8, 2006) (AR 0179).

Finally, the Administrative Record contains evidence affirmatively demonstrating that FSIS's long-standing food inspections have had no significant environmental impacts whatsoever.  *See* General Counsel Memorandum from D. Bear to R. Stafko (12/07/87; last page of Ex. 6 to DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT):

> FSIS is engaged primarily in inspection-related activities under the Federal Meat Inspection Act and the Poultry Products Inspection Act.  The purpose of these acts is to protect the consuming public by providing for the regular inspection of meat and poultry products, to regulate the processing and distribution of such articles, and to prevent the movement or sale of interstate and foreign commerce of adulterated or misbranded meat and poultry products.

Given the fact that FSIS's activities are confined to safeguarding the human food supply, it is not surprising that Plaintiffs are unable to show that their continuing horse inspection activities have had a "significant environmental effect."

In light of the foregoing, Cavel believes that it certainly has a substantial case on the merits which should be heard and adjudicated by the D.C. Circuit before Cavel is forced to close its business as a consequence of this Court's March 28, 2007 Order.

**D.**    **The Public Interest Will Be Served by a Stay of the March 28 Order**

The fourth factor courts consider is whether the public interest lies in granting a stay.  In this case it does.  First, the public has an interest in federal agencies' enforcement of Congressional will. The plain text of the Fiscal Year 2006 Appropriations

Act prohibits federal appropriations from being used to pay the salaries and expenses of FSIS inspectors. *See* Appropriations Act § 794. This directive has been followed by the USDA. There is no indication that Congress intended to prohibit the operation of horse slaughter facilities in this country. In fact, the conference report accompanying the Appropriations Act explained that "[i]t is the understanding of the conferees that the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and exported)." H.R. Rep. No. 109-255 at 107 (2005); *see also Auburn Housing Auth. v. Martinez,* 277 F.3d 138, 147 (2d Cir. 2002) ("The conference report is generally the most reliable evidence in legislative history of congressional intent because it represents the final statement of the terms agreed to by both houses.").

Second, this is not a case where the agency regulating the Defendant-Intervenor's operations or any court has ruled that "the service performed by [Cavel] is contrary to the public interest." *Holiday Tours, Inc.,* 559 F.2d at 843 (finding that there was no harm to the public interest where the regulating authority has not ruled that the service performed by the appellant was contrary to the public interest). In fact, as this Court acknowledged, the "USDA...has acted to preserve those same schemes" which ensure the continued operation of a lawful enterprise. P.I. Mem. Op. at 29.

Finally, the public interest cries out in support of a stay here when considering the immediate and extreme ramifications of the March 28 Order upon the 50 employees of Cavel who, immediately upon its entry, lost their livelihoods.

**IV.     CONCLUSION**

For the foregoing reasons, Defendant-Intervenor Cavel International, Inc. respectfully requests that its Emergency Motion for a Stay of the March 28 Order be granted.

Respectfully submitted,

/s/ James P. Murphy
James P. Murphy, Esq. (DC Bar No. 380857)
Katherine L. Halpin, Esq. (DC Bar No. 494139)
SQUIRE, SANDERS & DEMPSEY L.L.P.
1201 Pennsylvania Ave., N.W., Suite 500
Washington, DC 20004
Telephone: 202.626.6600
Fax: 202.626.6780

Date: April 2, 2007                    *Attorneys for Defendant-Intervenor*