UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**THE HUMANE SOCIETY**                  )
**OF THE UNITED STATES, ET AL.,**       )
                                        )        Civ. No. 1:06CV00265 (CKK)
            Plaintiffs,                 )
    v.                                  )
                                        )
**MIKE JOHANNS, ET AL.,**               )
                                        )
            Defendants.                 )
_____)


### PLAINTIFFS' OPPOSITION TO DEFENDANT-INTERVENOR'S EMERGENCY MOTION FOR A STAY OF THE COURT'S <u>MARCH 28, 2007 ORDER</u>

*Of Counsel*:

REBECCA G. JUDD
ETHAN CARSON EDDY
JONATHAN R. LOVVORN
THE HUMANE SOCIETY OF THE UNITED STATES
2100 L. St., N.W.
Washington, DC 20037
(202) 676-2333

ERIC R. GLITZENSTEIN
HOWARD M. CRYSTAL

MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, DC 20009

(202) 588-5206
(202) 588-5049 (fax)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………...ii

INTRODUCTION………………………………………………………………………...1

THE LEGAL FRAMEWORK FOR EVALUATING CAVEL'S MOTION
IN LIGHT OF THE COURT'S ENTRY OF FINAL JUDGMENT ON
PLAINTIFFS' NEPA CLAIM…………………………………………………….…..…3

CAVEL HAS NOT MET THE STRINGENT STANDARDS FOR A STAY…………………...7

    A. Cavel Is Unlikely To Prevail On The Merits………………………………………..8

    B. The Balance of Equities Does Not Support A Stay………………………………......16

        1. Cavel Has Failed To Establish That It Will Suffer Irreparable
        Harm Because The Harm Is Merely Economic And Is Neither
        "Certain" Nor "Great"………………………………………………………...….…17

        2. Plaintiffs And Plaintiffs' Members Will Suffer Irreparable
        Harm If Cavel's Plant Is Allowed To Resume Operations
        Pending Appeal………………………………………………………………….…22

        3. Harm to "Third Parties"……………………………………………………………26

    C. The Public Interest Does Not Support A Stay…………………………………….…..28

CONCLUSION…………………………………………………………………………..31

## <u>TABLE OF AUTHORITIES</u>

**CASES**

American Bioscience, Inc. v. Thompson,
    269 F.3d 1077 (D.C. Cir. 2001) ....................................................................................2

Amoco Production Co. v. Village of Gambell,
    480 U.S. 531 (1987)................................................................................................22, 24

Back Country Horsemen of America v. Johanns,
    424 F. Supp. 2d 89 (D.D.C. 2006) ............................................................................15

Berman v. DePetrillo,
    1997 WL. 148638 (D.D.C. 1997) ..............................................................................20

Blue Mountains Biodiversity Project v. Blackwood,
    161 F.3d 1208 (9th Cir. 1998) ...................................................................................28

Bristol-Myers Squibb Co. v. Shalala,
    923 F. Supp. 212 (D.D.C. 1996) ...............................................................................20

Citizens to Preserve Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971)....................................................................................................2

Empacadora de Carnes De Fresnillo, S.A. De C.V. v. Curry,
    476 F.3d 326 (5th Cir. 2007) ..............................................................................3, 7, 15

Esch v. Yeutter,
    876 F.2d 976 (D.C. Cir. 1989) ..................................................................................15

FCC v. Nextwave Personal Communications,
    537 U.S. 293 (2003)....................................................................................................2

Friends of the Earth, Inc. v. U.S. Army Corps of Engineers,
    109 F. Supp. 2d 30 (D.D.C. 2000) ..............................................................................6

Fund for Animals v. Norton,
    294 F. Supp. 2d 92 (D.D.C. 2003) ..............................................................................6

Fund for Animals v. Williams,
    391 F. Supp. 2d 191 (D.D.C. 2005) ..........................................................................15

Greater Yellowstone Coalition v. Bosworth,
    209 F. Supp. 2d 156 (D.D.C. 2002) ............................................................................6

Gulf Oil Corp. v. Department of Energy,
    514 F. Supp. 1019 (D.D.C. 1981) ............................................................18, 20

Hawaii Longline Association v. NMFS,
    281 F. Supp. 2d 1 (D.D.C. 2003) .........................................................................6

Humane Society of U.S. v. Department of Commerce,
    432 F. Supp. 2d 4 (D.D.C. 2006) .........................................................................6

International Center for Tech. Assess. v. Johanns,
    ____ F. Supp. 2d ___, 2007 WL 315633 (D.D.C. 2007)...........................12, 13

Lightfoot v. District of Columbia,
    2006 WL 175222 (D.D.C. Jan. 24, 2006) ................................................ passim

M.R.S. Enterprises, Inc. v. Sheet Metal Workers' International Association, Local 40,
    2006 WL 2612972 (D.D.C. Aug. 22, 2006) .......................................................8

Marsh v. Oregon Natural Resources Council,
    490 U.S. 360 (1989).............................................................................................6

Mylan Pharmaceuticals, Inc. v. Shalala,
    81 F. Supp. 2d 30 (D.D.C. 2000) ......................................................................20

NRDC v. Herrington,
    768 F.2d 1355 (D.C. Cir. 1985) ..........................................................................6

NRDC v. Pena,
    147 F.3d 1012 (D.C. Cir. 1998) ..........................................................................4

National Mining Association v. U.S. Army Corps of Engineers,
    145 F.3d 1399 (D.C. Cir. 1998) ........................................................................28

National Parks & Conservation Association v. Babbitt,
    241 F.3d 722 (9th Cir. 2001) ............................................................................16

Nevada v. Department of Energy,
    457 F.3d 78 (D.C. Cir. 2006) ..............................................................................2

Realty Income Trust v. Eckerd,
    564 F.2d 447 (D.C. Cir. 1977) ..........................................................................22

Sandoz, Inc. v. Food and Drug Admin.,
    439 F. Supp. 2d 26 (D.D.C. 2006) ....................................................................19

Shays v. FEC,
        340 F. Supp. 2d 39 (D.D.C. 2004) ....................................................................8

Sierra Club v. Marsh,
        872 F.2d 497 (1st Cir. 1989) ....................................................................6, 22

TGS Tech., Inc. v. United States,
        1992 U.S. Dist. LEXIS 195 (D.D.C. Jan. 14, 1992) .......................................20

University of Texas v. Camenisch,
        451 U.S. 390 (1981)..................................................................................4, 5

Virginia Petroleum Jobbers Association v. Federal Power Commission,
        259 F.2d 921 (D.C. Cir. 1958) ...........................................................16, 26, 27

Washington Metropolitan Transit Commission v. Holiday Tours,
        559 F.2d 841 (D.C. Cir. 1977)..................................................................18, 19

West Virginia Association of Community Health Centers v. Heckler,
        734 F.2d 1570 (D.C. Cir. 1984) ....................................................................4

## REGULATIONS AND STATUTES

7 C.F.R. § 1b.2(b) .........................................................................................10

7 C.F.R. § 1b.3(c).........................................................................................10

7 C.F.R. § 1b.4 ............................................................................................10

7  C.F.R. § 372.5(c)(3)(ii) ...............................................................................12

40 C.F.R. § 1508.27(b)(2)................................................................................14

40 C.F.R. § 1508.4 ........................................................................................10

Administrative Procedure Act,
        5 U.S.C. § 706(2) ........................................................................................2

National Environmental Policy Act,
        42 U.S.C. § 4321 .........................................................................................1

## MISCELLANEOUS

151 Cong. Rec. H4250 (June 8, 2005)..............................................................14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                               )
**THE HUMANE SOCIETY**                         )
**OF THE UNITED STATES, ET AL.,**              )
                                               )        Civ. No. 1:06CV00265 (CKK)
                        Plaintiffs,            )
            v.                                 )
                                               )
**MIKE JOHANNS, ET AL.,**                      )
                                               )
                        Defendants.            )
_____)

### PLAINTIFFS' OPPOSITION TO DEFENDANT-INTERVENOR'S EMERGENCY MOTION FOR A STAY OF THE COURT'S MARCH 28, 2007 ORDER

### INTRODUCTION

In its March 28, 2007 Memorandum Opinion and Order ("Mem. Op."), the Court held that the federal defendants violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA") by not "conducting any environmental review" before creating, for the first time ever, a fee-for-service ante-mortem horse slaughter inspection system that was expressly designed to sidestep a Congressional cutoff of federal funds for such inspections. Mem. Op. at 1. The Court's detailed analysis of plaintiffs' NEPA claim was based on a review of the entire Administrative Record ("AR"), and it carefully addressed and rejected defendants' and intervenors' various (and internally inconsistent) arguments for why the United States Department of Agriculture ("USDA") was under no obligation to prepare an Environmental Impact Statement ("EIS"), or at least an Environmental Assessment ("EA"), before adopting the regulation under review.

The Court also specifically addressed the relief that should flow from its legal determination. In particular, the Court addressed whether the regulation should be left in place during the time that USDA endeavors to comply with NEPA and make a new decision, in light of its belated NEPA analysis, whether to repromulgate the rule or take some alternative course of action. In determining that the regulation must be vacated pending compliance with NEPA, the Court relied on the plain terms of the APA – which provide that a reviewing court "<u>shall</u> . . . hold unlawful <u>and set aside</u> agency actions, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . and (D) without observance of procedure required by law . . . ." 5 U.S.C. §§ 706(2)(A) & (D) (emphasis added); <u>see</u> Mem. Op. at 46. In addition, in rejecting intervenors' contention that "'the appropriate approach would be for the Court to leave in place the Interim Final Rule while requiring the agency to conduct whatever NEPA analysis or document is deemed to be required,'" <u>id.</u> (quoting Def.-Intervs.' Opp'n at 3 n.2), the Court held that "[p]ursuant to the case law in this Circuit, <u>vacating a rule or action promulgated in violation of NEPA is the standard remedy</u>," <u>id.</u> (emphasis added) (citing <u>Am. Bioscience, Inc. v. Thompson</u>, 269 F.3d 1077, 1084 (D.C. Cir. 2001)), and that there was no compelling reason to deviate from that "standard remedy" in this case.[1]

---

[1] The Court's ruling that vacatur is the presumptive, if not mandatory, remedy under these circumstances is strongly supported by Supreme Court and Circuit precedent. <u>See</u> <u>also</u> <u>FCC v. Nextwave Personal Communications</u>, 537 U.S. 293, 300 (2003) (The APA "requires courts to set aside federal agency action that is 'not in accordance with law,'" 5 U.S.C. § 706(2)(A) "which means, of course, <u>any</u> law") (emphasis in original); <u>id.</u> ("In all cases agency action <u>must be set aside</u> if the action was 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;' or if the action failed to meet statutory, <u>procedural</u> or constitutional requirements") (emphasis added) (quoting <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 413-14 (1971)); <u>Nevada v. Dep't of Energy</u>, 457 F.3d 78, 85 (D.C. Cir.

Only <u>one</u> of the three defendant-intervenors now requests, in the form of an "Emergency Motion for A Stay," that the Court do exactly what the Court expressly <u>refused</u> to do only nine days ago, <u>i.e.,</u> leave the unlawfully promulgated regulation in place despite the Court's finding that the rule was issued in violation of NEPA. In requesting that abrupt about-face, however, intervenor Cavel International, Inc. ("Cavel") has not remotely satisfied the stringent standards for a stay. To the contrary, as discussed below, most of Cavel's motion is devoted to reiterating merits arguments that the Court has now squarely considered and rejected. The remainder of their arguments essentially assert garden-variety economic harms of the kind that courts have routinely deemed insufficient to constitute irreparable harm, much less justify the continuance of an activity in the face of an established NEPA violation.[2]

## THE LEGAL FRAMEWORK FOR EVALUATING CAVEL'S MOTION IN LIGHT OF THE COURT'S ENTRY OF FINAL JUDGMENT ON PLAINTIFFS' NEPA CLAIM

Before turning to intervenors' specific arguments, however, it is important to first set the record straight on one theme that runs throughout Cavel's motion, i.e., that the Court's ruling at the <u>preliminary injunction</u> stage somehow controls the Court's analysis now that the Court has entered <u>final judgment</u> for plaintiffs on the NEPA claim. <u>See</u> Cavel Mot. at 2, 4-5, 7, 12, 26. Cavel's approach is simply wrong as a matter of law.

---

2006) ("The APA <u>requires that we set aside</u> agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (emphasis added) (internal citation omitted).
     [2]  Two of the three intervenors – Beltex Corporation and Dallas Crown, Inc. – have not joined in the emergency motion, presumably because of a recent Fifth Circuit ruling that those companies may be prosecuted for violating a 1949 Texas law that "on its face prohibits the processing, sale or transfer of horsemeat for human consumption." <u>Empacadora de Carnes De Fresnillo, S.A. De C.V. v. Curry</u>, 476 F.3d 326, 329 (5th Cir. 2007). Nor has the federal agency

The Supreme Court has stressed the "basic distinction" between a ruling at the preliminary injunction phase and a "final judicial decision based on the <u>actual merits of the controversy</u>," and thus has held that it is "generally <u>inappropriate</u>" for a federal court to conflate a "final judgment on the merits" with findings predicated on "evidence that is less complete" at a preliminary phase of the case.  <u>University of Texas v. Camenisch</u>, 451 U.S. 390, 395-96 (1981) (emphasis added).  Accordingly, relying on <u>Camenisch</u>, the court of appeals has also admonished that a

> <u>court must be cautious in adopting findings and conclusions from the preliminary injunction stage in ruling on a motion for summary judgment</u> for two reasons.  First, a court's findings of fact and conclusions of law at the preliminary injunction stage are often based on incomplete evidence and a relatively hurried consideration of the issues . . . Second, the questions focused on differ in deciding a motion for preliminary injunction and in deciding a motion for summary judgment."

<u>NRDC v. Pena</u>, 147 F.3d 1012, 1023 (D.C. Cir. 1998) (emphasis added; internal quotation omitted); <u>see also</u> <u>West Virginia Ass'n of Community Health Centers v. Heckler</u>, 734 F.2d 1570, 1578 (D.C. Cir. 1984).

Those cautionary principles apply with particular force to this case, in which the Court stressed that its denial of relief at the preliminary stage was based in large measure on the Court's view that the pertinent "record [concerning plaintiffs' NEPA claim] is quite unclear in many respects."  March 14, 2006 Mem. Op. at 21.  In particular, the Court questioned whether there was "at least some history and record of agency deliberation regarding the environmental impact of [the Food Safety and Inspection Service's] policies that is simply not before the Court at this time, making any definitive assessment of the agency's conduct in light of an 'arbitrary

---

that plaintiffs actually sued for violating NEPA filed a motion for a stay; indeed, USDA has declined even to file a brief in support of Cavel's motion.

and capricious' standard nearly impossible and prone to error." Id. The Court further stressed that "[t]his gap in the record . . . is merely emblematic of other, larger gaps wherein relevant facts and arguments are dealt with in a more cursory manner due to the relevant time constraints" imposed by the nature of a request for emergency injunctive relief. Id. (emphasis added).

Hence, in the preliminary injunction ruling itself the Court made crystal-clear – in accord with the teachings of Camenisch and Pena – that the Court's final disposition of the NEPA claim would be based on a "definitive assessment" of the complete record and the parties' arguments based on that record, and that such an assessment would and should not be prejudiced by the Court's "more cursory" findings at the earlier stage of the case. Consistent with that understanding of the law, the Court has now made a "final judicial decision based on the actual merits of the [NEPA] controversy" in light of a full record and a comprehensive consideration of the parties' arguments, Camenisch, 451 U.S. at 396, and has determined that USDA had no sound legal or factual basis for failing to engage in NEPA review in connection with adoption of the "interim final rule" under review. The Court has also properly applied the plain terms of the APA, as well as D.C. Circuit precedent, in setting aside the rule in view of that final determination of a serious legal violation in the promulgation of the rule.

In short, Cavel's apparent view that the Court should now revert to its findings at the preliminary injunction stage is legally bankrupt because, as the Court has recognized, an entirely different remedial analysis is triggered now that the Court has entered judgment for plaintiffs on the NEPA claim. Indeed, not only does the APA's "shall . . . hold unlawful and set aside agency action[]" directive only now come into play, but the entire purpose of NEPA would be nullified if the Court were to allow the rule to remain in effect despite the now-adjudicated NEPA

violation.

Thus, contrary to Cavel's implication that the rule should remain in place because USDA simply "failed to follow a procedural rule," Cavel Mot. at 5, then-Judge (now Justice) Breyer has explained that the "harm at stake in a NEPA violation <u>is a harm to the environment, not merely to a legalistic 'procedure'</u> . . . [T]he risk implied by a violation of NEPA is that <u>real environmental harm will occur</u> through inadequate foresight and deliberation . . . ." <u>Sierra Club v. Marsh</u>, 872 F.2d 497, 504 (1st Cir. 1989) (emphasis added); <u>id.</u> at 503 ("as time goes on, it will become ever more difficult to undo an improper decision (a decision that in the presence of adequate environmental information, might have come out differently)"); <u>see also</u> <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 371 (1989)) ("NEPA ensures that the agency will not act on incomplete information only to regret its decision after it is too late to correct."); <u>Hawaii Longline Ass'n v. NMFS</u>, 281 F. Supp. 2d 1, 26 (D.D.C. 2003) ("Regardless of whether or not an agency action is declared substantively unlawful[], or procedurally flawed, the APA provides for the same remedy: 'The reviewing court shall . . . hold unlawful and set aside [the] agency action.'") (internal citation omitted).

Consequently, where, as here, NEPA was violated in connection with a particular agency decision, in keeping with NEPA's overarching purposes and with the plain terms of the APA, courts in this Circuit routinely vacate the agency action so that NEPA's objectives can be accomplished <u>before</u> even more environmental damage is sustained in the absence of appropriate agency analysis.[3]  As the Court has already recognized, and as discussed further below, there is

---

[3]  <u>See</u>, <u>e.g.</u>, <u>NRDC v. Herrington</u>, 768 F.2d 1355, 1433 (D.C. Cir. 1985) (finding that an agency failed to comply with NEPA and holding that "[o]n this ground alone we would be constrained to vacate the final rules under review and remand for reconsideration in accordance

simply no sound reason to deviate from that course in this case.[4]

## CAVEL HAS NOT MET THE STRINGENT
## STANDARDS FOR A STAY

When the proper legal framework is applied, and particularly where neither the

government nor two of the three intervenors have even moved for a stay, it is clear that Cavel has

not shouldered its very heavy burden of establishing that the Court should, in effect, reverse the

---

with NEPA"); Humane Soc'y of U.S. v. Dep't of Commerce, 432 F. Supp. 2d 4, 25 (D.D.C. 2006) (finding that the agency violated NEPA and vacating the decision pending completion of an EIS); Fund for Animals v. Norton, 294 F. Supp. 2d 92, 115 (D.D.C. 2003) (finding violations of NEPA and ordering that the Record of Decision be "vacated and remanded . . . for further proceedings not inconsistent with this Opinion"), *amended on other grounds*, 323 F. Supp. 2d 7 (D.D.C. 2004); Greater Yellowstone Coalition v. Bosworth, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) (relying on American Bioscience to set aside grazing permit issued in violation of NEPA); Friends of the Earth, Inc. v. U.S. Army Corps of Engineers, 109 F. Supp. 2d 30, 44 (D.D.C. 2000) (vacating permits in light of NEPA violation).

[4] Intervenor's apparent assumption that the Court and the parties are now in essentially the same posture that they were in at the preliminary injunction stage is not only legally baseless but also factually inaccurate, for several reasons. First, as noted above, at the preliminary injunction phase, three companies were urging the Court not to craft relief that would affect horse slaughter operations in the U.S. Now, however, two of the three are no longer even advancing that position, evidently because of the recent Fifth Circuit ruling that those companies have in fact been violating for many years a valid Texas law prohibiting horse slaughter for human consumption. See Empacadora de Carnes, 476 F.3d at 329. Moreover, the Fifth Circuit ruling specifically suggests that the Texas law is valid in part because the "significant monetary incentives in the global horsemeat market" may indeed contribute to the "theft of horses" and other adverse impacts, id. at 336 – impacts that should be fully studied in the NEPA analysis required by the Court's ruling before any new decision is made.

Second, at the preliminary injunction phase, USDA assured the Court that not only would the complete record reflect that USDA had indeed engaged in appropriate NEPA review of whether FSIS programs can ever have adverse environmental impacts, but that USDA would at least consider and respond to the public's comments on the "interim" final rule. Both of those representations have now proven to be erroneous. As the Court has correctly found, USDA has never revisited the propriety of its wholesale exclusion of FSIS activities and specifically did not do so with regard to the rule at issue here; moreover, USDA has never even bothered to respond to any of the nearly 60,000 public comments submitted to it, thus making clear beyond any doubt that USDA's *post hoc* solicitation of comments was nothing but a make-work exercise designed to create the appearance, rather than the reality, of public input into a controversial agency decision.

relief the Court ordered last week.  Thus, as this Court has recently reaffirmed, "[i]mportantly, it is 'the movant's obligation to justify the court's exercise of such an extraordinary remedy.'" M.R.S. Enterprises, Inc. v. Sheet Metal Workers' Int'l Ass'n, Local 40, No. Civ. A 05-1823, 2006 WL 2612972 at 5 (D.D.C. Aug. 22, 2006) (Kollar-Kotelly, J.) (quoting Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 978 (D.C. Cir. 1985)).  Accordingly, it is well-established that the "'applicant must satisfy stringent standards required for a stay pending appeal.'" Id. (quoting Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group, 230 F. Supp. 2d 12, 14 (D.D.C. 2002)).  Cavel's motion here satisfies none of the "stringent standards" for the extraordinary relief it seeks, let alone all of them.

## A.    Cavel Is Unlikely To Prevail On The Merits.

The "'first, and most important, hurdle which the petitioners must overcome is the requirement that they present a strong likelihood of prevailing on the merits of their appeal.'" Shays v. FEC, 340 F. Supp. 2d 39, 45 (D.D.C. 2004) (Kollar-Kotelly, J.) (emphasis added), aff'd 414 F.3d 76 (D.C. Cir. 2005).  Thus, "'[w]ithout such a substantial indication of probable success, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review.'"  Id. (quoting Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958)).  In other words, as this Court's prior rulings on similar stay motions make clear, "even should [Cavel] show irreparable harm would result without the imposition of [a] stay, if the requirement of a strong likelihood of success is not met, the petition will be denied." Id. (emphasis added; internal quotation omitted); see also Lightfoot v. Dist. of Columbia, No. Civ. 01-1484, 2006 WL 175222 at 4 (D.D.C. Jan. 24, 2006) (Kollar-Kotelly, J.).

Here, especially "[g]iven the wealth of precedent" analyzed in the Court's merits ruling, Cavel has fallen far short of "establish[ing] a substantial likelihood of victory on the merits upon appeal." Lightfoot, 2006 WL 175222 at * 5 (internal quotation omitted). To the contrary, for the most part, Cavel "offer[s] no new arguments in its motion[], but rather rehashes arguments that have been rejected" in the Cout's merits ruling. Id. at 4 (internal quotation omitted). As to the few new precedents Cavel cites – which should properly be raised in a motion for reconsideration, not a motion for a stay – those precedents support the Court's disposition of the merits.

To begin with, the vast majority of Cavel's motion is devoted merely to explicating Cavel's disagreement with the Court's review of the pertinent NEPA precedents and the Administrative Record before the Court, rather than demonstrating that Cavel is actually likely to prevail on the merits of any of those arguments. See Cavel Mot. at 12-24. In fact, rather than satisfy this critical threshold standard for obtaining a stay, Cavel actually succeeds in underscoring the weakness in its own NEPA arguments, which play fast and loose with the plain terms of the USDA's NEPA regulations and the CEQ regulations, as well as with the record before the Court.

For example, Cavel erroneously asserts that "this Court's Memorandum Opinion denied effect to USDA's CEQ-approved categorical exclusions and procedures" by somehow "impos[ing] new and additional documentation preconditions upon USDA's categorical exclusions which are inconsistent with the procedures established by USDA and contrary to USDA's interpretation of its own regulations for the last 24 years." Cavel Mot. at 15. In reality, however, the Court simply applied the plain terms of the pertinent regulations. Hence, the Court

explained that those regulations expressly provide that "'[a]gencies shall continue to scrutinize their activities to determine continued eligibility for categorical exclusions,'" Mem. Op. at 41 (emphasis in Mem. Op.) (quoting 7 C.F.R. § 1b.3(c)), and that "[d]efendants' interpretation of 7 C.F.R. § 1b.4" – under which the FSIS need never affirmatively revisit whether any of its activities may have a significant environmental impact – "would exempt the FSIS from any duty to scrutinize its activities in violation of 7 C.F.R. § 1b.3(c)." Mem. Op. at 41.

The Court further reasoned that "pursuant to 7 C.F.R. § 1b.2, '[e]ach USDA agency is responsible for compliance with this part, the regulations of CEQ, and NEPA,' 7 C.F.R. § 1b.2(b)," and, in turn, that the CEQ regulations provide that agencies "'shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.'" Mem. Op. at 41 (emphasis in Mem. Op.) (quoting 40 C.F.R. § 1508.4). Once again, therefore, the Court found that "[d]efendants' interpretation of 7 C.F.R. § 1b.4 as having required only a determination over twenty years ago that all 'FSIS activities have no significant environmental impact,' see Defs. Reply at 5, belies any compliance with FSIS's obligation to 'provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.'" Mem. Op. at 41. Accordingly, far from imposing duties on USDA that are "inconsistent" with the regulations, Cavel Mot. at 15, the Court applied those regulations according to their unequivocal terms as well as in the only manner in which they could possibly be construed as consistent with the CEQ regulations and NEPA's requirements and purposes.[5]

_____

[5] In light of its "conclu[sion] that Defendants' interpretation of 7 C.F.R. § 1b.4 as permitting the FSIS to never consider whether its actions have environmental impacts is arbitrary and capricious," the Court found it unnecessary to "reach the issue of whether Plaintiffs can or

10

Equally devoid of any substance is Cavel's argument – which was also advanced in its summary judgment papers and, conspicuously, never joined by USDA – that "[e]ven though it had no legal obligation to do so, FSIS did in fact determine that there were no 'extraordinary circumstances' in which the Interim Final Rule 'may have a significant environmental impact,' and this was clearly reflected in the Administrative Record." Cavel Mot. at 16. However, all that Cavel can manage to point to in the Record is the very same "unchecked" box in the Regulatory Review Workplan on which intervenors previously relied, and that the Court thoroughly addressed and then rejected as inadequate to demonstrate any consideration whatsoever of whether further NEPA review is required here. Compare Cavel Mot. at 19-20 with Mem. Op. at 42-44.

As the Court has already explained, "Defendant-Intervenors' theory about what the Regulatory Review Workplan actually demonstrates is belied" by USDA's own "deafening silence with respect to this assessment," as well as by USDA's overall "legal position and statements" making clear that – as plaintiffs have argued – the "box remained empty as a product of a wholesale approach to exclusion by FSIS," and that "neither the Secretary nor any proxy thereto ever[] considered whether or not an 'Environmental Impact Assessment' would be appropriate with respect to the Interim Final Rule." Mem. Op. at 43. That analysis is even more compelling now that USDA has declined to file its own motion for a stay or even to file a brief in

---

have properly brought an 'as applied' challenge against" the regulation itself. Mem. Op. at 44. However, if Cavel's counterintuitive reading of the regulations ultimately were to prevail – i.e., that they authorize USDA categorically to exclude from NEPA review everything an entire agency can do or ever will do, and that USDA need never take another look to see whether the agency is in fact having an adverse impact on the environment – then plaintiffs would very likely prevail on their alternative argument that such a regulation cannot conceivably be reconciled with the CEQ regulations or, for that matter, with NEPA itself.

support of Cavel's motion.  In other words, USDA's "silence" concerning the relevance of the

unchecked box is, if possible, now even more "deafening," for the obvious reason that Cavel

simply has it wrong and the Court has it right – i.e., the box is "unchecked" because USDA

always presumes that FSIS activities need not comply with NEPA and that presumption, rather

than any actual analysis of the potential impacts of the rule, held sway in this particular case as

well.[6]

      In addition to repeating arguments the Court has already deemed unpersuasive, Cavel

cites recent NEPA rulings, see Cavel Mot. at 21-22 & n. 13, that not only fail to justify a stay but

that actually reinforce the Court's analysis and conclusion.  Thus, Int'l Center for Tech. Assess.

v. Johanns, ___ F. Supp. 2d __, 2007 WL 315633 (D.D.C. 2007) squarely rejected USDA's

invocation of a categorical exclusion and did so on grounds that are strikingly similar to those

relied on by the Court here.  In that case, another agency within USDA denied a petition by the

plaintiffs to have certain genetically engineered varieties of grasses listed as noxious weeds, thus

subjecting them to more stringent regulation.  As here, USDA conceded that it had not prepared

an EIS or EA, but argued that its decision fell within a categorical exclusion specifically

designed for permits for "field releases of genetically engineered organisms and products."  7

---

      [6]  Cavel's contention that the "Administrative Record contains other evidence that FSIS
duly 'invoked' its categorical exclusion . . . prior to promulgation of the Interim Final Rule,
contrary to the suggestion in the Memorandum Opinion that FSIS did so only 'post hoc,'" Cavel
Mot. at 21 (emphasis in original), actually supports, rather than undercuts, the Court's reasoning.
Predictably, none of the Record citations in Cavel's motion reflects any analysis conducted in
connection with the Interim Final Rule itself.  Rather, they all involve past statements reiterating
the general exclusion of FSIS activities from NEPA review.  See id. at 21-24 (citing, e.g., 48
Fed. Reg. 11403 (Mar. 18, 1983))  But as set forth in the Court's ruling, that is precisely the
problem with the government's consideration (or lack thereof) of NEPA here: USDA has
impermissibly construed its own and CEQ's regulations as allowing it to exclude an entire
agency and to never evaluate whether that exclusion makes sense in a particular circumstance.

C.F.R. § 372.5(c)(3)(ii).

> Judge Kennedy agreed that the action fell within the categorical exclusion but reasoned:

> [t]hat the exemption applies, however, does not end the court's inquiry.  Even where [the agency] has determined that an action falls under one of the enumerated exemptions, it must nonetheless determine whether an <u>exception</u> to the exemption applies.   The regulation provides for such an exception, stating that where 'a categorically excluded action may have the potential to affect 'significantly' the quality of the 'human environment,' . . . an environmental assessment or an environmental impact statement will be prepared.'

2007 WL 315633 at *15 (internal citation omitted).  The Court found the record "devoid of any evidence" that the agency had considered the applicability of an exemption and concluded that the "absence manifests arbitrary and capricious agency action which is inconsistent with the terms used in [the agency's] own regulations, and which violates NEPA."  <u>Id.</u>  On that basis, the Court vacated the petition denial and also permanently enjoined USDA from processing any permit without complying with NEPA.  <u>Id.</u>  Likewise, as the Court has now held, the record here is also "devoid of any evidence" that USDA ever considered the applicability of an exemption to the general categorical exclusion for FSIS activities.

Even further, as in <u>Int'l Center for Tech. Assess.</u>, plaintiffs have presented the Court with "substantial evidence" that the agency action has the "potential to affect significantly the quality of the human environment," 2007 WL 315633 at * 15, in a manner that has never previously been considered in any NEPA document.  Likewise, in this case, contrary to Cavel's unsupported assertion that "Plaintiffs have failed to adduce even a scintilla of evidence of any such 'significant environmental effect' resulting from the Interim Final Rule," Cavel Mot. at 24, plaintiffs actually demonstrated — with no rebuttal whatsoever from defendants – that the CEQ criteria <u>for preparation of a full EIS are easily satisfied here</u>.  <u>See</u> Plaintiffs' May 1, 2006

Memorandum in Support of their Motion for Summary Judgment (Doc. 39) ("Pfs. Summ. Judg. Mem."), at 18-23.  Among other things, plaintiffs explained that the rule "affects public health and safety," 40 C.F.R. § 1508.27(b)(2), because the slaughtering of horses for human consumption concededly could not occur without the rule, and those slaughter operations have <u>in fact</u> seriously degraded the air and water of nearby communities, as specifically detailed in plaintiffs' many affidavits and the public comments submitted on the "interim final rule," <u>see</u> Decl. of Rebecca G. Judd (attached to Pfs. Sept. 8, 2006 Mot. for Summ. Judg. on Claim One (Doc. 55)), at ¶ 8, as well as in the statements of the Congressional co-sponsors of the FY 2006 Amendment eliminating any federal funding for the horse slaughter inspections.  <u>See</u>, <u>e.g.</u>, 151 Cong. Rec. H4250 (June 8, 2005) (Statement of House co-sponsor Rep. Whitfield) (one purpose of the Amendment was "to shut these plants down <u>because of their consistent violation of environmental laws</u>") (emphasis added); <u>id.</u> at S10219 (Statement of Senator Ensign) (detailing plight of local residents plagued by "air quality and other environmental concerns" and the "most horrific stench").  Indeed, plaintiffs also presented specific evidence that emissions from the horse slaughter operations were even harming a "daycare center" and a hospital, <u>see</u> Pfs. Summ. Judg. Mem. at 20 – impacts that continued only because of the novel inspection scheme invented by USDA and intervenors to circumvent the federal funding ban imposed by Congress.

Plaintiffs further demonstrated that the environmental effects associated with the new inspection clearly satisfy other CEQ "significance" criteria, including because (1) they are "highly controversial," (2) they involve "unique or unknown risks" to the public health and safety, (3) they "threaten[] violation[s] of Federal, State, or local law" – including repeated violations of local laws pertaining to waste disposal and protection of air and water resources

and, as now confirmed by the Fifth Circuit, a longstanding state law prohibiting the slaughter of horses for human consumption; (4) the novel inspection system "establish[es] a precedent for future actions with significant effects," and (5) the action may affect unique "historic or cultural resources," i.e., wild horse populations that are specifically protected by federal legislation. See Pfs. Summ. Judg. Mem. at 20-22 (internal citations omitted).

As to the latter point, as noted earlier, the recent Fifth Circuit ruling underscores plaintiffs' arguments by specifically suggesting that "monetary incentives in the global horsemeat market" may indeed serve to undercut the "preservation of horses" in the U.S., including by creating a financial motivation for the "theft of horses." Empacadora de Carne, 476 F.3d at 336. In any event, where, as here, plaintiffs submitted unrebutted evidence and arguments suggesting that at least six of the CEQ significance criteria appear to be triggered by the action at issue – and any one of them is sufficient to require preparation of a full EIS, see Pfs. Summ. Judg. Mem. at 19 – it borders on nonsensical for Cavel to assert that plaintiffs "failed to adduce even a scintilla of evidence" of potential environmental impacts. Cavel Mot. at 24.[7]

---

[7] Cavel's notion that "Plaintiffs were obliged to come forward with evidence from the Administrative Record demonstrating" that the rule may have adverse environmental impacts, Cavel at 23 (emphasis added), makes no sense in light of the fact that USDA not only failed to comply with NEPA, as the Court has ruled, but also refused to solicit or consider public comments before adopting the rule. In other words, where, as here, the core of plaintiffs' NEPA claim is that USDA excluded from the Administrative Record any consideration of environmental impacts, the Court must, of course, look outside that record for any "evidence" of such potential effects. See, e.g., Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989) (one of the "exceptions countenancing use of extra-record evidence" involves "cases arising under the National Environmental Policy Act"); Fund for Animals v. Williams, 391 F. Supp. 2d 191, 199 (D.D.C. 2005) ("in NEPA cases . . . a primary function of the court is to insure that the information available to the decisionmaker includes an adequate discussion of environmental effects and alternatives, which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored") (internal quotations omitted).

**B.**     **The Balance of Equities Does Not Support A Stay.**

Just as it fails to establish a likelihood of success on the merits, Cavel also fails to establish that it will suffer <u>any</u> irreparable harm, let alone irreparable harm that outweighs the irreparable environmental and aesthetic harms, and public health risks that its operations will inflict on plaintiffs and plaintiffs' members should a stay be granted.  Thus, to warrant the extraordinary relief requested – <u>i.e.</u>, permission to operate a slaughter plant plagued by significant pollution problems without the legally required NEPA review – Cavel must prove irreparable harm that is certain, great, and imminent, and that outweighs the harm to others from the relief it requests.  <u>See</u>, <u>e.g.</u>, <u>Lightfoot</u>, 2006 WL 175222 at *5 (citing <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)); <u>Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n</u>, 259 F.2d 921, 925 (D.C. Cir. 1958); <u>Nat'l Parks & Conservation Ass'n v. Babbitt</u>, 241 F.3d 722, 738 (9th Cir. 2001) (enjoining agency's increase of cruise ship entries into national parks as a result of its failure to comply with NEPA, even where it would cause economic harm to cruise ship company, because loss of revenues "does not outweigh the potential irreparable damage to the environment").  Its assertions, which must be reviewed for "substantiality, likelihood of occurrence and adequacy of proof," fail to meet this standard.

---

Indeed, elsewhere in its motion, Cavel appears to <u>invite</u> the Court to consider not only evidence that is outside the AR, but that <u>postdates</u> the decision under review.  <u>See</u> Cavel Mot. at 24 n.15 (stating that the "Interim Final Rule went into effect on March 10, 2006," and that any "significant environmental effect (if any) should have become manifest by now") (emphasis added).  But such effects are indeed "manifest," as reflected by the materials plaintiffs previously provided to the Court, as well as by even more recent evidence – which plaintiffs discuss in the next section – of serious ongoing pollution impacts associated with the horse slaughter operations, particularly at the Cavel plant.  In contrast, in the other recent case cited by Cavel, the federal agency had come to the "reasonable[] conclusion that [a] new trail classification system and design parameters" had "'<u>no impact</u> on the environment'" whatsoever.  <u>Back</u>

Cuomo, 772 F.2d at 976-77.

The fundamental problem with Cavel's stay motion is that the harm it asserts is merely economic and not irreparable. Cavel has not even alleged, much less proven, as it acknowledges it must, Cavel Mot. at 8, that the alleged economic harm would threaten the continued existence of its business, Wisconsin Gas Co., 758 F.2d at 674, let alone that it would be great, or even modest, in relation to the overall size of its business. See Lightfoot, 2006 WL 175222 at * 7, 8. Indeed, many of Cavel's purported economic injuries are seemingly avoidable, and therefore uncertain at best.

In contrast, should Cavel's DeKalb plant be allowed to resume full-scale horse slaughter operations pending appeal, the harm to plaintiffs, plaintiffs' members, and the DeKalb community are classic examples of the type of harm considered irreparable - environmental and aesthetic harms and public health risks - that justify maintaining the status quo first established by the FY 2006 Appropriations Amendment, and then reaffirmed by this Court's March 28, 2007 Order. As a result, Cavel cannot establish that the balance of the equities, any threatened harm to the company, or the public interest, would justify staying the Court's Order in this case.

1.    Cavel Has Failed To Establish That It Will Suffer Irreparable Harm Because The Harm Is Merely Economic And Is Neither "Certain" Nor "Great"

As Cavel's motion and supporting declarations make clear, Cavel's only injury is economic harm from the temporary cessation of its business while it pursues what it asserts will be a successful appeal. Yet "[i]t is ... well settled that economic loss does not, in and of itself,

_____

Country Horsemen of America v. Johanns, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (emphasis added; internal citation omitted).

constitute irreparable harm." Wisconsin Gas Co., 758 F.2d at 674. "'Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.'" Id. (citing Virginia Petroleum Jobbers Ass'n, 259 F.2d at 925). "The key word in this consideration is irreparable," and, as a general matter, "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." Wisconsin Gas Co., 758 F.2d at 674 (emphasis added); see also Washington Metropolitan Transit Comm'n v. Holiday Tours, 559 F.2d 841, 843 (D.C. Cir. 1977). Consistent with this standard, courts in this Circuit have repeatedly rejected claims that mere economic injury constitutes irreparable harm that would justify the "extraordinary relief" of an indefinite stay pending appeal or a preliminary injunction. See, e.g., Lightfoot, 2006 WL 175222 at * 8 (finding no irreparable harm; economic loss of up to $27 million asserted); Gulf Oil Corp. v. Department of Energy, 514 F. Supp. 1019, 1026 (D.D.C. 1981) (movant must demonstrate "that the injury [is] more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.").

Cavel cannot meet the irreparable harm standard because, among other issues, it has not established that the Court's order threatens the "very existence" of its business. Wisconsin Gas Co., 758 F.2d at 674. Neither of the declarations filed by Cavel even allege, much less prove, that Cavel will go out of business, or cease to exist, if Cavel cannot operate its plant during the pendency of the appeal, or during the USDA's compliance with NEPA. At most, Cavel's declarations identify potential economic losses from the temporary cessation of the DeKalb plant's operations, see Van Damme Decl. at ¶¶ 8-10; Tucker Decl. at ¶¶ 11-13 – which is per se inadequate to establish irreparable harm under Circuit precedent. Wisconsin Gas Co., 758 F.2d

18

at 674.

In fact, Cavel's declarations actually prove that the economic losses incurred by a temporary cessation of horse slaughter operations <u>do not</u> threaten Cavel with "destruction" at all, <u>Washington Metropolitan Transit Comm'n</u>, 559 F.2d at 843, n.2, since they candidly admit that Cavel ceased <u>all</u> operations for <u>two years</u> between 2002 and 2004 due to a fire at the facility, and yet still managed to resume operations.  <u>See</u> Van Damme Decl. at ¶ 9.  Since any suspension of operations caused by the legal violations in this case will almost certainly be less than the two year shut down Cavel has already weathered in the past, their own declarations disprove their theory of irreparable harm.

Nor can Cavel establish that the monetary injuries it will supposedly sustain are "great" - or even "modest" - in relation to the size of Cavel's business.  <u>Lightfoot</u>, 2006 WL 175222 at * 7, 8.  Cavel is a wholly owned subsidiary of a larger corporate entity, Velda NV, which owns a number of slaughtering plants and distribution companies on several continents.  <u>See</u> Fearing Decl. at ¶ 4 (Exh. 2).  There is simply nothing in Cavel's evidence that remotely suggests this multinational business operation is threatened with destruction from the suspension of operations at a single plant.  <u>Cf.</u> <u>Sandoz, Inc. v. Food and Drug Admin.</u>, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (finding harm not sufficiently irreparable and noting that the company requesting stay "is a part of" or a subsidiary of another very large company).

The very best that Cavel can assert is that, without a stay, it will lose: (1) $127,000 in stockpiled packaging and shipping supplies, Tucker Decl. at ¶ 12; (2) "Just over" $12,000 a month in rent, Tucker Decl. at ¶ 13; and (3) $150,000 in wages over a nine month span to shut the plant down, Tucker Decl. at ¶ 11.  These are the <u>only</u> quantified losses Cavel has identified it

will sustain, and they are hardly significant given the size of its parent company, Velda NV, or even just in relation to Cavel. Certainly these losses at a single plant in a multinational business operation do not warrant an emergency stay pending appeal. See Lightfoot, 2006 WL 175222 at * 8 ("modest losses are insufficient to meet the standards required for 'irreparable injury'"); Bristol-Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 220-21 (D.D.C. 1996) (no irreparable harm where movant would lose $80 million dollars); TGS Tech., Inc. v. United States, 1992 U.S. Dist. LEXIS 195, at * 10 (D.D.C. Jan. 14, 1992) (finding no irreparable harm where lost contract constituted 20% of movant's business); Gulf Oil Corp., 514 F. Supp. at 1026 (injury must be "serious in terms of its effect on the plaintiff").

To be sure, the Van Damme declaration claims that Cavel will lose $2 million a month in gross sales, and that it will also lose customers. Van Damme Decl. at ¶¶ 8, 10. But "[c]ourts within the Circuit have generally been hesitant to award injunctive relief based on assertions about lost opportunities and market share." Mylan Pharmaceuticals, Inc. v. Shalala, 81 F. Supp. 2d 30, 42-43 (D.D.C. 2000) (citing Berman v. DePetrillo, 1997 WL 148638 at * 2 (D.D.C. 1997) ("the loss of a business opportunity is a purely economic injury, and economic loss alone, however substantial, does not constitute 'irreparable harm'")). Moreover, in this case, the supposed losses are uncertain both in size and likelihood. Cavel has produced no evidence to establish how much of the $2 million per month in lost sales will actually result in economic loss, how much will be saved by cost reduction measures (such as by not purchasing horses for slaughter), and how much simply represents the lost business opportunity for profits from sales during the appeal. Nor has Cavel produced any evidence to substantiate the as-yet unidentified extent of any supposed customer loss it will experience. See Wisconsin Gas, 758 F.2d at 674

20

("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will <u>in fact</u> occur.") (emphasis in original).

Indeed, many of the quantified losses that Cavel contends it will sustain can likely be avoided and thus are theoretical and not at all "certain."  For example, Cavel could sell the $127,000 of supplies, or it could use them if it succeeds on appeal.  Similarly, although the Tucker Declaration asserts that Cavel will "need to pay" $12,000 in rent, Tucker Decl. at ¶ 13, the owner of the facility is Mr. Luc Van Damme himself: presumably this loss could be negotiated in some fashion.  <u>See</u> Fearing Decl. at ¶ 10 (attaching tax assessment records for the DeKalb plant).  Furthermore, contrary to the unsubstantiated claim that the DeKalb slaughter house is a "multi-million dollar facility," Cavel Mot. at 8, tax records set the value at below $400,000.  <u>See</u> Fearing Decl. at ¶ 10.

In short, Cavel has established, at most, that it may experience some economic harm from a temporary cessation of its operations.  But the purported economic losses that Cavel identifies are unproven, uncertain, and speculative at best, and clearly modest in relation to the overall assets of the company.  There is simply no evidence that proves that any harm suffered could "destroy" Cavel's business (indeed there is not so much as an allegation), nor that the harm would be "great" or even modest in relation to the size of its operations.  <u>Wisconsin Gas Co.</u>, 758 F.2d at 674; <u>see also</u> <u>Lightfoot</u>, 2006 WL 175222 at * 8.  Accordingly, Cavel has simply failed to establish the kind of irreparable harm to its interests that even arguably is necessary under Circuit precedent.

2.     Plaintiffs And Plaintiffs' Members Will Suffer Irreparable Harm If Cavel's
Plant Is Allowed To Resume Operations Pending Appeal

In stark contrast, should the Court allow Cavel to resume operations pending appeal, plaintiffs will suffer environmental and aesthetic harms, and public health risks, that present classic examples of irreparable harm that warrant rejecting Cavel's motion for a stay. As the Supreme Court has explained, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money." Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545 (1987). Thus, in cases such as this, "'when an action is being undertaken in violation of NEPA, there is a presumption'" of irreparable harm justifying a court order precluding "'continuation of the action until the agency brings itself into compliance.'" Cuomo, 772 F.2d at 976 (emphasis added) (quoting Realty Income Trust v. Eckerd, 564 F.2d 447, 456 (D.C. Cir. 1977)). Once again, this is precisely because "the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation . . . ." Sierra Club v. Marsh, 872 F. 2d at 504 (emphasis added).

In this case, not only did the Court conclude the USDA failed to undertake any NEPA inquiry at all, but there are very real irreparable environmental and aesthetic harms, and public health risks, that plaintiffs, plaintiffs' members, and others will suffer if the plant is allowed to resume operation.[8]

---

[8] In response to Cavel's simple dismissal of the significant injuries of its plant on plaintiffs and plaintiffs' members, plaintiff HSUS polled its members that still live in the community surrounding Cavel's plant to demonstrate exactly what the injuries are that forced Ms. Vacca to move away, that have kept her away, and that will plague HSUS's members that still live in the DeKalb community if the Cavel plant resumes operation. These harms are documented in the attached declarations of James Kitchen, Anita Fay, Joseph Marchini, Stacy

These harms are not theoretical or presumed. Rather, Cavel's DeKalb plant has a long history of environmental problems, and has repeatedly been fined for wastewater treatment violations, most recently for $25,500, and the local sanitary district has even ordered it to remedy its wastewater problems or face closure by May 31, 2007. See Radtke at ¶¶ 4, 6 (and Attachments 3, 4, and 5 to Radtke Decl.) (Exh. 1); see also, e.g., Fay Decl. at ¶¶ 5-6 (Exh. 3); Kershisnik Decl. at ¶ 4 (Exh. 4); Kitchen Decl. at ¶ 6-8 (Exh. 5); Marchini Decl. at ¶ 5 (Exh. 6). As recently as last month, its wastewater holding tank was seen oozing polluted foam and frozen chunks of polluted wastewater. Radtke Decl. at ¶ 5, Attachment 2; Kitchen Decl. at ¶ 5; Kershisnik Decl. at ¶ 5. Its operations leave "long trails of blood and animal residue on the streets" surrounding the plant. Kitchen Decl. at ¶ 4. Even the air is affected, as plant operations emit noxious odors that can be smelled in the community and in people's homes. Marchini Decl. at ¶¶ 4, 7; Kitchen Decl. at ¶ 5. Plaintiffs' members are thus inescapably confronted with, and disturbed by, the slaughtering of horses in their community. Marchini Decl. at ¶ 3; Radtke Decl. at ¶ 3; Fay Decl. at ¶ 3.

Furthermore, plaintiffs' members' ability to exist in and enjoy their community and the surrounding environment by, for example, fishing, walking their dogs and golfing is clearly harmed, as is their ability to live in their very homes. Marchini Decl. at ¶ 6; Polcyn Decl. at ¶ 3-5 (Exh. 7); Radtke Decl. at ¶ 4; Fay Decl. at ¶ 4; Kershisnik Decl. at ¶ 4. Not only might people come in contact with the blood and animal residues in the streets, but the stench reaches their homes, and pollution from the plant may also contaminate both groundwater that plaintiffs' members drink, and the nearby Kishwaukee River that they wish to use for outdoor recreation.

---

Polcyn, and Sarah Radtke, all members of HSUS, and all Dekalb residents.

<u>See</u>, <u>e.g.</u>, Kitchen Decl. at ¶ 4; Marchini Decl. at ¶ 5-9; Polcyn Decl. at 4.  Cavel's operations therefore cause significant environmental and aesthetic harm, and public health threats, and they diminish the value of people's homes.  Marchini Decl. at ¶ 7; <u>see also</u> Whitfield Decl. at ¶¶ 2, 6-8, 11 (Exh. 8).  Yet none of these aspects have ever been addressed in any NEPA analysis.[9]

Should the Court grant Cavel's request for a stay, these operations will obviously resume. So too will the irreparable harm that plaintiffs and their members suffer as a result of Cavel's pollution problems.  <u>See</u> <u>e.g.</u>, Marchini Decl. at ¶ 8; Radtke Decl at ¶¶ 7-9.  The injuries – environmental, aesthetic, and health risks – cannot be remedied by monetary means.  They are great, involving as they do the very ability to live in one's home, and community, without a stench of horse slaughter, or blood in the streets.  They are not mere potentialities, they are certainties.  And they are credibly established by numerous declarations from people in the community, and official records obtained from local environmental regulators.  Preventing their immediate recurrence easily outweighs the economic harms that Cavel has outlined in its declarations.  <u>See</u> <u>Amoco</u>, 480 U.S. at 545.

Cavel's dismissal of such injuries as longstanding and "cabined by statutory and regulatory provisions" is disingenuous.  Cavel Mot. at 12.  Cavel's operations, and the associated harms to the community, have increased over time, particularly since the recent resumption of its operations in 2004.  <u>See</u> Van Damme Decl. at ¶ 9 (300-400 slaughtered horses per week in 2004, increasing to "well over 500"); Fearing Decl. at ¶ 11 n.1 (1,000 horses a week by 2007) (citing

---

[9] Moreover, plaintiffs' members were deprived of the right to participate in any environmental review process and thus, were unable to submit comments on Cavel's air and water quality impacts to their enjoyment of their home and community.  Radtke Decl. at ¶ 10; Fay Decl. at ¶ 9; Polcyn Decl. at ¶ 8; Kershisnik Decl. at ¶ 8; Kitchen Decl. at ¶ 13; Marchini Decl. at ¶ 9.

USDA statistics); Def-Ints' Mem. Of Supp. For Mot. To Deny Plfs.' Mot. for Temp. Restraining Order, Ex. 4 (Tucker Decl. at ¶ 3) (stating Cavel ships 8,000 tons horsemeat per year in 2006) (filed Feb. 27, 2006); Cavel Mot. Ex. 2 (Tucker Decl. at ¶ 3) (Cavel ships 13,000 tons horsemeat per year in 2007)); Radtke Decl. at ¶ 6, Attachments 3, 4, 5 (sanitary district citations and fines). Thus, for the HSUS members living next to the plant, the serious environmental impacts caused by Cavel's increasing volume of operations have been ongoing for the two to three years since it reopened, and not the "decades" claimed by Intervenor. Moreover, the cumulative effect of these harms, increasing year after year, simply reinforce the irreparable nature of the harm at issue, and the need for relief.

Moreover, Cavel has been repeatedly violating of the very environmental laws it asserts "cabins" the plaintiffs' members' harm. This is reflected in, among other things, numerous fines by the local sanitary district for unlawful wastewater discharges, including the most recent fine of over $25,000. See Radtke Decl. at ¶ 6, Attachments 3, 4, 5. For Cavel to assert that plaintiffs' harms are addressed by environmental laws it is flagrantly violating is patently disingenuous.

In sum, the record before the Court demonstrates three things. First, the existence of Cavel's business is not threatened by a temporary cessation of its operations: it emerged from a two year cessation just a few years ago. Second, Cavel has not proven that the economic losses it might suffer are certain to occur, much less great in relation to the scope of its multinational business. Third, plaintiffs and their members will, in fact, suffer certain, great, and immediate irreparable harm should a slaughter plant with a proven track record of pollution problems be allowed to resume operations. Given the extent of the irreparable harm to plaintiffs' members,

and the Court's conclusion that the USDA unlawfully issued the Interim Final Rule without <u>any</u>

consideration under NEPA of such environmental impacts, Cavel's request for a stay should be

denied for these reasons as well.

       3.    <u>Harm to "Third Parties"</u>

Cavel's attempt to advance purported harm to third parties as a basis for a stay is equally

unavailing.  As a threshold issue, Cavel's standing to assert injuries to third parties - outside of

an inquiry into the general public interest - is lacking.  <u>Virginia Petroleum Jobbers Ass'n</u>, 259

F.2d at 926-27 ("The question of harm to others if a stay were granted is not really before us.

Except insofar as it may reflect on the public interest in saving taxpayers and consumers needless

expense, we do not think petitioner has standing to complain of potential losses or inconvenience

to the other parties in this case.").  And as discussed further below, Congress – presumably the

best arbiter of the public interest – has determined that the public interest lies in shuttering

Cavel's horse slaughtering for human consumption.  <u>See</u> Whitfield Decl. at ¶¶ 2, 6-8, 11.

In any event, even the harms to "third parties" that Cavel relies upon are largely

economic, uncertain and speculative.  With respect to Cavel's employees, Cavel has not provided

any declarations from these individuals as to the harms they will supposedly experience as a

consequence of the Court's order.  This is particularly telling given that the potential economic

harm suffered by their termination can likely be offset by unemployment benefits.  <u>See</u> Fearing

Decl. at ¶ 13.  In addition, the likelihood of rapid re-employment in the community is high: the

DeKalb area has a very low rate of unemployment (3.9%), and recent economic surveys indicate

that <u>half</u> of all companies surveyed in the area expected to hire employees during the second

quarter of 2007.  <u>Id.</u> at ¶ 12 (noting that of the remaining half of the companies surveyed, none

were planning to reduce their payrolls).  Indeed, implicit in Cavel's concern that it will lose "qualified employees" is its tacit acknowledgment that those employees will find work elsewhere.  Cf. Cavel Mot. at 9.[10]

Cavel also overstates the purported economic harm that the DeKalb community could suffer from the cessation of Cavel's operations.  Cavel employs fifty-six people, in contrast to DeKalb County's population of 97,665 – less than 0.001 per cent of the population.  See  U.S. Census     Bureau,     DeKalb     County,     Illinois     QuickFacts,     at http://quickfacts.census.gov/qfd/states/17/17037.html (last visited April 3, 2007).  And Cavel's contributions to the tax base is of no greater relative significance.  See Fearing Decl. at ¶ 15 (noting that Cavel contributed 0.12 percent to the commercial taxes collected by DeKalb County).[11]  Indeed, given the nominal economic harm that Cavel's temporary closure would have on the DeKalb community, and the significant environmental, aesthetic and public health harms that the community would suffer should Cavel's operations be allowed to resume, it is hard to fathom how DeKalb's interests would be harmed by staying the Court's Order, particularly given the lack of the NEPA review that should have preceded issuance of the rule.

---

[10]  Cortez III Service Corp. v. NASA does not support an injunction in this case, despite Cavel's reliance on it.  Cavel Mot. at 9-10.  In Cortez the Court found an injunction warranted on the ground that without it, a government bidding process would "go forward and plaintiff will be excluded from competing."  950 F.Supp. 357, 363 n.5 (D.D.C. 1996).  Unlike Cortez, there is no window of opportunity that Cavel may miss: it can always resume operations if it wins on appeal or if the rule is reissued after NEPA analysis.  Moreover, as the Cortez decision makes clear, the Court's discussion of 500 employees was in the context of discussing irreparable harm to the movant employer, not the employees.  950 F. Supp. at 363.

[11]  Similarly, unless Cavel can establish that universities cannot obtain horse parts elsewhere, any harm to universities from Cavel's decision to cease operations is speculative.

C.      <u>**The Public Interest Does Not Support A Stay.**</u>

Finally, as the Court has already recognized, the public interest also does not support allowing a rule to stay in effect that was "promulgated in violation of NEPA-mandated procedures and in violation of the law."  Mem. Op. at 48.  As before, Cavel has failed to proffer any "compelling reason, environmental or otherwise, to leave the Interim Final Rule in place pending NEPA review, nor that doing so would preserve NEPA-contemplated opportunities for FSIS."  <u>Id.</u>  To the contrary, particularly in view of the history of this case, it is evident that leaving the rule in place would not only contravene the "ordinary result" in this Circuit that unlawfully issued regulations must be vacated, <u>Nat'l Mining Ass'n v. U.S. Army Corps of Engineers</u>, 145 F.3d 1399, 1409 (D.C. Cir. 1998), but would completely undercut the overarching design of NEPA that agencies take a "hard look" at environmental implications <u>before</u> taking action.  <u>Blue Mountains Biodiversity Project v. Blackwood</u>, 161 F.3d 1208, 1211 (9th Cir. 1998).  Indeed, allowing the unlawfully issued rule to remain in place will virtually guarantee that any NEPA analysis will merely rubber-stamp the decision previously made rather than reflect the genuine consideration of impacts and alternatives that NEPA mandates.

Moreover, Cavel's contention that the public interest counsels in favor of leaving the rule in place contradicts <u>Congress's</u> own policy determination to cut off federal funding for inspections of horse slaughter operations – a determination that Congress anticipated, and specifically intended, would in fact result in cessation of horse killing for human consumption in the U.S.  Thus, the statements of the Congressional sponsors of the funding cutoff leave no doubt whatsoever that they concluded that the compelling animal protection and environmental reasons to terminate the horse slaughter operations by eliminating federal funding for the inspections

28

easily outweighed any economic or other interests in having those operations continue. See, e.g., 151 Cong. Rec. H4249 (Statement of Rep. Spratt) ("What is the effect of this amendment?  This amendment in simple terms will stop the slaughter [f]or human consumption of horses . . . [t]heir brutal slaughter . . . is the kind of slaughter that this bill will prohibit."); id. at H4249 ("[W]ho is affected?  Slaughterhouses in two States.  That is it.  Those are the net effects because, you see, Americans do not eat horse meat."); id. at S10220 (Statement of Senator Byrd) (advocating for the funding ban because "horses often suffer unnecessarily while in transit to slaughter[] . . . in trucks with ceilings so low that they prevent the horses from holding their heads in a normal, upright position").

Simply put, therefore, this is the unusual case in which Congress has already made a specific public policy judgment about where the "public interest" lies, and there is no need or justification for the Court to second-guess that judgment.  See Decl. of Hon. Edward Whitfield (Exh. 8) at ¶ 2 ("In light of the animal welfare, environmental, public health, and economic problems caused by horse slaughtering, I, along with other members of Congress introduced an Amendment to the FY 2006 Agriculture Appropriations Act, 'the goal of [which] is simple: to end the slaughter of America's horses for human consumption overseas.'") (quoting 151 Cong. Rec. S10218 (remarks of Sen. Ensign)); see also Whitfield Decl. at ¶ 6 ("The Congressional Record reflects Congress's policy judgment that animal welfare concerns, when combined with environmental and financial harms to the plants' communities and neighboring residents, compelled passage of the Amendment, notwithstanding any financial impact on the slaughtering businesses themselves").

Finally, although the Court has found it unnecessary to resolve plaintiffs' notice and comment claim under the APA, it is nonetheless pertinent to the public interest analysis that USDA received nearly 60,000 public comments after publishing the interim final rule, over ninety-five percent of which opposed the rule. See Judd Decl. at ¶¶ 5-7. The public comments – which, once again, USDA has never even bothered to address (or evidently even review, id. at ¶ 9) – mirror Congress's own reasons for terminating federal funding of the horse slaughter inspections. Id. at ¶ 8 ("[A] significant number of commentors expressed concerns about the inhumane nature of horse slaughter, citing the barbaric slaughter process itself and the cruel confinement of horses in double-decker transport trailers. Further, several commentors cited to the health and environmental effects of the horse slaughter plants on local communities.").

The bottom line, therefore, is that the public itself has manifested its overwhelming desire that the horse slaughter operations be halted – both by successfully urging their Congressional representatives to take action to accomplish that result, and then by overwhelmingly opposing USDA's and Cavel's effort to sidestep that legislation. And now, more than one year after the "interim" rule was adopted, there has never even been any agency consideration of this public input – through the NEPA process, compliance with section 553 of the APA, or any other mechanism. That extraordinary disregard for public involvement in agency decisionmaking, as well as for the prior representations USDA made to this Court, further reinforces that it is in the public's interest to at least set aside the agency action pending a public NEPA process, as the Court has now done.

## <u>CONCLUSION</u>

For the foregoing reasons, Cavel's motion for a stay should be denied.

Respectfully submitted,

/s/ _____

Eric R. Glitzenstein
D.C. Bar No. 358287
MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206


*Of Counsel*:

Rebecca G. Judd
(Member of Maryland Bar)

Ethan Carson Eddy
D.C. Bar No. 496406

Jonathan R. Lovvorn
D.C. Bar No. 461163

THE HUMANE SOCIETY OF THE
UNITED STATES
2100 L St., N.W.
Washington, D.C. 20037
(202) 676-2333

April 6, 2007                                   Counsel for Plaintiffs

31