# Exhibit 2 to Plaintiffs' Opposition to Defendant-Intervenor's Emergency Motion for a Stay

# Civ. No. 06-0265 (CKK)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY<br>OF THE UNITED STATES, ET AL.,<br><br>    Plaintiffs,<br>v.<br><br>MIKE JOHANNS and<br>BARBARA J. MASTERS,<br><br>    Defendants,<br><br>BELTEX CORPORATION,<br>CAVEL INTERNATIONAL, INC., and<br>DALLAS CROWN, INC.,<br><br>    Defendant-Intervenors. | Civ. No. 06-0265 (CKK) |

## DECLARATION OF JENNIFER L. FEARING

I, JENNIFER L. FEARING, hereby declare as follows:

1.  I am the Chief Economist for The Humane Society of the United States ("HSUS"). From July 1995 through June 2003, I was employed as a professional economist for Econ One Research, Inc., a national economic research and consulting firm with offices in Los Angeles, Sacramento, Houston, Austin, and Washington. I have a master of public policy degree with an emphasis on business and government policy from the John F. Kennedy School of Government at Harvard University and a bachelor's degree in economics with highest honors from the University of California, Davis. My areas of specialization are industrial organization (the study of markets) and law and economics. At Econ One, I provided economic research and data analysis in connection with business litigation involving government and commercial

entities on antitrust, intellectual property, and fraud matters. I worked extensively on the analysis of markets and the assessment of economic damages and their valuation. I have provided the lead support for the testimony of experts in Federal and State Courts. At HSUS I provide economic research and data analysis in the context of litigation, legislation and other program-specific matters in connection with animal protection issues.

2. I have been asked by HSUS to provide a declaration on the likely economic impact of the temporary suspension of operations of the Cavel International, Inc. ("Cavel") horse slaughter plant currently operating in DeKalb, Illinois. To this end, I find that I agree with the findings stated in the declaration submitted by Dr. Charles R. Mahla in this matter on March 2, 2006. Ex. 25 to Pls.' Mot. For Prelim. Inj. (also attached here as Attachment A). Cavel still has not conducted an economic impact study as described by Dr. Mahla, nor is there any evidence that Cavel's corporate structure has changed. I therefore concur with Dr. Mahla's finding that Cavel fails to substantiate any claim of substantial economic harm and incorporate all of his conclusions by reference.

3. I also have been asked to evaluate the current claims made by Cavel as to the economic harm that may be experienced if a stay is not granted during the appeal process.

**Limits on Irreparability of Harm to Cavel**

4. Cavel International, Inc. (DUNS 17-481-5167) (Attachment B) is owned by Van Damme Holding Co. (DUNS 19-566-4198) (Attachment C), which is a wholly owned subsidiary of Velda NV (DUNS 37-020-5288) (Attachment D), based in Zele, Belgium. According to its web site, Velda operates horse slaughter plants in South America and Australia, in addition to the DeKalb plant (http://www.veldaitalia.com/profilo/profilo_velda_group.htm). Distriva (DUNS

2

26-301-6503) (Attachment E), with two locations in France, is also owned by Velda NV and operates as the distributor of the meat processed in the plants. Dun & Bradstreet reports list Luc Van Damme as the head of all four companies.

5. Cavel characterizes the harm its DeKalb meat processing plant faces from the impact of the March 28 Order as "great." Def.-Int.'s Mot. for Stay at 8. To support its economic harm claims, Cavel relies exclusively on declarations submitted by Luc Van Damme, President ("Van Damme") and James D. Tucker, General Manager ("Tucker"), both of Cavel International, Inc. Both declarants state that Cavel will be "irreparably harmed" if the March 28 Order is not stayed pending appeal. Van Damme Decl. at ¶ 5; Tucker Decl. at ¶ 7. Neither declarant, however, provides sufficient economic evidence to demonstrate that any harm experienced during a temporary cessation of operations at Cavel is irreparable. Further, neither declarant appears to have considered any alternative business strategies that may serve to mitigate the economic harm that may be felt by the inability to process horsemeat for human consumption at the DeKalb location during the appeal period.

6. I understand that the only activity Cavel is presently prohibited from undertaking is the processing of horsemeat for human consumption. I also understand that the case at hand, even if plaintiffs ultimately prevailed on any appeal, would not require a permanent shutdown of Cavel's DeKalb meat processing plant. The March 28 Order is in effect until the earliest of: (a) the resolution of Cavel's stay motion in a manner favorable to it, or (b) the successful completion of the NEPA analysis the Court held is required before the fee-for-service ante-mortem inspection program can be re-implemented at Cavel, or (c) September 30, 2007, which is when the Joint Resolution of Congress that gives section 794 of the FY 2006 Agriculture Appropriations Act continuing effect expires. See Def.-Int.'s Mot. for Stay at 4 (citing

3

continuing resolution). During that time, Cavel may have alternatives to ceasing "its operations entirely," Van Damme Decl. at ¶ 5; Tucker Decl. at ¶ 7, and the irreparability of the economic harm is limited to the extent Cavel does not pursue alternative business strategies that may allow Cavel to operate at some level during the appeal period.

7. Despite Tucker's assertions that the Cavel plant cannot "operate profitably" unless it is permitted to slaughter horses for human consumption, there is some evidence from the experience of other horse slaughter plants to suggest otherwise. The two Texas plants, Dallas Crown and Bel-Tex, have continued to process fewer horses as well as other species, even though their respective prospects for re-opening are affected by the Fifth Circuit Court of Appeals ruling in Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry, 476 F.3d 326 (5th Cir. 2007), which affirmed the validity of Texas' ban on horse slaughter for human consumption. Given Cavel's belief that it "has a substantial likelihood of prevailing on the merits of its appeal," Def.-Int.'s Mot. for Stay at 16, it is unclear why Cavel would choose not to operate on a limited basis to preserve customer relationships and fulfillment of orders in the non-human consumption market or process other species. Recent news reports suggest Dallas Crown is processing between 8 and 43 percent of the number of horses it processed prior to the Fifth Circuit Court of Appeals ruling upholding the Texas state ban on the slaughter or horses for human consumption. This horsemeat is being sold to zoos. Beltex continues to process wild boar, bison and various wild animals. See Attachment F. While these sales may not yield as high a margin as exports of meat for human consumption, there is value in maintaining customer relationships during this temporary period so that these customers will not need to be regained when full operations resume.

4

8. Even reduced operations would allow Cavel to retain some of its more valued employees, one of Cavel's stated concerns. Any revenue that Cavel could generate during this period would offset the costs associated with maintaining its trained workforce. The choice Cavel has made to immediately lay off most of its employees in reaction to the temporary prohibition on processing horses for human consumption is a decision not clearly forced by the current situation. The extent of Cavel's potential harm with respect to its personnel costs is limited to the lesser of: (a) the net cost of paying its key employees throughout the appeal/review period and (b) the cost of hiring and training new employees when either the appeal or the review process is resolved.

9. Finally, Cavel has not demonstrated that it has considered alternatives to letting its customers be drawn away by competitors, especially over the long run. Van Damme claims that a Canadian company, Bouvry, has been contacting Cavel customers in Europe. See Van Damme Decl. at ¶ 7. Since Cavel believes that it "has a substantial likelihood of prevailing on the merits of its appeal," Def.-Int.'s Mot. for Stay at 16, it is not clear why Cavel has not proactively sought to ensure its customers uninterrupted service by negotiating with a company like Bouvry to temporarily service these accounts. It is plausible that Cavel could successfully negotiate a subcontract during this appeal/review period to maintain its customer relationships. These customers would be much more likely to continue their relationships with Cavel once Cavel begins processing horses for human consumption again, which it presumes it will.

10. As discussed in Dr. Mahla's declaration, the costs associated with pre-purchased packaging and shipping supplies and contracts to pay for utilities and rent "do not appear to constitute irreparable harm." Mahla Decl. at ¶ 17. These are all costs that can be recouped once Cavel reopens for business. Further, the matter of the $12,000 monthly rent identified by Tucker

is curious. Tucker Decl. at ¶ 13. Tax assessment records for 2005-06 reveal Mr. Van Damme as the property owner for the Cavel facility located at 108 Harvestore Drive in DeKalb. See Attachment G. The most recent assessed value of the property is less than $400,000. While it is not uncommon for parent companies to charge "rent" to subsidiaries, certainly the terms for this arrangement do not appear to be arms-length. First, charging $144,000 per year rent on a property valued at less than $400,000 may suggest an attempt to artificially increase costs to limit taxable income. Second, that Cavel is "required to maintain the property and ensure that its value does not decline," Tucker Decl. at ¶ 13, indicates that the lease terms ought to be highly negotiable given that Cavel's "landlord" is its parent company.

11.    Finally, it bears noting that Cavel did not go bankrupt after its facility burned to the ground in April 2002 and operations there were halted for more than two years while the plant was re-built. Tucker Decl. at ¶ 9. Cavel found it in its business interest to invest in rebuilding that facility and its customer base following a much more significant business interruption than will be affecting it during the review/appeal period. In fact, with the Texas slaughter plants facing potentially more dim prospects for re-opening, Cavel may have even greater market incentives and opportunities, particularly in the short run. There is some evidence that Cavel has already ramped up business in the aftermath of the Texas plants' significant reductions.[1]

---

[1] After the Fifth Circuit Court of Appeals decision in Empacadora, supra, but prior to this Court's Order dated March 27, 2007, Tucker stated publicly that Cavel "slaughters about 1,000 horses a week." Horse slaughter halted at DeKalb plant, Chicago Tribune, March 29, 2007, http://www.chicagotribune.com/news/local/chi-070329horse-slaughter,1,3039045.story?ctrack=3&cset=true) (Attachment H); see also USDA, US Equine Slaughter Statistics (Apr. 2, 2007) (Attachment I) (documenting 1,000 or more horses slaughtered per week after Empacadora decision); cf. Tucker Decl. at ¶ 9 (stating that Cavel's "full demand" is "well over 500 per week").

6

### Limits on Harm to Third Parties or the Public Interest

11. In addition to the harm Cavel asserts it will suffer if not permitted to process horses for human consumption during the appeal/review period, it also claims that third parties and the public interest are harmed. Specifically, Cavel asserts irreparable harm to the fifty production workers whose positions have already been terminated, the colleges and universities that will no longer receive educational byproducts, and the local and regional economy in DeKalb. See Tucker Decl. at ¶¶ 5, 6, 8, 11.

12. With respect to the former Cavel employees, as stated above, the declarants have not demonstrated sufficiently that this decision was the only one that could have been made.[2] Further, no evidence has been submitted to the Court to suggest there are specific constraints on these employees' ability to find alternative employment in the DeKalb area. The unemployment rate in the DeKalb area has been steadily declining over the past three years and is lower than the unemployment rate in Northern Illinois generally.[3] The average unemployment rate for DeKalb County during 2006 was the second lowest among the nine surrounding counties, at 3.9 percent.[4] Since January 2004, the unemployment rate in DeKalb County has fallen an average of one percent per month through December 2006.[5] In fact, declarants seem reasonably certain that their employees will not have trouble finding other employment by asserting to the Court that this temporary situation will cause Cavel to "lose long-term, qualified employees." Def.-Int.'s Mot. for Stay at 9. This inference is confirmed by results of a new national survey by Manpower Inc. that found that 50 percent of surveyed companies in the DeKalb area expect to hire more

---

[2] It is also curious that Cavel has already terminated these positions, even in advance of a ruling on its Emergency Motion requesting a stay.
[3] See "Northern Illinois Market Facts 2006: DeKalb Co.," p. 82, Figure 17M (http://www.cgsniu.org/publications/marketfacts/dekalb.pdf, accessed on April 1, 2007) (Attachment J).
[4] DeKalb County Economic Development Corporation, *Economic Profile*, "DeKalb County Labor Market Area 2006," p. 5 (http://www.dekalbcountyedc.org/DCEDC%20Economic%20Profile%20(web).doc, accessed on April 1, 2007) (Attachment K).
[5] Id., "Labor Statistics," p. 4.

7

employees during the second quarter of 2007.[6] The remaining companies reported plans to maintain current staffing levels, and none were expecting to reduce payroll.[7]

13. Finally, any employee whom Cavel has chosen to lay off is entitled to immediate unemployment benefits offered through the Illinois Department of Employment Security (IDES), if they meet requirements of general applicability. See Attachment L. By law, Cavel must provide each such worker within five days with a document from IDES entitled "What Every Worker Should Know About Unemployment Insurance." Id. The state of Illinois pays up to $475 per week in unemployment benefits. Id. IDES states that it takes approximately thirty minutes to apply for unemployment benefits. Id. Claims and benefits are effective as of the start of the calendar week in which they are received. Id.

14. The colleges and universities that Cavel is concerned will no longer receive equine parts for educational use can secure those parts from other slaughter plant operators in Canada, including from the very competitors that Cavel claims will be taking its human horsemeat customers. See Van Damme Decl. at 2. Again, Cavel could ensure this continued donation if it worked with such competitors to negotiate a temporary arrangement for servicing all of its customers during the appeal/review period.

15. When put in proper context, Cavel's claims of being a "significant employer and contributor of tax revenues" in DeKalb, Tucker Decl. at ¶ 5, are overstated. Cavel is not among DeKalb's top employers. There are 15 employers in DeKalb County that employ 200 people or more.[8] Manufacturing and/or meat processing are not among the "target industries" identified by

---

[6] "Jobs on the rise; Survey puts DeKalb employment outlook at 10th best in nation," *Northern Star*, April 3, 2007 (http://www.star.niu.edu/articles/?id=35966) (Attachment M).
[7] Id.
[8] DeKalb County Economic Development Corporation, "DeKalb County's Top Ten Employers" (http://www.dekalbcountyedc.org/quickFacts/topten.htm); and "DeKalb County's Top Ten Private Employers" (http://www.dekalbcountyedc.org/quickFacts/toptenprivate.htm) (Attachment N), accessed on April 1, 2007.

the DeKalb County Economic Development Corporation's most recent "Economic Profile" report.[9] Tucker states that Cavel paid $28,864.00 in real estate tax. Tucker Decl. at ¶5. In 2005, Van Damme paid $27,897.20 in taxes on an assessed value of the Cavel parcel of $343,627, according to the DeKalb County Assessment Office. See Attachment G. Cavel's contribution to DeKalb County real estate taxes amounted to 0.12 percent of commercial taxes paid and 0.02 percent of total DeKalb County property taxes paid. See Illinois Dept. of Revenue, County Summary Assessment (2005) (Attachment Q). Tucker asserts that Cavel paid $150,000 in state and federal income taxes. Tucker Decl. at ¶ 5. Though Cavel's taxable income is unknown, paying less than six-tenths of a percent on total revenue in income taxes is not a significant tax contribution ($150,000 / $26,059,224 = 0.58 percent).[10]

16.    Cavel's most significant cost is the "millions of dollars" paid for horses from "mainly farmers and ranchers in the Midwest and Western states." Tucker Decl. at ¶¶ 3, 6, This revenue has little to no direct economic impact on the DeKalb area.

17.    Cavel's operations notwithstanding, the DeKalb local and regional economies are doing well. Housing starts have risen each of the last three years,[11] the poverty rate is lower than the statewide average,[12] and a recent nationwide report ranked the current employment outlook

---

[9] DeKalb County Economic Development Corporation, *Economic Profile*, "Target Industries," pp. 15-16 (http://www.dekalbcountyedc.org/DCEDC%20Economic%20Profile%20(web).doc, accessed on April 1, 2007) (Attachment K).
[10] Plaintiffs have no way of confirming Cavel's 2006 sales revenue, but the Dun & Bradstreet report for Cavel shows $4.8 million, which would suggest a more than five-fold increase from 2005 to 2006. See Attachment B. Additionally, in Tucker's prior declaration in this matter, he claimed Cavel exported 8,000 tons of horsemeat each year, see Ex. 4 to Def.-Ints.' Opp'n to Mot. for Prelim. Inj. at 3, but in his current declaration he reports 13,000 tons of horsemeat exported. This is a 62.5 percent increase in volume from 2005 to 2006.
[11] DeKalb County Economic Development Corporation, "Housing Starts – Single Family" (http://www.dekalbcountyedc.org/quickFacts/starts_single2.htm, accessed April 3, 2007) (Attachment O).
[12] Heartland Alliance, "2007 Report on Illinois Poverty," p. 36 (http://www.heartlandalliance.org/maip/documents/2007PovertyReportFINAL_000.pdf, accessed April 3, 2007) (Attachment P).

for the DeKalb area as 10th best in the nation.[13] Cavel's 56 jobs comprises one-tenth of one percent of the DeKalb County labor force.[14]

**Conclusion**

19. For the foregoing reasons, I conclude that Cavel has not demonstrated irreparable harm to Cavel or to third parties. Further, Cavel has not demonstrated that a suspension of horse processing for human consumption during the appeal/review period will result in harm to the local economy.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Jennifer L. Fearing*
Jennifer L. Fearing

April 6, 2007

---

[13] "Jobs on the rise; Survey puts DeKalb employment outlook at 10th best in nation," *Northern Star*, April 3, 2007 (http://www.star.niu.edu/articles/?id=35966) (Attachment M).
[14] Id. at 7.