# Attachment A to Declaration of Jennifer Fearing
## Civ. No. 06-0265

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE HUMANE SOCIETY OF THE UNITED STATES, ET AL.** )<br>)<br>) | |
| Plaintiffs, )<br>) | Civ. No. 1:06CV00265 (CKK) |
| v. )<br>) | |
| **MIKE JOHANNS, ET AL.** )<br>) | |
| Defendants. )<br>) | |

## DECLARATION OF CHARLES R. MAHLA, PH.D.

I, CHARLES R. MAHLA, PH.D., hereby declare as follows:

1.      I am a senior economist with Econ One, an economic research and consulting firm with offices in Los Angeles, Sacramento, Houston and Austin. I have a doctoral degree in economics from the University of North Carolina at Chapel Hill and a bachelor's degree in economics from Lafayette College. My areas of specialization are industrial organization (the study of markets) and econometrics (the statistical analysis of marketplace relationships). During the more than fourteen years of my professional career, I have worked extensively on the analysis of markets and the assessment of economic damages and their valuation, as well as the assessment of firm value. In addition, I have testified in Federal and State Courts and have provided expert opinions regarding the economic impact on one or more parties to litigation resulting from claimed offences. Much of my professional work centers on the analysis of the economic ramifications of the initiation or cessation of economic activity. A more detailed summary of my training, past experience and prior testimony is shown in **Exhibit 1**.

2.      I have been asked by The Humane Society of the United States to provide a declaration on the appropriate methods of calculating the likely economic impact of closing three

horse slaughter facilities currently operating in Illinois and Texas. It is my understanding that these facilities are owned and operated by three foreign-based parent companies—Cavel International, Inc. (operator of a horse slaughter plant in DeKalb, IL), Dallas Crown, Inc. (operator of a horse slaughter plant in Kaufman, TX), and Beltex Corporation (operator of a horse slaughter plant in Fort Worth, TX) are all owned by Belgian firms. Also, it is my understanding that defendants in the current litigation claim that closing these facilities would cause substantial economic harm. To the extent that the defendants have not conducted an economic impact study along the methodological lines outlined below, such a claim is unsubstantiated.

3.    In addition, I have been asked to address the notion of "irreparable harm" as it relates to any economic losses the owners of the three horse slaughter plants may suffer resulting from the shuttering of these plants.

4.    In the course of my work to date, members of my staff and I have reviewed documents produced by Plaintiffs, Defendants, and non-litigating third parties, along with publicly available information. A list of the materials I have reviewed to date is attached as **Exhibit 2**.

**The Purpose of an Economic Impact Study**

5.    The purpose of an economic impact study is to analyze and estimate the overall changes to an economic system resulting from some form of exogenous shock. This shock, by definition coming from "outside the system," is typified by some addition or subtraction of economic activity that impacts the economic system at issue. The typical impact study endeavors to determine the overall output, employment, and/or tax changes in a region resulting

from some planned investment in infrastructure or production facility. A typical question of interest might be "what is the likely increase in employment in City A if a new highway is constructed that connects that city with another metropolitan area?" or "what additional income generation could City A expect if XYZ Corp. chose to construct a new manufacturing plant within its city limits?" Properly constructed, an economic impact study can identify and highlight the benefits resulting from the addition of some form of economic activity in an area. It should also identify and highlight the costs an area might incur from that same activity. The overall impact is the net benefits over costs.

6.    In the instant matter, a question of interest centers on the economic impact of *eliminating* a particular economic activity in three cities, namely horse slaughter in DeKalb, IL, Ft. Worth, TX, and Kaufman, TX. As described above, an appropriately devised impact study could answer the "net benefits" question—on balance, what is the net cost to each region from curtailing horse slaughter? It is important to recognize that without accounting for both benefits and costs arising from this curtailment, any answer to that question is potentially misleading.

7.    A number of models have been developed to account for the multiplicative change in overall economic activity resulting from an increase or decrease in production capability (the opening or closing of a plant).[1] Based on estimates of changes in direct output, employment, and taxes, these models can be used to estimate the indirect, downstream impact to calculate the total change in expected economic activity resulting from the addition or subtraction of a plant in a particular locale.

---

[1] One such model, called Impact Analysis for PLANning (IMPLAN), was developed by the U.S. Forest Service in cooperation with the Federal Emergency Management Agency and the Bureau of Land Management for land and resource management planning. This model uses regional parameters that describe the interactions between purchasers and producers in an economy—it estimates the indirect and induced impacts from changes in economic activity. Another, the Regional Input-Output Modeling System (RIMS) developed by the U.S. Commerce Department, provides regional multipliers that provide an estimate of the indirect impact from changes in economic activity. Both of these models are in wide use to conduct impact studies.

**Conducting an Economic Impact Study**

8.     To determine the likely impact of a plant addition or, in the instant case, a plant closure, a thorough economic impact study must be done. While the collection of the requisite data for such a study can be challenging, the modeling of the likely effects of economic change is relatively straightforward. In the case of a plant closure, the following data are relevant inputs into a model designed to capture the total effects of that closure:

- The dollar value of output from the plant, i.e., revenues generated from the plant;

- A count of total full-time employees at the plant;

- Total payroll at the plant;

- An accounting of property, sales and use taxes paid by the plant.

This list, while not exhaustive of the type of data used in regional impact models, is typical of the measures of direct economic impacts from a plant closure. The next step in the analysis involves the modeling of indirect economic effects resulting from these first-line impacts. As described above, a number of models, with varying levels of sophistication, can be utilized to accomplish this task.[2] The output from these models provides estimates of the total output (income), employment and tax effects resulting from direct impact of plant closure.

**Additional Factors to Consider in an Economic Impact Study**

9.     It should be recognized that many economic impact models are static in nature, meaning that they attempt to estimate the total economic impact from a plant opening or closing

---

[2] See **Exhibit 2** for a non-exhaustive list of economic impact studies that demonstrate the use of these models.

without regard to the timing of those effects.[3]  As such, these models give little insight into when the estimated effects will occur.  In addition, these models do little to account for alternative uses of resources involved in the economic activity at issue.  In the case of a plant closure, for example, the input-output models described here do not attempt to quantify how resources diverted from the closed plant might be redirected into another use.  For example, to the extent a region has a labor shortage, lost jobs from a closed plant might be readily absorbed by alternative employment opportunities.

10.    Another issue not accounted for by input-output models is what economists call externalities.    The classic example of a negative externality is pollution caused by a manufacturing facility.  Because there is a cost associated with pollution that is not fully borne by the manufacturer (the cost is not internalized but is rather an "external" cost), the manufacturer does not fully account for the costs of that production and, therefore, produces more than it otherwise would have had it been forced to recognize the costs to society from that pollution.  In the instant case, an example of a negative externality associated with horse slaughter is the pollution in the form of odorous emissions from the slaughterhouses.  The cost of these emissions are borne by local residents and are hard to quantify, but they are clearly present, as the numerous affidavits filed in this case describing this pollution can attest.  While this externality is difficult to quantify, another negative externality caused by the presence of horse slaughterhouses may not be.  To the extent that property values around the plants are depressed by the slaughterhouses' presence, an analysis of property value differentials could be done to estimate the effects, if any.

---

[3] There are econometric techniques that have been employed in very sophisticated models that provide a more dynamic analysis of the timing of various economic impacts.  Most studies I have seen rely on the static,

**No Economic Impact Study on the Closure of Horse Slaughtering Plants Has Been Conducted**

11.    Motions filed by the Defendants and the Applicant Defendant-Intervenors in response to plaintiffs' motion for a TRO and preliminary injunction contain claims that there would be a negative economic impact should the horse slaughter plants at issue be even temporarily closed down.[4]  Both motions highlight the possible lost employment associated with the three slaughter plants should they be shuttered.  In addition, the Defendants note that Beltex has estimated the indirect economic effects on the Dallas-Fort Worth Metroplex would be "on the order of $25 million annually."[5]

12.    While at least some economic displacement will occur if the three horse slaughter plants are closed, neither the Defendants nor the Applicant Defendant-Intervenors have conducted the requisite analysis to quantify the economic impact from the closings.  As noted above, to estimate the total net effect of these closings, an analysis of both the direct and indirect benefits resulting from the ongoing operations of these plants must be measured against the costs of these plants in order to accurately assess the impact they have on their local economies.  Put another way, the costs of closing these plants must be measured against the benefits of closing them to determine the net economic impact.  No such analysis has been done.

**The Question of Irreparable Harm to a Business**

13.    In their motion to deny Plaintiffs' motion for a temporary restraining order and for a preliminary injunction, the Defendant-Intervenors claim that "an order that effectively stays

---

multiplicative effects of economic change.
[4] Applicant Defendant-Intervenors' Motion to Deny Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction, February 27, 2006, pp. 13-14; Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, February 27, 2006, pp. 33-36.
[5] Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, February 27, 2006, p. 36.

the fee-for-service program threatens the very existence of Applicant Defendant-Intervenors' businesses."[6]  They go on to say that they "face the cessation of their businesses."[7]  They conclude that this cessation would cause irreparable harm.[8]

14.    It is my understanding that all three of the Defendant-Intervenors' "businesses" are owned by foreign-based companies.  For example, Dallas Crown, Inc., located in Kaufman, Texas, is owned by a Belgian company called Chevideco.  Chevideco operates four horse slaughter plants worldwide in addition to the Kaufman facility—in Argentina, Romania, New Zealand, and in Rekkem, Belgium.[9]  Likewise, Cavel International, Inc. is owned by a Belgian firm called Velda Group.  Information about Velda's corporate structure is difficult to obtain, but it appears that Velda operates numerous horse slaughter plants throughout the world.[10]  Finally, Beltex Corporation is owned by a Belgian company called Multimeat NV.[11]

15.    As it pertains to a corporate entity, a common dictionary definition of the word "business" is "a person, partnership, or corporation engaged in commerce, manufacturing, or a service; profit-seeking enterprise or concern."[12]  In this context, a *business* relates to the whole entity.  Clearly, a business is made up of a number of requisite parts—labor, management, and capital equipment.  These component parts can be maintained in a single physical facility or, as is common with larger organizations, can be located across numerous geographic locations. Many firms have multiple administrative offices along with multiple manufacturing plants located in diverse areas within and across international borders.  Regardless of whether a firm has one plant or many, the *business* is the complete set of the component parts.

---

[6] Applicant Defendant-Intervenors' Motion to Deny Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction, February 27, 2006, p. 12.
[7] Ibid.
[8] Ibid.
[9] See http://www.chevideco.be/en/index.htm.
[10] See http://inorganicallygonzo.blogspot.com/2005/12/cavel-distriva-velda.html
[11] D&B-Int. Dun's Market Identifier (Dialog File 518).

16.    Given the corporate structures of these three entities, the closing of the three horse slaughter plants at issue do not constitute the entire "businesses" of the parent companies. While it is tautological that closing the three slaughter plants in the United States "threatens the very existence" of these plants, it not clear that the overall businesses that own these plants will be irreparably harmed by their closure. No evidence has been offered by the Applicant Defendant-Intervenors that would substantiate such a claim.

17.    Furthermore, the possible costs to the companies running these plants highlighted by the Applicant Defendant-Intervenors do not appear to constitute irreparable harm. For example, being forced to honor contracts with local utilities or losing the value of stockpiled supplies are costs that can be recouped if these plants once again open for business. To the extent these three slaughterhouses are profitable to the parent companies, they can re-open when the restriction on inspection ends.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Charles R. Mahla, Ph.D.

March 1, 2006

---

[12] See http://www.infoplease.com/ipd/A0356774.html.

8