**Attachment A to Declaration of Edward Whitfield**

**Plaintiffs' Opposition to Defendants' Motion for Stay
Civ. No. 06-0265 (CKK)**

We have so much work to do in this area. The Hinchey amendment does not put any new requirements upon the FDA, merely enforces the law as is written; and this Congress should stand up and enforce the law as explained in previous Congresses.

Mr. LATHAM. Mr. Chairman, I yield myself such time as I may consume.

I would like to note that in response to past amendments in the same effect, the Office of Government Ethics has said the government would be depriving itself of much of the best and most relevant outside expertise in many areas.

The amendment would prohibit waivers for financial interests that are so insubstantial, remote, or inconsequential that they are typically permitted, even for regular full-time government employees.

They went on to say, existing law strikes the correct balance between protecting the government from inappropriate conflicts of interest and recognizing the need for temporary experts who may have unavoidable conflicts in relevant fields of inquiry. I think those concerns are relevant to the Hinchey amendment before us and support a "no" vote on this amendment.

Mr. Chairman, I reserve the balance of my time.

Mr. HINCHEY. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, I frankly find the arguments that have been presented against this amendment, in a word, incredible. They seem to me to be coming from the entities in our country, in our economy, that need regulation. It seems as if the words were written by them.

We have 125 medical schools in this country. We have a bevy of expert scientists who are capable of dealing with these kinds of issues. For anyone to stand on the floor of this House and say that you cannot construct a panel, an advisory panel to advise the Food and Drug Administration with regard to the safety and security of a particular drug without putting on that panel one-third of the members who are conflicted in their interests, who are being paid by the economic entities that are about to be regulated, or should be regulated, or who have done commercial advertisements for some of those entities, that you cannot construct a panel without having a third of the members with that kind of conflict of interest, is the most absurd statement I think I have ever heard uttered on the floor of this House.

We have scientific bodies throughout our government and throughout the private sector, throughout the National Institutes of Health, throughout any number of scientific organizations, who put together panels; and they are never obliged to include within those panels people who are conflicted in their interests with regard to the decisions that are going to be made by those panels. It is ridiculous, absurd to stipulate that you cannot construct a panel without having people with a conflict of interest.

I am just asking the Members of this body to tell the Food and Drug Administration that when you draw together a panel, do the same thing that other regulatory bodies do. Make sure that among the members of those panels, there is no one who is conflicted in their interests.

No one who is being monetarily compensated by the entity that is being regulated; in the case of the drug companies no one who is getting money from the drug companies, no one who is on the payroll of drug companies. That is all you have to do. It is a very simple thing. There are thousands of people to reach out to who are capable and qualified to come onto those panels and make those kinds of decisions.

To say that you cannot put together a panel without including in it one-third of the members who are conflicted in their interests is absolutely ridiculous.

And so, Mr. Chairman, I ask the Members of this body to do something that is in the best interests of the people of our Nation. Let us have a Food and Drug Administration that is actually carrying out its regulatory authorities as this Congress set them up to do.

Let us have an FDA that actually regulates the entities.

Mr. Chairman, I yield such time as she may consume to the gentlewoman from Connecticut (Ms. DeLauro).

Ms. DeLAURO. Mr. Chairman, let me just ask a point of inquiry here. As I understand it, this amendment is for a year's duration?

Mr. HINCHEY. Mr. Chairman, will the gentlewoman yield?

Ms. DeLAURO. I yield to the gentleman from New York.

Mr. HINCHEY. That is correct.

Ms. DeLAURO. Does it not make sense that we try this to see what is workable? I mean, we are not talking about in perpetuity. Am I right in my assessment of that?

Mr. HINCHEY. The gentlewoman from Connecticut (Ms. DeLauro) is correct. This would simply be for 1 year. It is a trial, in effect; and we ought to put it in place.

Mr. LATHAM. Mr. Chairman, I yield back the balance of my time.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New York (Mr. HINCHEY).

The question was taken; and the Chairman announced that the noes appeared to have it.

Mr. HINCHEY. Mr. Chairman, I demand a recorded vote.

The CHAIRMAN. Pursuant to clause 6 of rule XVIII, further proceedings on the amendment offered by the gentleman from New York (Mr. HINCHEY) will be postponed.

AMENDMENT OFFERED BY MR. SWEENEY

Mr. SWEENEY. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. SWEENEY:

At the end of the bill (before the short title), insert the following new section:

SEC. ___. None of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. 603) or under the guidelines issued under section 903 the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 1901 note; Public Law 106-127).

Mr. BONILLA. Mr. Chairman, I ask unanimous consent that debate on this amendment and any amendment thereto be limited to 30 minutes to be equally divided and controlled by the proponent and myself, the opponent.

The CHAIRMAN. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. SWEENEY. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, several weeks ago we passed on the floor here an amendment banning the slaughter of wild horses that had been sneaked into the omnibus bill by a substantial bipartisan vote.

This amendment I offer today is a supplement to that amendment, and one that we have sought a vote on, an up-or-down vote, for several years in this body. For that reason in particular, I want to thank the subcommittee chairman for affording us this opportunity.

The amendment essentially would end the use of taxpayer dollars to enable and subsidize foreign enterprises, largely operating in opposition to the vast opinion and support of United States citizens, and in fact the majority of States have outlawed the slaughter of horses for human consumption; and yet this process continues on.

Mr. Chairman, there has been a lot of misinformation spread about this issue. The opposition will say this amendment will lead to an increase in the abuse of horses, or horses running wild in our streets. Such statements are not true, and I want to offer some facts.

First of all, each year 65,000 horses are slaughtered in this country for human consumption in Europe and in Asia, not here, where they are sold as a delicacy.

Another 30,000 are trucked to Canada and Mexico for slaughter. Misstatement number one, that slaughter is the same as humane euthanasia, it is not, Mr. Chairman. Slaughter is not the same as humane euthanasia administered by a veterinarian. Euthanasia of horses is administered by lethal injection, whereas slaughter is administered by unskilled, untrained workers using the captive bolt. Many times this is administered improperly, causing unnecessary pain and suffering before death, and that is after these horses have been transported in excess of 1,000 miles in the most inhumane conditions perceived.

Misstatement number two, that if this legislation is successful, we will

cause an overpopulation of horses. Passage of this amendment will not cause an overpopulation of horses, since each year the numbers are this, about 690,000 horses die in the U.S., many of which are euthanized by licensed veterinarians.

Slaughter represents only 1 percent of the horses that die each year, and this would not result in overpopulation of horses as some have suggested.

Mr. Chairman, it is simply this: Americans do not profit from slaughtering horses. Horses are not bred in the United States for that purpose. This is an export-driven market. Foreigners eat our horses and foreign companies make money off the sale of the meat. This amendment simply says that the use of American taxpayer dollars to pay for the salaries and the work of USDA inspectors ought to stop, and those resources ought to be committed to making sure the food supply and the food chain here in this country are fully protected.

Let us stop this practice, a practice that flies in the face of generations of precedent here in Congress and strong opposition by the American public.

Mr. Chairman, I reserve the balance of my time.

Mr. BONILLA. Mr. Chairman, I do rise in opposition to this amendment, and yield myself such time as I may consume.

The gentleman from New York (Mr. SWEENEY), for whom I have a great deal of respect, has worked on this issue for some time. I know he also has a separate legislating bill that he is trying to move through the process, where this issue and this whole topic could be more appropriately addressed through the authorizing committee.

This amendment will shut down an industry without having a hearing, or any due process. The amendment creates a crisis for animal health issues. It prohibits USDA from inspecting horses that may have West Nile virus, or vesicular stomatitis, both of which can affect other animals and humans if those horses are destined for slaughter.

The estimated cost to feed and care for 50,000 horses is at least 60 to $100 million per year. Who will pay, or will more horses go to the rendering plant instead? What is the real effect of this measure? There is no way of knowing, because it has not been vetted through the process.

Demand for the product will not change. Almost all of the meat from the U.S. is exported, and those countries will simply find another source. I oppose this amendment very strongly.

Mr. Chairman, I yield for as much time as he may consume to the chairman of the authorizing committee, the gentleman from Virginia (Mr. GOODLATTE).

Mr. GOODLATTE. Mr. Chairman, I rise in strong opposition to this amendment. This amendment is a piece of legislation that has been introduced by Members of the House that would ban horse slaughter in the country.

And, quite frankly, this legislation has been opposed by me and many others, but it is also a fact that this particular amendment is far worse than the legislation that the gentleman has offered for this reason: the principal concern stated by the gentleman from New York (Mr. SWEENEY) is that the manner of the transport and the actual slaughter of these horses is inhumane.

But this amendment would simply limit the inspection of the horses for the purpose of slaughter; does not in any way stop what his other legislation at least attempts to do, that is, the transport of the horses to Canada, Mexico or anywhere else for the purpose of slaughter. The effect of that then is that the inhumane transport and the slaughter itself continue, but the horses are transported far greater distances.

Now, the gentleman makes reference to the fact that this is only 1 percent of the horses that die each year. And he cites 65,000 as a figure. But I would suggest to the gentleman that he is way, way, way off on his numbers, because there are not 65,000 times 100 or 6½ million horses dying each year in this country.

With the average life expectancy of a horse of more than 25 years, that would mean that we have more than 150 million horses in the United States. We do not have anywhere near that number. So this percentage is a far higher percentage.

That gives rise to the concern raised by the gentleman from Texas (Mr. BONILLA) and many others that you are going to have hundreds of thousands of unwanted horses, perhaps at the rate of as many as 50,000 a year according to the American Veterinary Medical Association. At a cost of $2,000 per horse to take care of them, that is a hundred million dollars times the average life expectancy that would remain in the lives of these horses if they were not sent to slaughter.

If that average is 10 years, you are talking about a billion dollars after you get 10 years out from now in terms of having to support and take care of these horses.

Now, the gentleman says no problem with that, but the evidence is pretty sparse that there will not be any problem with that because no country anywhere ever, ever has banned the slaughter of horses. That is what his amendment would accomplish.

☐ 1530

So I suggest that that is a very, very bad idea with far-reaching complications.

I am not by any means alone in this concern. More than 60 reputable horse organizations, animal health organizations, and agricultural organizations have banded together to oppose this amendment, and they are some of the most respected people who own horses and take care of horses in the United States. The American Quarter Horse Association, the largest association of

horse owners in the world, strongly opposes this amendment. The American Painted Horse Association, the second largest association of horse owners, opposes this amendment. More than a dozen State horse councils, including the New York State Horse Council and the Virginia State Horse Council, oppose the gentleman's legislation.

It is also opposed by those who take care of the health of our horses, very respected organizations like the American Veterinarian Medical Association, the American Association of Equine Practitioners. More than 7,000 horse doctors, the people who take care of horses themselves, are concerned about the implications of what this amendment will have if it is allowed to go into effect and ban the slaughter of horses.

Now, I do not believe anybody in this room eats horses. What this is about is what is the best approach for the humane treatment of horses, and the American Veterinarian Medical Association and the American Association of Equine Practitioners recognize the method by which horses are slaughtered in the United States as a humane method of euthanasia of disposing of horses.

So the bill does not prohibit other means of deposition of horses. If people still want to put down their horse by some other means, it does not stop them from doing that. It will simply stop the proper inspection of these horses, which, as the gentleman from Texas correctly notes, will deprive us of a lot of useful information that will be gathered by those veterinarians about diseases and so on that will confront these horses if indeed they do not get properly inspected and they have serious diseases.

Other organizations that oppose this: The American Farm Bureau opposes this legislation. The American Meat Institute opposes this legislation. The Equine Nutrition and Physiology Society opposes this legislation. The Animal Welfare Council opposes this legislation. The National Horse Show Commission opposes this legislation. Organizations that represent literally millions of horse owners in this country and elsewhere around the world oppose this legislation because of their concern, not about whether somebody is eating horses or not but whether or not these horses will be treated humanely if they are not allowed to go through the process they go through today.

So I urge my colleagues to oppose this amendment. It is not in the best interest of America's horses, it is not in the best interest of America's horse owners, and it is not in the best interest of the fiscal concerns that we must have if we are confronted down the road with the possibility of having to take care of these many, many horses.

Mr. SWEENEY. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, let me quickly respond to some of the information that has been put out there.

*June 8, 2005*    CONGRESSIONAL RECORD — HOUSE    H4249

First of all, on the cost end of it, CBO said already this is a cost-neutral proposition. In fact, it is my contention that it will give the USDA extra resources to do the job of protecting the American food chain.

Secondly, we talked about the failure of a lack of a hearing. We looked for a hearing for 2 years. That necessitated bringing this legislation.

Finally, if we are simply going to get into a debate over which organizations support it, there are vastly more organizations, some of the most preeminent experts in the horse industry who support this legislation, including Congress's top veterinarian, Senator ENSIGN, who is introducing a counterpart bill in the Senate.

Mr. Chairman, I yield 3 minutes to the gentleman from South Carolina (Mr. SPRATT).

Mr. SPRATT. Mr. Chairman, first question, what is the effect of this amendment?

This amendment in simple terms will stop the slaughter or human consumption of horses, the meat of which will be exported to foreign countries. It does not stop, affect or any way impede euthanasia by veterinarians. It stops the brutal slaughter at slaughterhouses. Sometimes horses are jacked up by their hind legs and have their throats slit. This is the kind of slaughter that this bill will prohibit so that the meat can be exported to Europe and other places.

Secondly, who is affected? Slaughterhouses in two States. That is it. Three different slaughterhouse locations in two States. That is it. Those are the net effects because, you see, Americans do not eat horse meat.

These horses are not slaughtered in this country, 65,000 last year, for consumption here. They are slaughtered for consumption in Europe and Asia, and 35,000 were not trucked to Mexico and Canada only to be euthanized there. They were shipped there to be slaughtered. So this affects foreign consumers of American horse meat. That is all. No Americans are affected, and only three plants in two States are actually affected.

Who is for it and who is against it? I will leave this 7-page memorandum which shows individuals, organizations, horse raisers, horse racers, horse farmers, horse lovers of all kinds who support it, including a substantial number of veterinarians. Seven pages long, that is how many people are in favor of it.

Next question: What do we know about the consequences of this? What happens when you stop the slaughter of horses at, albeit, just three plants? Well, we know from practical experience in five States, including California, the largest State for the last 7 years, this law has been in effect Statewide in California and four other States and in California since 1998. What has been the effect? Have there been horses that have been left for neglect, derelict horses? No, there have

been no effects. Have there been horses that have been too numerous to be euthanized? No. Practically, in the five States that have implemented this law, there has been no effect whatsoever.

Finally, what is the legislative history of this bill? The legislative history is we filed a bill like this in the last Congress. We filed it again in this Congress. In the last Congress, after we put on an effort to win support for it, we collected 225 co-sponsors. We never had a hearing. We were entitled to one. So we come here today using a different parliamentary procedure.

But this bill has been thoroughly exposed, thoroughly supported, thoroughly argued for and against; and today we are entitled to this vote on the House floor. And if the 225 Members who have supported our bill in the past come forward, we will see that the will of the House is that this becomes the law of the land.

Mr. BONILLA. Mr. Chairman, I yield 2 minutes to the gentleman from Iowa (Mr. KING).

Mr. KING of Iowa. Mr. Chairman, I thank the chairman for yielding me time, and I appreciate the opportunity to say a few words on this issue.

As I listen to this debate and I am listening to the points that are being made by the other side, and, by the way, I rise in opposition to the Sweeney amendment, one of the questions that has not been answered here is what is the distinction between a steer, a hog, and a horse? Why would we elevate the horse to a level beyond that of another animal? Does it have a certain intrinsic value that distinguishes it?

That is something that I would like to hear, but I think it is important for the people who own horses to manage their horses.

Another question is, should horses be eaten? I have not really heard the answer to that. I know they do that in other places of the world. I have never eaten a horse. I had some zebra in Africa last year and, actually, it was the best meat I had on the continent. I never felt the desire to eat a horse, but they do that in other countries.

We have a horse herd that needs to be managed. Whatever that is, whether it is a 1 percent, a 2 percent or a 10 percent of the herd that is slaughtered, all of it does something that allows them to cull out the herd. It saves those horses from disease and starvation. And if you have seen those horses as I have in dry lot that were not taken care of, you do not want to turn these horses over to the people who do not have the means to take care of them.

But the U.S. horse herd should be managed. We should be humane with our animals. We should treat them well and give them veterinarian treatment, and those that do not fit into the plans need to be managed and taken care of and euthanized.

Now there is also the address made that we are doing this for foreign interests, that this is for the interests of

foreign markets and foreign palates. We have a balance of trade that is now a minus $617 billion a year. What is wrong with marketing American products that help that, reduce the deficit in the balance of trade? And, by the way, if it is the euros that come from France, that is okay with me. I think that is a great way for us to start to repair the balance of trade.

Another thing we cannot do is set up a species in this country that sets it up as a sacred species. American horses cannot be turned into sacred cows by the Sweeney amendment.

Mr. SWEENEY. Mr. Chairman, how much time remains?

The CHAIRMAN. The gentleman from New York (Mr. SWEENEY) has 8½ minutes remaining. The gentleman from Texas (Mr. BONILLA) has 6 minutes remaining.

Mr. SWEENEY. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, let me quickly answer my good friend, the gentleman from Iowa (Mr. KING) by saying 2 things. When Ferdinand, the great horse champion, was sold for slaughter, he was marketed as "eating an American champion." There is a distinction there.

Number two, I would ask how many zebras, how many cows do we know the names of? We know the names of many horses, and the fact is horses are not raised in this Nation for human consumption.

Mr. Chairman, I yield 4 minutes to the gentleman from Kentucky (Mr. WHITFIELD).

Mr. WHITFIELD. Mr. Chairman, I want to commend the gentleman from South Carolina (Mr. SPRATT) and the gentleman from West Virginia (Mr. RAHALL) and the gentleman from New York (Mr. SWEENEY) for bringing this amendment to the floor.

I would point out that we hear a lot from the American Equine Veterinarian Practitioners and the American Quarter Horse Association about their great concern for these horses, and yet there are hundreds of organizations in the country today who provide funding through their foundation to provide retirement homes for unwanted horses. Yet I am not aware that the American Equine Veterinarian Practitioners do that through a foundation, nor the American Quarter Horse Association, nor do they do it through a foundation; and they are the most prolific breeders of any breed in the country.

I will also say we are talking about two foreign-owned companies here, one owned by a French family, one owned by a Belgium family. They are the only ones slaughtering horses in America.

In addition to that, the Attorney General of Texas, who is now a U.S. Senator, wrote a legal opinion while he was Attorney General stating that it was illegal to slaughter horses in Texas. And yet, despite that, the slaughterhouse brought a lawsuit, and that case is now pending in U.S. District Court.

The Mayor of Kaufman, Texas, where one of plants is located, has written a letter to us urging us to try to shut these plants down because of their consistent violation of environmental laws.

But one of the things that is most difficult about this process is that, first of all, I think everyone would agree horses have not been raised for slaughter. Unlike cows, pigs and chickens, they have not been raised for slaughter.

When you take a cow, pig, chicken or whatever to an auction house you know it is going to be slaughtered. But many people when they take a horse to an auction are unaware because there is a lack of disclosure. In fact, there is an effort made to conceal that self-described "killer buyers" are at the auction house and they take the horses to slaughter.

Then the process of the captive penetrating bolt being administered by low-skilled workers, low-paid workers who frequently have to do it two or three times before the horse is stunned and then his throat is slit, I would dare to say that is not humane. Now the leadership of the American Equine Practitioners say that it is humane. But if you talk to individual veterinarians, they would take controversy with that.

For every page of supporters opposing this legislation, we have pages of entities and individuals and organizations that support this legislation. And I might add a few of them that support it.

We have the owners of the last 12 Kentucky Derby winners supporting it. We have the National Thoroughbred Racing Association supporting it. We have the Thoroughbred Owners and Breeders Association supporting it. We have the New York Racing Authority supporting it. We have Churchill Downs supporting it. I could go on and on and on. But, most important, we have an inconsistent policy in the U.S. Government today on this issue. We prohibit sending horses out of America by sea for the purpose of slaughter, and yet we allow them to be slaughtered in the United States.

So it is an inconsistent policy. There is a lack of disclosure at the auction house. And when California banned horse slaughter, the only thing that they found was that, one, horse theft went down and horse abuse and neglect did not go up.

☐ 1545

With that, I would urge the support of the Sweeney amendment.

Mr. BONILLA. Mr. Chairman, I yield for as much time as he may consume to the gentleman from Virginia (Mr. GOODLATTE), chairman of the authorizing committee.

Mr. GOODLATTE. Mr. Chairman, I thank the chairman for the time.

I want to respond to a few of the remarks made by the gentleman from Kentucky and the gentleman from New York.

First of all, he talked about an inconsistent policy because we do not allow horses to be shipped overseas for slaughter purposes by boat. We do nothing to stop that from being done with regard to transport to Canada or Mexico. The fact of the matter is this amendment does not stop it.

So when my colleagues talk about the humane treatment of horses, this amendment is going to result in more inhumane treatment of horses if that is their guide, because they are going to be shipped greater distances to Canada and Mexico because they cannot be sent to slaughter facilities in the U.S.

Second, the gentleman from New York makes reference to the great racehorse Ferdinand, like this amendment would have stopped Ferdinand from having gone to slaughter. It absolutely would not have. I did not like seeing Ferdinand go to slaughter, but Ferdinand was sold to a Japanese owner and exported not for slaughter purposes but for breeding purposes; and later on in Japan, he was slaughtered. This amendment will do absolutely nothing to stop that same situation from happening to any other racehorse in the world.

Thirdly, the gentleman makes references to just three slaughter facilities. That is not true either. There are other slaughter facilities for horses. For example, there is a slaughterhouse in Nebraska which solely slaughters horses for zoos and sanctuaries for big cats which would be essentially shut down by this amendment because horses provide the proper type of high protein diet for those animals, when they are not out racing across the savannahs, because beef simply is not good for cats, these large cats.

The gentleman from New York says it is budget neutral, but the fact of the matter is all he is talking about there is budget neutral in terms of this particular amendment not costing any money; but consequences of the amendment will cost a lot of money because this amendment does absolutely nothing to stop the many practices that occur in this country that create unwanted horses, everything from nurse mares in the thoroughbred racing industry, to Premarin mares to produce the drug Premarin, to the foals of those mares, to the fact that for every Smarty Jones that is created, there are hundreds and hundreds of unwanted racehorses who do not make the grade and other horses that are unsuitable for riding and other pleasure purposes or showing. Those horses, as well, will fall into that category of unwanted horses.

Nor does the amendment do anything to take care of all those unwanted horses as they start to accumulate in our society. We have already talked about the massive estimated costs that will take place as a result of that.

Finally, the gentleman from Kentucky talks about the facilities that exist that would take care of horses, and we have some of those facilities in the country today. This amendment does not establish standards of care that horse rescue facilities must meet.

The humane society of the United States, which supports the amendment, admits that equine shelters are less well-established than cat and dog shelters. Citing extreme costs and staff time needed to shelter horses, the humane society warned of needing to be aware of distinctions between sheltering horses and sheltering other companion animals. Current horse-rescue facilities are overwhelmed with the amount of horses they already care for without this amendment being in effect and are in desperate search of additional funding.

The American Association of Equine Practitioners estimated that in the first year alone of a slaughter ban 2,700 additional equine facilities would be needed to keep up with unwanted horses displaced by the ban, compounding the problem by adding additional facilities that will also be searching for additional funding.

This is a bad, bad idea. I know there is a lot of emotion that says this is a great thing to do. It is not and it is not in the best interests of the horses of this country to pass this amendment. I urge my colleagues to oppose it.

Mr. SWEENEY. Mr. Chairman, I yield myself such time as I may consume.

I just simply say, before I recognize, that the gentleman raises some interesting points; and I would hope that the authorizing committee could go to hearings in the near future.

Mr. Chairman, I yield 2 minutes to the gentleman from Virginia (Mr. MORAN).

Mr. MORAN of Virginia. Mr. Chairman, I thank my friends, the gentleman from New York (Mr. SWEENEY); the gentleman from South Carolina (Mr. SPRATT); and the gentleman from Kentucky (Mr. WHITFIELD).

What has become of us as a country, selling these horses off for horse meat to be eaten on the other side of our oceans?

The wild horse is an icon of American history. The gentleman from Iowa asked what is the difference between a horse and a steer and a hog? The horse is an icon along with the bald eagle. What is the difference between a bald eagle and a pigeon or a turkey? And if you do not know the difference, we cannot explain it to you.

Shakespeare once said that "Horses are as full of spirit as the month of May and as gorgeous as the sun in midsummer". Does everything have to be converted to the bottom line? There are so many alternatives to slaughtering these beautiful creatures that are on public lands. We used to have 1 million at the turn of the century. We are down to 35,000 wild horses on public lands. That is sad and wrong.

We have responsibility over these beautiful creatures. They ought not be cut up in such an inhumane way, and shipped overseas for people who want

*June 8, 2005*          CONGRESSIONAL RECORD—HOUSE          H4251

to eat horse meat. That is not what we are about as a country. There are so many other alternatives.

We can use animal contraception methods. We could reopen over 100 herd management areas that the Bureau of Land Management has closed. We could start centers such as the one I saw this weekend, 61 horses brought from the wild West for adoption. They came from Nevada and Wyoming and California, beautiful creatures. People in the east coast are adopting them.

There are so many things we could be doing rather than selling these beautiful creatures for horse meat. We are not just about dollars and cents. We are about the things that made our country great. The wild horse is one of those things. It inspires poetry; and if my colleagues do not understand that, I guess we can't very well communicate why this is so important to us. But I trust the majority of this Congress knows what we are talking about.

Mr. BONILLA. Mr. Chairman, I yield back the balance of my time.

Mr. SWEENEY. Mr. Chairman, I yield myself such time as I may consume.

Before I recognize my final speaker to close, Mr. Chairman, let me just point out if it is about the bottom line, it is about making sure USDA inspectors inspect the American food chain and not foreign food chains.

Mr. Chairman, I yield the balance of the time to the gentleman from West Virginia (Mr. RAHALL).

Mr. RAHALL. Mr. Chairman, I thank the gentleman from New York for yielding me time, and I appreciate his leadership, as well as the gentleman from Kentucky (Mr. WHITFIELD) and the gentleman from South Carolina (Mr. SPRATT).

I want to remind my colleagues that this particular amendment, which is a funding limitation, however, is still very similar to an amendment that the House voted on shortly before we broke before the Memorial Day district work period. That particular amendment passed in an overwhelming fashion and in a bipartisan fashion. So this is truly bipartisan when it comes to recognizing how valuable the horse is to this country and what a symbol it is of our freedom and how important it is to recognize this truly American icon.

When Americans think of the horse, I do not believe they think of it in terms of foreign cuisine on the tables of countries around the European area.

This amendment has invoked a lot of emotion and misinformation. The opposition has said that this will increase the abuse of horses and horses running wild out West. Such statements are not true.

Here are the facts. Each year some 65,000 horses are slaughtered in this country for human consumption in Europe and Asia where they are sold in restaurants as a delicacy. Another 30,000 are trucked to Canada and Mexico for slaughter. This amendment will end that slaughter of American horses for human consumption overseas.

Slaughter is not the same as humane euthanasia administered by a veterinarian in a very controlled environment. Euthanasia of horses is administered by legal injection, whereas slaughtered is administered by unskilled, untrained workers using the captive bolt. Many times this is administered improperly, causing unnecessary pain and suffering before death.

Passage of this amendment will not cause an overpopulation of horses. Each year 690,000 horses die in the U.S. many of which are euthanized by a licensed veterinarian. Slaughtered horses represent only 1 percent of horses that die each year. This would not result in an overpopulation of horses as some suggest.

There are alternatives available. Americans do not profit from slaughtering horses. This is an export-driven market. Foreigners eat our horses and foreign companies make money, and we should stop looking at it in that perspective and start looking at it in the American perspective.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New York (Mr. SWEENEY).

The question was taken; and the Chairman announced that the ayes appeared to have it.

Mr. SWEENEY. Mr. Chairman, I demand a recorded vote.

The CHAIRMAN. Pursuant to clause 6 of rule XVIII, further proceedings on the amendment offered by the gentleman from New York (Mr. SWEENEY) will be postponed.

Mr. BONILLA. Mr. Chairman, I move that the Committee do now rise.

The motion was agreed to.

Accordingly, the Committee rose; and the Speaker pro tempore (Mr. KING of Iowa) having assumed the chair, Mr. RYAN of Wisconsin, Chairman of the Committee of the Whole House on the State of the Union, reported that that Committee, having had under consideration the bill (H.R. 2744) making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for the fiscal year ending September 30, 2006, and for other purposes, had come to no resolution thereon.

---

**LIMITATION ON AMENDMENTS DURING FURTHER CONSIDERATION OF H.R. 2744, AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2006**

Mr. BONILLA. Mr. Speaker, I ask unanimous consent that during further consideration of H.R. 2744 in the Committee of the Whole pursuant to House Resolution 303, no further amendment to the bill may be offered except:

Pro forma amendments offered at any point in the reading by the chairman or ranking minority member of the Committee on Appropriations or their designees for the purpose of debate;

Amendments printed in the CONGRESSIONAL RECORD and numbered 3 and 6;

Amendment printed in the CONGRESSIONAL RECORD and numbered 5, which shall be debatable for 30 minutes;

An amendment by Mr. HEFLEY, regarding an across-the-board cut;

an amendment by Mr. TIAHRT, regarding regulations;

an amendment by Mr. BROWN of Ohio, regarding school food program;

an amendment by Mr. KUCINICH, regarding genetically engineered fish;

an amendment by Mr. KUCINICH, regarding BSE testing;

an amendment by Mr. WEINER, regarding minimum guarantees for agriculture funding for States;

an amendment by Mr. STUPAK, regarding FDA clinical trials;

an amendment by Mr. STUPAK, regarding FDA whistleblowers;

an amendment by Ms. KAPTUR, regarding Emerald Ash borer;

an amendment by Mr. GARRETT of New Jersey, regarding 213A of the Immigration and Nationality Act.

Each such amendment may be offered only by the Member named in this request or a designee, or the Member who caused it to be printed in the RECORD or a designee, shall be considered as read, shall not be subject to amendment except that the chairman and ranking minority member of the Committee on Appropriations and the Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies each may offer one pro forma amendment for the purpose of debate; and shall not be subject to a demand for division of the question in the House or in the Committee of the Whole.

Except as otherwise specified, each amendment shall be debatable for 10 minutes, equally divided and controlled by the proponent and an opponent. An amendment shall be considered to fit the description stated in this request if it addresses in whole or in part the object described.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Texas?

There was no objection.

---

**AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2006**

The SPEAKER pro tempore. Pursuant to House Resolution 303 and rule XVIII, the Chair declares the House in the Committee of the Whole on the State of the Union for the further consideration of the bill, H.R. 2744.

□ 1600

IN THE COMMITTEE OF THE WHOLE

Accordingly, the House resolved itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (H.R. 2744) making appropriations for Agriculture, Rural Development, Food and

Evans
Farr
Fattah
Filner
Fitzpatrick (PA)
Foley
Ford
Frank (MA)
Gonzalez
Gordon
Green, Al
Green, Gene
Grijalva
Gutierrez
Gutknecht
Harman
Hefley
Herseth
Higgins
Hinchey
Hinojosa
Holden
Holt
Honda
Hooley
Hoyer
Hulshof
Inslee
Israel
Jackson (IL)
Jenkins
Jindal
Johnson, E. B.
Jones (NC)
Jones (OH)
Kanjorski
Kaptur
Kelly
Kennedy (RI)
Kildee
Kilpatrick (MI)
Kind
Kirk
Kucinich
Langevin
Lantos
Larsen (WA)
Larson (CT)
Leach
Lee
Levin
Lewis (GA)

Lewis (KY)
Lipinski
Lofgren, Zoe
Lowey
Lynch
Maloney
Markey
Marshall
Matsui
McCarthy
McCollum (MN)
McDermott
McGovern
McHugh
McIntyre
McKinney
McNulty
Meehan
Meek (FL)
Melancon
Michaud
Millender-
  McDonald
Miller, George
Mollohan
Moore (KS)
Moore (WI)
Moran (KS)
Moran (VA)
Murtha
Nadler
Napolitano
Neal (MA)
Northup
Oberstar
Obey
Oliver
Ortiz
Owens
Pallone
Pascrell
Pastor
Paul
Payne
Pelosi
Peterson (PA)
Platts
Pomeroy
Rahall
Rangel
Reyes
Rogers (KY)

Ross
Rothman
Roybal-Allard
Ruppersberger
Ryan (OH)
Sabo
Salazar
Sánchez, Linda
  T.
Sanchez, Loretta
Sanders
Schakowsky
Schiff
Schwartz (PA)
Scott (GA)
Scott (VA)
Serrano
Shays
Sherman
Skelton
Smith (WA)
Snyder
Solis
Spratt
Stark
Strickland
Stupak
Tanner
Tauscher
Taylor (MS)
Thompson (CA)
Thompson (MS)
Tierney
Udall (CO)
Udall (NM)
Van Hollen
Velázquez
Visclosky
Wamp
Wasserman
  Schultz
Waters
Watson
Watt
Waxman
Weiner
Weldon (FL)
Weldon (PA)
Wexler
Woolsey
Wu
Wynn

Musgrave
Myrick
Neugebauer
Ney
Norwood
Nunes
Nussle
Osborne
Otter
Oxley
Pearce
Pence
Peterson (MN)
Petri
Pickering
Pitts
Poe
Pombo
Porter
Price (GA)
Price (NC)
Pryce (OH)
Putnam
Radanovich
Ramstad
Regula

Rehberg
Reichert
Renzi
Reynolds
Rogers (AL)
Rogers (MI)
Rohrabacher
Ros-Lehtinen
Royce
Ryan (WI)
Ryun (KS)
Saxton
Schwarz (MI)
Sensenbrenner
Sessions
Shadegg
Shaw
Sherwood
Shimkus
Shuster
Simmons
Simpson
Smith (NJ)
Smith (TX)
Sodrel
Souder

Stearns
Sullivan
Sweeney
Tancredo
Taylor (NC)
Terry
Thomas
Thornberry
Tiahrt
Tiberi
Towns
Turner
Upton
Walden (OR)
Walsh
Weller
Westmoreland
Whitfield
Wicker
Wilson (NM)
Wilson (SC)
Wolf
Young (AK)
Young (FL)

Ferguson
Filner
Fitzpatrick (PA)
Foley
Forbes
Ford
Fossella
Frank (MA)
Frelinghuysen
Gallegly
Gerlach
Gibbons
Gilchrest
Gohmert
Gonzalez
Goode
Gordon
Green (WI)
Green, Al
Green, Gene
Grijalva
Gutierrez
Gutknecht
Hall
Harman
Harris
Hayworth
Herseth
Higgins
Hinchey
Hinojosa
Hobson
Holt
Hooley
Hostettler
Hoyer
Hunter
Hyde
Inglis (SC)
Inslee
Israel
Issa
Jackson (IL)
Jefferson
Jindal
Johnson (CT)
Johnson (IL)
Johnson, E. B.
Jones (NC)
Jones (OH)
Kanjorski
Keller
Kelly
Kennedy (MN)
Kennedy (RI)
Kildee
Kilpatrick (MI)
Kind
King (NY)
Kirk
Kline
Kucinich
Kuhl (NY)
Langevin
Lantos
Larsen (WA)

Larson (CT)
LaTourette
Lee
Levin
Lewis (GA)
Lewis (KY)
Linder
Lipinski
LoBiondo
Lofgren, Zoe
Lowey
Lungren, Daniel
  B.
Lynch
Maloney
Markey
Matsui
McCarthy
McCaul (TX)
McCollum (MN)
McCotter
McDermott
McGovern
McIntyre
McNulty
Meehan
Meek (FL)
Meeks (NY)
Mica
Michaud
Millender-
  McDonald
Miller (NC)
Miller, Gary
Miller, George
Mollohan
Moore (KS)
Moore (WI)
Moran (VA)
Murtha
Myrick
Nadler
Napolitano
Neal (MA)
Ney
Obey
Oliver
Ortiz
Owens
Pallone
Pascrell
Paul
Payne
Pelosi
Pence
Pickering
Pitts
Platts
Poe
Porter
Price (NC)
Pryce (OH)
Rahall
Ramstad
Reichert
Renzi

Rogers (KY)
Rogers (MI)
Lee
Levin
Rothman
Ros-Lehtinen
Roybal-Allard
Ruppersberger
Ryan (OH)
Sabo
Sánchez, Linda
  T.
Sanches, Loretta
Sanders
Saxton
Schakowsky
Schiff
Schwartz (PA)
Schwarz (MI)
Scott (VA)
Sensenbrenner
Serrano
Shaw
Shays
Sherman
Simmons
Smith (NJ)
Solis
Spratt
Stark
Strickland
Stupak
Sweeney
Tancredo
Tanner
Tauscher
Taylor (MS)
Thompson (CA)
Thompson (MS)
Tiahrt
Tierney
Towns
Turner
Udall (CO)
Udall (NM)
Upton
Van Hollen
Velázquez
Visclosky
Wamp
Wasserman
  Schultz
Waters
Watson
Waxman
Weiner
Weldon (PA)
Weller
Wexler
Whitfield
Wilson (SC)
Wolf
Woolsey
Wu
Wynn
Young (FL)

### NOT VOTING—6

Cox
Hastings (FL)

Jackson-Lee
  (TX)
Menendez

Rush
Slaughter

☐ 1745

Messrs. SHAYS, THOMPSON of Mississippi, BOREN, WYNN and MORAN of Kansas changed their vote from "no" to "aye."

So the amendment was agreed to.

The result of the vote was announced as above recorded.

AMENDMENT OFFERED BY MR. SWEENEY

The CHAIRMAN. The pending business is the demand for a recorded vote on the amendment offered by the gentleman from New York (Mr. SWEENEY) on which further proceedings were postponed and on which the ayes prevailed by voice vote.

The Clerk will designate the amendment.

The Clerk designated the amendment.

RECORDED VOTE

The CHAIRMAN. A recorded vote has been demanded.

A recorded vote was ordered.

The CHAIRMAN. This will be a 5-minute vote.

The vote was taken by electronic device, and there were—ayes 269, noes 158, not voting 6, as follows:

[Roll No. 233]

AYES—269

Abercrombie
Ackerman
Aderholt
Allen
Andrews
Baca
Bachus
Baird
Baldwin
Barrow
Bartlett (MD)
Bass
Bean
Becerra
Berkley
Berman
Biggert
Bilirakis
Bishop (GA)
Bishop (NY)
Blumenauer
Boehlert
Bono
Boozman
Brady (PA)
Brown (OH)

Brown (SC)
Brown, Corrine
Brown-Waite,
  Ginny
Burgess
Burton (IN)
Butterfield
Capito
Capps
Capuano
Cardin
Carnahan
Case
Castle
Chabot
Chandler
Clay
Cleaver
Clyburn
Conyers
Costello
Cramer
Crowley
Cummings
Cunningham
Davis (AL)

Davis (CA)
Davis (FL)
Davis (IL)
Davis (KY)
Davis, Jo Ann
Davis, Tom
DeFazio
DeGette
DeLauro
Dent
Diaz-Balart, L.
Diaz-Balart, M.
Dicks
Doggett
Doyle
Dreier
Ehlers
Emanuel
Engel
English (PA)
Eshoo
Etheridge
Evans
Everett
Farr
Fattah

### NOES—210

Aderholt
Akin
Alexander
Bachus
Baker
Barrett (SC)
Bartlett (MD)
Barton (TX)
Beauprez
Biggert
Bilirakis
Bishop (UT)
Blackburn
Blunt
Boehner
Bonilla
Bonner
Bono
Boozman
Boustany
Brady (TX)
Burgess
Buyer
Calvert
Camp
Cannon
Cantor
Capito
Carter
Castle
Chabot
Chocola
Clyburn
Coble
Cole (OK)
Conaway
Cooper
Costa
Cramer
Crenshaw
Cubin
Culberson
Cunningham
Davis (KY)
Davis, Jo Ann

Davis, Tom
Deal (GA)
DeLay
Dent
Diaz-Balart, L.
Diaz-Balart, M.
Doolittle
Drake
Dreier
English (PA)
Etheridge
Everett
Feeney
Ferguson
Flake
Forbes
Fortenberry
Fossella
Foxx
Franks (AZ)
Frelinghuysen
Gallegly
Garrett (NJ)
Gerlach
Gibbons
Gilchrest
Gillmor
Gingrey
Gohmert
Goode
Goodlatte
Granger
Graves
Green (WI)
Hall
Harris
Hart
Hastert
Hastings (WA)
Hayes
Hayworth
Hensarling
Herger
Hobson
Hoekstra

Hostettler
Hunter
Hyde
Inglis (SC)
Issa
Istook
Jefferson
Johnson (IL)
Johnson, Sam
Keller
Kennedy (MN)
King (IA)
King (NY)
Kingston
Kline
Knollenberg
Kolbe
Kuhl (NY)
LaHood
Latham
LaTourette
Lewis (CA)
Linder
LoBiondo
Lucas
Lungren, Daniel
  E.
Mack
Manzullo
Marchant
Matheson
McCaul (TX)
McCotter
McCrery
McHenry
McKeon
McMorris
Meeks (NY)
Mica
Miller (FL)
Miller (MI)
Miller (NC)
Miller, Gary
Murphy

### NOES—158

Akin
Alexander
Baker
Barrett (SC)
Barton (TX)
Beauprez
Berry
Bishop (UT)
Blackburn
Blunt
Boehner
Bonilla
Bonner
Boozman
Boren
Boswell
Boucher
Boustany
Boyd
Brady (TX)
Buyer
Calvert
Camp
Cannon
Cantor
Cardoza
Carson
Carter
Chocola
Coble
Cole (OK)

Conaway
Cooper
Costa
Crenshaw
Cubin
Cuellar
Culberson
Davis (TN)
Deal (GA)
Delahunt
DeLay
Dingell
Doolittle
Drake
Duncan
Edwards
Emerson
Feeney
Flake
Fortenberry
Foxx
Franks (AZ)
Garrett (NJ)
Gillmor
Gingrey
Goodlatte
Granger
Graves
Hart
Hastings (WA)
Hayes

Hefley
Hensarling
Herger
Hinojosa
Hobson
Hoekstra
Honda
Hulshof
Istook
Jenkins
Johnson, Sam
King (IA)
Kingston
Knollenberg
Kolbe
LaHood
Latham
Leach
Lewis (CA)
Lucas
Mack
Manzullo
Marchant
Marshall
Matheson
McCrery
McHenry
McHugh
McKeon
McKinney
McMorris

McIancon
Miller (FL)
Miller (MI)
Moran (KS)
Murphy
Musgrave
Neugebauer
Northup
Norwood
Nunes
Nussle
Oberstar
Osborne
Otter
Oxley
Pastor
Pearce
Peterson (MN)
Peterson (PA)
Petri
Pombo
Pomeroy

Price (GA)
Putnam
Radanovich
Rangel
Regula
Rehberg
Reyes
Reynolds
Rogers (AL)
Rohrabacher
Ross
Royce
Ryan (WI)
Ryun (KS)
Salazar
Scott (GA)
Sessions
Shadegg
Sherwood
Shimkus
Shuster
Simpson

Skelton
Smith (TX)
Smith (WA)
Snyder
Sodrel
Souder
Stearns
Sullivan
Taylor (NC)
Terry
Thomas
Thornberry
Tiberi
Walden (OR)
Walsh
Watt
Welch (NH)
Westmoreland
Wicker
Wilson (NM)
Young (AK)

NOT VOTING—6

Cox
Hastings (FL)

Jackson-Lee (TX)
Menendez

Rush
Slaughter

□ 1755

Mr. ROGERS of Michigan, Ms. WA-
TERS and Ms. CORRINE BROWN of
Florida changed their vote from "no"
to "aye."

So the amendment was agreed to.

The result of the vote was announced
as above recorded.

PERSONAL EXPLANATION

Ms. SLAUGHTER. Mr. Chairman, on rollcall
No. 232, 233, had I been present, I would
have voted "aye" on both.

AMENDMENT NO. 5 OFFERED BY MR.
BLUMENAUER

The CHAIRMAN. The pending busi-
ness is the demand for a recorded vote
on the amendment offered by the gen-
tleman from Oregon (Mr. BLUMENAUER)
on which further proceedings were
postponed and on which the noes pre-
vailed by voice vote.

The Clerk will redesignate the
amendment.

The Clerk redesignated the amend-
ment.

RECORDED VOTE

The CHAIRMAN. A recorded vote has
been demanded.

A recorded vote was ordered.

The CHAIRMAN. This will be a 5-
minute vote.

The vote was taken by electronic de-
vice, and there were—ayes 146, noes 280,
not voting 7, as follows:

[Roll No. 234]

AYES—146

Akin
Allen
Andrews
Baldwin
Bartlett (MD)
Bass
Bean
Berkley
Berman
Biggert
Bilirakis
Bishop (NY)
Blackburn
Blumenauer
Boehlert
Boucher
Bradley (NH)
Brady (PA)
Brown (SC)
Burgess
Burton (IN)
Capps
Capuano

Carson
Castle
Chabot
Chocola
Conyers
Cooper
Davis (CA)
Davis (IL)
Davis, Jo Ann
Davis, Tom
DeGette
Delahunt
Dent
Doggett
Doyle
Duncan
Ehlers
Emanuel
English (PA)
Eshoo
Fattah
Ferguson
Fitzpatrick (PA)

Flake
Forbes
Fossella
Frank (MA)
Frelinghuysen
Garrett (NJ)
Gerlach
Gibbons
Gingrey
Gordon
Green (WI)
Hart
Hayworth
Kelley
Hensarling
Herger
Holt
Hostettler
Inglis (SC)
Inslee
Istook
Jackson (IL)
Johnson, Sam

Kanjorski
Keller
Kennedy (RI)
Kind
Kingston
Kirk
Kolbe
Kuhl (NY)
Langevin
Lee
Lewis (GA)
Linder
Lipinski
LoBiondo
Lowey
Manzullo
Markey
Matheson
McDermott
McHenry
McKinney
McNulty
Meehan
Meeks (NY)
Miller, George
Moore (KS)

Moore (WI)
Moran (VA)
Murphy
Myrick
Ney
Owens
Pallone
Pascrell
Paul
Payne
Pence
Peterson (PA)
Petri
Pitts
Platts
Poe
Porter
Price (GA)
Ramstad
Rehberg
Royce
Ryan (WI)
Schiff
Schwartz (PA)
Scott (VA)
Sensenbrenner

Sessions
Shadegg
Shaw
Shays
Shuster
Simmons
Smith (NJ)
Smith (WA)
Solis
Souder
Stark
Sweeney
Tancredo
Tiberi
Tierney
Udall (NM)
Upton
Van Hollen
Velázquez
Wamp
Watson
Waxman
Weiner
Wilson (SC)
Young (FL)

NOES—280

Abercrombie
Ackerman
Aderholt
Alexander
Baca
Bachus
Baird
Baker
Barrett (SC)
Barrow
Barton (TX)
Beauprez
Becerra
Berry
Bishop (GA)
Bishop (UT)
Blunt
Boehner
Bonilla
Bonner
Bono
Boozman
Boren
Boswell
Boustany
Boyd
Brady (TX)
Brown (OH)
Brown, Corrine
Brown-Waite,
  Ginny
Butterfield
Buyer
Calvert
Camp
Cannon
Cantor
Capito
Cardin
Cardoza
Carnahan
Carter
Case
Chandler
Clay
Cleaver
Clyburn
Coble
Cole (OK)
Conaway
Costa
Costello
Cramer
Crenshaw
Crowley
Cubin
Cuellar
Culberson
Cummings
Cunningham
Davis (AL)
Davis (FL)
Davis (KY)
Davis (TN)
Deal (GA)
DeFazio
DeLauro
DeLay
Diaz-Balart, L.
Diaz-Balart, M.
Dicks

Dingell
Doolittle
Drake
Dreier
Edwards
Emerson
Engel
Etheridge
Evans
Everett
Farr
Feeney
Filner
Foley
Ford
Fortenberry
Foxx
Franks (AZ)
Gallegly
Gilchrest
Gillmor
Gohmert
Gonzalez
Goode
Goodlatte
Granger
Graves
Green, Al
Green, Gene
Grijalva
Gutierrez
Gutknecht
Hall
Harman
Harris
Hastings (WA)
Hayes
Herseth
Higgins
Hinchey
Hobson
Hoekstra
Holden
Honda
Hooley
Hoyer
Hulshof
Hunter
Hyde
Israel
Issa
Jefferson
Jenkins
Jindal
Johnson (CT)
Johnson (IL)
Johnson, E. B.
Jones (NC)
Jones (OH)
Kaptur
Kelly
Kennedy (MN)
Kildee
Kilpatrick (MI)
King (GA)
King (NY)
Kline
Knollenberg
Kucinich
LaHood
Lantos

Larsen (WA)
Latham
LaTourette
Leach
Levin
Lewis (CA)
Lewis (KY)
Lofgren, Zoe
Lucas
Lungren, Daniel
  E.
Lynch
Mack
Maloney
Marchant
Marshall
Matsui
McCarthy
McCaul (TX)
McCollum (MN)
McCotter
McCrery
McGovern
McHugh
McIntyre
McKeon
McMorris
Meek (FL)
Melancon
Mica
Michaud
Millender-
  McDonald
Miller (FL)
Miller (MI)
Miller (NC)
Miller, Gary
Mollohan
Moore (KS)
Murtha
Musgrave
Nadler
Napolitano
Neal (MA)
Neugebauer
Northup
Norwood
Nunes
Nussle
Oberstar
Obey
Ohter
Ortiz
Osborne
Otter
Oxley
Pastor
Pearce
Pelosi
Peterson (MN)
Pickering
Pombo
Pomeroy
Price (GA)
Pryce (OH)
Putnam
Radanovich
Rahall
Rangel
Regula
Rehberg

Reichert
Renzi
Reyes
Reynolds
Rogers (AL)
Rogers (KY)
Rogers (MI)
Ros-Lehtinen
Ross
Rothman
Roybal-Allard
Ruppersberger
Ryan (OH)
Ryun (KS)
Sabo
Salazar
Sánchez, Linda
  T.
Sanchez, Loretta
Sanders
Saxton
Schakowsky
Schwarz (MI)
Scott (GA)

Serrano
Sherman
Sherwood
Shimkus
Simpson
Skelton
Slaughter
Smith (TX)
Snyder
Sodrel
Spratt
Stearns
Strickland
Stupak
Sullivan
Tanner
Tauscher
Taylor (MS)
Taylor (NC)
Terry
Thomas
Thompson (CA)
Thompson (MS)
Thornberry

Tiahrt
Towns
Turner
Udall (CO)
Visclosky
Walden (OR)
Walsh
Wasserman
  Schultz
Waters
Watt
Weldon (FL)
Weldon (PA)
Weller
Westmoreland
Wexler
Whitfield
Wicker
Wilson (NM)
Wolf
Woolsey
Wu
Wynn
Young (AK)

NOT VOTING—7

Cox
Hastings (FL)
Hinojosa

Jackson-Lee (TX)
Larson (CT)

Menendez
Rush

□ 1803

So the amendment was rejected.

The result of the vote was announced
as above recorded.

Stated against:

Mr. HINOJOSA. Mr. Chairman, on rollcall
No. 234, had I been present, I would have
voted "no."

PERSONAL EXPLANATION

Mrs. NORTHUP. Mr. Chairman, I inadvert-
ently voted "no" on an amendment to the fis-
cal year 2006 Agriculture, Rural Development,
Food and Drug Administration, and Related
Agencies Appropriations Act, H.R. 2744. I in-
tended to vote "aye" on the Blumenauer-Flake
Amendment regarding payments to the Sugar
Loan Program, rollcall vote number 234.

AMENDMENT NO. 6 OFFERED BY MR. CHABOT

The CHAIRMAN. The pending busi-
ness is the demand for a recorded vote
on the amendment offered by the gen-
tleman from Ohio (Mr. CHABOT) on
which further proceedings were post-
poned and on which the noes prevailed
by voice vote.

The Clerk will redesignate the
amendment.

The Clerk redesignated the amend-
ment.

RECORDED VOTE

The CHAIRMAN. A recorded vote has
been demanded.

A recorded vote was ordered.

The CHAIRMAN. This will be a 5-
minute vote.

The vote was taken by electronic de-
vice, and there were—ayes 66, noes 356,
not voting 11, as follows:

[Roll No. 235]

AYES—66

Akin
Andrews
Bachus
Barrett (SC)
Bartlett (MD)
Bass
Berkley
Bradley (NH)
Brown (OH)
Burgess
Capuano
Carson
Castle
Chabot
Davis, Jo Ann
DeGette

Dent
Doggett
Duncan
Ehlers
English (PA)
Feeney
Ferguson
Fitzpatrick (PA)
Flake
Fossella
Franks (AZ)
Frelinghuysen
Garrett (NJ)
Gibbons
Hayworth
Hensarling

Hostettler
Hyde
Inglis (SC)
Istook
Kucinich
Linder
Lipinski
LoBiondo
Manzullo
Markey
Matheson
McDermott
McHenry
McKinney
Miller, Gary
Moore (WI)

AMENDMENT NO. 1751

At the appropriate place in the bill (page 173 after line 24), insert the following new paragraphs:

"SEC.    . (a) Hereafter, none of the funds made available by this Act or any other Act may be used to publish, disseminate, or distribute Agriculture Information Bulletin Number 787.

(b) Of the funds provided to the Economic Research Service, the Secretary of Agriculture shall enter into an agreement with the National Academy of Sciences to conduct a comprehensive report on the economic development and current status of the sheep industry in the United States."

AMENDMENT NO. 1752

On page 173, after line 24 insert the following:

"SEC.    . The Secretary of Agriculture may establish a demonstration intermediate relending program for the construction and rehabilitation of housing for the Choctaw Nation: *Provided*, That the interest rate for direct loans shall be 1 percent: *Provided further*, That no later than one year after the establishment of this program the Secretary shall provide the Committees on Appropriations with a report providing information on the program structure, management, and general demographic information on the loan recipients."

The PRESIDING OFFICER. The Senator is recognized.

Mr. BENNETT. Mr. President, the first amendment is in regard to a study on the sheep industry in the United States by the National Academy of Sciences. The second authorizes a demonstration tribal housing program. And the third authorizes a land transfer in Mississippi from the Agricultural Research Service to Mississippi State University.

All three of these amendments have been considered carefully on both sides. They have been cleared on both sides. I ask that they be approved en bloc by a voice vote.

The PRESIDING OFFICER. Is there objection? Without objection, the question is on agreeing to the amendments en bloc.

The amendments (Nos. 1750, 1751, and 1752) were agreed to en bloc.

Mr. BENNETT. Mr. President, I ask that the vote be reconsidered and that reconsideration be laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BENNETT. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. ENSIGN. Mr. President, I ask unanimous consent that the order for the quorum call be dispensed with.

The PRESIDING OFFICER (Mr. VOINOVICH). Without objection, it is so ordered.

Mr. ENSIGN. Mr. President, I ask unanimous consent that the pending amendment be set aside.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. ENSIGN. Mr. President, I ask unanimous consent that I may offer an amendment dealing with horse inspection and that no second-degree amendments be in order.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

Mr. ENSIGN. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. ENSIGN. Mr. President, I ask unanimous consent that the order for the quorum call be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. ENSIGN. Mr. President, I withdraw my previous unanimous consent request and I call for the regular order with respect to amendment No. 1726.

The PRESIDING OFFICER. The amendment is now pending.

AMENDMENT NO. 1753 TO AMENDMENT NO. 1726

Mr. ENSIGN. Mr. President, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Nevada [Mr. ENSIGN], for himself, Mr. BYRD, Ms. LANDRIEU, Mr. LOTT, Mr. GRAHAM, Ms. STABENOW, Mr. DEMINT, Mrs. FEINSTEIN, and Mr. LAUTENBERG, proposes an amendment numbered 1753 to amendment numbered 1726.

Mr. ENSIGN. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To prohibit the use of appropriated funds to pay the salaries or expenses of personnel to inspect horses under certain authority or guidelines)

At the appropriate place, add the following:

SEC.    . None of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. 603) or under the guidelines issued under section 903 the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 1901 note; Public Law 104–127).

Mr. ENSIGN. Mr. President, I rise, along with my colleagues, Senators BYRD, LANDRIEU, GRAHAM, LOTT, STABENOW, DEMINT, FEINSTEIN, and LAUTENBERG, to submit an amendment to the 2006 Senate Agriculture appropriations bill.

The goal of our amendment is simple: to end the slaughter of America's horses for human consumption overseas.

I graduated from Colorado State with a degree in veterinary medicine. I have been concerned with animal welfare since my earlier days as a youth and pursued those interests as a practicing veterinarian.

Our Nation's history and cultural heritage is strongly associated with horses. George Washington is pictured many places with horses. We are reminded of the legend of Paul Revere's ride and the Pony Express in the West. The Depression era race between Seabiscuit and War Admiral raised the morale of our country during desperate times.

The owners who sell their horses at auction are often unaware that those horses may be on their way to one of the three remaining horse slaughterhouses in America. These slaughterhouses—two in Texas and one in Illinois—are owned by French and Belgium companies. They slaughter American horses almost exclusively for one purpose—exporting the meat overseas for human consumption.

Workhorses, racehorses, and even pet horses—many young and healthy—are slaughtered for human consumption in Europe and Asia, where their meat is considered a delicacy. The profits, along with the product, are shipped overseas. These horses are slaughtered in America and shipped to Japan, France, Belgium, Italy, Germany for human consumption.

Last year, nearly 100,000 American horses were slaughtered for human consumption overseas. Sixty-five thousand of these were sent to three slaughterhouses in the United States, and more than 30,000 were shipped across our borders to Canada and Mexico for slaughter.

Our amendment effectively stops this practice. It restricts the use of Federal funds for the inspection of horses being sent to slaughterhouses for human consumption. Without these inspections, required under the Federal Meat Inspection Act, horses cannot be slaughtered, or exported for slaughter, for human consumption overseas.

Strong support for our amendment is reflected in the House of Representatives, where an identical measure was passed by a vote of 269 to 158 this past June.

We have several articles and editorials from around the country that have been written in support of our amendment. Articles have appeared in the Washington Times, the St. Petersburg Times, the Charleston Gazette, and the Louisville Courier-Journal, just to name a few. I ask unanimous consent to have these articles printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

[From the Washington Times, Sept. 15, 2005]

SAVE THE HORSES

Most Americans would sooner starve than eat fillet of horse with cranberry chutney, or however they do it in Europe. It might then come as a surprise that 66,000 horses were slaughtered for consumption in the United States last year, and 20,000 more were exported abroad for the same purposes. Even more so when one considers that nearly none of this horse flesh ends up on American platters—and for that we are thankful.

While cattle and poultry are bred specifically for food, horses are not. Many of those sold to slaughterhouses are privately owned or caught in the wild by the federal Bureau of Land Management, which then tries to find adoptive homes. When it cannot, the horses go to the highest bidder, in this case either to one of the three Belgian- or French-owned plants.

Fortunately, there is growing opposition in Congress to this kind of thing. In June, the House passed by a bipartisan majority an

*September 20, 2005*    CONGRESSIONAL RECORD — SENATE    S10219

amendment to the agriculture appropriations bill banning the use of federal funds in the slaughtering of horses. The Senate is schedule to vote on the amendment, sponsored by veterinarian Sen. John Ensign, next week. We encourage senators to support this ban.

Certain veterinary groups, rather ironically, oppose the amendment. They claim that it is humane to put aging or neglected horses out of their misery. But if anyone actually saw how these noble beasts are slaughtered—strung up by their hind legs and bled—they might think twice before supporting such conduct. The only problem with attaching the amendment to an appropriations bill is that it will expire next year.

So, Mr. Ensign has also introduced independent legislation that would ban the slaughter of horses entirely. Some critics contend an outright ban is an abuse of congressional power. But Cass Sunstein, the distinguished University of Chicago law professor, conclusively addressed those concerns a few years ago: "A ban on commercial slaughter of horses would be plainly within congressional authority, if accompanied by reasonable findings that such slaughter is often or generally a way of yielding products for interstate or international sale, and therefore has a substantial effect on interstate or international commerce." Few would argue that it doesn't.

We admit to a certain sentimentality in our appeal to ban horse slaughter. The horse has always held a hallowed place in our national identity, much like the bald eagle. And just as no American would consider ordering up a bald eagle, if only out of respect, so would none ask for a horse steak.

[From the Louisville Courier-Journal, Sept. 13, 2005]

HORSE SENSE IN SENATE

This week, the U.S. Senate may vote on an amendment to the agriculture appropriations bill that would outlaw the slaughter of horses for food. For most Kentuckians—in fact, for most Americans—it's shocking that such a vote would need to be taken. In this country, horses are raised to be companion animals. Most folks don't know that in three foreign-owned slaughterhouses within our borders, about 45,000 horses are killed each year.

The meat is then shipped to Japan and several European countries, where horse is served for dinner. In the international market, the meat of American horses is especially coveted, since most of them have been well fed and have received superior care.

This should be an easy vote for Sens. Mitch McConnell and Jim Bunning. Horses are central to Kentucky's culture. Our famous Bluegrass farms breed and raise them for higher purposes than ending up on some dinner table overseas.

And no horse is currently safe from that fate. Ferdinand, the 1986 Kentucky Derby winner, was killed in a Japanese slaughterhouse when his stud services were no longer needed. This past spring, 41 wild mustangs were slaughtered for food in a Texas plant after being purchased through a program meant to give them new homes.

That's why, in June, the U.S. House of Representatives overwhelmingly passed legislation identical to what the Senate is considering. Kentucky's own Rep. Ed Whitfield, R-1st District, led the effort.

Now the Senate should do the same, with Kentuckians again playing a leadership role.

[From the St. Petersburg Times, Sept. 13, 2005]

BRING AN END TO HORSE SLAUGHTER

Horse slaughter has no place in the United States. The House of Representatives confirmed that earlier this year by passing an amendment to the agriculture spending bill that would, in essence, stop the practice. Now it is the Senate's turn.

Currently, horses that are no longer wanted are sold to buyers who presumably seek them for recreation or as pets too often end up in slaughterhouses or in the hands of exporters who send them outside the country for slaughter. Sometimes the buyers hide their true intentions and make a profit by selling the horses for slaughter. Each year, nearly 100,000 horses are subjected to a cruel end to their lives.

Horse meat for human consumption hasn't been sold in the United States for decades and isn't even used in pet food here. If a horse is near the end of its useful life, there are more humane ways for an owner to get rid of it. Adoption groups offer horses a peaceful retirement, and if the horses need to be euthanized, it can be done painlessly and humanely for a couple hundred dollars.

The Senate vote could come up in the next few days, so those opposed to horse slaughter should contact their senators and tell them to support the amendment, which would deny the Agriculture Department taxpayer dollars for the inspection of horse meat. Without such inspections, legalized horse slaughter in this country will end. And good riddance.

[From the Charleston Gazette, Sept. 13, 2005]

SAVE HORSES—BILL WOULD STOP SLAUGHTER

Around 90,000 American horses are slaughtered each year for human consumption. Foreign-owned slaughterhouses on American soil kill about 50,000 of them; the other 20,000 are sent live to Mexico or Canada. Some are wild horses that still wander ranges of the West; others are unwanted, disposed of by their owners or unscrupulous dealers who promise they will go to good homes.

Many of these creatures undergo extreme suffering en route to their final destination. Transport law allows them to go for 24 hours without food, water or rest, even if they are badly injured or heavily pregnant.

West Virginia Sen. Robert Byrd plans an amendment to the Agriculture appropriations bill banning horse slaughter in the United States. All three of the state's representatives voted for a similar amendment in the House that passed, 269–158.

There are alternatives to the slaughter of unwanted horses. The recent auction of wild mustangs in Ronceverte resulted in new homes for horses trucked in and sold for a nominal amount. Many horse rescue operations work with retired racehorses, many of whom have tragically ended at slaughterhouses—even big-time steeds, including Kentucky Derby winner Ferdinand. The rescue organizations retrain them and find them new homes and careers. Horses that have truly come to the end of their useful or comfortable lives can be humanely euthanized, rather than having to endure the pain, panic and trauma of a trip to the slaughterhouse.

The bond between horses and humans is as close as the connection between dogs or cats and their owners. The horsemeat industry is not a vital part of the American economy. We hope the Senate will pass this humane amendment.

CITY OF KAUFMAN,
*Kaufman, TX, September 6, 2005.*
Re Support Congressional efforts to end horse slaughter.

DEAR SENATOR: As the Mayor of Kaufman, Texas, I am all too well acquainted with an issue that has been getting plenty of attention on Capitol Hill recently: horse slaughter.

Kaufman is "home" to Dallas-Crown, one of only three slaughterhouses that continue to operate in this country (the other plants are in Ft. Worth, TX and DeKalb, IL). Together, the plants killed more than 65,000 of our horses last year for human consumption abroad. All three plants, are foreign owned, and all three are out of step with American public opinion. Seventy-eight percent of Texans oppose horse slaughter and polls from other parts of the country reflect this sentiment. Both of the Texas plants operating in violation of state law which prohibits the sale of horsemeat for human consumption. And Dallas-Crown is operating in violation of a multitude of local laws pertaining to wastemanagement, air quality and other environmental concerns.

When the District Attorneys in the two Texas jurisdictions moved to prosecute under the state law, the plants filed suit and the District Attorneys were prevented from proceeding. Horses continued to be slaughtered while the case languished in federal court. Recently, the judge ruled in the plants' favor. The District Attorneys are considering an appeal.

When the city took action against the plant for releasing pollutants into the sewer system far in excess of legally acceptable limits, we ended up in court and are now forced to mediate on an issue that can't be mediated. Meanwhile, our municipal sewer system is overburdened, but we simply cannot afford to refurbish the system so that it can tolerate overload from Dallas-Crown.

Residents are also fed up with the situation. Long-established neighbors living adjacent to the plant cannot open their windows or run their air conditioners without enduring the most horrific stench. Children playing in their yards do so with the noise of horses being sent to their deaths in the background. Landowners have difficulty securing loans to develop their property. The residents have petitioned the city council to take corrective action against the plant. On August 15 the Kaufman City Council voted unanimously to implement termination proceedings against the plant.

But the ultimate remedy rests with the federal government, which has the authority—and opportunity—to close this shameful industry down. I urge you to cosponsor the American Horse Slaughter Prevention Act when it is introduced by Senator John Ensign, and to support the Ensign amendment to the Senate Agriculture Appropriations Bill for Fiscal Year '06 that will prohibit the use of federal funds to facilitate horses slaughter.

As a community leader where we are directly impacted by the horse slaughter industry, I can assure you the economic development return to our community is negative. The foreign-owned companies profit at our expense—it is time for them to go. If I can provide you with further information, please don't hesitate to contact me at 972-932-2856.

Sincerely,

PAULA BACON,
*Mayor of Kaufman, Texas.*

Mr. ENSIGN. Mr. President, the Ensign-Byrd amendment also has strong support from some of the people most familiar with the slaughterhouses. Paula Bacon, the mayor of Kaufman, TX, which is home to the Dallas Crown Slaughterhouse, recognized the importance of ending this slaughter.

She stated:

My city is little more than a doormat for a foreign-owned business that drains our resources, thwarts economic development and stigmatizes our community. There is no justification for spending American tax dollars to support this industry.

**S10220**

**CONGRESSIONAL RECORD — SENATE**

*September 20, 2005*

That is Paula Bacon, mayor of Kaufman, TX, home to the Dallas Crown horse slaughterhouse facility.

Members of the local community would like to see this slaughterhouse closed, as well.

Concerns have been raised about what will happen if this slaughter is ended. Many of these horses will be sold to a new owner. Some horses will be kept longer by their original owner, others will be euthanized humanely by a licensed veterinarian, and still others will be cared for by the horse rescue community. Efforts are underway to standardize practices for horse rescue organizations. Guidelines for this ever-growing sector have been developed by the animal protection community and embraced by sanctuaries.

Statistics do not support claims that this legislation will result in more abuse and neglect of unwanted horses. In Illinois, the number of abuse cases actually dropped from 2002 to 2004, when the State's only slaughterhouse was closed due to fire. In California, there has been no rise in neglect cases since the State passed a ban on slaughter for human consumption in 1998.

Furthermore, it is illegal to "turn out," neglect, or starve a horse, so this amendment will not lead to more orphaned horses. If a person attempts to turn his or her horses out, animal control agents can enforce humane laws. These animals still can be euthanized and disposed of by a veterinarian for about $225, a fraction of the cost to keep a horse. That cost is not too big of a burden to bear when no other options are available.

Our amendment is good for horses. That is why it is supported by many animal protection groups. The Humane Society of the United States, the American Society for the Prevention of Cruelty to Animals, the Doris Day Animal League, the American Humane Association, and Society for Animal Protective Legislation—all support our legislation. We have also received support from much of the horse industry and veterinarians nationwide. In fact, congressional measures to end horse slaughter are supported by Veterinarians for Equine Welfare, the National Thoroughbred Racing Association, Churchill Downs, Incorporated, and dozens of owners and trainers of champion racehorses, including Kentucky Derby winners.

The time to end this slaughter is now. Please join my colleagues and me in supporting this important amendment.

I yield the floor and suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. CONRAD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. THOMAS). Without objection, it is so ordered.

Mr. BENNETT. Mr. President, I ask unanimous consent that the Senator be recognized to speak as in morning business. We are under the Agriculture bill, and no one seems to be coming forward under the Agriculture bill, so I obviously have no objection, but I think, to be clear, it should be as in morning business; therefore, I ask unanimous consent that the Senator be given the opportunity to do that.

The PRESIDING OFFICER. Is there objection?

Hearing none, it is so ordered.

Mr. CONRAD. Mr. President, I thank my colleague from Utah for his graciousness, and my colleague from Wisconsin as well. I appreciate this opportunity to speak.

(The remarks of Mr. CONRAD pertaining to the introduction of S. 1730 are printed in today's RECORD under "Statements on Introduced Bills and Joint Resolutions.")

Mr. BYRD. Mr. President, Winston Churchill said, "when you are on a great horse, you have the best seat you will ever have." Indeed, throughout the ages, the horse has carried mankind across continents, helped forge civilizations, and has been that beloved beast of burden that has borne the human race on its back.

In America, the horse was the primary source of transportation of our founding fathers, the vehicle of our Revolutionary soldiers, and a symbol of the majestic strength and character that this great country was based upon. Our fledgling urban centers rose with the help of the horse's brawn. Our American frontier expanded farther and farther west, with families traveling by horse-drawn wagons across mountains and valleys, the plains and prairies. The American cowboy, an indelible image of the fierce and undying determination of the American spirit, was never without his trusty four-legged companion.

But each year, 65,000 horses are slaughtered in this country for human consumption in Europe and Asia, where horsemeat is considered a delicacy. Another 30,000 horses are shipped every year to Canada and Mexico to be slaughtered.

These horses often suffer unnecessarily while in transit to slaughterhouses. Horses can be shipped for more than 24 hours without food, water, or rest. They can be transported with broken legs, missing eyes, or while heavily pregnant. The horses are kept in cramped conditions, in trucks with ceilings so low that they prevent the horses from holding their heads in a normal, upright position. The cramped nature of their transport often results in trampling, with some horses arriving at the slaughterhouses seriously injured or dead.

Even more cruel than the suffering these animals endure while in transit is their often injurious end. Improper use of stunning equipment at the slaughterhouse can result in the animal having to endure repeated blows to head, meaning that horses sometimes remain conscious throughout the slaughter process.

The market for horsemeat is not an American market. Horsemeat is shipped abroad. The three slaughterhouses in the U.S. are foreign-owned. Thus, American horses are sold to a foreign company, killed for consumption in a foreign market, and foreign-owned companies profit from the export of horse meat. Many Americans would be shocked to learn that our animals suffer such a fate, all in order to satisfy the tastes of those living in Europe and Asia. Indeed, many individuals who sell horses to slaughterhouses do so unwittingly. Slaughterhouses often send third parties, called "killer buyers," to auction to buy horses.

Senator ENSIGN and I have offered an amendment to stop the slaughter of horses for human consumption by preventing taxpayer dollars from being used to inspect the horses intended for slaughter. Without these inspections, which are paid for by the American taxpayer, it would be impossible for these companies to slaughter horses in the U.S., or to transport horses abroad for slaughter.

I ask my colleagues to support the Ensign-Byrd amendment to end the slaughter of one of the most precious American symbols.

The PRESIDING OFFICER. The Senator from Utah.

Mr. BENNETT. Mr. President, I understand the Senator from Hawaii has some amendments to the Agriculture appropriations bill.

The PRESIDING OFFICER. The Senator from Hawaii.

Mr. AKAKA. Mr. President, what is the pending order of business?

The PRESIDING OFFICER. The Bennett amendment is now pending.

Mr. AKAKA. I ask unanimous consent to set the pending amendment aside.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 1729

Mr. AKAKA. Mr. President, I have two amendments to offer. I call up amendment No. 1729 to H.R. 2744, the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies appropriations bill.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Hawaii [Mr. AKAKA] proposes an amendment numbered 1729.

Mr. AKAKA. I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To prohibit Federal funding of research facilities that purchase animals from Class-B dealers)

On page 173, after line 24, insert the following:

SEC. 7____. None of the funds made available by this Act may be used to provide funding to a research facility that purchases animals from a dealer that holds a Class B license under the Animal Welfare Act (7 U.S.C. 2131 et seq.).

aisle, and I believe we are now prepared to pass it on a voice vote.

The PRESIDING OFFICER. The question is on agreeing to the amendment.

The amendment (No. 1726) was agreed to.

Mr. BENNETT. Mr. President, I move to reconsider the vote and ask that that be laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BENNETT. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. TALENT. Mr. President, I ask unanimous consent that the order for the quorum call be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 1763

Mr. TALENT. Mr. President, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Missouri [Mr. TALENT], for himself and Mr. PRYOR, proposes an amendment No. 1763.

Mr. TALENT. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To prohibit the use of funds to close or relocate certain local offices of the Farm Service Agency)

On page 173, after line 24, insert the following:

SEC. 7 . None of the funds made available by this or any other Act may be used to close or relocate a county or local Farm Service Agency office unless or until the Secretary of Agriculture has determined the cost effectiveness and enhancement of program delivery of the closure or relocation, and report to the House and Senate Committees on Agriculture and Appropriations.

Mr. TALENT. Mr. President, this amendment, which I am offering on behalf of myself and Mr. PRYOR, the Senator from Arkansas, is an attempt to address a development within the Department of Agriculture. The Department is proposing closing about a quarter to a third of the Farm Service Agency's local offices around the country, including, as far as we can tell, around 30 out of the 90 offices in Missouri, the object, according to the Department, being to modernize and consolidate functions and to provide better service.

Certainly nobody is opposed to better service. But I want to emphasize something here. The key with regard to how we handle FSA offices has to be service to the agricultural community and to our producers. The idea is accessibility. The idea is responsiveness. The idea is not necessarily somebody's planning in Washington about how they would organize everything in the United States if they could do it exactly the way they wanted.

I am a little concerned about changing our FSA offices when, from what I am told back in Missouri, there has been little or no consultation either with local FSA people or with producer organizations, more particularly farmers or the affected communities. I don't know how we can do this in a way that emphasizes service, acceptability, and accountability without having to talk to the people whom we are trying to serve.

The amendment basically says hold up on this until we have an opportunity for that kind of accessibility and that kind of accountability.

Again, I am not saying—and I don't think Mr. PRYOR is saying either—that no consolidation is possible. I imagine it is possible in Missouri. We certainly want to look at how we can modernize these offices so we can perform better service. But we have to remember that these are the offices our producers have to go to any time they want to deal with any of the Government's various programs that affect them. Some of them in Missouri are already driving 30, 40 minutes, or more than that, and if they drive and they don't have all the forms they need, or they left something at home, they have to go all the way home, get it, and turn around and come back.

When you are proposing eliminating some of those offices when they are already difficult to access, in many cases, I think that is something we need to look at. I certainly believe we need more consolidation, at least in Missouri, than we have had now.

That is all this amendment says. I appreciate very much the bill managers working with us. I understand they are going to be willing to accept the amendment. I appreciate that. I pledge to work with them in conference.

This language isn't necessarily the be-all and end-all with regard to this issue. I think they see what Senator PRYOR and I are driving at, and I think everybody would agree this is something we want to do with consultation and discussions with the affected communities—in particular the affected producer and producer groups. They are not opposed to making the Farm Service Agency work better. We all know the problems that have sometimes occurred. But we have potentially disaster relief coming down the pike, and I certainly hope so for producers who have been affected negatively by the hurricane, or by drought. We have another farm bill that is not that far away. We need to do this right, if we are going to do it. That is what the amendment says.

I appreciate the support of the Senator from Utah, and certainly pledge to work with him and his ranking member in conference on this amendment.

I yield the floor.

Mr. BENNETT. Mr. President, I share the concern and frustration of the Senator from Missouri with the proposal. We have had some of that same concern and frustration in Utah. Charitably, I will say that the efforts to close these offices have been handled a little less wisely than might otherwise have been the case.

I hope that between now and the conference we can learn more about this proposal. I think the Senator's comments about getting information and input from those directly affected is very wise.

I pledge to work with all the Senators concerned on this issue between now and the time we get to conference. So knowing that this will be the vehicle whereby we can get to conference, I am willing to proceed now to a voice vote and urge Senators to support it. I understand it has been cleared on both sides.

The PRESIDING OFFICER. Is there further debate? If not, the question is on agreeing to the amendment.

The amendment (No. 1763) was agreed to.

AMENDMENT NO. 1753

Mr. BENNETT. Mr. President, as we are approaching the hour of 4:45, which has been set as the time for the vote on the Ensign amendment, I say to my colleagues that Senator ENSIGN outlined the reasons for his amendment. I have heard others who for one reason or another have already been opposed to it. But so far, none of them have come to the floor to express that opposition.

I make it clear to anyone who is following the proceedings that one of the reasons we have delayed the vote as we have and kept the afternoon as open as we have has been to allow those who may be opposed to the Ensign amendment the opportunity to present their proposals.

We now are at 4:45. I expect the time is far gone and the vote will proceed. I didn't want anyone thinking we had made any effort to prevent anybody from presenting a different point of view than what Senator ENSIGN laid out when he proposed his amendment this afternoon.

The PRESIDING OFFICER. The hour of 4:45 having arrived, the question is on agreeing to the amendment of the Senator from Nevada.

The yeas and nays have been ordered.

The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New Jersey (Mr. CORZINE), the Senator from Louisiana (Ms. LANDRIEU), and the Senator from West Virginia (Mr. ROCKEFELLER) are necessarily absent.

The PRESIDING OFFICER (Mr. ALEXANDER). Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 68, nays 29, as follows:

[Rollcall Vote No. 237 Leg.]

YEAS—68

| Akaka | Bayh | Boxer |
| Alexander | Bennett | Bunning |
| Allen | Biden | Barr |

| | | |
|---|---|---|
| Byrd | Hagel | Mikulski |
| Cantwell | Harkin | Murkowski |
| Carper | Hatch | Murray |
| Chafee | Hutchison | Nelson (FL) |
| Chambliss | Inouye | Nelson (NE) |
| Clinton | Isakson | Obama |
| Coleman | Jeffords | Reed |
| Collins | Kennedy | Reid |
| Dayton | Kerry | Santorum |
| DeMint | Kohl | Sarbanes |
| DeWine | Kyl | Schumer |
| Dodd | Lautenberg | Smith |
| Dole | Leahy | Snowe |
| Durbin | Levin | Specter |
| Ensign | Lieberman | Stabenow |
| Feingold | Lott | Sununu |
| Feinstein | Lugar | Vitter |
| Frist | Martinez | Warner |
| Graham | McCain | Wyden |
| Gregg | McConnell | |

NAYS—29

| | | |
|---|---|---|
| Allard | Craig | Roberts |
| Baucus | Crapo | Salazar |
| Bingaman | Domenici | Sessions |
| Bond | Dorgan | Shelby |
| Brownback | Enzi | Stevens |
| Burns | Grassley | Talent |
| Coburn | Inhofe | Thomas |
| Cochran | Johnson | Thune |
| Conrad | Lincoln | Voinovich |
| Cornyn | Pryor | |

NOT VOTING—3

| | | |
|---|---|---|
| Corzine | Landrieu | Rockefeller |

The amendment (No. 1753), as modified, was agreed to.

Mr. BENNETT. Mr. President, I move to reconsider the vote.

Mr. SUNUNU. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. BENNETT. Mr. President, I have been asked throughout the vote whether that is the last vote of the evening. That obviously is not my call. It is the responsibility of the leader to make that decision. At the moment, I don't know of any amendment that would require a vote. I would hope that our colleagues who have amendments would be aggressive in coming to the floor now and offering them. We could offer an amendment now, lay it down for a vote in the morning.

Mr. ROBERTS. Will the Senator yield?

Mr. BENNETT. I yield.

Mr. ROBERTS. I have an amendment. I would like to offer it.

Mr. BENNETT. The Senator from Kansas satisfies our request instantly. I am happy to yield the floor.

AMENDMENT NO. 1742

Mr. ROBERTS. Mr. President, I have an amendment pending at the desk numbered 1742. I ask for its immediate consideration.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Kansas [Mr. ROBERTS] proposes an amendment numbered 1742.

Mr. ROBERTS. I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To modify the conditions under which the Federal Crop Insurance Corporation may offer crop insurance to single producers)

On page 173, after line 24, insert the following:

SEC. 7____. Section 508(a)(4)(B) of the Federal Crop Insurance Act (7 U.S.C. 1508(a)(4)(B)) is amended by inserting "or similar commodities" after "the commodity".

Mr. ROBERTS. Mr. President, this amendment is very straightforward. It has been cleared by both the chairman and ranking member of the Agriculture Committee, and I have also received word that the Risk Management Agency is supportive of this change.

Very simply, the amendment amends the section of the Federal Crop Insurance Act regarding the use of written agreements for commodities in counties where the crop has not yet been approved for crop insurance purposes.

The problem is that 3 years of cropping history is needed in order to issue a written agreement for coverage. However, producers cannot get a history of planting because the banker won't lend the money if they can't get insurance coverage. Thus, it is an endless cycle.

We have many counties where coverage exists for sunflowers, and we would like to use that data to expand coverage to canola. The Risk Management Agency has indicated that this would be an acceptable practice. However, the current law says that data must be used from the same commodity for which the policy is being issued. This amendment simply changes that language to allow data from agronomically similar crops to be used in providing written agreements.

The amendment has been given a score of zero by the CBO, and I urge my colleagues to accept it.

I yield the floor.

The PRESIDING OFFICER. The Senator from Utah.

Mr. BENNETT. Mr. President, I have no objection to this amendment and believe we should move forward on a voice vote.

The PRESIDING OFFICER. Is there further debate on the current amendment?

Mr. BENNETT. Mr. President, I ask that we withhold from the vote, and I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. BENNETT. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BENNETT. Mr. President, we are now prepared to proceed to a voice vote on the Roberts amendment.

The PRESIDING OFFICER. If there is no further debate, the question is on agreeing to amendment No. 1742.

The amendment (No. 1742) was agreed to.

The PRESIDING OFFICER. The Senator from Wisconsin.

AMENDMENT NO. 1765

Mr. KOHL. Mr. President, on behalf of Senator HARKIN, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Wisconsin [Mr. KOHL], for Mr. HARKIN, proposes an amendment numbered 1765.

Mr. KOHL. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To require the Secretary of Agriculture to provide notice to Congress before initiating any structural change in a mission area of the Department)

On page 173, after line 24, insert the following:

SEC. 7____. 90 days before initiating any structural change in a mission area of the Department, the Secretary of Agriculture shall provide notice of the change to the Committees on Appropriations of the Senate and the House of Representatives.

Mr. KOHL. I ask for adoption of the amendment.

The PRESIDING OFFICER. Is there further debate? If not, the question is on agreeing to the amendment.

The amendment (No. 1765) was agreed to.

Mr. KOHL. I move to reconsider the vote, and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

AMENDMENT NO. 1766

Mr. KOHL. Mr. President, on behalf of Senator PRYOR, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Wisconsin [Mr. KOHL], for Mr. PRYOR, proposes an amendment numbered 1766.

Mr. KOHL. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To provide a technical correction for the community eligibility for rural utilities programs in Arkansas)

On page 154, line 10, insert ", Cleburne County, Arkansas," after "Montana".

Mr. KOHL. I ask for adoption of the amendment.

The PRESIDING OFFICER. If there is no further debate, the question is on agreeing to the amendment.

The amendment (No. 1766) was agreed to.

Mr. KOHL. I move to reconsider the vote, and I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. KOHL. I yield the floor.

Mr. BENNETT. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. DAYTON. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.