UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY
OF THE UNITED STATES, *et al*.,

    Plaintiffs,

      v.

MIKE JOHANNS, *et al*.,

    Defendants.

Civil Action No. 06–265 (CKK)

**MEMORANDUM OPINION**
(April 13, 2007)

In Claim Three of Plaintiffs' Amended Complaint, Plaintiffs had alleged that, "by creating a fee-for-service ante-mortem horse slaughter inspection system without first conducting any environmental review under the National Environmental Policy Act [(NEPA)], 42 U.S.C. § 4321, *et seq.*, [United States Department of Agriculture (USDA)] has violated NEPA and the [Council on Environmental Quality's (CEQ's)] implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the Administrative Procedure Act [(APA)], 5 U.S.C. § 706(2)." Am. Compl. ¶ 98. On March 28, 2007, the Court issued an [67] Order and accompanying [68] Memorandum Opinion with respect to Claim Three, granting [39] Plaintiffs' Motion for Summary Judgment, denying [37] Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, and denying [38, 40] Defendant-Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment on Claim Three of Plaintiffs' First Amended Complaint. In its Order, the Court declared the Interim Final Rule at issue to be in violation of the APA and NEPA, vacated the Interim Final Rule, permanently enjoined the Food Safety and Inspection

Service (FSIS) from implementing the Interim Final Rule, and dismissed this case in its entirety.

Presently before the Court is Defendant-Intervenor Cavel International, Inc's [69] Emergency Motion for a Stay of the Court's March 28, 2007 Order. On April 3, 2007, the Federal Defendants indicated that while they "support[ed]" Cavel's motion, they would "not file a brief as the Federal Defendants' previous filings comprehensively present the Federal Defendants' position." *See dkt. entry* April 3, 2007. On April 6, 2007, Plaintiffs filed an Opposition. Defendant-Intervenor Cavel (hereinafter, "Cavel") indicated that it will not file a Reply. *See dkt. entry* [71] at 1. Based on a review of the Parties' filings, the relevant statutes and case law, and the history of the case (including the Court's prior orders and memorandum opinions in this case), the Court shall DENY [69] Defendant-Intervenor Cavel's Emergency Motion for a Stay of the Court's March 28, 2007 Order.

## I: BACKGROUND

A.    *Factual History*[1]

At the time Plaintiffs filed their Complaint, horses were slaughtered at three different foreign-owned facilities in the United States to provide horse meat for human consumption abroad and for use in zoos and research facilities domestically. The instant case pertains to the web of legislation and regulations pertaining to the inspection of such horses prior to slaughter. The Court notes that as of the Court's March 28, 2007 Order and Memorandum Opinion, Cavel was the only facility still in operation processing horsemeat for human consumption, see Cavel's Mem. to Stay Order at 2-3, as a recent ruling of the United States Court of Appeals for the Fifth

---

[1] The Court shall repeat the factual predicate and procedural history, to the extent applicable, as set out in its March 28, 2007 Memorandum Opinion. *See* [68] Mem. Op. at 3-7.

Circuit held that the other two Intervenors could be prosecuted for violating a Texas law that "on

its face prohibits the processing, sale or transfer of horsemeat for human consumption."

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 329 (5th Cir. 2007).

On November 10, 2005, Section 794 of the FY 2006 Agricultural Appropriations Act was

signed into law.  Introduced by members of Congress as an amendment to the FY 2006

Agricultural Appropriations Act, the Amendment provides:

> Effective 120 days after the date of enactment of this Act, none of the funds made available
> in this Act may be used to pay the salaries or expenses of personnel to inspect horses under
> section 3 of the Federal Meat Inspection Act (21 U.S.C. Sec. 603) or under the guidelines
> issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996.

*See* Pub. L. 109-97, § 794, 119 Stat. 2120, 2164 (A.R. 51).  The provision of the Federal Meat

Inspection Act ("FMIA"), 21 U.S.C. § 603, pertaining to the inspection of horses provides:  "For

the purpose of preventing the use in commerce of meat and meat food products which are

adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an

examination and inspection of all amenable species [including cattle, sheep, swine, goats, horses,

mules, and other equines] before they shall be allowed to enter into any slaughtering, packing,

meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the

meat and meat food products thereof are to be used in commerce . . . ."  21 U.S.C. § 603(a).  *See*

*also* 21 U.S.C. § 601(w)(1).  The provision of section 903 of the Federal Agriculture

Improvement and Reform (FAIR) Act of 1996 pertaining to the inspection of horses relates to

inspections during the transport of horses, which is not at issue in the instant case.  Plaintiffs

understand the FY 2006 Amendment to in effect prohibit the slaughter of horses for human

consumption.  Pls.' Mot. for Prelim. Inj. at 10.

3

On November 23, 2005, Beltex Corporation, Dallas Crown, Inc., and Cavel (collectively the "Slaughter Facility Operators") filed a petition for "emergency rulemaking" with the USDA to create a "fee-for-service" inspection program with respect to ante-mortem horse inspections and transportation-related horse inspections. Pls.' Mot. for Prelim. Inj., Ex. 10 (Petition) at 1. On February 8, 2006, FSIS published in the Federal Register an amendment to 9 C.F.R. Pt. 352, "amending the Federal meat inspection regulations to provide for a voluntary fee-for-service program under which official establishments that slaughter horses will be able to apply for and pay for ante-mortem inspection." 71 Fed. Reg. 6337, 6337 (Feb. 8, 2006). The "interim final rule" was given an effective date of March 10, 2006; additionally, FSIS provided a shortened comment period "because it is issuing an interim final rule and finds that it is in the public interest for [FSIS] to receive comments on an expedited basis" before March 10, 2006, the date on which the 2006 Amendment to the Agricultural Appropriations Act would take effect. *Id.* at 6337, 6340. Elaborating on the need for immediate action, FSIS states:

> [w]ith the passage of the FY 2006 Appropriations Act, if FSIS does not establish a means for official establishments that slaughter horses to obtain anti-mortem inspection, these establishments will not be able to operate and presumably will be forced out of business. This interim final rule is necessary to avoid disruption of operations at official establishments that slaughter horses. Therefore, the Administrator has determined that prior notice and opportunity for public comment are impracticable and contrary to the public interest under 5 U.S.C. 553(b), and that there is good cause under 5 U.S.C. 553(d) for making the action effective as specified herein.

*Id.* at 6340. FSIS further specified that it is "establishing this fee-for-service program under the Agricultural Marketing Act (AMA)." *Id.* at 6337.

### B.    *Procedural History*

In Plaintiffs' [3] First Amended Complaint, filed on February 21, 2006, Plaintiffs made

three claims for relief.  First, Plaintiffs claimed that the fee-for-service inspection system was

created in violation of the APA, 5 U.S.C. § 553, because advance public notice and opportunity

to comment was not provided.  Am. Compl. ¶¶ 94, 95.  Second, Plaintiffs claimed that

Defendants violated the APA, 5 U.S.C. § 706, principally by acting arbitrarily and capriciously in

violation of both the 2006 Agricultural Appropriations Act Amendment and the FMIA.  Am.

Compl. ¶¶ 96, 97.  Finally, Plaintiffs claimed that Defendants violated NEPA and its

implementing regulations by acting arbitrarily and capriciously in violation of the APA, 5 U.S.C.

§ 706.  Am. Compl. ¶¶ 98, 99.

Shortly after filing their First Amended Complaint, Plaintiffs filed [4] Plaintiffs' Motion

for a Temporary Restraining Order and for a Preliminary Injunction, and Request for a Hearing

("Motion for Preliminary Injunction") on February 22, 2006.  In their Motion, Plaintiffs

reiterated the grounds for relief stated in their First Amended Complaint and furthermore

requested that the Court preliminarily enjoin and declare unlawful the fee-for-service ante-

mortem inspection program that would become effective on March 10, 2006 on the grounds that

Plaintiffs had demonstrated likelihood of success on the merits, irreparable harm, lack of harm to

Defendants, and public interest factors necessary to obtain injunctive relief.  Pls.' Mot. for

Prelim. Inj. at 1-2.  On February 24, 2006, Beltex Corporation, Cavel, and Dallas Crown, Inc.

filed an unopposed [7] Motion to Intervene as of right as Defendants, which was granted by the

Court on March 1, 2006.  On March 14, 2006, the Court issued an [21] Order and [22]

Memorandum Opinion denying Plaintiffs' request for a preliminary injunction and dismissing

Claims One and Two of Plaintiffs' Amended Complaint.  The Court also noted that unclear

briefing and incomplete documentation by both sides with respect to Plaintiffs' NEPA claim

5

precluded the Court from making a determination on the merits based on the record before it.

Following the Court's March 14, 2006 ruling, the Parties submitted Motions for Summary Judgment with respect to Claim Three of the Amended Complaint. On May 1, 2006, Defendants filed [37] Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment; Defendant-Intervenors filed [38, 40] Defendant-Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment on Claim Three of Plaintiffs' First Amended Complaint; and Plaintiffs filed [39] Plaintiffs' Motion for Summary Judgment.

On March 24, 2006, Plaintiffs also filed [23] Plaintiffs' Motion Under Fed. R. Civ. P. 54(b) for Reconsideration of the Court's *Sua Sponte* Dismissal of Claims One and Two or, In the Alternative, for Certification of Those Claims for Immediate Appellate Review, and Request for an Expedited Hearing. Therein, Plaintiffs asked the Court to reconsider its dismissal of Claims One and Two, which had been made on the Court's finding that Plaintiffs lacked prudential standing to pursue the claims set forth in these two claims. Pls.' Mot. Reconsider at 1. Plaintiffs further requested that in the alternative, the Court certify Claims One and Two for immediate appellate review. *Id.* Finally, Plaintiffs requested a hearing related to their Motion to Reconsider. *Id.*

On August 28, 2006, the Court issued an [53] Order and [54] Memorandum Opinion granting Plaintiffs' [23] Motion to Reconsider with respect to the Court's dismissal of Claim One of the Amended Complaint, but denying Plaintiffs' Motion with respect to Claim Two of the Amended Complaint. Furthermore, the Court denied Plaintiffs' request for certification for immediate appellate review with respect to Claim Two and denied Plaintiffs' request for a hearing as unnecessary and counter to the interests of judicial economy. The Court also provided

6

a briefing schedule with respect to Claim One, and indicated that the Court would address

Plaintiffs' NEPA claim (Claim Three) at the same time it addressed briefing with respect to

Claim One.  Following the Court's August 28, 2006 ruling, the Parties (Plaintiffs, Defendants,

and Defendant-Intervenors) submitted Motions for Summary Judgment with respect to Claim

One.

Finally, on March 28, 2007, the Court issued an [67] Order and an accompanying 49-page

[68] Memorandum Opinion with respect to Claim Three, granting [39] Plaintiffs' Motion for

Summary Judgment; denying [37] Defendants' Motion to Dismiss, or Alternatively, for

Summary Judgment; and denying [38, 40] Defendant-Intervenors' Motion to Dismiss or, in the

Alternative, for Summary Judgment on Claim Three of Plaintiffs' First Amended Complaint.

Based on the Court's finding of a NEPA violation, the Court declared the Interim Final Rule to

be in violation of the APA and NEPA, vacated the Interim Final Rule, permanently enjoined the

FSIS from implementing the Interim Final Rule, and dismissed this case.  (The Court also

determined that it need not reach the issue of whether the Notice and Comment provisions of the

APA were violated in the promulgation of the Interim Final Rule at issue, accordingly denying as

moot [55] Plaintiffs' Motion for Summary Judgment on Claim One; [58] Defendant-Intervenors'

Cross-Motion for Summary Judgment on Claim One of Plaintiffs' First Amended Complaint;

and Defendants' [60] Motion for Summary Judgment on Claim One and Defendants' Motion to

Dismiss, or Alternatively for Summary Judgment on this Claim.)

On April 2, 2007, Cavel, which operates in DeKalb, Illinois, filed an [69] Emergency

Motion for a Stay of the Court's March 28, 2007 Order.  The Court notes that the other two

Intervenors–Beltex Corporation and Dallas Crown, Inc.–did not join Cavel in filing its

Emergency Motion.  On April 3, 2007, the Federal Defendants indicated that while they

"support[ed]" Cavel's motion, they would "not file a brief as the Federal Defendants' previous

filings comprehensively present the Federal Defendants' position."  *See dkt. entry* April 3, 2007.

On April 6, 2007, Plaintiffs filed an Opposition.  Cavel indicated that it will not file a Reply.  *See*

*dkt. entry* [71] at 1.  Accordingly, Cavel's motion is now ripe for adjudication.

## II:  LEGAL STANDARD

The following factors are to be considered when determining whether a stay pending

appeal is warranted:

> (1) the likelihood that the party seeking the stay will prevail on the merits of the
> appeal; (2) the likelihood that the moving party will be irreparably harmed absent
> a stay; (3) the prospect that others will be harmed if the court grants the stay; and
> (4) the public interest in granting the stay.  To justify the granting of a stay, a
> movant need not always establish a high probability of success on the merits.
> Probability of success is inversely proportional to the degree of irreparable injury
> evidenced.  A stay may be granted with either a high probability of success and
> some injury, or *vice versa*.

*Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (internal

citation omitted); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843

(D.C. Cir. 1977); *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C.

Cir. 1958).

Importantly, it is "the movant's obligation to justify the court's exercise of such an

extraordinary remedy."  *Cuomo*, 772 F.2d at 978; *see also Twelve John Does v. District of*

*Columbia*, Civ. No. 80–2136, 1988 WL 90106 at *1 (D.D.C. Aug. 4, 1988) ("An indefinite stay

pending appeal is an extraordinary remedy, and is to be granted only after careful deliberation has

persuaded the Court of the necessity of the relief.") (citing *Va. Petroleum Jobbers*, 259 F.2d at

925).  "This Circuit has recently reiterated that a moving party must satisfy 'stringent standards

required for a stay pending appeal.'" *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*,
230 F. Supp. 2d 12, 14 (D.D.C. 2002) (quoting *Summers v. Howard Univ.*, Civ. No. 02-7069,
2002 WL 31269623 (D.C. Cir. Oct. 10, 2002)).  Where a moving party fails to establish a
substantial case on the merits, and further fails to "demonstrate that the balance of equities or the
public interest strongly favor the granting of a stay," a motion for stay is properly denied.
*Cuomo*, 772 F.2d at 978.  In the instant case, Cavel has not satisfied the "stringent standards
required for a stay pending appeal," as the Court will discuss below.

### III.  DISCUSSION

*A.      Cavel has not demonstrated a likelihood of success on the merits*

"The first, and most important, hurdle which the petitione[r for a stay] must overcome is
the requirement that [it] present a strong likelihood of prevailing on the merits of [its] appeal."
*Am. Cetacean Soc'y v. Baldrige,* 604 F. Supp. 1411, 1414 (D.D.C. 1985).  *See also Shays v.
FEC*, 340 F. Supp. 2d 39, 45 (D.D.C. 2004), *aff'd*, 414 F.3d 76 (D.C. Cir. 2005).  "Without such
a substantial indication of probable success, there would be no justification for the Court's
intrusion into the ordinary processes of administration and judicial review."  *Va. Petroleum
Jobbers,* 259 F.2d at 925.  "Even should the petitioner show irreparable harm would result
without the imposition of [a] stay, if the requirement of a strong likelihood of success is not met,
the petition will be denied."  *Am. Cetacean Soc'y*, 604 F. Supp. at 1414 (citing *Blankenship v.
Boyle,* 447 F.2d 1280 (D.C. Cir. 1971)).  This does not mean that the applicant's chances of
success on appeal must appear as a "mathematical probability," but that the trial court, in the
exercise of its discretion, must weigh the probability of success on appeal in a "balance of
equities" with the three other factors.  *Holiday Tours,* 559 F.2d at 844.

Cavel argues that it has a substantial likelihood of prevailing on the merits of its appeal based on three grounds, which the Court will address in turn:[2]

(1) Cavel argues that the Court "failed to give 'controlling weight' to FSIS's interpretation of its own categorical exclusion regulations and appropriate deference to FSIS's determination of no 'extraordinary circumstances[.]'" Cavel's Mem. to Stay Order at 16-19. However, the Court dealt at length with this argument in the Court's [68] Memorandum Opinion, and hereby incorporates its reasoning therein as set forth below:

> An agency cannot invoke a categorical exclusion for the first time in legal briefings when no such invocation exists in the record. *See Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142 (D.D.C. 1993) ("Dispositive here, however, is the virtual admission of counsel for the defendant that neither defendant nor any authorized subordinate made any contemporaneous determination as to whether the study falls within or without a categorical exclusion under 7 C.F.R. § 1b.3, or that either an EIS or an EA (one or the other of which is required in the absence of a categorical exclusion) should be prepared. Invocation of the categorical exclusion for the first time by counsel after the complaint was filed in this case appears to be a *post hoc* rationalization, and is inadequate as a basis for review."). "Although the Court of Appeals has not addressed this particular issue, both judges of this Court that have considered the issue have found that a post hoc invocation of a categorical exclusion during litigation cannot justify a failure to prepare an EA or EIS. *See Anacostia Watershed Soc'y v. Babbitt,* 871 F. Supp. 475, 481 (D.D.C. 1994); *Fund for Animals v. Espy,* 814 F. Supp. 142, 149-51 (D.D.C. 1993)." *Edmonds Inst. v. Babbitt*, 42 F. Supp. 2d 1, 18 (D.D.C. 1999). While Defendants in this case relied in their legal filings on the categorical exclusion of FSIS as an agency as set forth in 7 C.F.R. § 1b.4, rather than the action-based categorical exclusions set forth in 7 C.F.R. § 1b.3, Defendants have pointed to no case law suggesting that FSIS is exempted from contemporaneously invoking its categorical exclusion with respect to each action it undertakes in light of the "extraordinary circumstances" caveat in 7 C.F.R. § 1b.4 itself. *See* Pls.' Mem. for Summ. J. at 34. However, the Court need not reach the issue of precisely what process is required of FSIS pursuant to 7 C.F.R. § 1b.4. *Cf. California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) ("In many instances, a brief statement that a categorical exclusion is being invoked will suffice."). What is clear is

---

[2] Cavel also states that the Court's ruling "essentially imposes new and additional documentation preconditions upon USDA's categorical exclusions . . . ." Cavel's Mem. to Stay Order at 15. However, in its Memorandum Opinion, the Court explicitly stated that "[i]t need not reach the issue of precisely what process is required of FSIS." [68] Mem. Op. at 40.

that in this case, Defendants' failure to give any consideration as to whether or not the Interim Final Rule invoked "extraordinary circumstances" such that it "may have a significant environmental effect," violated 7 C.F.R. § 1b.4 and NEPA's implementing regulations. Concretely, 7 C.F.R. § 1b.4 does not permit FSIS to avoid any consideration of whether extraordinary circumstances apply, and Defendants' interpretation to this effect is arbitrary and capricious.

Pursuant to USDA regulations, "[a]ctions of [the FSIS] are categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect." 7 C.F.R. § 1b.4. However, this regulation does not exist in a vacuum. It is qualified by another USDA regulation–7 C.F.R. § 1b.3(c)–as follows: "[n]otwithstanding the exclusions listed in paragraphs (a) of this section and § 1b.4, or identified in agency procedures, agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action. Agencies *shall continue to scrutinize their activities* to determine continued eligibility for categorical exclusion." 7 C.F.R. § 1b.3(c) (emphasis added). Defendants' interpretation of 7 C.F.R. § 1b.4 would exempt the FSIS from any duty to scrutinize its activities in violation of 7 C.F.R. § 1b.3(c).

Furthermore, pursuant to 7 C.F.R. § 1b.2, "[e]ach USDA agency is responsible for compliance with this part, the regulations of CEQ, and NEPA." 7 C.F.R. § 1b.2(b). CEQ regulations require that "[a]ny procedures [invoked by an agency] under this [categorical exclusion] section *shall provide for extraordinary circumstances* in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4 (emphasis added). Defendants' interpretation of 7 C.F.R. § 1b.4 as having required only a determination over twenty years ago that all "FSIS activities have no significant environmental impact," see Defs.' Reply at 5, belies any compliance with FSIS's obligation to "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect."

Ultimately, the Court agrees that "any notion that USDA may avoid NEPA review simply by <u>failing</u> even to consider whether a normally excluded action may have a significant environmental impact flies in the face of the CEQ regulations," Pls.' Mem. for Summ. J. at 36, as well as USDA's own NEPA regulations.

[68] Mem. Op. at 39-41. While Cavel argues that the Interim Final Rule was categorically

excluded from NEPA review pursuant to both 7 C.F.R. § 1b.3 and 7 C.F.R. § 1b.4, see Cavel's

Mem. to Stay Order at 17-18, Cavel ignores Federal Defendants' failure to invoke either

exclusion in the record with respect to the promulgation of the Interim Final Rule. While Cavel

further argues that "the district court decisions followed by this Court in support of its March 28,

2007 summary judgment ruling involved substantial questions concerning whether or not the

agency action at issue fell within the scope of the agency's categorical exclusion or else a

complete lack of any reference to the exclusion in the record," Cavel's Mem. to Stay Order at 18

n.10, Cavel cannot differentiate the instant case via its legally and factually unsupported

argument that "the comprehensive breadth of the FSIS's categorical exclusion under 7 C.F.R. §

1b.4 " somehow exempts Defendants from actually invoking a categorical exclusion.  *See*

Cavel's Mem. to Stay Order at 21-22.  Cavel's reliance on *Back Country Horsemen of America v.*

*Johanns* for this argument is misplaced, as the court therein acknowledged that "the [USDA]

does not argue that NEPA does not apply to actions undertaken by the Forest Service," whereas

the Federal Defendants make precisely that argument in this case.  *Back Country Horsemen of*

*Am. v. Johanns*, 424 F. Supp. 2d 89, 98 (D.D.C. 2006).  *See also Int'l Ctr. for Tech. Assessment*

*v. Johanns*, 473 F. Supp. 2d 9 (D.D.C. 2007) ("Even where [the agency] has determined that an

action falls under one of the enumerated exemptions, it must nonetheless determine whether an

*exception* to the exemptions applies.").

> (2) Cavel further argues that "FSIS did in fact determine that there were no 'extraordinary

circumstances' in which the Interim Final Rule 'may have a significant environmental impact,'

and this was clearly reflected in the Administrative Record[.]"  Cavel's Mem. to Stay Order at

16, 19-22.  Again, the Court squarely dealt with this issue, briefed by all of the Parties, in its [68]

Memorandum Opinion, and hereby incorporates its reasoning therein as set forth below:

> The administrative record does not contradict Plaintiffs' assessment that "there is
> no evidence whatsoever that the 'agency head'–or any USDA official–even <u>contemplated</u>
> whether the rule 'may have a significant environmental effect' that should be considered
> in an EA or EIS, 7 C.F.R. § 1b.4, let alone made an affirmative contemporaneous
> determination that this exception to the general categorical exclusion for all FSIS
> programs should <u>not</u> apply here."  Pls.' Mem. for Summ. J. at 32-33.  *See also id.* at 36

("[T]he Record contains no hint that USDA ever even considered whether the 'extraordinary circumstances' criteria applied to its decision.").

Initially, Defendant-Intervenors' attempted to interpret the Administrative Record as including documentation of Defendants' active invocation of the categorical exclusion via its Regulatory Review Workplan. *See* Def-Intervs.' Opp'n at 2. Specifically, Defendant-Intervenors expressed their interpretation of USDA-FSIS Regulatory Review Workplan #05-007 (Nov. 23, 2005), A.R. at 202-206, as follows:

> [T]wo documents in the Administrative Record–FSIS Directive No. 1232.4 and FSIS Regulatory Review Workplan No. 05-007–[] conclusively demonstrate that the FSIS considers the applicability of NEPA in *every* rulemaking action, including its promulgation of the Interim Final Rule. <u>See</u> FSIS Directive 1232.4, "Regulations Development and Clearance (Nov. 20, 2001) ("FSIS Directive," AR 0192-AR0201), at pp. 9-10 (AR0200-0201); USDA-FSIS Regulatory Review Workplan #05-007 (Nov. 23, 2005) ("Workplan," AR0202-0206). Moreover, the Administrative Record readily confirms that the FSIS specifically determined that further NEPA review was not required in conjunction with the agency's promulgation of the Interim Final Rule. <u>See</u> Workplan at p. 4 (AR0205).

Def-Intervs.' Opp'n at 5. Furthermore, Defendant-Intervenors argued that "[t]he Regulatory Review Workplan provides a specific mechanism by which the FSIS indicates for each rulemaking action whether an 'Environmental Impact Assessment' is required under NEPA. If further review is required, the agency checks a corresponding box in the "Required Analysis" section to indicate such an affirmative determination. Here, the box is notably unchecked. The FSIS agency head and USDA Under/Assistant Secretary confirmed the determination that no further NEPA analysis was required by approving the Regulatory Review Workplan without comment." Def-Intervs.' Opp'n at 12 (internal citations omitted). *See also* Def-Intervs.' Mem. for Summ. J. at 3-4.

However, Defendant-Intervenors' theory about what the Regulatory Review Workplan actually demonstrates is belied both by Federal Defendants' deafening silence with respect to this assessment as well as Defendant-Intervenors' eliminating this argument in their Reply. Notwithstanding Defendants' statement that "[c]onsistent with 7 C.F.R. § 1b.4 and FSIS's regulatory clearance directive, 'Environmental Impact Assessment' is not checked on the Workplan for the Interim Final Rule at issue thus indicating that neither an EA nor its EIS is required," Defs.' Mem. for Summ. J. at 11-12, it is clear, both from Defendants' legal position and statements that the box remained empty as a product of a wholesale approach to exclusion by FSIS, that neither the Secretary nor any proxy thereto every considered whether or not an "Environmental Impact Assessment" would be appropriate with respect to the Interim Final Rule. *See* Defs.' Mem. for Summ. J. at 12 ("Requiring the USDA to take any additional steps absent a finding of a significant environmental impact by the agency head would be redundant and superfluous . . . .").

> In Plaintiffs' Motion for Summary Judgment, Plaintiffs state that the
> Administrative Record submitted by Defendants "contained no NEPA documentation in
> connection with the rule or petition, nor any indication that any USDA official had ever
> given any consideration to whether an EIS or EA should be prepared." Pls.' Mem. for
> Summ. J. at 13.  Defendants do not refute this.  Accordingly, for the legal reasons set
> forth in Section III(B)(2) of this Opinion, and based on the factual findings above that
> FSIS never environmentally assessed the Interim Final Rule in any manner whatsoever,
> the Court concludes that Defendants have violated NEPA and its implementing
> regulations.

[68] Mem. Op. at 42-44.  Despite Cavel's already-negated argument that "the agency head made .

. . a _negative_ determination concerning the need for an 'Environmental Impact Assessment' by

leaving its box unchecked and then signing the Workplan," Cavel's Mem. to Stay Order at 20,

the record and Federal Defendants' lack of support for this theory more than clarify that Cavel's

interpretation of the Workplan is wrong.  *See* Pls.' Opp'n to Cavel's Mot. to Stay Order at 11-12.

(3) Finally, Cavel argues that "Plaintiffs utterly failed to meet their burden of proving that

the Interim Final Rule 'may have a significant environmental impact' sufficient to support a

determination that FSIS's determination of no 'extraordinary circumstances' was arbitrary and

capricious." Cavel's Mem. to Stay Order at 16, 22-25.  However, Cavel's argument assumes that

Defendants actually made a finding of no extraordinary circumstances,[3] which as painstakingly

detailed in the Court's March 28, 2007 [68] Memorandum Opinion as well as the section above,

never occurred.  Accordingly, Plaintiffs do not shoulder the burden of proving that Defendants

should have determined that extraordinary circumstances existed when it is clear from the record

---

[3] Cavel frames its argument making said incorrect assumption: "As noted above, by completing and signing the Regulatory Review Workplan, FSIS's agency head determined that there were no 'extraordinary circumstances' that 'may have a significant environmental effect' in connection with the Interim Final Rule.  In order to prevail on their NEPA claim, Plaintiffs are required to prove that *this no extraordinary circumstances determination* was 'arbitrary and capricious,' a highly deferential standard of review." Cavel's Mem. to Stay Order at 22-23 (emphasis added).

(and Federal Defendants' failure to support Cavel's interpretation thereof) that no environmental consideration of any kind was undertaken with respect to the Interim Final Rule. While the Court could ostensibly make a preliminary finding of significant environmental impact[4] based on the numerous unrefuted statements and declarations proffered by Plaintiffs, see [39] Pls.' Mem. for Summ. J. at 18-23; Pls.' Opp'n to Cavel's Mot. to Stay Order at 14-15, it would be inappropriate for the Court to do so at this juncture, as FSIS never assessed the environmental effects of the Interim Final Rule in the first instance.

In sum, Cavel has not demonstrated a likelihood, let alone a substantial likelihood, of success on the merits in its request for a stay of the Court's March 28, 2007 Order.

B.    *Cavel has not demonstrated that it will suffer irreparable harm in the absence of a stay*

"Under this Circuit's precedent, the harms to each party are tested for 'substantiality, likelihood of occurrence, and adequacy of proof.'" *Judicial Watch*, 230 F. Supp. 2d at 15 (quoting *Cuomo*, 772 F.2d at 976-77). As the D.C. Circuit has outlined, the moving party must establish (1) that "the injury must be both certain and great; it must be actual and not theoretical," *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); (2) that "'[t]he injury complained of [is] of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm,'" *Id.* (quoting *Ashland Oil, Inc. v. Fed. Trade Comm'n*, 409 F. Supp. 297, 307 (D.D.C. 1976), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976)) (emphasis in original); and (3) substantial unrecoverable economic harm, given the fact that "economic loss does not, in and of itself, constitute irreparable harm"; rather, "'[t]he possibility that adequate

---

    [4] *See, e.g.,* 40 C.F.R. § 1508.27(a), (b)(2), and (b)(4).

compensatory or other corrective relief will be available at a later date . . . weighs heavily against

a claim of irreparable harm,'" *id.* (quoting *Va. Petroleum Jobbers*, 259 F. 2d at 925).

At the outset, the Court rejects Cavel's reliance on the Court's March 14, 2006 [22]

Memorandum Opinion on Plaintiffs' Motion for a Preliminary Injunction as the basis for its

irreparable harm argument or other arguments, see, *e.g.*, Def.'s Mem. for Stay at 7, 11, 12, as the

Court clearly indicated in that Opinion that insurmountable gaps in the information before it

precluded any definitive assessment on the merits of Claim Three at that time.  The Court fully

and finally (as opposed to preliminarily) addressed Plaintiffs' Claim Three in its recent March

28, 2007 [67] Order and [68] Memorandum Opinion, concluding that Defendants violated NEPA

in promulgating the Interim Final Rule.

Cavel argues that the harm it suffers is certain and great because "[t]he March 28 Order

forced Cavel to cease its operations immediately upon issuance of the Order[,]" threatening

Cavel's business:

> Cavel suffers not a mere economic or monetary loss for which it can be easily
> compensated.  The company operates a multi-million dollar facility,[5] which is profitable
> but also expensive to maintain, particularly when the company has been forced to shut
> down.  Moreover, long-standing Cavel customers in Europe . . . will now turn to other
> North American suppliers for their meat.  It will be very difficult . . . for Cavel to ever
> regain its customers from its Canadian competitors.  Likewise, Cavel will lose long-term,
> qualified employees . . . .
>
> Finally, Cavel has no other avenue to even temporarily ensure the continued
> operation of the slaughterhouse or employment of its workers.

Cavel's Mem. to Stay Order at 8-9 (internal citations omitted).  Cavel relies on *Holiday Tours*

---

[5]  According to the Declaration of Jennifer L. Fearing, Chief Economist for Plaintiff The
Humane Society, the most recent assessed value of the property is less than $400,000.  *See* Pls.'
Opp'n to Cavel's Mot. to Stay Order, Ex. 2 ¶ 10 & Attach. G (Fearing Decl.).

and *Wisconsin Gas Co.* for its argument that "[c]essation of a business is clearly an 'irreparable harm.'" *Id.* at 8 (citing *Wisconsin Gas. Co.*, 758 F.2d at 674; *Holiday Tours*, 559 F.2d at 843 n.2).[6]

However, "[i]t is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co.*, 758 F.2d at 674. "The key word in this consideration is *irreparable*," and "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Id.* (internal quotation omitted). *See also Holiday Tours*, 559 F.2d at 843. As Plaintiffs point out:

> Cavel cannot meet the irreparable harm standard because, among other issues, it has not established that the Court's order threatens the "very existence" of its business. <u>Wisconsin Gas Co.</u>, 758 F.2d at 674. Neither of the declarations filed by Cavel even <u>allege</u>, much less prove, that Cavel will go out of business, or cease to exist, if Cavel cannot operate its plant during the pendency of the appeal, or during the USDA's compliance with NEPA. At most, Cavel's declarations identify potential economic losses from temporary cessation of the DeKalb plant's operations . . . which is <u>per se</u> inadequate to establish irreparable harm under Circuit precedent.

---

[6] While Cavel attempts to argue on behalf of third parties–including specifically, its "fifty production workers"–in the context of irreparable harm, Cavel does not demonstrate why such interests would be appropriately considered by the Court in assessing the irreparable harm to Cavel as required under this prong of the Court's analysis. Cavel's Mem. to Stay Order at 9. *See Va. Petroleum Jobbers*, 259 F.2d at 926-27 ("The question of harm to others if a stay were granted is not really before us. Except insofar as it may reflect on the public interest in saving taxpayers and consumers needless expense, we do not think petitioner has standing to complain of potential losses or inconvenience to the other parties in this case."). Neither does Cavel assert standing to argue on behalf of "[c]olleges and universities [that] will no longer benefit from other horse byproducts to conduct research and educate students." Cavel's Mem. to Stay Order at 10. To the extent that these arguments would more appropriately factor into the Court's assessment of whether a stay would be in the public interest, the Court concludes that the alleged harms stated above are 1) unsupported by declarations from even one production worker or any college or university allegedly harmed, and 2) are outweighed by the public's interest in the promulgation of regulations that comply with federal law. Neither does Cavel's tax contribution support a finding of significant harm to the DeKalb community in the event of its closure. *See* Pls.' Opp'n to Cavel's Mot. to Stay Order at 27.

Pls.' Opp'n to Cavel's Mot. to Stay Order at 18.  In fact, Cavel previously ceased all operations

for a period of two years due to a fire and managed to resume operations.  *Id.* at 19; Cavel's Mot.

to Stay Order, Ex. 1 ¶ 9 (Declaration of Luc Van Damme, President of Cavel International, Inc.).

Furthermore, Cavel is a subsidiary of a larger corporate entity, Velda NV, and Cavel has made no

claim that a closure of its plant will threaten this entity as a whole.  Pls.' Opp'n to Cavel's Mot.

to Stay Order at 19, Ex. 2 ¶ 4 (Fearing Decl.).  *See Sandoz, Inc. v. Food & Drug Admin.*, 439 F.

Supp. 2d 26, 32 (D.D.C. 2006).  Cavel has not established that its losses are great relative to the

size of the business.  *See Lightfoot v. District of Columbia*, Civ. No. 01-1484, 2006 WL 175222

at *7, 8 (D.D.C. Jan. 24, 2006).  Additionally, many of the "losses" alleged by Cavel can in fact

be mitigated, for example, by the sale of supplies and/or the termination of rent payments (as the

owner of the facility is Cavel President Van Damme himself).  Pls.' Opp'n to Cavel's Mot. to

Stay Order at 19, Ex. 2 ¶ 10 (Fearing Decl.); Cavel's Mot. to Stay Order, Ex. 2 ¶¶ 12, 13

(Declaration of James Tucker, General Manager of Cavel International, Inc.).  Finally, the loss of

"$2 million" in gross sales and supposed "extreme difficulty" regaining customers in the future

alleged by Mr. Van Damme, see Van Damme Decl. ¶¶ 8, 10, are respectively insufficient (in light

of mitigating measures that can be taken and the reach of Cavel's parent company) and

speculative.  *See Lightfoot*, 2006 WL 175222 at *8 ("relatively modest losses are insufficient to

meet the standards required for 'irreparable injury'"); *Bristol-Myers Squibb Co. v. Shalala*, 923

F. Supp. 212, 220-21 (D.D.C. 1996) (finding no irreparable harm where movant would lose $80

million dollars, less than 1% of its total sales); *Mylan Pharma., Inc. v. Shalala*, 81 F. Supp. 2d

30, 42-43 (D.D.C. 2000) ("Courts within this Circuit have generally been hesitant to award

injunctive relief based on assertions about lost opportunities and market share.").  In sum, Cavel

has not demonstrated irreparable injury warranting a stay of the Court's March 28, 2007 Order.

      *C.*     *Harm to Plaintiffs*

      As with irreparable harm to the movant, harms to other parties interested in this action are tested for "substantiality, likelihood of occurrence, and adequacy of proof." *Judicial Watch,* 230 F. Supp. 2d at 15 (quoting *Cuomo,* 772 F.2d at 976, 977). "Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents." *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.,* 501 F.2d 917, 924 (3d Cir. 1974) (quoting *Va. Petroleum Jobbers,* 259 F.2d at 925).

      Cavel argues that Plaintiffs will not be harmed by a stay of the Court's Order because "any potential harm to Plaintiffs is merely theoretical." Cavel's Mem. to Stay Order at 10. Cavel defines Plaintiffs' alleged injuries as 1) "caused by the USDA's failure to comply with the APA and NEPA, which has allegedly affected the animal advocacy organizations' ability to engage in education, legislative, and advocacy activities," and 2) individual Plaintiffs' aesthetic injuries. *Id.* at 10. Cavel argues that because it will ostensibly prevail on the merits of its NEPA claim on appeal and because the alleged harms to individual Plaintiffs cannot be "irreparable" because of Cavel's duty to comply with environmental, sanitary and animal protection laws, the Court should discount such alleged harms to Plaintiffs. *Id.* at 10-11.

      The Court has already rejected the first of Cavel's arguments (that it will allegedly prevail on the merits) in Section III(A) of this Opinion, but notes nonetheless that Cavel's argument does not address any actual *harm* to Plaintiffs. As to Cavel's second argument, even assuming *arguendo* that Cavel had actually complied with environmental, sanitary, and protection laws as

it alleges, such compliance would not belie the environmental and aesthetic harms alleged by

individual Plaintiffs as attached to the Amended Complaint and reiterated in attachments to

Plaintiff's Opposition to Cavel's Emergency Motion to Stay the Court's March 28, 2007 Order.

*See generally* Pls.' Opp'n to Cavel's Mot. to Stay Order, Exs. 1, 3, 4, 6, 7, 8. "Environmental

injury, by its nature, can seldom be adequately remedied by money damages and is often

permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*,

480 U.S. 531, 545, 107 S. Ct. 1396, 1404, 94 L. Ed. 2d 542 (1987).

> D.     *The Public Interest does not favor a stay of the Court's Order requiring a federal*
> *agency to comply with NEPA*

"The public interest is a uniquely important consideration in evaluating a request for

[interim relief]." *Am. Cetacean Soc'y,* 604 F. Supp. at 1416 (quoting *Nat'l Ass'n of*

*Farmworkers Orgs. v. Marshall,* 628 F.2d 604, 616 (D.C. Cir. 1980)).  In its March 28, 2007

Memorandum Opinion, in considering whether the Court should vacate the Interim Final Rule or

allow it to remain in place on remand to the agency, the Court noted:

> Pursuant to the case law in this Circuit, vacating a rule or action promulgated in
> violation of NEPA is the standard remedy.  *See Am. Bioscience, Inc. v. Thompson*, 269
> F.3d 1077, 1084 (D.C. Cir. 2001) ("If an appellant has standing-which is undeniable here-
> and prevails on its APA claim, it is entitled to relief under that statute, which normally
> will be a vacatur of the agency's order").  *See also Greater Yellowstone Coal. v.*
> *Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) ("As a general matter, an agency
> action that violates the APA must be set aside.  As this Circuit explained in *American*
> *Bioscience, Inc. v. Thompson,* 269 F.3d 1077 (D.C. Cir. 2001), if a plaintiff 'prevails on
> its APA claim, it is entitled to relief under that statute, which normally will be a vacatur
> of the agency's order.' *Id.* at 1084.  Based on this authority, I shall vacate the permit,
> with the understanding that the Service can reissue another permit if and when the NEPA
> record of decision so allows."); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145
> F.3d 1399, 1409 (D.C. Cir. 1998) ("We have made clear that when a reviewing court
> determines that agency regulations are unlawful, the ordinary result is that the rules are
> vacated . . . ." (internal quotation omitted)).
> ...

Neither Defendants nor Defendant-Intervenors have pointed to either a compelling reason, environmental or otherwise, to leave the Interim Final Rule in place pending NEPA review, nor that doing so would preserve NEPA-contemplated opportunities for FSIS. . . .  Accordingly, the Court shall vacate the Interim Final Rule, which was promulgated in violation of NEPA-mandated procedures and in violation of the law.

[68] Mem. Op. at 46-48.

The effect of the Court's Order is to vacate an illegally promulgated agency rule.  *See FCC v. Nextwave Personal Commc'ns*, 537 U.S. 293, 300, 123 S. Ct. 832, 154 L. Ed. 2d 863 (2003) (The APA "requires federal courts to set aside federal agency action that is 'not in accordance with law,' . . . which means of course *any* law . . . .");  *Nev. v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006) ("The APA requires that we set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (internal citation omitted)).  Cavel, on the other hand, has not demonstrated why a stay of this Order would be in the public interest.  The Court has already addressed Cavel's argument that the public interest would favor a stay which in turn would save the jobs of Cavel's employees, none of whom has provided a supporting affidavit or declaration on his or her own behalf.  *See infra* at 17 n.6.  Cavel's other two arguments fare no better.  Cavel argues that "the public has an interest in federal agencies' enforcement of Congressional will[,]" and that "the conference report accompanying the Appropriations Act explained that '[i]t is the understanding of the conferees that the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and exported).'"  Cavel's Mem. to Stay Order at 25-26.  For Cavel, who has throughout the course of this litigation argued that the FY 2006 Amendment "effects only a change in the source of funding for the ante-mortem inspection of horses conducted by the FSIS," [38] Def.-Intervs' Mem. to Dismiss or for Summ J. at 4, to argue

21

that the Court should infer that this section of the conference report for an appropriations bill *eliminating funding* for inspection services actually evinces an intention to *provide* such services presses the boundaries of good faith. Second, Cavel's statement that "this is not a case where the agency regulating Defendant-Intervenor's operations or any court has ruled that 'the service performed by [Cavel] is contrary to the public interest[,]" Cavel's Mem. for Stay at 26, is unpersuasive, as Cavel cannot argue that continuity of its operations is in the public interest by stating that such continuity would not be *against* the public interest.

The Court finds that a stay of its March 28, 2007 Order would not be in the public interest, and particularly in light of Cavel's failure to demonstrate a likelihood of success on the merits and adequately demonstrate irreparable injury, the Court finds that a balancing of the factors enumerated above supports denying Cavel's request for a stay.

### IV. CONCLUSION

Based on the aforementioned reasoning, the Court shall DENY Defendant-Intervenor Cavel's [69] Emergency Motion for a Stay of the Court's March 28, 2007 Order. An Order accompanies this Memorandum Opinion.


Date:   April 13, 2007


                                                    _/s/_____
                                                    COLLEEN KOLLAR-KOTELLY
                                                    United States District Judge


22