UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY
OF THE UNITED STATES, *et al*.,

    Plaintiffs,

      v.

MIKE JOHANNS, *et al*.,

    Defendants.

Civil Action No. 06–265 (CKK)

**MEMORANDUM OPINION**
(March 28, 2007)

Two claims remain in the instant action, found in Claim I and Claim III of Plaintiffs'
Amended Complaint.  In Claim III, Plaintiffs allege that, "by creating a fee-for-service ante-
mortem horse slaughter inspection system without first conducting any environmental review
under the National Environmental Policy Act [(NEPA)], 42 U.S.C. § 4321, *et seq.*, [United States
Department of Agriculture (USDA)] has violated NEPA and the [Council on Environmental
Quality's (CEQ's)] implementing regulations, abused its discretion, and acted arbitrarily and
capriciously in violation of the Administrative Procedure Act [(APA)], 5 U.S.C. § 706(2)."  Am.
Compl. ¶ 98.  The Parties, including Defendant-Intervenors, filed cross-dispositive motions as to
Claim III after the Court, on March 14, 2006, denied [4] Plaintiffs' Motion for a Temporary
Restraining Order and for a Preliminary Injunction.  Presently before the Court with respect to
Claim III are [37] Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment; [38,
40] Defendant-Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment on
Claim Three of Plaintiffs' First Amended Complaint; and [39] Plaintiffs' Motion for Summary

Judgment.  All three Motions have been fully briefed.

In Claim I of Plaintiffs' Amended Complaint, Plaintiffs allege that "[b]y creating a fee-for-service ante-mortem horse slaughter inspection system without providing advance public notice and an advance opportunity to comment, USDA has violated the Administrative Procedure Act, 5 U.S.C. § 553."  Am. Compl. ¶ 94.  The Parties filed cross-dispositive motions with respect to this claim after the Court issued its Order and Memorandum Opinion on August 28, 2006, which reinstated Claim One.  Presently before the Court with respect to Claim One are [55] Plaintiffs' Motion for Summary Judgment on Claim One; [58] Defendant-Intervenors' Cross-Motion for Summary Judgment on Claim One of Plaintiffs' First Amended Complaint; and Defendants' [60] Motion for Summary Judgment on Claim One and Defendants' Motion to Dismiss, or Alternatively for Summary Judgment on this Claim.  All three Motions have been fully briefed.

Based on the aforementioned filings, the history of the case, the administrative record, and the relevant statutes and case law, the Court shall grant [39] Plaintiffs' Motion for Summary Judgment, and shall deny both [37] Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, and [38, 40] Defendant-Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment on Claim Three of Plaintiffs' First Amended Complaint. Based on the Court's finding of a NEPA violation, the Court shall declare the Interim Final Rule to be in violation of the APA and NEPA, vacate the Interim Final Rule, and permanently enjoin the Food Safety and Inspection Service (FSIS) of the USDA from implementing the Interim Final Rule.  Accordingly, the Court need not reach the issue of whether the Notice and Comment provisions of the APA were violated in the promulgation of the Interim Final Rule at issue such

that the Court shall deny as moot [55] Plaintiffs' Motion for Summary Judgment on Claim One;

[58] Defendant-Intervenors' Cross-Motion for Summary Judgment on Claim One of Plaintiffs'

First Amended Complaint; and Defendants' [60] Motion for Summary Judgment on Claim One

and Defendants' Motion to Dismiss, or Alternatively for Summary Judgment on this Claim.

## I: BACKGROUND

A.    *Factual History*[1]

At the time Plaintiffs filed their Complaint, horses were slaughtered at three different

foreign-owned facilities in the United States to provide horse meat for human consumption

abroad and for use in zoos and research facilities domestically.  The instant case pertains to the

web of legislation and regulations pertaining to the inspection of such horses prior to slaughter.

On November 10, 2005, Section 794 of the FY 2006 Agricultural Appropriations Act was

signed into law.  Introduced by members of Congress as an amendment to the FY 2006

Agricultural Appropriations Act, the Amendment provides:

> Effective 120 days after the date of enactment of this Act, none of the funds made available
> in this Act may be used to pay the salaries or expenses of personnel to inspect horses under
> section 3 of the Federal Meat Inspection Act (21 U.S.C. Sec. 603) or under the guidelines
> issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996.

*See* Pub. L. 109-97, § 794, 119 Stat. 2120, 2164 (A.R. 51).  The provision of the Federal Meat

Inspection Act ("FMIA"), 21 U.S.C. § 603, pertaining to the inspection of horses provides:  "For

the purpose of preventing the use in commerce of meat and meat food products which are

adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an

---

[1]  The Court shall repeat the factual predicate, to the extent applicable, as set out in its
March 14, 2006, Memorandum Opinion related to Plaintiff's Motion for Preliminary Injunction.
*See* [22] P.I. Mem. Op. at 2-4.

examination and inspection of all amenable species [including cattle, sheep, swine, goats, horses, mules, and other equines] before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce . . . ." 21 U.S.C. § 603(a). *See also* 21 U.S.C. § 601(w)(1). The provision of section 903 of the Federal Agriculture Improvement and Reform (FAIR) Act of 1996 pertaining to the inspection of horses relates to inspections during the transport of horses, which is not at issue in the instant case. Plaintiffs understand the FY 2006 Amendment to in effect prohibit the slaughter of horses for human consumption. Pls.' Mot. for Prelim. Inj. at 10.

On November 23, 2005, Beltex Corporation, Dallas Crown, Inc., and Cavel International (collectively the "Slaughter Facility Operators") filed a petition for "emergency rulemaking" with the USDA to create a "fee-for-service" inspection program with respect to ante-mortem horse inspections and transportation-related horse inspections. Pls.' Mot. for Prelim. Inj., Ex. 10 (Petition) at 1. On February 8, 2006, FSIS published in the Federal Register an amendment to 9 C.F.R. Pt. 352, "amending the Federal meat inspection regulations to provide for a voluntary fee-for-service program under which official establishments that slaughter horses will be able to apply for and pay for ante-mortem inspection." 71 Fed. Reg. 6337, 6337 (Feb. 8, 2006). The "interim final rule" was given an effective date of March 10, 2006; additionally, FSIS provided a shortened comment period "because it is issuing an interim final rule and finds that it is in the public interest for [FSIS] to receive comments on an expedited basis" before March 10, 2006, the date on which the 2006 Amendment to the Agricultural Appropriations Act would take effect. *Id.* at 6337, 6340. Elaborating on the need for immediate action, FSIS states:

4

> [w]ith the passage of the FY 2006 Appropriations Act, if FSIS does not establish a means for official establishments that slaughter horses to obtain anti-mortem inspection, these establishments will not be able to operate and presumably will be forced out of business. This interim final rule is necessary to avoid disruption of operations at official establishments that slaughter horses.  Therefore, the Administrator has determined that prior notice and opportunity for public comment are impracticable and contrary to the public interest under 5 U.S.C. 553(b), and that there is good cause under 5 U.S.C. 553(d) for making the action effective as specified herein.

*Id.* at 6340.  FSIS further specified that it is "establishing this fee-for-service program under the Agricultural Marketing Act (AMA)."  *Id.* at 6337.

   B.    *Procedural History*

   In Plaintiffs' [3] First Amended Complaint, filed on February 21, 2006, Plaintiffs made three claims for relief.  First, Plaintiffs claimed that the fee-for-service inspection system was created in violation of the APA, 5 U.S.C. § 553, because advance public notice and opportunity to comment was not provided.  Am. Compl. ¶¶ 94, 95.  Second, Plaintiffs claimed that Defendants violated the APA, 5 U.S.C. § 706, principally by acting arbitrarily and capriciously in violation of both the 2006 Agricultural Appropriations Act Amendment and the FMIA.  Am. Compl. ¶¶ 96, 97.  Finally, Plaintiffs claimed that Defendants violated NEPA and its implementing regulations by acting arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706.  Am. Compl. ¶¶ 98, 99.

   Shortly after filing their First Amended Complaint, Plaintiffs filed [4] Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction, and Request for a Hearing ("Motion for Preliminary Injunction") on February 22, 2006.  In their Motion, Plaintiffs reiterated the grounds for relief stated in their First Amended Complaint and furthermore requested that the Court preliminarily enjoin and declare unlawful the fee-for-service ante-

mortem inspection program that would become effective on March 10, 2006 on the grounds that Plaintiffs have demonstrated likelihood of success on the merits, irreparable harm, lack of harm to Defendants, and public interest factors necessary to obtain injunctive relief.  Pls.' Mot. for Prelim. Inj. at 1–2.  On February 24, 2006, Beltex Corporation, Cavel International, Inc., and Dallas Crown, Inc. filed an unopposed [7] Motion to Intervene as of right as Defendants, which was granted by the Court on March 1, 2006.

On March 14, 2006, the Court issued an [21] Order and [22] Memorandum Opinion denying Plaintiffs' request for a preliminary injunction and dismissing Claims One and Two of Plaintiffs' Amended Complaint.  The Court also noted that unclear briefing and incomplete documentation by both sides with respect to Plaintiffs' NEPA claim precluded the Court from making a determination on the merits based on the record before it.  However, the Court held with respect to Plaintiffs' NEPA claim that "while Defendants might well have accurately claimed that the ante-mortem Interim Final Rule at issue would have been categorically excluded from environmental analysis under 7 C.F.R. § 1b.3(a)(2) because the Rule is apparently concerned only with discretionary financial decisions, such a claim cannot be asserted at this time because it is uncontested that Defendants did not consider such an exemption at the time the Interim Final Rule was promulgated."  [22] P.I. Mem. Op. at 23.

Following the Court's March 14, 2006 ruling, the Parties submitted Motions for Summary Judgment with respect to Claim Three of the Amended Complaint.  On May 1, 2006, Defendants filed [37] Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment; Defendant-Intervenors filed [38, 40] Defendant-Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment on Claim Three of Plaintiffs' First Amended Complaint; and

Plaintiffs filed [39] Plaintiffs' Motion for Summary Judgment.  All three motions are fully briefed.

On March 24, 2006, Plaintiffs also filed [23] Plaintiffs' Motion Under Fed. R. Civ. P. 54(b) for Reconsideration of the Court's *Sua Sponte* Dismissal of Claims One and Two or, In the Alternative, for Certification of Those Claims for Immediate Appellate Review, and Request for an Expedited Hearing.  Therein, Plaintiffs asked the Court to reconsider its dismissal of Claims One and Two, which had been made on the Court's finding that Plaintiffs lacked prudential standing to pursue the claims set forth in these two claims.  Pls.' Mot. Reconsider at 1.  Plaintiffs further requested that in the alternative, the Court certify Claims One and Two for immediate appellate review.  *Id.*  Finally, Plaintiffs requested a hearing related to their Motion to Reconsider.  *Id.*

On August 28, 2006, the Court issued an Order and Memorandum Opinion granting Plaintiffs' [23] Motion to Reconsider with respect to the Court's dismissal of Claim One of the Amended Complaint, but denied Plaintiffs' Motion with respect to Claim Two of the Amended Complaint.  Furthermore, the Court denied Plaintiffs' request for certification for immediate appellate review with respect to Claim Two and denied Plaintiffs' request for a hearing as unnecessary and counter to the interests of judicial economy.  The Court also provided a briefing schedule with respect to Claim One, and indicated that the Court would address Plaintiffs' NEPA claim (Claim Three) at the same time it addressed briefing with respect to Claim One.  Following the Court's August 28, 2006 ruling, the Parties (Plaintiffs, Defendants, and Defendant-Intervenors) submitted Motions for Summary Judgment with respect to Claim One, which are now fully briefed.

## II: LEGAL STANDARD

*A.     Rule 12(b)(6)*

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, unlike resolving a motion under Rule 12(b)(1), the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations.  *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged.").  While the court must construe the Complaint in the Plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are unsupported by the facts set out in the complaint."  *Kowal v. MCI Comm'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Moreover, the court is not bound to accept the legal conclusions of the non-moving party.  *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997).  The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record.  *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).  Factual allegations in briefs of memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint.  *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994); *cf. Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834, 840, 133 L. Ed. 2d 773 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint

control).

B.    *Summary Judgment*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S. Ct. 2548.

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52, 106 S. Ct. 2505 (the court must determine "whether the evidence presents a sufficient

9

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative,

summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S. Ct. 2505

(internal citations omitted). "Mere allegations or denials of the adverse party's pleading are not

enough to prevent the issuance of summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46,

49 (D.D.C. 1996). The adverse party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,

475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Instead, while the movant

bears the initial responsibility of identifying those portions of the record that demonstrate the

absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward

with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587, 106 S. Ct. 1348

(citing Fed. R. Civ. P. 56(e)) (emphasis in original).

     C.     *National Environmental Policy Act*

     NEPA, the "basic national charter for protection of the environment," 40 C.F.R. §

1500.1(a), requires that federal agencies take a "hard look" at the environmental consequences of

their projects before taking action. 42 U.S.C. § 4332(C); *Marsh v. Or. Natural Res. Council*, 490

U.S. 360, 374, 109 S. Ct. 1851, 1859, 104 L. Ed. 2d 377 (1989); *Baltimore Gas & Elec. Co. v.*

*Natural Res. Def. Council*, 462 U.S. 87, 97, 103 S. Ct. 2246, 2252, 76 L. Ed. 2d 437 (1983).

     Pursuant to NEPA, an environmental impact statement ("EIS") must be prepared for

"major Federal actions significantly affecting the quality of the human environment . . . ." 42

U.S.C. § 4332(C); *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 371 (D.C. Cir. 1999).

The EIS must include "a detailed statement" regarding:

(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the
proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the
maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be
involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C)(i)-(v). In situations where an EIS is required, the agency is required to

prepare "a concise public record of decision" that describes the factors it considered in making its

decision, and must identify "all alternatives considered by the agency in reaching its decision,

specifying the alternative or alternatives which were considered . . . ." 40 C.F.R. § 1505.2;

*Corridor H*, 166 F.3d at 371. The agency must "identify and discuss all such factors including

any essential considerations of national policy which were balanced by the agency in making its

decision . . . ." *Id.*

However, an EIS may not be required under certain circumstances. First, "[a]n EIS is not

required if the agency makes a determination based on a more limited document, an

'environmental assessment' ("EA") that the proposed action would not have a significant impact

on the environment." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 81 (D.D.C. 2006) (citing 40

C.F.R. §§ 1501.4, 1508.13). "The EA is to be a 'concise public document' that '[b]riefly

provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't*

*of Transp. v. Pub. Citizen,* 541 U.S. 752, 757, 124 S. Ct. 2204, 2210, 159 L. Ed. 2d 60 (2004)

(quoting 40 C.F.R. § 1508.9(a)). "If, pursuant to the EA, an agency determines that an EIS is not

required under applicable CEQ regulations, it must issue a 'finding of no significant impact'

(FONSI), which briefly presents the reasons why the proposed agency action will not have a

significant impact on the human environment." *Id.* at 757-58, 124 S. Ct. 2204 (citing 40 C.F.R.

§§ 1501.4(e), 1508.13).

Second, a "categorical exclusion" may exempt certain agency actions from NEPA review.

A "categorical exclusion" is defined by CEQ regulations as follows:

> a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. . . . Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4. The USDA has issued NEPA regulations that "supplemen[t]," "incorporat[e]," and "adop[t]" the CEQ regulations described herein. 7 C.F.R. § 1b.1(a). Pursuant to 7 C.F.R. § 1b.4, certain USDA agencies and agency units, including FSIS, have been deemed to "conduct programs and activities that have been found to have no individual or cumulative effect on the human environment," and therefore "are excluded from the requirements of preparing procedures to implement NEPA. Actions of USDA agencies and agency units listed in paragraph (b) of this section are categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect." 7 C.F.R. § 1b.4(a). However, "[n]otwithstanding the exclusions listed in . . . § 1b.4, or identified in agency procedures, agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action. Agencies shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion." 7 C.F.R. § 1b.3(c).

NEPA "requires that agencies assess the environmental consequences of federal projects by following certain procedures during the decision-making process." *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 866 (D.C. Cir. 1999). Ultimately, NEPA has twin aims. "First, it places

upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co.*, 462 U.S. at 97, 103 S. Ct. 2246 (internal quotation omitted). "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* Accordingly, NEPA's "mandate is essentially procedural." *City of Alexandria*, 198 F.3d at 866 (internal quotation omitted); *North Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980) (NEPA requirements are essentially procedural and a court should not substitute its own policy judgment for that of the agency). "NEPA merely prohibits uninformed – rather than unwise – agency action." *Robertson v. Methow Valley Citizen's Council*, 490 U.S. 332, 351, 109 S. Ct. 1835, 1846, 104 L. Ed. 2d 351 (1989). Compliance with the procedural requirements themselves, however, is not discretionary and a court may review the decision to forego production of an EIS. *Kleppe v. Sierra Club*, 427 U.S. 390, 406, 96 S. Ct. 2718, 2728, 49 L. Ed. 2d 576 (1976).

Because NEPA provides no private right of action, Plaintiffs' claims have been brought under the APA. *See* 5 U.S.C. § 706(2)(A); *Pub. Citizen*, 541 U.S. at 763, 124 S. Ct. 2204; *Tulare Co. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). As such, "[t]he Court's role in reviewing a challenge to an agency's compliance with NEPA is limited to ensuring 'that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'" *Valley Ctmy. Pres. Comm'n v. Mineta*, 231 F. Supp. 2d 23, 39 (D.D.C. 2002) (quoting *Baltimore Gas & Elec. Co.*, 462 U.S. at 97-98, 103 S. Ct. 2246). "While deferential, a court must thoroughly review an agency's decision and may not 'rubber stamp' decisions that are inconsistent with statutory mandate or congressional policy." *Gov't of the Province of Manitoba v. Norton*, 398 F. Supp. 2d 41, 54 (D.D.C. 2005).

## III. DISCUSSION

While the Parties have appropriately filed Statements of Material Facts Not in Dispute, it

is clear to the Court that at issue is whether Defendants were legally required to undertake some

type of environmental review pursuant to NEPA prior to issuing the Interim Final Rule and that

the underlying facts related thereto are not in dispute.  Plaintiffs, in their Motion for Summary

Judgment, argue specifically that Defendants

> have violated NEPA by promulgating an 'Interim Final Rule' creating new regulations that
> establish a 'fee-for-service' inspection system . . . without preparing either an Environmental
> Impact Statement or an Environmental Assessment, as required by NEPA.  Plaintiffs also
> move for summary judgment on the grounds that defendants unlawfully invoked a
> 'categorical exclusion' under NEPA without explaining their decision to do so in the
> administrative record.

Pls.' Mot. for Summ. J. at 1.

As stated in the Court's March 14, 2006 Memorandum Opinion, Plaintiffs claim – and

Defendants do not contest – that Defendants did not undertake any review pursuant to NEPA, nor

did they prepare any NEPA document addressing the environmental impact associated with their

issuance of the Interim Final Rule.  *See* Pls.' Mot. for Prelim. Inj. at 33-34; Defs.' Opp'n to Pls.'

Mot. for Prelim. Inj. at 26-27 & n.10; Pls.' Reply to Pls.' Mot. for Prelim. Inj. at 21-24.  Rather,

Defendants (and Defendant-Intervenors) argue that Defendants were not required to subject the

Interim Final Rule to review pursuant to NEPA because 1) the Interim Final rule did not

constitute a "major Federal action" triggering NEPA requirements, and 2) the FSIS was

"categorically exempt" from NEPA review requirements such that it was not required to subject

the Interim Final Rule to such review.  *See* Defs.' Opp'n at 3.  The Court shall address these

arguments in turn, as well as Defendants' claim that even assuming *arguendo* that the Interim

Final Rule was subject to review pursuant to NEPA, conflict between NEPA and another federal

statute–specifically, the FMIA–precluded NEPA review.  *See* Defs.' Opp'n at 3.

> A.    *Issuance of the Interim Final Rule is a "Major Federal Action" that requires review pursuant to NEPA*

NEPA applies to "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).  Pursuant to 40 C.F.R. § 1508.18, a "major Federal action" includes "actions with effects that may be major and which are potentially subject to Federal control and responsibility.  Major reinforces but does not have a meaning independent of significantly (§ 1508.27)." 40 C.F.R. § 1508.18.  Accordingly, actions are deemed "major" if they "significantly" affect the environment as defined pursuant to 40 C.F.R. § 1508.27.  Whether an action "significantly" affects the environment involves considerations of both "context" and "intensity." *Id.*  A consideration of context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a).  An evaluation of "intensity," which refers to "the severity of the impact," includes an assessment of the following:

> (2) The degree to which the proposed action affects public health or safety. . . .  (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.  (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks. . . .  (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

*Id.* § 1508.27(b).  "Effects," or impacts, include direct and indirect effects, and include

> ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative.  Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

40 C.F.R. § 1508.8.

Pursuant to 40 C.F.R. § 1508.18, actions include:

> new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

40 C.F.R. § 1508.18(a). Federal actions include the "[a]doption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs"; and "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18(b)(1) & (3).

Neither Defendants nor Defendant-Intervenors refute Plaintiffs' argument that horse slaughter operations have "significantly" impacted the environment within the meaning of NEPA as set forth in 40 C.F.R. § 1508.27. *See Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 218 (D.D.C. 2003) ("courts have found that '[t]he presence of one or more of [the CEQ significance] factors should result in an agency decision to prepare an EIS." (quoting *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1023 (9th Cir. 2003)). However, whether Plaintiffs' assessment of the "significance" of such impacts is correct is not presently subject to review, as it is clear that the related-NEPA analysis was never conducted by the agency in the first instance. Rather, both Defendants and Defendant-Intervenors claim that the Interim Final Rule does not constitute a major Federal action subject to review pursuant to NEPA because 1) Federal control is not

16

implicated, and 2) the Interim Final Rule allegedly perpetuates the status quo. The Court will address these arguments in turn, as well as the key question of whether the impacts of the horse slaughter facilities themselves are sufficiently causally related to the Interim Final Rule such that they can be considered "effects" of the Rule itself.

### 1. The Interim Final Rule is a Major Federal Action

Defendants and Defendant-Intervenors argue that the Interim Final Rule is not a major Federal action subject to NEPA review because the Rule does not implicate Defendants' control over the horse slaughter operations themselves. *See* Defs.' Opp'n at 10 ("In the present case, neither USDA's action in allowing ante-mortem inspection of horses at horse slaughter plants to be funded via a fee-for-service program, nor the ante-mortem inspections themselves, constitute 'a "proposal for major [F]ederal action" subject [to] an environmental document' because neither activity demonstrates 'any significant federal involvement' in the approval and operation of the plants. Save Barton Creek Association, 950 F.2d 1129, 1133-34 (5th Cir. 1992)."); Def-Intervs.' Opp'n at 1 ("The FSIS does not control and is not responsible for the operation of these establishments, and the Interim Final Rule does not otherwise change any regulatory requirements applicable to the operations of these establishments."). Furthermore, Defendant-Intervenors claim that "Plaintiffs do not set forth any facts to suggest that the inspection-related activities conducted by the FSIS at the establishments–whether carried out pursuant to federal funding or the voluntary payment of fees–in and of themselves significantly affect the human environment, which clearly they do not. Instead, the crux of Plaintiffs' summary judgment argument is that the precursor slaughter operations conducted at Defendant-Intervenors' ***privately owned and operated establishments*** allegedly affect the human environment, and 'but for' the

Interim Final Rule, those establishments would be forced to cease operating."  Def-Intervs.'

Opp'n at 6.

  Defendants and Defendant-Intervenors mistakenly focus on "federal control" over non-

federal actions in their filings.  *See* Def-Intervs' Opp'n at 6 ("Actions undertaken by private,

commercial entities are not subject to NEPA.").  However, unlike the numerous cases cited by

Defendants and Defendant-Intervenors,[2] the federal "action" at issue in this case is not a non-

---

  [2] Relevant cases cited by Defendants, distinguished because the potential major Federal action at issue is a non-federal *project* rather than a federal *rule* promulgated by a federal agency, include the following:  *Save Barton Creek Assoc. v. Fed. Highway Admin.*, 950 F.2d 1129, 1130-31, 1134 (5th Cir. 1992), *cert. denied*, 505 U.S. 1220, 112 S. Ct. 3029 (1992) (holding that state-funded highway construction projects were not "major federal actions" that required preparation of an EIS.  "In actuality, no federal funds have been requested or spent, and no federal approvals have been given.  *Id.* at 1135.); *Ringsred v. City of Duluth*, 828 F.2d 1305, 1308 (8th Cir. 1987) ("We [] conclude that the Secretary's actions relating to the parking ramp project were so incidental that the project does not constitute part of a major federal action.  No federal action is a legal condition precedent to the construction of the parking ramp."); *Atlanta Coal. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979) (regional development plan not a "major federal action"); and *Citizens for Responsible Area Growth v. Adams*, 680 F.2d 835, 839 (1st Cir. 1982) ("a project such as this one, which is not itself federally funded nor significantly bound up in a federally funded project, is not "federal.'").  Other cases cited by Defendants pertain to federal agency approval of non-federal programs rather than an independent rule or regulation issued by the agency itself.  *See, e.g., NAACP v. Med. Ctr., Inc.*, 584 F.2d 619, 628-29 (3d Cir. 1978) (federal approval of private non-capital expenditure plan did not constitute a "major federal action").

  Cases relied upon by Defendant-Intervenors also pertain directly to non-federal projects (or the approval thereof) rather than an agency rule or regulation:  *Macht v. Skinner*, 916 F.2d 13, 18 (D.C. Cir. 1990) (action to enjoin construction of state light rail project); *Citizens Alert Regarding the Env't v. EPA*, 259 F. Supp. 2d 9, 13 (D.D.C. 2003) (action to enjoin township construction of sewage pipeline); *Born Free USA v. Norton*, 278 F. Supp. 2d 5, 19 (D.D.C. 2003), *vac'd on other grounds*, 2004 WL 180263 (D.C. Cir. Jan 21, 2004) (approval of permits to non-federal zoos to import African elephants at issue); *Save the Bay, Inc. v. U.S. Army Corps. of Eng'rs*, 610 F.2d 322, 326 (5th Cir. 1980) (grant of pipeline construction permit to nonprofit corporation); *Landmark West! v. U.S. Postal Serv.*, 840 F. Supp. 994, 1005-06 (S.D. N.Y. 1993) (action to halt construction of skyscraper by private developers)*; Sugarloaf Citizens Assoc. v. Fed. Energy Reg. Comm'n*, 959 F.2d 508, 514 (4th Cir. 1992) (certification of small power production facility).  *But see Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 54-56 (D.D.C. 2003) (while plaintiffs challenged the revision of an agency regulation, the court considered

federal program subject to federal funding and/or approval, but rather the agency's promulgation of the Interim Final Rule itself. Defendants and Defendant-Intervenors cannot (and do not) seriously argue that FSIS did not have control over the issuance of its own Rule. Notably, one of the cases cited by Defendants makes light of the distinction between a federal action (such as the Interim Final Rule itself) and the non-federal undertaking (in this case, the horse slaughter facilities) to which it relates: "NEPA review, however, is triggered only by a major Federal action. Therefore, unless the construction itself is pursuant to federal financial assistance, NEPA review may *only* be conducted with regard to the issuance of a discharge permit, which constitutes, of course, the major Federal action." *Natural Res. Def. Council, Inc. v. U.S. Environ. Prot. Agency*, 822 F.2d 104, 128 (D.C. Cir. 1987). In the instant case, the Interim Final Rule has already been issued such that this is the "federal action" undertaken.

This Court's holding that an FDA statement of policy did not constitute a major Federal action in *Alliance of Bio-Integrity v. Shalala* is not to the contrary. *Alliance of Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166 (D.D.C. 2000). In *Bio-Integrity*, the Court did not consider an FDA policy statement creating a rebuttable presumption that foods produced through rDNA technology be declared generally recognized as safe to be a major federal action because 1) this declaration of "presumption" was not a final determination with respect to any particular food; 2) the FDA did not undertake an "overt action" ("In certain cases, agencies may take action by authorizing private action, but in such cases the government still must undertake some overt act, such as issuing a permit or affirming a substance . . . ."); and 3) the Statement of Policy did not

---

whether the private, non-federally funded mining exploration projects addressed by such regulations constituted "major federal action" and found that they did not).

affect the "regulatory status quo." *Id.* at 174-75. While the Court will address the "regulatory status quo" component of the Court's reasoning in the next section of this Opinion, the Court finds that application of the reasoning in *Bio-Integrity* distinguishes the major Federal action at issue in the instant case. In the instant case, the FSIS's promulgation of the Interim Final Rule was not a simple *statement* of policy but rather the *creation* of a required, fee-for-inspection program applicable to all horse slaughter facilities, and is thus both an overt action and has been proven to be a final (rather than a proposed) determination with respect to the manner in which ante-mortem inspections will be conducted by FSIS. The Court notes that neither Defendants nor Defendant-Intervenors ever contest that the Interim Final Rule was not a "final" agency action such that it would be premature to subject it to APA review.

While the promulgation of the Interim Final Rule itself unquestionably constitutes a major Federal action, some environmental effect must be caused by the Interim Final Rule for it to come within the rubric of NEPA. There is a major Federal action subject to NEPA review "whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment." *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1088-89 (D.C. Cir. 1973). *See also NAACP v. Med. Ctr., Inc.*, 584 F.2d 619, 629 n.15 (3d Cir. 1978) ("In each instance cited by Judge Wright in Scientists' Institute, the agency action was one which was an absolute legal condition precedent to the action which would affect the environment.").

Pursuant to CEQ regulations themselves, NEPA review is implicated by both foreseeable direct and indirect impacts:

> Indirect effects [] are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing

20

effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

40 C.F.R. § 1508.8(b). "Indirect impacts need only to be 'reasonably foreseeable' to require an assessment of the environmental impact." *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 41 (D.D.C. 2000). Plaintiffs argue that if reasonably foreseeable environmental impacts would not occur but for the action at issue, the action constitutes a "major Federal action" subject to NEPA. *See Western Land Exch. Project v. U.S. Bureau of Land Mgmt.*, 315 F. Supp. 2d 1068, 1089 (D. Nev. 2004) ("The impacts here are 'caused by the action,' in the most straightforward sense, insofar as they would not occur but for [the action.]"). However, the Supreme Court, in a key 2004 case cited in the Parties' cumulative filings only once (in Plaintiff's Reply brief for an entirely different proposition), held that the appropriate test in determining whether a particular effect was caused by a federal action was not a "but for" inquiry, but rather whether the federal action was the "legally relevant cause" of the effect. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 769, 124 S. Ct. 2204, 2216, 159 L. Ed. 2d 60 (2004). Considering the import of this case to the Court's determination of whether the environmental effects of the horse slaughter operations are effects of the Interim Final Rule for purposes of NEPA review, the Court shall set forth the contours of *Public Citizen* and how it applies to the case presently before the Court.

In *Public Citizen*,[3] the Court held that "the increase in cross-border operations of Mexican motor carriers, with the correlative release of emissions by Mexican trucks" was not an effect as defined by NEPA of "[Federal Motor Carrier Safety Administration's (FMSCA's)] issuance of the Application and Safety Monitoring Rules." *Id.* at 764, 124 S. Ct. 2204. Prior to 1982, motor carriers domiciled in Mexico could operate in the United States upon obtaining certification. *Id.* at 759, 124 S. Ct. 2204. In 1982, Congress enacted a two-year moratorium on new grants of operating authority to Mexican motor carriers. *Id.*, 124 S. Ct. 2204. The President was authorized to extend the two-year period and did so with respect to Mexican motor carriers until November 2002. *Id.* at 759-62, 124 S. Ct. 2204. Prior to lifting the moratorium in November of 2002, the President had "made clear his intention to lift the moratorium on Mexican motor carrier certification following the preparation of new regulations governing grants of operating authority to Mexican motor carriers." *Id.* at 760, 124 S. Ct. 2204.

Meanwhile, in May 2001, FMSCA proposed rules which were published concerning safety regulation of Mexican motor carriers. *Id.* In December 2001, Congress enacted an Appropriations Act that provided "that no funds appropriated under the Act could be obligated or expended to review or to process any application by a Mexican motor carrier for authority to operate in the interior of the United States until FMCSA implemented specific application and safety-monitoring requirements for Mexican carriers." *Id.* Congress extended these conditions via appropriations for Fiscal Years 2003 and 2004. *Id.* at 761, 124 S. Ct. 2204. After issuing a programmatic EA, the FMCSA issued the proposed rules as interim rules on March 19, 2002,

---

[3] The Court notes that in *Public Citizen*, and all of the cases cited hereafter in this subsection which discuss *Public Citizen*, some form of environmental assessment (usually in the form of an EA) was actually conducted.

with an effective date of May 3, 2002. *Id.* at 762, 124 S. Ct. 2204. Plaintiffs in *Public Citizen* filed suit before the President lifted the moratorium on qualified Mexican motor carriers in November 2002. *Id.*

In rejecting Plaintiffs' view that the increase in cross-border operations of Mexican motor carriers and corresponding increased vehicle emissions was an "effect" subject to NEPA review of the safety regulations promulgated by the FMSCA, the Court determined that "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations. As this Court held in *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 774, 103 S. Ct. 1556, 75 L. Ed. 2d 534 (1983), NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause." *Id.* at 767, 124 S. Ct. 2204. Finding that "FMCSA has no ability to countermand the President's lifting of the moratorium or otherwise categorically to exclude Mexican motor carriers from operating within the United States," *id.* at 766, 124 S. Ct. 2204, the Court further noted that despite Congress' restriction on FMSCA's spending any funds to process or review applications by Mexican motor carriers before it implemented safety-monitoring regulations, the FMSCA also had a statutory duty pursuant to 49 U.S.C. § 13902(a)(1) to register persons to provide transportation as a motor carrier upon finding that a person is willing and able to comply with the requisite safety and financial responsibility requirements. *Id.*

> We hold that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant "cause" of the effect. Hence, under NEPA and the implementing CEQ regulations, the agency need not consider these effects in its EA when determining whether its action is a "major Federal action." Because the President, not FMCSA, could authorize (or not authorize) cross-border operations from Mexican motor carriers, and because FMCSA has no discretion to prevent the entry of Mexican trucks, its EA did not need to

consider the environmental effects arising from the entry.

*Id.* at 770, 124 S. Ct. 2204.

*Public Citizen* relies in part on *Metropolitan Edison Co.*, wherein the Court held that the Nuclear Regulatory Commission did not violate NEPA when it did not consider the "potential psychological health damage" flowing from the *risk* of a nuclear accident in its environmental assessment accompanying its decision to permit resumed operation of a nuclear power plant:

> Some effects that are "caused by" a change in the physical environment in the sense of "but for" causation, will nonetheless not fall within [NEPA] because the causal chain is too attenuated. . . .
>
> Our understanding of the congressional concerns that led to the enactment of NEPA suggests that the terms "environmental effect" and "environmental impact" in § 102 be read to include a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue. This requirement is like the familiar doctrine of proximate cause from tort law.

*Metro. Edison Co.*, 460 U.S. at 774, 103 S. Ct. 1556. However, the Court was quick to clarify that

> [i]n drawing this analogy, we do not mean to suggest that any cause-effect relation too attenuated to merit damages in a tort suit would also be too attenuated to merit notice in an EIS; nor do we mean to suggest the converse. In the context of both tort law and NEPA, courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not.

*Id.* at 774 n.7, 103 S. Ct. 1556. In its holding, the Court noted that "the element of risk lengthens the causal chain beyond the reach of NEPA." *Id.* at 775, 103 S. Ct. 1556. "If contentions of psychological health damage caused by risk were cognizable under NEPA, agencies would, at the very least, be obliged to expend considerable resources developing psychiatric expertise that is not otherwise relevant to their congressionally assigned functions." *Id.* at 776, 103 S. Ct. 1556.

One court has explained that when an agency serves effectively as a "gatekeeper" for private action, that agency can no longer be said to have "no ability to prevent a certain effect." *See Wyo. Outdoor Council Powder River Basin Resources Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1242 (D. Wyo. 2005) ("When a particular oil and gas developer, however, proposes to discharge dredge and fill material into the waters of the United States in conjunction with a project, [the relevant agency] becomes the gatekeeper for approval of the project. The project becomes 'so interdependent that it would be unwise or irrational to complete [the development] without [a permit to discharge dredge and fill material].'" (citation omitted)).

However, the most pertinent analysis and application of *Public Citizen* in a case to date was conducted by Judge John D. Bates in *Sierra Club v. Mainella*. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006). In *Sierra Club*, the court concluded that the National Park Service's decision to permit directional drilling operations under a National Preserve violated NEPA because the NPS did not evaluate impacts from the surface activities of the directional drilling that occurred outside of the park. *Id.* at 105. NPS had argued that it had "no authority to regulate surface operations outside of park boundaries or otherwise prevent their impacts," and pursuant to *Public Citizen*, that NEPA accordingly would not require an EA to cover those impacts. *Id.* at 103-104. Plaintiffs had argued that because NPS had the ability "to prevent the activities causing the environmental impact by denying access to the Preserve," such extra-Preserve activities and their impacts necessarily required consideration pursuant to NEPA. *Id.* at 104.

Judge Bates, characterizing *Public Citizen* as "involv[ing] circumstances where the agency clearly had 'no ability' to take actions that could lessen the environmental impacts of

concern to the plaintiffs, *id.*, summarized the factors on which the Supreme Court's holding

hinged in that case as follows:

> In determining that there was no causal link, the Court stressed that "a critical feature" to its decision was that the agency had "*no ability* to countermand the President's lifting of the moratorium or otherwise categorically to exclude Mexican motor carriers from operating within the United States." *Id.* at 766 (emphasis added). The Court also noted that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause," and thus but-for causation is insufficient. *Id.* at 767.

*Id.* at 104-105. Judge Bates accordingly distinguished the facts in *Public Citizen* as follows:

> it is readily apparent that, to determine whether NPS action on an application to drill beneath the Preserve pursuant to a section 9.32(e) exemption is a major federal action under NEPA, one must evaluate impacts from the surface activities of the directional drilling. The holding in *Public Citizen* extends only to those situations where an agency has "no ability" because of lack of "statutory authority" to address the impact. NPS, in contrast, is only constrained by *its own regulation* from considering impacts on the Preserve from adjacent surface activities.
> . . .
> . . . it makes sense for NPS to assess the impacts from surface activities because there is a reasonably close causal relationship between such impacts and NPS's decision to grant an operator access to oil and gas beneath the Preserve pursuant to an exemption from the 9B regulations. The surface drilling activities are functionally inseparable from the downhole drilling activities, which may not take place until NPS grants the operator access through the Preserve . . . .

*Id.* at 105.

Turning to the issue pending before this Court, both the legal framework surrounding

ante-mortem inspections of horses to be slaughtered for consumption, and the intent of FSIS as

expressed in the notice issued prior to the promulgation of the Interim Final Rule, reveal that the

Rule is appropriately the "legally relevant cause" of the environmental effects of horse slaughter

operations after the FY 2006 Amendment went into effect.

First of all, unlike in *Public Citizen*, there is no intervening link between the Interim Final Rule and the horse slaughter operations and their environmental effects. While in *Public Citizen* the President's lifting of the moratorium was determined to be the legally relevant cause to increased cross-border operation of Mexican motor carriers, no such action enabled the horse slaughter operations to continue functioning aside from the Interim Final Rule. Pursuant to the FMIA, 21 U.S.C. § 603(a), "an [FSIS] examination and inspection of all amenable species" is required "before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce." Since ante-mortem inspections of horses must be conducted pursuant to 21 U.S.C. § 603(a), and Congress eliminated federal funding for such inspections pursuant to the relevant FY 2006 Amendment, upon passage of the Amendment, no further inspections could take place under the FMIA, which requires that such inspections be undertaken by federally-compensated inspectors. *See* 21 U.S.C. § 695 ("The cost of inspection rendered on and after July 1, 1948, under the requirements of laws relating to Federal inspection of meat and meat food products shall be borne by the United States . . . ."). According to the text of the FSIS's Federal Register publication, "if FSIS does not establish a means for official establishments that slaughter horses to obtain ante-mortem inspection, these establishments will not be able to operate," such that the interim final rule "is necessary to . . . operations at official establishments that slaughter horses." 71 Fed. Reg. 26 6340 (quoted in Pls.' Mem. for Summ. J. at 9).[4] Defendants likewise admit that without the Interim Final Rule,

_____

[4] While Plaintiffs also argue, in their Reply brief, that "plaintiffs' claim is targeted at federal defendants' discrete, affirmative decision to grant a rulemaking petition for the adoption of a substantive regulation," Pls.' Reply at 4, it is clear to the Court that Plaintiffs previously

the horse slaughter facilities would not continue to function as such.  *See* Defs' Opp'n to Prelim

J. Mot. at 33 ("[b]ecause all livestock, including horses, intended for human consumption, must

be inspected by the FSIS prior to slaughter, withholding such services will force the companies to

cease their operations unless the fee-for-service inspection program is implemented as intended

by the USDA and provided for in the Interim Final Rule.").

Second, while the FMCSA "ha[d] no discretion to prevent the entry of Mexican trucks,*"*

*Public Citizen,* 541 U.S. at 770, 124 S. Ct. 2204, promulgation of the Interim Final Rule was

within Defendants' discretion, despite Defendants protestations to the contrary.  In *Public*

*Citizen*, Congress enacted an Appropriations Act that provided "that no funds appropriated under

the Act could be obligated or expended to review or to process any application by a Mexican

motor carrier for authority to operate in the interior of the United States *until* FMCSA

implemented specific application and safety-monitoring requirements for Mexican carriers."  *Id.*

at 760, 124 S. Ct. 2204 (emphasis added).  Yet a different statute–49 U.S.C. §

13902(a)(1)–mandated that the FMSCA register persons to provide transportation as a motor

carrier upon finding that a person is willing and able to comply with the requisite safety and

financial responsibility requirements.  *Id.* at 766, 124 S. Ct. 2204.  In the instant case, the FY

2006 Amendment eliminated funding for FSIS ante-mortem inspections entirely, as opposed to

contingent on the USDA promulgating new regulations.  Furthermore, Defendants cannot argue

that Defendants were required to issue the Interim Final Rule–or any rule creating a mechanism

for ante-mortem horse inspections–based on any statutory duty.  While the FMIA states that "the

characterized the "major Federal action" at issue in this case as the issuance of the Interim Final
Rule itself, and as such Plaintiffs shall not be permitted to re-frame the debate in their Reply
brief.  *See* Pls.' Mot. for Summ. J. at 1.

Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and

inspection of all amenable species before they shall be allowed to enter into any slaughtering,

packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered

and the meat and meat food products thereof are to be used in commerce," 21 U.S.C. § 603, the

FMIA also explicitly states that the costs of said inspections "shall be borne by the United

States," 21 U.S.C. § 695. As the Interim Final Rule was promulgated pursuant to the AMA

specifically because the FMIA would explicitly prohibit the promulgation of a "fee-for-

inspection" rule, Defendants cannot argue that they were *required* by the FMIA to promulgate a

Rule contrary to the very same statute.

Thus, the Interim Final Rule is the "legally relevant cause" of the environmental effects

of the horse slaughter facilities after the FY 2006 Amendment went into effect. Judge Bates in

*Sierra Club v. Mainella* considered the impacts of surface-drilling activities to be "functionally

inseparable" from activities for which NPS granted applications because they "may not take

place until NPS grants the operator access through the Preserve." *Mainella*, 459 F. Supp. 2d at

105. Similarly, the horse slaughter operations and their environmental impacts are "functionally

inseparable" from the fee-for-service inspections authorized by the Interim Final Rule because

horse slaughtering for human consumption "may not take place" pursuant to the FMIA until the

FSIS has conducted ante-mortem inspections. Accordingly, the environmental effects of horse

slaughter operations themselves should have been assessed pursuant to NEPA prior to

promulgating the Interim Final Rule, as they are "reasonably causally related" to be considered

effects of the Rule itself.

2.    <u>Issuance of the Interim Final Rule Does Not Simply Maintain the Status Quo</u>

In the Court's Preliminary Injunction Memorandum Opinion, the Court explained that one of the reasons that Plaintiffs had not yet demonstrated a substantial likelihood of success on the merits was because of Plaintiffs' failure to explain why the Interim Final Rule promulgated by FSIS did not simply perpetuate the status quo ante.  *See* [22] P.I. Mem. Op. at 24–25.  The Court noted that "for approximately thirty (30) years, facilities in this country have engaged in the slaughter of horses and the processing of horsemeat for consumption without the amendment or repeal of the underlying authorizing statute."  *Id*. at 26.  Plaintiffs respond that the Interim Final Rule does not perpetuate the status quo because (1) "<u>but for</u> USDA's discretionary decision to grant the petition for rulemaking, <u>the horse slaughter operations</u>–and hence all of the environmental impacts associated with them–would have ceased on March 10, 2006, by operation of the FY 2006 Amendment"; (2) "federal defendants have <u>never previously analyzed the environmental effects</u> associated with the horse slaughter facilities in any NEPA document"; and (3) "USDA has never previously adopted, or otherwise authorized, a fee-for-inspection funding system for the slaughter of animals covered by the FMIA."  Pls.' Mem. for Summ. J. at 23-24; Pls.' Stmt. Mat. Facts ¶¶ 17, 18.  Defendants' responses thereto do not reveal an actual factual dispute.  *See also* Defs.' Response to Pls.' Stmt. Mat. Facts ¶ 17 ("This statement contains an opinion and not a statement of fact"), ¶ 18 ("Plaintiffs' allegations that the Administrative Record contains no NEPA documents is controverted by the rulemaking and regulatory documents establishing the categorical exclusion for FSIS activities.  <u>See</u> Administrative Record filed April 12, 2006.  Plaintiffs' allegation that the FSIS failed to conduct

an EIS or EA is not material.").  Because the USDA "has never previously adopted . . . a fee-for-inspection funding system for the slaughter of animals covered by the FMIA," such that the FSIS has created an entirely new regulatory framework for its ante-mortem inspections, the Court agrees that the Interim Final Rule does not perpetuate the regulatory status quo and accordingly is not exempted from NEPA review on this basis.

> Defendants argue that:
>
> the Interim Final Rule merely provides for the horse slaughter plants themselves to pay for ante-mortem inspection of horses via a fee-for-service program and does not constitute federal approval of the plants' operations, nor does it constitute significant federal involvement in or control over their operations except for the specific operations that must comply with federal meat inspection requirements.  The action merely switches the funding of such inspections from a public source (i.e., federal appropriated funds) to a private source (i.e., the horse slaughter plants) to maintain a longstanding program . . . .

Defs.' Opp'n at 12-13.  Defendants miss the point.  While Defendants and Defendant-Intervenors state that the Rule "merely adjusts the funding arrangement, from direct federal funding to a voluntary fee-for-service program," Def-Intervs.' Opp'n at 1, the fact is that the Interim Final Rule creates a *new* inspection mechanism under an entirely distinct statutory rubric.

Pursuant to 40 C.F.R. § 1508.18, NEPA applies to actions which constitute "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17)."  40 C.F.R. § 1508.18.  The Interim Final Rule is clearly a "new" activity, as it constitutes a new agency rule as described in 40 C.F.R. § 1508.18.  *See also supra* § III(A)(2).

However, pursuant to a line of cases, actions which simply perpetuate the "status quo"

31

may be exempt from NEPA review. "The duty to prepare an EIS normally is triggered when there is a proposal to change the status quo." *Comm. for Auto Responsibility v. Solomon*, 603 F.2d 992, 1002-03 (D.C. Cir. 1979). The Parties have different ideas about what constitutes the "status quo" in the instant case–Plaintiffs argue that "status quo" refers to the legal or regulatory status quo, whereas Defendants and Defendant-Intervenors define "status quo" according to whether an action, albeit legally different, will perpetuate the same effects. After analyzing the pertinent case law, the Court adopts the former view.

In *Committee for Auto Responsibility,* the D.C. Circuit held that GSA's decision to lease a parking lot to a particular private parking management firm, when the parking lot had been leased to various private parking management firms for decades, was not a major Federal action because the specific lease at issue did "not alter the status quo ante." 603 F.2d at 1003. However, the D.C. Circuit relied on the principle that the legal authority underlying the lease to a new parking management company had not changed: "Without a change in parking policy concerning the [federally-owned] Great Plaza [parking] area there is no proposal for major federal action significantly affecting the environment." *Id*. Similarly, in *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80 (D.C. Cir. 1997), the Court emphasized the pertinent regulations in determining whether the action at issue simply perpetuated the status quo. In *Fund for Animals*, the Forest Service adopted a policy that bear baiting (used in hunting) would be regulated entirely by the individual states rather than by the Forest Service. In fact, bear baiting had already been regulated by the individual states in every state but Wyoming since at least 1995. *Id.* at 83 ("[B]y 1995, when the national policy was adopted, baiting remained federally regulated only in Wyoming . . . ."). While the Forest Service had issued special use permits with respect to bear

baiting in Wyoming prior to the implementation of the policy in question, the court noted that the substantive requirements of Wyoming's *regulations* were nearly identical to substantive requirements of the formerly used federal special use permits. *Id.* at 83-84.[5]

In *Committee for Auto Responsibility* and *Fund for Animals* as well as other cases relying on the reasoning therein, agency decisions that maintain the "status quo" perpetuate the status quo regulatory framework. *See, e.g., Alliance for Bio-Integrity*, 116 F. Supp. 2d at 174 ("Defendants maintain correctly that their actions have not altered the status quo because 'rDNA modified foods ... were regulated no differently before the publication of the Policy Statement than they are now.' Because the announcement of a rebuttable presumption of [Generally Recognized as Safe] does not affect the substantive *regulatory status quo*, it is not a major federal action. *See Fund for Animals,* 127 F.3d at 84." (internal citation omitted) (emphasis added). *See also Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 481 (D.D.C. 1994) (holding in part that a transfer of jurisdiction over portions of a National Park to the District of Columbia for a development project was not "a mere paper transaction that did not change the status quo."); *Or. Natural Desert Assoc. v. Green*, 953 F. Supp. 1133, 1147 (D.D.C. 1997) ([Defendants and intervenors] assert that an EIS was not required because livestock grazing in

---

[5]  "As for Wyoming itself, the effect there was minimal because the substantive requirements of Wyoming's regulations vary only insignificantly from those of the federal special use permit conditions they replaced. The Wyoming regulations prohibit baiting in grizzly bear habitats, as did the federal conditions, and impose equally stringent limitations on the number of baits per permittee, bait density, the distance of baits from roads, trails and camping and picnic grounds, the composition of baits, removal time after hunting season and placement of identifying information at baiting. Because the new national policy maintained the substantive *status quo,* it cannot be characterized as a 'major federal action' under NEPA." *Id.* at 83-84 (internal footnote omitted).

the Donner und Blitzen river area is the status quo, and an EIS is not required for an agency's

continued management activities that have been in existence for many years. . . . The court does

not agree . . . .  The River Plan here purports to authorize cattle grazing in accordance with the

strictures of the [Wild and Scenic Rivers Act]; that involves distinctly different considerations

from prior decisions to allow grazing.").  In the instant case, it is clear that the Interim Final Rule

creates an entirely new regulatory structure both in content (via fee-for-service inspections as

opposed to the former federally-funded inspections) and in regulatory authority (authorized under

the AMA, not the FMIA), changing the regulatory framework under which ante-mortem

inspections of horses occur, and as such, the regulatory status quo.

　　　　Cases cited by Defendants-Intervenors do not demonstrate otherwise.  The Ninth Circuit's

holding in *City of San Francisco v. United States*, 615 F.2d 498, 501 (9th Cir. 1980), *does not*

conclude that the Department of the Navy's decision to lease a naval shipyard property to a

private bidder instead of to the City of San Francisco meant that the lease at issue was not a

major Federal action because use of the property as a shipyard would perpetuate the status quo.

Rather, the Ninth Circuit held that the Department of the Navy reasonably established that "the

proposed lease of [] property for shipbuilding and repair would not result in significant adverse

environmental effects from pollution or traffic congestion." *Id*.  While the court acknowledged

that "[t]he Navy and the district court recognized that the use to which the property would be put

under the lease was the same as that to which the property had been devoted by the Navy for over

30 years," the Court relied as a matter of law on the "significance" of the effects examined in a

Candidate EIS. *Id*.  Finally, while the Ninth Circuit's opinion in *Burbank Anti-Noise Group v.*

*Goldschmidt*, 623 F.2d 115, 116-17 (9th Cir. 1980), cited by Defendant-Intervenors, rests on

alternative legal grounds to those adopted by this Court, it is nonetheless easily distinguishable
from the case at hand. Holding that "[a]n EIS need not discuss the environmental effects of mere
continued operation of a facility" because "an EIS is not required . . . when the proposed federal
action will effect no change in the status quo," the Ninth Circuit exempted the act of financing
the acquisition of an existing airport from NEPA review. *Id.* at 116. *See also Nat'l Wildlife
Fed'n,* 45 F.3d at 1343-44 (agreeing that "because the wetlands were used for grazing before
[Farmers Home Administration] acquired the Ranch [from a private owner] and are now used for
that purpose by [another private owner], FmHA's transfer of the title did not alter the status quo."
However, in *Burbank Anti-Noise Group*, it is clear that regardless of who was the owner of the
airport and whether or not federal financing was approved, the airport would continue to operate
as such–accordingly, regardless of the federal action taken, the "status quo" of the airport's
function would be maintained. The Interim Final Rule does not meet this definition of
perpetuating the "status quo," as without it, the horse slaughter facilities would not continue to
function. Thus, while the Court concludes that determining whether an action perpetuates the
"regulatory status quo" is the proper measure of whether NEPA analysis should apply, the Court
notes that even under the definition proposed by Defendant-Intervenors, the Interim Final Rule
does not perpetuate the "status quo."

> B.      *The Categorical Exclusion was arbitrarily and capriciously applied in this case*

As stated above, a "categorical exclusion" is defined by regulations issued by the Council
on Environmental Quality as follows:

> a category of actions which do not individually or cumulatively have a significant effect on
> the human environment and which have been found to have no such effect in procedures
> adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which,

> therefore, neither an environmental assessment nor an environmental impact statement is required. . . . Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4.  The USDA has issued NEPA regulations that "supplemen[t]," "incorporat[e]," and "adop[t]" the CEQ regulations described herein.  7 C.F.R. § 1b.1(a). Pursuant to 7 C.F.R. § 1b.4, certain USDA agencies and agency units, including FSIS, have been deemed to "conduct programs and activities that have been found to have no individual or cumulative effect on the human environment," and therefore "are excluded from the requirements of preparing procedures to implement NEPA.  Actions of USDA agencies and agency units listed in paragraph (b) of this section are categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect."  7 C.F.R. § 1b.4(a).  However, "[n]otwithstanding the exclusions listed in . . . § 1b.4, or identified in agency procedures, agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action. Agencies shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion."  7 C.F.R. § 1b.3(c).

In the Court's Preliminary Injunction Memorandum Opinion, the Court explained that another reason why Plaintiffs had not yet demonstrated a substantial likelihood of success on the merits was because neither Plaintiffs nor Defendants had provided a "convincing, definitive answer" as to the allocation of the burden under 7 C.F.R. § 1b.4:

> The question left unanswered by the parties following this round of filings is the allocation of the burden under 7 C.F.R. § 1b.4 – specifically, does the regulation presume exemption of the FSIS's programs and require no action whatsoever unless and until the agency head makes an affirmative determination that an action may have a significant environmental

> impact, or does 7 C.F.R. § 1b.4 simply allow the FSIS to escape certain requirements but still
> ensures that an agency head's affirmative or tacit determination that no "significant impact"
> is likely can still be reviewed under the "arbitrary and capricious" standard of review?

[22] P.I. Mem. Op. at 24 (internal footnote omitted).  Defendants and Defendant-Intervenors

support the former allocation of the burden, see Defs.' Mem. for Summ. J. at 10, Defs.' Opp'n at

13, Def-Intervs' Mem. for Summ. J. at 7, while Plaintiffs support the latter, see Pls.' Mem. for

Summ. J. at 33.  Defendant-Intervenors broadly state, without providing any supporting case law,

that "[t]he categorical exclusion of 7 C.F.R. § 1b.4(b)(6) does not require the agency head to

make an affirmative determination that each particular activity of the FSIS shall be categorically

excluded from NEPA's procedural requirements."  Def-Intervs.' Mem. for Summ. J. at 9.  Upon

examining the case law and relevant statutes, the Court concludes that both NEPA and its

implementing regulations preclude Defendants' and Defendant-Intervenors' interpretation that

pursuant to 7 C.F.R. § 1b.4, a "categorically excluded" agency may ignore NEPA entirely.

### 1.    Standard of Review

Defendants argue that "the first part of the Court's query reflects the USDA's

longstanding interpretation of the agency-wide exclusion set forth in 7 C.F.R. § 1b.4, and

USDA's interpretation should be accorded 'controlling-weight.'" Defs.' Opp'n at 13 (citing

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S. Ct. 2381, 2386, 129 L. Ed. 2d 405

(1994) ("We must give substantial deference to an agency's interpretation of its own

regulations.")).  The instant Circuit has explicitly held that when an agency actually invokes a

categorical exclusion, arbitrary and capricious review applies:

> CE's are categories of actions that have been predetermined not to involve significant
> environmental impacts, and therefore require no further agency analysis absent extraordinary

> circumstances. 23 C.F.R. § 771.117(a) (1974). In other words, traditional arbitrary-and-capricious review is sufficient where the question is whether the [Federal Highway Administration (FHWA)] properly invoked a CE.
>
> . . .
>
> After reviewing the record that was before the FHWA, the District Court properly deferred to the agency's interpretation of its own regulations. Administrative agencies are entitled to wide latitude in interpreting their own regulations.
>
> When construction of an agency regulation is in issue, courts owe great deference to the interpretation adopted by the agency and will uphold that interpretation if it is reasonable and consistent with the regulation. The court need not find the agency's construction is the only possible one, or even the one that the court would have adopted in the first instance. *Belco Petroleum Corp. v. FERC,* 589 F.2d 680, 685 (D.C. Cir. 1978). The administrative interpretation is controlling, "unless it is plainly erroneous or inconsistent with the regulation," *United States v. Larionoff,* 431 U.S. 864, 872, 97 S. Ct. 2150, 2155, 53 L. Ed. 2d 48 (1977) (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413-14, 65 S. Ct. 1215, 1217, 89 L. Ed. 1700 (1945)). The District Court was correct in concluding the FHWA was not arbitrary or capricious in its compliance with section 102(2)(c) of NEPA.

*Nat'l Trust for Historic Preservation in the U.S. v. Dole*, 828 F.2d 776, 781-782 (D.C. Cir. 1987). Furthermore, Judge Ellen S. Huvelle of this Court found that an "agency's interpretation of the scope of one of its own CE's is 'given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation.'" *Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (quoting *Alaska Ctr. for Env't v. U.S. Forest Serv.,* 189 F.3d 851, 857 (9th Cir.1999)).

However, "[a]lthough federal agencies have discretion to decide whether a proposed action 'is significant enough to warrant preparation of an EIS,' the Court owes no deference to the [agency's] interpretation of NEPA or the CEQ regulations because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to the [USDA] alone." *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 341-42 (D.C. Cir. 2002). Furthermore, the instant scenario is not one where the agency has made any actual determination

38

with respect to the application of a categorical exclusion to the Interim Final Rule–the action at

issue.  The Court takes note of Plaintiffs' assessment that

> Federal defendants' contention that they may take 'no action whatsoever unless and until the
> agency head makes an affirmative determination that an action may have a significant
> impact,' Fed. Def. Mem. at 10, is, necessarily, an interpretation not only of USDA's own
> regulations, but also the <u>CEQ regulations</u> governing agencies' use of categorical exclusions,
> since, once again, USDA concedes it is bound by those regulations as well.

Pls.' Reply at 20.  The Court finds, however, that it need not (and does not) reach the question of

what standard of review to apply to Defendants' interpretation of 7 C.F.R. § 1b.4 as permitting

an agency to forgo any consideration of NEPA altogether, as even under the "arbitrary and

capricious" standard, Defendants' interpretation of 7 C.F.R. § 1b.4 as shielding the Interim Final

Rule from any environmental consideration is arbitrary and capricious, as it is inconsistent with

the terms of 7 C.F.R. § 1b.4 itself, as well as applicable CEQ regulations.

> 2.    <u>Even under the "arbitrary and capricious standard," agencies subject to the
> exclusion provision delineated in 7 C.F.R. § 1b.4 must demonstrate
> consideration of NEPA in some fashion</u>

An agency cannot invoke a categorical exclusion for the first time in legal briefings when

no such invocation exists in the record.  *See Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142

(D.D.C. 1993) ("Dispositive here, however, is the virtual admission of counsel for the defendant

that neither defendant nor any authorized subordinate made any contemporaneous determination

as to whether the study falls within or without a categorical exclusion under 7 C.F.R. § 1b.3, or

that either an EIS or an EA (one or the other of which is required in the absence of a categorical

exclusion) should be prepared.  Invocation of the categorical exclusion for the first time by

counsel after the complaint was filed in this case appears to be a *post hoc* rationalization, and is

inadequate as a basis for review."). "Although the Court of Appeals has not addressed this particular issue, both judges of this Court that have considered the issue have found that a post hoc invocation of a categorical exclusion during litigation cannot justify a failure to prepare an EA or EIS. *See Anacostia Watershed Soc'y v. Babbitt,* 871 F. Supp. 475, 481 (D.D.C. 1994); *Fund for Animals v. Espy,* 814 F. Supp. 142, 149-51 (D.D.C. 1993)." *Edmonds Inst. v. Babbitt*, 42 F. Supp. 2d 1, 18 (D.D.C. 1999). While Defendants in this case relied in their legal filings on the categorical exclusion of FSIS as an agency as set forth in 7 C.F.R. § 1b.4, rather than the action-based categorical exclusions set forth in 7 C.F.R. § 1b.3, Defendants have pointed to no case law suggesting that FSIS is exempted from contemporaneously invoking its categorical exclusion with respect to each action it undertakes in light of the "extraordinary circumstances" caveat in 7 C.F.R. § 1b.4 itself. *See* Pls.' Mem. for Summ. J. at 34. However, the Court need not reach the issue of precisely what process is required of FSIS pursuant to 7 C.F.R. § 1b.4. *Cf. California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) ("In many instances, a brief statement that a categorical exclusion is being invoked will suffice."). What is clear is that in this case, Defendants' failure to give any consideration as to whether or not the Interim Final Rule invoked "extraordinary circumstances" such that it "may have a significant environmental effect," violated 7 C.F.R. § 1b.4 and NEPA's implementing regulations. Concretely, 7 C.F.R. § 1b.4 does not permit FSIS to avoid any consideration of whether extraordinary circumstances apply, and Defendants' interpretation to this effect is arbitrary and capricious.

Pursuant to USDA regulations, "[a]ctions of [the FSIS] are categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect." 7 C.F.R. § 1b.4. However, this regulation does not exist in a

vacuum. It is qualified by another USDA regulation–7 C.F.R. § 1b.3(c)–as follows: "[n]otwithstanding the exclusions listed in paragraphs (a) of this section and § 1b.4, or identified in agency procedures, agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action. Agencies *shall continue to scrutinize their activities* to determine continued eligibility for categorical exclusion." 7 C.F.R. § 1b.3(c) (emphasis added). Defendants' interpretation of 7 C.F.R. § 1b.4 would exempt the FSIS from any duty to scrutinize its activities in violation of 7 C.F.R. § 1b.3(c).

Furthermore, pursuant to 7 C.F.R. § 1b.2, "[e]ach USDA agency is responsible for compliance with this part, the regulations of CEQ, and NEPA." 7 C.F.R. § 1b.2(b). CEQ regulations require that "[a]ny procedures [invoked by an agency] under this [categorical exclusion] section *shall provide for extraordinary circumstances* in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4 (emphasis added). Defendants' interpretation of 7 C.F.R. § 1b.4 as having required only a determination over twenty years ago that all "FSIS activities have no significant environmental impact," see Defs.' Reply at 5, belies any compliance with FSIS's obligation to "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect."

Ultimately, the Court agrees that "any notion that USDA may avoid NEPA review simply by failing even to consider whether a normally excluded action may have a significant environmental impact flies in the face of the CEQ regulations," Pls.' Mem. for Summ. J. at 36, as well as USDA's own NEPA regulations.

        3.    <u>In the instant case, FSIS demonstrates that it did not give any consideration as to whether the Interim Final Rule should be exempt from the Section 1b.4 exclusion provision</u>

The administrative record does not contradict Plaintiffs' assessment that "there is no evidence whatsoever that the 'agency head'–or any USDA official–even <u>contemplated</u> whether the rule 'may have a significant environmental effect' that should be considered in an EA or EIS, 7 C.F.R. § 1b.4, let alone made an affirmative contemporaneous determination that this exception to the general categorical exclusion for all FSIS programs should <u>not</u> apply here." Pls.' Mem. for Summ. J. at 32-33. *See also id.* at 36 ("[T]he Record contains no hint that USDA ever even considered whether the 'extraordinary circumstances' criteria applied to its decision.").

Initially, Defendant-Intervenors' attempted to interpret the Administrative Record as including documentation of Defendants' active invocation of the categorical exclusion via its Regulatory Review Workplan. *See* Def-Intervs.' Opp'n at 2. Specifically, Defendant-Intervenors expressed their interpretation of USDA-FSIS Regulatory Review Workplan #05-007 (Nov. 23, 2005), A.R. at 202-206, as follows:

> [T]wo documents in the Administrative Record–FSIS Directive No. 1232.4 and FSIS Regulatory Review Workplan No. 05-007–[] conclusively demonstrate that the FSIS considers the applicability of NEPA in *every* rulemaking action, including its promulgation of the Interim Final Rule. <u>See</u> FSIS Directive 1232.4, "Regulations Development and Clearance (Nov. 20, 2001) ("FSIS Directive," AR 0192-AR0201), at pp. 9-10 (AR0200-0201); USDA-FSIS Regulatory Review Workplan #05-007 (Nov. 23, 2005) ("Workplan," AR0202-0206). Moreover, the Administrative Record readily confirms that the FSIS specifically determined that further NEPA review was not required in conjunction with the agency's promulgation of the Interim Final Rule. <u>See</u> Workplan at p. 4 (AR0205).

Def-Intervs.' Opp'n at 5. Furthermore, Defendant-Intervenors argued that "[t]he Regulatory Review Workplan provides a specific mechanism by which the FSIS indicates for each rulemaking action whether an 'Environmental Impact Assessment' is required under NEPA. If further review is required, the agency checks a corresponding box in the "Required Analysis" section to indicate such an affirmative determination. Here, the box is notably unchecked. The

FSIS agency head and USDA Under/Assistant Secretary confirmed the determination that no further NEPA analysis was required by approving the Regulatory Review Workplan without comment." Def-Intervs.' Opp'n at 12 (internal citations omitted). *See also* Def-Intervs.' Mem. for Summ. J. at 3-4.

However, Defendant-Intervenors' theory about what the Regulatory Review Workplan actually demonstrates is belied both by Federal Defendants' deafening silence with respect to this assessment as well as Defendant-Intervenors' eliminating this argument in their Reply. Notwithstanding Defendants' statement that "[c]onsistent with 7 C.F.R. § 1b.4 and FSIS's regulatory clearance directive, 'Environmental Impact Assessment' is not checked on the Workplan for the Interim Final Rule at issue thus indicating that neither an EA nor its EIS is required," Defs.' Mem. for Summ. J. at 11-12, it is clear, both from Defendants' legal position and statements that the box remained empty as a product of a wholesale approach to exclusion by FSIS, that neither the Secretary nor any proxy thereto every considered whether or not an "Environmental Impact Assessment" would be appropriate with respect to the Interim Final Rule. *See* Defs.' Mem. for Summ. J. at 12 ("Requiring the USDA to take any additional steps absent a finding of a significant environmental impact by the agency head would be redundant and superfluous . . . .").

In Plaintiffs' Motion for Summary Judgment, Plaintiffs state that the Administrative Record submitted by Defendants "contained no NEPA documentation in connection with the rule or petition, nor any indication that any USDA official had ever given any consideration to whether an EIS or EA should be prepared." Pls.' Mem. for Summ. J. at 13. Defendants do not refute this. Accordingly, for the legal reasons set forth in Section III(B)(2) of this Opinion, and

based on the factual findings above that FSIS never environmentally assessed the Interim Final Rule in any manner whatsoever, the Court concludes that Defendants have violated NEPA and its implementing regulations.

4.    <u>The Court need not reach the issue of whether Plaintiffs can properly bring an "as applied" challenge against 7 C.F.R. § 1b.4 itself</u>

Referencing 7 C.F.R. § 1b.4, Defendants claim that "plaintiffs in this suit appear to assail or attack the validity of the regulation adopting the categorical exclusion itself," Defs.' Opp'n at 14, and that a collateral attack on said regulation is prohibited because it is time-barred. *See* Defs.' Mem. for Summ. J. at 12. In response, Plaintiffs, in their Opposition, state that "[a]t least <u>as applied to the facts of this case</u>, a NEPA implementing regulation that would, in effect, immunize an <u>entire</u> agency's programs from NEPA review, as well as from any judicial review as to whether NEPA analysis should be conducted in a particular case, is patently 'arbitrary, capricious, an abuse of discretion, or not in accordance with the law.' 5 U.S.C. § 706(2)." Pls.' Opp'n at 13. As Plaintiffs did not set forth this claim in their Amended Complaint or their Motion for Summary Judgment, and as the Court has concluded that Defendants' interpretation of 7 C.F.R. § 1b.4 as permitting the FSIS to never consider whether its actions have environmental impacts is arbitrary and capricious, the Court shall not reach the issue of whether Plaintiffs can or have properly brought an "as applied" challenge against 7 C.F.R. § 1b.4 itself.

C.    *There is no automatic conflict between FSIS compliance with NEPA-mandated procedure and FSIS compliance with the FMIA in the instant case*

Defendants cite *Carton County Board of Commissioners, N.M. v. U.S. Fish and Wildlife Service*, 75 F.3d 1429, 1435 (10th Cir. 1996), for the proposition that "[c]ompliance with NEPA

44

is excused when there is a statutory conflict with the agency's authorizing legislation that prohibits or renders compliance impossible." *Id.* (quoted in Defs.' Opp'n at 15). Defendants argue that "given that the FSIS's provision of inspection services under the FMIA does not allow for the withholding of such services for environmental purposes, NEPA's purpose must necessarily yield to the food safety law." Defs.' Opp'n at 16-17.

However, implicit in Defendants' argument is that review of the Interim Final Rule pursuant to NEPA would result in a substantive decision that the Interim Final Rule violated NEPA. To the contrary, NEPA clearly implicates *review* of major Federal actions for their environmental effects rather than mandating a particular outcome. NEPA's "mandate is essentially procedural." *City of Alexandria*, 198 F.3d at 866 (internal quotation omitted); *North Slope*, 642 F.2d at 599 (NEPA requirements are essentially procedural and a court should not substitute its own policy judgment for that of the agency). "NEPA merely prohibits uninformed – rather than unwise – agency action." *Methow Valley Citizen's Council*, 490 U.S. at 351, 109 S. Ct. 1835. Defendants do not, and cannot, argue that the processes implicated by NEPA itself would violate the FMIA.

Furthermore, as detailed in Section III(A)(1), since the Interim Final Rule was promulgated pursuant to the AMA specifically because the FMIA would explicitly prohibit the promulgation of a "fee-for-inspection" rule, Defendants cannot argue that they were fulfilling a duty to comply with the FMIA by promulgating a Rule contrary to the very same statute. "[S]ince Congress 'prohibit[ed]' FSIS from using any <u>appropriated</u> funds, and also, in the FMIA itself, foreclosed <u>industry-funded</u> inspections, any 'duty' FSIS may have arguably had under the FMIA was purposefully suspended by Congressional action . . . ." Pls.' Reply at 7 (citing *Envtl.*

*Def. Ctr. v. Babbitt*, 73 F.3d 867, 871-72 (9th Cir. 1995) ("Although the appropriations rider does not repeal the Secretary's duty to make a final determination whether the California red-legged frog is endangered, the rider (and the budget resolution continuing the rider's moratorium on funding) necessarily restrict the Secretary's ability to comply with this duty by denying him funding. . . .  Accordingly, the Secretary may not take final action on the California red-legged frog listing proposal at this time.")).

> D.    *The Court Shall Vacate the Interim Final Rule*

Pursuant to the APA, 5 U.S.C. § 706, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall . . . (2) *hold unlawful and set aside* agency action, findings, and conclusions found to be-- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . (D) without observance of procedure required by law . . . ."  5 U.S.C. § 706(2)(A) & (D) (emphasis added).  While Plaintiffs ask the Court to vacate the Interim Final Rule, Defendants and Defendant-Intervenors essentially argue that "should the Court decide that any remedy is necessary at all, the appropriate approach would be for the Court to leave in place the Interim Final Rule while requiring the agency to conduct whatever NEPA analysis or documentation is deemed to be required."  Def-Intervs' Opp'n at 3 n.2.

Pursuant to the case law in this Circuit, vacating a rule or action promulgated in violation of NEPA is the standard remedy.  *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) ("If an appellant has standing-which is undeniable here-and prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's

order."). *See also Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C.

2002) ("As a general matter, an agency action that violates the APA must be set aside. As this

Circuit explained in *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001), if a

plaintiff 'prevails on its APA claim, it is entitled to relief under that statute, which normally will

be a vacatur of the agency's order.' *Id.* at 1084. Based on this authority, I shall vacate the

permit, with the understanding that the Service can reissue another permit if and when the NEPA

record of decision so allows."); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399,

1409 (D.C. Cir. 1998) ("We have made clear that when a reviewing court determines that agency

regulations are unlawful, the ordinary result is that the rules are vacated . . . ." (internal quotation

omitted)).

 While Defendants and Defendant-Intervenors collectively cite to three cases that

purportedly support their argument that the Court should allow the Interim Final Rule to remain

in effect pending NEPA review, none of these cases is convincing as applied to the instant case.

*See State of Alaska v. Andrus*, 580 F.2d 465, 485 (D.C. Cir. 1978), *vac'd in part by W. Oil & Gas

Ass'n v. Alaska*, 439 U.S. 922, 99 S. Ct. 303, 58 L. Ed. 2d 315 (1978) ("where courts have

enjoined ongoing projects, they have done so primarily to preserve for the relevant

decisionmaker the full opportunity to choose among alternatives that is contemplated by

NEPA."); *Nat'l Org. for the Reform of Marijuana Laws v. U.S. Dep't of State*, 452 F. Supp.

1226, 1234 (D.D.C. 1978) (withholding an injunction against a federal program assisting the

government of Mexico in eradicating heroin and marijuana production pending compliance with

NEPA, noting the impact on criminal laws and foreign policy at issue); *Fund for Animals v.

Mainella*, 283 F. Supp. 2d 418, 434 (D. Mass. 2003) ("However, the Court declines the invitation

to enjoin the hunting program. Because the environmental consequences of the hunting program have not been comprehensively evaluated, it cannot be known whether or not *ending* hunting will have a deleterious environmental effect, such as by allowing for the over-breeding of some species, like deer. The most equitable and prudent solution is to allow the status quo to continue during the pendency of the environmental review."). Neither Defendants nor Defendant-Intervenors have pointed to either a compelling reason, environmental or otherwise, to leave the Interim Final Rule in place pending NEPA review, nor that doing so would preserve NEPA-contemplated opportunities for FSIS. Defendants' argument that vacatur "would be against the public interest because it would penalize the horse slaughter plants for an error or omission on the part of the agency," Defs.' Opp'n at 17 n.3, gives no real consideration of a what a "public interest" analysis would entail in the instant case. Any argument with respect to Defendants' "duty" pursuant to the FMIA has already been rejected. Accordingly, the Court shall vacate the Interim Final Rule, which was promulgated in violation of NEPA-mandated procedures and in violation of the law.

## IV:  CONCLUSION

Based on the aforementioned reasoning, the Court shall grant [39] Plaintiffs' Motion for Summary Judgment, and shall deny both [37] Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, and [38, 40] Defendant-Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment on Claim Three of Plaintiffs' First Amended Complaint. The Court shall declare the Interim Final Rule to be in violation of the APA and NEPA, vacate the Interim Final Rule, and permanently enjoin FSIS from implementing the Interim Final Rule. Accordingly, the Court need not reach the issue of whether the Interim Final Rule violated 5

U.S.C. § 553, and the Court shall deny as moot [55] Plaintiffs' Motion for Summary Judgment

on Claim One; [58] Defendant-Intervenors' Cross-Motion for Summary Judgment on Claim One

of Plaintiffs' First Amended Complaint; and Defendants' [60] Motion for Summary Judgment on

Claim One and Defendants' Motion to Dismiss, or Alternatively for Summary Judgment on this

Claim.  This case is dismissed.  An appropriate Order accompanies this Memorandum Opinion.


Date:   March 28, 2007

                                                            /s/
                                                 COLLEEN KOLLAR-KOTELLY
                                                 United States District Judge